UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X  Case No. 08 cv 00453 (CM)

SCANTEK MEDICAL INC.,                                      :
                                                           :
            Plaintiff,                                     :
                                                           :
        vs.                                                :
                                                           :
ANGELA CHEN SABELLA and ACCORDANT             :
HOLDINGS, LLC,                                             :
                                                           :
            Defendants.                                   :
-------------------------------------------------------------- X


DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS AMENDED COMPLAINT


McCue Sussmane & Zapfel, P.C.
Attorneys for Defendants
521 Fifth Avenue, 28th Floor
New York, New York 10175
212 931-5500

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ................................................................................................................... 2

ARGUMENT ........................................................................................................ 10

   A.   General ....................................................................................... 10

   B.   Criminal usury is strictly an affirmative defense. ................... 10

   C.   Plaintiff is Estopped from Asserting Criminal Usury ............ 12

   D.   Plaintiff has Failed to Plead Usurious Intent ......................... 15

   E.   GOL 5-521(3) Does Not Apply to a Defaulted Obligation. ... 18

CONCLUSION ..................................................................................................... 19

# TABLE OF AUTHORITIES

PAGE

**Statutes**

*FRCP 12(b)(6)* ............................................................................................ 10

*N.Y. General Obligations Law §5-521* ........................................................ 11

*N.Y. Penal Law § 15.05* .............................................................................. 15

*N.Y. Penal Law § 190.40* ........................................................................ 11,15

*N.Y.State Legislative Annual*, 1965, p. 50........................................................ 16

**Cases**

*Abramovitz v. Kew Realty Equities, Inc.*, 180 A.D.2d 568, 580 N.Y.S.2d 269
(1st Dept. 1992) ........................................................................................ 12

*American Express Co. v. Brown,* 392 F.Supp. 235 (S.D.N.Y. 1975) .............. 18

*Bristol Inv. Fund, Inc. v. Carnegie Intern. Corp.*, 310 F.Supp.2d 556, 562
(S.D.N.Y. 2003)........................................................................................ 18

*General Obligations Law Section 5-521(3)* ...................................................... 16

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 63
(2d. Cir. 1997)........................................................................................ 10

*Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589-590,
431 N.E.2d 278, 446 N.Y.S.2d 917 (1981).................................................. 16

*Hammond v. Marrano*, 88 A.D.2d 758, 451 N.Y.S.2d 484 (4th Dept.  1982) ................. 13

*In re Integrated Res., Inc. Real Estate Ltd. P'ships Sec. Litig.*,
851 F.Supp. 556, 565 (S.D.N.Y.1994).......................................................... 18

*Intima-Eighteen, Inc., v. A.H. Schreiber Co., Inc.*, 172 A.D.2d 456,
568 N.Y.S.2d 802 (1st Dept. 1991) .............................................................. 11

*Krimstock v. Kelly*, 306 F.3d 40, 47-48 (2d Cir. 2002).................................... 10

*Lehman v. Roseanne Investors Corp.*, 106 A.D.2d 617,618,
483 N.Y.S.2d 106,108 (2nd Dept. 1984) ...................................................... 16

*Manfra, Tordella & Brookes, Inc. v. Bunge,* 794 F.2d 61, 63 n. 3 (2d Cir.1986) ........... 18

*Miller Planning Corp. v. Wells et al.,* 253 A.D.2d 859,
678 N.Y.S.2d 340, 341 (2d Dep't 1998) ...................................................... 19

*Reisman v. William Hartman & Son, Inc.*  51 Misc.2d 393, 95, 273 N.Y.S.2d 295,
297 (Queens County 1966) ........................................................................ 16

*Schaaf v. Borsher*, 82 A.D.2d 880, 440 N.Y.S.2d 312,313 (2nd Dept. 1981) .................. 13

*Seidel v. 18 East 17th Street Owners, Inc.*,  79 N.Y.2d 735, 743, 598 N.E.2d 7, 11,
586 N.Y.S.2d 240, 244 (1992).................................................................. 12

*Transmedia Restaurant Co., Inc. v. 33 E. 61st Street Restaurant Corp.*,
184 Misc. 2d 706, 710 N.Y.S.2d 756 (N.Y. County 2000) ......................... 16

*Zoo Holdings, LLC v. Clinton*, 11 Misc.3d 1051(A), 814 N.Y.S.2d 893
(N.Y. County 2006) ................................................................................ 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X Case No. 08 cv 00453 (CM)

