UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------- X  Case No. 08 cv 00453 (CM)
SCANTEK MEDICAL INC.,                :
                                     :
                Plaintiff,           :  AFFIDAVIT OF ANGELA SABELLA
                                     :
        vs.                          :
                                     :
ANGELA CHEN SABELLA and ACCORDANT    :
HOLDINGS, LLC,                       :
                                     :
                Defendants           :
-------------------------------- X

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK   )

        I, Angela Chen Sabella, being duly sworn, do depose
and say, that:

        1.   I am a defendant in this action.

        2.   I am the sole member of defendant Accordant
Holdings LLC, a Delaware limited liability company
("Accordant").

        3.   I submit this affirmation in support of my motion
to dismiss all of plaintiff's claims in this action.

        4.   From April 2002 through May 2004, Accordant and I
invested $825,000 in Scantek Medical, Inc. ("Scantek"), a public
company.  Scantek has sued me to void securities representing
$300,000 of such investment.

        5.   In August 2002 Scantek delivered to me the
following documents (attached hereto as Exhibit A) in connection
with Scantek's offer to sell to me $250,000 of Scantek
securities in a private placement:

                              1

Subscription Agreement dated August 20, 2002
Promissory note dated August 20, 2002
Collateral Assignment of Patents
UCC 1 Financing Statement
Confessions of Judgment.

6.    In February and March 2003 Scantek delivered to Accordant the following documents (attached hereto as Exhibit B) in connection with Scantek's offer to sell Accordant $50,000 of Scantek securities in a private placement transaction:

Subscription Agreement dated February 10, 2003
Promissory Note dated February 10, 2003
Escrow Agreement dated March 5, 2003

7.    All documents that I received were drafted by Scantek's counsel, Mintz & Fraade P.C. (the "Mintz Firm").

8.    The Mintz Firm represented me in connection with certain investments made by me on or about the time of my investments in Scantek.

9.    I was aware of the fact that Scantek was a public company and was required to file reports with the U.S. Securities Exchange Commission and audited financial statements. I relied on Scantek and the Mintz Firm to draft offering documents that were legal and binding on Scantek.

10.   Accordant and I did not retain separate counsel to review the documents in connection with the investments in Scantek.

2

11.  I relied on the Mintz Firm to disclose to me all facts relevant to my decision to investment in Scantek.  At no time from April 2002 through May 2004 did the Mintz Firm advise me of any possibility or risk that any investments in Scantek could violate any law.

12.  I am appalled that Scantek and the Mintz Firm are now alleging that I violated New York's criminal usury statutes by accepting their offer to purchase securities pursuant to a transaction structured and drafted solely by the Mintz Firm.

13.  Scantek and the Mintz Firm never disclosed to me their opinions that the securities offered to me by Scantek were usurious and that Scantek could void the securities.  They knew that I would never have accepted their offer if such opinion had been disclosed to me.

14.  Scantek and the Mintz Firm never disclosed to me that they were engaged in a scheme to issue securities that Scantek did not intend to honor.

_____
Angela Chen Sabella

Sworn to before me
this ‖ day of February, 2008

_____
Notary Public
KENNETH S. SUSSMANE
Notary Public, State of New York
No. 02SU6057419
Qualified in New York County
Commission Expires November 11, 20 ‖‖

3

**EXHIBIT E**

# FORM 10-QSB

# SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C.

**[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2003

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ............. to ..............

*Commission File Number: 000-27592*

# SCANTEK MEDICAL INC.

### (Exact name of registrant as specified in its charter)

```
          DELAWARE                                84-1090126
(State or other jurisdiction of                 (I.R.S. Employer
incorporation or organization)                  Identification No.)
```

### 4B WING DRIVE, CEDAR KNOLLS, NEW JERSEY 07927

(973) 401-0434

(Address and telephone number, including area code, of
registrant's principal executive office)

(Former name, former address and former fiscal year, if changed
since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

```
        YES          NO X
        ---          ---
```

```
        Indicate the number of shares outstanding of each of the issuer's
```

classes of common stock, as of the latest practicable date.

At April 30, 2003, there were 44,977,398 shares of Common Stock, $.001
par value, outstanding.

SCANTEK MEDICAL INC.

INDEX
-----

Part I.          Financial Information                                    Page
                                                                         ----

        Item 1.      Financial Statements                                  1

                     Consolidated Balance Sheets as of
                       March 31, 2003 (unaudited)                          2

                     Consolidated Statements of Operations
                       and Comprehensive Loss for the
                       Nine Months and Three Months Ended
                       March 31, 2003 and 2002 (unaudited)                 3

                     Consolidated Statements of Cash Flows
                       For the Nine Months Ended March
                       31, 2003 and 2002 (unaudited)                       4

                     Notes to Consolidated Financial Statements          5 - 11
                       (unaudited)

        Item 2.      Management's Discussion and Analysis of
                       Financial Condition and Results of
                       Operations                                         12

        Item 14.     Controls and Procedures                              20

Part II.         Other Information                                        20
                                                                         20
        Item 1.      Legal Proceedings                                    20
        Item 2.      Changes in Securities
        Item 3.      Defaults Upon Senior Securities                      20
        Item 4.      Submission of Matters to a Vote of Security
                       Holders                                            20
        Item 5.      Other Information                                    20
        Item 6.      Exhibits and Report on Form 8-K                      21

        Signatures                                                        22

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements**

Certain information and footnote disclosures required under accounting principles generally accepted in the United States of America have been condensed or omitted from the following consolidated financial statements pursuant to the rules and regulations of the Securities and Exchange Commission. It is suggested that the following condensed consolidated financial statements be read in conjunction with the year-end consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-KSB for the year ended June 30, 2002.

The results of operations for the nine and three month period ended March 31, 2003, are not necessarily indicative of the results to be expected for the entire fiscal year or for any other period.

-1-

**SCANNER MEDICAL INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

March 31,
2003
(Unaudited)

## ASSETS

| | |
|---|---:|
| Current Assets: | |
| Cash | $ 779 |
| Marketable securities | 2,212 |
| Inventories | 562,037 |
| Total Current Assets | 565,028 |
| | |
| Property and equipment - net | 677,803 |
| Other assets - net | 18,911 |
| TOTAL ASSETS | $ 1,261,742 |

### LIABILITIES AND STOCKHOLDERS' DEFICIENCY

| | |
|---|---:|
| Current Liabilities: | |
| Short-term debt | $ 1,484,980 |
| Current portion of long-term debt | 1,274,560 |
| Accounts payable (includes $808,303 to a related party) | 1,448,594 |
| Accrued interest | 1,626,540 |
| Accrued salaries | 1,967,472 |
| Accrued expenses | 658,217 |
| Total Current Liabilities | 8,460,363 |
| | |
| Long-term debt | 2,119,905 |
| Total Liabilities | 10,580,268 |
| | |
| Commitments and Contingencies | |
| | |
| Stockholders' Deficiency: | |
| Preferred stock, par value $.001 per share - authorized 5,000,000 shares; none issued | -- |
| Common stock, par value $.001 per share - authorized 45,000,000 shares; outstanding 44,977,398 shares | 44,977 |
| Additional paid-in-capital | 5,312,867 |
| Cumulative other comprehensive income | 2,212 |
| Deficit | (14,678,582) |
| Total Stockholders' Deficiency | (9,318,526) |
| | |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIENCY | $ 1,261,742 |

See notes to consolidated financial statements.

SCANTEK MEDICAL INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS
(UNAUDITED)

| | Nine Months Ended March 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2003 | 2002 | 2003 | 2002 |
| Revenues: | | | | |
| Net sales | $ -- | $ -- | $ -- | $ -- |
| License fees | -- | -- | -- | -- |
| | -- | -- | -- | -- |
| Costs and expenses: | | | | |
| Cost of sales (consisting of depreciation expense) | 198,288 | 201,636 | 66,096 | 66,654 |
| General and administrative expenses | 932,709 | 554,473 | 294,306 | 176,519 |
| Research and development | -- | 210,000 | -- | 70,000 |
| | 1,130,997 | 966,109 | 360,402 | 313,173 |
| Loss from operations | (1,130,997) | (966,109) | (360,402) | (313,173) |
| Other income (expense): | | | | |
| Interest and dividends | -- | 8 | -- | 2 |
| Miscellaneous income | -- | -- | -- | -- |
| Interest expense | (396,438) | (313,651) | (120,220) | (101,940) |
| | (396,438) | (313,643) | (120,220) | (101,938) |
| Net loss | $ (1,527,435) | $ (1,279,752) | $ (480,622) | $ (415,111) |
| Loss per common share - basic and diluted | $ (0.05) | $ (0.05) | $ (0.01) | $ (0.02) |
| Weighted average number of common shares outstanding - basic and diluted | 32,857,889 | 26,311,385 | 38,781,255 | 26,921,523 |
| Net loss | $ (1,527,435) | $ (1,279,752) | $ (480,622) | $ (415,111) |
| Other comprehensive income (expense) net of income taxes: | | | | |
| Unrealized loss on marketable securities | (829) | 691 | (553) | 691 |
| Comprehensive loss | $ (1,528,264) | $ (1,279,061) | $ (481,175) | $ (414,420) |