SCANTEK MEDICAL INC.,                       :
                                            :
          Plaintiff,                        :   DEFENDANTS' MEMORANDUM OF
                                            :   LAW IN SUPPORT OF MOTION
          vs.                               :   TO DISMISS AMENDED
                                            :   COMPLAINT
ANGELA CHEN SABELLA and ACCORDANT           :
HOLDINGS, LLC,                              :
                                            :
          Defendants.                       :
------------------------------------------------------------- X

      Defendants Angela Chen Sabella ("Sabella") and Accordant Holdings, LLC

("Accordant"), by their attorneys McCue Sussmane & Zapfel, P.C, respectfully submit this

Memorandum of Law in support of their motion to dismiss the Amended Complaint.

PRELIMINARY STATEMENT

      Scantek Medical, Inc. ("Scantek" or the "Company") is a public company in which

defendants invested $825,000. *Sabella Aff. ¶4.*

      Mintz & Fraade, P.C. (the "Mintz Firm") is a law firm which acted as counsel to Scantek

at all time relevant hereto, and through an affiliate, is the second largest shareholder of Scantek.

*Sussmane Aff. ¶¶9,10.*

      In order to fund the capital needs of Scantek, the Mintz Firm structured private

placements pursuant to which Scantek offered to sell to investors a combination of its promissory

notes and restricted common stock (collectively the "Securities"). The Securities were purchased

by Sabella, Accordant and numerous third parties, as well as Scantek's President, its Vice

President and Secretary, its Vice President of Development, and two directors. *Sussmane Aff.*

*¶14, Exhibits C, pages 23-26, Exhibit D, pages 23-35.*

1

Sabella relied on Scantek and the Mintz Firm to disclose to her all facts relevant to the decision to investment in Scantek.  At no time from April 2002 through May 2004 did the Mintz Firm advise Sabella of any possibility or risk that defendants' investments in Scantek violated any law. *Sabella Aff. ¶11.*

Scantek and the Mintz Firm are now alleging that Sabella violated New York's criminal usury statutes by accepting their offer to purchase the Securities pursuant to a transaction structured and drafted solely by the Mintz Firm (*Sabella Aff. ¶12)* and have brought this action to void promissory notes in the face amount of $303,250 and to void 2,000,0000 shares of common stock issued to Sabella. *Exhibit F.*

Scantek and the Mintz Firm never disclosed to Accordant or Sabella their opinions that the securities offered by Scantek were usurious and that Scantek could void the securities. Scantek and the Mintz Firm knew that Sabella would never have accepted their offer if such opinion had been disclosed to Sabella. *Sabella Aff. ¶13.*

FACTS

Accordant is a Delaware limited liability company. Sabella is the sole member of Accordant. *Sabella Aff. ¶2.*

Mintz & Fraade Enterprises, LLC ("Mintz LLC") is a New York limited liability company and an affiliate of the Mintz Firm. Upon information and belief Mintz LLC is Scantek's second largest shareholder, holding at least 3,300,000 shares of Scantek Common Stock issued in exchange for the legal services of the Mintz Firm and attorney Fred Mintz.  Such shares include 3,000,000 shares (over 9% of Scantek's common stock) issued to the Mintz Firm as payment for $45,000 of legal services.  *Sussmane Aff. ¶10.*

2

Scantek claims to be engaged in the business of developing, manufacturing, selling and licensing of products and devices that assist in the early detection and diagnosis of disease. *Sussmane Aff. ¶8 , and Exhibit C, page 2.*

From 1999 through the quarter ending March 31, 2003, Scantek filed the periodic reports required of public companies by the SEC. For the periods after March 31, 2003, Scantek ceased filing its quarterly and annual reports (Forms 10Q and Forms 10K) and financial statements with the SEC in violation of federal securities law and its fiduciary obligations to its shareholders. *Sussmane Aff. ¶11.*

Scantek reported the following financial information in its SEC filings:

|  | 9 months ended March 31, 2003 | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|---|
| Accumulated Deficit | $(14,678,582) | $(12,849,147) | $(10,827,551) | $(8,466,380) | $(5,649,915) |
| Stockholder's deficiency | $(9,318,526) | $(8,280,364) | $(6,815,733) | $(5,001,859) | $(2,364,728) |
| Net Sales | 0 | 0 | $21,137 | $88,775 | $855,275 |
| Net Loss | $(1,527,435) | $(2,021,596) | $(2,361,171) | $(2,816,465) | $(1,579,568) |
| Weighted Average # shares of common stock outstanding | 32,857,889 | 26,557,923 | 20,521,527 | 18,431,820 | 17,679,575 |