-3-

SCANTEK MEDICAL INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)

|  | Nine Months Ended March 31, | |
|  | 2003 | 2002 |
| Cash flows from operating activities: | | |
|    Net loss | $(1,527,435) | $(1,279,752) |
| Adjustments to reconcile net | | |
|  loss to net cash used in operating activities: | | |
|    Depreciation and amortization | 218,058 | 221,438 |
|    Write off of leasehold improvements | 14,231 | -- |
|    Non-employee stock based compensation | 97,547 | 165,669 |
|    Non-cash officers compensation | 7,212 | -- |
|    Other non-cash items | 135,343 | -- |
|    Changes in operating assets | | |
|    and liabilities | 790,979 | 607,936 |
|      Net Cash Used in | | |
|       Operating Activities | (264,065) | (284,709) |
| Cash flows from financing activities: | | |
|    Proceeds from borrowings | 314,000 | 162,960 |
|    Proceeds from officer loans | 4,947 | 55,159 |
|    Repayment of officer loans | (9,029) | (3,759) |
|    Repayment of notes | (56,303) | (7,245) |
|    Proceeds from sale of common stock | -- | 72,000 |
|      Net Cash Provided by | | |
|       Financing Activities | 253,615 | 279,115 |
| Net decrease in cash | (10,450) | (5,594) |
| Cash - beginning of period | 11,229 | 6,026 |
| Cash - end of period | $    779 | $    432 |
| Changes in operating assets and liabilities consist of: | | |
|    Decrease in other assets | $ 14,441 | $    -- |
|    Increase in accounts payable | | |
|    and accrued expenses | 776,538 | 607,936 |
|  | $ 790,979 | $ 607,936 |
| Supplementary information: | | |
|    Cash paid during the period for: | | |
|      Interest | $    328 | $    225 |
|      Income Taxes | $    340 | $    200 |
| Non-cash investing activities: | | |
|    Unrealized loss on | | |
|    marketable securities | $   (829) | $    691 |
| Non-cash financing activities: | | |
|    Common stock issued to officers for | | |
|    loan financing | $  7,212 | $    -- |
|    Common stock issued for loan financing | $ 55,947 | $  6,405 |
|    Issuance of stock options to non-employees | $ 135,343 | $ 42,044 |
|    Common stock issued for bonuses and | | |
|    consulting services | $ 41,600 | $ 117,220 |
|    Common stock issued in exchange for debt | $ 250,000 | $    -- |

-4-

SCANTEK MEDICAL, INC. AND SUBSIDIARIES

**NOTES CONDENSED TO CONSOLIDATED FINANCIAL STATEMENTS**

1. ORGANIZATION

Scantek Medical, Inc. and its subsidiaries (the "Company"), operates in one industry segment and is engaged, in developing, manufacturing, marketing, and licensing the BreastCare(TM)/BreastAlert(TM). The BreastCare(TM)/BreastAlert(TM) is an early screening device which can detect certain breast tissue abnormalities, including breast cancer. This device has been patented and has Food and Drug Administration ("FDA") approval for sale.

2. BASIS OF PRESENTATION

The consolidated balance sheet as of March 31, 2003, and the consolidated statements of operations and cash flows for the period presented herein have been prepared by the Company and are unaudited. In the opinion of management, all adjustments (consisting solely of normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows for all period presented have been made.

The financial statements in the Form 10-QSB were not reviewed Company's independent auditors in accordance with Item 310 of Regulation SX.

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business.

The Company has experienced losses during its development stage. Losses and negative cash flows from operations have continued in the current fiscal year subsequent to June 30, 2002. As of March 31, 2003, the Company has a working capital deficit of approximately $6.8 million.

The activities of the Company are being financed through the sale of its common stock and debt securities. The Company's continued existence is dependent upon its ability to obtain needed working capital through additional equity and/or debt financing, and the commercial acceptability of the BreastCare(TM)/BreastAlert(TM) to create sales that will help the Company achieve a profitable level of operations. However, there is no assurance that additional capital will be obtained or the BreastCare(TM)/BreastAlert(TM) will be commercially successful. This raises substantial doubt about the ability of the Company to continue as a going concern.

The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

The Company classifies its investments in equity securities as "available for sale", and accordingly, reflects unrealized gains and losses as a separate component of stockholders' deficiency.

The fair value of marketable securities are estimated based on quoted market prices. Realized gains or losses from the sale of marketable securities are based on the specific identification method.

The Company uses professional judgment to determine whether a decline of an available-for-sale instrument is temporary or other than temporary. The Company determines whether the decline in value results from Company-specific events, industry developments, general economic conditions or other reasons. After the general reason for the decline is identified, further determinations are required as to whether those events are likely to reverse and whether that reversal is likely to result in a recovery of the fair value of the investment.

## 4. INVENTORIES

The Company's policy is to reserve or write-off surplus or obsolete inventory. The inventory is reviewed by management for each reporting period.

## 5. REVENUE RECOGNITION

Revenue is recognized when the BreastCare(TM)/BreastAlert(TM) is shipped and title passes to customers.

Revenue from licensing the BreastCare(TM)/BreastAlert(TM) will be recognized when licensees commence operations and substantial performance has occurred. The Company historically has amended and renegotiated its licensees agreements. Therefore, upon receipt of license fee income in the future, the Company will recognize license fee income over the life of the agreement.

## 6. RESEARCH AND DEVELOPMENT

Research and development costs are expensed as incurred, consisting primarily of salaries of employees in developing the BreastCare (TM)/BreastAlert(TM).

## 7. FOREIGN CURRENCY TRANSLATION

Expenses for the Company's foreign subsidiaries are currently transacted in U.S. dollars. Future revenues will be invoiced and collected in U.S. dollars. The functional currency for the foreign subsidiary is the U.S. dollar. For the nine months ended March 31, 2003 and 2002, there were no foreign exchange gains or losses as all transactions were in U.S. dollars.

8. LOSS PER SHARE

Basic loss per common share is computed by dividing net loss by the weighted average number of common shares outstanding during the year. Diluted earnings per common share are computed by dividing net earnings by the weighted average number of common and potential common shares outstanding during the year. Potential common shares used in computing diluted earnings per share relate to stock options and warrants that, if exercised, would have a dilutive effect on earnings per share. For the nine and three months ended March 31, 2003 and 2002, potential common shares were not used in the computation of diluted loss per common share, as their effect would be antidilutive.

9. SEGMENTS - GEOGRAPHIC AREAS

The Company does not have reportable operating segments as defined in the Statement of Financial Accounting Standards No. 131, "Disclosure about Segments of an Enterprise and Related Information". The method for attributing revenues to individual countries is based on the destination to which finished goods are shipped. The Company operates facilities in the United States and South America. Revenues, when received, include license fees received by the Company in connection with various arrangements contracted throughout the world.

|  | Nine Months Ended March 31, | | Three Months Ended March 31, | |
|  | 2003 | 2002 | 2003 | 2002 |
| Total Revenues: |  |  |  |  |
| United States | $     -- | $     -- | $     -- | $     -- |
| South America | -- | -- | -- | -- |
| Less intergeographic revenue | -- | -- | -- | -- |
|  | $     -- | -- | -- | -- |
| Loss from operations: |  |  |  |  |
| United States | $(1,060,875) | $(890,449) | $(336,162) | $(308,173) |
| South America | (70,122) | (75,660) | (9,000) | (5,000) |
|  | $(1,130,997) | $(966,109) | $(345,162) | $(313,173) |

-7-

In December 2002, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure, an amendment of FASB Statement No. 123". SFAS No. 148 provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. It also requires disclosure in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. SFAS No. 148 is effective for annual and interim periods beginning after December 15, 2002. The Company will continue to account for stock-based employee compensation under the recognition and measurement principle of APB Opinion No. 25 and related interpretations. The Company complied with the additional annual and interim disclosure requirements effective December 31, 2002 and March 31, 2003.

## 11. STOCK ISSUED FOR SERVICES AND LOAN FINANCING

During the nine months ended March 31, 2003 and 2002, the Company issued 2,232,242 and 1,062,500 shares, respectively, of the Company's common stock to employees and non-employees as stock - based compensation in the amount of $104,759 and $123,625. The Company accounts for the services using the fair market value of the services received.

## 12. STOCKHOLDERS' DEFICIENCY

On September 30, 2002, the Company issued 1,426,039 shares of the Company's common stock to officers and non employees for consulting services and loan financing valued at $.035 per share. The Company recorded an expense of $49,911 during the nine months ended March 31, 2003.

On November 2, 2002, the Company granted 1,000,000 warrants to non-employees for services performed to purchase the Company's common stock at an exercise price of $.05 per share the fair market value at the date of grant. The Company recorded an expense of $48,051 during the nine months ended March 31, 2003 in connection with the issuance of the warrants. The warrants are exercisable immediately and expire on November 1, 2007.

On November 8, 2002, the Company issued 3,000,000 shares of the Company's common stock in exchange for the reduction of a $45,000 liability for professional services.

On November 18, 2002, the Company issued 1,200,000 shares of the Company's common stock to non-employees from the exercise of options and warrants in exchange for the reduction of accrued interest of $26,500 and a $21,000 liability for professional services. The Company also issued 565,000 shares of the Company's common stock to non-employees for consulting services and loan financing valued at $45,200.

On February 20, 2003, the Company issued 10,500,000 shares of the Company's common stock to officers and non-employees from the exercise of options and warrants in exchange for the reduction of accrued wages of $135,000, a liability for professional services of $15,000 and a liability of consulting services of $7,500.

On March 14, 2003, the Company issued 241,203 shares of the Company's common stock to officers and non-employees for loan financing valued at $9,648.

On March 31, 2003, the Company expensed $87,292 for warrants granted previously and not yet fully amortized.

During the nine months ended March 31, 2002 the Company sold 975,000 shares of the Company's common stock for $72,000.

During the nine months ended March 31, 2002 the Company issued options to purchase shares of the Company's common stock to non-employees. The fair value of the options of $42,044 has been expensed to operations.

|  | Nine Months Ended March 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
|  | 2003 | 2002 | 2003 | 2002 |
|  | ---- | ---- | ---- | ---- |
| Net loss: | | | | |
| As reported | $(1,527,435) | $(1,279,752) | $(480,622) | $(415,111) |
| Amortization of compensation expense | (86,491) | -- | -- | -- |
| Proforma | (1,613,926) | (1,279,752) | (480,622) | (415,111) |
| Basic and diluted loss per share: | | | | |
| As report | $  (0.05) | $  (0.05) | $  (0.01) | $  (0.02) |
| Proforma | $  (0.05) | $  (0.05) | $  (0.01) | $  (0.02) |

## 13. LEGAL PROCEEDINGS

The Company is a defendant in various legal proceedings seeking claims aggregating approximately $100,000, which has been included in accrued expenses in the Company's financial statements at March 31, 2003.