*Sussmane Aff. ¶12 , Exhibits C, pages F-4-5, Exhibit D, pages F-3-4, and Exhibit E pages 2-5.*

Scantek's SEC filings reported negligible sales for the fiscal years ended June 30, 2000, and June 30, 2001, no sales for the fiscal year ended June 30, 2002, and no sales for the nine months ending March 31, 2003.  Each Form 10 K filed by Scantek reported that:

> "The Company's need for funds has increased from period to period . . .  Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Operating Officer and major shareholder."

*Sussmane Aff. ¶13., Exhibit C page 30, and Exhibit D page 28.*

From 1999 through 2003, Scantek's Forms 10K reported information regarding the following 18 private placements of the Securities under the heading "Recent Sales of Unregistered Securities":

|    | Date     | Name                                  | Number of Shares Issued Pursuant to Financing | Office     |
|----|----------|---------------------------------------|-----------------------------------------------|------------|
| 1  | 12/1/98  | Three individuals                     | 75,000                                        |            |
| 2  | 7/1/99   | Sagi                                  | 79,250                                        | Pres./CEO  |
| 3  | 7/1/99   | Patricia Furness                      | 5,703                                         | V.P/Sec.   |
| 4  | 7/1/99   | Louis Gottlieb                        | 25,000                                        | V.P.       |
| 5  | 7/1/99   | Two individuals including Paul Nelson | 52,500                                        | Director   |
| 6  | 12/30/99 | Two individuals including Paul Nelson | 7,500                                         | Director   |
| 7  | 3/8/00   | Paul Nelson                           | 2,500                                         | Director   |
| 8  | 3/8/00   | Louis Gottlieb                        | 23,750                                        | V.P.       |
| 9  | 4/14/00  | Louis Gottlieb                        | 50,000                                        | V.P.       |
| 10 | 4/14/00  | Paul Nelson                           | 2,500                                         | Director   |
| 11 | 8/1/00   | Sagi                                  | 67,900                                        | Pres./CEO  |
| 12 | 8/1/00   | Patricia Furness                      | 8,750                                         | V.P/Sec.   |
| 13 | 10/20/00 | Carriage House                        | 100,000                                       |            |
| 14 | 12/14/01 | A lender                              | 300,000                                       |            |
| 15 | 6/30/02  | two companies                         | 79,390                                        |            |
| 16 | 6/30/02  | Sagi                                  | 6,435                                         | Pres./CEO  |
| 17 | 6/30/02  | Patricia Furness                      | 31,141                                        | V.P/Sec.   |
| 18 | 8/20/02  | Sabella                               | 2,000,000                                     |            |

*Sussmane Aff.14,  Exhibit C, pages 23-36, and Exhibit D pages 23-25.*

Private placements of Securities after August 20, 2002 are not reported because Scantek ceased its SEC filings. *Sussmane Aff. ¶15.*

The financial statements of Scantek filed with the SEC with its Forms 10K reported that:

4

(a) During the years ended June 30, 2000, 2001 and 2002 Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors secured notes in the face amount of $492,500 and 135,625 shares of common stock.

(b) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors unsecured notes in the face amount of $1,059,393 and 2,377,765 shares of common stock.

(c) During the years ended June 30, 2000, 2001 and 2002 Scantek engaged in private placements of Securities pursuant to which it offered and sold to Sagi and the Vice President of the Scantek unsecured notes in the face amount of $107,257 and 45,594 shares of common stock.

(d) During the years ended June 30, 2000, 2001 and 2002 Scantek engaged in private placements of Securities pursuant to which it offered and sold Sagi unsecured notes in the face amount of $1,128,684 and 153,585 shares of common stock.