## 14. RECENT ACCOUNTING PRONOUNCEMENTS

In August 2001, the FASB issued SFAS No. 143 "Accounting for Asset Retirement Obligations". SFAS No. 143 addresses financial accounting and reporting for obligations and costs associated with the retirement of tangible long-lived assets. The Company adopted SFAS 143 on January 1, 2003. The adoption of SFAS No.143 did not have a material impact on the Company's results of operations or financial position.

-9-

In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, and 64, Amendment of FASB Statement No. 13, and Technical Corrections". This statement eliminates the automatic classification of gain or loss on extinguishment of debt as an extraordinary item of income and requires that such gain or loss be evaluated for extraordinary classification under the criteria of Accounting Principles Board No. 30 "Reporting Results of Operations". This statement also requires sales-leaseback accounting for certain lease modifications that have economic effects that are similar to sales-leaseback transactions, and makes various other technical corrections to existing pronouncements. The Company adopted SFAS No. 145 on July 1, 2002. The adoption of this statement did not have a material effect on the Company's results of operations or financial position.

In June 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." This Statement requires recording costs associated with exit or disposal activities at their fair values when a liability has been incurred. Under previous guidance, certain exit costs were accrued upon management's commitment to an exit plan. The Company adopted SFAS No. 146 on July 1, 2002. The adoption of SFAS No. 146 did not have a material impact on the Company's result of operations or financial position.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement No. 133 on Derivative Instruments and Hedging Activities." This statement amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts and for hedging activities under FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities." This Statement is effective for contracts entered into or modified after June 30, 2003, and for hedging relationships designated after June 30, 2003.

In November 2002, the FASB issued FASB Interpretation No. 45 (FIN 45), Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and interpretation of FASB Statements No. 5, 57,and 107 and Rescission of FASB Interpretation No. 34. FIN 45 clarifies the requirements of FASB Statement No. 5, Accounting for Contingencies, relating to the guarantor's accounting for, and disclosure of, the issuance of certain types of guarantees. This interpretation clarifies that a guarantor is required to recognize, at the inception of certain types of guarantees, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of this Interpretation are applicable on a prospective basis to guarantees issued or modified after December 31, 2002, irrespective of the guarantor's fiscal year-end. The disclosure requirements in this interpretation are effective for financial statements of interim or annual periods ending after December 15, 2002. The Company adopted FIN 45 on January 1, 2003. The adoption of FIN 45 did not have a material impact on the Company's disclosure requirements.

-10-

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which addresses consolidation by business enterprises of variable interest entities. In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. A variable interest entity often holds financial assets, including loans or receivables, real estate or other property. A variable interest entity may be essentially passive or it may engage in research and development or other activities on behalf of another company. The objective of Interpretation No. 46 is not to restrict the use of variable interest entities but to improve financial reporting by companies involved with variable interest entities. Until now, a company generally has included another entity in its consolidated financial statements only if it controlled the entity through voting interests. Interpretation No. 46 changes that by requiring a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation No. 46 apply immediately to variable interest entities created after January 31, 2003. The consolidation requirements apply to older entities in the first fiscal year or interim period beginning after June 15, 2003. Certain of the disclosure requirements apply in all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. The Company does not have any variable interest entities, and, accordingly, adoption is not expected to have a material effect on the Company.

## of Operations

The Company's quarterly and annual operating results are affected by a wide variety of factors that could materially and adversely affect revenues and profitability, including competition from other suppliers; changes in the regulatory and trade environment; changes in consumer preferences and spending habits; the inability to successfully manage growth; seasonality; the ability to introduce and the timing of the introduction of new products and the inability to obtain adequate supplies or materials at acceptable prices. As a result of these and other factors, the Company may experience material fluctuations in future operating results on a quarterly or annual basis, which could materially and adversely affect its business, financial condition, operating results, and stock price. Furthermore, this document and other documents filed by the Company with the Securities and Exchange Commission (the "SEC") contain certain forward-looking statements under the Private Securities Litigation Reform Act of 1995 with respect to the business of the Company. These forward-looking statements are subject to certain risks and uncertainties, including those mentioned above, and those detailed in the Company's Annual Report on Form 10-KSB for the year ended June 30, 2002, which may cause actual results to differ significantly from these forward-looking statements. The Company undertakes no obligation to publicly release the results of any revisions to these forward-looking statements which may be necessary to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. An investment in the Company involves various risks, including those mentioned above and those that are detailed from time to time in the Company's SEC filings.

The following discussion and analysis should be read in conjunction with the Company's consolidated financial statements and the notes related thereto. The discussion of results, causes and trends should not be construed to infer any conclusion that such results, causes or trends will necessarily continue in the future.

### Critical Accounting Policies

The Company's discussion and analysis of its financial condition and results of operations are based upon the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires the Company to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an on-going basis, the Company evaluates its estimates, including those related to product returns, bad debts, inventories, intangible assets, investments, income taxes and contingencies and litigation. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results under different assumptions or conditions may differ from these estimates.

The Company believes the following critical accounting policies affect its more significant judgments and estimates used in the preparation of its consolidated financial statements. The Company maintains allowances for doubtful accounts for estimated losses resulting from the inability of its customers to make required payments. If the financial condition of the Company's customers were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required.

The Company intends to make purchasing decisions principally based upon firm sales orders from customers, the availability and pricing of raw materials and projected customer requirements. Future events that could adversely affect these decisions and result in significant charges to the Company's operations include slow down in customer demand, customers delaying the issuance of sales orders to the Company, miscalculating customer requirements, technology changes which render the raw materials and finished goods obsolete, loss of customers and/or cancellation of sales orders. The Company writes down its inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value based upon the aforementioned assumptions. If actual market conditions are less favorable than those projected by management, additional inventory write-downs may be required. Even though sales have been minimal, the Company has received a purchase order in Brazil for the BreastCare(TM)/BreastAlert(TM). Based upon the purchase order received, the Company anticipates the entire inventory will be used in calendar 2003.

The Company seeks sales and profit growth by expanding its existing customer base, developing new products and by pursuing strategic acquisitions that meet the Company's criteria relating to (i) the market for the products; (ii) the Company's ability to efficiently manufacture the product; (iii) synergies that are created by the acquisition; and (iv) a purchase price that represents fair value. If the Company's evaluation of a target company misjudges its technology, estimated future sales and profitability levels, or inability to keep pace with the latest technology, these factors could impair the value of the investment, which could materially adversely affect the Company's profitability.

The Company files income tax returns in every jurisdiction in which it has reason to believe it is subject to tax. Historically, the Company has been subject to examination by various taxing jurisdictions. To date, none of these examinations has resulted in any material additional tax. Nonetheless, any tax jurisdiction may contend that a filing position claimed by the Company regarding one or more of its transactions is contrary to that jurisdiction's laws or regulations.

-13-

**Results of Operations**

The following table sets forth for the periods indicated, the percentage increase or (decrease) of certain items included in the Company's consolidated statement of operations:

|  | % Increase (Decrease) from Prior Period | % Increase (Decrease) from Prior Period |
|---|---|---|
|  | Nine Months Ended March 31, 2003 compared with Nine Months Ended March 31, 2002 | Three Months Ended March 31, 2003 compared with Three Months Ended March 31, 2002 |
| Sales | -- % | -- % |
| Cost of sales | (1.7)% | (0.8)% |
| General and administrative expense | 68.2 % | 66.7 % |
| Research and development | (100.0) | (100.0)% |
| Interest expense | 26.4 % | 17.9 % |
| Net (loss) | 19.4 % | 15.8 % |

### NINE MONTHS ENDED MARCH 31, 2003 VS. NINE MONTHS ENDED MARCH 31, 2002

#### Revenues

There were no sales for the nine months ended March 31, 2003 and 2002. The Company expects sales to commence in the last quarter of its fiscal year.

#### Cost of Sales

Cost of sales (which consists of depreciation expense) decreased 1.7% to $198,288 during the nine months ended March 31, 2003 from $201,636 during the nine months ended March 31, 2002.

#### General and Administrative Expenses

General and administrative expenses increased 68.2% to $932,709 during the nine months ended March 31, 2003 from $554,473 during the nine months ended March 31, 2002 due to increases in travel expenses, rent, outside services, accrued wages and professional fees attributable to stock and stock options issued for services offset by higher consulting fees in 2002 also attributable to stock options issued for services.

#### Interest Expense

Interest expense increased to $396,438 during the nine months ended March 31, 2003 from $313,651 during the nine months ended March 31, 2002 primarily due to interest expense on stock issuance for loan financing and additional interest on increase in debt.

-14-

### Research and Development Expense

Research and development decreased from $210,000 for the nine months ended March 31, 2002 to $-0- for the nine months ended March 31, 2003. The Company fully developed the BreastCare(TM)/BreastAlert(TM) but in the future contemplates to develop other products to market.

### THREE MONTHS ENDED MARCH 31, 2003 VS.
### THREE MONTHS ENDED MARCH 31, 2002

### Revenues

There were no sales for the three months ended March 31, 2003 and 2002.

### Cost of Sales

Cost of sales (which consists of depreciation expense) decreased .8% to $66,096 during the three months ended March 31, 2003 from $66,654 during the three months ended March 31, 2002.