*Sussmane Aff. ¶16, Exhibit C, page F-18 and Exhibit D, page F-16.*

The audited financial statements of Scantek and its SEC filings contain no reference to or discussion of the violation of any usury law by the officers, directors and third parties to whom Scantek issued the Securities. *Sussmane Aff. ¶17.*

August 2002 Note

In August 2002 Scantek delivered to Sabella a document drafted by the Mintz Firm titled "SUBSCRIPTION AGREEMENT" which set forth the proposed terms of the offering of Securities by Scantek to Sabella (the "August 2002 Subscription Agreement"). The August 2002 Subscription Agreement stated:

    1. The "Securities"

        I hereby agree to invest $150,000 in Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a 10% promissory note in the principal amount of one hundred and fifty thousand ($150,000) dollars (the "Note"); and to purchase shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "8" of this Subscription Agreement . . . The Note and the Shares are hereinafter jointly referred to as the "Securities."  I hereby agree to pay for the Securities subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

    2.    Payment

        I am herewith forwarding the aggregate amount one hundred and fifty thousand ($150,000) dollars by wire transfer to the account of "Mintz & Fraade, P.C."

*Sabella Aff. ¶¶5,7.*

Sabella paid to Mintz & Fraade, P.C. the sum of $150,000. *Sabella Aff. ¶4.*

Scantek issued to Sabella a promissory note dated August 20, 2002 in the principal amount of $253,250 (the "August 2002 Note").  The August 2002 Note reflected the incorporation and cancellation of a prior promissory note issued by Scantek to Sabella in April 2002, thereby extending the repayment date of the $100,000 and capitalizing unpaid interest in the amount of $3,250.  *Sabella Aff. ¶5, Exhibit A.*

The August 2002 Note bears interest at the rate of 10% per annum, and provides that in the event of  a default, interest is payable at the rate of 24% per annum. *Sabella Aff. ¶5, Exhibit A.*

The August 2002 Note required monthly payments of interest and periodic principal payments, with the entire unpaid balance of principal and interest due and payable on February 20, 2003.  *Sabella Aff. ¶5.*

The August 2002 Note provided that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision. *Sabella Aff. ¶5, Exhibit A.*

Scantek and Mr. Sagi delivered confessions of judgment with respect to the August 2002 Note. *Sabella Aff. ¶5, Exhibit A.*

The August 2002 Subscription Agreement provided for the purchase by Sabella of such number of shares of the common stock of Scantek as will result in ownership by Sabella of six percent of all issued and outstanding common stock, including previously purchased shares. Scantek's SEC filings report that Sabella purchased 2,000,000 shares for par value of $.001 per share pursuant to the August 2002 Subscription Agreement (the "Sabella Shares"). *Sabella Aff. ¶5, Exhibit A.*

The Sabella Shares issued on August 20, 2002 were included in the 2,099,466 shares reported as issued for the year ended June 30, 2002, for which Scantek's auditors reported a "Value" of $2,099, or a "Value" of $2,000 for the 2,000,000 Sabella Shares. Sussmane *Aff. Exhibit C, page F-6.*

Such valuation reflects the fact that the Sabella shares were restricted and could not be sold without the filing of a registration statement or otherwise complying with the rules and regulations regarding sale of unregistered shares of stock. *Sussmane Aff. ¶18 .*

Such valuation reflects the facts that Scantek had no sales since December 2000, and that as of June 30, 2002, the date of Scantek's last audited financial statements, Scantek had a negative net worth of $.31 per share and an accumulated deficit of $.48 per share. *Sussmane Aff. Exhibit C, page F-4.*

7

February 2003 Note

In February 2003 Scantek delivered to Accordant a document drafted by the Mintz Firm titled "SUBSCRIPTION AGREEMENT" which purported to set forth the terms of the offering of $50,000 of Securities by Scantek to Accordant (the "February 2003 Subscription Agreement"). The February 2003 Subscription Agreement states:

> The "Securities"
>
> 1. The undersigned hereby agree to invest an aggregate of fifty thousand ($50,000) dollars in Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a promissory note in the principal amount of fifty thousand ($50,000) dollars bearing interest at the rate of one (1%) percent per month (the "Note"); and to the purchase of shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "9" of this Subscription Agreement. . . The Note and the Shares are hereinafter jointly referred to as the "Securities." The undersigned hereby agree to pay for the Securities subscribed for by the undersigned in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").
>
> Payment
>
> 2. We are herewith agreeing to forward the amount of the Subscription Price upon execution hereto to the account of "Mintz & Fraade, P.C."