### General and Administrative Expenses

General and administrative expenses increased 66.7% to $294,306 during the three months ended March 31, 2003 from $176,519 during the three months ended March 31, 2002 due to primarily the same reasons set forth in the nine months analysis.

### Interest Expense

Interest expense increased to $120,220 during the three months ended March 31, 2003 from $101,940 during the three months ended March 31, 2002 primarily due to interest expense on stock issuance for loan financing and additional interest on increased debt.

### Research and Development Expense

Research and development expense decreased from $70,000 for the three months ended March 31, 2002 to $-0- for the three months ended March 31, 2003 due to primarily the same reasons set forth in the nine month analysis.

### Liquidity and Capital Resources

The Company's need for funds has increased from period to period, as it has incurred expenses for among other things, research and development; applications for and maintenance of domestic and international trademarks and international patent protection; licensing and pre-marketing activities; and, attempts to raise the necessary capital to expand the Company's production capacity. Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Executive Officer and major shareholder. The Company has entered into various license agreements that have raised additional funds. In addition, the Company's auditors' report for the year ended June 30, 2002 dated October 10, 2002, expressed an opinion as to the Company continuing as a going concern.

-15-

During September 1998, the Company commenced the sale of its BreastCare(TM)/BreastAlert(TM) device in Brazil, Uruguay and Paraguay through its South American licensee. The Company terminated its license agreement with its former licensee in South America. The Company's Brazilian subsidiary plans to manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) device in Brazil and export to other South American countries. As of this date only minimal shipments have been made and the Company has not generated any material revenues.

Until cash flow generated from the shipment of the BreastCare(TM) device is sufficient to support the Company's operations, the Company will require financing to fund its current overhead and various capital requirements. As of March 31, 2003, the Company borrowed approximately $2.7 million from unaffiliated third parties. These loans are payable by the Company on various dates through December 31, 2003. In addition, as of March 31, 2003, the Company's President advanced the Company approximately $1.1 million. These loans have supported the Company through the prior and the current fiscal year. The Company expects the cash flow from sales commencing in 2003 to cover the operations of the Company through December 2003, provided the Company is successful in raising additional capital to support the operations until cash flows generated from the sales of the BreastCare(TM)/BreastAlert(TM) device commences.

In 2003, the Company will market and distribute the BreastCare(TM)/BreastAlert(TM) device throughout South America through the Company's South American subsidiaries.

Through its Brazilian subsidiary, the Company signed an agreement with the State of Pernambuco in December 1999. The State of Pernambuco has the second largest concentration of hospitals in Brazil offering quality care and management believes that the location is also the most desirable for production, shipping, financing and tax incentives. The State of Pernambuco has offered various incentives, including acreage to build the facility at a reduced price, an 85% reduction in taxes through 2013, free shipping outside the state, and in connection with the federal programs offered in Northeast Brazil, financing programs to help fund the operations and capital improvements.

The Company plans to ship the BreastCare(TM)/BreastAlert(TM) device from the United States until a production facility in Brazil is operational.

On July 14, 1999, the Company granted an exclusive license to NuGard HealthCare Ltd. ("NuGard"), an Irish Company; to market Scantek's BreastCare(TM)/BreastAlert(TM) device in Ireland and the United Kingdom. Pursuant to the licensing agreement, NuGard is obligated to pay a non-refundable licensing fee of $350,000 in various stages, of which $59,000 was received, and the Company received common shares equivalent to fifteen (15%) percent of NuGard's total outstanding common shares. The purchase price will range from $10 to $15 per unit - FOB US. The licensing agreement requires minimum purchases of 5,000 units a month and payments of licensing fees, both of which NuGard is in default. At the present time the Company has not renegotiated the license agreement.

In August/September 2001, Fiocruz, a government agency in the Ministry of Health assisted in the BreastCare(TM) educational program for the Women's Health Program for the City of Nova Iguacu and Fiocruz will be an integrated part of the Company's BreastCare(TM) educational process.

-16-

On October 1, 2005 the Company signed an agreement with Compat Comercio Exterior Ltd, a Brazilian company located in Rio De Janeiro, Brazil, for a long-term exclusive marketing and sales agreement for the BreastCare(TM) product in the country of Brazil, excluding 4 states where the Company is pursuing more direct agreements. The Compat Comercio agreement calls for the shipment of a minimum of 100,000 units during the first six months of the term of the agreement, 400,000 units during the second six months and 1,000,000 units during the second year. Management believes that the timely fulfillment of the Compat Comercio agreement will result in net profits in excess of $2,000,000 for the first year of the Compat Comercio agreement, subject to Compat Comercio meeting its minimum purchase obligations to the Company. Pursuant to such agreement which has a term of five years with a renewal term of an additional five years, subsequent to the initial two year term of the agreement, the Company has the right to terminate the agreement if the parties cannot agree upon the minimum number of units. There can be no assurance that Compat Comercio will meet the minimum purchase requirement, or that the Company will recover any damages that may result from such failure.

Pursuant to the Compat Comercio agreement, the first shipment of 10,000 BreastCare(TM) units will be prepaid and such payments will be deposited into a bank escrow account and will be released when a Brazil government import license is secured. Subsequent shipments will be paid fifty (50%) at the time of request and fifty (50%) percent sixty (60) days later.

The Company's working capital and capital requirements will depend on numerous factors, including the level of resources that the Company devotes to support start-up production and to the marketing aspects of its products. The Company intends to construct assembly centers abroad to manufacture, market and sell the BreastCare(TM)/BreastAlert(TM) device in the international market. The Company entered into an agreement with Zigmed Inc., pursuant to which Zigmed Inc. will manufacture the sensor production equipment needed for manufacturing of the BreastCare(TM)/BreastAlert(TM) device. The balance of $718,276 will be paid when the Company raises the additional capital.

The Company's success is dependent on raising sufficient capital to establish a fully operable production and assembly facility to manufacture the BreastCare(TM)/BreastAlert(TM) device for the international market. The Company believes the device will be commercially accepted throughout the international market. The Company does not have all the financing in place at this time, nor may it ever, to meet these objectives.

This Management's Discussion and Analysis of Financial Condition and Results of Operations includes forward-looking statements that may or may not materialize. Additional information on factors that could potentially affect the Company's financial results may be found in the Company's filings with the Securities and Exchange Commission.

In August 2001, the FASB issued SFAS No. 143 "Accounting for Asset Retirement Obligations". SFAS No. 143 addresses financial accounting and reporting for obligations and costs associated with the retirement of tangible long-lived assets. The Company adopted SFAS 143 on January 1, 2003. The adoption of SFAS No.143 did not have a material impact on the Company's results of operations or financial position.

In April 2002, the FASB issued SFAS No. 145 "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections". This statement eliminates the automatic classification of gain or loss on extinguishment of debt as an extraordinary item of income and requires that such gain or loss be evaluated for extraordinary classification under the criteria of Accounting Principles Board No. 30 "Reporting Results of Operations". This statement also requires sales-leaseback accounting for certain lease modifications that have economic effects that are similar to sales-leaseback transactions, and makes various other technical corrections to existing pronouncements. This statement will be effective for the Company for the year ending December 31, 2003. Management believes that adopting this statement will not have a material effect on the Company's results of operations or financial position.

In June 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." This Statement requires recording costs associated with exit or disposal activities at their fair values when a liability has been incurred. Under previous guidance, certain exit costs were accrued upon management's commitment to an exit plan. The Company adopted SFAS No. 146 on January 1, 2003. The adoption of SFAS No. 146 did not have a material impact on the Company's result of operations or financial position.

In January 2003, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure, an amendment of FASB Statement No. 123" SFAS No. 148 provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. It also requires disclosure in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. SFAS No. 148 is effective for annual and interim periods beginning after December 15, 2002. The Company will continue to account for stock-based employee compensation under the recognition and measurement principle of APB Opinion No. 25 and related interpretations. On January 1, 2003 the Company adopted the disclosure provisions of SFAS No. 148.

-18-

In November 2002, the FASB issued FASB Interpretation No. 45 ("FIN 45"), Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and interpretation of FASB Statements No. 5, 57,and 107 and Rescission of FASB Interpretation No. 34. FIN 45 clarifies the requirements of FASB Statement No. 5, Accounting for Contingencies, relating to the guarantor's accounting for, and disclosure of, the issuance of certain types of guarantees. This interpretation clarifies that a guarantor is required to recognize, at the inception of certain types of guarantees, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of this Interpretation are applicable on a prospective basis to guarantees issued or modified after December 31, 2002, irrespective of the guarantor's fiscal year-end. The disclosure requirements in this interpretation are effective for financial statements of interim or annual periods ending after December 15, 2002. The Company adopted FIN 45 on January 1, 2003. The adoption of FIN 45 did not have a material impact on the Company's disclosure requirements.

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which addresses consolidation by business enterprises of variable interest entities. In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. A variable interest entity often holds financial assets, including loans or receivables, real estate or other property. A variable interest entity may be essentially passive or it may engage in research and development or other activities on behalf of another company. The objective of Interpretation No. 46 is not to restrict the use of variable interest entities but to improve financial reporting by companies involved with variable interest entities. Until now, a company generally has included another entity in its consolidated financial statements only if it controlled the entity through voting interests. Interpretation No. 46 changes that by requiring a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation No. 46 apply immediately to variable interest entities created after January 31, 2003. The consolidation requirements apply to older entities in the first fiscal year or interim period beginning after June 15, 2003. Certain of the disclosure requirements apply in all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. The Company does not have any variable interest entities, and, accordingly, adoption is not expected to have a material effect on the Company.

-19-

**Item 14. Controls and Procedures**

Within the 90 days prior to the date of this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-14. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective. There have been no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

**PART II. Other Information**

**Item 1. Legal Proceedings**

There are several lawsuits against the Company that may have a material impact on the consolidated results of operations or financial condition of the Company.