*Sabella Aff. ¶6 and Exhibit B.*

Accordant paid to Mintz & Fraade P.C. the sum of $50,000. *Sabella Aff. ¶4.*

The February 2003 Subscription Agreement, the August 2002 Subscription Agreement (*Sabella Aff. Exhibits A and B)* and subscription agreements delivered to other investors provided for the delivery funds in payment for the Securities to the operating account of "Mintz & Fraade, P.C.", not Scantek's operating account, and not an escrow account maintained by any attorney, bank or brokerage firm. Due to Scantek's failure to prepare SEC reports and financial statements, the Mintz Firm has not accounted for the funds deposited into its account.

Scantek issued to Accordant a promissory note dated February 10, 2003 in the principal amount of $50,000 (the "February 2003 Note"). The February 2003 Note bears interest at the rate of 12% per annum. Interest and principal was payable in full on June 6, 2003. *Sabella Aff. Exhibit B.*

The February 2003 Note provides that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision. *Sabella Aff. Exhibit B.*

Scantek made no payments of principal or interest to Sabella or Accordant under the August 2002 Promissory Note, the February 2003 Promissory Note, the Additional Accordant Loans or the Additional Sabella Loan.

The Mintz Firm also represented Sabella in connection with certain investments made by Sabella on or about the time of her investments in Scantek. *Sabella Aff. ¶8.*

All documents received by Sabella were drafted by the Mintz Firm. *Sabella Aff. ¶7.*

Sabella relied on the fact that Scantek was a public company and was required to file reports with the U.S. Securities Exchange Commission and file audited financial statements.

Sabella relied on Scantek and the Mintz Firm to draft offering documents that were legal and binding on Scantek. *Sabella Aff. ¶9.*

Accordant and Sabella did not retain separate counsel to review the documents in connection with the investments in Scantek. *Sabella Aff. ¶10.*

Sabella relied on Scantek and the Mintz Firm to disclose to her all facts relevant to the decision to investment in Scantek. At no time from April 2002 through May 2004 did the Mintz Firm advise Sabella of any possibility or risk that any investments in Scantek could violate any law. *Sabella Aff. ¶11.*

Scantek and the Mintz Firm are now alleging that Sabella violated New York's criminal usury statutes by accepting their offer to purchase securities pursuant to a transaction structured and drafted solely by the Mintz Firm. *Sabella Aff. ¶12.*

Scantek and the Mintz Firm never disclosed to Accordant or Sabella their opinions that the securities offered by Scantek were usurious and that Scantek could void the securities. Scantek and the Mintz Firm knew that Sabella would never have accepted their offer if such opinion had been disclosed to Sabella. *Sabella Aff. ¶13.*

Scantek and the Mintz Firm never disclosed to Accordant or Sabella that they were engaged in a scheme to issue securities that Scantek did not intend to honor. *Sabella Aff. ¶14.*

## ARGUMENT

### A. General

The standards governing motions to dismiss pursuant to *FRCP 12(b)(6)* are well-settled. When considering a motion to dismiss, a court is required to accept as true all of the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Krimstock v. Kelly*, 306 F.3d 40, 47-48 (2d Cir. 2002). A motion to dismiss should be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 63 (2nd Cir. 1997). Plaintiff can prove no set of facts to support his claim for violation of New York criminal usury law.

### B. Criminal usury is strictly an affirmative defense.

The amended complaint must be dismissed because Plaintiff fails state to a claim upon which relief can be granted. Plaintiff seeks a declaratory judgment declaring that the August

2002 Promissory Note, February 2003 Promissory Note and Sabella Shares are void as criminally usurious.

As a general matter, a corporation is prohibited by N.Y. General Obligations Law §5-521(1) from asserting a usury defense to the payment of an obligation. However, pursuant to §5-521(3), a corporation may assert a defense of criminal usury when the rate of interest exceeds 25 percent per annum, as set forth in *N.Y. Penal Law §190.40*.   New York courts have strictly construed the statute to provide that criminal usury may be asserted strictly as an affirmative defense in an action seeking repayment of a loan, and cannot be asserted as a claim for relief. *Intima-Eighteen, Inc., v. A.H. Schreiber Co., Inc*., 172 A.D.2d 456, 568 N.Y.S.2d 802 (1st Dept. 1991); and *Zoo Holdings, LLC v. Clinton*, 11 Misc.3d 1051(A), 814 N.Y.S.2d 893 (N.Y. County 2006).