**Item 2. Changes in Securities**

None

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Submission of Matters to a Vote of Security Holders**

None

**Item 5. Other Information**

None

-20-

**Item 6. Exhibits and Reports on Form 8-K**

(a) Exhibits:

Exhibit 99.1 Certification of Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(b) There were no current reports on Form 8-k filed during the quarter ended March 31, 2003.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**SCANTEK MEDICAL INC.**

```
                          By: /s/ Zsigmond L. Sagi
                              --------------------------------
                              Zsigmond L. Sagi, President and
                              Chief Financial Officer
```

```
        Dated:  May 20, 2003
```

-22-

1. I have reviewed this quarterly report on Form 10-Q of Scantek Medical Inc;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. I have indicated in this quarterly report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

```
        Date: May 20, 2003


                                By:  /s/Zsigmond L. Sagi
                                     ------------------------------------
                                     Zsigmond L. Sagi, President and
                                     Chief Financial Officer
```

-23-

EXHIBIT 99.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
AS ADOPTED PURSUANT TO
<u>SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002</u>

In connection with the quarterly report of Scantek Medical Inc (the "Company") on Form 10-Q for the quarter ended March 31, 2003 filed with the Securities and Exchange Commission (the "Report"), I, Zsigmond L. Sagi, President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934;and

(2) The information contained in the Report fairly presents, in all material respects, the consolidated financial condition of the Company as of the dates presented and consolidated result of operations of the Company for the period presented.

```
        Dated: May 20, 2003


                        By: /s/ Zsigmond L. Sagi
                        --------------------------------
                        Zsigmond L. Sagi, President
                          and Chief Financial Officer
```

This certification has been furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. A signed original of this written statement required by Section 906 has been provided to Scantek Medical, Inc. and will be retained by Scantek Medical, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

---

EXHIBIT B

# SCANTEK MEDICAL, INC.

## SUBSCRIPTION AGREEMENT

## DATED FEBRUARY 10, 2003

Scantek Medical, Inc.
4 B Wing Drive,
Cedar Knolls, NJ 07927
Attn: Dr. Zsigmond L. Sagi, President

Gentlemen:

### 1.    The "Securities"

The undersigned hereby agree to invest an aggregate of fifty thousand ($50,000) dollars in Scantek Medical, Inc, a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a promissory note in the principal amount of fifty thousand ($50,000) dollars bearing interest at the rate of one (1%) percent per month (the "Note"); and to the purchase of shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "9" of this Subscription Agreement which shall be registered pursuant to Article "9" of this Subscription Agreement. The Note in the principal amount of fifty thousand ($50,000) dollars, is annexed hereto as Exhibit "A". The Note and the Shares are hereinafter jointly referred to as the "Securities." The undersigned hereby agree to pay for the Securities subscribed for by the undersigned in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

### 2.    Payment

We are herewith agreeing to forward the amount of fifty thousand ($50,000) dollars upon execution hereto to the account of "Mintz & Fraade, P.C."

### 3.    The Offering

The undersigned understands the following:

(A)    This offering will terminate on, or prior to, February 17, 2003, subject to extension, in the sole and absolute discretion of the Company;

1

(B)    This offering may be so extended without amending this Subscription Agreement and without notice to either the Investors who have submitted their subscription documents to the Company or to prospective Investors; and

(C)    The Company reserves the right, in its sole and absolute discretion, (i) to withdraw the subject offering or (ii) to reject any subscription for Securities in whole or in part. In the event of a complete rejection, the Company will return to me all of my subscription documents and my subscription funds for the subscription, without interest thereon and without deduction of escrow costs.  In the event of a partial rejection, the Company will return to me the appropriate portion of my subscription funds for the rejected portion of the subscription, without interest thereon and without deduction of escrow costs, and I will be obligated to promptly furnish the Company with such amended subscription documents as the Company may request, including, but not limited to, a new Subscription Agreement.  If my subscription is accepted for a lesser number of Securities than requested by me, it will be within the sole and absolute discretion of the Company whether or not to allow me to withdraw my full subscription.

4.    <u>Acceptance of Subscription</u>

The undersigned understands the following:

(A)    That this Subscription Agreement is not binding upon the Company unless and until it is accepted by the Company; and

(B)    That the acceptance of my subscription to purchase Securities by the Company shall not be deemed binding upon the Company until the funds paid by me herewith clear and are credited to the account of Mintz & Fraade, P.C.

5.    <u>No Reliance</u>

The undersigned acknowledges the following:

(A)    That I have received, read, understand, and am familiar with this Subscription Agreement;

(B)    That no statements, representations or warranties, have been made or furnished to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Securities, and/or the economic, tax, or any other aspects or consequences of this investment, and that I have not relied upon any information with respect to the offering, written or oral, other than the information contained in this Subscription Agreement; and

N:\Clients\Scantek Medical Inc\Bridge Financing\Sabella\$50,000 loan\sub.ag.vACC.final2.docv1

(C)    I further understand that any documents other than this Subscription Agreement, regardless of whether distributed prior to, simultaneously with, or subsequent to, the date of this Subscription Agreement should not be relied upon in determining whether to make an investment in the Securities and I expressly acknowledge, agree and affirm that I have not relied upon any such literature in making my determination to make an investment in the Securities.

6.    Representations and Warranties of the Investor

In order to induce the Company, Counsel and their respective agents, to accept our subscription, each of the undersigned further represent and warrant to the Company, Counsel, and their respective Affiliates, as follows:

(A)    If I have chosen to do so, I have been represented by such advisors as I have found necessary to consult concerning the purchase of the Securities, and such representation has included an examination of applicable documents and an analysis of all tax, financial, and securities law aspects thereof. I, my advisors, and such other persons with whom I have found it necessary or advisable to consult, have sufficient knowledge and experience in business and financial matters to evaluate the information set forth in this Subscription Agreement, and the risks of the investment, and to make an informed investment decision with respect thereto;

(B)    With respect to the tax aspects of my investment, I am relying solely upon the advice of my own personal tax advisors, and upon my own knowledge with respect thereto;

(C)    I have not relied, and will not rely upon, any information with respect to this offering other than the information contained herein and set forth in the Company's filings with the Securities and Exchange Commission;

(D)    I understand that this offering has not been, and it is not anticipated that the same will be, registered under the Securities Act of 1933, as amended (the "1933 Act"), or pursuant to the provisions of the securities or other laws of any other applicable jurisdictions. I am fully aware of the restrictions on sale, transferability and assignment of the Securities and that I must bear the economic risk of my investment herein for an indefinite period of time because the offering has not been registered under the 1933 Act and, therefore, the Securities cannot be offered or sold unless the offering is subsequently registered under the 1933 Act or an exemption from such registration is available to me;

(E)    My execution and delivery of this Subscription Agreement has been duly authorized by all necessary action. I do not presently have any plans to pledge, transfer or assign the Securities and any Shares issuable upon the conversion of the Note which we acquire pursuant to this offering. I am making the investment hereunder for my own account and not for the account of others and for investment purposes only and not with a view to or for the transfer,

3

assignment, resale or distribution thereof, in whole or in part. I have no present plans to enter into any such contract, undertaking, agreement or arrangement;

(F)    I agree that, subject to any applicable state securities laws, I shall not cancel, terminate or revoke this Subscription Agreement, executed by me with respect to the purchase of the Securities, and that this Subscription Agreement shall survive my death or disability, except pursuant to the laws of any applicable jurisdiction;

(G)    Although one of my motivations for investing in the Company is to derive the economic benefits, I am aware that the purchase of the Securities is a speculative investment involving a high degree of risk and that there is no guarantee that I will realize any gain from my investment, realize any tax benefits therefrom and that I may lose all or a substantial part of my investment. I can afford the loss of my entire investment;

(H)    The address set forth below is my true and correct residence, and I have no present intention of becoming a resident of any other state or jurisdiction prior to our purchase of the Securities;

(I)    I understand the meaning and legal consequences of the foregoing representations and warranties, which are true and correct as of the date hereof and will be true and correct as of the date of my purchase of the Securities subscribed for herein. Each such representation and warranty shall survive such purchase;

(J)    I agree that it shall not be a defense to a suit for damages for any misrepresentation or breach of covenant or warranty of mine that the Company knew or had reason to know that any covenant, representation or warranty in this Subscription Agreement or furnished or to be furnished to the Company contained untrue statements. The foregoing shall survive any investigation by the Company;

(K).    No representation or warranty which I have made in this Subscription Agreement, or in a writing furnished or to be furnished pursuant to this Subscription Agreement, contains or shall contain any untrue statement of fact, or omits or shall omit to state any fact which is required to make the statements which are contained herein or therein, in light of the circumstances under which they were made, not misleading; and

(L)    I am an "accredited investor" as that term is defined in Rule 501 of Regulation D, which was promulgated under the 1933 Act. Pursuant to Rule 501, an accredited investor includes (i) a natural person who (with spouse, if any) has a net worth which exceeds $1,000,000 at the time of the purchase; (ii) a natural person who has had an individual income in excess of $200,000 for the prior two years (or joint income with such spouse which exceeds $300,000 in each such year) and have a reasonable expectation of reaching the same income level (or joint income level) in the current year; (iii) an organization as described in section 501 (c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total

4

assets in excess of $5,000,000; (iv) a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 (b)(2)(ii); or (v) an entity in which all of the equity owners are accredited investors.

7.    Indemnification by the Investor

Each of the undersigned hereby agree to indemnify and hold harmless the Company, Counsel, and persons affiliated with them, from any and all damages, losses, costs and expenses (including reasonable attorneys' fees) which they, or any of them, may incur by reason of any of the undersigned failure, or alleged failure, to fulfill any of the terms and conditions of this Subscription Agreement or by reason of any of the undersigned breach of any of the undersigned representations and warranties contained in this Subscription Agreement.