The court in *Intima* explained:

"General Obligations Law §5-521(1) specifically provides: 'No corporation shall hereafter interpose the defense of usury in any action.'   An exception to this prohibition is set forth in General Obligations Law §5-521(3), which permits a corporation to interpose a defense of criminal usury when the rate of interest exceeds 25 percent per annum, as set forth in Penal Law §190.40.  While the statute expressly prohibits only the interposition of usury as a 'defense', this court has employed the principle that a party may not accomplish by indirection what is directly forbidden to it and has accorded the rule a broader scope.  The statutory exception for interest exceeding 25 percent per annum is strictly an affirmative defense to an action seeking repayment of a loan and may not…be employed as a means to effect recovery by the corporate borrower." (citations omitted)

*Intima-Eighteen, Inc.,* 172 A.D2d 456, 457-58.

In *Zoo Holdings*,  11 Misc.3d 1051(A), 814 N.Y.S.2d 893 (N.Y. County 2006), the plaintiff sought to nullify the defendant's recapitalization plan alleging that the proposed stock offerings providing for a 30 percent rate of return were actually criminally usurious loans. The Court granted the defendant's motion to dismiss the cause of action seeking a declaration of

11

usury and denied the plaintiff's prayer for affirmative monetary relief.  Noting that the plaintiff,

"improperly attempts to use a shield created by the Legislature as a sword," the Court denied

relief because the criminal usury statute is to be used solely as an affirmative defense.  *Id.* at 4-5.

Plaintiff seeks to void the August 2002 Promissory Note and February 2003 promissory

and recover the Sabella Shares.  Such claims are not affirmative defenses and must be dismissed.

C.     Plaintiff is Estopped from Asserting Criminal Usury

The New York Court of Appeals endorsed the doctrine of estoppel to prevent

defendants from asserting the defense of usury in *Seidel v. 18 East 17th Street Owners, Inc.*,  79

N.Y.2d 735, 743, 598 N.E.2d 7, 11, 586 N.Y.S.2d 240, 244 (1992):

> "The Appellate Divisions, and the majority of States to consider the issue, have
> recognized that a borrower may be estopped from interposing a usury defense
> when, through a special relationship with the lender, the borrower induces
> reliance on the legality of the transaction (citations omitted).  We endorse such a
> rule. Otherwise, a borrower could void the transaction, keep the principal, and
> 'achieve a total windfall, at the expense of an innocent person, through his own
> subterfuge and inequitable deception' (Citations omitted).

79 N.Y.2d at 743, 598 N.E.2d at 11, 586 N.Y.S.2d at 244.

In *Abramovitz v. Kew Realty Equities, Inc.*, 180 A.D.2d 568, 580 N.Y.S.2d 269 (1st Dept.

1992), the court ruled that a borrower, who, because of a fiduciary or other like relationship of

trust with the lender, is under a duty to speak and who fails to disclose the illegality of the rate of

interest he proposes, is estopped from asserting the defense of usury where the lender rightfully

relies upon the borrower in making the loan.  The individual defendants, both experienced and

sophisticated businessmen licensed to practice law, induced plaintiff to advance them $650,000

to further their real estate interests, by taking advantage of plaintiff's long-standing friendship

and trust in his attorney. Defendant then drafted the original documents and set the financial

12

terms that defendants now claim are usurious; and that although defendants were aware of the legal rate of interest at the time they drafted the documents and borrowed the money, they did not so advise the plaintiff, nor did they advise him to seek independent counsel.

In *Hammond v. Marrano*, 88 A.D.2d 758, 451 N.Y.S.2d 484 (4th Dept. 1982) the court ruled that although the defendant was aware of the legal rate of interest at the time he drew the note and borrowed the money, he did not tell the plaintiff that the note was usurious. Due to the close personal relationship between the parties, and defendant's superior knowledge, he had a duty to disclose that fact. The court ruled that even where a party is not strictly speaking, a fiduciary, he may stand in such a relation of trust and confidence to the other as to give the other the right to expect disclosure. The court stated that:

> A borrower, who, because of a fiduciary relationship with the lender, is under a duty to speak and who fails to disclose the illegality of the rate of interest he proposes, is estopped from asserting the defense of usury where the lender rightfully relies upon the borrower in making the loan.

88 A.D. 2d at 760, 451 N.Y.S. 2d at 486. *See also Schaaf v. Borsher*, 82 A.D.2d 880, 440 N.Y.S.2d 312,313 (2nd Dept. 1981) (an attorney was estopped from asserting the defense of usury where he has induced the plaintiff's reliance, arranged the terms of the investment, and had actually drawn up the promissory note sued upon).