8.    Subscription for Shares

The Company shall issue to the undersigned such number of Shares which will result in the ownership by the undersigned as follows:

(A) For every $1 loaned to the Company, six (6) Shares;

(B) If the Note is not paid in full on or prior to the Maturity Date (as defined in the Promissory Note) for each of the first five (5) business days after the Maturity Date that the Note remains unpaid, two hundred (200) Shares for every $1000 loaned to the Company by the Investor; and

(C) After the five (5) business day period set forth in Paragraph "(B)" of this Article "8", for each day that the Note remains unpaid, five hundred (500) Shares for every $1000 loaned to the Company by the Investor.

9.    Registration

(A)    Upon the occurrence of an Event of Default (as defined in the Promissory Note), the Company shall in the Company's sole and absolute discretion either (i) deliver freely tradeable Shares to the Payee or (ii) file a Registration Statement with the Securities and Exchange Commission which shall include the Shares issued hereunder within sixty (60) days after the date of such Event of Default. If no Event of Default occurs, the Company shall file a Registration Statement with the Securities and Exchange Commission which shall include the Shares issued hereunder within one hundred twenty (120) days after closing of this offering.

(B)    All expenses in connection with preparing and filing any registration statement under Article "4" hereof (and any registration or qualification under the securities or "Blue Sky"

5

laws of states in which the offering will be made under such registration statement) shall be borne in full by the Payor; provided, however, that the Payee shall pay any and all underwriting commissions and expenses and the fees and expenses of any legal counsel selected by the Payee to represent them with respect to the sale of the Securities.

10. Changes in Common Stock

If there are any changes in the Company's common stock on or after to February 10, 2003, by way of stock split, stock dividend, reverse split, combination or reclassification, or through merger, consolidation, reorganization or recapitalization, or by any other means, appropriate adjustment shall be made in the provisions hereof, as may be required, so that any such adjustment shall result in the aggregate amount of shares issued to the undersigned pursuant to this Subscription Agreement shall equal not less than one hundred fifty thousand (150,000) shares of the Company's common stock effective immediately after the effective date of such action.

11. General Provisions

(A)    Headings. The headings contained in this Subscription Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Subscription Agreement.

(B)    Enforceability. If any provision which is contained in this Subscription Agreement should, for any reason, be held to be invalid or unenforceable in any respect under the laws of any State of the United States, such invalidity or unenforceability shall not affect any other provision of this Subscription Agreement. Instead, this Subscription Agreement shall be construed as if such invalid or unenforceable provisions had not been contained herein.

(C)    Notices. Any notice or other communication required or permitted hereunder must be in writing and sent by either (i) registered or certified mail, postage prepaid, return receipt requested, (ii) overnight delivery with confirmation of delivery or (iii) facsimile transmission with an original mailed by first class mail, postage prepaid, in each case addressed as follows:

To the Company:            Scantek Medical, Inc.
                           4 B Wing Drive,
                           Cedar Knolls, NJ 07927
                           Attn.: Dr. Zsigmond L. Sagi, President
                           Facsimile No.: (973) 401-0459

Copy to:                   Mintz & Fraade, P.C.
                           488 Madison Avenue, Suite 1100

6

N:\Clients\Scantek Medical Inc\Bridge Financing\Sabella\$50,000 loan\sub.ag.vACC.final2.docv1

New York, New York 10022
Attn.: Frederick M. Mintz, Esq.
Facsimile No.:(212) 486-0701

To the Investor:                     Accordant Holdings, LLC
                                     853 East Valley Boulevard, Suite 200
                                     San Gabriel, CA, 91776
                                     Attn.: Angela C. Sabella

Copy to:                             _____
                                     _____
                                     _____

or in each case to such other address and facsimile number as shall have last been furnished by like notice. If mailing by registered or certified mail is impossible due to an absence of postal service, and if the other methods of sending notice set forth in Paragraph "C" of this Article "11" of this Subscription Agreement are not otherwise available, notice shall be in writing and personally delivered to the aforesaid addresses. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be; provided, however, that any notice sent by facsimile shall be deemed to have been given as of the date sent by facsimile if a copy of such notice is also mailed by first class mail on the date sent by facsimile; if the date of mailing differs from the date of sending by facsimile, then the date of mailing by first class mail shall be deemed to be the date upon which notice given.

(D)    Governing Law; Disputes.    This Subscription Agreement shall in all respects be construed, governed, applied and enforced with the laws of the State of New York without giving effect to the principles of conflicts of laws and be deemed to be an agreement entered into in the State of New York and made pursuant to the laws of the State of New York. The parties hereby consent to and irrevocably submit to personal jurisdiction over each of them by the Courts of the State of New York in any action or proceeding, irrevocably waive trial by jury and personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph "C" of this Article "11" of this Subscription Agreement.

The parties agree, further, that the prevailing party in any action or proceeding as determined by the Tribunal making the final and non-appealable determination of the matter in dispute shall be entitled to reimbursement of all its reasonable fees, costs and expenses, including its attorneys fees, in connection with such matter. In connection with the Tribunal's

7

determination for the purpose of which party, if any, is the prevailing party, the Tribunal shall take into account all of the factors and circumstances including, without limitation, the relief sought, and by whom, and the relief, if any, awarded, and to whom.    In addition, and notwithstanding the foregoing sentence, a party shall not be deemed to be the prevailing party in a claim seeking monetary damages, unless the amount of the final determination exceeds the amount offered in a writing by the other party by fifteen percent (15%) or more.  For example, if the party initiating a claim ("A") seeks damages of $100,000 plus costs and expenses, the other party ("B") has offered A $50,000 prior to the commencement of the proceeding, and if the Tribunal awards any amount less than $57,500 to A, the Tribunal should determine that B has "prevailed".

       (E)    Further Actions.    The parties agree to execute any and all instruments and documents, and to take any and all such further actions reasonably required to effectuate this Agreement and the intents and purposes hereof.

       (F)    Binding Agreement.  This Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns

       (G)    Waiver.    Except as otherwise expressly provided herein, no waiver of any covenant, condition, or provision of this Subscription Agreement shall be deemed to have been made unless expressly set forth in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Subscription Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment for the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Subscription Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other or subsequent breach.

       (H)    Counterparts. This Subscription Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

       (I)    Entire Agreement.    The parties have not made any representations, warranties, or covenants with respect to the subject matter hereof, orally or in writing, which are not set forth herein, and this Subscription Agreement, together with any instruments or other agreements executed simultaneously herewith, constitutes the entire agreement between them with respect to the subject matter hereof.  All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Subscription Agreement and any such instrument, which alone fully and completely expresses their agreement.  This Subscription Agreement may not be changed, modified, extended, terminated

8

or discharged orally, but only by an agreement in writing, which is signed by all of the parties to this Subscription Agreement.

     12.    Certification with respect to Federal Interest Payments; Backup Withholding in Lieu of Internal Revenue Service Form W-9 --

    Under penalties of perjury each of the undersigned certify as follows:

     The number(s) shown below as my (our) taxpayer identification number(s) (social security number or employer identification number) is my (our) correct taxpayer identification number; and I (we) am (are) not subject to backup withholding either because I (we) have not been notified by the Internal Revenue Service that I (we) am (are) subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me (us) that I (we) am (are) no longer subject to backup withholding.

[Signature page follows]

9

IN WITNESS WHEREOF, I have executed this Subscription Agreement this 10th day of February 2003.

**Individuals:**                                    **Entities:**

_____                    _____
Name (Please Print)                            Name of Entity (Please Print)


_____                    By:_____
Signature                                          Signature and Title


_____
Social Security Number


_____                    _____
Name of Joint Tenant or                        Employer Identification
Tenant in-Common, if                           Number
applicable (Please Print)
                                                   [Corporate Seal (if applicable)]


_____
Signature of Joint Tenant
or Tenant-in-Common, if
applicable.


_____
Social Security Number

10

## TO BE COMPLETED BY ALL SUBSCRIBERS

Address to which information regarding
this subscription should be mailed:

_____

Street Address

_____

City and State                    Zip

( )_____
Telephone Number

( )_____
Facsimile Number

Accepted And Agreed To This ____ Day of _____ _____, 2003

Scantek Medical, Inc.

By:

Name: _____

Title: _____ PRESIDENT.

## PROMISSORY NOTE

$50,000

February 10, 2003

FOR VALUE RECEIVED, Scantek Medical, Inc., a Delaware corporation with an address at 4B Wing Drive, Cedar Knolls, NJ 07927 (hereinafter referred to as the "Payor"), agrees to pay to the order of Accordant Holdings, LLC  with an address at 853 East Valley Boulevard, Suite 200, San Gabriel, CA, 91776 (the "Payee"), on the Maturity Date set forth in Paragraph "(A)" of Article "2" of this Promissory Note (the "Note"), unless earlier redeemed in accordance with the terms of this Note, the principal sum of Fifty Thousand ($50,000) Dollars, with interest on the aforesaid amount as calculated in Article "1" below.

1.    Interest

(A)    Interest on the unpaid principal balance shall be calculated from the date of each advance received by the Payor pursuant to this Note to and including the date of repayment at an interest rate equal to one (1%) percent per month.

(B)    Payment of the accrued and unpaid interest shall be due and payable upon payment of the principal balance of this Note pursuant to Paragraph "(A)" of Article "2" of this Note.

2.    Method of Payment

(A)    Payment of the principal balance of this Note, together with any unpaid and accrued interest thereon, shall be due and payable in full on or prior to June 6, 2003 (the "Maturity Date").

(B)    Repayment of this Note by the Payor shall be made by certified or bank check drawn to the Payee and delivered to Mintz & Fraade, P.C. on or prior to the Maturity Date at the address set forth in Paragraph "C" of Article "12" of this Note .

3.    Events of Default

The term "Event of Default" as used herein shall mean the occurrence of any one or more of these following events:

(A)    The failure of the Payor to pay when due any payment due hereunder.