In the instant case the Mintz Firm had an attorney client relationship with Sabella. Such fiduciary relationship is indisputable. The Mintz Firm was counsel to Scantek and the agent of Scantek. Mintz LLC was the second largest shareholder in Scantek.

Scantek had a fiduciary duty to its shareholders, including Sabella. As an issuer of its securities, Scantek had special relationship and duty under federal securities law to disclose all facts material to the offer of the Securities.

13

The offer of the Securities to defendants was structured by the Mintz Firm and all documents were drafted by the Mintz Firm. Defendants did not retain separate counsel to review the documents in connection with the investments in Scantek.

Defendants relied on the fact that Scantek was a public company required to file reports with the U.S. Securities Exchange Commission and audited financial statements and had a duty to disclose all material facts in connection with the Securities. Defendants relied on the fiduciary relationship with the Mintz Firm and its legal and ethical obligation to disclose all material facts and provide advice on the legality of the transactions.

In order to fund the capital needs of Scantek, the Mintz Firm structured numerous private placements of the Securities to defendants and others. From 1999 through 2003, Scantek's Forms 10K reported information regarding 18 private placements of the Securities, including sales to the President, two vice presidents and two directors of Scantek. Neither the SEC filings nor the financial statements prepared by Scantek's auditors discussed or disclosed any issue or risk that Securities issued to third parties or insiders of Scantek may run afoul of criminal usury statutes. In fact, the auditors "blessed" the transactions by issuing numerous financial statements discussing the transactions.

Scantek and the Mintz firm had duties to disclose to Defendants the risks inherent in the structure of the private placement of the Securities which they offered to Defendants. Instead, Scantek and the Mintz Firm induced the reliance by Defendants on the legality of the transaction. They were under a duty to speak and instead induced reliance by Defendants to invest in a company in which Mintz Firm was a major shareholder.

Scantek and the Mintz Firm never disclosed to defendants their opinions that the Securities offered to Sabella Scantek were usurious and that Scantek could void the securities, or

14

even any risk that the Securities violated any law.  Scantek and the Mintz Firm never disclosed to Sabella that they were engaged in a scheme to issue securities that Scantek did not intend to honor.

Any doubts that Scantek and the Mintz Firm believed that the Securities were usurious and were engaged in a  fraudulent scheme to issue voidable securities is erased by the filing and signing of the Amended Complaint by the Mintz Firm seeking a declaratory judgment voiding the Securities issued to Defendants.

Scantek, because of a fiduciary or other like relationship of trust with Defendants, was under a duty to speak and failed to do so.  Scantek is estopped from asserting the defense of usury or a cause of action based on usury because defendants rightfully relied upon Scantek in purchasing the Securities.

D.      Plaintiff has Failed to Plead Usurious Intent

A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period. *N.Y. Penal Law § 190.40.*  A person acts "knowingly" with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists. *N.Y. Penal Law § 15.05*

Prior to 1965 corporations were prohibited from interposing the defense of usury in any action and there was for practical purposes, no criminal sanction whatsoever for usury.  *General Obligations Law Section 5-521(3)* was enacted in order to curb certain abuses by persons commonly known as loan sharks who charged high interest rates but avoided the defense of

usury by insisting that the individual borrower organize a corporation which then became the nominal borrower. *See N.Y.State Legislative Annual*, 1965, p. 50; *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589-590, 431 N.E.2d 278, 446 N.Y.S.2d 917 (1981); and *Reisman v. William Hartman & Son, Inc.*  51 Misc.2d 393, 95, 273 N.Y.S.2d 295, 297 (Queens County 1966). The instant case could not be farther from the type of transaction that the statute was intended combat.

There is a strong presumption against the finding of usurious intent.  *See Lehman v. Roseanne Investors Corp.*, 106 A.D.2d 617,618, 483 N.Y.S.2d 106,108 (2nd Dept. 1984); *Transmedia Restaurant Co., Inc. v. 33 E. 61st Street Restaurant Corp.*, 184 Misc. 2d 706, 710 N.Y.S.2d 756 (N.Y. County 2000) (it must appear that the real purpose of the transaction was, on the one side, to lend money at usurious interest reserved in some form by the contract and, on the other side, to borrow upon the usurious terms dictated by the lender); and *Schaaf v. Borsher*, 82 A.D.2d 880, 440 N.Y.S.2d 312 (2nd Dept. 1981)(a usurious agreement will not be presumed from facts equally consistent with a lawful purpose).