(B)    The default in the performance of any material covenant on the part of the Payor to be performed pursuant to the terms hereof and, except for a default pursuant to Article "A" of this Article "3" of this Note, for which no notice or cure period shall be applicable, such failure continues for ten (10) days after Payee notifies Payor thereof in writing, pursuant to Paragraph "(C)" of Article "12" of this Note;

(C)     The admission in writing by the Payor of its inability to pay its debts as they mature;

(D)     The filing by the Payor of a petition in bankruptcy;

(E)     The making of an assignment by the Payor for the benefit of its creditors;

(F)     Consent by the Payor to the appointment of, or possession by, a custodian for itself or for all or substantially all of its property;

(G)     The filing of a petition in bankruptcy against the Payor with the consent of the Payor;

(H)     The filing of a petition in bankruptcy against the Payor without the consent of the Payor, and the failure to have such petition dismissed within sixty (60) days from the date upon which such petition is filed;

(I)     Notwithstanding the sixty (60) day provision in Paragraph "(H)" of this Article "3"of this Note, on a petition in bankruptcy filed against Payor, Payor is adjudicated;

(J)     The entry by a court of competent jurisdiction of a final non-appealable order, judgment or decree appointing, without the consent of the Payor, of a receiver, trustee or custodian for the Payor or of all or substantially all of the respective property or assets of Payor;

(K)     The commencement of a proceeding to foreclose the security interest in, or lien on, any property or assets to satisfy the security interest or lien therein of any creditor of the Payor;

(L)     The entry of a final judgment for the payment of money by a court of competent jurisdiction against the Payor, which judgment the Payor shall not discharge (or provide for such discharge) in accordance with its terms within ninety (90) days of the date of entry thereof, or procure a stay of execution thereof within ninety (90) days from the date of entry thereof and, within such ninety (90) day period, or such longer period during which execution of such judgment shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal; and

(M)     The imposition of any attachment or levy, or the issuance of any note of eviction against the assets or properties of the Payor.

4.    Remedies Upon Default

Upon the occurrence of an Event of Default (as defined in Article "3" of this Note), and any time thereafter while such Event of Default is continuing, the entire unpaid principal balance which is due pursuant to this Note shall, at the Payee's option, be accelerated and become and be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Payor.

5.    Non-Exclusive Remedy

Any remedy that is set forth in this Note is not exclusive of any remedies that are provided by law.

6.    Liability Upon Default

The liability of the Payor upon default shall be unconditional and shall not be in any manner affected by any indulgence whatsoever granted or consented to by the Payee including, but not limited to, any extension of time, renewal, waiver or other modification.

7.    Exercise of Remedy Upon Default

No failure on the part of the Payee to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

8.    Security.

A.    This Promissory Note shall be secured by three million (3,000,000) shares of Common Stock of the Payor (the "Security Shares"), which are to be held in escrow pursuant to that certain Escrow Agreement by and between Dr. Zsigmond L. Sagi, the Payee, the Payor and Mintz & Fraade, P.C., to be executed simultaneously with this Promissory Note (the "Escrow Agreement").

B.    Upon default by the Payor, the Payor shall cause the Security Shares to be included in a Registration Statement and to file said Registration Statement with the Securities and Exchange Commission within sixty (60) days after the date of default and use its best efforts to cause such Registration Statement to be declared effective; provided, however, that such Registration Statement shall not be required if in the opinion of the Payor's counsel, the Security Shares will be freely tradable if the Payee receives the Security Shares pursuant to Subparagraph "B" of Paragraph "2" of the Escrow Agreement upon default by the Payor.

C.    All expenses in connection with preparing and filing any registration statement pursuant to this Article "8" hereof (and any registration or qualification under the securities or "Blue Sky" laws of states in which the offering will be made under such registration statement) shall be borne in full by the Payor.

9.     Validity of Provisions

Any provision of this Note that may prove to be unenforceable under any law shall not affect the validity of any other provision of this Note.

10.    Collection Costs

Payor agrees to pay all reasonable costs of collection, including attorney's fees and costs, which may be paid or incurred by Payee in connection with Payee's exercise of its rights or remedies under this Note.

11.    Full Recourse

Anything in this Note to the contrary notwithstanding, the Payor hereunder shall be liable on this Note for the full amount of the principal and interest due pursuant to this Note.

12.    Miscellaneous

(A)    Modification   This Note may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by the Payor and the Payee of this Note.

(B)    Further Actions   The Payor agrees to execute any and all instruments and documents, and to take any and all such further actions reasonably required to effectuate this Note and the intents and purposes hereof.

(C)    Notices   All notices or other communications required or permitted hereunder shall be in writing and shall be mailed by First Class, Registered or Certified Mail (Return Receipt Requested), postage prepaid, as follows:

> To the Payor:     Scantek Medical, Inc.
> 4 B Wing Drive,
> Cedar Knolls, NJ 07927
> Attention:  Dr. Zsigmond Sagi, President
>
>
> Copy to:     Mintz & Fraade, P.C.
> 488 Madison Avenue
> New York, New York 10022
> Attn.: Frederick M. Mintz, Esq.

To the Payee:          Accordant Holdings, LLC
                       853 East Valley Boulevard, Suite 200
                       San Gabriel, CA, 91776
                       Attn.: Angela C. Sabella


Copy to:               _____

                       _____

                       _____

or in each case to such other address as shall have last been furnished by like notice.  If mailing by Registered or Certified Mail is impossible due to an absence or delay in the postal service, notice shall be in writing and personally delivered to the appropriate address set forth above.  Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be.

(D)     Governing Law        This Note shall in all respects be construed, governed, applied and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed therein, without giving effect to the principles of conflicts of law.  The parties hereby consent to and irrevocably submit to personal jurisdiction over each of them by the Courts of the State of New York in any action or proceeding, irrevocably waive trial by jury and personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph "C" of this Article "12" of this Note.

(E)     Assignment    This Note may be assigned or transferred by the Payee without the prior written consent of the Payor.

(F)     Successors and Assigns   This Note shall be binding upon the Payor and its successors and assigns.

(G)     Binding Agreement   This Note shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.


[Signature page follows]

IN WITNESS WHEREOF, the Payor has executed this Note as of the 10th day of February 2003.

Scantek Medical, Inc.

By: _____
Zsigmond L. Sagi, President & CEO


In order to induce the Payor to enter into the foregoing Note, the payment and performance of the obligations of the Payor are hereby personally guaranteed by Zsigmond L. Sagi and Zsigmond L. Sagi, as guarantor hereof, hereby consents that any provisions of this Note, may be waived, modified or extended without affecting the liability of Zsigmond L. Sagi, as guarantor of the Payor.

_____
Zsigmond L. Sagi

# MINTZ & FRAADE, P.C.

COUNSELORS AT LAW
488 MADISON AVENUE
NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

————

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
ARTHUR L. PORTER, JR
MELVIN L. LEBOW
JON M. PROBSTEIN
MARTIN L. LERNER

SENIOR COUNSEL
FRANK J. GLINSKY

March 5, 2003

Scantek Medical, Inc.
4 B Wing Drive,
Cedar Knolls, NJ 07927
Attention: Dr. Zsigmond Sagi, President

Accordant Holdings, LLC
853 East Valley Boulevard, Suite 200
San Gabriel, CA 91776
Attn: Angela C. Sabella

Re:    Escrow Agreement

Gentlemen:

Mintz & Fraade, P.C. (hereinafter referred to as the "Escrow Agent") agrees to act as escrow agent pursuant to the terms of this Escrow Agreement and receive three million (3,000,000) shares of common stock of Scantek Medical, Inc. ("Scantek").

1.    A.    The Escrow Agent hereby acknowledges receipt of the following (the "Escrow Items"): (i) stock powers executed in blank by the recordholder of the Shares (the "Stock Powers"), a copy of which is annexed hereto as Exhibit "A," and (iii) a Promissory Note dated as of the 10th day of February, 2003 (the "Scantek Note"), with Accordant Holdings, LLC as the payee (the "Payee"), a copy of which is annexed hereto as Exhibit "B," evidencing indebtedness to the Payee in the sum of Fifty Thousand ($50,000) dollars.

B.    A stock certificate evidencing an aggregate of Three Million (3,000,000) shares (the "Shares") of common stock of Scantek, registered in the name of Dr. Zsigmond L. Sagi ("Dr. Sagi") shall be delivered to the Escrow Agent on or prior to May 15, 2003.

C.     The Escrow Agent shall have no obligation to take any action with respect to collecting the payments pursuant to the Scantek Note.

2.     The Escrow Agent agrees to hold the Escrow Items, in escrow, in accordance with the following terms and conditions:

A.     The Escrow Agent shall deliver to Dr. Sagi the Shares, the Stock Powers and the Scantek Note ten (10) days after the Escrow Agent receives written notice (the "Release Notice") pursuant to Article "15" of this Escrow Agreement from any party stating that the Note has been satisfied; provided, however, that the Escrow Agent shall not release the Escrow Items if the Escrow Agent receives written notice from any other party within ten (10) days after receipt of the Release Notice objecting to such release being made.

B.     If the Escrow Agent does not receive a bank or certified check as set forth in Paragraph "B" of Article "2" of the Scantek Note, the Escrow Agent shall deliver the Shares, the Stock Powers and the Scantek Note to the Payee as instructed by the Payee.

C.     The Escrow Agent shall deliver the Escrow Items to the party or parties specified in a written notice received from all Parties instructing the Escrow Agent to deliver the Escrow Items to a specified party or parties. Said written notice must be in form and substance satisfactory to the Escrow Agent in the Escrow Agent's sole and absolute discretion.