The Amended Complaint is devoid of the requisite pleading of any criminal intent by defendants, because no such intent exists.  The Amended Complaint fails to allege that Accordant or Sabella knowingly charged, took or received any money or other property as interest on a loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum.  The Amended Complaint does not allege that defendants knew that the Securities violated usury law or that defendants took any part in the structuring of the terms of the Securities.

The documentary evidence presented with this motion in the form of Scantek's SEC filings and the subscriptions agreements delivered to defendants prove that Scantek is a public

16

company which structured offerings of the Securities to numerous investors, as well as the President, two Vice Presidents and two directors of Scantek.  Scantek did not disclose to Sabella or Accordant any risk that the Securities could be deemed usurious. The Company's SEC filings and audited financial statements discussed the offer and sale of the Securities without any reference to possible violation of usury laws by the holders of the Securities, including Scantek's insiders.

Unable to plead the requisite intent, plaintiff resorts to misquoting the documents which it fails to append to its amended complaint.  Plaintiff falsely claims that each of the promissory notes "is criminally usurious on its face." Amended Complaint (Exhibit F) ¶¶22, 33.  The August 2002 Note provides for interest at the rate of 10% and interest upon default at the rate of 24% per annum. *Sabella Aff., Exhibit A.* The February 2003 Note provided for interest at the  rate of 12% per annum.  *Sabella Aff., Exhibit B.* Neither promissory note refers to issuance of any stock or payment of any additional consideration to the holders.

Plaintiff falsely claims that:

"The August 2002 Subscription Agreement specifically states that as consideration for the loans to Plaintiff totaling $250,000, Defendant Sabella received the August 2002 Note and was entitled to the 2,000,000 August 2002 Shares."

*Amended Compliant ¶19.*

The August 2002 Subscription Agreement in fact stated that Sabella agreed to invest $150,000 "in Scantek . . .. evidenced by a 10% promissory note in the principal amount of one hundred and fifty thousand ($150,000) dollars (the "Note"); and to purchase shares of Common Stock, par value $.001." *Exhibit B.*  Scantek's SEC filing reported  that Sabella purchased 2,000,000 shares for par value of $.001 per share.

17

E.  GOL 5-521(3) Does Not Apply to a Defaulted Obligation.

Plaintiff alleges in his Third Claim for Relief that the February 2003 Note is void because the February 2003 Subscription Agreement provides that in the event of a default, Scantek must issue additional shares to Accordant as a late fee.

The Second Circuit has recognized that New York usury law does not apply to defaulted obligations. *Manfra, Tordella & Brookes, Inc. v. Bunge,* 794 F.2d 61, 63 n. 3 (2d Cir.1986).

*Bristol Inv. Fund, Inc. v. Carnegie Intern. Corp.*, 310 F.Supp.2d 556, 562 (S.D.N.Y. 2003) stated that it is well established that the usury statutes do not apply to defaulted obligations.  The court rejected the defendant's usury argument because the damages about which defendant complained were available to plaintiff  only because defendant defaulted, and would not have been recoverable had defendant adhered to the terms of the agreements.

In *American Express Co. v. Brown,* 392 F.Supp. 235 (S.D.N.Y. 1975) the court held that "abundant authority exists in New York for the holding that there is no usury where an excessive rate of interest is made payable after maturity."

*In re Integrated Res., Inc. Real Estate Ltd. P'ships Sec. Litig.,* 851 F.Supp. 556, 565 (S.D.N.Y.1994)  held that any penalty interest rates or late fees assessed against the plaintiffs did not constitute usury, since New York's usury statutes do not apply to defaulted obligations.

*Miller Planning Corp. v. Wells et al.,* 253 A.D.2d 859, 678 N.Y.S.2d 340, 341 (2d Dep't 1998) held that the defense of usury does not apply where the terms of the mortgage and note impose a rate of interest in excess of the statutory maximum only after default or maturity.

CONCLUSION

For the reasons stated above, defendants' motion to should be granted dismissing all

causes of action.

Dated:        New York, New York
              February 11, 2008


                              Respectfully Submitted,


                              /Ken Sussmane/
                              Kenneth Sussmane (KS 9301)
                              McCue Sussmane & Zapfel, P.C.
                              Attorneys for Defendants
                              521 Fifth Avenue , 28th Floor
                              New York, New York 10175
                              212 931-5500