3.     The Escrow Agent is hereby released and exculpated from all liability, costs, and expenses whatsoever which arise out of or in connection with the Escrow Agent's activities as escrow agent hereunder. The Escrow Agent shall be liable only to the extent of any loss or damage which is caused by its willful misconduct.

4.     The Escrow Agent may act or refrain from acting with respect to any matter which is referred to herein in reliance upon either: (A) the advice of any counsel who may be selected by the Escrow Agent from time to time, including, but not limited to, the Escrow Agent if it is acting as its own counsel; or (B) a good faith determination by the Escrow Agent. The Escrow Agent is hereby released and exculpated from all liability whatsoever which arises out of or in connection with so acting or in so refraining from acting upon either: (A) the advice of any counsel, including, but not limited to, the Escrow Agent if it is acting as its own counsel; or (B) a good faith determination by the Escrow Agent.

5.     The Escrow Agent may rely and is hereby released and exculpated from all liability, including, but not limited to losses, costs, and expenses whatsoever which arises out of or in connection with its actions based upon any paper or other document which may be submitted to the Escrow Agent in connection with its duties hereunder which is believed by the Escrow Agent to be genuine and to have been signed by the proper party or parties and the Escrow Agent shall have no liability or responsibility with respect to the form, execution or validity thereof.

6.    The Escrow Agent may institute or defend any action or legal process which involves any matter which is referred to herein which in any manner affects the Escrow Agent or its duties or liabilities hereunder, but the Escrow Agent shall not be required to institute or defend such action or process unless or until requested to do so, and then only upon receiving full indemnity, against any and all claims, liabilities, judgments, reasonable attorneys' fees including the fair value for legal fees rendered by it if the Escrow Agent acts as its own counsel and other expenses of every kind in relation thereto such indemnification shall be in form and amount satisfactory to the Escrow Agent in its sole and absolute discretion and from such parties determined by the Escrow Agent in its sole and absolute discretion.

7.    The Payee, Dr. Sagi and Scantek agree to and shall jointly and severally indemnify and save the Escrow Agent harmless from and against any losses, claims, liabilities, judgments, reasonable attorneys' fees and other expenses of every kind and nature which may be suffered, sustained or incurred by the Escrow Agent by reason of its acceptance of, and its performance under, this Escrow Agreement except for the Escrow Agent's willful misconduct.  In addition, the Escrow Agent shall be entitled to the fair value of the legal services incurred to outside counsel, or all legal fees and expenses incurred by it if it determines, in its sole and absolute discretion, to act as its own counsel, with respect to the Escrow Agent's acceptance of, and its performance pursuant to this Escrow Agreement.

8.    The Escrow Agent may at any time, in its sole and absolute discretion, deposit the Escrow Items with a court of competent jurisdiction in New York County, New York State pursuant to an action of interpleader, and upon such deposit the Escrow Agent shall be released from any further liability or obligation as the Escrow Agent.

9.    In the event of any dispute which is referred to herein, the Escrow Agent shall be entitled to consult with counsel, including itself, and commence or defend any legal proceeding if the Escrow Agent, in its good faith determination, determines to do so, and shall be reimbursed by the Parties for all legal fees and expenses in connection with such consultation and legal proceeding and shall be further entitled to the fair value of the legal fees incurred by it if the Escrow Agent decides to act as its own counsel, and expenses in connection with such consultation and legal proceeding and shall be further entitled to receive from the Parties all reasonable expenses which are incurred by the Escrow Agent in connection with its acting as the Escrow Agent.

10.    The Escrow Agent shall only be required to notify the parties to this Escrow Agreement of every written notice which it receives hereunder if either it decides to do so or if such written notice requests that it notify the other parties to this Escrow Agreement of its receipt thereof.

11.    Nothing which is contained herein or in any instruments executed simultaneously herewith, shall prevent the Escrow Agent from representing as counsel anyone including, but not limited to, Scantek, Dr. Sagi, or the Payee in any matter

whatsoever, including but not limited to any action or proceeding which relates to this Escrow Agreement, or any instruments which are executed simultaneously herewith.

12.    Except as otherwise specifically provided for hereunder, no party to this Escrow Agreement shall be deemed to have waived any of his, her or its rights hereunder or under any other agreement, instrument or paper signed by any of them with respect to the subject matter hereof, unless such waiver is in writing and signed by the party waiving said right. Except as otherwise specifically provided for hereunder, no delay or omission by any party to this Escrow Agreement in exercising any right with respect to the subject matter hereof shall operate as a waiver of such right or of any such other right. A waiver on any one occasion with respect to the subject matter hereof shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

13.    The parties to this Escrow Agreement have not made any representations, warranties, or covenants which are not set forth herein with respect to the subject matter hereof, and this Escrow Agreement constitutes the entire agreement between them with respect to the subject matter hereof. All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Escrow Agreement.

14.    This Escrow Agreement shall not be changed, modified, extended, terminated, or discharged orally, but only by an agreement, in writing, signed by all of the parties to this Escrow Agreement.

15. All notices or other communications which are required or permitted hereunder shall be delivered to all parties hereto and shall be in writing and shall be mailed by First Class, Registered or Certified Mail, Return Receipt Requested, postage prepaid, or by a nationally known overnight delivery service with an acknowledgment of receipt as follows:

| | |
|---|---|
| If to Scantek: | Scantek Medical, Inc.<br>4 B Wing Drive,<br>Cedar Knolls, NJ 07927<br>Attn: Dr. Zsigmond L. Sagi, President<br>Facsimile No.: (973) 401-0459 |
| with a copy to: | Mintz & Fraade, P.C.<br>488 Madison Avenue<br>New York, New York 10022<br>Attention: Frederick M. Mintz, Esq.<br>Facsimile No.: (212) 486-0701 |
| If to Dr. Sagi: | Dr. Zsigmond Sagi, President<br>Scantek Medical, Inc.<br>4 B Wing Drive<br>Cedar Knolls, NJ 07927 |

Facsimile No.: (973) 401-0459

with a copy to:                    Mintz & Fraade, P.C.
                                        488 Madison Avenue
                                        New York, New York 10022
                                        Attention: Frederick M. Mintz, Esq.
                                        Facsimile No.: (212) 486-0701

To the Payee:                     Accordant Holdings, LLC
                                          853 East Valley Boulevard, Suite 200
                                        San Gabriel, CA 91776
                                        Attn: Angela C. Sabella

Copy to:                         _____
                                        _____

If to the Escrow Agent:         Mintz & Fraade, P.C.
                                        488 Madison Avenue
                                        New York, New York 10022
                                        Attention: Frederick M. Mintz, Esq.
                                        Facsimile No.: (212) 486-0701

with a copy to:                    Alan P. Fraade, Esq.
                                        18 Nob Court
                                        New Rochelle, New York 10804
                                        Facsimile No. (914) 636-3391

or in each case to such other address as shall have last been furnished by like notice. If mailing by Registered or Certified Mail is impossible due to an absence of postal service, notice shall be in writing and personally delivered to the appropriate address set forth above. Each notice or communication shall be deemed to have been given as of the date received by the addressee.

     16.    This Escrow Agreement shall in all respects be construed governed, applied and enforced in accordance with the internal laws of the State of New York, without giving effect to conflicts of law.

     17.    This Agreement shall be deemed to be an agreement entered into in the State of New York and made pursuant to the laws of the State of New York. Except as otherwise provided in Article "8" of this Escrow Agreement, the parties agree that they shall be deemed to have agreed to binding arbitration in New York, New York with respect to the entire subject matter of any and all disputes relating to or arising under this Agreement including, but not limited to, the specific matters or disputes as to which

arbitration has been expressly provided for by other provisions of this Agreement. Any such arbitration shall be by and pursuant to the rules then obtaining of the American Arbitration Association in New York, New York. In all arbitrations, judgment upon the arbitration award may be entered in any court having jurisdiction.    The parties specifically designate the Courts in the City, County and State of New York as properly having venue for any proceeding to confirm and enter judgment upon any such arbitration award. The parties hereby consent to and submit to personal jurisdiction over each of them by Courts of the State of New York in any action or proceeding to enforce the arbitration award, waive personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested in accordance with Article "15" of this Agreement. The parties agree, further, that the prevailing party in any such arbitration as determined by the arbitrators shall be entitled to such costs and attorney's fees, if any, in connection with such arbitration as may be awarded by the arbitrators; provided, however, that if a proceeding is commenced to confirm and enter a judgment thereon by the Courts of the State of New York and such application is denied, no such costs or attorney's fees shall be paid. In connection with the arbitrators' determination for the purpose of which party, if any, is the prevailing party, they shall take into account all of the factors and circumstances including, without limitation, the relief sought, and by whom, and the relief, if any, awarded, and to whom.

18.    The parties to this Escrow Agreement agree to execute any and all such other and further instruments and documents, and to take any and all such further actions reasonably required to effectuate this Escrow Agreement and the intents and purposes hereof.

19.    This Escrow Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

20.    This Escrow Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

21.    The persons executing this Escrow Agreement hereby represent that each is duly authorized to enter into this Escrow Agreement in the capacity specified, and upon request, will provide documentation to the Escrow Agent and the other party which supports his or her authority to enter into this Escrow Agreement.

[Signature Page Follows]

Please sign the attached counterpart of this Escrow Agreement where indicated below to acknowledge your agreement with the foregoing.

Very truly yours,

Mintz & Fraade, P.C.

By: _____

Alan P. Fraade

Scantek Medical, Inc.

By: _____

Dr. Zsigmond Sagi, President

Accordant Holdings, LLC

By: _____

Please sign the attached counterpart of this Escrow Agreement where indicated below to acknowledge your agreement with the foregoing.

Very truly yours,

Mintz & Fraade, P.C.

By: _____
Alan P. Fraade

Scantek Medical, Inc.

By: _____
Dr. Zsigmond Sagi, President

Accordant Holdings, LLC

By: _____