UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X  Case No. 08 cv 00453 (CM)

SCANTEK MEDICAL INC.,                                      :
                                                          :
       Plaintiff,                                        :     AFFIRMATION OF
                                                          :     KENNETH SUSSMANE
     vs.                                                 :
                                                          :
ANGELA CHEN SABELLA and ACCORDANT                         :
HOLDINGS, LLC,                                            :
                                                          :
      Defendants                                       :
---------------------------------------------------------- X

STATE OF NEW YORK    )
                        )ss.
COUNTY OF NEW YORK  )

        I, Kenneth Sussmane, being duly sworn, do depose and say, that:

        1.      I am the attorney for defendants in this action.

        2.      I submit this affirmation in support of defendants' motion to dismiss all of plaintiff's claims in this action.

        3.      I make this affirmation based on my review of filings made by plaintiff Scantek Medical Inc. with the U.S. Securities Exchange Commission.

        4.      Attached hereto as Exhibit C is Form 10KSB filed by Scantek on October 17, 2002 for the year ending June 30, 2002.

        5.      Attached hereto as Exhibit D is Form 10KSB filed by Scantek on October 13, 2000 for the year ending June 30, 2000.

        6.      Attached hereto as Exhibit E is Form 10QSB filed by Scantek on May 20, 2003 for the nine month period ending March 31, 2003.

        7.      Attached hereto as Exhibit F is the Amended Compliant in this action.

        8.      Scantek claims to be engaged in the business developing, manufacturing, selling and licensing of products and devices that assist in the early detection and diagnosis of disease. *Exhibit C, page 2.*

9. Mintz & Fraade, P.C. (the "Mintz Firm") is a law firm which acted as counsel to Scantek's counsel at all time relevant hereto.

10. Mintz & Fraade Enterprises, LLC ("Mintz LLC") is a New York limited liability company and an affiliate of the Mintz Firm. Upon information and belief Mintz LLC is Scantek's second largest shareholder, holding at least 3,300,000 shares of Scantek Common Stock issued in exchange for the legal services of the Mintz Firm and attorney Fred Mintz. Such shares include 3,000,000 shares (over 9% of Scantek's common stock) issued to the Mintz Firm as payment for $45,000 of legal services.

11. From 1999 through the quarter ending March 31, 2003, Scantek filed the periodic reports required of public companies by the SEC. For the periods after March 31, 2003, Scantek ceased filing its quarterly and annual reports (Forms 10Q and Forms 10K) and financial statements with the SEC.

12. Scantek reported the following financial information in its SEC filings:

| | 9 months ended March 31, 2003 | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|---|
| Accumulated Deficit | $(14,678,582) | $(12,849,147) | $(10,827,551) | $(8,466,380) | $(5,649,915) |
| Stockholder's deficiency | $(9,318,526) | $(8,280,364) | $(6,815,733) | $(5,001,859) | $(2,364,728) |
| Net Sales | 0 | 0 | $21,137 | $88,775 | $855,275 |
| Net Loss | $(1,527,435) | $(2,021,596) | $(2,361,171) | $(2,816,465) | $(1,579,568) |
| Weighted Average # shares of common stock outstanding | 32,857,889 | 26,557,923 | 20,521,527 | 18,431,820 | 17,679,575 |

*Exhibit C, pages F-4-5; Exhibit D, pages 3-4; and Exhibit E, pages 2-5.*

13.    Scantek's SEC filings reported negligible sales for the fiscal years ended June 30, 2000, and June 30, 2001, no sales for the fiscal year ended June 30, 2002, and no sales for the nine months ending March 31, 2003.  Each Form 10 K filed by Scantek reported that:

> "The Company's need for funds has increased from period to period . . .  Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Operating Officer and major shareholder."

*Exhibit C, page 30; and Exhibit D, page 28.*

14.    In order to fund the capital needs of Scantek, the Mintz Firm structured private placements pursuant to which Scantek offered to sell to investors a combination of its promissory notes and restricted common stock (collectively the "Securities"). From 1999 through 2003, Scantek's Forms 10K reported information regarding the following 18 private placements of the Securities under the heading "Recent Sales of Unregistered Securities":

|    | Date | Name | Number of Shares Issued Pursuant to Financing | Office |
|----|------|------|------|------|
| 1  | 12/1/98 | three individuals | 75,000 | |
| 2  | 7/1/99 | Sagi | 79,250 | Pres./CEO |
| 3  | 7/1/99 | Patricia Furness | 5,703 | V.P/Sec. |
| 4  | 7/1/99 | Louis Gottlieb | 25,000 | V.P. |
| 5  | 7/1/99 | Two individuals including Paul Nelson | 52,500 | Director |
| 6  | 12/30/99 | Two individuals including Paul Nelson | 7,500 | Director |
| 7  | 3/8/00 | Paul Nelson | 2,500 | Director |
| 8  | 3/8/00 | Louis Gottlieb | 23,750 | V.P. |
| 9  | 4/14/00 | Louis Gottlieb | 50,000 | V.P. |
| 10 | 4/14/00 | Paul Nelson | 2,500 | Director |
| 11 | 8/1/00 | Sagi | 67,900 | Pres./CEO |
| 12 | 8/1/00 | Patricia Furness | 8,750 | V.P/Sec. |
| 13 | 10/20/00 | Carriage House | 100,000 | |
| 14 | 12/14/01 | A lender | 300,000 | |
| 15 | 6/30/02 | two companies | 79,390 | |
| 16 | 6/30/02 | Sagi | 6,435 | Pres./CEO |
| 17 | 6/30/02 | Patricia Furness | 31,141 | V.P/Sec. |
| 18 | 8/20/02 | Sabella | 2,000,000 | |

*Exhibit C, pages 23-26; Exhibit D, pages23-25*

15.     Private placements of Securities after August 20, 2002 are not reported because Scantek ceased its SEC filings.

16.     The financial statements of Scantek filed with the SEC with its Forms 10K reported that:

(a) During the years ended June 30, 2000, 2001 and 2002 Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors secured notes in the face amount of $492,500 and 135,625 shares of common stock.

(b) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors unsecured notes in the face amount of $1,059,393 and 2,377,765 shares of common stock.

(c) During the years ended June 30, 2000, 2001 and 2002 Scantek engaged in private placements of Securities pursuant to which it offered and sold to Sagi and the Vice President of the Scantek unsecured notes in the face amount of $107,257 and 45,594 shares of common stock.

(d) During the years ended June 30, 2000, 2001 and 2002 Scantek engaged in private placements of Securities pursuant to which it offered and sold Sagi unsecured notes in the face amount of $1,128,684 and 153,585 shares of common stock.

*Exhibit C, page F-18; and Exhibit D, page F-16*

17.     The audited financial statements of Scantek and its SEC filings contain no reference to or discussion of the violation of any usury law by the officers, directors and third parties to whom Scantek issued the Securities.

18.     The 2,000,0000 shares issued to Sabella on August 20, 2002 were included in the 2,099,466 shares reported as issued for the year ended June 30, 2002, for which Scantek's auditors reported a "Value" of $2,099, or a "Value" of $2,000 for the 2,000,000 Sabella Shares. *Exhibit C, page F-6.* Such valuation reflects the fact that the Sabella shares were restricted and could not be sold without the filing of a registration statement or otherwise complying with the rules and regulations regarding sale of unregistered shares of stock. Such valuation reflects the facts that Scantek had no sales since December 2000, and that as of June 30, 2002, the date of Scantek's last audited financial statements, Scantek had a negative net worth of $.31 per share and an accumulated deficit of $.48 per share.

New York, New York
February 11, 2008

/s/ Ken Sussmane

_____
Kenneth Sussmane (KS 9301)

**EXHIBIT C**

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-KSB

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED JUNE 30, 2002**

**[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM _____ TO _____**

*COMMISSION FILE NUMBER 000-27592*

# SCANTEK MEDICAL INC.
(Exact name of registrant as specified in its charter)

```
        DELAWARE                              84-1090126
----------------------------            -------------------
(State or Other Jurisdiction              (I.R.S.Employer
 Incorporation                          or Identification No.)
 of Organization)
```

**4B WING DRIVE, CEDAR KNOLLS, NEW JERSEY 07927**
(973) 401-0434
(Address and telephone number, including area code, of
registrant's principal executive office)

321 Palmer Road, Denville, NJ 07834
(Former name, former address and former fiscal year,
if changed since last report)

**Securities registered pursuant to Section 12(b) of the Act: NONE**

**Securities registered pursuant to Section 12(g) of the Act:
COMMON STOCK, $.001 PAR VALUE**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

YES [X] NO [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to

Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-KSB or any amendment to this Form 10-KSB. [ ]

Aggregate market value of voting stock held by non-affiliates as of September 30, 2002 was approximately $891,994 (based upon the closing sales price of those shares reported on the National Association of Securities Dealers Bulletin Board for that day).

Number of shares of Common Stock outstanding as of October 1, 2002: 29,255,156.

**DOCUMENTS INCORPORATED BY REFERENCE: NONE**

INDEX

Part I
      Page
      Item 1.  Business      1

      Item 2.  Properties      21

      Item 3.  Legal Proceedings      21

      Item 4.  Submission of Matters to Vote of
          Security Holders      21

Part II

      Item 5.  Market for Registrant's Common Equity
          and Related Stockholders Matters      22

      Item 6.  Management's Discussion and Analysis
          of Financial Condition and Results
          of Operations      27

      Item 7.  Financial Statements      33*

      Item 8.  Changes in and Disagreements with
          Accountants on Accounting and
          Financial Disclosure      34

Part III

      Item 9.  Directors and Executive Officers;      34
          Promoters and Control Persons;
          Compliance with Section 16(a)
          of the Exchange Act

      Item 10.  Executive Compensation      36

      Item 11.  Security Ownership of Certain Beneficial
          Owners and Management      38

      Item 12.  Certain Relationships and
          Related Transactions      41

Part IV

      Item 13.  Exhibits and Reports on Form 8-K      43

      Signatures      48

      * Page F-1 follows page 33

PART I

All statements contained herein that are not historical facts, including, but not limited to, statements regarding anticipated growth in revenue, gross margins and earnings, statements regarding the Company's current business strategy, the Company's projected sources and uses of cash, and the Company's expectations, are forward-looking statements in nature and involve a number of risks and uncertainties. Actual results may differ materially. Among the factors that could cause results to differ materially are the following: the availability of sufficient capital to finance the Company's business plans on terms satisfactory to the Company's competitive factors; the ability of the terms satisfactory to the Company's competitive factors; the ability of the Company to adequately defend or reach a settlement of outstanding litigations and investigations involving the Company or its management; changes in labor, equipment and capital costs; changes in regulations affecting the Company's business; future acquisitions or strategic partnerships; general business and economic conditions; and other factors described from time to time in the Company's reports filed with the Securities and Exchange Commission. The Company wishes to caution readers not to place undue reliance on any such forward-looking statements. These statements are made pursuant to the Private Litigation Reform Act of 1995 and, as such, speak only as of the date made.

## ITEM 1. BUSINESS

### GENERAL

Scantek Medical, Inc. (OTCBB: SKML.OB) (the "Company"), a Delaware corporation, was organized under the name "Jenncor Acquisition Inc." on June 10, 1988, to obtain funding for prospective business opportunities available to publicly held entities. Until October 3, 1991, when the Company exchanged its shares with Scantek Digital Systems Inc. ("SDSI"), the Company's only business activities involved raising capital through a public offering pursuant to Regulation A of the Securities Act of 1933, as amended (the "Act"). Pursuant to the share exchange between the Company and SDSI, the then holder of several patents relating to a medical product known as the BreastCare(TM)/BreastAlert (TM), Differential Temperature Sensor/Breast Abnormality Indicator (the "BreastCare(TM)/BreastAlert(TM)"), SDSI became a wholly-owned subsidiary of the Company. The Company was formerly a developmental stage company and became fully operational in early 1999.

On June 6, 2000, the Company opened its web site, www.scantekmedical.com. The web site provides information about the Company and its business, and its principal product, BreastCare(TM)/BreastAlert(TM). Also included are summaries of clinical studies, sales and distribution progress and plans, press releases and financial information, participation at medical conferences, and links to other sites for information on breast cancer.

-1-

The Company is headquartered in Cedar Knolls, New Jersey, where it maintains approximately 14,000 square feet of manufacturing and administrative space. At this facility, the Company has two production lines in which to manufacture the BreastCare(TM)/BreastAlert(TM). These production lines are capable of producing two million units per shift annually. The Company maintains an administrative staff and intends to add to its staff in key functional areas, pending funding of the Company and revenue from sales of the BreastCare(TM)/BreastAlert (TM) units.

The Company is a medical company engaged in developing, manufacturing, selling and licensing of products and devices to assist in the early detection and diagnosis of disease. At the present time, the Company is focusing on manufacturing, selling and licensing the Company's first product, the BreastCare(TM)/BreastAlert(TM) in response to the global demand for the early detection of breast disease, a major threat to women's health in developing as well as industrial countries. In today's health care environment, containment of medical care cost is a major priority. The Company has focused its business on easy to use low cost products and devices for its domestic and international markets, which will have an impact on preventive health care and cost containment. The BreastCare(TM)/BreastAlert(TM) has United States Food and Drug Administration ("FDA") marketing clearance; the BreastCare(TM)/BreastAlert(TM) is to be used by physicians as an adjunct to clinical breast examination, mammography and other established procedures for the detection of breast disease. The BreastCare(TM)/BreastAlert(TM) is a single-use, non-invasive, easy to use and cost-effective test to alert the physician to the possibility of a physiological condition that may be thermally active cancer.

The BreastCare(TM)/BreastAlert(TM) can detect cellular abnormalities as small as one-half centimeter in diameter as established through biopsy proven tumors. The Company believes that this technology upon which the BreastCare(TM)/BreastAlert(TM) is based will be useful in measuring certain other body disorders.

**THE PRODUCT**

At present, the fear of breast cancer continues to escalate, comparatively because little is actually known with respect to managing breast cancer. It is estimated worldwide, that each year, over 300,000 women will die from breast cancer. In fact, according to the America Cancer Society, this grave disease has been identified to be the medical issue of highest priority for women's health. Moreover, it cannot be predicted who will develop this epidemic cancer; any woman at any age may develop breast cancer. Breast cancer is the second leading cause of death for women in the U.S., but the most common for women between the ages of 35 and 54. Worldwide, breast cancer ranked highest as the leading cause of cancer deaths for women. Early detection and diagnosis of breast cancer are important in the reduction of mortalities.

measure, mammography. In developing countries however, mammography is not readily available to women, even for those women who have the resources to pay for such. There is a void between manifestation of the breast cancer and

detection due to unavailable screening systems. Failure to intervene during this period may significantly reduce the likelihood of survival because the cancer then metastasizes. The American Cancer Society, on Cancer Facts & Figures in 2002, reported that if cancer is localized at the time of diagnosis, there is a 96% chance of a 5-year survival rate, which has risen from 72% in 1940. Nevertheless, in spite of research and efforts to detect breast cancer in the early stages, the rate of mortality due to breast cancer in developing countries has consistently increased over the past four decades.

Management believes that the BreastCare(TM)/BreastAlert(TM) will help to detect breast cancer in its early stages. Management believes that the BreastCare(TM)/BreastAlert(TM) will assist in the recognition of abnormal early cellular development by recording the heat differentiation of corresponding areas of the breast. The BreastCare(TM)/BreastAlert(TM) is not a definitive test for cancer (i.e., a biopsy, the removal and examination of, usually microscopic, tissue from the living body, performed to establish a precise diagnosis) but is a risk marker to identify and follow breast abnormalities by means of temperature conductivity integration when used adjunctly with clinical palpation and mammography.

One of the important biological activities of malignant tumors is the increased rate of growth as compared to the surrounding or "host" tissue. The malignant propensities are directly related to the speed of cell division; this in turn is reflected by accelerated local metabolism, which is adequately supported by increased blood and lymphatic vascularity. These biological alterations can be detected by measuring temperature differences in the tumor and its immediate environment, or by comparing to the same area of the opposite breast.

The BreastCare(TM)/BreastAlert(TM) is designed to assist in the detection of pathology of the breast by recognizing "significant" heat differences in the underlying tissue of a particular area, by comparing corresponding (mirror-image) segments of one breast to the other. The cause of the hyperthermia cannot be determined by this test alone; therefore, the BreastCare(TM)/BreastAlert(TM) serves as an early warning signal to alert the doctor to the fact that there is evidence of a pathological process, one of which could be thermally active breast cancer, which should be further evaluated within a particular area of the breast.

The BreastCare(TM)/BreastAlert(TM) is designed to complement, not replace, conventional breast abnormality screening methods and devices. It is intended for use by women of all ages. The BreastCare(TM)/BreastAlert(TM) is available for a routine, primary office care procedure used by physicians, gynecologists and other medical specialists as part of a breast disease monitoring program adjunctively with Breast Self Examination (BSE), Clinical Breast Examination (CBE), (depending upon a patient's age, family history, and other factors) mammography and other established clinical procedures.

-3-

The basis for the BreastCare(TM)/BreastAlert(TM) is based upon data going back a number of years which show that blood on the venous side of breast cancers is warmer than blood on the arterial side of the lesion. This indication of heat generation is presumably due to increased metabolic rate of neoplastic tissue, including more rapid cell division, angiogenesis, etc. However, heat is not specific to neoplasia and may for example be due to inflammation. The presence of asymmetrical patterns (one side is warmer than the other by 2 degrees Fahrenheit) is a sign that may be detected with the BreastCare(TM)/BreastAlert(TM).

The BreastCare(TM)/BreastAlert(TM) consists of a pair of mirror-image, non-invasive, lightweight, disposable soft pads, each of which has three wafer-thin foil segments containing columns of heat sensitive chemical sensors that change color from blue to pink reflecting an 8.5 degree temperature range between 90 and 98.5 Fahrenheit. When placed against a woman's breast inside her brassiere for a period of 15 minutes, the BreastCare(TM)/BreastAlert(TM) registers the temperature variations due to heat conducted from within the breast tissue to the surface of the skin. The result will be digitally, not analogically, indicated by color changes for each temperature gradation. Significant temperature differences (2 degrees Fahrenheit or four bars) in the corresponding areas of the breast may indicate an abnormal unilateral thermal activity long before a lump is discovered by self-examination, clinical examination or other detection methods such as mammography, ultrasound, etc. Accordingly, by comparing the mirror-image temperature differences between the two breasts registered by the BreastCare (TM)/BreastAlert(TM), a determination can be made as to whether a sufficient abnormality is present to warrant further site-specific testing by other diagnostic techniques, including, but not limited to mammography and/or biopsy. The BreastCare(TM)/BreastAlert(TM) test does not replace recommended guidelines for scheduled mammographic screening.

The BreastCare(TM)/BreastAlert(TM) is a safe, non-invasive, economical and easy to use test. The BreastCare(TM)/BreastAlert(TM), which is disposable, can be administered and evaluated by health care providers after minimal instruction and a permanent record of results can be placed in the patient's files. Management believes that the utilization of the BreastCare(TM)/BreastAlert(TM) is cost effective and when used in combination with a mammographic work-up or at intervals of recommended screenings, will have an impact on breast cancer mortality and improve a woman's preventive health strategy.

Infrared thermography for the evaluation of breast lesions was introduced in 1956, and systems employing thermosensitive liquid crystal films have generated renewed interest since 1978. Studies by Dr. Michael Gautherie, University of Strasbourg, France and others dating from 1970 have directly evaluated the heat of cancerous breast tissue compared with that of healthy breast tissue. These studies found that tumor temperature was always higher than the surrounding temperature and suggested that the increase in tumor heat resulted from an increased metabolism. Furthermore, two other phenomena were found to occur: (i) tumor heat was found to be transported within the surrounding breast tissue (principally by blood convection through the veins) resulting in local or diffuse increases in skin temperature and (ii) vascular changes were observed in the tumor area and further in the subcutaneous breast tissues. In short, both hyperthermia and hypervascularization were found to have occurred in the tumor and at its periphery, in comparison to the temperature and blood flow of healthy tissue in the contralateral breast. Further research by Dr. Gautherie and others has demonstrated an unequivocal relationship between the metabolic heat production of cancer tissue and the doubling time of tumor volume: the faster the tumor grows the more heat it generates.

The BreastCare(TM)/BreastAlert(TM) measures underlying breast tissue temperature and not skin surface temperature by retaining emitted heat when the BreastCare(TM)/BreastAlert(TM) is placed against the breast. It differs from preexisting infrared and liquid crystal thermography techniques, which allow the heat to escape or radiate during measurement. The BreastCare(TM)/BreastAlert(TM) takes into consideration that the average temperature patterns of a healthy woman's breast are closely symmetrical. This method detects abnormalities by comparing the temperature differences in the corresponding mirror image areas of a woman's breast.

Recently, the scientific foundation for the BreastCare(TM)/BreastAlert(TM) effectiveness has been considerably strengthened. Comprehensive research has established in detail the mechanisms by which malignancies radically alter the host tissue environment, notably through two quantitatively measurable processes: (i) A tumor significantly elevates overall rates of metabolic activity and (ii) A tumor greatly intensifies capillary vascularization in host tissues. In particular, this latter process of angiogenesis was a very critical finding because it is the probable mechanism by which cancers with an enhanced mestastic potential prepare to invade the host. These are only two of a number of measurable host alterations and each is associated with asymmetric heat distribution.

-5-

Development and clinical trials of the BreastCare(TM)/BreastAlert(TM) were completed between 1980 and 1984. This testing showed that the BreastCare(TM)/BreastAlert(TM) is capable of detecting lesions in the breast earlier than through clinical examination by sensing metabolic changes in the breast. Biopsy and screening clinical trials were conducted at well-established U.S. institutions to assess and validate BreastCare (TM)/BreastAlert(TM) usefulness in detecting breast cancer at Memorial Sloan-Kettering Hospital in New York, at M.D. Anderson Memorial Hospital in Houston, at Brotman Memorial Hospital at UCLA, and at Guttman Breast Diagnostic Institute in New York. The BreastCare (TM)/BreastAlert(TM) was found to be accurate in terms of the documented sensitivity of the BreastCare(TM)/BreastAlert(TM) (true positive for cancer) and specificity (true negatives - no cancer detectable by accepted medical methods) in relation to the biopsy (the "Gold Standard" diagnostic procedure), clinical breast examination and mammography.

BreastCare(TM)/BreastAlert(TM) Test Results vs. Biopsy Findings: In the first study in 1984, the BreastCare(TM)/BreastAlert(TM) was the focus of a clinical trial involving 179 women who underwent a biopsy. This multi-center study was conducted at three prestigious cancer institutions: M.D. Anderson Hospital and Tumor Institute, Memorial Sloan-Kettering Hospital, and Brotman Memorial Hospital. The BreastCare(TM)/BreastAlert(TM) tested positive for the suspicion of cancer in 93 of the 112 women who were diagnosed with cancer, for an overall sensitivity index of 83.0% and was notably stronger in detecting unilateral cancers - a sensitivity index of 88.1% (that is, 74 of the 84 unilateral cancers diagnosed). The frequency of false negatives was higher among patients who underwent biopsies of both breasts (less than 3% of breast cancers are believed to be bilateral generally).

The biopsy results were subjected to a breakdown by the size of the cancer detected and the patient's age. The threshold tumor size detectable with the BreastCare(TM)/BreastAlert(TM) is five millimeters and up, an early-stage cancer; out of a total of eight cancers under 1.0 centimeters which were diagnosed during the screening study, seven tested positive using the BreastCare(TM)/BreastAlert(TM). It appears that the BreastCare(TM)/BreastAlert(TM) has the proven ability to detect small, early-stage cancers which are most likely to be associated with favorable treatment outcomes. Moreover, a breakdown of the BreastCare(TM)/BreastAlert(TM) results by age suggests an especially high efficacy in detecting suspicious abnormalities in younger women. This is noteworthy because a pre-screening method is critically needed for women under 50 who have not been urged or who have chosen not to seek a mammogram on an annual basis, since fast-growing, potentially aggressive cancers are associated with the women in this age distribution. The BreastCare(TM)/BreastAlert(TM) will be used adjunctively with palpation and mammography.

BreastCare(TM)/BreastAlert(TM) Test Results vs. Clinical Findings on Mammography and Physical Examination. In the second clinical trial study in 1984, the BreastCare(TM)/BreastAlert(TM) was studied prospectively in 2,805 asymptomatic women for the test's ability to detect abnormalities suspicious of breast cancer. Specifically, the BreastCare(TM)/BreastAlert(TM) data was compared to the mammographic and clinical findings, as well as to a limited number of cytological findings. Of the 2,805 women screened, 99 were recommended for a biopsy based on the suspicion of cancer in 86 of the 99 women (a sensitivity index of 86.9%). Fifty-nine biopsies were subsequently performed and 13 of the 15 cancers diagnosed were positive for the BreastCare(TM)/BreastAlert(TM) test (a sensitivity index of 86.7% against biopsy). Of the 2,706 women who had no suspicion of cancer based on mammogram and/or clinical examinations, 2,340 had negative BreastCare (TM)/BreastAlert(TM) results (a specificity index of 86.5%).

The BreastCare(TM)/BreastAlert(TM) is accurate, both in terms of sensitivity and specificity. Notably, the very low false positive rate (true negatives with a positive BreastCare(TM)/BreastAlert(TM) test) of 13.5% for the initial screening trial of BreastCare(TM)/BreastAlert(TM) actually assumes two additional circumstances: (1) that no mammographically undetectable cancers occurred; and (2) that the rate of subsequent cancers within this so-called false positive group is not statistically higher than that of the population of women as a whole. A lower true false positive rate for the BreastCare(TM)/BreastAlert(TM) can be assumed if abnormal thermal distribution is a risk marker for future disease incidences, as had frequently been suggested. In fact, several publications have documented a positive predictive value for thermographically based tests to detect future cancers. The screening study demonstrated reliability approaching that of mammography and significantly greater than distantly related thermographic techniques.

In conclusion, these studies have demonstrated the following with respect to use of the BreastCare(TM)/BreastAlert(TM): (i) the BreastCare (TM)/BreastAlert(TM) measures differences in temperature between corresponding areas of the left and right breasts, (ii) the BreastCare (TM)/BreastAlert(TM) is a safe device; no adverse reactions were observed, (iii) minimal variances were found due to clinical influences of hormones, (iv) a positive test result was found to be a strong indication that a breast abnormality exists which warrants further examination by a physician with respect to the possibility of breast cancer; and (v) it is advisable to confirm a positive test result with a repeat test. The best results were achieved upon arising in the morning, a time which is characterized by low body temperature in normal tissue (a positive result was confirmed with a retest). Although a negative test result was found to indicate a greatly reduced likelihood of cancer, it does not mean that the woman is free of breast abnormalities, including cancer. The BreastCare(TM)/BreastAlert(TM) may fail to detect the very slow growing (cold) tumors which have a relatively low rate of metabolic activity. In a study of 200 asymptomatic women, comparison of two successive tests indicated that 12 of 178 negative scores (7%) shifted to a positive level in the second test.

In the screening case of 2,805 women at the Guttman Breast Diagnostic Institute, the observed 13.5% "false positive" index of the BreastCare (TM)/BreastAlert(TM) test on 366 women did not correlate with the Guttman clinical staff conclusion on any breast abnormality indicating the positive of cancer. The observed 13.5% "false positive" index does not mean that the BreastCare(TM)/BreastAlert(TM) yielded a positive reading in 13.5% of the women with no abnormalities of the breast. The clinical staff screens for conditions that warrant investigation regarding the possibility of breast cancer. Thus, breast abnormalities that produce elevation of temperature in one breast may result in a positive BreastCare(TM)/BreastAlert(TM) score, but may be classified as nonmalignant by the clinical staff. Furthermore, because the thermal signal will often proceed the tentative confirmation by imaging or clinical findings by trained physicians, a number of women classified as "false positive" could have cancer and would be confirmed by biopsy at a later time. Various follow-up studies using other thermology technologies have shown this to be true and unofficial 1-year follow-ups by Sloan Kettering of the false positive results were proven to be fast growing fatal cancers. The 2,805 women in the Guttman study may not be considered representative of the general population since many symptomatic women were referred to this center by other concerned physicians (In a separate home study test of 200 asymptomatic women, only 5.5% had false positive).

## ADDITIONAL CLINICAL STUDIES

Through the efforts of the Company, the European Institute of Oncology, located in Milan, Italy, has performed clinical studies on the BreastCare(TM)/BreastAlert(TM). The study, which involves 250 women, was under the supervision of Dr. Virgilio Sacchini, a world-renowned surgical oncologist. The final report is forthcoming.

On June 11, 1999, at the International Mastology Meeting in Sao Paulo, Brazil, Dr. Alfred Barros, surgical oncologist and president of the Brazilian Society of Mastology, and Dr. Carlos Menke, gynecologist, professor of the University of Rio Grande Do Sul and Mastologist of the Clinical Center of Porto Alegre, presented the results of the Brazilian multi center clinical study of the Company's BreastCare(TM)/BreastAlert (TM) device. The clinical study was conducted by physician members of the Brazilian Society of Mastology using a uniform protocol to examine the capabilities of the BreastCare(TM)/BreastAlert(TM) with a screening method and diagnostic validation of cases suspicious of cancer. The BreastCare(TM)/BreastAlert(TM) was compared with corresponding mammographic (909 cases) and /or biopsy (151) results. The results were analyzed and evaluated by Dr. Alvaro Ronco, the head of Cancer Epidemiology at Pronacam (National Breast Cancer Program, Ministry of Public Health of Uruguay) and a member of the New York Academy of Sciences and of the Society for Epidemiological Research in Baltimore as follows: (i) If clinical breast examination is normal or doubtful (absence of suspicion of cancer) and the BreastCare (TM)/BreastAlert(TM) test is negative, the probability of absence of cancer confirmed by biopsy is around 95%; (ii) if clinical breast examination is suspicious of cancer and the BreastCare(TM)/BreastAlert(TM) is positive, the probability of having cancer is about 98%; and (iii) the performance of the BreastCare(TM)/BreastAlert(TM) is slightly better in women under 50 years old, who are mainly pre menopausal.

-8-

In August 1999, the BreastCare(TM)/BreastAlert(TM), was presented by speakers via satellite at the European School of Oncology Congress in Rio de Janeiro, Brazil. The Chairmen were Professors Umberto Veronesi (Italy) and Jose A. Pinotti (Sao Paulo)

Dr. Virgilio Sacchini, Surgical Oncologist of the European Institute of Oncology Milan, Italy presented "Experience in the Clinical Application of the BreastCare(TM)/BreastAlert(TM) in Medical Practices", via satellite, which related to the European and Brazilian experience which discussed: 1) The need for a low-cost, accurate test, which provides immediate results with physical examination, and mammography; 2) A new technology called BreastCare(TM)/BreastAlert(TM), which can supply the need; 3) That there is evidence of recent clinical studies in South America and Europe that suggest the evaluation of heat on the surface of the breast, that BreastCare(TM)/BreastAlert(TM) can be an auxiliary modality in diagnosing breast cancer; 4) With the new modality, objective results are produced immediately; and, 5) That the technology is based on cellular epithelial increases in temperature when abnormal metabolic process happens, which is proliferation of atypical epithelial.

Dr. Carlos Menke, Gynecologist, professor of University of Rio Grande Do Sul and Mastologist of the Clinical Hospital of Porto Alegre also spoke on the Brazilian experience with the clinical studies. Management is very confident with the results of the studies i.e., when clinical examination is normal and BreastCare(TM)/ BreastAlert(TM) is negative, the probability of the absence of breast cancer is 95%, and if clinical examination is suspicious and BreastCare(TM)/BreastAlert(TM) is positive, the probability of the presence of cancer is 98%.

In September 1999, the BreastCare(TM)/BreastAlert(TM) was presented at its exhibition and several symposiums at the III North East Mastology Congress in Salvador-Bahia-Brazil. Dr. Ezio Novais Dias, president of the Congress, is a renowned gynecologist and mastologist at the San Rafael Hospital in Salvador-Bahia. Dr. Dias is vice president of the International Society of Mastology, President of the Brazilian Mastology School and is the new president of the Brazilian Mastology Society.

The Company's BreastCare(TM)/BreastAlert(TM) was given extensive exposure at the Congress by some of the most renowned mastologists in South America, as well as, in the world. Dr. Jose Antonio Ribeiro Filho, Gynecologist and Mastologist, and President of the Brazilian Academy of Medicine coordinated a symposium on "BreastCare(TM)/ BreastAlert(TM); A New Method of Diagnosis of Breast Cancer."

Also Dr. Alvaro Ronco, head of Cancer Epidemiology at Pronocam (National Breast Cancer Program, Ministry of Public Health of Uruguay), member of the New York Academy of Sciences (New York) and of the Society for Epidemiological Research (Baltimore) presented the "Epidemiology Aspects with BreastCare(TM)/BreastAlert(TM)."

Dr. Alfredo Barros, Gynecologist and Mastologist at University Medical Hospital in São Paulo and president of the Brazilian Mastology Society gave the results of the Brazilian Mastology Society's "BreastCare(TM)/BreastAlert(TM) clinical studies." Dr. Carlos Henrique Menke, gynecologist, professor at University of Rio Grande Do Sul and Mastologist at the Clinical Center of Porto Alegre, presented "Clinical Applications of BreastCare(TM)/BreastAlert(TM)."

The Company anticipates that such studies, as well as future studies, will play a vital role for future screening projects in hospital and clinical settings.

## REGIONAL REPORT: SOUTH AMERICA

The Company has focused a substantial portion of its resources in South America. The Company's efforts, though not well funded, have provided an important proving ground for the Company's operating model, which consists of
(i) regionalized production and assembly, supported by local marketing partners;
(ii) the support of opinion leaders, medical societies and mastologists; (iii) public and medical awareness of the advantages of the BreastCare (TM)/BreastAlert(TM) screening; (iv) organized forums and training for doctors by region; and (v) government screening programs. The Company intends to deploy this model in other regions throughout the world. A summary of the Company's efforts in South America are as follows:

In January 1998, the Company organized a wholly owned subsidiary, Scantek Medical S.A., Inc., an Uruguayan company, to distribute the BreastCare(TM)/BreastAlert(TM)in South America.

Through its Brazilian subsidiary, the Company signed an agreement with the State of Pernambuco in December 1999. The State of Pernambuco has the second largest concentration of hospitals in Brazil offering quality care and is also the most desirable location for production, shipping, financing and tax incentive.

The State of Pernambuco and the federal government has offered various incentives including acreage, at a reduced price, to build the facility, a 75% reduction in income taxes through 2013, free shipping outside the state, and in connection with the federal programs offered in Northeast Brazil, financing programs to help fund the operations and capital improvements.

In 2002, the Company's Brazilian subsidiary received notification of a termination of its agreement with a federal program organized to develop the Northeast area of Brazil. The Company's Brazilian subsidiary was approved to receive funding but failed to fulfil certain milestones by December 31, 2001.

On June 1, 2000 Scantek Medical do Brasil Ltda signed letters of commitment with the Infantile Maternal Institute of Pernambuco ("IMIP") and Unimed Recife ("Unimed").

-10-

IMIP will use the BreastCare(TM)/BreastAlert(TM) in a pilot screening program for the detection of breast cancer. Scantek Medical do Brasil Ltda is supporting the pilot program by donating BreastCare(TM)/ BreastAlert(TM) units. The IMIP will reaffirm its social commitment by developing and incorporating the BreastCare(TM)/BreastAlert(TM) usage in its pilot screening program.

Unimed, a Brazilian healthcare provider, will incorporate the BreastCare(TM)/BreastAlert(TM) into the program of approved examination procedures for the detection of breast cancer. Unimed Recife is part of Unimed, a national organization that is a major health care provider for over 11 million participants in Brazil. Scantek Medical do Brasil Ltda is supporting this pioneering institution in the private sector of the medical community in Recife with the first sale to Unimed for 3,000 BreastCare(TM)/BreastAlert(TM) units.

Both IMIP and Unimed programs will be molded after the methodology used at the Gynecology and Obstetrics of the University of Medicine of Sao Paulo University.

In early July 2001 a classification number was assigned to BreastCare(TM). Thereafter, based on the State of Rio de Janeiro's classification number assigned to BreastCare(TM), any government agencies, municipalities and states in Brazil will not have to go through any preliminary process before ordering the BreastCare(TM).

At the end of July 2001, the Company's Brazilian Managers and medical representatives met with the Health Municipal Partnership for Baixada Fluminense (CISBAF) to discuss the expansion of the Women's Health Project for the Baixada Fluminense territory for an approximate $3 million order. Baixada Fluminense is a region in the northern section of the State of Rio de Janeiro composed of 13 municipalities with an aggregate population of 4 million people and 71 health centers. CISBAF is the representative for all the municipalities of the Health Ministry in Brazil. CISBAF is the most important health organization in Baixada Fluminense. The final agreement and receipt of the purchase order are anticipated before the end of June 2003.

In August/September 2001, Fiocruz, a government agency in the Ministry of Health assisted in the BreastCare(TM) educational program for the Women's Health Program for the City of Nova Iguacu.

The Company plans to ship the BreastCare(TM)/BreastAlert(TM) from the United States until a production facility in Brazil is operational.

### FEDERAL PROGRAM

In October, 1999, the Company donated 2,100 BreastCare(TM)/ BreastAlert(TM) units to Fiocruz, a federal agency in Recife, Pernambuco-Brazil to be used in a pilot screening project for 2,000 women over 40 years of age. Dr. Alexandre Bezerra de Carvalho, Director of CPqam/Fiocruz, of the Ministry of Health organized the government-sponsored project specifically for validation of BreastCare(TM)/BreastAlert(TM)'s usefulness in a major breast cancer-screening program being organized in Brazil.

-11-

This pilot program is intended to prove the viability of the BreastCare(TM)/BreastAlert(TM) as a low cost, accurate test to increase the indexes of early detection of breast cancer in Brazil. With the assistance of SUS (Public System of Health), the Primary Assistance Program uses Sanitary Agents (skilled health personnel) to screen indigent women for breast cancer with the BreastCare(TM)/BreastAlert(TM) test. The Company is confident of the acceptance of the use of BreastCare(TM)/BreastAlert(TM) by Agents of Health (ACS), the Ministry of Health and Secretaries of Health. BreastCare(TM)/BreastAlert(TM) has proven its value in the Fiocruz pilot cancer project. The Company is anticipating to receive confirmation from the government of Pernambuco to confirm BreastCare(TM)/BreastAlert(TM) usage in its screening program.

As is known, in developed countries, the strategy of early detection of breast cancer is based on the wide use of mammography for women over 40 years of age. In developing countries the lack of mammography equipment, trained human resources and financial resources are major constraints to use this strategy. According to Dr. Bezerra de Carvalho, Brazil would need 4,000 mammography machines to assist the population of approximately 120 million people that uses the Public System of Health of which about 14.5 million women who are over 40 years of age. This gives a good picture of the dimension of the problem in Brazil.

## SAO PAULO

In December 1999, BreastCare(TM)/BreastAlert(TM) has been integrated into a very important Brazilian Breast Cancer Prevention Collaborative Project in Sao Paulo Brazil. The Collaborative Project is being coordinated by Professor Jose Aristodemo Pinotti, and is being implemented by the Gynecology Clinic of the University Medical School of Sao Paulo, with the support of the Brazilian Mastology Society, Anna Bove Foundation and "Fundacao Pro Mulher" at the Clinical Hospital of the University at Sao Paulo.

The Company's BreastCare(TM)/BreastAlert(TM) is being used in adjunct with clinical breast examination and the Gail Risk Factor (criteria used to measure ones risk for breast cancer) in a pilot breast cancer screening program at the Gynecology Clinic of the University Medical School of Sao Paulo. This pilot breast cancer-screening center is the first collaborative project to establish Breast Cancer Screening Centers and the integration of BreastCare(TM)/ BreastAlert(TM) in the detection process.

The cases detected at the Breast Cancer Screening Centers will be properly guided to diagnosis and treatment. This process of referral will be facilitated by the fact that "PRO-MULHER" (a private, non-profit institution) is linked to Gynecologic services under Dr. Pinotti at Sao Paulo University, which have substantially all the facilities for diagnosis and treatment of breast cancer, and after the program is completed in the first half of 2003 the final report will be issued.

Brazil and its various states are currently back to where it started in terms of Breast Cancer Control Programs, but are undergoing a transition to provide better screening for women.

On April 15, 2000, D-Lanz Development Group, Inc. ("D-Lanz") and the Company entered into an agreement to amend its previous license agreement dated April 29, 1997 and amended June 11, 1999. D-Lanz had a change in control and the License will be assigned to a new corporation, Global Agri-Med Technologies, Inc. ("Global"). The Company agreed to assign and transfer the license to Global, which includes the exclusive license in Chile and Singapore. In addition, the Company has agreed to give Global non-exclusive license extensions to Africa, Korea, and South Asia. Global must receive final clearance from the Company before any participation or distribution can proceed in any city, state, territory or country in the non-exclusive extensions as stated above. Both parties have agreed to update certain terms in the previous agreement that will be beneficial to both parties.

## REGIONAL REPORT: EUROPE

Management of the Company has currently suspended the expansion into Europe due to limited availability of human and financial resources. However, strategic planning with potential European partners have been examining the model it established in South America and are designing a plan for the target markets.

On July 14, 1999, the Company granted an exclusive license to NuGard HealthCare Ltd. ("NuGard"), an Irish Company, to market the Company's BreastCare(TM)/BreastAlert(TM) in Ireland and the United Kingdom. Pursuant to this licensing agreement, NuGard will pay a non-refundable licensing fee of $350,000 in various stages, of which $59,000 was received as of June 30, 2000, and the Company received common shares equivalent to fifteen (15%) percent of NuGard's total outstanding common shares. The purchase price will range from $10 to $15 per unit - FOB US. The license agreement requires minimum purchases of 5,000 units a month and payments of licensing fees, both of which NuGard is in default. At this time, the Company has not renegotiated the license agreement.

Through the efforts of the Company, the European Institute of Oncology, located in Milan, Italy, has performed clinical studies on the BreastCare(TM)/BreastAlert(TM). The study, which involved 250 women, under the supervision of Dr. Virgilio Sacchini, a world-renowned surgical oncologist. The final report is forthcoming in 2003.

In order to sell medical devices to the new European Community, a Certification Europe ("CE") is required, which is based primarily upon documentation of a compliant Quality Control System. In August 1999, the Company received a CE for the BreastCare(TM)/BreastAlert(TM).

## REGIONAL REPORT: UNITED STATES

The Company 's goals in North America for the immediate future are to review and reorganize marketing and sales, utilizing the Company's experience and approach it has used in South America. However, in order to accomplish this,
additional funding will be needed to implement a new marketing and sales strategy in order to re-launch the BreastCare(TM)/BreastAlert(TM), which it anticipates will begin 10 to 12 months after major financing is completed.

-13-

Pursuant to a License Agreement, dated March 17, 1995, as amended on July 31, 1995, October 10, 1995 and May 11, 1995, together with three extensions on February 26, 1996, March 17, 1996 and April 29,1996, the Company granted HumaScan Inc. ("HumaScan") an exclusive license to manufacture and sell the BreastCare(TM)/BreastAlert(TM) in the United States and Canada. On March 15, 1999, pursuant to a Settlement Agreement, dated as of the 11th day of March 1999, the Company regained the rights to market and sell its BreastCare (TM)/BreastAlert(TM) in the U.S. and Canada. Pursuant to the Settlement Agreement, all licensing agreements between the Company and HumaScan, which gave HumaScan the right to manufacture, market and sell the BreastCare(TM)/BreastAlert(TM), were terminated. Pursuant to the original and amended licensing agreements, HumaScan was indebted to the Company for failure to pay license fees, royalties and other sums of money. In exchange for the cancellation of $575,000 of indebtedness, due to it by HumaScan and for the payment by the Company to HumaScan of an additional $340,000, HumaScan agreed to assign certain special manufacturing equipment, furniture, raw materials, tools, materials, laboratory equipment and inventory of HumaScan for the manufacture of the BreastCare(TM)/BreastAlert(TM). In addition, the Company received 150,000 shares of HumaScan's common stock as part of the Settlement Agreement.

The Company has two complete sensor manufacturing and assembly lines for the production of the BreastCare(TM)/BreastAlert(TM) product. The value of these two manufacturing lines is estimated by the Company to be approximately $5.5 million.

On July 11, 2000 the Company was issued a new patent for its Differential Temperature Sensor Device For Use in the Detection of Breast Cancer. The patent No. 6,086,247 will expire on February 5, 2018, twenty (20) years from the date of filing. The patent was filed on the invention for improvements over the prior art.

On October 24, 2000, the U.S. Letters Patent No. 6,135,968 was issued for its Differential Temperature Measuring Device and Method for prostate examination. The device is trademarked under the name ProstAlert. The patent will remain in effect for 20 years after initial filing, expiring September 10, 2017. Preliminary testing was done in 1998 with very promising results. The Company will be unable to expand its product line unless additional funding is completed. Clinical trials need to be performed to determine the efficacy of the test with results presented to the United States Food and Drug Administration ("FDA") for marketing clearance.

## REGULATIONS

The Company's development and manufacture of medical devices is controlled by the Food, Drug and Cosmetic Act (the "Act"). The Food and Drug Administration ("FDA"), which administers the Act, has promulgated a number of regulations which dictate the method by which new products are allowed to enter the United States market (Title 21, CFR Section 807, Premarket Notification), and the documentation and control of manufacturing processes (Title 21, CFR Section 820, Good manufacturing Practices for the Manufacturing, Storage and Installation of Medical Devices).

Subject to the potential changes in regulatory status, the Company believes that it is in full compliance with the requirements of Part 807 Premarket Notification, as promulgated under Section 510(k) of the Act, and has received permission to market the BreastCare (TM)/BreastAlert(TM). On January 24, 1984, the FDA determined that the BreastCare(TM)/BreastAlert(TM) is substantially equivalent to a device marketed in interstate commerce and accordingly may be freely marketed without further FDA authorization. Also included under Part 807 is a requirement for product registration and listing, which the Company believes has been satisfied.

Management believes that the proprietary nature of the product is protected under patent rights issued in the United States and certain foreign countries.

**FOREIGN REGULATION**

Because the Company proposes to distribute its product in foreign countries, the Company will be required to comply with the regulations of those countries where its product is distributed by the Company through licensees. No assurances can be given that the Company and/or its licensees will be able to comply with the regulatory requirements of the foreign markets in which the BreastCare(TM)/BreastAlert(TM) will be sold.

Most countries require product registration before you can sell. In South America, the Company's subsidiary, Scantek Medical S.A. have applied for and have received product registration in Brazil, Uruguay, Argentina and Peru. Paraguay and Bolivia have no registration requirements to sell. In addition, the Company has applied for and received a Certification Europe (CE), which is required, as of June, 1998, of all products marketed in the European Union.

**PATENTS**

The proprietary nature of the BreastCare(TM)/BreastAlert(TM) is protected under patent rights issued in the U.S. and foreign countries. However, in general, the level of protection afforded by a patent is directly proportional to the ability of the patent owner to protect and enforce his rights under the patent. Since the financial resources of the Company are currently limited, and patent litigation can be both expensive and time consuming, there is a risk that enforcing the patents for the BreastCare(TM)/BreastAlert(TM) will have a material adverse financial effect on the Company or the Company will not have the financial resources necessary to enforce its patents. Once the Company's existing patents expire, other companies may be able to create substantially similar products. If this were to happen, the Company would not be able to avail itself of the protection afforded by the patent laws.

Case 1:08-cv-00453-CM-HBP    Document 9-2    Filed 02/11/2008    Page 19 of 90

- - Patent No. RE 32,000, granted and issued on October 8, 1985; this patent is a reissue of Patent No, 4, 190,058 for a "Device For Use in Early Detection of Breast Cancer", which was granted and issued on February 26, 1980 and has since expired.

- - Patent No. 4,651,749, granted on March 24, 1987, entitled "Cancer Detection Patch for Early Detection of Breast Cancer; Temperature, Indicators, Flexibility, Thermoconductivity, Webs"; this patent is a partial continuation of Patent No. 4,190,058 above

- - Patent No. RE 4,624,264 granted November 24, 1986; this patent has been reinstated and expires November 25, 2003.

- - Patent No. 6,086,247 granted on July 11, 2000, for Differential Temperature Sensor Device for Use in the Detection of Breast Cancer and Breast Disease; this patent expires February 5, 2018. -- Patent No. 6,135,968 granted on October 24, 2000, for Differential Temperature Measuring Device and Method for prostate examination; this patent expires September 10, 2017.

In addition, in accordance with the Settlement Agreement between the Company and HumaScan, HumaScan has assigned all of its rights, title and interests in certain U.S. patents and U.S. and foreign trademarks, including the following patents:

- - File No. 08/854,144, filed May 14, 1997, entitled "Breast and Axilla Cancer Screening Device and Method"

## SUPPLIES AND RAW MATERIALS

Supplies and raw materials for the manufacture of the BreastCare(TM)/BreastAlert(TM) are available from various sources. Historically, other than on a few rare occasions, the supplies and raw materials for producing the BreastCare(TM)/BreastAlert(TM) have been readily available and the cost of such materials has not experienced any material fluctuation. The Company has determined the inventory planning and control, as well as other production management systems, it intends to use. In addition, the Company has acquired supplies and raw materials in connection with its settlement with HumaScan.

The Company has created an international marketing plan for licensing and distribution to capture a significant portion of the $6 billion annual global breast cancer market with a device that alerts the physician and patient to the possibility of either proliferating thermally active breast cancer cells or certain types of thermally active breast disease.

Management believes that in emerging and developing countries, the BreastCare(TM)/BreastAlert(TM) has the potential to become an important part of the overall screening protocols used to detect breast disease. To market the BreastCare(TM)/BreastAlert(TM) abroad, the Company intends to utilize the following basic strategies:

o Foreign production: The Company intends to set up its own Regional Production Centers overseas. All sensor manufacturing will remain in the United States under the Company's control, unless manufacturing is established at the Company's subsidiary.

o Foreign Licensing: The Company intends to enter into exclusive agreements with various foreign entities, whereby the Company will either permit such entity to distribute the BreastCare(TM)/BreastAlert(TM) or give such entity the right to utilize the Company's trademark and patent in a specified geographical area.

o Joint Ventures: The Company intends to enter into agreements whereby the Company will grant one or more partners (usually partner of the host country) the right to share in the risks, cost and management of a foreign operation. The Company, however, will retain control of the manufacturing. The joint venture, if established, is anticipated to be with a major medical supply manufacturer or pharmaceutical company which could benefit from the sales and distribution of the BreastCare(TM)/BreastAlert(TM).

o Government Programs: Municipalities, State and Federal.

o BreastCare(TM)/BreastAlert(TM) Centers: The Company anticipates that it will establish breast care centers in cooperation with governments and private businesses in order to utilize the BreastCare(TM)/BreastAlert(TM) with an established protocol.

The Company intends to manufacture the BreastCare(TM)/BreastAlert(TM) for sale to partners pursuant to distribution agreements or intends to control the manufacturing if a joint venture is established. With respect to pursuing the International market for distribution of the BreastCare(TM)/BreastAlert(TM), the Company intends to enter into new markets by establishing Regional Production centers to manufacture and distribute within each target market. Management believes that partnerships with companies which either have working relationships with distributors throughout the world or have a distribution network established in the medical communities of the target markets, will be an excellent marketing vehicle for the Company. Each agreement will be exclusive and tailored to maximize the penetration of each market. Initially the Company intends to establish regional production centers and distribution networks in the U.S., Brazil, Hungary, Ireland, United Kingdom and China.

-17-

The Company, as it has done in the past intends to conduct a premarket investigation of the market before marketing is commenced and prior to finalizing any agreements. A market profile for each market will be completed to analyze the target markets. The profile will establish the strongest distributors and the buying decision-makers (i.e., physicians, hospitals, clinics, government agencies and over the counter customers). Management believes that a standard market profile will permit comparisons between markets at a later date and provide profiles of the types of markets that provide the best results. In addition, the Company will expand communications with the Ministries of Health, Department of Health and Clinical Services to investigate the statutory controls regulating the sale of medical devices.

The Company has focused on developing partnerships with various international companies who have relationships with distributors throughout the world and who have connections in the medical communities of the target markets. Recently, the Company has been negotiating with distributors who have direct contact with the distribution of medical product to government agencies, i.e., Brazil and will be the distributors for BreastCare(TM).

Strategically, the Company intends to centralize manufacturing and decentralize marketing in each geographical region. Specific markets within that region shall be covered by individual agreements which provide for the promotion and distribution of the BreastCare (TM)/BreastAlert(TM). Accordingly, the Company intends to utilize centralization for control and decentralization for market penetration. Management believes that the Company's expansion of several regional centers for the manufacturing locations will give the Company good access to shipping, tax considerations and low manufacturing cost, and to police the crossover among distributors' areas where distribution is segmented.

**South America Marketing**

The Company intends to open a production center in Brazil. In South America, the development of distributorships with selling partners has been and are further being developed to approach private hospitals, clinics, physicians and governments. The Company is introducing the BreastCare(TM) program, which has been developed at the Sao Paulo University Hospital, for use in municipality, state, and federal screening programs.

A carefully structured program of publications and professional meetings between such revered specialists and the rest of the physician population has been underway throughout 1998, 1999 and 2000 and it is anticipated that such will be expanded in ensuing years. This marketing approach will be directed by the International Medical Advisory Board of the Company, consisting of some of the top specialists in the world in the diagnosis and treatment of breast disease. State and Federal governments are also helping to create screening programs in accordance with the above activities.

On October 1, 2002 the Company signed an exclusive distribution agreement with Compat Comercio Exterior Ltda, a Brazilian commercial company located in Rio De Janerro, Brazil, for a long-term marketing and sales agreement for the BreastCare(TM) product. Pursuant to the Compat Comercio agreement, Compat Comercio has agreed to a minimum purchase of the BreastCare(TM) product of 100,000 units during the first six months of the term of the agreement and 400,000 units during the second six months. The second year minimum purchase order is 1,000,000 units. Management believes that the timely fulfillment of the Compat Comercio agreement will result in net profits in excess of $2,000,000 for the first year of the Compat Comercio agreement, subject to Compat Comercio meeting its minimum purchase obligations to the Company. Pursuant to such agreement which has a term of five years with a renewal term of an additional five years, subsequent to the initial two year term of the agreement, the Company has the right to terminate the agreement if the parties cannot agree upon the minimum number of units. There can be no assurance that Compat Comercio will meet the minimum purchase requirement, or that the Company will recover any damages that may result from such failure.

-18-

The Company has been introducing the BreastCare(TM)/BreastAlert(TM) in Europe at educational forums which were covered by the press and television. Also, the Company will be exhibiting the BreastCare(TM)/BreastAlert(TM) at medical congresses to introduce the device to the physician market in the very near future.

The Company intends to utilize government contracts to mass market the BreastCare(TM)/BreastAlert(TM). Countries, such as Ireland and Spain lend themselves to this approach, as well as do larger independent Eastern European countries, including but not limited to, Romania, Bulgaria, Ukraine, Russia, Greece and Turkey.

**United States and Canada Marketing**

The Company's first introduction of the BreastCare(TM)/BreastAlert(TM) product was by its former United States and Canadian licensee, HumaScan which launched the product in December 1997. Before relaunching the BreastCare(TM)/BreastAlert(TM) the Company plans to take a carefully constructed approach to the marketplace in the United Sates and Canada. The Company intends to spend between nine to twelve months reviewing and analyzing the best marketing and sales approaches focused toward the physician user and managed care insurers. The Company intends to mirror the approach used in South America with respect to advisement and leadership from renowned breast disease specialists.

**FUTURE MARKETS**

The Company intends to concentrate its efforts to market and sell the BreastCare(TM)/ BreastAlert(TM) through 2003 in South America, primarily in Brazil. Thereafter, the Company also intends to commence its marketing efforts for the BreastCare(TM)/BreastAlert(TM) in Europe and the United States and investigate and develop the marketplace in Asia, the Middle East and the African continent. Ultimately, the Company intends to expand its marketing efforts worldwide.

**COMPETITION**

The Company believes that the BreastCare(TM)/BreastAlert(TM), which provides digital quantitative recordings of underlying tissue temperature, represents a significant improvement over thermographic technology products because such other products are subject to the inherent problems of subjective evaluation of heat patterns. Based upon these differences, the Company believes that the prospects for the BreastCare(TM)/BreastAlert(TM) as a supplement to currently existing screening tests are very good.

The Company believes it is in a unique position because there are no known competing low cost screening devices on the market which would compete directly with the BreastCare(TM)/BreastAlert(TM) for use by primary care physicians. As a result, the Company believes that the BreastCare(TM)/BreastAlert(TM) will augment other existing forms of screening and technology.

-19-

Some of the Company's future competitors may be large, well-financed and established companies which have greater resources for research and development, manufacturing, and marketing than the Company has and, therefore, may be better able than the Company to compete for a share of the market, even in areas in which the Company may have superior technology. There can be no assurance that the Company can continue to produce a product which is commercially acceptable, or, that if continued to be produced, such a product will be competitive with existing or future products. It is also possible that there will be technological changes or developments by competitors which will render the Company's products noncompetitive or obsolete.

**FUTURE PRODUCTS**

The Company believes that the BreastCare(TM)/BreastAlert(TM) may have applicability as a screening device for other abnormalities, including measuring ovulation cycles for infertile couples, measuring changes in the cardiovascular system to screen for potential stroke victims, and detecting abnormalities in the kidneys, prostate and testicles. Although some testing was performed during the BreastCare (TM)/BreastAlert(TM) development stage, these initial tests were preliminary only, and in order to obtain FDA approval, which would be required in order to market a future product. The Company intends to further explore its initial findings and perhaps, introduce products in furtherance of these findings.

On October 24, 2000, patent #6,135,968 was granted for its Differential Temperature Measuring Device and Method for prostate examination. This device is trade marked under the name, ProstAlert(TM).

**EMPLOYEES**

The Company employs a total of 8 employees. Two of these employees are employed in the U.S. as President and Chief Executive Officer and Vice President/ Corporate Secretary. Additional personnel and consultants are utilized, as required, on a contractual basis. Additionally, manufacturing personnel have been targeted to be utilized when the purchase order from Brazil has been received.

The remaining employees are employed in South America by the Company's two South American subsidiaries, as follows: a General Manager, a Medical Director, two (2) other Senior employees, and two (2) support staff employees.

None of the Company's employees are covered by a collective bargaining agreement with a union. The Company considers its relationship with its employees to be good.

The Company's business is subject to a number of risks and uncertainties, including, but not limited to; (a) the risk that it may be unable to raise enough capital to fund the Company's operations, (b) the risk that the BreastCare(TM)/BreastAlert(TM) will not be accepted commercially, (c) the Company's reliance on certain customers, and (d) the highly competitive nature of the Company's industry and the impact that competitors' new products and pricing may have upon the Company. Such factors, as well as shortfalls in the Company's results of operations as compared with analyst's expectations, capital market conditions and general economic conditions, may also cause substantial volatility in the market price of the Company's Common Stock.

## PUBLIC INFORMATION

The Company electronically files with the Securities and Exchange Commission (the "SEC") all its reports, including, but not limited to, its annual and quarterly reports. The SEC maintains an Internet site which contains all such reports and other information with respect to the Company on its website, http://www.sec.gov. Additional information on the Company may be obtained from the Company's web site, http://www.scantekmedical.com.

## ITEM 2. PROPERTIES

The Company occupies approximately 14,000 square feet of warehouse and office space, all of which is leased through leases expiring in August 2005. See Note 13 of Notes to Consolidated Financial Statements for additional information.

## ITEM 3. LEGAL PROCEEDINGS

There are several lawsuits against the Company that may have a material impact on the consolidated results of operations or financial condition of the Company.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of the Company's shareholders during the fourth quarter of the year ending June 30, 2002.

PART II

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS**

(a) Market Information

The Company's common stock, par value $.001 per share (the "Common Stock"), is traded in the over-the-counter market. The Common Stock is available for quotation on the NASD Over the Counter Bulletin Board. The following table sets forth the periods indicated high and low bid quotation (as reported by the OTC Bulletin Board) for the Common Stock:

|  | HIGH | LOW |
|---|---|---|
| Fiscal Year ended June 30, 2001 | | |
| First Quarter | $.75000 | $  .12500 |
| Second Quarter | .37500 | .09375 |
| Third Quarter | .12500 | .06250 |
| Fourth Quarter | .28125 | .06250 |
| Fiscal Year ended June 30, 2002 | | |
| First Quarter | .27 | .08 |
| Second Quarter | .09 | .03 |
| Third Quarter | .13 | .04 |
| Fourth Quarter | .08 | .02 |

The Common Stock is reported under the Symbol SKML. As of the date of this report, the Company's shares of Common Stock were "non-designated" securities as defined under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

These quotations reflect an inter-dealer price, without retail mark-up, markdown or commission, and may not necessarily reflect actual transactions.

(b) Holders

As of September 30, 2002, there were 210 shareholders of record of the Company's Common Stock.

(c) Dividends

The Company has not paid any cash dividends and has no current plans to pay any such dividends. There are no restrictions on the Company's ability to pay dividends.

(d) Recent Sales of Unregistered Securities

On July 1, 1999 the Company issued Zsigmond L. Sagi, the Company's President and Chief Executive Officer, 79,250 shares of Common Stock of the Company pursuant to financing, at an issue price of $.416 per share.

On July 1, 1999 the Company issued Ms. Patricia Furness, the Company's Vice-President/Corporate Secretary, 5,703 shares of Common Stock of the Company pursuant to financing, at an issue price of $.5625 per share.

On July 1, 1999 the Company issued Mr. Louis Gottlieb, the Company's Vice-President of Corporate Development, 25,000 shares of Common Stock of the Company pursuant to financing, at an issue price of $.375 per share.

On July 1, 1999 the Company issued 52,500 shares of Common Stock of the Company pursuant to financing, to two individuals including Paul Nelson (a Director of the Company), at an issue price of $.40625 per share.

On July 7, 1999 the Company sold 45,767 shares of Common Stock to Maurice Siegel, Vice-President and Director of the Company, at a purchase price of $.2185 per share, pursuant to Section 4(2) of the Securities Act of 1933, based upon the nature of the sale and the purchaser.

On July 7, 1999, the Company issued 50,000 shares of Common Stock of the Company to Kenneth Courey, a former Director of the Company, pursuant to a consulting contract, at an issue price of $.1875 per share.

On December 30, 1999 the Company issued 7,500 shares of Common Stock of the Company pursuant to financing, to two individuals including Paul Nelson, a Director of the Company, at an issue price of $.07 per share.

On March 8, 2000 the Company issued 2,500 shares of Common Stock of the Company to Paul Nelson, pursuant to financing, at an issue price of $.53125 per share.

On March 8, 2000 the Company issued 23,750 shares of Common Stock of the Company to Louis Gottlieb, pursuant to financing, at an issue price of $.1875 and $.25 per share.

On April 14, 2000 the Company issued 30,000 shares of Common Stock of the Company to Louis Gottlieb pursuant to financing, at an issue price of $.25 per share.

On April 14, 2000 the Company issued 35,200 shares of Common Stock of the Company to Maurice Siegel, a Vice-President and Director of the Company, for consulting services, at an issue price of $.25 per share.

On April 14, 2000 the Company issued 125,000 shares of Common Stock of the Company to Stock Siren LLC, pursuant to advertising and public relations, at an issue price of $.1875 per share.

On July 6, 2000 the Company issued 2,500 shares of Common Stock of the Company to Paul Nelson, pursuant to financing, at an issue price of $.51 per share.

On August 1, 2000 the Company issued 67,900 shares of Common Stock of the Company to Zsigmond L. Sagi, the Company's President and Chief Executive Officer pursuant to financing, at an issue price of $.51 per share.

On August 1, 2000 the Company issued Ms. Patricia Furness, the Company's Vice-President and Corporate Secretary, 8,750 shares of Common Stock of the Company pursuant to financing, at an issue price of $.51 per share.

On October 20, 2000, the Company issued 100,000 shares of Common Stock of the Company to Carriage House pursuant to financing at an issue price of $.20 per share.

On October 24, 2000, the Company issued 19,000 shares of Common Stock of the Company to (2) two individuals for loan extensions at an issue price of $.20 per share.

On October 24, 2000, the Company issued 120,000 shares of Common Stock of the Company to the Company's attorney for services rendered, at an issue price of $.25 per share.

On November 10, 2000, the Company sold 60,000 shares of Common Stock of the Company to a former director at a purchase price of $.20 per share, pursuant to Section 4(2) of the Securities Act of 1933, as amended, based upon the nature of the sale and the purchaser.

On November 10, 2000, the Company issued 12,000 shares of Common Stock of the Company to a former director at an issue price of $.20 as a bonus for the sale of stock.

On December 29, 2000, the Company issued 100,000 shares of Common Stock of the Company to a former director at an issue price of $.10 per share, pursuant to converting a $10,000 loan.

On December 29, 2000, the Company issued 15,000 shares of Common Stock of the Company to Paul Nelson pursuant to loan extensions at an issue price of $.10 per share.

On February 9, 2001 and April 3, 2001 the Company issued 25,000 and 15,000 shares of Common Stock of the Company to Carriage House at an issued price of $.09 and $.08, respectively pursuant to loan extensions.

On April 3, 2001, the Company sold 2,986,250 shares of the Common Stock of the Company to outside parties at a purchase price of $.08 per share pursuant to Sections 4(2) of the Securities Act of 1933, as amended, based upon the nature of the sale and the purchasers.

On April 3, 2001, the Company issued 750,000 shares of Common Stock of the Company to Zsigmond L. Sagi the Company's President and Chief Executive Officer for bonuses, at an issue price of $.08 per share.

On April 3, 2001, the Company issued 350,000 shares of Common Stock of the Company to Ms. Patricia Furness the Company's Vice President and Secretary for bonuses at an issued price of $.08 per share.

On April 3, 2001, the Company issued 250,000 shares of Common Stock of the Company to Zsigmond G. Sagi for consultant services at an issue price of $.08 per share.

On April 3, 2001, the Company issued Mr. Louis Gottlieb the Company's Vice President of Corporate Development, 86,250 shares of Common Stock of the Company pursuant to loan extensions, at an issue price of $.08 per share.

On April 3, 2001, the Company issued 132,500 shares of Common Stock of the Company to (3) three individuals and (1) one company at an issue price of $.08 per share, pursuant to loan extensions.

On April 3, 2001, the Company issued 950,000 shares of Common Stock of the Company to DC Consultants, pursuant to consulting services, at an issue price of $.08 per share.

On July 6, 2001, the Company issued 500,000 shares of Common Stock of the Company to employees of the Company's Brazilian subsidiary, pursuant to consulting services and bonuses, at an issue price of $.20 per share.

On July 31, 2001, the Company sold 775,000 shares of Common Stock of the Company to outside parties at a purchase price of $.08 per share pursuant to
Section 4(2) of the Securiteis Act of 1933, as amended, based upon the nature of the sale and the purchases.

On December 14, 2001, the Company issued 22,500 shares of Common Stock of the Company to two individuals, pursuant to loan extensions, at an issue price of $.042 per share.

On December 14, 2001, the Company issued 110,000 shares of Common Stock of the Company to the Company's attorney for legal services at an issue price of $.042 per share.

On December 14, 2001 the Company issued 300,000 shares of Common Stock of the Company to a lender pursuant to financing at an issue price of $.042 per share.

On December 14, 2001 and June 30, 2002, the Company issued 130,000 and 130,000 shares of Common Stock of the Company to Carriage House at an issue price of $.042 and $.035 per share, pursuant to loan extension.

On February 8, 2002 the Company sold 200,000 shares of Common Stock the Company to outside parties at a purchase price at $.05 per share pursuant to
Section 4(2) of the Securities Act of 1933, as amended, based upon the nature of the sale and the purchases.

On June 30, 2002, the Company issued 79,390 shares of Common Stock of the Company to (2) two companies at an issue price of $.035 per share, pursuant to financing.

On June 30, 2002 the Company issued 6,435 shares of Common Stock of the Company to Zsigmond L. Sagi, the Company's President and Chief Executive Officer pursuant to financing at an issue price of $.035 per share.

On June 30, 2002 the Company issued 31,141 shares of Common Stock of the Company to Ms. Patricia Furness, the Company's Vice President and Secretary pursuant to financing at an issue price of $.035 per share.

On August 20, 2002 the Company issued 2,000,000 shares of Common Stock of the Company to Ms. Angela Chen Sabella, pursuant to financing at an issue price of $.035 per share.

**ITEM 6. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis should be read in conjunction with the Company's consolidated financial statements and the notes related thereto. The discussion of results, causes and trends should not be construed to infer any conclusion that such results, causes or trends will necessarily continue in the future.

**Critical Accounting Policies**

The Company's discussion and analysis of its financial condition and results of operations are based upon the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires the Company to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an on-going basis, the Company evaluates its estimates, including those related to product returns, bad debts, inventories, intangible assets, investments, income taxes and contingencies and litigation. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results under different assumptions or conditions may differ from these estimates.

The Company believes the following critical accounting policies affect its more significant judgments and estimates used in the preparation of its consolidated financial statements. The Company maintains allowances for doubtful accounts for estimated losses resulting from the inability of its customers to make required payments. If the financial condition of the Company's customers were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required.

The Company makes purchasing decisions principally based upon firm sales orders from customers, the availability and pricing of raw materials and projected customer requirements. Future events that could adversely affect these decisions and result in significant charges to the Company's operations include slow down in customer demand, customers delaying the issuance of sales orders to the Company, miscalculating customer requirements, technology changes which render the raw materials and finished goods obsolete, loss of customers and/or cancellation of sales orders. The Company writes down its inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value based upon the aforementioned assumptions. If actual market conditions are less favorable than those projected by management, additional inventory write-downs may be required.

-27-

The Company seeks sales and profit growth by expanding its existing customer base, developing new products and by pursuing strategic acquisitions that meet the Company's criteria relating to (i) the market for the products; (ii) the Company's ability to efficiently manufacture the product; (iii) synergies that are created by the acquisition; and (iv) a purchase price that represents fair value. If the Company's evaluation of a target company misjudges its technology, estimated future sales and profitability levels, or inability to keep pace with the latest technology, these factors could impair the value of the investment, which could materially adversely affect the Company's profitability.

The Company files income tax returns in every jurisdiction in which it has reason to believe it is subject to tax. Historically, the Company has been subject to examination by various taxing jurisdictions. To date, none of these examinations has resulted in any material additional tax. Nonetheless, any tax jurisdiction may contend that a filing position claimed by the Company regarding one or more of its transactions is contrary to that jurisdiction's laws or regulations.

The Company has evaluated its disclosure controls and procedures within 90 days (the "Evaluation Date") prior to this report and concluded that there were no material weaknesses in those controls and procedures as of that date. To the best of Management's knowledge and belief, there have been no significant changes in internal controls and other factors subsequent to the Evaluation Date that could materially affect internal controls and procedures.

## RESULTS OF OPERATIONS

The following table sets forth for the periods indicated the percentage increase or decrease of items included in the Company's consolidated statement of operations:

| | % Increase (Decrease) from Prior Period | |
| --- | --- | --- |
| | June 30, 2002 compared with 2001 | June 30, 2001 compared with 2000 |
| Sales | (100.00) % | (29.00) |
| License fee revenues | * | * |
| Cost of sales | (46.20) | (13.40) |
| General and administrative expenses | (11.70) | (32.20) |
| Research and development | * | (2.20) |
| Interest expense | (11.40) | 22.50 |

## REVENUES

Net sales decreased to $-0- for the year ended June 30, 2002 from $21,137 for the year ended June 30, 2001. The Company is refocusing its South American marketing strategy in Brazil. The Company expects to ship the BreastCare(TM)/BreastAlert(TM) device from the United States during the fourth quarter of calendar 2002 to Brazil until a manufacturing facility in Brazil is complete and operational. Shipments to other parts of South America will commence during 2003. Manufacturing in Brazil is planned to commence after the construction of a manufacturing facility in Brazil. The Company expects to find a new location and construct a facility during 2003. Manufacturing for Europe will continue in the United States facility until the Company establishes a manufacturing facility in Europe.

-28-

Net sales decreased $2,403 during the year ended June 30, 2001 from $29,775 during the year ended June 30, 2000. The Company contributes the decline due to the factors mentioned above.

No licensing revenue was recognized during the year ended June 30, 2002 or 2001.

License fee revenue decreased to $-0- during the year ended June 30, 2001 from $59,000 for the year ended June 30, 2000 as the Company recognized lower license fees from NuGard Healthcare Ltd. as compared to higher license fees from Sandell Corp, D-Lanz Corp and HumaScan from the preceding year.

## COST OF SALES

Cost of sales decreased to $250,256 for the year ended June 30, 2002 from $465,282 for the year ended June 30, 2001 primarily due to an inventory write-off of $119,000 for expired product at the South American location during the year ended June 30, 2001.

Cost of sales decreased to $465,282 during the year ended June 30, 2001 from $537,216 during the year ended June 30, 2000 primarily due to the reduction in manufacturing labor and reduced write-offs of obsolete material during the year.

## GENERAL AND ADMINISTRATIVE EXPENSES

General and administrative expenses decreased 11.7% to $1,018,069 for the year ended June 30, 2002 compared to $1,152,915 for the year ended June 30, 2001. This decrease is primarily due to decrease in travel expenses, professional fees, outside services, insurance and rent expenses offset by higher consulting fees in South America due to the issuance of common stock for $100,000 in services and bonuses.

General and administrative expenses decreased 32.2% to $1,152,915 for the year ended June 30, 2001 compared to $1,699,922 for the year ended June 30, 2000. This decrease is primarily due to a reduction of consulting services in Brazil and reversal of an over accrual for consulting services in Uruguay.

## RESEARCH AND DEVELOPMENT

Research and development expense of $280,000 stayed the same for the years ended June 30, 2002 and 2001. Salaries incurred by the Company in the experimental area of development of its product remained constant.

Research and development expenses decreased 2.2% to $280,000 for the year ended June 30, 2001 from $286,223 for the year ended June 30, 2000. The decrease is primarily attributable to the elimination of minor research and development expenses.

**INTEREST EXPENSE**

Interest expense was $452,779 for the year ended June 30, 2002 compared to $511,141 for the year ended June 30, 2001. The 11.4% decrease was primarily attributable to lower interest rates and a decrease in interest related financing activities.

Interest expense was $511,141 for the year ended June 30, 2001 compared to $417,109 for the year ended June 30, 2000. The 22.5% increase was primarily attributable to increases in the Company's short-term debt.

## LIQUIDITY AND CAPITAL RESOURCES

The Company's need for funds has increased from period to period, as it has incurred expenses for among other things, research and development; applications for and maintenance of domestic and international trademarks and international patent protection; licensing and pre-marketing activities; and, attempts to raise the necessary capital to expand the Company's production capacity. Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Executive Officer and major shareholder. The Company has entered into various license agreements that have raised additional funds. In addition, the Company's auditors' report for the year ended June 30, 2002 dated October 10, 2002, expressed an opinion as to the Company continuing as a going concern.

During September 1998, the Company commenced the sale of its BreastCare(TM)/BreastAlert(TM) device in Brazil, Uruguay and Paraguay through its South American licensee. The Company terminated its license agreement with its former licensee in South America. The Company's Brazilian subsidiary plans to manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) device in Brazil and export to other South American countries. As of this date only minimal shipments have been made and the Company has not generated any material revenues.

Until cash flow generated from the shipment of the BreastCare(TM) device is sufficient to support the Company's operations, the Company will require financing to fund its current overhead and various capital requirements. As of June 30, 2002, the Company borrowed approximately $2.3 million from unaffiliated third parties. These loans are payable by the Company on various dates through December 31, 2003. In addition, as of June 30, 2002, the Company's President advanced the Company approximately $1.1 million. These loans have supported the Company through the prior and the current fiscal year. The Company expects the cash flow from sales commencing in the fourth quarter of calendar 2002 to cover the operations of the Company through December 2003, provided the Company is successful in raising additional capital to support the operations until cash flows generated for the sales of the BreastCare(TM)/BreastAlert(TM) device commences.

In 2003, the Company will market and distribute the BreastCare(TM)/BreastAlert(TM) device throughout South America through the Company's South American subsidiaries.

-30-

Through its Brazilian subsidiary, the Company signed an agreement with the State of Pernambuco in December 1999. The State of Pernambuco has the second largest concentration of hospitals in Brazil offering quality care and management believes that the location is also the most desirable for production, shipping, financing and tax incentives. The State of Pernambuco has offered various incentives, including acreage to build the facility at a reduced price, an 85% reduction in taxes through 2013, free shipping outside the state, and in connection with the federal programs offered in Northeast Brazil, financing programs to help fund the operations and capital improvements.

The Company plans to ship the BreastCare(TM)/BreastAlert(TM) device from the United States until a production facility in Brazil is operational.

On July 14, 1999, the Company granted an exclusive license to NuGard HealthCare Ltd. ("NuGard"), an Irish Company; to market Scantek's BreastCare(TM)/BreastAlert(TM) device in Ireland and the United Kingdom. Pursuant to the licensing agreement, NuGard will pay a non-refundable licensing fee of $350,000 in various stages, of which $59,000 was received as of June 30, 2000, and the Company received common shares equivalent to fifteen (15%) percent of NuGard's total outstanding common shares. The purchase price will range from $10 to $15 per unit - FOB US. The licensing agreement requires minimum purchases of 5,000 units a month and payments of licensing fees both of which NuGard is in default. At the present time the Company has not renegotiated the license agreement.

In August/September 2001, Fiocruz, a government agency in the Ministry of Health assisted in the BreastCare(TM) educational program for the Women's Health Program for the City of Nova Iguacu and Fiocruz will be an integrated part of the Company's BreastCare(TM) educational process.

On October 1, 2002, the Company signed an agreement with Compat Comercio Exterior Ltda, a Brazilian company located in Rio De Janeiro, Brazil, for a long-term exclusive marketing and sales agreement for the BreastCare(TM) product in the country of Brazil, excluding 4 states where the Company is pursuing more direct agreements. The Compat Comercio agreement calls for the shipment of a minimum of 100,000 units during the first six months of the term of the agreement, 400,000 units during the second six months and 1,000,000 units during the second year. Management believes that the timely fulfillment of the Compat Comercio agreement will result in net profits in excess of $2,000,000 for the first year of the Compat Comercio agreement, subject to Compat Comercio meeting its minimum purchase obligations to the Company. Pursuant to such agreement which has a term of five years with a renewal term of an additional five years, subsequent to the initial two year term of the agreement, the Company has the right to terminate the agreement if the parties cannot agree upon the minimum number of units. There can be no assurance that Compat Comercio will meet the minimum purchase requirement, or that the Company will recover any damages that may result from such failure.

Pursuant to the Compat Comercio agreement, the first shipment of 10,000 BreastCare(TM) units have been prepaid and deposited into a bank escrow account and will be released when a Brazil government import license is secured. Subsequent shipments will be paid fifty (50%) at the time of request and fifty (50%) percent sixty (60) days later.

The Company's working capital and capital requirements will depend on numerous factors, including the level of resources that the Company devotes to support start-up production and to the marketing aspects of its products. The Company intends to construct assembly centers abroad to manufacture, market and sell the BreastCare(TM)/BreastAlert(TM) device in the international market. The Company entered into an agreement with Zigmed Inc., pursuant to which Zigmed Inc. will manufacture the sensor production equipment needed for manufacturing of the BreastCare(TM)/BreastAlert(TM) device. The balance of $718,276 will be paid when the Company raises the additional capital.

The Company's success is dependent on raising sufficient capital to establish a fully operable production and assembly facility to manufacture the BreastCare(TM)/BreastAlert(TM) device for the international market. The Company believes the device will be commercially accepted throughout the international market. The Company does not have all the financing in place at this time, nor may it ever, to meet these objectives.

This Management's Discussion and Analysis of Financial Condition and Results of Operations includes forward-looking statements that may or may not materialize. Additional information on factors that could potentially affect the Company's financial results may be found in the Company's filings with the Securities and Exchange Commission.

New Accounting Pronouncements

Statement of Financial Accounting Standards (SFAS) No. 133, "Accounting for Derivative Instruments and Hedging Activities," is effective for all fiscal years beginning after June 15, 2000. SFAS 133, as amended, establishes accounting and reporting standards for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities. Under SFAS 133, certain contracts that were not formerly considered derivatives may now meet the definition of a derivative. The Company adopted SFAS 133 effective July 1, 2000. The adoption of SFAS 133 has not had a significant impact on the consolidated financial position, results of operations, or cash flows of the Company.

On June 29, 2001, the Financial Accounting Standards Board (FASB) issued SFAS No. 141, "Business Combinations", and SFAS No. 142, "Goodwill and Intangible Assets". Major provisions of these Statements are as follows: all business combinations initiated after June 30, 2001 must use the purchase method of accounting; the pooling of interest method of accounting is prohibited; goodwill and intangible assets with indefinite lives are not amortized but are tested for impairment annually, except in certain circumstances, and whenever there is an impairment indicator; all acquired goodwill must be assigned to reporting units for purposes of impairment testing; effective July 1, 2002, goodwill will no longer be subject to amortization.

In June 2001, the FASB issued SFAS No. 143 "Accounting for Asset Retirement Obligations". SFAS No. 143 addresses financial accounting and reporting for obligations and costs associated with the retirement of tangible long-lived assets. The Company is required to implement SFAS No. 143 on July 1, 2003, and management does not expect its adoption to have a material impact on the Company's results of operations or financial position.

In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets", effective for fiscal years beginning after December 15, 2001. Under SFAS No. 144 assets held for sale will be included in discontinued operations if the operations and cash flows will be or have been eliminated from the ongoing operations of the entity and the entity will not have any significant continuing involvement in the operations of the component. The Company is planning to adopt SFAS No. 144 for the fiscal year beginning July 1, 2002. The Company believes the adoption of SFAS No. 144 will not have a material impact on the Company's results of operations or financial position.

In April 2002, the FASB issued SFAS No. 145 "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections". This statement eliminates the automatic classification of gain or loss on extinguishment of debt as an extraordinary item of income and requires that such gain or loss be evaluated for extraordinary classification under the criteria of Accounting Principles Board No. 30 "Reporting Results of Operations". This statement also requires sales-leaseback accounting for certain lease modifications that have economic effects that are similar to sales-leaseback transactions, and makes various other technical corrections to existing pronouncements. This statement will be effective for the Company for the year ending December 31, 2003. The adoption of this statement will not have a material effect on the Company's results of operations or financial position.

In July 2002, the Financial Accounting Standards Board issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." SFAS No. 146 will supersede Emerging Issues Task Force Issue No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." SFAS No. 146 requires that costs associated with an exit or disposal plan be recognized when incurred rather than at the date of a commitment to an exit or disposal plan. SFAS No. 146 is to be applied prospectively to exit or disposal activities initiated after December 31, 2002.

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

### PAGE

Independent Auditors' Reports                                      F-1 - F-3

Financial Statements:

        Consolidated Balance Sheets,
          June 30, 2002 and 2001                                  F-4

        Consolidated Statements of Operations,
          Years Ended June 30, 2002, 2001, 2000                   F-5

        Consolidated Statements of Stockholders'
          Deficiency Years Ended June 30, 2002, 2001, 2000        F-6

        Consolidated Statements of Cash Flows,
          Years Ended June 30, 2002, 2001, 2000                   F-7 - F-8

Notes to Consolidated Financial Statements                        F-9 - F-30

33

# INDEPENDENT AUDITORS' REPORT

To the Board of Directors
Scantek Medical, Inc. and Subsidiaries

We have audited the accompanying consolidated balance sheet of Scantek Medical, Inc. and Subsidiaries as of June 30, 2002, and the related consolidated statements of operations, changes in stockholders' deficiency and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Scantek Medical, Inc. and Subsidiaries as of June 30, 2002, and the consolidated results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company has sustained continuing losses and a working capital deficiency of approximately $5,500,000 at June 30, 2002, which raises substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are described further in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty

```
                                        /s/ Grassi & Co. CPAs, P.C.
                                        ----------------------------
                                        Grassi & Co. CPAs,  P.C
                                        Certified Public Accountants
```

```
        October 10, 2002
        New York, New York
```

F-1

# INDEPENDENT AUDITORS' REPORT

To the Board of Directors and Stockholders of Scantek Medical, Inc.

We have audited the accompanying consolidated balance sheet of Scantek Medical, Inc. and subsidiaries (the "Company") as of June 30, 2001, and the related consolidated statements of operations, stockholders' deficiency, and cash flows for each of the two years in the period ended June 30, 2001. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such consolidated financial statements referred to above present fairly, in all material respects, the financial position of Scantek Medical, Inc. and subsidiaries at June 30, 2001, and the results of their operations and their cash flows for each of the two years in the period ended June 30, 2001 in conformity with principles generally accepted in the United States of America.

F-2

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. The Company is engaged in manufacturing and marketing a product that detects early breast tissue abnormalities including cancer. As more fully explained in Note 1 of Notes to Consolidated Financial Statements, the Company needs to obtain additional financing to fulfill its activities and achieve a level of sales adequate to support its cost structure. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Managements' plans are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of these uncertainties should the Company be unable to continue as a going concern.

**WIENER, GOODMAN & COMPANY, P.C.**
Certified Public Accountants
Eatontown, New Jersey

September 18, 2001

F-3

**SCANTEK MEDICAL, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

|  | June 30, | |
| --- | --- | --- |
|  | 2002 | 2001 |

**ASSETS**

**Current Assets:**

| | | |
| --- | --- | --- |
| Cash | $ 11,229 | $ 6,026 |
| Marketable securities | 3,041 | 2,765 |
| Inventories | 562,037 | 547,824 |
| Total Current Assets | 576,307 | 556,615 |
| Property and equipment - net | 910,092 | 1,248,558 |
| Other assets - net | 33,352 | 33,567 |
| TOTAL ASSETS | $ 1,519,751 | $ 1,838,740 |

**LIABILITIES AND STOCKHOLDERS' DEFICIENCY**

**Current Liabilities:**

| | | |
| --- | --- | --- |
| Short-term debt | $ 1,354,080 | $ 1,298,628 |
| Current portion of long-term debt | - | 850,000 |
| Accounts payable (Including $800,003 and $810,178 to a related party in 2002 and 2001) | 1,346,734 | 1,269,839 |
| Accrued interest | 1,323,886 | 927,490 |
| Accrued salaries | 1,892,472 | 1,612,472 |
| Accrued expenses | 611,193 | 554,435 |
| Total Current Liabilities | 6,528,365 | 6,512,864 |
| Long-term debt-less current portion | 3,271,750 | 2,141,609 |
| Total Liabilities | 9,800,115 | 8,654,473 |

Commitments and Contingencies

**Stockholders' Deficiency:**

| | | |
| --- | --- | --- |
| Preferred stock, par value $.001 per share - authorized 5,000,000 shares; none issued | - | - |
| Common stock, par value $.001 per share - 45,000,000 shares authorized; Issued and outstanding - 28,045,156 shares at June 30, 2002 and 24,970,690 shares at June 30, 2001 | 28,045 | 24,971 |
| Additional paid-in-capital | 4,839,697 | 4,286,082 |
| Cumulative other comprehensive loss | (298,959) | (299,235) |
| Accumulated deficit | (12,849,147) | (10,827,551) |
| Total Stockholders' Deficiency | (8,280,364) | (6,815,733) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIENCY | $ 1,519,751 | $ 1,838,740 |

See notes to consolidated financial statements

F-4

**SWANPEK MEDICAL, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Years Ended June 30, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Revenues: | | | |
| Net sales | $ | $ 21,137 | $ 29,775 |
| License fees | – | – | 59,000 |
| | – | 21,137 | 88,775 |
| Costs and expenses: | | | |
| Cost of sales (principally depreciation expense of $250,000, $264,000 and $277,000 in 2002, 2001 and 2000 respectively) | 250,256 | 465,282 | 537,216 |
| General and administrative expenses | 1,018,069 | 1,152,915 | 1,699,922 |
| Research and development | 280,000 | 280,000 | 286,223 |
| | 1,548,325 | 1,898,197 | 2,523,361 |
| Loss from operations | (1,548,325) | (1,877,060) | (2,434,586) |
| Other income (expense): | | | |
| Interest and dividends | 8 | 30 | 223 |
| Loss on investment | (20,500) | – | – |
| Gain on sale of marketable securities | – | – | 25,007 |
| Interest expense | (452,779) | (511,141) | (417,109) |
| Miscellaneous | – | 27,000 | 10,000 |
| | (473,271) | (484,111) | (381,879) |
| Net loss | $ (2,021,596) | $ (2,361,171) | $ (2,816,465) |
| Loss per common share - basic and diluted | $ (0.08) | $ (0.12) | $ (0.15) |
| Weighted average number of common shares outstanding - basic and diluted | 26,557,923 | 20,521,527 | 18,431,820 |

See notes to consolidated financial statements

F-5

**SWANTEK MEDICAL, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY**

| | Total | Comprehensive Income (Loss) | Accumulated Deficit | Cumulative Other Comprehensive Income (Loss) | Common Stock # of Shares | Common Stock Value | Additional Paid-In Capital |
|---|---|---|---|---|---|---|---|
| Balance June 30, 1999 | $(2,364,728) | | $(5,649,915) | $ (165,885) | 18,070,200 | $18,070 | $ 3,433,002 |
| Sale of common stock (at $.2185 per share) | 10,000 | | | | 45,767 | 46 | 9,954 |
| Common stock issued for loan financing and services rendered (issued at $.01 to $.5625 per share) | 199,254 | | | | 694,573 | 694 | 198,560 |
| Issuance of stock warrants for services (issued at $.1875 to $.75 per share) | 85,460 | | | | | | 85,460 |
| Net unrealized loss on marketable securities | (115,380) | $ (115,380) | | (115,380) | | | |
| Net loss | (2,816,465) | (2,816,465) | (2,816,465) | | | | |
| Comprehensive loss | | $(2,931,845) | | | | | |
| Balance, June 30, 2000 | (5,001,859) | | (8,466,380) | (281,265) | 18,810,540 | 18,810 | 3,726,976 |
| Common stock issued for loan financing and services rendered (issued at $.08 to $.51 per share) | 302,517 | | | | 3,013,900 | 3,015 | 299,502 |
| Common stock issued for loan conversion (issued at $.10 per share) | 10,000 | | | | 100,000 | 100 | 9,900 |
| Sale of common stock (at $.08 to $.20 per share) | 250,900 | | | | 3,046,250 | 3,046 | 247,854 |
| Issuance of stock warrants for services (issued at $.07 per share) | 1,850 | | | | | | 1,850 |
| Net unrealized loss on marketable securities | (17,970) | $ (17,970) | | (17,970) | | | |
| Net loss | (2,361,171) | (2,361,171) | (2,361,171) | | | | |
| Comprehensive loss | | $ (2,379,141) | | | | | |
| Balance, June 30, 2001 | (6,815,733) | | (10,827,551) | (299,235) | 24,970,690 | 24,971 | 4,286,082 |
| Sale of common stock ($.05 to $.08 per share) | 72,000 | | | | 975,000 | 975 | 71,025 |
| Common stock issued for loan financing and services rendered (issued at $.035 to $.20 per share) | 159,918 | | | | 2,099,466 | 2,099 | 157,819 |
| Issuance of stock warrants for services (issued at $.015 to $.07 per share) | 324,771 | | | | | | 324,771 |
| Net unrealized gain on marketable securities | 276 | $ 276 | | 276 | | | |
| Net loss | (2,021,596) | (2,021,596) | (2,021,596) | | | | |
| Comprehensive loss | | $ (2,021,320) | | | | | |
| Balance, June 30, 2002 | $ (8,280,364) | | $ (12,849,147) | $ (298,959) | 28,045,156 | $28,045 | $ 4,839,697 |

See notes to consolidated financial statements

F-6

**SWANPEK MEDICAL, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For The Years Ended June 30, | | |
| --- | --- | --- | --- |
| | 2002 | 2001 | 2000 |
| Cash flows from operating activities: | | | |
| Net loss | $ (2,021,596) | $ (2,361,171) | $ (2,816,465) |
| Adjustments to reconcile net (loss) to net cash used in operating activities: | | | |
| Depreciation and amortization | 295,181 | 367,065 | 367,065 |
| Net gain on sale of marketable securities | - | - | (25,007) |
| Loss on investment | 20,500 | - | - |
| Write-off of obsolete inventory | - | 119,286 | - |
| Non-employee stock based compensation | 158,603 | 167,600 | 124,725 |
| Non-cash officers compensation | 281,315 | 136,767 | 74,529 |
| Other non-cash items | 44,771 | - | 85,460 |
| Changes in operating assets and liabilities | 795,836 | 787,646 | 1,259,815 |
| Net Cash Used in Operating Activities | (425,390) | (782,807) | (929,878) |
| | | | |
| Cash flows from investing activities: | | | |
| Proceeds from sale of marketable securities | - | - | 298,164 |
| Purchase and deposits of property and equipment | - | - | (43,500) |
| | - | -- | |
| Net Cash Provided by Investing Activities | - | - | 254,664 |
| | - | -- | |
| Cash flows from financing activities: | | | |
| Proceeds from borrowings | 311,460 | 575,600 | 473,215 |
| Proceeds from officer loans | 58,137 | - | 309,413 |
| Repayment of officer loans | (3,759) | (15,000) | (76,084) |
| Repayment of notes | (7,245) | (25,565) | (43,948) |
| Proceeds from sale of common stock | 72,000 | 250,900 | 10,000 |
| Net Cash Provided by Financing Activities | 430,593 | 785,935 | 672,596 |
| | | | |
| Net Increase (Decrease) in Cash | 5,203 | 3,128 | (2,618) |
| Cash - beginning of year | 6,026 | 2,898 | 5,516 |
| Cash - end of year | $  11,229 | $  6,026 | $  2,898 |

See notes to consolidated financial statements

F-7

**SWANKEK MEDICAL, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

|  | For The Years Ended June 30, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
|  | ---- | ---- | ---- |
| Changes in operating assets and liabilities consist of: | | | |
| Decrease (increase) in accounts receivable | $       – | $ 24,000 | $ (24,000) |
| (Increase) decrease in inventory | (14,213) | 54,205 | 177,481 |
| Decrease in prepaid expenses | – | 8,511 | 75,776 |
| (Increase) in other assets | – | – | (8,602) |
| Increase in accounts payable and accrued expenses | 810,049 | 700,930 | 1,039,160 |
|  | -------- | --------- | --------- |
|  | $ 795,836 | $ 787,646 | $ 1,259,815 |
|  | ========== | ========== | =========== |
| Supplementary information: | | | |
| Cash paid during the year for: | | | |
| Interest | $ 225 | $ 18,937 | $ 38,583 |
|  | ========== | ========== | =========== |
| Income Taxes | $ 240 | $ 400 | $ 450 |
|  | ========== | ========== | =========== |
| Non-cash investing activities: | | | |
| Unrealized gain (loss) on marketable securities | $ 276 | $(17,970) | $ (115,380) |
|  | ========== | =========== | =========== |
| Non-cash financing activities: | | | |
| Conversion of notes payable to common stock | $    – | $ 10,000 | $ – |
|  | ========== | =========== | =========== |
| Common stock issued for loan financing and extensions | $ 159,918 | $ 302,517 | $ 199,254 |
|  | ========== | ========== | =========== |
| Issuance of stock warrants for services rendered | $ 324,771 | $   1,850 | $ 85,460 |
|  | ========== | ========== | ========== |

See notes to consolidated financial statements

F-8

SCANTEK MEDICAL, INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Organization

Scantek Medical, Inc. and its subsidiaries (the "Company"), operates in one industry segment and is engaged, in developing, manufacturing, marketing, and licensing the BreastCare(TM)/BreastAlert(TM). The BreastCare(TM)/BreastAlert(TM) is an early screening device which can detect certain breast tissue abnormalities, including breast cancer. This device has been patented and has Food and Drug Administration ("FDA") approval for sale.

During the year ended June 30, 1999, the Company's principal operations commenced shipments of the BreastCare(TM)/BreastAlert(TM) device in South America. The Company also regained rights to manufacture and sell BreastCare(TM)/BreastAlert(TM) in the United States of America, Canada and their territories and possessions. See Note 6 of Notes to Consolidated Financial Statements for further information. Accordingly, the Company is no longer considered a development stage enterprise, as it was through June 30, 1998. There is no assurance that commercially successful products will be developed, nor that the Company will achieve a profitable level of operations.

Basis of Presentation

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business.

The Company has experienced losses during its development stage. Losses and negative cash flows from operations have continued in the current fiscal year and subsequent to June 30, 2002. As of June 30, 2002, the Company has a working capital deficit of approximately $5.5 million.

The activities of the Company are being financed through the sale of its common stock and debt securities. The Company's continued existence is dependent upon its ability to obtain needed working capital through additional equity and/or debt financing, and the commercial acceptability of the BreastCare(TM)/BreastAlert(TM) to create sales that will help the Company achieve a profitable level of operations. However, there is no assurance that additional capital will be obtained or the BreastCare(TM)/BreastAlert(TM) will be commercially successful. This raises substantial doubt about the ability of the Company to continue as a going concern.

The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

Principles of Consolidation

The consolidated financial statements include the accounts of Scantek Medical, Inc. and its wholly-owned subsidiaries (the "Company"). All intercompany transactions have been eliminated.

Use of Estimates

The preparation of the financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Marketable Securities

The Company classifies its investment in equity securities, as "available for sale", and accordingly, reflects unrealized losses as a separate component of stockholders' deficiency.

The fair values of marketable securities are estimated based on quoted market prices. Realized gains or losses from the sales of marketable securities are based on the specific identification method.

Concentration of Credit Risk

Financial instruments, which potentially subject the Company to concentrations of credit risk, consist principally of temporary cash investments. The Company places its temporary cash investments with high credit quality financial institutions and by policy, in the future, will limit the amount of credit exposure with any one financial institution.

Inventories

Inventories are stated at the lower of weighted average cost or market.

Revenue Recognition

Revenue is recognized when the BreastCare(TM)/BreastAlert(TM) is shipped and title passes to customers.

Revenue from licensing the BreastCare(TM)/BreastAlert(TM) is usually recognized when licensees commence operations and substantial performance has occurred. The Company historically has amended and renegotiated its licensees' agreements. Therefore, the Company recognizes license fee income when received.

Depreciation

Equipment is stated at cost, less accumulated depreciation. Depreciation is recorded using the straight-line method over the estimated useful lives of the assets, which are between 5 and 10 years.

**Patent Costs**

The costs associated with the acquisition and filings of the United States, French, English, Dutch and other patents have been capitalized. The patents are amortized using the straight-line method over their respective lives, not to exceed ten (10) years. The Company periodically reviews the carrying value of intangible assets and impairments are recognized when the expected future operating cash flows to be derived from such intangible assets is less than their carrying value.

F-10

Income Taxes
The Company accounts for income taxes using an asset and liability approach under which deferred income taxes are recognized by applying enacted tax rates applicable to future years to the differences between the financial statement carrying amounts and the tax basis of reported assets and liabilities.

The principal items giving rise to deferred taxes are certain expenses which are not currently deductible for income tax purposes and the future tax benefit of certain net operating loss carry-forward.

Research and Development
Research and development costs are expensed as incurred.

Evaluation of Long-Lived Assets Long-lived assets are assessed for recoverability on an ongoing basis. In evaluating the fair value and future benefits of long-lived assets, their carrying value would be reduced by the excess, if any, of the long-lived asset over management's estimate of the anticipated undiscounted future net cash flows of the related long-lived asset. As of June 30, 2002, management concluded that no impairment exists.

Stock-Based Compensation
The Company accounts for employee stock options in accordance with the provisions of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees." Accordingly, stock options granted to employees are recorded using the intrinsic value method. The Company has adopted the disclosure-only provisions of Statement Of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation." The standard encourages, but does not require, companies to recognize compensation expense for grants of stock, stock options and other equity instruments to employees based on fair value.

Loss Per Share
Basic loss per common share is computed by dividing net loss by the weighted average number of common shares outstanding during the year. Diluted earnings per common share are computed by dividing net earnings by the weighted average number of common and potential common shares outstanding during the year. Potential common shares used in computing diluted earnings per share relate to stock options and warrants that, if exercised, would have a dilutive effect on earnings per share. The number of potential common shares outstanding were 16,595,000, 20,056,170 and 14,402,170 for the years ended June 30, 2002, 2001 and 2000, respectively. During the years ended June 30, 2002, 2001 and 2000, potential common shares were not used in the computation of diluted loss per common share, as their effect would be antidilutive.

Fair Value of Financial Instruments For financial instruments including cash, amounts due from licensees, accounts payable, accrued expenses and short term debt, it was assumed that the carrying amount approximated fair value because of the short-term nature of these instruments. The fair value of marketable securities is based on quoted market prices. It is not practicable to estimate the fair value of the non-publicly traded long-term debt.

F-11

New Accounting Pronouncements

Statement of Financial Accounting Standards (SFAS) No. 133, "Accounting for Derivative Instruments and Hedging Activities," is effective for all fiscal years beginning after June 15, 2000. SFAS 133, as amended, establishes accounting and reporting standards for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities. Under SFAS 133, certain contracts that were not formerly considered derivatives may now meet the definition of a derivative. The Company adopted SFAS 133 effective July 1, 2001. The adoption of SFAS 133 has not had a significant impact on the consolidated financial position, results of operations, or cash flows of the Company.

On June 29, 2001, the Financial Accounting Standards Board (FASB) issued SFAS No. 141, "Business Combinations", and SFAS No. 142, "Goodwill and Intangible Assets". Major provisions of these Statements are as follows: all business combinations initiated after June 30, 2001 must use the purchase method of accounting; the pooling of interest method of accounting is prohibited; goodwill and intangible assets with indefinite lives are not amortized but are tested for impairment annually, except in certain circumstances, and whenever there is an impairment indicator; all acquired goodwill must be assigned to reporting units for purposes of impairment testing; effective July 1, 2002, goodwill will no longer be subject to amortization.

In June 2001, the FASB issued SFAS No. 143 "Accounting for Asset Retirement Obligations". SFAS No. 143 addresses financial accounting and reporting for obligations and costs associated with the retirement of tangible long-lived assets. The Company is required to implement SFAS No. 143 on July 1, 2003, and management does not expect its adoption to have a material impact on the Company's results of operations or financial position.

In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets", effective for fiscal years beginning after December 15, 2001. Under SFAS No. 144 assets held for sale will be included in discontinued operations if the operations and cash flows will be or have been eliminated from the ongoing operations of the entity and the entity will not have any significant continuing involvement in the operations of the component. The Company is planning to adopt SFAS No. 144 for their fiscal year beginning July 1, 2002. The Company believes the adoption of SFAS No. 144 will not have a material impact on the Company's results of operations or financial position.

In April 2002, the FASB issued SFAS No. 145 "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections". This statement eliminates the automatic classification of gain or loss on extinguishment of debt as an extraordinary item of income and requires that such gain or loss be evaluated for extraordinary classification under the criteria of Accounting Principles Board No. 30 "Reporting Results of Operations". This statement also requires sales-leaseback accounting for certain lease modifications that have economic effects that are similar to sales-leaseback transactions, and makes various other technical corrections to existing pronouncements. This statement will be effective for the Company for the year ending December 31, 2003. The adoption of this statement will not have a material effect on the Company's results of operations or financial position.

F-12

In July 2002, the Financial Accounting Standards Board issued SFAS No. 146, "Accounting for Cost Associated with Exit or Disposal Activities." SFAS No. 146 will supersede Emerging Issues Task Force Issue No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." SFAS No. 146 requires that costs associated with an exit or disposal plan be recognized when incurred rather than at the date of a commitment to an exit or disposal plan. SFAS No. 146 is to be applied prospectively to exit or disposal activities initiated after December 31, 2002.

## 2. INVESTMENT IN SUBSIDIARIES

(a) In July 1999, the Company organized Scantek Medical do Brazil LTDA, a Brazilian Company and a wholly owned subsidiary, to distribute the BreastCare(TM)/BreastAlert(TM) in Brazil. The subsidiary will manufacture the BreastCare(TM)/BreastAlert(TM) for South America in a proposed production facility in the state of Pernambuco. The facility previously expected to be constructed has been terminated due to non-performance by the Company. During the year ended June 30, 2002 the Company wrote off the land in the amount of $43,500 in connection with the non-performance. See Note 5 of Notes to Consolidated Financial Statements. The Company expects to find a new location and construct a facility during 2003.

(b) In January, 1998, the Company organized a wholly-owned subsidiary, Scantek Medical S.A. Inc., a Uruguayan company, to distribute the BreastCare(TM)/BreastAlert(TM)in South America.

## 3. MARKETABLE SECURITIES

|  | Cost | Estimated Fair Value | Gross Unrealized Gains | Gross Unrealized Losses |
|---|---|---|---|---|
| June 30, 2002: | | | | |
| Marketable securities-current: | | | | |
| Common stock | $ 2,000 | $ 3,041 | $ 1,041 | $ - |
| Warrants | $ 300,000 | $ - | $ - | $300,000 |
| June 30, 2001: | | | | |
| Marketable securities-current: | | | | |
| Common stock | $ 2,000 | $ 2,765 | $ 765 | $ - |
| Warrants | $ 300,000 | $ - | $ - | $300,000 |

Gross realized gains were $-0- in 2002, $-0-in 2001 and $145,912 in 2000. Gross realized losses were $-0- in 2002, $-0- in 2001 and $120,905 in 2000.

F-13

4. INVENTORIES

|  | June 30, | |
| --- | --- | --- |
|  | 2002 | 2001 |
| Raw materials | $ 562,037 | $ 547,824 |
|  | $ 562,037 | $ 547,824 |

## 4. PROPERTY AND EQUIPMENT

|  | June 30, | |
| --- | --- | --- |
|  | 2002 | 2001 |
| Land | $       - | $ 43,500 |
| Equipment | 2,014,545 | 2,014,545 |
| Furniture and fixtures | 27,489 | 27,489 |
| Leasehold improvements | 16,525 | 16,525 |
|  | 2,058,559 | 2,102,059 |
| Less accumulated depreciation | 1,148,467 | 853,501 |
|  | $ 910,092 | $ 1,248,558 |

Depreciation expense for the years ended June 30, 2002, 2001 and 2000 was $294,966, $299,458 and $299,458, respectively.

## 5. OTHER ASSETS

|  | June 30, | |
| --- | --- | --- |
|  | 2002 | 2001 |
| Patent costs | $ 676,069 | $ 676,069 |
| Security deposits | 33,352 | 33,352 |
|  | 709,421 | 709,421 |
| Less accumulated amortization | 676,069 | 675,854 |
|  | $ 33,352 | $ 33,567 |

## 6. HUMASCAN AGREEMENT/SETTLEMENT

On March 15, 1999 pursuant to a Settlement Agreement ("Agreement") dated as of the 11th day of March 1999, between the Company and HumaScan, Inc. ("HumaScan"), the Company regained the rights to market and sell its BreastCare(TM)/BreastAlert(TM) in the United States and Canada.

F-14

Pursuant to the original and amended licensing agreements between the Company and HumaScan which gave HumaScan the right to manufacture, market and sell the BreastCare(TM)/BreastAlert(TM), were terminated. Pursuant to the original and amended licensing agreements, HumaScan was indebted to the Company for failure to pay license fees, royalties and other sums of money. In exchange for the cancellation of $575,000 of indebtedness due to the Company by HumaScan and for the payment by the Company to HumaScan of an additional $340,000, HumaScan agreed to assign certain special manufacturing equipment, furniture, raw materials, tools, materials, laboratory equipment and inventory of HumaScan for the manufacture of the BreastCare(TM)/BreastAlert(TM). The Company recorded raw materials and finished goods in the amount of approximately $856,000, which represents the fair market value of the inventory received. Equipment with an initial acquisition cost of approximately $2.5 million has been recorded for approximately $59,000, which represents the cost the Company paid HumaScan as part of the Agreement.

## 7. LICENSE AGREEMENTS

a) The Company entered into an exclusive license agreement, dated September 22, 1997, and amended February 18, 1998, with Sandell Corporation S.A. (the "Sandell Agreement"), a Uruguayan corporation, ("Sandell"), pursuant to which the Company granted to Sandell an exclusive license to market and distribute the BreastCare(TM)/BreastAlert(TM) in Brazil, Venezuela, Columbia, Costa Rica, Ecuador, Nicaragua, Paraguay, Panama, Peru, Bolivia, Argentina and Uruguay. The Sandell Agreement was for a term of fourteen (14) years. As of June 30, 1999, upon mutual consent of both parties, the Company terminated its agreement with Sandell. The Company will manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) throughout the majority of South America through the Company's South American subsidiaries.

b) In July 14, 1999, the Company granted an exclusive license to NuGard HealthCare Ltd. ("NuGard"), an Irish Company; to market the Company's BreastCare(TM)/BreastAlert(TM)in Ireland and the United Kingdom. Pursuant to the licensing agreement, NuGard will pay a non-refundable licensing fee of $350,000, of which $59,000 was received as of June 30, 2001, and recorded as income during the year ended June 30, 2000. The purchase price for the BreastCare(TM)/BreastAlert(TM)will range from $10 to $15 per unit - FOB US. The license agreement requires minimum purchases of 5,000 units a month and payments of licensing fees, both of which NuGard is in default. The Company also received common shares equivalent to fifteen (15%) percent of NuGards total outstanding common shares. The shares received have no value and nothing has been recorded. As of June 30, 2002, the Company has not been able to renegotiate the license agreement and no shipments have been made nor monies received which were due on the license agreement.

F-15

c) On April 15, 2000, D-Lanz Development Group, Inc. ("D-Lanz") and the Company entered into an agreement to amend its previous license agreement dated April 29, 1997 and amended June 11, 1999. D-Lanz had a change in control and the License will be assigned to a new corporation, Global Agri-Med Technologies, Inc. ("Global"). The Company agreed to assign and transfer the license to Global, which includes the exclusive license in Chile and Singapore. In addition, the Company has agreed to give Global non-exclusive license extensions to Africa, Korea, and South Asia. Global must receive final clearance from the Company before any participation or distribution can proceed in any city, state, territory or country in the non-exclusive extensions as stated above.

The Company received 2,000,000 common shares of Global and $27,500 in cash, which the Company recorded as income during the year ended June 30, 1999. The payment extinguishes the Company's right to minimum royalties in any year until the first full calendar year following the fiscal year in which Global becomes profitable. The shares will be delivered, prior the establishment of a trading market for Global shares. The terms in this agreement will be deemed to amend the prior agreement, and thus will govern the prior agreement in the terms related to the previous agreement. Both parties have agreed to update certain terms in the previous agreement that will be beneficial to both parties. At June 30, 2001, the Company wrote down the marketable securities to $-0- as there was no quoted market value for the marketable securities.

F-16

8. DEBT Short-term debt at June 30, is as follows:

|  | 2002 | 2001 |
|---|---|---|
| Secured notes, interest at 10% to 12% per year, due on demand. The loans are secured by inventory, receivables and equipment (1) | $ 492,500 | $ 330,000 |
| Unsecured notes, interest at 10% to 16% per year, due on demand (2) | 654,323 | 890,628 |
| Unsecured note, interest at 10%, due February 2003 (6) | 100,000 | – |
| Unsecured officer loans, due 6/30/03, interest at prime plus 2% (6.75% at June 30, 2002) (3) | 107,257 | 78,000 |
|  | $ 1,354,080 | $ 1,298,628 |

Long-term debt at June 30, is as follows:

|  | 2002 | 2001 |
|---|---|---|
| Secured note due December 31, 2003, interest at 12% per year. The loan is secured by production equipment | $ 850,000 | $ 850,000 |
| Secured notes, interest at 10% to 12% per year. The loans are secured by equipment. (1) | – | 150,000 |
| Unsecured officer loans, due December 31, 2003 interest at prime plus 2% (6.75% at June 30, 2002) (4) | 1,128,684 | 1,103,603 |
| Unsecured notes, interest at 10% per year, due December 31, 2003 (2) | 405,060 | – |
| Unsecured notes, interest at prime plus 2% (6.75% at June 30, 2002) due December 31, 2003 (5) | 888,006 | 888,006 |
|  | 3,271,750 | 2,991,609 |
| Current portion of long-term debt | – | 850,000 |
|  | $ 3,271,750 | $ 2,141,609 |

F-17

Annual maturities on long-term debt as of June 30, 2002 during the next five years are:

```
                Year Ending June 30,
        -------------------------------

                2003                          $ 3,764,250
                2004                                    -
                2005                                    -
                2006                                    -
                2007                                    -
                                              -------------
                                              $ 3,764,250
                                              =============
```

(1) The holders of these notes received as additional consideration 135,625 shares of the Company's common stock. For the years ended June 30, 2002, 2001 and 2000 the Company recorded interest expense of $109, $ 6,600 and $20,313, respectively.

(2) The holders of these notes received as additional consideration 2,377,765 shares of the Company's common stock. For the year ended June 30, 2002, 2001 and 2000 the Company recorded interest and consulting expense in the amount of $26,224, $126,425 and $70,802, respectively.

(3) The unsecured note payable represents loans made to the Company by the Company's Vice-President and Secretary. Interest expense for the year ended June 30, 2002, 2001 and 2000 amounted to $8,674, $7,536 and $1,223, respectively. Accrued interest at June 30, 2002 and 2001 was $14,292 and $5,618, respectively. In consideration for the loan, the Company issued 45,594 shares of the Company's common stock and recorded additional interest expense in the amount of $1,090, $4,463 and $3,208 for the years ended June 30, 2002, 2001 and 2000.

(4) The unsecured note payable represents loans made to the Company by Mr. Zsigmond Sagi ("Mr. Sagi"), the Company's president and Chief Executive Officer. Interest expense for the years ended June 30, 2002, 2001 and 2000 amounted to $83,840, $108,800 and $105,452, respectively. Accrued interest at June 30, 2002 and 2001 was $340,244 and $256,404, respectively. In consideration for loans, the Company issued 153,585shares of the Company's common stock and recorded additional interest expense in the amount of $225, $34,629 and $32,969 for the years ended June 30, 2002, 2001 and 2000.

(5) The holder of the note was a corporation controlled by Mr. Sagi. On March 31, 1998, the corporation holding the note dissolved and distributed the note to its five shareholders in equal amounts of $177,601. Two of the five shareholders are executive officers of the Company, including Mr. Sagi and Carlo Civelli, former Vice President of Finance International. The note terms were renegotiated with the lenders with principal payments due December 31, 2000 and interest at prime plus two (2%) percent. The notes have been extended to December 31, 2003. Accrued interest at June 30, 2002 and 2001 was $385,170 and $318,570, respectively. Interest expense for the years, ended June 30, 2002, 2001 and 2000, amounted to $66,600, $88,800 and $88,800, respectively.

F-18

(6) The unsecured note payable was renegotiated on August 20, 2002. The unaffiliated third party advanced an additional $150,000 and, including accrued interest, the new note amounted to $253,206. The note matures on February 20, 2003. The Company is required to make payments of $50,000 per month commencing November 20, 2002 and the balance payable at maturity or, if greater, the Company will pay $0.475 for each unit of the BeastCare devices sold in Brazil for which the Company receives payment.

## 9. INCOME TAXES

At June 30, 2002, the Company had a net operating loss ("NOL") carryforward of approximately $12,000,000 for financial reporting purposes and approximately $7,700,000 for tax purposes. The difference between financial reporting and tax purposes results from the temporary difference caused by the capitalization of start-up expenditures for tax purposes required by Internal Revenue Code Section 195 and the net unrealized losses on marketable securities. The Company has not reflected any benefit of such net operating loss carryforwards in the accompanying financial statements in accordance with Financial Accounting Standards Board Statement No. 109 as the realization of this deferred tax benefit is not more than likely. The tax NOL carryforwards expire in the years 2005 through 2020.

A reconciliation of taxes on income at the federal statutory rate to amounts provided is as follows:

|  | Years Ended June 30, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
| Tax benefit computed at the Federal statutory rate | $(687,000) | $ (945,000) | $ (1,127,000) |
| Increase (decrease) in taxes resulting from: |  |  |  |
| Effect of unused tax losses | 687,000 | 945,000 | 1,127,000 |
|  | $ - | $ - | $ - |

The types of temporary differences between the tax basis of assets and liabilities and their financial reporting amounts that give rise to a deferred tax asset and deferred tax liability and their approximate tax effects are:

|  | June 30, | | | |
|  | 2002 | | 2001 | |
|  | Temporary Difference | Tax Effect | Temporary Difference | Tax Effect |
|---|---|---|---|---|
| Net operating loss carry-forward | $ (7,700,000) | $(3,080,000) | $(6,635,000) | $(2,654,000) |
| Deferred start-up expenses | (3,666,000) | (1,466,000) | (3,666,000) | (1,466,000) |
| Unrealized (losses) on marketable securities | (299,000) | (120,000) | (299,000) | (120,000) |
| Valuation allowance | 11,665,000 | 4,666,000 | 10,600,000 | 4,240,000 |
|  | $ - | $ - | $ - | $ - |

## 10. SEGMENTS - GEOGRAPHIC AREAS

The Company does not have reportable operating segments as defined in the Statement of Financial Accounting Standards No. 131, "Disclosure about Segments of an Enterprise and Related Information". The method for attributing revenues to individual countries is based on the destination to which finished goods are shipped. The Company operates facilities in the United States and South America.

All sales attributable to South America of the BreastCare(TM)/BreastAlert(TM) for the year ended June 30, 2000, were to the Company's South American licensee, Sandell Corporation S.A.("Sandell"), a related party, which the Company previously owned 35% of the outstanding shares. Sales of the BreastCare(TM)/BreastAlert(TM) were not recorded by the Company until Sandell shipped the BreastCare(TM)/BreastAlert(TM) to unrelated entities. As of June 30, 1999 the Company terminated its license agreement with Sandell. All sales for the year ended June 30, 2001 were shipped from the United States to one customer in Brazil. Revenues include license fees received by the Company in connection with various arrangements contracted throughout the world. See Note 7 of Notes to Consolidated Financial Statements for further information.

|                                                                | 2002 | 2001 | 2000 |
|----------------------------------------------------------------|------|------|------|
| **Revenues from unrelated entities and countries of Company's domicile:** | | | |
| United States                                                  | $ -  | $ -  | $ 59,420 |
| South America                                                  | -    | 21,137 | 24,000 |
| Ireland                                                        | -    | -    | 5,355 |
|                                                                | $ -  | $ 21,137 | $ 88,775 |
| **Total Revenues:**                                            | | | |
| United States                                                  | $ -  | $ -  | $ 59,420 |
| South America                                                  | -    | 21,137 | 24,000 |
| Ireland                                                        | -    | -    | 5,355 |
|                                                                | -    | 21,137 | 88,775 |
| Less: intergeographic revenue                                  | -    | -    | - |
|                                                                | $ -  | $ 21,137 | $ 88,775 |
| **Loss from operations:**                                      | | | |
| United States                                                  | $(1,432,331) | $(1,510,441) | $(1,880,632) |
| South America                                                  | (115,994) | (366,619) | (553,954) |
|                                                                | $(1,548,325) | $(1,877,060) | $(2,434,586) |
| **Assets:**                                                    | | | |
| United States                                                  | $ 2,710,448 | $ 2,867,192 | $ 3,125,614 |
| South America                                                  | 8,389 | 103,474 | 118,599 |
|                                                                | 2,718,837 | 2,970,666 | 3,244,213 |
| Less: intergeographic eliminations                             | (1,199,086) | (1,131,926) | (887,564) |
|                                                                | $ 1,519,751 | $ 1,838,740 | $ 2,356,649 |
| **Capital Expenditures:**                                      | | | |
| United States                                                  | $ -  | $ -  | $ - |
| South America                                                  | -    | -    | 43,500 |
|                                                                | $ -  | $ -  | $ 43,500 |
| **Depreciation and amortization expense:**                     | | | |
| United States                                                  | $ 295,180 | $ 367,065 | $ 367,065 |
| South America                                                  | -    | -    | - |
|                                                                | $ 295,180 | $ 367,065 | $ 367,065 |

F-21

Transfers between geographic areas include raw materials manufactured in the United States which are shipped to South America to be manufactured into finished products. Loss from operations represents total revenue less operating expenses.

Identifiable assets are those assets of the Company that are identified with the operation of each geographic area.

## 11. STOCK ISSUED FOR SERVICES AND LOAN FINANCING

For the years ended June 30, 2002, 2001 and 2000, the Company issued 2,099,466, 3,013,900 and 694,573, respectively of the Company's common stock to employees and non-employees as stock-based compensation in the amount of $159,918, $302,517 and $199,254, respectively.

## 12. STOCK OPTIONS AND WARRANTS

The Company has adopted the disclosure-only provisions of the Statement of Financial Accounting Standards No. 123 "Accounting for Stock-Based Compensation". Accordingly, no compensation cost has been recognized for the stock options awarded. Had compensation cost for the Company's issuance of stock options and warrants been determined based on the fair value at the grant date for awards in fiscal years ended 2002, 2001 and 2000, consistent with the provision of SFAS No. 123, the Company's net loss and net loss per share would have increased to the pro-forma amounts indicated below:

|  | June 30, | | |
| --- | --- | --- | --- |
|  | 2002 | 2001 | 2000 |
| Net (loss) - as reported | $ (2,021,596) | $ (2,361,171) | $ (2,816,465) |
| Net (loss) - pro-forma | (2,219,413) | (2,823,392) | (3,260,223) |
| Loss per share - basic and diluted - as reported | $ (0.08) | $ (0.12) | $ (0.15) |
| Loss per share - basic and diluted -pro-forma | $ (0.08) | $ (0.14) | $ (0.18) |

F-22

The fair value of options and warrants are estimated on the date of grant using the Black-Scholes option pricing method with the following weighted average assumptions issued for grants in 2002, 2001 and 2000, respectively: dividend yield of 0%, expected volatility of 151% to 180%, risk free interest rate of 5.0% and expected lives of 2 1/2 years.

The Company has granted stock options and warrants as follows:

(a) On March 7, 1995, the Company established a Non-Qualified Stock Option Plan (the "Plan"), which provides for the granting to key employees stock options. The Plan provides for the issuance of up to 500,000 shares, none of which have been registered. No shares have been granted as of June 30, 2002.

(b) On March 7, 1995, the Company established a Stock Grant Program, which provides for the granting to key employees common stock of the Company. The Stock Grant Program provides for the issuance of up to 500,000 shares, none of which have been registered. No shares have been granted as of June 30, 2002.

(c) The following options and warrants were granted outside the two March 7, 1995 Plans:

On May 1, 2002, the Company granted 750,000 warrants to purchase the Company's common stock at an exercise price of $.015 per share, which was below the fair value on the date of grant, to professionals and consultants for services rendered in the amount of $25,597. The warrants are exercisable immediately and expire April 30, 2007.

On May 1, 2002, the Company granted options to purchase up to 10,000,000 shares of the Company's common stock at an exercise price of $.015, which was below the fair value at the date of grant to the Company's President and Chief Executive Officer. The Company recorded additional compensation expense of $200,000 for the year ended June 30, 2002, which is included in selling, general and administrative expenses. The options are exercisable immediately and expire on April 30, 2007.

On May 1, 2002, the Company granted options to purchase 4,000,000 shares of the Company's common stock at an exercise price of $.015, which was below the fair value at the date of grant, to the Company's Vice President and Secretary. The Company recorded additional compensation expense of $80,000 for the year ended June 30, 2002, which is included in selling, general and administrative expenses. The options are exercisable immediately and expire April 30, 2007.

On February 8, 2002, the Company granted 1,050,000 warrants to purchase the Company's common stock at an exercise price of $.035 per share, the fair value on the date of grant, to professionals and consultants for services rendered, in the amount of $35,317. The warrants are exercisable immediately and expire February 6, 2007.

F-23

On April 3, 2001, the Company granted warrants to purchase 330,000 shares of the Company's common stock at an exercise price of $.07 per share, the fair market value at the date of grant to the Company's attorneys and consultants for services rendered charged to general and administrative expenses in the amount of $1,850. The warrants were cancelled on October 8, 2001.

On April 3, 2001, the Company granted options to three directors totaling 40,000 shares each (120,000 shares) of the Company's common stock at an exercise price of $.07 per share, the fair value at the date of grant. The options are exercisable immediately and expire April 2, 2006.

On April 3, 2001, the Company granted options to purchase up to 3,392,857 shares of the Company's common stock at an option price of $.07 per share, the fair value at the date of grant, for the conversion of accrued salaries from January 1, 2000 through March 31, 2001 to the Company's President and Chief Executive Officer. The options were cancelled on October 8, 2001.

On April 3, 2001, the Company granted options to purchase up to 1,606,143 shares of the Company's common stock at an option price of $.07 per share, the fair value at the date of grant, for the conversion of accrued salaries from January 1, 2000 through March 31, 2001 to the Company's Vice President and Secretary. The options were cancelled on October 8, 2001.

On December 30, 1999 the Company granted warrants to purchase 190,000 shares of the Company's common stock at an exercise price of $.07 per share, the fair value at the date of grant, to the Company's attorneys, for legal services, which were charged to general and administrative expenses, in the amount of $9,728. The warrants are exercisable immediately and expire December 29, 2004.

On December 30, 1999, the Company granted options to purchase up to 5,428,571 shares of the Company's common stock at an option price of $.07 per share, the fair value at the date of grant, for the conversion of accrued salaries to the Company's President and Chief Executive Officer. The options were cancelled on October 8, 2001.

On December 30, 1999, the Company granted options to purchase up to 1,428,572 shares of the Company's common stock at an option price of $.07 per share, the fair value at the date of grant, for the conversion of accrued salaries to the Company's Vice President and Secretary. The options were cancelled on October 8, 2001.

On December 30, 1999, the Company granted warrants to purchase 100,000 shares of the Company's common stock at an exercise price of $.07 per share, the fair value at the date of grant, to consultants for financial consulting services rendered, which was charged to general and administrative expense, in the amount of $5,120. The warrants were cancelled on October 8, 2001.

F-24

On December 30, 1999, the Company granted warrants to purchase 600,000 shares of the Company's common stock at an exercise price of $.07 per share, the fair value at the date of grant, to the Company's President and Chief Executive Officer. The warrants were cancelled on October 8, 2001.

On December 30, 1999, the Company granted warrants to purchase 340,000 shares of the Company's common stock at an exercise price of $.07, the fair value at the date of grant, to the Company's Vice-President and Secretary. Such warrants were cancelled on October 8, 2001.

On December 30, 1999, the Company granted options to three directors totaling 40,000 shares each (120,000 shares) of the Company's common stock at an exercise price of $.07, the fair value at the date of grant. The options are exercisable immediately and expire December 29, 2004.

On December 30, 1999, the Company granted warrants to purchase 750,000 shares of the Company's common stock at an exercise price of $.07, the fair value at the date of the grant, to employees of the Company. The warrants were cancelled on October 8, 2001.

On May 14, 1999, the Company granted 4,375,027 options to officers and employees to purchase the Company's common stock at an exercise price of $.21875 per share, the fair value at the date of grant. The options are exercisable immediately and expire May 14, 2004. On October 8, 2001, 4,275,027 options were cancelled.

On December 14, 1998 the Company granted warrants to purchase 100,000 shares of the Company's common stock at an exercise price of $.1875 per share, the fair value at the date of grant, to consultants in exchange for professional services rendered which were charged to general and administrative expense, in the amount of $3,981. The warrants were cancelled on October 8, 2001.

On August 5, 1998, the Company granted options to two directors totaling 40,000 shares each (80,000 shares) of the Company's common stock at an option price of $.5625 per share, the fair value at the date of grant. The options are exercisable immediately and expire August 5, 2003.

During the year ended June 30, 1998, the Company granted 400,000 warrants to purchase the Company's common stock at exercise prices ranging from $.55 to $1.125, the fair value on the date of grant, to consultants for services rendered, which were charged to general and administrative expenses, in the amount of $27,780. The warrants are exercisable immediately and expire on dates ranging from July 31, 2000 to January 26, 2003. 15,000 warrants on July 31, 2000 and 200,000 warrants were cancelled on October 31, 2001.

On January 26, 1998, the Company granted options to officers of the Company to purchase a total of 450,000 shares of the Company's common stock at an exercise price of $.55 per share, the fair value at the date of grant. The options were cancelled on October 8, 2001.

Information regarding the Company's Stock Option Plan and Warrants, for fiscal years ended 2002, 2001 and 2000, is as follows:

|  | 2002 | | 2001 | | 2000 | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price |
| Options and warrants outstanding beginning of year | 20,056,170 | $ 0.11 | 14,402,170 | $ 0.15 | 6,418,205 | $ 0.28 |
| Options and warrants exercised | – | – | – | – | – | – |
| Options and warrants granted | 15,800,000 | 0.016 | 5,669,000 | 0.07 | 8,957,163 | 0.07 |
| Options and warrants expired /cancelled | (19,261,170) | (0.12) | (15,000) | 1.13 | (973,198) | 0.48 |
| Options and warrants out-standing, end of year | 16,595,000 | $ 0.030 | 20,056,170 | $ 0.11 | 14,402,170 | $ 0.15 |
| Option and warrants price range at end of year | $.015 – $.75 | | $.07 to $.75 | | $.07 to $1.13 | |
| Option and warrants price range for exercised shares | – | | – | | – | |
| Options and warrants available for grant | 1,000,000 | | 1,000,000 | | 1,000,000 | |
| Weighted average fair value of options and warrants granted during the year | $ 0.034 | | $ .05 | | $ .05 | |
| Options and warrants granted below fair market value | 14,750,000 | $ 0.015 | | | | |

The following table summarizes information about fixed-price stock options and warrants outstanding at June 30, 2002.

| Range of Exercise Prices | Number Outstanding at June 30, 2002 | Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable at June 30, 2002 | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $.015 - $.035 | 15,800,000 | 4.0 years | $ 0.016 | 15,800,000 | $ 0.016 |
| $.07 | 430,000 | 3.0 years | $ 0.040 | 430,000 | $ 0.090 |
| $21875 | 100,000 | 1.8 years | $ 0.220 | 100,000 | $ 0.220 |
| $.5625 | 265,000 | .4 years | $ 0.690 | 265,000 | $ 0.690 |
| | 16,595,000 | | | 16,595,000 | |

## 13. RELATED PARTY TRANSACTIONS

(a) On March 31, 1998, SMC Corp. dissolved and distributed the note due from the Company to its five shareholders, including Mr. Sagi and Carlo Civelli. See Number (5) in Note 8 of Notes to Consolidated Financial Statements for further information. The principal amount of the note at June 30, 2002 and 2001 was $177,601 for Mr. Sagi and Mr. Civelli. Interest expense for the year ended June 30, 2002, 2001 and 2000 was $13,320, $17,538 and $17,760 each, for Mr. Sagi and Mr. Civelli. As of June 30, 2002 and 2001 accrued interest in the amount of $77,034 and $63,714 was due Mr. Sagi and Mr. Civelli.

(b) On June 30, 2002, August 1, 2000 and July 1, 1999, the Company issued 6,435, 67,900 and 79,250 shares of the Company's common stock to Mr. Sagi in consideration for loan financing for operations. In connection with the transaction the Company recorded interest expense in the amount of $225, $34,629 and $32,969 for the years ending June 30, 2002, 2001 and 2000, respectively.

F-27

(c) On June 30, 2002, August 1, 2001 and July 1, 1999, the Company issued 31,141, 8,930 and 5,765 shares of the Company's common stock to the Company's Vice President and Secretary, in consideration for loan financing for operations. In connection with the transaction the Company recorded interest expense in the amount of $1,090, $4,463 and $3,208 for the years ending June 30, 2002, 2001 and 2000, respectively.

(d) On December 29, 2000, July 6, 2000, March 8, 2000, December 30, 1999 and July 1, 1999 the Company issued a total of 25,000 shares of the Company's common stock to a Company director in consideration for loan financing for operations. In connection with the transaction the Company recorded interest expense in the amount of $2,775 and $2,419 for the year ending June 30, 2001 and 2000, respectively.

(e) On July 7, 1999, the Company issued 50,000 shares of the Company's common stock to a former director of the Company as part of his employment agreement. In connection with the transaction the Company recorded compensation expense in the amount of $9,375 for the year ending June 30, 2000.

(f) On July 7, 1999, the Company sold 45,767 shares of the Company's common stock to an officer and director of the Company. The Company received $10,000 net proceeds from the sale. On April 14, 2000, the Company also issued 35,200 shares of the Company's common stock to the same officer and director in exchange for consulting services worth $8,800.

(g) On April 3, 2001, the Company issued 750,000 and 350,000 shares of the Company's common stock to Mr. Sagi and the Company's Vice-President/Secretary, respectively for bonuses. In connection with the transaction the Company recorded compensation expense in the amount of $88,000 for the year ended June 30, 2001.

(h) The Company and Zigmed Corporation ("Zigmed") have entered into various agreements. Zigmed is owned and controlled by two sons of Mr. Sagi, who, prior to 1990, owned Zigmed. The Company has contracted with Zigmed to manufacture its sensor production equipment needed for its production centers. The Company sublets warehouse space to Zigmed for $1,970 per month and received $23,148 and $23,640 as rental income from Zigmed for the years ended June 30, 2001 and 2000. The Company has also contracted with Zigmed for the production of the BreastCare(TM)/BreastAlert(TM) sensors. Zigmed provided material, labor and product testing services of $30,000 and $34,748 for the years ended June 30, 2002 and 2001. The Company owes Zigmed approximately $82,000 and $92,000 as of June 30, 2002 and 2001 for labor.

F-28

**Leases**

The Company leases office and warehousing facilities. Certain of these leases require the Company to pay certain executory costs (such as insurance and maintenance). In June, 1997 the Company signed a three
(3) year lease for office and warehouse space in Denville, New Jersey and amended its lease on April 15, 1999 to include an additional 6,000 square feet adjacent to its corporate headquarters. The lease was further amended on June 14, 2001 for 7,000 square feet of office and warehouse space and extended through June 14, 2003. The Company also rents office space in Brazil, on a month-to-month basis, costing approximately $350 a month.

Future minimum lease payments for operating leases are as follows:

```
       Years Ending June 30,
       ---------------------
       2003                            $120,463
       2004                             131,032
       2005                             131,032
       2006                              21,839
       2007                                   -
       Thereafter                            -
                                      --------------
                                       $404,366
```

Rent expense for the years ended June 30, 2002, 2001 and 2000 was approximately $120,000, $126,000 and $104,000, respectively.

**Employment Agreements**

The Company has entered into employment contracts with the two officers/directors of the Company. The agreements all provide the following: base salaries increasing upon certain conditions, incentive bonus plans and severance benefits.

**Production Agreements**

The Company has entered into an amended agreement with Zigmed pursuant to which Zigmed manufactured the sensor production equipment needed for the manufacturing centers for the contract price of $1,850,680 plus 100,000 shares of the Company's common stock. In August 1996, the Company paid Zigmed an advance deposit of $200,000 to begin production of the manufacturing equipment, and in September 1996 issued Zigmed 100,000 shares of the Company's common stock (valued at $1.00 per share) against the contract. The manufacturing equipment has been completed and delivered to the Company for use. As of June 30, 2002, the Company owes Zigmed $718,276.

The Company's Brazilian subsidiary terminated an agreement to construct a 2,550 square meter manufacturing facility in Recife, Pernambuco - Brazil at the new port of Suape due to non-performance by the Company. The Company expects to find a new location and construct a facility during 2003.

### Financial Agreements

In 2002, the Company's Brazilian subsidiary received notification of a termination of its agreement with a federal program organized to develop the Northeast area of Brazil. The Company's Brazilian subsidiary was approved to receive funding but failed to fulfil certain milestones by December 31, 2001.

### Legal Proceedings

The Company is a defendant in various legal proceedings seeking claims aggregating approximately $100,000, which has been included in accrued expenses in the Company's financial statements at June 30, 2002.

F-30

**ITEM 8. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

On October 2, 2002 Wiener, Goodman & Company, P.C., the Company's Independent Public accountants resigned. Wiener, Goodman & Company, P.C. determined that it would be necessary to provide internal accounting services with respect to the Company which it determined would make it inappropriate for it to continue as the Company's Independent Accountants.

The Company engaged Grassi & Co., CPA's, P.C. as the Company's certifying accountants to audit the financial statements for its fiscal year ending June 30, 2002.

## PART III

## ITEM 9. DIRECTORS AND EXECUTIVE OFFICERS; PROMOTERS AND CONTROL PERSONS; COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT

The following table and biographical outlines set forth the directors, and officers within the Company, positions presently held by each executive officer of the Company, and a brief account of the business experience of each such director and officer for the past five years.

| Name | Age | Positions and Officers within the Company/ Business Experience |
| ---- | ----- | ------------------------------- |
| Zsigmond L. Sagi, Ph.D. | 69 | President, Chairman of the Board, and Chief Executive Officer |
| Patricia B. Furness | 55 | Vice President, Corporate Secretary and Director |
| Maurice Siegel, Ph.D. | 72 | Vice President of Research and Development and Director |
| Louis Gottlieb | 74 | Vice President of Corporate Development |
| Paul Nelson | 72 | Director |

-34-

ZSIGMOND L. SAGI, PH.D., has served as President, Chairman of the Board, Chief Executive Officer and Chief Scientist of the Company since October 1991. Mr. Sagi has over 30 years experience in the health-care field and has invented or developed several commercial medical devices and technological products. From 1968 until 1977 he served as Executive Vice President and Chief Operating Officer of Bio-Medical Sciences, Inc., a publicly held company of which he was one of the founders. Thereafter, he organized and managed several companies, including Zigmed Corp., a healthcare engineering firm. In 1974, he founded BCSI Laboratories, Inc., the company which developed the BreastCare(TM)/BreastAlert(TM). From 1986 until 1991, Mr. Sagi served as Chairman of the Board and President of SMC Corp., a company he founded in 1986. Mr. Sagi has been issued numerous United States and foreign patents in the fields of healthcare, chemical applications, electronics and mechanics, including the disposable oral thermometer, the Zigzag sewing machine, an ambulatory automated feeding device, and a sterilization indicator. He received his master's in mechanical engineering in 1954 and his doctorate in Physics in 1956 from the Technical University of Hungary.

PATRICIA B. FURNESS, has served as the Vice President, Secretary and Director of the Company since 1991. In addition to managing marketing and public relations for the Company, Ms. Furness is also responsible for coordinating product and business information to the medical and financial community and for coordinating clinical follow up studies. From 1988 until 1991 she served as Vice President and Secretary of Scantek Medical Corp., and, in 1989, was elected to its Board of Directors. In 1987, Ms. Furness became the Manager of Corporate Development of Zigmed, Inc., a manufacturer of automated systems for the health care industry. Ms. Furness received a Bachelor of Science Degree in education from Appalachian State University in Boone, North Carolina in 1969 and graduate course study in Human Relations.

MAURICE SIEGEL, PH.D., has served as the Company's Vice President of Research and Development since 1991 and as a Director of the Company since August 1997. Since 1989, Mr. Siegel served in the same capacity with Scantek Medical Corp., the Company's predecessor. From 1980 to 1984, Mr. Siegel was responsible for the continuing research and development of the BreastCare(TM)/BreastAlert(TM). He supervised the analytical and manufacturing operation and was involved in the process of receiving FDA medical device approval for the BreastCare(TM)/BreastAlert(TM)for sale to the professional market. Mr. Siegel was employed by Faberge, Inc. from 1957 through 1987, as Director of Research and Development from 1957 to 1996, as Vice President of Research and Development from 1966 to 1977, and last holding the position of Executive Vice President of Research and Development from 1977 to 1987. Since 1987, Mr. Siegel has been self employed and has served, and continues to serve, as a consultant to numerous companies, including Tri-Scent, Imported Beauty Lines, Telebrands and Sun Laboratories. Mr. Siegel received a Ph.D. in Physical and Organic Chemistry from New York University in 1957.

LOUIS GOTTLIEB has served as Vice President of Corporate Development since August 1996. Presently, he is on the Board of Directors at Brookdale Hospital Medical Center, Linrock Nursing Home, First Central Financial Corp. From 1992-1995, Mr. Gottlieb was Treasurer and a board member of South Shore Association for Independent Living. Since 1973 he has served as CEO of the Gottlieb Group, one of the largest 500 construction firms in the U.S. From 1942 to 1945, Mr. Gottlieb served in the US Air Corps. as a Commissioned Lt. Fighter pilot. Mr. Gottlieb studied civil engineering at Brooklyn Polytechnical Institute.

-35-

PAUL NELSON has served on the Company's Board of Directors since 1994. From 1987 until 1990 he served as a Director of Scantek Medical Corp., the Company's Predecessor. In 1968, Mr. Nelson founded compressed Gas, Inc., a wholesale supplier of medical and industrial compressed gases, whereby he served as President and a Director of such company; Mr. Nelson has since sold his ownership in such company. Mr. Nelson received a Bachelor of Science Degree from the University of North Carolina in Chapel Hill, North Carolina.

**Compliance with 16(a) of the Securities and Exchange Act of 1934**

To the Company's knowledge, based solely on a review of such materials as are required by the Securities and Exchange Commission, no officer, director or beneficial holder of more than ten (10%) percent of the Company's issued and outstanding shares of Common Stock failed to timely file with the Securities and Exchange Commission any form or report required to be so filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 during the fiscal year ended June 30, 2002.

**ITEM 10. EXECUTIVE COMPENSATION**

The following sets forth, for the fiscal years ended June 30, 2002, 2001 and 2000, the annual and long-term compensation paid or accrued of the Company's named officers.

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Year | Annual Compensation Salary | Bonus | Underlying Other | Long-Term Compensation Awards Securities Options/SARs (#) | Compensation |
|---|---|---|---|---|---|---|
| Zsigmond L. Sagi President, Chairman of the Board, Chief Executive Officer | 2002 2001 2000 | $190,000 190,000 190,000 | $-- $60,000 $-- $-- | 10,000,000 3,392,857 6,028,571 | $-- $-- $-- | |
| Patricia Furness Vice President Secretary and | 2002 2001 2000 | 90,000 90,000 90,000 | $-- 28,000 $-- -- $-- | 4,000,000 1,606,143 1,768,572 | $-- $-- $-- | |

**EMPLOYMENT AGREEMENTS**

In July 1996, the Company entered into employment agreements in principle with Mr. Sagi and Ms. Furness. The agreements provide for base salaries of $190,000 and $75,000 respectively, incentive bonus plans and severance benefits. Mr. Furness's base salary was increased to $90,000 effective July 1997.

In April 2001, the Company issued 750,000 and 350,000 shares of the Company's common stock to Mr. Sagi and Ms. Furness as bonuses and for deferring their salaries for the part three years.

The following table contains information regarding the grant of stock options during the year ended June 30, 2002 to the named Executive Officers.

## OPTION/SAR GRANTS IN LAST FISCAL YEAR

| Name | Number of Securities Underlying Options/SARs Granted (#) | Percent of Total Options/SARs Granted to Employees in 2001 | Exercise or Base Price ($/sh.) | Expiration Date | Potential Realizable at Assumed Value Annual Rates of Stock Price Appreciation For Option Term (3) | |
|------|---------|---------|---------|------|------|------|
| | | | | | 5% | 10% ($) |
| | | | | | ------ | ------ |
| Zsigmond L. Sagi (1) | 10,000,000 | 71.4 % | $.015 | 04/30/2007 | 445,000 | 562,000 |
| Patricia Furness (2) | 4,000,000 | 28.6 % | $.015 | 04/30/2007 | 178,000 | 224,800 |

(1) On May 1, 2002 the Company issued 10,000,000 options to purchase the Company's common stock to Mr. Sagi for accrued salaries.

(2) On May 1, 2002 the Company issued 4,000,000 options to purchase the Company's common stock to Ms. Furness for accrued salaries.

(3) Amounts represent hypothetical gains that could be achieved if the listed options were exercised at the end of the option term. These gains are based on assumed rates of stock price appreciation of 5% and 10% compounded annually from the date the options were granted to their expiration date, based upon fair market value of the Common Stock as of the date the options were granted. Actual gains, if any, on stock option exercises and stock holdings are dependent upon the future performance of the Company and overall financial market conditions. There can be no assurance that amounts reflected in this table will be achieved.

## Option Exercises and Holdings

The following table sets forth information regarding stock options exercised by the Named Officers during the year ended June 30, 2002, including the aggregate value of gains on the date of exercise. In addition, the following table provides data regarding the number of shares covered by both exercisable and non-exercisable stock options at June 30, 2002. Also reported are the values for "in-the-money" options, which represent the positive spread between the exercise price of existing options and $.07 the closing sale price of the Company's common stock on June 30, 2002.

-37-

**AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION/SAR VALUES**

| Name | Common Shares Acquired on Exercise # | Realized Value (Market Price on Exercise Date Less Date Less Exercise Price) ($) | Number of Securities Underlying Unexercised Options/SARs at Year End # | | Value of Unexercised In-The-Money Options/SARs at Year End $ | |
|------|------|------|------|------|------|------|
| | | | Excersiable | Unexercisable | Excersiable | Unexercisable |
| Zsigmond L. Sagi | - | -- | 10,000,000 | -- | 550,000 | -- |
| Patricia Furness | - | -- | 4,000,000 | -- | 220,000 | -- |

## ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information known to the Company as of the date of this Statement, with respect to beneficial ownership of: (i) each person who is known by the Company to be the beneficial owner of more than five (5%) percent of the Company's outstanding Common Stock; (ii) each of the Company's directors and executive officers; and (iii) all officers and directors as a group. Except as otherwise indicated, the Company believes that the beneficial owners of the Common Stock listed below, based on information furnished by such owners, have sole investment and voting power with respect to such shares, subject to community property laws, where applicable.

-38-

| Title of Class | Name & Address of Beneficial Owner | Amount & Nature of Beneficial Owner | Percentage of Class |
|---|---|---|---|
| Common Stock | Zsigmond L. Sagi<br>P.O. Box 307<br>Mountain Lakes, NJ 07046 | 14,701,002<br>(2), (3), (4), (5) | 37.4 % |
| Common Stock | 361 Acquisition Corp.<br>885 W. Georgia St. Suite 1200<br>Vancouver, BC<br>Canada V6L 3E8 | 2,121,250 | 7.3 % |
| Common Stock | Patricia B. Furness<br>25 Beechway Road<br>Mountain Lakes, NJ 07046 | 5,412,594<br>(6), (7), (8), (9) | 16.3 % |
| Common Stock | Angela Chen Sabella<br>853 East Valley Blvd,<br>Suite 200<br>San Garbrial, CA 91776 | 2,000,000 | 6.8 % |
| Common Stock | Louis Gottlieb<br>20 N. Central Avenue<br>Valley Stream, NY 11580 | 646,250<br>(10) | 2.2 % |
| Common Stock | Paul Nelson<br>69 Lookout Road<br>Mountain Lakes, NJ 07046 | 244,500<br>(11) | .01 % |
| Common Stock | Maurice L. Siegel<br>560 W. 43rd Street<br>New York, NY 10036 | 230,967<br>(12) | .01 % |
| Common Stock | All Directors & Officers as a Group (consisting of 5 persons) | 21,235,313 | 48.8% |

(1) There were 29,255,156 shares of Common Stock outstanding as of October 1, 2002.

-39-

(2) Includes 750,000 shares of the Company's Common Stock issued to Mr. Sagi on April 3, 2001 for deferring annual salary.

(3) Includes 10,000,000 shares issuable to Mr. Sagi upon the exercise of options granted on May 1, 2002 for the conversion of accrued salary.

(4) Does not include 45,000 shares of the Company's Common Stock owned by Mr. Sagi's former wife, and 98,500 shares of the Company's Common Stock owned by Mr. Sagi's children and their spouses, as to which Mr. Sagi disclaims beneficial ownership.

(5) Includes 6,435 shares issued on June 30,2002 in connection with financing for the Company.

(6) Includes 10,000 shares owned by Ms. Furness' children, as to which Ms. Furness disclaims beneficial ownership.

(7) Includes 350,000 shares of the Company's Common Stock issued to Ms. Furness on April 3, 2001 for deferring annual salaries.

(8) Includes 4,000,000 shares issuable to Ms. Furness upon the exercise of options granted on May 1, 2002 for the conversion of accrued salary.

(9) Includes 31,441 shares issued to Ms. Furness on June 30, 2002 in connection with financing for the Company.

(10) Includes 40,000 shares issuable to Mr. Gottlieb upon the exercise of options granted April 3, 2001.

(11) Includes 80,000 shares issuable to Mr. Nelson upon the exercise of options granted on December 30, 1999 and April 3, 2001.

(12) Includes 120,000 shares of the Company's Common Stock, issuable upon the exercise of options granted on August 5, 1998, December 30, 1999 and April 3, 2001 to Mr. Siegel.

-40-

(a) The Company and SMC Corp. entered into various agreements with an investment banking firm ("361 Acquisition Corp.") to, among other things, provide financing for the Company in exchange for shares of common stock. In exchange for terminating all prior agreements between 361 and the Company and SMC Corp., the Company issued 621,250 shares of its common stock to 361 representing services valued at approximately $78,000, which was approved by the Board of Directors on March 7, 1995. On March 31, 1998, SMC Corp. dissolved and distributed the note receivable of $888,006 from the Company to its five shareholders in equal amounts of $177,601, including Mr. Sagi (the Company's President and Chief Executive Officer), Carlo Civelli (former Vice President of Finance International of the Company), Kilham Management, Malir Enterprises Corp., and Zurow Investment S.A. The note terms were renegotiated with the lenders with interest at prime plus two (2%) percent. As of June 30, 2002, accrued interest in the amount of $77,034was due Mr. Sagi, of which $13,320 was expensed during the year ended June 30, 2002. The notes have been extended to December 31, 2003.

(b) The Company intends to construct regional production centers throughout the world to manufacture, assemble and market the BreastCare (TM)/BreastAlert(TM). Accordingly, the Company entered into an agreement dated August 25, 1996, as amended, with Zigmed, Inc. ("Zigmed"), a company owned by the two sons of Mr. Zsigmond Sagi; Zigmed, Inc. was owned by Mr. Sagi prior to 1990. Pursuant to such agreement, Zigmed agreed to manufacture the sensor production equipment for such manufacturing centers for the contract price of $1,850,680 plus 100,000 shares of the Company's Common Stock. In August 1996, the Company paid Zigmed an advance deposit of $200,000 to begin production of the manufacturing equipment, and in March 1997 issued Zigmed 100,000 shares of the Company's Common Stock (valued at $1.00 per share) against the contract. As of June 30, 2002, the Company owes Zigmed $718,276.

(c) The Company and Zigmed have entered into various agreements. The Company contracted with Zigmed for the production of the BreastCare(TM)/BreatAlert(TM) sensors. Zigmed provided material, labor and product testing services of $30,000 for the year ended June 30, 2002. The Company owes Zigmed approximately $82,000 as of June 30, 2002 for labor. See Note 13 of Notes to Consolidated Financial Statements for further information.

(d) The Company has borrowed funds from Mr. Zsigmond Sagi, the Company's President and Chief Executive Officer. The promissory note to Mr. Sagi bears interest at prime plus two (2%) percent, 6.75% at June 30, 2002, and is payable on December 31, 2003. The principal amount of the note is $1,128,684 at June 30, 2002. Interest expense for the year ended June 30, 2002 was $83,840.

(e) On June 30, 2002, the Company issued 6,435 shares of Common Stock of the Company to Zsigmond L. Sagi the Company's President and Chief Executive officer pursuant to financing. In connection with the transaction the Company recorded interest expense of $225 for the year ended June 30, 2002.

(f) The Company has borrowed funds from Ms. Patricia Furness, the Company's Vice President and Secretary. The promissory note to Ms. Furness bears interest at prime plus two (2%) percent, 6.75% at June 30, 2002 and is payable on June 30, 2003. The principal amount of the note is $107,257 at June 30, 2002. Interest expense for the year ended June 30, 2002 was $8,674.

(g) On June 30, 2002 the Company issued Ms. Patricia Furness, the Company's Vice-President and Secretary 31,141 shares of Common Stock of the Company pursuant to financing. In connection with the transaction the Company recorded interest expense of $1,090 for the year ending June 30, 2002.

-42-

(a) The following financial statements are filed as part of this Annual Report on Form 10-KSB:

|  | Page |
|---|---|
| 1. Financial Documents: | |
| Independent Auditors' Report | F-1 – F-3 |
| Consolidated Balance Sheets, June 30, 2001 and 2000 | F-4 |
| Consolidated Statements of Operations, Years Ended June 30, 2001, 2000 and 1999 | F-5 |
| Consolidated Statements of Stockholders' Deficiency, Years Ended June 30, 2001, 2000 and 1999 | F-6 |
| Consolidated Statements of Cash Flows, Years Ended June 30, 2001, 2000 and 1999 | F-7 – F-8 |
| Notes to Consolidated Financial Statements | F-9 – F-30 |

All schedules are omitted because they are inapplicable, not required or the information is included in the financial statements or notes thereto.

(b) Reports on Form 8-K:

There were no reports on Form 8-K during the quarter ended June 30, 2001.

(c) The following Exhibit Index sets forth the applicable exhibits (numbered in accordance with Item 601 of Regulation S-B) which are required to be filed with this Annual Report on Form 10-KSB.

| Exhibit Number | Title |
| --- | --- |
| 3.1 | Certificate of Incorporation and Bylaws of the Registrant -- Incorporated by Reference to Exhibit 2.1 and 2.2 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996. |
| 3.2 | Amendment to the Certificate of Incorporation filed March 31, 1997 -- Incorporated by Reference to Exhibit 3.2 of the Company's Report on Form 10-KSB for the year ended June 30, 1997. |
| 10.1 | Private Placement Memorandum dated May 17, 1994 -- Incorporated by Reference to Exhibit 3.1 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996. |
| 10.2 | Instrument defining shareholder rights regarding 18,000 shares of the Company's Common Stock purchased on November 29, 1991 -- Incorporated by Reference to Exhibit 3.2 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996. |
| 10.3 | Instruments defining shareholder rights regarding 18,000 shares of the Company's Common Stock purchased between June and August, 1993 -- Incorporated by Reference to Exhibit 3.3 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996. |
| 10.4 | Agreement defining Bio-Life shareholders' rights regarding 35,000 shares of the Company's Common Stock -- Incorporated by Reference to Exhibit 3.4 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996. |
| 10.5 | Asset Transfer Agreement among SDSI (as SMC Acquisition Corp.), Mr. Sagi and Scantek Medical Corp. dated August 12, 1991 -- Incorporated by Reference to Exhibit 6.1 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996. |
| 10.6 | Letter Agreement between SMC Corp. and Zigmed Corporation dated January 8, 1991 ("Zigmed Agreement") -- Incorporated by Reference to Exhibit 6.2 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996. |

10.7       Amendment to Purchase Order Agreement dated
           August 28, 1996 - Incorporated by Reference to Exhibit 10.7 of
           the Company's Form 10-KSB for the year ended June 30, 1997.

10.8       Purchase Order between SMC Corp. and Zigmed Corp. dated January 22, 1991 -- Incorporated by
           Reference to Exhibit 6.3 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.9       Amendment to Purchase Order Agreement dated August 28, 1996 - Incorporated by Reference to
           Exhibit 10.9 of the Company's Form 10-KSB for the year ended June 30, 1997.

10.10      Non-Disclosure Agreement between SMC Corp. and Zigmed Corp. dated January 7, 1990 --
           Incorporated by Reference to Exhibit 6.4 of the Company's Report on Form 10-SB/A-1 dated
           September 17, 1996.

10.11      Escrow Agreement among SMC Corp., 361 Acquisition Corp. and Chase Lincoln First Bank dated
           August 20, 1991 -- Incorporated by Reference to Exhibit 6.5 of the Company's Report on Form
           10-SB/A-1 dated September 17, 1996.

10.12      Termination Agreement among Scantek Medical Corp., Mr. Sagi, 361 Acquisition Corp., Dal
           Brynelsen, Douglas E. McRae and Scantek Medical Ltd. dated August 12, 1991 -- Incorporated by
           Reference to Exhibit 6.6 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.13      Acquisition Agreement (Amendment No. 2) between SMC Corp., Mr. Sagi, 361 Acquisition Corp.,
           Brynelsen, Scantek Medical Ltd. and Scantek Medical, Inc. dated March 7, 1995 -- Incorporated
           by Reference to Exhibit 6.7 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.14      HumaScan Inc. Licensing Agreement between Scantek Medical, Inc. and HumaScan, Inc. dated
           October 20, 1995 -- Incorporated by Reference to Exhibit 6.8 of the Company's Report on Form
           10-SB/A-1 dated September 17, 1996.

10.15      Amendment to the HumaScan Inc. Licensing Agreement between Scantek Medical, Inc. and HumaScan,
           Inc. dated April 29, 1996 -- Incorporated by Reference to Exhibit 6.9 of the Company's Report
           on Form 10-SB/A-1 dated September 17, 1996.

10.16      Lease between Scantek Medical, Inc. and Kabert Realty Corporation for Storage and Office Space
           -- Incorporated by Reference to Exhibit 6.10 of the Company's Report on Form 10-SB/A-1 dated
           September 17, 1996.

10.17      Lease between Scantek Medical, Inc. and Carol Yang for Office Space -- Incorporated by
           Reference to Exhibit 6.11 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.18       Amendment to Scantek Medical and Pablito, L.L.C. Office Lease and Lease Agreement dated
            June 13, 1997 - Incorporated by Reference to Exhibit 10.18 of the Company's Form 10-KSB for the
            year ended June 30, 1997.

10.19       Letters of Employment for Mr. Zsigmond Sagi and Ms. Patricia Furness dated February 26, 1993 --
            Incorporated by Reference to Exhibit 6.12 of the Company's Report on Form 10-SB/A-1 dated
            September 17, 1996.

10.20       Amendment to the HumaScan Inc. Licensing Agreement between Scantek Medical, Inc. and HumaScan,
            Inc. dated May 31, 1996 -- Incorporated by Reference to Exhibit 6.13 of the Company's Report on
            Form 10-SB/A-1 dated September 17, 1996.

10.21       Licensing Agreement with Health Technologies International Inc. and Scantek Medical Inc. dated
            August 15, 1996 -- Incorporated by Reference to Exhibit 10.21 of the Company's Form 10-KSB for
            the year ended June 30, 1997.

10.22       Amendment to Licensing Agreement dated August 15, 1996 between Health Technologies
            International Inc. and Scantek Medical, Inc. dated April 30, 1997 -- Incorporated by Reference
            to Exhibit 10.22 of the Company's Form 10-KSB for the year ended June 30, 1997.

10.23       Licensing Agreement with Scantek Medical, Inc. and Sandell Corp. S.A. dated September 22, 1997
            -- Incorporated by Reference to Exhibit 10.23 of the Company's Form 10-KSB for the year ended
            June 30, 1997.

10.24       Amendment to Licensing Agreement between HumaScan, Inc. and Scantek Medical Inc. dated May 15,
            1998 -- Incorporated by Reference to Exhibit 10.1 of the Company's Form 8-K filed May 27, 1998.

10.25       Amendment to Licensing Agreement with Scantek Medical, Inc. and Sandell Corp. S.A. dated
            February 18, 1998 -- Incorporated by Reference to Exhibit 10.25 of the Company's Form 10-KSB
            for the year ended June 30, 1998.

10.26       Settlement Agreement between Scantek Medical, Inc and HumaScan, Inc. dated March 11, 1999 --
            Incorporated by reference to Exhibit 10.1 of the Company's Form 8-K filed April 2, 1999.

10.27       Amendment to Lease Agreement between Scantek Medical, Inc. and Pablito, L.L.C. dated April 15,
            1999--Incorporated by reference to Exhibit 10.27 of the Company's Form 10-KSB for the year ended
            June 30, 1999.

10.28       Distribution Agreement with Scantek Medical, Inc. and Nugard HealthCare Ltd. dated July 14,
            1999. --Incorporated by reference to Exhibit 10.28 of the Company's Form 10-KSB for the year
            ended June 30, 1999.

10.29 Investment and Development Agreement with Scantek Medical S.A. and the Government of Pernambuco dated November 19, 1999 - - Incorporated by reference to Exhibit 10.29 of the Company's Form 10-KSB for the year ended June 30, 2000.

10.30 Consulting Agreement with Scantek Medical Inc. and Multiconsulteria S/C LTDA dated November 1999 - - Incorporated by reference to Exhibit 10.30 of the Company's Form 10-KSB for the year ended June 30, 2000.

10.31 Letter of Approval for funding with Scantek Medical Inc./Scantek Medical do Brasil Ltda and North East Brazil Federal Program of Sudene Finor Article 9 dated May 11, 2000 - - Incorporated by reference to Exhibit 10.31 of the Company's Form 10-KSB for the year ended June 30, 2000.

10.32 Letter of Intent Agreement with Scantek Medical Inc. and Scantek Medical do Brasil Ltda and Instituto Materno Infantil de Pernambuco dated May 31, 2000 - - Incorporated by reference to Exhibit 10.32 of the Company's Form 10-KSB for the year ended June 30, 2000.

10.33 Suape Land Purchase Agreement with Scantek Medical do Brasil Ltda and the State of Pernambuco dated May 25, 2000 - - Incorporated by reference to Exhibit 10.33 of the Company's Form 10-KSB for the year ended June 30, 2000.

10.34 Letter of Commitment for BreastCare(TM)usage and purchase order with Scantek Medical do Brasil Ltda and Unimed Recife-Cooperativa de Trabalho Medico dated June 1, 2000 - - Incorporated by reference to Exhibit 10.34 of the Company's Form 10-KSB for the year ended June 30, 2000.

10.35 Subscription Agreement and Promissory Note dated August 20, 2002

10.36 Compat Comercio Exterior Ltda. Exclusive Distribution Agreement dated August 19, 2002

11 A statement regarding the computation of earnings per share is omitted because such computation can be clearly determined from the material contained in this Annual Report on Form 10-KSB.

21 Subsidiaries of the Registrant: (i) Scantek Medical S.A., Inc., incorporated in Uruguay; and (ii) Scantek Medical do Brasil, LTDA, incorporated in Brazil.

99.1 Reinstatement of Patent No. RE.4,624,264 United States, Extension to November 25, 2003, dated August 12, 1997 -- Incorporated by reference of the Company's Form 10-KSB for the year ended June 30, 1998.

99.2 Certification of Chief Executive and Chief Financial Officer pursuant to Section 302 of the Sarbanes - Oxley Act of 2002.

99.3 Certification Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SCANTEK MEDICAL INC.**

```
By: /s/ ZSIGMOND L. SAGI
------------------------------------
        Zsigmond L. Sagi, President

Date:  October 15, 2002
```

-48-

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

*/s/ ZSIGMOND L. SAGI*
*- ------------------------------------*
*Zsigmond L. Sagi*
*President, Chairman of the Board,*
*Chief Executive Officer*
*and Director*

*/s/ PATRICIA B. FURNESS*
*- ------------------------------------*
*Patricia B. Furness*
*Vice President, Corporate Secretary*
*and Director*

*/s/ PAUL NELSON*
*- ------------------------------------*
*Paul Nelson*
*Director*

*/s/ MAURICE SIEGEL*
*- ------------------------------------*
*Maurice Siegel*
*Vice-President and Director*

-49-

## EXCLUSIVE DISTRIBUTION AGREEMENT

This AGREEMENT is effective as of August 19, 2002 and is by and between Scantek Medical Inc., having a place of business at 413 Wing Drive, Cedar Knolls, New Jersey 07927, U.S.A represented at this moment by its President, Dr Zsigmond Laszlo Sagi, an american citizen, with social security # 141/32/7414, living at 19 Lockaley Court, Mountain Lakes NJ 07046, U.S.A. on one side, from now on designated "SCANTEK" and, from the other, Compat Comercio Exterior Ltda., a brazilian commercial company, located at Av. Almirante Barroso n (degree) 139 - gr. 701 - Centro - Rio de Janeiro, RJ, Brazil, registered at CNPJ/MF under number 02.779.121/000109, represented at this moment by its legal representatives, Rosa Maria Gomes Menaes Moreira an brazilian citizen, with ID #02578643/5 IFP, and CPF # 018.031.957/46 e Cristiano Mendes Moreira, an brazilian citizen with ID #09031489.9 IFP, and CPF/MF # 002.390.077-60 from now on designated "COMPANY", with the authorization of SCANTEK MEDICAL DO BRASIL LTDA, a brazilian commercial company, located at Av. Eng. Domingos Ferreira no. 4.371, 902, Boa Viagem, Recife, Pernambuco, represented at this moment by Teofilo Estevarn da Silva Filho, with ID number 1.351.955 SSP-PE, from now on designated "AGENT". The COMPANY designates as its official importer the company RICHARDS DO BRASIL PROD. CIR. LTDA, a brazilian commercial company, located at Rua Pedro de Toledo, 130 - Sala 35 - Sao Paulo, SP, Brasil , registered at CNPJ/MF under number 48.767.628/0001-42, represented at this moment by its legal representative, Ricardo Freire Machado, a brazilian citizen with ID# 18.205.469 SSI'/SP, and CPF # 129.409.208-18 from now on designated "IMPORTER".

The parties hereto hereby agree as follows:

Article 1. Appointment of Distributor

1.1 SCANTEK hereby appoints COMPANY as its exclusive distributor in Brazil ("TERRITORY"), except in Bahia, Pernambuco, Maranhao and Ceara, for the medical product denominated BreastCare, properly patented in United States of America (n(degree) 4.190.058.624.264.510-K) and properly registered in US FDA (n(degree) K 832.989-510 K),

1.1.1 In the event of a National Campaign against Breast Cancer using the product BreastCare, the COMPANY will be granted the full distributorship in the TERRITORY, including Bahia, Pernambuco, Maranhao and Ceara.

1.1.2 In the event of a National Campaign against Breast Cancer using the product BreastCare, the COMPANY must not be liable of any commission or fee to any company.

1.2 Pursuant to and during the term of this Agreement, including any extensions thereof, SCANTEK shall not grant to any third party the right to sell or distribute the BreastCare in the TERRITORY.

2.1 Take the needed actions before the several public and private agencies, including the registration and license at the Health Ministry, in order to allow the COMPANY to import the products for present and future sales.

2.2 Provide every technical material exist to this date, needed to the marketing of BreastCare in all events scheduled with the media and public agencies.

2.2.1 The COMPANY will formally communicate SCANTEK the schedule of the events mentioned on this article at least fifteen (15) days in advance.

2.3 Present quarterly to the COMPANY a detailed report of the BreastCare exported to Brazil, indicating quantity, amounts and shipping dates, purchased by the COMPANY or others, allowing fire access to the controls in order to allow verification of such reports.

Article 3. COMPANY Responsibilities

3.1 Plan and execute, in a twelve (12) month period, a program of promotion and marketing of the BreastCare looking forward to start a National Campaign against Breast Cancer.

3.1.1 Create a Business Plan with in forty-five (45) days from the signing of this agreement with definite priorities, activities and objectives, with a Timetable for the execution.

3.2 Maintain contacts with public authorities and civilian personalities in order to create a desire in the people's opinion to stimulate the Health Ministry to prioritize the National Program of Breast Cancer Prevention.

3.2.1 The COMPANY is responsible in one hundred and twenty (120) days to seek final approval from INCA, for accepting BreastCare as a screening device for government use.

3.3 Hire consulting and Marketing firms to insure the promotion and launch of the BreastCare are effected on a professional way, including the development of propaganda material like catalogs, flyers, etc; that should be previously approved by SCANTEK.

3.4 Present to SCANTEK a report showing the work realized every ninety (90) days,

3.5 The COMPANY will be responsible for all expenses needed to the normal exercise of the distribution here appointed, except for all the expenses effected by the physicians indicated by SCANTEK as seen on article 6.1.

4.1 SCANTEK or its designee shall sell and COMPANY shall purchase such quantities of BreastCare as COMPANY shall require for sale in the TERRITORY by placement of orders at the prices and discounts established by SCANTEK for the TERRITORY.

4.2 COMPANY shall use every reasonable effort to create and maintain a market for and to increase the sales of BreastCare in the TERRITORY. COMPANY shall maintain at its expense an organization, deemed by SCANTEK to be proper and adequate, for continuous sale and distribution of BreastCare throughout the TERRITORY. COMPANY shall sell, ship and invoice the BreastCare for its own account.

4.3 By agreement between SCANTEK and COMPANY, SCANTEK will grant the price of Seven US Dollars (US$7.00) FOB New Jersey per unit when purchase is made directly by the COMPANY. The price will be reviewed and renegotiated after the first contract year.

4.4 In the event that COMPANY provides educational, promotional, technical or other customer services in the TERRITORY, on behalf of SCANTEK, such as in connection with accounts which may buy directly from SCANTEK, if any, shall be reported to COMPANY and shall be credited against the sales goals. In such case, SCANTEK must shall use a price Eight US Dollars and Seventy Five cents (US$8.75) per unit and shall pay agent's commission of Twenty percent (20%) to the COMPANY or its designee, if the amount of values shall be changed in the future it must be agreed by both parties.

4.4.1 After obtaining the approval from INCA, all sales effected on Bahia, Pernambuco, Maranhao and Ceara must add up and count against the SCANTEK and COMPANY Minimum Purchase Requirements, even though no commission or fee is owed to the COMPANY

Article 5. Minimum Purchase Requirements

5.1 In order to maintain its rights of distribution under this Agreement, COMPANY must maintain a minimum specified level of purchases of BreastCare from SCANTEK (the minimum level of purchases which COMPANY is required to maintain from time to time is hereinafter call the "Minimum Purchase Requirement").

5.2 COMPANY acknowledges and agrees that Minimum Purchase Requirement is an essential term of this Agreement in reliance on which SCANTEK agreed to enter into this Agreement. COMPANY understands and agreed that failure to satisfy the Minimum Purchase Requirement for any reason shall constitute a material breach and just cause for immediate termination of this Agreement.

5.3 The Minimum Purchase Requirement for each contract year during this Agreement and each year during any renewal thereof shall be agreed upon as follows:

5.3.1 The first contract year is divided into two (2) consecutive six (6) month period, following the ANVISA approval.

5.3.1.1 During the first six (6) month period, the minimum purchase order is one hundred thousand (100,000) BreastCare units. Of this one hundred thousand (100,000) units, ten thousand (10,000) units must be purchased at the signing of this agreement and delivery of the following documents: (a) the Authenticated Copy of the Brazilian Health Ministry Registration Certificate (ANVISA), (b) Authenticated Copy of the Registration Process with the Product Index Card form to the Trustee (Fiel Depositoro) to SCANTEK upon the issuance of the Import License in the name of RICHARDS DO BRASIL. The remaining ninety thousand (90,000) will be ordered after SCANTEK delivery the following documents: (c) notarized declaration of the company that retains the right to import and the Registration Certificate authorizing the COMPANY to import and distribute the product BreastCare, (d) Authenticated Copy of the FDA and CE Approval Letter notarized and consularized and, (e) six (6) papers about the BreastCare being used in the United States of America, Europe and Brazil. requested as needed and paid fifty percent (50%) at the request and fifty percent (50%) within 60 days.

5.3.1.2 In the event SCANTEK must to present all the documents within the thirty (30) days from signing.

5.3.1.3 The second six (6) month minimum order is four hundred thousand (400,000) BreastCare units, that will be requested as needed and paid fifty percent (50%) at the request and fifty percent (50%) within 60 days.

5.3.1.4 The parties have established the Minimum Purchase Requirement for the second year and the following years of the Agreement to be one million (1,000,000) units. For each other year of the Agreement, if any, and for each renewal year, if this Agreement is renewed by the parties, the Minimum Purchase Requirement shall be changed upon agreement by SCANTEK and COMPANY. If the parties are unable to agree on the Minimum Purchase Requirement for any year subsequent to the second year of the Agreement, then SCANTEK may terminate this Agreement.

6.1 SCANTEK shall respond to the technical support requests made by the COMPANY, when requested at least ten (10) business days in advance, indicating physician apt to present the products at conventions, TV and Radio appearances and all events promoted by the COMPANY.

Article 7. Payment for Products

7.1 All payments must be by letter of credit or sight draft.

7.2 All amounts due to SCANTEK shall be payable in United States Dollars pursuant to a wire transfer to SCANTEK's designated bank account, in each case in an amount sufficient to cover all outstanding orders placed by COMPANY. Payment for orders placed during the first ninety (90) days of this Agreement shall be due prior to shipment. Payment for subsequent orders shall be due fifty percent (50%) at the request and fifty percent (50%) within 60 days.

7.3 COMPANY shall be responsible for, bear the cost of and pay all foreign, federal, state or local income taxes, sales taxes, withholding taxes, excise taxes, use taxes, custom duties or assessments, or other taxes, charges, duties or assessments, including interest and penalties, levied or imposed on Distributor's net income.

Article 8. Shipment and Delivery

8.1 SCANTEK will ship the PRODUCTS FOB New Jersey. All costs for transportation and insurance will be paid by COMPANY.

Article 9. Term, Renewal, Termination and Expiration

9.1 This Agreement and the distributorship hereby created shall begin upon execution of this Agreement by both parties and shall continue in effect for a period of five (5) years and shall be automatically renewed for another five (5) years, unless sooner terminated as provided herein.

9.2 During the first year of this agreement the COMPANY will make all the investments for marketing and promotion.

9.3 In the event that the COMPANY shall active a National Campaign against Breast Cancer using the Breast Care this agreement will be automatically valid for ten (10) Years.

9.4 Either party may terminate this Agreement with cause upon one hundred and eighty (180) days' prior written notice to other party. Upon such notice, this Agreement shall be automatically converted into

a non-exclusive distributor agreement for the duration of the notice period.

9.5 COMPANY and SCANTEK have considered the possibility of making expenditures in the performance of this Agreement and the possibility of losses and damages resulting to each of them upon termination or expiration of this Agreement. COMPANY and SCANTEXC enter into this Agreement with full knowledge of these possibilities and agree as follows:

9.5.1 Neither COMPANY nor SCANTEK shall be liable to the other, by reason of termination or expiration of this Agreement, for compensation, reimbursement or damages on account of previous efforts to establish the market (except as dictated by COMPANY'S local laws), the loss of prospective profits or anticipated sales or on account of expenditures, investments, leases or commitments in connection with the business or good will of COMPANY or SCANTEK, or for any other reason whatsoever.

9.5.2 COMPANY expressly waives the provisions of any law which, if asserted, would authorize the payment to COMPANY of any money on account of the termination or expiration of this Agreement.

```
         Article 10.        Governing Law and Arbitration

         10.1     All aspects of this Agreement shall be governed by the
                  substantive laws of The State of New York. All disputes arising in
                  connection with this Agreement shall be finally settled by arbitration
                  conducted in accordance with the rules and procedures established by
                  the international Chamber of Commerce then in force by three (3)
                  arbitrators appointed in accordance with said rules. The English
                  language shall be used in any and all arbitral proceedings. The place
                  of arbitration shall be New Jersey, New York, U.S.A. notwithstanding
                  the foregoing; SCANTEK shall have the right to seek injunctive relief
                  and/or bring an action and pursue its available remedies for payment of
                  amounts owed from COMPANY hereunder before any competent court or
                  judicial body.
```

IN WITNESS WHEREOF, the parties have executed this Agreement.

**SCANTEK MEDICAL, INC.**

**KK**

```
                         By: /s/ Zsigmond Laszlo Sagi
                         Name: Zsigmond Laszlo Sagi
                         Title:  President
                         Date:  October 1, 2002
```

**COMPAT COMERCIO EXTERIOR LTDA.**

```
By: /s/ Cristiano Mendes Moreira
Name:  Cristiano Mendes Moreira
Title:  President
Date:  October 1, 2002
```

**SCANTEK MEDICAL DO BRASIL LTDA.**

```
By: /s/ Teofilo Estevam da Silva Filho
Name:  Teofilo Estevam da Silva Filho
Title:  President
Date:  October 1, 2002
```

**RICHARDS DO BRASIL PROD CIR LTDA.**

```
By: /s/ Ricardo Freire Machado
Name:  Ricardo Freire Machado
Title:  President
Date:  October 1, 2002
```

Statement Under Oath Regarding Facts and Circumstances Relating to Exchange Act Filings

I, Zsigmond L. Sagi, certify that

1. I have reviewed this annual report on Form 10-KSB of Scantek Medical, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

```
                    Date: October 15, 2002
                    /s/Zsigmond L. Sagi
                    Zsigmond L. Sagi
                    President, Chairman of the Board,
                    Chief Executive Officer and
                    Chief Financial Officer
```

Subscribed and sworn to
Before me this 15 day of
October 2002

_____

**Notary Public**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**

SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Scantek Medical, Inc. (the "Company") on Form 10-KSB for the year ended June 30, 2002 filed with the Securities and Exchange Commission (the "Report"), I, Zsigmond L. Sagi, Chief Executive Officer and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934;and

(2) The information contained in the Report fairly presents, in all material respects, the consolidated financial condition of the Company as of the dates presented and consolidated result of operations of the Company for the period presented.

```
        Dated:  October 16, 2002


                                    /s/ Zsigmond L. Sagi
                                    ---------------------------
                                    Zsigmond L. Sagi,
                                    Chief Executive Officer and
                                    Chief Financial Officer
```

This certification has been furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and has not been filed as part of the Report or as a separate disclosure document.



**EXHIBIT D**

# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 10-KSB

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED JUNE 30, 2000**

**[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM _____ TO _____**

*COMMISSION FILE NUMBER 000-27592*

# SCANTEK MEDICAL INC.

(Exact name of registrant as specified in its charter)

```
        DELAWARE                              84-1090126
-----------------------------         --------------------
(State or Other Jurisdiction               (I.R.S.Employer
Incorporation                          or Identification No.)
of Organization)
```

**321 PALMER ROAD, DENVILLE, NEW JERSEY 07834**
(973) 366-5250
(Address and telephone number, including area code, of
registrant's principal executive office)

**Securities registered pursuant to Section 12(b) of the Act: NONE**

**Securities registered pursuant to Section 12(g) of the Act:**
**COMMON STOCK, $.001 PAR VALUE**

Indicate by check mark whether the Registrant(1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

YES [X] NO [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-KSB or any amendment to this Form 10-KSB. [ ]

Aggregate market value of voting stock held by non-affiliates as of September 30, 2000 was approximately $9,416,252 (based upon the closing sales price of those shares reported on the National Association of Securities Dealers Bulletin Board for that day).

Number of shares of Common Stock outstanding as of September 30, 2000:
19,639,690.

**DOCUMENTS INCORPORATED BY REFERENCE: NONE**

INDEX

Part I

                                                                      Page

        Item 1.  Business ..............................................   1

        Item 2.  Properties ...........................................  22

        Item 3.  Legal Proceedings ....................................  22

        Item 4.  Submission of Matters to Vote of
                 Security Holders .....................................  22

Part II

        Item 5.  Market for Registrant's Common Equity
                 and Related Stockholders Matters .....................  23

        Item 6.  Management's Discussion and Analysis
                 of Financial Condition and Results
                 of Operations ........................................  26

        Item 7.  Financial Statements .................................  32*

        Item 8.  Changes in and Disagreements with
                 Accountants on Accounting and
                 Financial Disclosure .................................  33

Part III

        Item 9.  Directors and Executive Officers; .....................  33
                 Promoters and Control Persons;
                 Compliance with Section 16(a)
                 of the Exchange Act

        Item 10. Executive Compensation ...............................  35

        Item 11. Security Ownership of Certain Beneficial
                 Owners and Management ................................  37

        Item 12. Certain Relationships and
                 Related Transactions ................................  40

Part IV

        Item 13. Exhibits and Reports on Form 8-K .....................  42

        Signatures ....................................................  47

        * Page F-1 follows page 32

PART I

All statements contained herein that are not historical facts, including, but not limited to, statements regarding anticipated growth in revenue, gross margins and earnings, statements regarding the Company's current business strategy, the Company's projected sources and uses of cash, and the Company's expectations, are forward-looking statements in nature and involve a number of risks and uncertainties. Actual results may differ materially. Among the factors that could cause results to differ materially are the following: the availability of sufficient capital to finance the Company's business plans on terms satisfactory to the Company's competitive factors; the ability of the terms satisfactory to the Company's competitive factors; the ability of the Company to adequately defend or reach a settlement of outstanding litigations and investigations involving the Company or its management; changes in labor, equipment and capital costs; changes in regulations affecting the Company's business; future acquisitions or strategic partnerships; general business and economic conditions; and other factors described from time to time in the Company's reports filed with the Securities and Exchange Commission. The Company wishes to caution readers not to place undue reliance on any such forward-looking statements. These statements are made pursuant to the Private Litigation Reform Act of 1995 and, as such, speak only as of the date made.

## ITEM 1. BUSINESS

### GENERAL

Scantek Medical, Inc. (OTC: BB, SKML) (the "Company"), a Delaware corporation, was organized under the name "Jenncor Acquisition Inc." on June 10, 1988, to obtain funding for prospective business opportunities available to publicly held entities. Until October 3, 1991, when the Company exchanged its shares with Scantek Digital Systems Inc. ("SDSI"), the Company's only business activities involved raising capital through a public offering pursuant to Regulation A of the Securities Act of 1933, as amended (the "Act"). Pursuant to the share exchange between the Company and SDSI, the then holder of several patents relating to a medical product known as the BreastCare(TM)/BreastAlert (TM), Differential Temperature Sensor/Breast Abnormality Indicator (the "BreastCare(TM)/BreastAlert(TM)"), SDSI became a wholly-owned subsidiary of the Company. The Company was formerly a developmental stage company and became fully operational in early 1999.

On June 6, 2000 , the Company opened its web site, WWW.SCANTEKMEDICAL.COM. The web site will provide information about the Company and its business, and its principal product, BreastCare(TM)/BreastAlert(TM). Also included will be summaries of clinical studies, sales and distribution progress and plans, press releases and financial information, participation at medical conferences, and links to other sites for information on breast cancer."

-1-

The Company is headquartered in Dennis, New Jersey, where it maintains approximately 17,000 square feet of manufacturing and administrative space. At this facility, the Company has two production lines in which to manufacture the BreastCare(TM)/BreastAlert(TM). These production lines are capable of producing two million units per shift annually. One production line will be shipped to the Company's subsidiary, Scantek Medical do Brasil Ltda, when the new manufacturing facility is completed at Port Suape, Pernambuco-Brazil in the first half of calendar year 2001. The Company maintains a manufacturing and administrative staff and intends to add to its staff in key functional areas, pending funding of the Company and revenue from sales of the BreastCare(TM)/BreastAlert(TM) units.

The Company is a medical company engaged in developing, manufacturing, selling and licensing of products and devices to assist in the early detection and diagnosis of disease. At the present time, the Company is focusing on manufacturing, selling and licensing the Company's first product, the BreastCare(TM)/BreastAlert(TM) in response to the global demand for the early detection of breast disease, a major threat to women's health in developing as well as industrial countries. In today's health care environment, containment of medical care cost is a major priority. The Company has focused its business on easy to use low cost products and devices for its domestic and international markets, which will have an impact on preventive health care and cost containment. The BreastCare(TM)/BreastAlert(TM) has United States Food and Drug Administration ("FDA") marketing clearance; the BreastCare(TM)/BreastAlert(TM) is to be used by physicians as an adjunct to clinical breast examination, mammography and other established procedures for the detection of breast disease. The BreastCare(TM)/BreastAlert(TM) is a single-use, non-invasive, easy to use and cost-effective test to alert the physician to the possibility of a physiological condition that may be thermally active cancer.

The BreastCare(TM)/BreastAlert(TM) can detect cellular abnormalities as small as one-half centimeter in diameter as established through biopsy proven tumors. The Company believes that this technology upon which the BreastCare(TM)/BreastAlert(TM) is based will be useful in measuring certain other body disorders.

**THE PRODUCT**

At present, the fear of breast cancer continues to escalate, comparatively because little is actually known with respect to managing breast cancer. It is estimated worldwide, that each year, over 300,000 women will die from breast cancer. In fact, according to the America Cancer Society, this grave disease has been identified to be the medical issue of highest priority for women's health. Moreover, it cannot be predicted who will develop this epidemic cancer; any woman at any age may develop breast cancer. Breast cancer is the second leading cause of death for women in the U.S., but the most common for women between the ages of 35 and 54. Worldwide, breast cancer ranked highest as the leading cause of cancer deaths for women. Early detection and diagnosis of breast cancer are important in the reduction of mortalities.

In the United States, American women are provided with a preventive health measure, mammography; in developing countries however, mammography is not readily available to women, even for those women who have the resources to pay for such. There is a void between manifestation of the breast cancer and detection due to unavailable screening systems. Failure to intervene during this period may significantly reduce the likelihood of survival because the cancer then metastasizes. The American Cancer Society, on Cancer Facts & Figures in 2000, reported that if cancer is localized at the time of diagnosis, there is a 96% chance of a 5-year survival rate, which has risen from 72% in 1940. Nevertheless, in spite of research and efforts to detect breast cancer in the early stages, the rate of mortality due to breast cancer in developing countries has consistently increased over the past four decades.

Management believes that the BreastCare(TM)/BreastAlert(TM) will help to detect breast cancer in its early stages. Management believes that the BreastCare(TM)/BreastAlert(TM) will assist in the recognition of abnormal early cellular development by recording the heat differentiation of corresponding areas of the breast. The BreastCare(TM)/BreastAlert(TM) is not a definitive test for cancer (i.e., a biopsy, the removal and examination of, usually microscopic, tissue from the living body, performed to establish a precise diagnosis) but is a risk marker to identify and follow breast abnormalities by means of temperature conductivity integration when used adjunctly with clinical palpation and mammography.

One of the important biological activities of malignant tumors is the increased rate of growth as compared to the surrounding or "host" tissue. The malignant propensities are directly related to the speed of cell division; this in turn is reflected by accelerated local metabolism, which is adequately supported by increased blood and lymphatic vascularity. These biological alterations can be detected by measuring temperature differences in the tumor and its immediate environment, or by comparing to the same area of the opposite breast.

The BreastCare(TM)/BreastAlert(TM) is designed to assist in the detection of pathology of the breast by recognizing "significant" heat differences in the underlying tissue of a particular area, by comparing corresponding (mirror-image) segments of one breast to the other. The cause of the hyperthermia cannot be determined by this test alone; therefore, the BreastCare(TM)/BreastAlert(TM) serves as an early warning signal to alert the doctor to the fact that there is evidence of a pathological process, one of which could be thermally active breast cancer, which should be further evaluated within a particular area of the breast.

The BreastCare(TM)/BreastAlert(TM) is designed to complement, not replace, conventional breast abnormality screening methods and devices. It is intended for use by women of all ages. The BreastCare(TM)/BreastAlert(TM) is available for a routine, primary office care procedure used by physicians, gynecologists and other medical specialists as part of a breast disease monitoring program adjunctively with Breast Self Examination (BSE), Clinical Breast Examination
(CBE), (depending upon a patient's age, family history, and other factors)
mammography and other established clinical procedures.

The basis for the BreastCare(TM)/BreastAlert(TM) is based upon data going back a number of years which show that blood on the venous side of breast cancers is warmer than blood on the arterial side of the lesion. This indication of heat generation is presumably due to increased metabolic rate of neoplastic tissue, including more rapid cell division, angiogenesis, etc. However, heat is not specific to neoplasia and may for example be due to inflammation. The presence of asymmetrical patterns (one side is warmer than the other by 2 degrees Fahrenheit) is a sign that may be detected with the BreastCare(TM)/BreastAlert(TM).

The BreastCare(TM)/BreastAlert(TM) consists of a pair of mirror-image, non-invasive, lightweight, disposable soft pads, each of which has three wafer-thin foil segments containing columns of heat sensitive chemical sensors that change color from blue to pink reflecting an 8.5 degree temperature range between 90 and 98.5 Fahrenheit. When placed against a woman's breast inside her brassiere for a period of 15 minutes, the BreastCare(TM)/BreastAlert(TM) registers the temperature variations due to heat conducted from within the breast tissue to the surface of the skin. The result will be digitally, not analogically, indicated by color changes for each temperature gradation. Significant temperature differences (2 degrees Fahrenheit or four bars) in the corresponding areas of the breast may indicate an abnormal unilateral thermal activity long before a lump is discovered by self-examination, clinical examination or other detection methods such as mammography, ultrasound, etc. Accordingly, by comparing the mirror-image temperature differences between the two breasts registered by the BreastCare (TM)/BreastAlert(TM), a determination can be made as to whether a sufficient abnormality is present to warrant further site-specific testing by other diagnostic techniques, including, but not limited to mammography and/or biopsy. The BreastCare(TM)/BreastAlert(TM) test does not replace recommended guidelines for scheduled mammographic screening.

The BreastCare(TM)/BreastAlert(TM) is a safe, non-invasive, economical and easy to use test. The BreastCare(TM)/BreastAlert(TM), which is disposable, can be administered and evaluated by health care providers after minimal instruction and a permanent record of results can be placed in the patient's files. Management believes that the utilization of the BreastCare(TM)/BreastAlert(TM) is cost effective and when used in combination with a mammographic work-up or at intervals of recommended screenings, will have an impact on breast cancer mortality and improve a woman's preventive health strategy.

-4-

Infrared thermography for the evaluation of breast lesions was introduced in 1956, and systems employing thermosensitive liquid crystal films have generated renewed interest since 1978. Studies by Dr. Michael Gautherie, University of Strasbourg, France and others dating from 1970 have directly evaluated the heat of cancerous breast tissue compared with that of healthy breast tissue. These studies found that tumor temperature was always higher than the surrounding temperature and suggested that the increase in tumor heat resulted from an increased metabolism. Furthermore, two other phenomena were found to occur: (i) tumor heat was found to be transported within the surrounding breast tissue (principally by blood convection through the veins) resulting in local or diffuse increases in skin temperature and (ii) vascular changes were observed in the tumor area and further in the subcutaneous breast tissues. In short, both hyperthermia and hypervascularization were found to have occurred in the tumor and at its periphery, in comparison to the temperature and blood flow of healthy tissue in the contralateral breast. Further research by Dr. Gautherie and others has demonstrated an unequivocal relationship between the metabolic heat production of cancer tissue and the doubling time of tumor volume: the faster the tumor grows the more heat it generates.

The BreastCare(TM)/BreastAlert(TM) measures underlying breast tissue temperature and not skin surface temperature by retaining emitted heat when the BreastCare(TM)/BreastAlert(TM) is placed against the breast. It differs from preexisting infrared and liquid crystal thermography techniques, which allow the heat to escape or radiate during measurement. The BreastCare(TM)/BreastAlert(TM) takes into consideration that the average temperature patterns of a healthy woman's breast are closely symmetrical. This method detects abnormalities by comparing the temperature differences in the corresponding mirror image areas of a woman's breast.

Recently, the scientific foundation for the BreastCare(TM)/BreastAlert(TM) effectiveness has been considerably strengthened. Comprehensive research has established in detail the mechanisms by which malignancies radically alter the host tissue environment, notably through two quantitatively measurable processes: (i) A tumor significantly elevates overall rates of metabolic activity and (ii) A tumor greatly intensifies capillary vascularization in host tissues. In particular, this latter process of angiogenesis was a very critical finding because it is the probable mechanism by which cancers with an enhanced mestastic potential prepare to invade the host. These are only two of a number of measurable host alterations and each is associated with asymmetric heat distribution.

-5-

Development and clinical trials of the BreastCare(TM)/BreastAlert(TM) were completed between 1980 and 1984. This testing showed that the BreastCare(TM)/BreastAlert(TM) is capable of detecting lesions in the breast earlier than through clinical examination by sensing metabolic changes in the breast. Biopsy and screening clinical trials were conducted at well-established U.S. institutions to assess and validate BreastCare (TM)/BreastAlert(TM) usefulness in detecting breast cancer at Memorial Sloan-Kettering Hospital in New York, at M.D. Anderson Memorial Hospital in Houston, at Brotman Memorial Hospital at UCLA, and at Guttman Breast Diagnostic Institute in New York. The BreastCare (TM)/BreastAlert(TM) was found to be accurate in terms of the documented sensitivity of the BreastCare(TM)/BreastAlert(TM) (true positive for cancer) and specificity (true negatives - no cancer detectable by accepted medical methods) in relation to the biopsy (the "Gold Standard" diagnostic procedure), clinical breast examination and mammography.

BREASTCARE(TM)/BREASTALERT(TM) TEST RESULTS vs. BIOPSY FINDINGS: In the first study in 1984, the BreastCare (TM)/BreastAlert(TM) was the focus of a clinical trial involving 179 women who underwent a biopsy. This multi-center study was conducted at three prestigious cancer institutions: M.D. Anderson Hospital and Tumor Institute, Memorial Sloan-Kettering Hospital, and Brotman Memorial Hospital. The BreastCare(TM)/BreastAlert(TM) tested positive for the suspicion of cancer in 93 of the 112 women who were diagnosed with cancer, for an overall sensitivity index of 83.0% and was notably stronger in detecting unilateral cancers - a sensitivity index of 88.1% (that is, 74 of the 84 unilateral cancers diagnosed). The frequency of false negatives was higher among patients who underwent biopsies of both breasts (less than 3% of breast cancers are believed to be bilateral generally).

The biopsy results were subjected to a breakdown by the size of the cancer detected and the patient's age. The threshold tumor size detectable with the BreastCare(TM)/BreastAlert(TM) is five millimeters and up, an early-stage cancer; out of a total of eight cancers under 1.0 centimeters which were diagnosed during the screening study, seven tested positive using the BreastCare(TM)/BreastAlert(TM). It appears that the BreastCare(TM)/BreastAlert(TM) has the proven ability to detect small, early-stage cancers which are most likely to be associated with favorable treatment outcomes. Moreover, a breakdown of the BreastCare(TM)/BreastAlert(TM) results by age suggests an especially high efficacy in detecting suspicious abnormalities in younger women. This is noteworthy because a pre-screening method is critically needed for women under 50 who have not been urged or who have chosen not to seek a mammogram on an annual basis, since fast-growing, potentially aggressive cancers are associated with the women in this age distribution. The BreastCare(TM)/BreastAlert(TM) will be used adjunctively with palpation and mammography.

BREASTCARE(TM)/BREASTALERT(TM) TEST RESULTS VS CLINICAL FINDINGS/3. MAMMOGRAPHY AND PHYSICAL EXAMINATION: In the second clinical trial study in 1984, the BreastCare(TM)/BreastAlert(TM) was studied prospectively in 2,805 asymptomatic women for the test's ability to detect abnormalities suspicious of breast cancer. Specifically, the BreastCare(TM)/BreastAlert(TM) data was compared to the mammographic and clinical findings, as well as to a limited number of cytological findings. Of the 2,805 women screened, 99 were recommended for a biopsy based on the suspicion of cancer in 86 of the 99 women (a sensitivity index of 86.9%). Fifty-nine biopsies were subsequently performed and 13 of the 15 cancers diagnosed were positive for the BreastCare(TM)/BreastAlert(TM) test (a sensitivity index of 86.7% against biopsy). Of the 2,706 women who had no suspicion of cancer based on mammogram and/or clinical examinations, 2,340 had negative BreastCare(TM)/BreastAlert(TM) results (a specificity index of 86.5%).

The BreastCare(TM)/BreastAlert(TM) is accurate, both in terms of sensitivity and specificity. Notably, the very low false positive rate (true negatives with a positive BreastCare(TM)/BreastAlert(TM) test) of 13.5% for the initial screening trial of BreastCare(TM)/BreastAlert(TM) actually assumes two additional circumstances: (1) that no mammographically undetectable cancers occurred; and (2) that the rate of subsequent cancers within this so-called false positive group is not statistically higher than that of the population of women as a whole. A lower true false positive rate for the BreastCare(TM)/BreastAlert(TM) can be assumed if abnormal thermal distribution is a risk marker for future disease incidences, as had frequently been suggested. In fact, several publications have documented a positive predictive value for thermographically based tests to detect future cancers. The screening study demonstrated reliability approaching that of mammography and significantly greater than distantly related thermographic techniques.

In conclusion, these studies have demonstrated the following with respect to use of the BreastCare(TM)/BreastAlert(TM):(i) the BreastCare(TM)/BreastAlert(TM) measures differences in temperature between corresponding areas of the left and right breasts, (ii) the BreastCare(TM)/BreastAlert(TM) is a safe device; no adverse reactions were observed, (iii) minimal variances were found due to clinical influences of hormones, (iv) a positive test result was found to be a strong indication that a breast abnormality exists which warrants further examination by a physician with respect to the possibility of breast cancer; and (v) it is advisable to confirm a positive test result with a repeat test. The best results were achieved upon arising in the morning, a time which is characterized by low body temperature in normal tissue (a positive result was confirmed with a retest). Although a negative test result was found to indicate a greatly reduced likelihood of cancer, it does not mean that the woman is free of breast abnormalities, including cancer. The BreastCare(TM)/BreastAlert(TM) may fail to detect the very slow growing (cold) tumors which have a relatively low rate of metabolic activity. In a study of 200 asymptomatic women, comparison of two successive tests indicated that 12 of 178 negative scores (7%) shifted to a positive level in the second test.

In the screening case of 2,805 women at the Guttman Breast Diagnostic Institute, the observed 13.5% "false positive" index of the BreastCare(TM)/BreastAlert(TM) test on 366 women did not correlate with the Guttman clinical staff conclusion on any breast abnormality indicating the positive of cancer. The observed 13.5% "false positive" index does not mean that the BreastCare(TM)/BreastAlert(TM) yielded a positive reading in 13.5% of the women with no abnormalities of the breast. The clinical staff screens for conditions that warrant investigation regarding the possibility of breast cancer. Thus, breast abnormalities that produce elevation of temperature in one breast may result in a positive BreastCare(TM)/BreastAlert(TM) score, but may be classified as nonmalignant by the clinical staff. Furthermore, because the thermal signal will often proceed the tentative confirmation by imaging or clinical findings by trained physicians, a number of women classified as "false positive" could have cancer and would be confirmed by biopsy at a later time. Various follow-up studies using other thermology technologies have shown this to be true and unofficial 1-year follow-ups by Sloan Kettering of the false positive results were proven to be fast growing fatal cancers. The 2,805 women in the Guttman study may not be considered representative of the general population since many symptomatic women were referred to this center by other concerned physicians (In a separate home study test of 200 asymptomatic women, only 5.5% had false positive).

## ADDITIONAL CLINICAL STUDIES

Through the efforts of the Company, the European Institute of Oncology, located in Milan, Italy, is now performing clinical studies on the BreastCare(TM)/BreastAlert(TM). The study, which involves 500 women is under the supervision of Dr. Virgilio Sacchini, a world-renowned surgical oncologist. Upon completion of the study, Dr. Sacchini will submit the study for publication in medical journals.

On June 11, 1999, at the International Mastology Meeting in Sao Paulo, Brazil, Dr. Alfred Barros, surgical oncologist and president of the Brazilian Society of Mastology, and Dr. Carlos Menke, gynecologist, professor of the University of Rio Grande Do Sul and Mastologist of the Clinical Center of Porto Alegre, presented the results of the Brazilian multi center clinical study of the Company's BreastCare(TM)/BreastAlert (TM) device. The clinical study was conducted by physician members of the Brazilian Society of Mastology using a uniform protocol to examine the capabilities of the BreastCare(TM)/BreastAlert (TM) with a screening method and diagnostic validation of cases suspicious of cancer. The BreastCare(TM)/BreastAlert(TM) was compared with corresponding mammographic (909 cases) and /or biopsy (151) results. The results were analyzed and evaluated by Dr. Alvaro Ronco, the head of Cancer Epidemiology at Pronacam (National Breast Cancer Program, Ministry of Public Health of Uruguay) and a member of the New York Academy of Sciences and of the Society for Epidemiological Research in Baltimore as follows: (i) If clinical breast examination is normal or doubtful (absence of suspicion of cancer) and the BreastCare (TM)/BreastAlert(TM) test is negative, the probability of absence of cancer confirmed by biopsy is around 95%; (ii) if clinical breast examination is suspicious of cancer and the BreastCare(TM)/BreastAlert(TM) is positive, the probability of having cancer is about 98%; and (iii) the performance of the BreastCare(TM)/BreastAlert(TM) is slightly better in women under 50 years old, who are mainly pre menopausal.

In August, 1999, the BreastCare(TM)/BreastAlert(TM), was presented by speakers via satellite at the European School of Oncology Congress in Rio de Janeiro, Brazil. The Chairmen were Professors Umberto Veronesi (Italy) and Jose A. Pinotti (Sao Paulo)

Dr. Virgilio Sacchini, Surgical Oncologist of the European Institute of Oncology Milan, Italy presented "Experience in the Clinical Application of the BreastCare(TM)/BreastAlert(TM) in Medical Practices", via satellite, which related to the European and Brazilian experience which discussed: 1) The need for a low-cost, accurate test, which provides immediate results with physical examination, and mammography; 2) A new technology called BreastCare(TM)/BreastAlert(TM) , which can supply the need; 3) That there is evidence of recent clinical studies in South America and Europe that suggest the evaluation of heat on the surface of the breast, that BreastCare(TM)/BreastAlert(TM) can be an auxiliary modality in diagnosing breast cancer; 4) With the new modality, objective results are produced immediately; and, 5) That the technology is based on cellular epithelial increases in temperature when abnormal metabolic process happens, which is proliferation of atypical epithelial.

Dr. Carlos Menke, Gynecologist, professor of University of Rio Grande Do Sul and Mastologist of the Clinical Hospital of Porto Alegre also spoke on the Brazilian experience with the clinical studies. Management is very confident with the results of the studies i.e., when clinical examination is normal and BreastCare(TM)/ BreastAlert(TM) is negative, the probability of the absence of breast cancer is 95%, and if clinical examination is suspicious and BreastCare(TM)/BreastAlert(TM) is positive, the probability of the presence of cancer is 98%.

In September 1999, the BreastCare(TM)/BreastAlert(TM) was presented at its exhibition and several symposiums at the III North East Mastology Congress in Salvador-Bahia-Brazil. Dr. Ezio Novais Dias, president of the Congress, is a renowned gynecologist and mastologist at the San Rafael Hospital in Salvador-Bahia. Dr. Dias is vice president of the International Society of Mastology, President of the Brazilian Mastology School and a member of the Company's Brazilian Medical Board.

The Company's BreastCare(TM)/BreastAlert(TM) was given extensive exposure at the Congress by some of the most renowned mastologists in South America, as well as, in the world. Dr. Jose Antonio Ribeiro Filho, Gynecologist and Mastologist, and President of the Brazilian Academy of Medicine coordinated a symposium on "BreastCare(TM)/ BreastAlert(TM); A New Method of Diagnosis of Breast Cancer."

Also Dr. Alvaro Ronco, head of Cancer Epidemiology at Pronocam (National Breast Cancer Program, Ministry of Public Health of Uruguay), member of the New York Academy of Sciences (New York) and of the Society for Epidemiological Research (Baltimore) presented the "Epidemiology Aspects with BreastCare(TM)/BreastAlert(TM)."

Dr. Alfredo Barros, Gynecologist and Mastologist at University Medical Hospital in Sao Paulo and president of the Brazilian Mastology Society gave the results of the Brazilian Mastology Society's "BreastCare(TM)/BreastAlert(TM) clinical studies." Dr. Carlos Henrique Menke, gynecologist, professor at University of Rio Grande Do Sul and Mastologist at the Clinical Center of Porto Alegre, presented "Clinical Applications of BreastCare(TM)/BreastAlert(TM)."

The Company anticipates that such studies, as well as future studies, will play a vital role for future screening projects in hospital and clinical settings.

**REGIONAL REPORT: SOUTH AMERICA**

The Company has focused a substantial portion of its resources in South America. The Company's efforts, though not well funded, have provided an important proving ground for the Company's operating model, which consists of
(i) regionalized production and assembly, supported by local marketing partners;
(ii) the support of opinion leaders, medical societies and mastologists; (iii) public and medical awareness of the advantages of the BreastCare (TM)/BreastAlert(TM) screening; and (iv) organized forums and training for doctors by region. The Company intends to deploy this model in other regions throughout the world. A summary of the Company's efforts in South America are as follows:

In January, 1998, the Company organized a wholly-owned subsidiary, Scantek Medical S.A., Inc., a Uruguayan company, to distribute the BreastCare(TM)/BreastAlert(TM)in South America.

The Company entered into an exclusive license agreement (the "License Agreement"), dated September 22, 1997 and amended February 18, 1998, with Sandell Corp. S.A. ("Sandell"), a Uruguayan corporation, whereby the Company granted Sandell an exclusive license to market and distribute the BreastCare(TM)/BreastAlert(TM) in Brazil, Venezuela, Columbia, Costa Rica, Ecuador, Nicaragua, Paraguay, Panama, Peru, Bolivia, Argentina and Uruguay. As of June 30, 1999, upon mutual consent of both parties, the Company terminated the License Agreement with Sandell. In connection with the termination of the License Agreement, the Company wrote off the balance of the $400,000 license fee due the Company and approximately $103,000, which represented its investment in Sandell.

During September 1998, the Company commenced the sale of its BreastCare(TM)/BreastAlert(TM) in Brazil, Uruguay and Paraguay through its South American licensee. During February 1999, the Brazilian economy declined and the Brazilian currency lost fifty (50%) percent of its value. Brazil increased the import and value - added tax from approximately twenty-one (21%) percent in December 1998 to approximately seventy-four (74%) percent in February 1999. Due to these factors, sales substantially decreased in Brazil, which represents approximately eighty (80%) percent of the Company's expected revenue. The Company is establishing a production facility in Brazil. This will eliminate the high value-added tax and hopefully will be able to facilitate sales. The Company terminated its license agreement with its former licensee in South America and key personnel for the former licensee have joined the Company and continue to play a major role in the Company's South American marketing and sales. The Company's Brazilian subsidiary, Scantek Medical do Brasil Ltda, plans to manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) in Brazil and export to other South American countries.

In July 1999 the Company, through its Brazilian subsidiary Scantek Medical do Brasil LTDA, executed a letter of intent with another entity to create a joint venture with exclusive rights to import, manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) in Brazil. After completing its due diligence the Company terminated the letter of intent.

-10-

Through its Brazilian subsidiary the Company signed an agreement with the State of Pernambuco in December 1999. The State of Pernambuco has the second largest concentration of hospitals in Brazil offering quality care and is also the most desirable location for production, shipping, financing and tax incentive. The Company is establishing a 2,550 square meter manufacturing facility in Recife, Pernambuco at the new port of Suape. The Company has broken ground, and anticipates construction to be completed by the first half of calendar year 2001. The Company will ship the production equipment for arrival by the time construction is completed.

The Company is in advanced negotiations with the state of Brasilia, Sao Paulo, Bahia and Pernambuco to provide for statewide breastcare screening programs. The total BreastCare(TM)/BreastAlert(TM) units under consideration for these programs is 200,000, which the Company anticipates will commence when the Scantek Medical do Brasil Ltda manufacturing faciltity is operational. The statewide programs are pilots, and if successful, may lead to a larger screening program. The combined female population of these regions is 25 million.

The State of Pernambuco and the federal government has offered various incentives including acreage, at a reduced price, to build the facility, a 75% reduction in income taxes through 2013, free shipping outside the state, and in connection with the federal programs offered in Northeast Brazil, financing programs to help fund the operations and capital improvements.

On May 11, 2000 the Company's Brazilian subsidiary received final approval to participate in the Sudene Program, a federal program organized to develop the Northwest of Brazil. Scantek Medical do Brasil, Ltda was approved to receive funding for approximately $3 million in the Sudene federal program under Finor Article 9. Final documentation will be presented to Sudene in October, 2000, with funding expected in 60 to 90 days.

The Company has a contractual arrangement with Multiconsultoria led by Dr. Gustavo Krause, who is the former Secretary of Treasury of the State of Pernambuco, former Mayor of the city of Recife, former Governor of the State of Pernambuco, former Minister of Environment and former Minister of Treasury of Brazil. The Multiconsultoria is working with Sudene to arrange financing for the Scantek Medical do Brasil, Ltda project and is coordinating the necessary steps to finalize the project with the State of Pernambuco

On June 1, 2000 Scantek Medical do Brasil Ltda signed letters of commitment with the Infantile Maternal Institute of Pernambuco ("IMIP") and Unimed Recife ("Unimed").

IMIP will use the BreastCare(TM)/BreastAlert(TM) in a pilot screening program for the detection of breast cancer. Scantek Medical do Brasil Ltda is supporting the pilot program by donating BreastCare(TM)/ BreastAlert(TM) units. The IMIP will reaffirm its social commitment by developing and incorporating the BreastCare(TM)/BreastAlert(TM) usage in its pilot screening program.

-11-

Unimed, a Brazilian healthcare provider will incorporate the BreastCare(TM)/BreastAlert(TM) into the programs approved examination procedures for the detection of breast cancer. Unimed Recife is part of Unimed, a national organization that is a major health care provider for over 11 million participants in Brazil. Scantek Medical do Brasil Ltda is supporting this pioneering institution in the private sector of the medical community in Recife with the first sale to Unimed for 3,000 BreastCare(TM)/BreastAlert(TM) units.

Both IMIP and Unimed programs will be molded after the methodology used at the Gynecology and Obstetrics of the University of Medicine of Sao Paulo University.

The Company plans to ship the BreastCare(TM)/BreastAlert(TM) from the United States until the production facility in Brazil is operational.

## FEDERAL PROGRAM

In October, 1999, the Company donated 2,100 BreastCare(TM)/ BreastAlert(TM) units to Fiocruz, a federal agency in Recife, Pernambuco-Brazil to be used in a pilot screening project for 2,000 women over 40 years of age. Dr. Alexandre Bezerra de Carvalho, Director of CPqam/Fiocruz, of the Ministry of Health organized the government-sponsored project specifically for validation of BreastCare (TM)/BreastAlert(TM)'s usefulness in a major breast cancer-screening program being organized in Brazil.

This pilot program is intended to prove the viability of the BreastCare(TM)/BreastAlert(TM) as a low-cost, accurate test to increase the indexes of early detection of breast cancer in Brazil. With the assistance of SUS (Public System of Health), the Primary Assistance Program uses Sanitary Agents (skilled health personnel) to screen indigent women for breast cancer with the BreastCare(TM)/BreastAlert(TM) test. The Company is confident of the acceptance of the use of BreastCare(TM)/BreastAlert(TM) by Agents of Health (ACS), the Ministry of Health and Secretaries of Health.
BreastCare(TM)/BreastAlert(TM) has proven its value in the Fiocruz pilot cancer project. The Company is anticipating to receive confirmation from the government of Pernambuco to confirm BreastCare(TM)/BreastAlert(TM) usage in its screening program.

As is known, in developed countries, the strategy of early detection of breast cancer is based on the wide use of mammography for women over 40 years of age. In developing countries the lack of mammography equipment, trained human resources and financial resources are major constraints to use this strategy. According to Dr. Bezerra de Carvalho, Brazil would need 4,000 mammography machines to assist the population of approximately 120 million people that uses the Public System of Health of which about 14.5 million women who are over 40 years of age. This gives a good picture of the dimension of the problem in Brazil.

SAOPAULO

In December, 1999, BreastCare(TM)/BreastAlert(TM) has been integrated into a very important Brazilian Breast Cancer Prevention Collaborative Project in Sao Paulo Brazil. The Collaborative Project is being coordinated by Professor Jose Aristodemo Pinotti. and is being implemented by the Gynecology Clinic of the University Medical School of Sao Paulo, with the support of the Brazilian Mastology Society, Anna Bove Foundation and "Fundacao Pro Mulher" at the Clinical Hospital of the University at Sao Paulo.

The Company's BreastCare(TM)/BreastAlert(TM) is being used in adjunct with clinical breast examination and the Gail Risk Factor (criteria used to measure ones risk for breast cancer) in a pilot breast cancer screening program at the Gynecology Clinic of the University Medical School of Sao Paulo. This pilot breast cancer-screening center is the first collaborative project to establish Breast Cancer Screening Centers and the integration of BreastCare(TM)/ BreastAlert(TM) in the detection process.

The cases detected at the Breast Cancer Screening Centers will be properly guided to diagnosis and treatment. This process of referral will be facilitated by the fact that "PRO-MULHER" (a private, non-profit institution) is linked to Gynecologic services under Dr. Pinotti at Sao Paulo University, which have substantially all the facilities for diagnosis and treatment of breast cancer.

Brazil and its various states are currently back to where it started in terms of Breast Cancer Control Programs, but are undergoing a transition to provide better screening for women.

The new Pilot Breast Cancer Screening Center at the Gynecology Clinic of the University of Medicine of Sao Paulo University is a first step in this transition.

## REGIONAL REPORT: CHILE AND SINGAPORE

On April 15, 2000, D-Lanz Development Group, Inc. ("D-Lanz") and the Company entered into an agreement to amend its previous license agreement dated April 29, 1997 and amended June 11, 1999. D-Lanz will have a change in control and the License will be assigned to a new corporation, Global Agri-Med Technologies, Inc. ("Global"). The Company agreed to assign and transfer the license to Global, which includes the exclusive license in Chile and Singapore. In addition, the Company has agreed to give Global non-exclusive license extensions to Africa, Korea, and South Asia. Global must receive final clearance from the Company before any participation or distribution can proceed in any city, state, territory or country in the non-exclusive extensions as stated above. Both parties have agreed to update certain terms in the previous agreement that will be beneficial to both parties.

-13-

Management of the Company is working to replicate the model it established in South America, in Europe as well. The Company, although progressing in Europe, is not as advanced as the Company's South American business, due to the limited availability of human and financial resources.

The Company entered into a letter of understanding with Grupo Grifols, a publicly held medical products manufacturer and distributor, headquartered in Barcelona, Spain. Grupo Grifols has approximately $600 million in sales. Pursuant to this letter of understanding, the Company intends to grant to Grupo Grifols the exclusive right to sell the BreastCare(TM)/BreastAlert(TM) to the public and private markets of Portugal and Spain. Grupo Grifols has agreed to purchase the BreastCare(TM)/BreastAlert(TM) from the Company at a price of approximately $10.00 (U.S. dollars) per unit. No final agreement has been executed with respect to this arrangement between the Company and Grupo Grifols.

On July 14, 1999, the Company granted an exclusive license to NuGard HealthCare Ltd. ("NuGard"), an Irish Company, to market the Company's BreastCare(TM)/BreastAlert(TM) in Ireland and the United Kingdom. Pursuant to this licensing agreement, NuGard will pay a non-refundable licensing fee of $350,000 in various stages, of which $59,000 was received as of June 30, 2000, and the Company received common shares equivalent to fifteen (15%) percent of NuGard's total outstanding common shares. The purchase price will range from $10 to $15 per unit - FOB US. The license agreement requires minimum purchase of 5,000 units a month and payments of licensing fees, which have been postponed until the license agreement can be renegotiated.

Through the efforts of the Company, the European Institute of Oncology, located in Milan, Italy, is now performing clinical studies on the BreastCare(TM)/BreastAlert(TM). The study, which involves 500 women, began in January 1999 under the supervision of Dr. Virgilio Sacchini, a world-renowned surgical oncologist. Upon completion of the study, Dr. Sacchini will submit the study for publication in medical journals.

In order to sell medical devices to the new European Community, a Certification Europe ("CE") is required, which is based primarily upon documentation of a compliant Quality Control System. In August 1999, the Company received a CE for the BreastCare(TM)/BreastAlert(TM).

-14-

The Company 's goals in North America for the immediate future are to review and reorganize marketing and sales, utilizing the Company's experience and approach it has used in South America. However, in order to accomplish this, additional funding will be needed to implement a new marketing and sales strategy in order to re-launch the BreastCare(TM)/BreastAlert(TM), which it anticipates will begin 10 to 12 months after financing is completed.

Pursuant to a License Agreement, dated March 17, 1995, as amended on July 31, 1995, October 20, 1995 and May 31, 1996, together with three extensions on February 26, 1996, March 17, 1996 and April 29,1996, the Company granted HumaScan Inc. ("HumaScan") an exclusive license to manufacture and sell the BreastCare(TM)/BreastAlert(TM) in the United States and Canada. On March 15, 1999, pursuant to a Settlement Agreement, dated as of the 11th day of March, 1999, the Company regained the rights to market and sell its BreastCare (TM)/BreastAlert(TM) in the U.S. and Canada. Pursuant to the Settlement Agreement, all licensing agreements between the Company and HumaScan, which gave HumaScan the right to manufacture, market and sell the BreastCare(TM)/BreastAlert(TM), were terminated. Pursuant to the original and amended licensing agreements, HumaScan was indebted to the Company for failure to pay license fees, royalties and other sums of money. In exchange for the cancellation of $575,000 of indebtedness, due to it by HumaScan and for the payment by the Company to HumaScan of an additional $340,000, HumaScan agreed to assign certain special manufacturing equipment, furniture, raw materials, tools, materials, laboratory equipment and inventory of HumaScan for the manufacture of the BreastCare(TM)/BreastAlert(TM). In addition, the Company received 150,000 shares of HumaScan's common stock as part of the Settlement Agreement.

The Company has two complete sensor manufacturing and assembly lines for the production of the BreastCare(TM)/BreastAlert(TM) product. The value of these two manufacturing lines is estimated by the Company to be approximately $5.5 million. One complete manufacturing line will be shipped to Brazil.

On July 11, 2000 the Company was issued a new patent for its Differential Temperature Sensor Device For Use in the Detection of Breast Cancer. The patent No. 6,086,247 will expire on February 5, 2018, twenty (20) years from the date of filing. The patent was filed on the invention for improvements over the prior art. The invention provides a foam breast sensor pad and on one face a two-sided adhesive layer which secures the sensors to the pad and provides perimeter adhesive around the sensors for good contact with the breasts to be examined. Also, the disk-shaped pad has two cutouts creating a mushroom-like shaped pad and has a nipple hole in the middle.

**REGULATIONS**

The Company's development and manufacture of medical devices is controlled by the Food, Drug and Cosmetic Act (the "Act"). The Food and Drug Administration ("FDA"), which administers the Act, has promulgated a number of regulations which dictate the method by which new products are allowed to enter the United States market (Title 21, CFR Section 807, Premarket Notification), and the documentation and control of manufacturing processes (Title 21, CFR Section 820, Good manufacturing Practices for the Manufacturing, Storage and Installation of Medical Devices).

Subject to the potential changes in regulatory status, the Company believes that it is in full compliance with the requirements of Part 807 Premarket Notification, as promulgated under Section 510(k) of the Act, and has received permission to market the BreastCare (TM)/BreastAlert(TM). On January 24, 1984, the FDA determined that the BreastCare(TM)/BreastAlert(TM) is substantially equivalent to a device marketed in interstate commerce and accordingly may be freely marketed without further FDA authorization. Also included under Part 807 is a requirement for product registration and listing, which the Company believes has been satisfied.

Management believes that the proprietary nature of the product is protected under patent rights issued in the United States and certain foreign countries.

**FOREIGN REGULATION**

Because the Company proposes to distribute its product in foreign countries, the Company will be required to comply with the regulations of those countries where its product is distributed by the Company through licensees. No assurances can be given that the Company and/or its licensees will be able to comply with the regulatory requirements of the foreign markets in which the BreastCare(TM)/BreastAlert(TM) will be sold.

Most countries require product registration before you can sell. In South America, the Company's subsidiary, Scantek Medical S.A., Inc., and its marketing partners have applied for and have received product registration in Brazil, Uruguay, Argentina and Peru. Paraguay and Bolivia have no registration requirements to sell. In addition, the Company has applied for and received a Certification Europe (CE), which is required, as of June, 1998, of all products marketed in the European Union.

**PATENTS**

The proprietary nature of the BreastCare(TM)/BreastAlert(TM) is protected under patent rights issued in the U.S. and foreign countries. However, in general, the level of protection afforded by a patent is directly proportional to the ability of the patent owner to protect and enforce his rights under the patent. Since the financial resources of the Company are currently limited, and patent litigation can be both expensive and time consuming, there is a risk that enforcing the patents for the BreastCare(TM)/BreastAlert(TM) will have a material adverse financial effect on the Company or the Company will not have the financial resources necessary to enforce its patents. Once the Company's existing patents expire, other companies may be able to create substantially similar products. If this were to happen, the Company would not be able to avail itself of the protection afforded by the patent laws.

-- Patent No. RE 32,000, granted and issued on October 8, 1985; this patent is a reissue of Patent No, 4, 190,058 for a "Device For Use in Early Detection of Breast Cancer", which was granted and issued on February 26, 1980 and has since expired.

-- Patent No. 4,651,749, granted on March 24, 1987, entitled "Cancer Detection Patch for Early Detection of Breast Cancer; Temperature, Indicators, Flexibility, Thermoconductivity, Webs"; this patent is a partial continuation of Patent No. 4,190,058 above

-- Patent No. RE 4,624,264 granted November 24, 1986; this patent has been reinstated and expires November 25, 2003.

-- Patent No. 6,086,247 granted on July 11, 2000, for Differential Temperature Sensor Device for Use in the Detection of Breast Cancer and Breast Disease; this patent expires February 5, 2018.

Foreign patents for the BreastCare(TM)/BreastAlert(TM) include:

```
            -- Belgium     Patent No. 884,382; issued July 18, 1980; expires July 18, 2000

            -- Israel      Patent No. 58422; issued March 1, 1983; expires October 9, 1999

            -- Venezuela   Patent No. 44,664; registered April 20, 1987; will automatically
                           be extended upon shipment of products from Venezuela
```

In addition, in accordance with the Settlement Agreement between the Company and HumaScan, HumaScan has assigned all of its rights, title and interests in certain U.S. patents and U.S. and foreign trademarks, including the following patents:

-- File No. 08/854,144, filed May 14, 1997, entitled "Breast and Axilla Cancer Screening Device and Method"

-- File No. 08/926,790, filed September 10, 1997, entitled "Differential Temperature Measuring Device and Method

## SUPPLIES AND RAW MATERIALS

Supplies and raw materials for the manufacture of the BreastCare(TM)/BreastAlert(TM) are available from various sources. Historically, other than on a few rare occasions, the supplies and raw materials for producing the BreastCare(TM)/BreastAlert(TM) have been readily available and the cost of such materials has not experienced any material fluctuation. The Company has determined the inventory planning and control, as well as other production management systems, it intends to use. In addition, the Company has acquired supplies and raw materials in connection with its settlement with HumaScan.

-17-

The Company has created an international marketing plan for licensing and distribution to capture a significant portion of the $6 billion annual global breast cancer market with a device that alerts the physician and patient to the possibility of either proliferating thermally active breast cancer cells or certain types of thermally active breast disease.

Management believes that in emerging and developing countries, the BreastCare(TM)/BreastAlert(TM) has the potential to become an important part of the overall screening protocols used to detect breast disease. To market the BreastCare(TM)/BreastAlert(TM) abroad, the Company intends to utilize the following basic strategies:

o Foreign production: The Company intends to set up its own Regional Production Centers overseas. All sensor manufacturing will remain in the United States under the Company's control, unless manufacturing is established at the Company's subsidiary.

o Foreign Licensing: The Company intends to enter into exclusive agreements with various foreign entities, whereby the Company will either permit such entity to distribute the BreastCare(TM)/BreastAlert(TM) or give such entity the right to utilize the Company's trademark and patent in a specified geographical area.

o Joint Ventures: The Company intends to enter into agreements whereby the Company will grant one or more partners (usually partner of the host country) the right to share in the risks, cost and management of a foreign operation. The Company, however, will retain control of the manufacturing. The joint venture, if established, is anticipated to be with a major medical supply manufacturer or pharmaceutical company which could benefit from the sales and distribution of the BreastCare(TM)/BreastAlert(TM).

o BreastCare(TM)/BreastAlert(TM) Centers: The Company anticipates that it will establish breast care centers in cooperation with governments and private businesses in order to utilize the BreastCare(TM)/BreastAlert(TM) with an established protocol.

The Company intends to manufacture the BreastCare(TM)/BreastAlert(TM) for sale to partners pursuant to distribution agreements or intends to control the manufacturing if a joint venture is established. With respect to pursuing the International market for distribution of the BreastCare(TM)/BreastAlert(TM), the Company intends to enter into new markets by establishing Regional Production centers to manufacture and distribute within each target market. Management believes that partnerships with companies which either have working relationships with distributors throughout the world or have a distribution network established in the medical communities of the target markets, will be an excellent marketing vehicle for the Company. Each agreement will be exclusive and tailored to maximize the penetration of each market. Initially the Company intends to establish regional production centers and distribution networks in the U.S., Brazil, Hungary, Ireland, United Kingdom and China.

The territories under negotiations for exclusive marketing and distribution rights are as follows: (i) Eastern and Western European countries, (ii) Asia, (iii) South America and (iv) Africa. In markets where there are no definite leaders or where the distributors are highly fragmented , the Company intends to seek two or three non-exclusive partners to cover such market. Additionally, as an integral part of the marketing plan, the Company intends to focus in target markets where there are the highest incidences of breast cancer, as well as in the majority of European countries where the death rates are increasingly high, including, but not limited to, Ireland, the United Kingdom and Germany, all of which have higher death rates than the United States.

The Company, as it has done in the past, intends to conduct a premarket investigation of the market before marketing is commenced and prior to finalizing any agreements. A market profile for each market will be completed to analyze the target markets. The profile will establish the strongest distributors and the buying decision-makers (i.e., physicians, hospitals, clinics, government agencies and over the counter customers). Management believes that a standard market profile will permit comparisons between markets at a later date and provide profiles of the types of markets that provide the best results. In addition, the Company will expand communications with the Ministries of Health, Department of Health and Clinical Services to investigate the statutory controls regulating the sale of medical devices.

The Company has focused on developing partnerships with various international companies who have relationships with distributors throughout the world and who have connections in the medical communities of the target markets.

Strategically, the Company intends to centralize manufacturing and decentralize marketing in each geographical region. Specific markets within that region shall be covered by individual agreements which provide for the promotion and distribution of the BreastCare (TM)/BreastAlert(TM). Accordingly, the Company intends to utilize centralization for control and decentralization for market penetration. Management believes that the Company's expansion of several regional centers for the manufacturing locations will give the Company good access to shipping, tax considerations and low manufacturing cost, and to police the crossover among distributors' areas where distribution is segmented.

## SOUTH AMERICA MARKETING

The Company intends to open a production center in Brazil. In South America, the development of distributorships with selling partners has been and are further being developed to approach private hospitals, clinics and physicians. Simultaneously, the Company intends to launch the BreastCare(TM)/BreastAlert(TM) Centers with cooperation with some of the most renowned physician specialists in the field of breast disease, beginning with Brazil. Over 25 sites are anticipated to be launched within the first two years of operations with a capacity to screen 60 women per site per day. A carefully structured program of publications and professional meetings between such revered specialists and the rest of the physician population

-19-

has been underway throughout 1998, 1999 and 2000 and it is anticipated that such will be expanded in ensuing years. This marketing approach will be directed by the International Medical Advisory Board of the Company, consisting of some of the top specialists in the world in the diagnosis and treatment of breast disease. State and Federal governments are also helping to create screening programs in accordance with the above activities.

In addition, as indicated previously, the Company signed a letter of intent with CEC and EPIC, to create a joint venture with exclusive right to import, manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) in Brazil. After completing its due diligence, the Company terminated the Letter of Intent.

## EUROPE MARKETING

The Company has been introducing the BreastCare(TM)/BreastAlert(TM) in Europe at educational forums which were covered by the press and television. Also, the Company is exhibiting the BreastCare(TM)/BreastAlert(TM) at medical congresses to introduce the device to the physician market.

The Company intends to utilize government contracts to mass market the BreastCare(TM)/BreastAlert(TM). Countries, such as Ireland and Spain lend themselves to this approach, as well as do larger independent Eastern European countries, including but not limited to, Romania, Bulgaria, Ukraine, Russia, Greece and Turkey.

Exploration has commenced on the feasibility of establishing breast care centers in Europe. If found to be appropriate and effective for certain countries, the Company intends to commence development in the year 2001.

## UNITED STATES AND CANADA MARKETING

The Company's first introduction of the BreastCare(TM)/BreastAlert(TM) product was by its former United States and Canadian licensee, HumaScan which launched the product in December 1997. Before relaunching the BreastCare(TM)/BreastAlert(TM) the Company plans to take a carefully constructed approach to the marketplace in the United Sates and Canada. The Company intends to spend between nine to twelve months reviewing and analyzing the best marketing and sales approaches focused toward the physician user and managed care insurers. The Company intends to mirror the approach used in South America with respect to advisement and leadership from renowned breast disease specialists.

## FUTURE MARKETS

The Company intends to market and sell the BreastCare(TM)/ BreastAlert(TM) worldwide. It has inaugurated potential distributorships in China, Korea, Nigeria and Kenya. The Company intends to concentrate its efforts through 2001 in South America, Europe and the United States. Simultaneously, the Company intends to investigate and develop the marketplace in Asia, the Middle East and the African continent. Sales are anticipated to flow from these areas beginning in the year 2001 and on.

-20-

The Company believes that the BreastCare(TM)/BreastAlert(TM), which provides digital quantitative recordings of underlying tissue temperature, represents a significant improvement over thermographic technology products because such other products are subject to the inherent problems of subjective evaluation of heat patterns. Based upon these differences, the Company believes that the prospects for the BreastCare(TM)/BreastAlert(TM) as a supplement to currently existing screening tests are very good.

The Company believes it is in a unique position because there are no known competing low cost screening devices on the market which would compete directly with the BreastCare(TM)/BreastAlert(TM) for use by primary care physicians As a result, the Company believes that the BreastCare(TM)/BreastAlert(TM) will augment other existing forms of screening and technology.

Some of the Company's future competitors may be large, well-financed, and established companies which have greater resources for research and development, manufacturing, and marketing than the Company has and, therefore, may be better able than the Company to compete for a share of the market, even in areas in which the Company may have superior technology. There can be no assurance that the Company can continue to produce a product which is commercially acceptable, or, that if continued to be produced, such a product will be competitive with existing or future products. It is also possible that there will be technological changes or developments by competitors which will render the Company's products noncompetitive or obsolete.

## FUTURE PRODUCTS

The Company believes that the BreastCare(TM)/BreastAlert(TM) may have applicability as a screening device for other abnormalities, including measuring ovulation cycles for infertile couples, measuring changes in the cardiovascular system to screen for potential stroke victims, and detecting abnormalities in the kidneys, prostate and testicles. Although some testing was performed during the BreastCare (TM)/BreastAlert(TM) development stage, these initial tests were preliminary only, and in order to obtain FDA approval, which would be required in order to market a future product. The Company intends to further explore its initial findings and perhaps, introduce products in furtherance of these findings.

## EMPLOYEES

The Company employs a total of 13 employees. Three of these employees are employed in the U.S. as follows: (i) two full time employees: President and Chief Executive Officer and Vice President/ Corporate Secretary, and (ii) one part time employee: Vice President of Corporate Development of the Company. Additional personnel and consultants are utilized, as required, on a contractual basis.

The remaining 10 employees are employed in South America by the Company's two South American subsidiaries, as follows: a General Manager, a Medical Director, four (4) other Senior employees, and four (4) support staff employees.

None of the Company's employees are covered by a collective bargaining agreement with a union. The Company considers its relationship with its employees to be good.

## RISKS AND UNCERTAINTIES

The Company's business is subject to a number of risks and uncertainties, including, but not limited to; (a) the risk that it may be unable to raise enough capital to fund the Company's operations, (b) the risk that the BreastCare(TM)/BreastAlert(TM) will not be accepted commercially, (c) the Company's reliance on certain customers, and (d) the highly competitive nature of the Company's industry and the impact that competitors' new products and pricing may have upon the Company. Such factors, as well as shortfalls in the Company's results of operations as compared with analyst's expectations, capital market conditions and general economic conditions, may also cause substantial volatility in the market price of the Company's Common Stock.

## PUBLIC INFORMATION

The Company electronically files with the Securities and Exchange Commission (the "SEC") all its reports, including, but not limited to, its annual and quarterly reports. The SEC maintains an Internet site which contains all such reports and other information with respect to the Company on its website, http://www.sec.gov. Additional information on the Company may be obtained from the Company's web site, http://www.scantekmedical.com.

## ITEM 2. PROPERTIES

The Company occupies approximately 13,000 square feet of warehouse and office space, all of which is leased through leases expiring in June, 2001. See Note 13 of Notes to Consolidated Financial Statements for additional information.

On November 19, 1999 Scantek Medical do Brasil Ltda signed an agreement with the State of Pernambuco-Brazil to establish a production facility at the sea port of Suape, which is approximately 45 kilometers from Reife, Pernambuco-Brazil. The Company's subsidiary acquired approximately 40,000 square meters of land and has broken ground to build a 2,550 square meter production facility. The production facility will be completed in the first half of calendar year 2001.

## ITEM 3. LEGAL PROCEEDINGS

The Company is not a party to any litigation or pending legal proceedings.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of the Company's shareholders during the fourth quarter of the year ending June 30, 2000.

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS**

(a) Market Information

The Company's common stock, par value $.001 per share (the "Common Stock"), is traded in the over-the-counter market. The Common Stock is available for quotation in the "pink sheets" published by the National Quotation Bureau, Incorporated and on the "bulletin board" operated by NASD. The following table sets forth the periods indicated high and low bid quotation (as reported by the OTC Bulletin Board) for the Common Stock:

```
                                      HIGH              LOW
                                      ----              ---
        Fiscal Year ended June 30, 1999
                First Quarter          1               3/16
                Second Quarter        19/32            3/16
                Third Quarter         23/32            1/4
                Fourth Quarter         1/2             5/32

        Fiscal Year ended June 30, 2000
                First Quarter         18/32            3/16
                Second Quarter         3/16            1/16
                Third Quarter         18/32            1/16
                Fourth Quarter         3/4             1/2
```

The Common Stock is reported under the Symbol SKML. As of the date of this report, the Company's shares of Common Stock were "non-designated" securities as defined under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

These quotations reflect an inter-dealer price, without retail mark-up, markdown or commission, and may not necessarily reflect actual transactions.

(b) Holders

As of September 15, 2000, there were 201 shareholders of record of the Company's Common Stock.

(c) Dividends

The Company has not paid any cash dividends and has no current plans to pay any such dividends. There are no restrictions on the Company's ability to pay dividends.

(d) Recent Sales of Unregistered Securities

On March 13, 1998 the Company issued 12,000 shares of Common Stock of the Company pursuant to financing, to two individuals at an issue price of .5625 per share.

On November 16, 1998, the Company sold 150,000 shares of Common Stock each to Kenneth Courey, a former Director of the Company and Louis Gottlieb, Vice President of Corporate Development of the Company, at a purchase price of $.3333 per share, pursuant to Section 4(2) of the Securities Act of 1933, as amended, based upon the nature of the sale and the purchasers.

On December 1, 1998, the Company issued 75,000 shares of Common Stock of the Company pursuant to financing, to three individuals at an issue price of $.1875 per share.

On July 1, 1999 the Company issued Zsigmond L. Sagi, the Company's President and Chief Executive Officer, 79,250 shares of Common Stock of the Company pursuant to financing, at an issue price of $.416 per share.

On July 1, 1999 the Company issued Ms. Patricia Furness, the Company's Vice-President/Corporate Secretary, 5,703 shares of Common Stock of the Company pursuant to financing, at an issue price of $.5625 per share.

On July 1, 1999 the Company issued Mr. Louis Gottlieb, the Company's Vice-President of Corporate Development, 25,000 shares of Common Stock of the Company pursuant to financing, at an issue price of $.375 per share.

On July 1, 1999 the Company issued 52,500 shares of Common Stock of the Company pursuant to financing, to two individuals including Paul Nelson (a Director of the Company), at an issue price of $.40625 per share.

On July 7, 1999 the Company sold 45,767 shares of Common Stock to Maurice Siegel, Vice-President and Director of the Company, at a purchase price of $.2185 per share, pursuant to Section 4(2) of the Securities Act of 1933, based upon the nature of the sale and the purchaser.

On July 7, 1999, the Company issued 50,000 shares of Common Stock of the Company to Kenneth Courey, a former Director of the Company, pursuant to a consulting contract, at an issue price of $.1875 per share.

On December 30, 1999 the Company issued 7,500 shares of Common Stock of the Company pursuant to financing, to two individuals including Paul Nelson, a Director of the Company, at an issue price of $.07 per share.

On March 8, 2000 the Company issued 2,500 shares of Common Stock of the Company to Paul Nelson, pursuant to financing, at an issue price of $.53125 per share.

On March 8, 2000 the Company issued 23,750 shares of Common Stock of the Company to Louis Gottlieb, pursuant to financing, at an issue price of $.1875 and $.25 per share.

-24-

On April 14, 2000 the Company issued 30,000 shares of Common Stock of the Company to Louis Gottlieb pursuant to financing, at an issue price of $.25 per share.

On April 14, 2000 the Company issued 35,200 shares of Common Stock of the Company to Maurice Siegel, a Vice-President and Director of the Company, for consulting services, at an issue price of $.25 per share.

On April 14, 2000 the Company issued 125,000 shares of Common Stock of the Company to Stock Siren LLC, pursuant to advertising and public relations, at an issue price of $.1875 per share.

On August 1, 2000 the Company issued 67,900 shares of Common Stock of the Company to Zsigmond L. Sagi, the Company's President and Chief Executive Officer pursuant to financing, at an issue price of $.4667 per share.

On August 1, 2000 the Company issued Ms. Patricia Furness, the Company's Vice-President and Corporate Secretary, 8,750 shares of Common Stock of the Company pursuant to financing, at an issue price of $.4667 per share.

On August 1, 2000 the Company issued 2,500 shares of Common Stock of the Company to Paul Nelson, pursuant to financing, at an issue price of $.4667 per share.

On September 27, 2000 the Company sold 750,000 shares of Common Stock to Fernando Schver, at a purchase price of $.4667 per share, pursuant to Section 4(2) of the Securities Act of 1933, as amended, based upon the nature of the sale and the purchasers.

-25-

## OVERVIEW

The following discussion and analysis should be read in conjunction with the Company's consolidated financial statements and the notes related thereto. The discussion of results, causes and trends should not be construed to infer conclusions that such results, causes or trends necessarily will continue in the future.

## RESULTS OF OPERATIONS

The following table sets forth for the periods indicated the percentage increase or decrease of items included in the Company's consolidated statement of operations:

|  | % Increase (Decrease) from Prior Period | |
|---|---|---|
|  | June 30, 2000 compared with 1999 | June 30, 1999 compared with 1998 |
| Sales (1) ........................... | (76.7)% | *% |
| License fee revenues ................ | (91.8) | (59.6) |
| Cost of sales (1) ................... | 30.4 | * |
| General and administrative expenses ........................... | 48.0 | 8.3 |
| Research and development ............ | (41.6) | 44.7 |
| Interest expense ................... | 48.5 | 52.8 |

(*) Percentage not meaningful

## REVENUES

Net sales decreased to $29,775 during the year ended June 30, 2000 from $127,775 during the year ended June 30, 1999 as the Company is re-focusing its South American marketing strategy in Brazil. The Company will ship the BreastCare(TM)/BreastAlert(TM) from the United States during the fourth quarter of calendar 2000 to South America until the manufacturing facility in Brazil is completed and operational. Shipments to Ireland commenced in October 1999 for test marketing and shipments to other parts of Europe will commence during the first half of calendar 2001. Manufacturing in Brazil is planning to commence during the first half of calendar 2001 after the Company completes construction of its new manufacturing facility in Brazil. Until then the Company will manufacture the BreastCare(TM)/BreastAlert(TM) in its U.S. facilities. Manufacturing for Europe will continue in its U.S. facilities until the Company establishes a manufacturing facility in Europe.

Net sales increased to $127,775 for the year ended June 30, 1999 from $-0- for the year ended June 30, 1998 as the Company commenced initial shipments of its BreastCare(TM)/BreastAlert(TM) during fiscal year 1999.

-26-

License fee revenue decreased to $30,400 during the year ended June 30, 2000 from $727,500 for the year ended June 30, 1999 as the Company recognized lower license fees from Nugard Healthcare Ltd. as compared to higher license fees from Sandell Corp, D-Lanz Corp and HumaScan from the preceding year.

License fee revenue decreased to $727,500 during the year ended June 30, 1999 from $1,801,582 for the year ended June 30, 1998, as the Company recognized lower license fees from Sandell and D-Lanz, as compared to the license fees from HumaScan the preceding year. The current year license fee revenue was further impacted, as $400,000 of the license fee revenue from Sandell was written off against the current year revenue.

## COST OF SALES

Cost of sales increased to $537,216 during the year ended June 30, 2000 from $411,834 during the year ended June 30, 1999 primarily due to depreciation expenses of $276,844 on the production equipment, compared to $198,288 for the same annual period ended June 30, 1999.

Cost of sales increased to $411,834 for the year ended June 30, 1999 from $-0- for the year ended June 30, 1998 primarily due to the initial shipments of its BreastCare(TM)/BreastAlert(TM) during the first quarter of the Company's current fiscal year. Depreciation expense of approximately $198,288 on the production equipment also increased the cost of sales for the year.

## GENERAL AND ADMINISTRATIVE EXPENSES

General and administrative expenses increased 48.0% to $1,699,922 for the year ended June 30, 2000 compared to $1,148,449 for the year ended June 30, 1999. This increase is primarily due to increases in consulting services and travel expenses in connection with the Company's South American marketing strategies in Brazil.

General and administrative expenses increased 8.3% to $1,148,499 for the year ended June 30, 1999 compared to $1,060,766 for the year ended June 30, 1998. This increase is primarily due to increases in consulting, travel and outside services mainly attributable to the Company's South American operations, offset in part by decreased legal fees.

## RESEARCH AND DEVELOPMENT

Research and development expenses decreased 41.6% to $286,223 during the year ended June 30, 2000 from $490,482 during the year ended June 30, 1999. The decrease is primarily attributable to decreased salaries incurred by the Company in the experimental area of development of its product.

Research and development expenses increased 44.7% to $490,482 for the year ended June 30, 1999 from $339,037 for the year ended June 30, 1998. The increase is primarily attributable to stock-based bonuses given to two officers of the Company working in the experimental area of development, for deferring their salaries so the Company could use those funds for working capital.

-27-

**INTEREST EXPENSE**

Interest expense was $417,109 for the year ended June 30, 2000 compared to $280,978 for the year ended June 30, 1999. The 48.5% increase was attributable to the increase in the Company's short-term debt.

Interest expense was $280,978 for the year ended June 30, 1999 compared to $183,889 for the year ended June 30, 1998. The 52.8% increase was primarily attributable to increased short-term loans and officer loans coupled with imputed interest on stock issued in consideration for the short term loans.

## OTHER INCOME

The Company was required to sell marketable securities to meet a margin call on its secured margin loan, resulting in a gain on marketable securities of approximately $400,000 for the year ended June 30, 1998.

## LIQUIDITY AND CAPITAL RESOURCES

The Company's need for funds has increased from period to period, as it has incurred expenses for among other things, research and development; applications for and maintaining of domestic and international trademarks and international patent protection; licensing and pre-marketing activities; and, attempts to raise the necessary capital to expand the Company's capacity. Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Executive Officer and major shareholder. The Company has entered into various license agreements that have raised additional funds. In addition, the Company's auditors' report for the year ended June 30, 2000 dated August 17, 2000, expressed an opinion as to the Company continuing as a going concern.

During September 1998, the Company commenced the sale of its BreastCare(TM)/BreastAlert(TM) in Brazil, Uruguay and Paraguay through its South American licensee. During February 1999, the Brazilian economy declined and the Brazilian currency lost fifty (50%) percent of its value. Brazil increased the import and value - added tax from approximately twenty - one (21%) percent in December 1998 to approximately seventy - four (74%) percent in February 1999. Due to these factors, sales substantially decreased in Brazil, which represents approximately eighty (80%) percent of the Company's expected revenue. The Company is establishing a production facility in Brazil. This will eliminate the high value - added tax and hopefully will be able to facilitate sales. The Company terminated its license agreement with its former licensee in South America but key personnel for the former licensee have joined Scantek. The Company's Brazilian subsidiary plans to manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) in Brazil and export to other South American countries.

The Company commenced its distribution operations in South America during the second half of calendar 2000, while shipments to Ireland commenced in October 1999 for test marketing and shipments to other parts of Europe will commence during the first half of calendar 2001. However, until cash flow generated from the shipment of the BreastCare(TM) device is sufficient to support the Company's operations, the Company needs financing to fund its current

-28-

overhead and various capital requirements. As of June 30, 2000, the Company borrowed $644,715 from unaffiliated third parties, of which approximately $429,715 was advanced since June 30, 1999. These loans are payable by the Company on various dates through December 2001. In addition, as of August 17, 2000, the Company's President advanced the Company an additional $227,600 since July 1999. These loans have supported the Company through the prior fiscal year and the current fiscal year, and the Company expects the cash flow from sales commencing in the first quarter of calendar 2001 to cover the operations of the Company in calendar 2001 and 2002, providing the Company is successful in raising additional capital to support the operations until cash flows generated for the sales of the BreastCare(TM)/BreastAlert (TM) commences.

As previously noted, the Company terminated its license agreement with its South American licensee. The Company will manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) throughout South America through the Company's South American subsidiaries.

In July 1999, the Company, through its Brazilian subsidiary Scantek Medical do Brasil Ltda, executed a letter of intent with another entity to create a joint venture with exclusive rights to import, manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) in Brazil. After completing its due diligence, the Company terminated the letter of intent.

Through its Brazilian subsidiary, the Company signed an agreement with the State of Pernambuco in December 1999. The State of Pernambuco has the second largest concentration of hospitals in Brazil offering quality care and is also the most desirable location for production, shipping, financing and tax incentives. The Company is establishing a 2,550 square meter manufacturing facility in Recife, Pernambuco at the new port of Suape. The Company has broken ground, and anticipates construction to be completed by the first half of calendar 2001. The Company will ship the production equipment for arrival by the time construction is complete.

The State of Penambuco has offered various incentives, including acreage, at a reduced price, to build the facility, a 75% reduction in taxes through 2013, free shipping outside the state, and in connection with the federal programs offered in Northeast Brazil, financing programs to help fund the operations and capital improvements.

The Company plans to ship the BreastCare(TM)/BreastAlert(TM) from the United States until the production facility in Brazil is operational.

On September 30, 2000, the Company and its Brazilian subsidiary executed an agreement with a Brazilian investment group. Scantek Medical Inc. will sell 36% of its equity in Scantek Medical do Brasil Ltda for two million ($2,000,000) dollars to the Brazilian company investment group.

The new partner will play a major roll in expediting the Brazilian operations, including the construction of the new manufacturing facility, expanding Scantek Medical do Brasil Ltda's operations, marketing and sales. The $2,000,000 will be funded in various stages and milestones until the Sudene Federal Funding from the government is completed.

-29-

In connection with the agreements the Brazilian Investment Group purchased 750,000 shares of Scantek's Medical, Inc. common stock for $350,000. The Company has guaranteed to redeem these shares within twelve months at a price of not less than $350,000. If the total market value at the time of redemption is greater than $350,000 the Company will guarantee the $350,000 plus fifty (50%) percent of the profit generated.

On July 14, 1999, the Company granted an exclusive license to NuGard HealthCare Ltd. ("NuGard"), an Irish Company; to market Scantek's BreastCare(TM)/BreastAlert(TM) in Ireland and the United Kingdom. Pursuant to the licensing agreement, NuGard will pay a non-refundable licensing fee of $350,000 in various stages, of which $59,000 was received as of June 30, 2000, and the Company received common shares equivalent to fifteen (15%) percent of NuGard's total outstanding common shares. The purchase price will range from $10 to $15 per unit - FOB US. The license agreement requires minimum purchases of 5,000 units a month and payments of licensing fees, which have been postponed until the license agreement can be renegotiated.

The Company's working capital and capital requirements will depend on numerous factors, including the level of resources that the Company devotes to the purchase of manufacturing equipment to support start-up production and to the marketing aspects of its products. The Company intends to construct production and/or assembly centers abroad to manufacture, market and sell the BreastCare(TM)/BreastAlert(TM) in the international market. The Company entered into an agreement with Zigmed Inc., pursuant to which Zigmed Inc. will manufacture the sensor production equipment needed for manufacturing of the BreastCare(TM)/BreastAlert(TM) device for the contract price of $1,850,680. The Company, as of June 30, 2000, has advanced Zigmed Inc. payments of $1,068,304 and issued Zigmed Inc. 100,000 shares of the Company's common stock (valued at $1.00 per share) against the contract price. The balance of $782,376 will be paid when the Company raises the additional capital.

The Company's success is dependent on raising sufficient capital to establish a fully operable production and assembly facility to manufacture the BreastCare(TM)/BreastAlert(TM) for the international market. The Company believes the BreastCare(TM)/BreastAlert(TM) will be commercially accepted throughout the international market. The Company does not have all the financing in place at this time, nor may it ever, to meet these objectives.

This Management's Discussion and Analysis of Financial Condition and Results of Operations includes forward-looking statements that may or may not materialize. Additional information on factors that could potentially affect the Company's financial results may be found in the Company's filings with the Securities and Exchange Commission.

In June 1998, the Financial Accounting Standards Board issued SFAS No. 133, Accounting for Derivative Instruments and Hedging Activities ("SFAS No. 133"). This statement establishes accounting and reporting standards for derivative instruments and hedging activities. It requires the recognition of all derivatives as either assets or liabilities in the statement of financial position and measurement of these instruments at fair value. The accounting for change of the fair value of a derivative is dependent upon the intended use of the derivative. SFAS No. 133 will be effective in the Company's first quarter in the year ending June 30, 2001 and retroactive application is not permitted. Management does not believe that this statement will have a material impact on the Company.

-31-

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**PAGE**

Independent Auditors' Report                                    F-1 - F-2

Financial Statements:

          Consolidated Balance Sheets,
           June 30, 2000 and 1999                              F-3

          Consolidated Statements of Operations,
           Years Ended June 30, 2000, 1999, 1998              F-4

          Consolidated Statements of Stockholders'
           Equity, Years Ended June 30, 2000, 1999, 1998      F-5

          Consolidated Statements of Cash Flows,
           Years Ended June 30, 2000, 1999, 1998              F-6 - F-7

Notes to Consolidated Financial Statements                    F-8 - F-26

**INDEPENDENT AUDITORS' REPORT**

To the Board of Directors and Stockholders of Scantek Medical, Inc.

We have audited the accompanying consolidated balance sheet of Scantek Medical, Inc. and subsidiaries (the "Company") as of June 30, 2000 and 1999, and the related consolidated statements of operations, stockholders' deficiency, and cash flows for each of the three years ended June 30, 2000. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such consolidated financial statements referred to above present fairly, in all material respects, the financial position of Scantek Medical, Inc. and subsidiaries at June 30, 2000 and 1999, and the results of their operations and their cash flows for each of the three years ended June 30, 2000 in conformity with generally accepted accounting principles.

F-1

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. The Company is engaged in manufacturing and marketing a product that detects early breast tissue abnormalities including cancer. As more fully explained in Note 1 of Notes to Consolidated Financial Statements, the Company needs to obtain additional financing to fulfill its activities and achieve a level of sales adequate to support its cost structure. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Managements' plans are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of these uncertainties should the Company be unable to continue as a going concern.

**WIENER, GOODMAN & COMPANY, P.C.**
Certified Public Accountants
Eatontown, New Jersey

August 17, 2000

F-2

**SCANPEK MEDICAL INC. AND SUBSIDARIES**
**CONSOLIDATED BALANCE SHEETS**

|  | June 30, | |
|---|---|---|
|  | 2000 | 1999 |

### ASSETS

| Current Assets: | | |
|---|---|---|
| Cash | $ 2,898 | $ 5,516 |
| Marketable securities | 20,735 | 409,272 |
| Accounts receivable | 24,000 | -- |
| Inventories | 721,315 | 898,796 |
| Prepaid expenses | 8,511 | 84,287 |
| Total Current Assets | 777,459 | 1,397,871 |
| Property and equipement - net | 1,548,016 | 1,803,974 |
| Other assets - net | 101,174 | 160,179 |
| TOTAL ASSETS | $ 2,426,649 | $ 3,362,024 |

### LIABILITIES AND STOCKHOLDERS' DEFICIENCY

| Current Liabilities: | | |
|---|---|---|
| Short-term debt | $ 860,593 | $ 524,271 |
| Current portion of long-term debt | 300,000 | -- |
| Accounts payable | 1,263,095 | 1,210,861 |
| Accrued interest | 539,333 | 224,279 |
| Accrued salaries | 1,332,472 | 1,106,119 |
| Accrued expenses | 528,406 | 84,213 |
| Total Current Liabilities | 4,823,899 | 3,149,743 |
| Long-term debt | 2,604,609 | 2,577,009 |
| Total Liabilities | 7,428,508 | 5,726,752 |
| Commitments and Contingencies | | |

| Stockholders' Deficiency: | | |
|---|---|---|
| Preferred stock, par value $.001 per share - authorized 5,000,000 shares; none issued | -- | -- |
| Common stock, par value $.001 per share - authorized 45,000,000 shares; outstanding 18,810,540 and 18,070,200 shares | 18,810 | 18,070 |
| Additional paid-in-capital | 3,726,976 | 3,433,002 |
| Cumulative other comprehensive loss | (281,265) | (165,885) |
| Deficit | (8,466,380) | (5,649,915) |
| Total Stockholders' Deficiency | (5,001,859) | (2,364,728) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIENCY | $ 2,426,649 | $ 3,362,024 |

See notes to consolidated financial statements

F-3

**SWANPEK MEDICAL INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Years Ended June 30, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| **Revenues:** | | | |
| Net sales ..................................... | $ 29,775 | $ 127,775 | $ -- |
| License fees ................................. | 59,000 | 727,500 | 1,801,582 |
| | 88,775 | 855,275 | 1,801,582 |
| **Costs and expenses:** | | | |
| Cost of sales ................................ | 537,216 | 411,834 | -- |
| General and administrative expenses ................................. | 1,699,922 | 1,148,449 | 1,060,766 |
| Research and development ..................... | 286,223 | 490,482 | 339,037 |
| | 2,523,361 | 2,050,765 | 1,399,803 |
| Income (loss) from operations ................... | (2,434,586) | (1,195,490) | 401,779 |
| **Other income (expense):** | | | |
| Interest and dividends ....................... | 223 | -- | 21,507 |
| Gain on sale of marketable securities ................................. | 25,007 | -- | 413,504 |
| Loss on investments .......................... | -- | (103,100) | -- |
| Interest expense ............................. | (417,109) | (280,978) | (183,889) |
| Miscellaneous ................................ | 10,000 | -- | 1,900 |
| | (381,879) | (384,078) | 253,022 |
| Net earnings (loss) ............................. | $ (2,816,465) | $ (1,579,568) | $ 654,801 |
| Earnings (loss) per common share - basic ................................. | $ (0.15) | $ (0.09) | $ 0.04 |
| Earnings (loss) per common share - diluted ............................... | $ (0.15) | $ (0.09) | $ 0.03 |
| Weighted average number of common shares outstanding - basic ............. | 18,431,820 | 17,679,575 | 17,220,200 |
| Weighted average number of common shares outstanding - diluted ........... | 18,431,820 | 17,679,575 | 18,742,501 |

See notes to consolidated financial statements.

F-4

SCANTEK MEDICAL, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIENCY)

| | Total | Comprehensive Income (Loss) | Retained Earnings (Deficit) | Cumulative Other Comprehensive Income (Loss) | Common Stock | Additional Paid-In Capital |
|---|---|---|---|---|---|---|
| Balance, July 1, 1997 | $ 3,824,113 | | $(4,725,148) | $ 5,566,615 | $ 17,220 | $ 2,965,426 |
| Issuance of stock warrants for services (issued at $.55 to $1.125 per share) | 27,780 | | | | | 27,780 |
| Net unrealized loss on marketable securities | (2,944,999) | $(2,944,999) | | (2,944,999) | | |
| Net earnings | 654,801 | 654,801 | 654,801 | | | |
| Comprehensive loss | | $(2,290,198) | | | | |
| Balance, June 30, 1998 | 1,561,695 | | (4,070,347) | 2,621,616 | 17,220 | 2,993,206 |
| Common stock issued in lieu of compensation (issued at $.1875 per share) | 65,625 | | | | 350 | 65,275 |
| Sale of common stock (at $.3333 per share) | 100,000 | | | | 300 | 99,700 |
| Common stock issued for loan financing (issued at $.1875 to $.5625 per share) | 84,375 | | | | 200 | 84,175 |
| Issuance of stock options and warrants for services (issued at $.1875 to $1.125 per share) | 190,646 | | | | | 190,646 |
| Net unrealized loss on marketable securities | (2,787,501) | $(2,787,501) | | (2,787,501) | | |
| Net (loss) | (1,579,568) | (1,579,568) | (1,579,568) | | | |
| Comprehensive loss | | $(4,367,069) | | | | |
| Balance June 30, 1999 | (2,364,728) | | (5,649,915) | (165,885) | 18,070 | 3,433,002 |
| Sale of common stock (at $.2185 per share) | 10,000 | | | | 46 | 9,954 |
| Common stock issued for loan financing and services rendered (issued at $.01 to $.5625 per share) | 199,254 | | | | 694 | 198,560 |
| Issuance of stock warrants for services (issued at $.1875 to $.75 per share) | 85,460 | | | | | 85,460 |
| Net unrealized loss on marketable securities | (115,380) | $ (115,380) | | (115,380) | | |
| Net loss | (2,816,465) | (2,816,465) | (2,816,465) | | | |
| Comprehensive loss | | $(2,931,845) | | | | |
| Balance, June 30, 2000 | $(5,001,859) | | $(8,466,380) | $ (281,265) | $ 18,810 | $ 3,726,976 |

See notes to consolidated financial statements.

F-5

**SWANPEK MEDICAL, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

|  | For the Years Ended June 30, | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
| Cash flows from operating activities: | | | |
| Net earnings (loss) .......................... | $(2,816,465) | $(1,579,568) | $ 654,801 |
| Adjustments to reconcile net earnings (loss) to net cash used in operating activities: | | | |
| Depreciation and amortization ............... | 367,065 | 288,655 | 84,220 |
| Net gain on sale of marketable securities ............................... | (25,007) | -- | (413,504) |
| Non-employee stock based compensation ............................. | 85,460 | 84,375 | -- |
| Non-cash officers compensation .............. | -- | 195,418 | -- |
| Other non-cash items ........................ | 199,254 | 60,853 | 27,780 |
| Changes in operating assets and liabilities ........................... | 1,259,815 | 512,755 | (1,015,074) |
| Net Cash (Used in) Operating Activities ................... | (929,878) | (437,512) | (661,777) |
| Cash flows from investing activities: | | | |
| Proceeds from sale of marketable securities ................................. | 298,164 | -- | 1,168,445 |
| Purchase and deposits of property and equipment ............................ | (43,500) | (1,202,980) | (447,203) |
| Purchase of marketable securities ............ | -- | -- | (345,342) |
| Net Cash Provided by (Used in) Investing Activities ..................... | 254,664 | (1,202,980) | 375,900 |
| Cash flows from financing activities: | | | |
| Proceeds from borrowings ..................... | 473,215 | 1,150,000 | 101,202 |
| Proceeds from officer loans .................. | 309,413 | 342,281 | 317,000 |
| Repayment of officer loans ................... | (76,084) | (1,000) | -- |
| Repayment of notes .......................... | (43,948) | (1,202) | (994,789) |
| Proceeds from sale of common stock ........... | 10,000 | 100,000 | -- |
| Net Cash Provided by (Used in) Financing Activities ..................... | 672,596 | 1,590,079 | (576,587) |
| Net (decrease) in Cash ...................... | (2,618) | (50,413) | (862,464) |
| Cash - beginning of period .................... | 5,516 | 55,929 | 918,393 |
| Cash - end of period ......................... | $ 2,898 | $ 5,516 | $ 55,929 |

See notes to consolidated financial statements.

(Continued)

**SWANTEK MEDICAL, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Years Ended June 30, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| Changes in operating assets and liabilities consist of: | | | |
| (Increase) in accounts receivable ...... | $    (24,000) | $      -- | $      -- |
| (Increase) decrease in inventory ....... | 177,481 | (898,796) | -- |
| Decrease in due from licenses .......... | -- | 801,900 | 248,100 |
| (Increase) decrease in prepaid expenses ........................... | 75,776 | (60,770) | 47,191 |
| (Increase) in marketable securities non-current ......................... | -- | -- | (300,000) |
| (Increase) in other assets ............. | (8,602) | 80,490 | (92,115) |
| Increase (decrease) in accounts payable and accrued expenses ......... | 1,039,160 | 1,342,431 | 458,332 |
| Increase (decrease) in deferred income ............................... | -- | (752,500) | (1,376,582) |
| | $ 1,259,815 | $   512,755 | $(1,015,074) |
| Supplementary information: | | | |
| Cash paid during the year for: | | | |
| Interest ............................. | $     38,583 | $   103,924 | $   155,709 |
| Income Taxes .......................... | $        450 | $     5,637 | $      -- |
| Non-cash investing activities: | | | |
| Unrealized loss on marketable securities ................ | $   (115,380) | $(2,787,501) | $(2,944,999) |
| Non-cash financing activities | | | |
| Conversion of accounts payable and accrued expenses to common stock .................................. | $    199,254 | $    84,375 | $      -- |
| Conversion of accounts payable and accrued expenses to stock options and warrants . | $     85,460 | $   190,646 | $    27,780 |
| Conversion of accrued officers salaries to common stock .............. | $       -- | $    65,625 | $      -- |
| Details of settlement agreement: | | | |
| Fair value of assets received .......... | | $   915,000 | |
| Liabilities forgiven .................. | | 575,000 | |
| Net cash paid .......................... | | $   340,000 | |

See notes to consolidated financial statements.

F-7

SCANTEK MEDICAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### ORGANIZATION

Scantek Medical, Inc. and its subsidiaries (the "Company"), operates in one industry segment and is engaged, in developing, manufacturing, marketing, and licensing the BreastCare(TM)/BreastAlert(TM). The BreastCare(TM)/BreastAlert(TM) is an early screening device which can detect certain breast tissue abnormalities, including breast cancer. This device has been patented and has Food and Drug Administration ("FDA") approval for sale.

During the year ended June 30, 1999, principal operations commenced and the Company commenced shipments of the BreastCare (TM)/BreastAlert(TM) in South America. The Company also regained rights to manufacture and sell the BreastCare(TM)/BreastAlert(TM) in the United States of America, Canada and their territories and possessions. See Note 6 of Notes to Consolidated Financial Statements for further information. Accordingly, the Company is no longer considered a development stage enterprise, as it was through June 30, 1998. There is no assurance that commercially successful products will be developed, nor that the Company will achieve a profitable level of operations.

### BASIS OF PRESENTATION

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business.

The Company has experienced losses during its development stage. Losses and negative cash flows from operations have continued in the current fiscal year and subsequent to June 30, 2000. As of June 30, 2000, the Company has a working capital deficit of approximately $4.5 million.

The activities of the Company are being financed through the sale of its common stock and debt securities. The Company's continued existence is dependent upon its ability to obtain needed working capital through additional equity and/or debt financing, and the commercial acceptability of the BreastCare(TM)/BreastAlert(TM) to create sales that will help the Company achieve a profitable level of operations. However, there is no assurance that additional capital will be obtained or the BreastCare(TM)/BreastAlert(TM) will be commercially successful. This raises substantial doubt about the ability of the Company to continue as a going concern.

The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

### PRINCIPLES OF CONSOLIDATION

The consolidated financial statements include the accounts of Scantek Medical, Inc. and its wholly-owned subsidiaries (the "Company"). All intercompany transactions have been eliminated.

F-8

## USE OF ESTIMATES

The preparation of the financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

## MARKETABLE SECURITIES

The Company classifies its investment in equity securities, as "available for sale", and accordingly, reflects unrealized losses as a separate component of stockholders' deficiency.

The fair values of marketable securities are estimated based on quoted market prices. Realized gains or losses from the sales of marketable securities are based on the specific identification method.

## CONCENTRATION OF CREDIT RISK

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of temporary cash investments. The Company places its temporary cash investments with high credit quality financial institutions and by policy, in the future, will limit the amount of credit exposure with any one financial institution.

## INVENTORIES

Inventories are stated at the lower of weighted average cost or market.

## REVENUE RECOGNITION

Revenue is recognized when the BreastCare(TM)/BreastAlert(TM) are shipped and title passes to customers.

Revenue from licensing the BreastCare(TM)/BreastAlert(TM) is usually recognized when licensees commence operations and substantial performance has occurred. The Company historically has amended or renegotiated its licensees' agreements. Therefore, the Company recognizes license fee income when received.

## DEPRECIATION

Equipment is stated at cost, less accumulated depreciation. Depreciation is recorded using the straight-line method over the estimated useful lives of the assets, which are between 5 and 10 years.

## PATENT COSTS

The costs associated with the acquisition and filings of the United States, French, English, Dutch and other patents have been capitalized. The patents are amortized using the straight-line method over their respective lives, not to exceed ten (10) years. The carrying value of intangible assets is periodically reviewed by the Company, and impairments are recognized when the expected future operating cash flows to be derived from such intangible assets is less than their carrying value.

### RESEARCH AND DEVELOPMENT

Research and development costs are expensed as incurred.

### EVALUATION OF LONG-LIVED ASSETS

Long-lived assets are assessed for recoverability on an ongoing basis. In evaluating the fair value and future benefits of long-lived assets, their carrying value would be reduced by the excess, if any, of the long-lived asset over management's estimate of the anticipated undiscounted future net cash flows of the related long-lived asset. As of June 30, 2000, management concluded that no impairment exists.

### STOCK-BASED COMPENSATION

The Company has adopted the disclosure-only provisions of the Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation". The standard encourages, but does not require, companies to recognize compensation expense for grants of stock, stock options and other equity instruments to employees based on fair value.

### EARNINGS (LOSS) PER SHARE

Basic earnings (loss) per common share are computed by dividing net earnings (loss) by the weighted average number of common shares outstanding during the year. For the year ended June 30, 1998, diluted earnings per common share are computed by dividing net earnings by the weighted average number of common and potential common shares outstanding during the year. Potential common shares used in computing diluted earnings per share relate to stock options and warrants which, if exercised, would have a dilutive effect on earnings per share. The number of potential common shares outstanding were 14,402,170, 6,418,205 and 2,013,178 for the years ended June 30, 2000, 1999 and 1998, respectively. During the years ended June 30, 2000 and 1999, potential common shares were not used in the computation of diluted loss per common share, as their effect would be antidilutive.

### FAIR VALUE OF FINANCIAL INSTRUMENTS

For financial instruments including cash, amounts due from licensees, accounts payable, accrued expenses and short term debt, it was assumed that the carrying amount approximated fair value because of the short-term nature of these instruments. The fair value of marketable securities are based on quoted market prices. It is not practicable to estimate the fair value of the non-publicly traded long-term debt.

### NEW FINANCIAL ACCOUNTING STANDARDS

In June 1998, the Financial Accounting Standards Board issued SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities ("SFAS No. 133"). This Statement establishes accounting at reporting standards for derivative instruments and hedging activities. It requires the recognition of all derivatives as either assets or liabilities in the statement of financial position and measurement of those instruments at fair value. The accounting for changes in the fair value of a derivative is dependent upon the intended use of the derivative. SFAS No. 133 will be effective in the Company's first quarter in the year ending June 30, 2001 and retroactive application is not permitted. Management does not believe that this Statement will have a material impact on the Company.

RECLASSIFICATIONS

Certain reclassifications have been made to prior year balances in order to conform with the current year's presentation.

## 2. INVESTMENT IN SUBSIDIARIES

(a) In July 1999, the Company organized Scantek Medical do Brazil LTDA, a Brazilian Company and a wholly owned subsidiary, to distribute the BreastCare(TM)/BreastAlert(TM) in Brazil. The subsidiary will manufacture the BreastCare(TM)/BreastAlert(TM) for South America in its proposed production facility in the state of Pernambucco, which the Company expects to be completed by the first half of calendar 2001. Construction cost is anticipated to be approximately $1,000,000.

(b) In January, 1998, the Company organized a wholly-owned subsidiary, Scantek Medical S.A. Inc., a Uruguayan company, to distribute the BreastCare(TM)/BreastAlert(TM) in South America.

## 3. MARKETABLE SECURITIES

| | Cost | Estimated Fair Value | Gross Unrealized Gains | Gross Unrealized Losses |
|---|---|---|---|---|
| June 30, 2000: | | | | |
| Marketable securities- current: | | | | |
| Common stock ........ | $ 2,000 | $ 20,735 | $ 20,735 | $ 2,000 |
| Warrants ............ | $ 300,000 | $ -- | $ -- | $300,000 |
| June 30, 1999: | | | | |
| Marketable securities- current: | | | | |
| Common stock ........ | $ 275,157 | $ 409,272 | $ 318,000 | $183,885 |
| Marketable securities- non-current: | | | | |
| Warrants ............ | $300,000 | $ -- | $ -- | $300,000 |

Gross realized gains were $145,912 in 2000, $-0- in 1999 and $435,352 in 1998. Gross realized losses were $120,905 in 2000, $-0- in 1999 and $21,848 in 1998.

## 4. INVENTORIES

| | June 30, | |
|---|---|---|
| | 2000 | 1999 |
| Raw materials .............. | $ 614,138 | $ 783,175 |
| Finished goods .............. | 107,177 | 115,621 |
| | $ 721,315 | $ 898,796 |

F-11

5. PROPERTY AND EQUIPMENT

|  | June 30, | |
|---|---|---|
|  | 2000 | 1999 |
| Land ............................ | $   43,500 | $    -- |
| Equipment ........................ | 2,014,545 | 2,014,545 |
| Furniture and fixtures .......... | 27,489 | 27,489 |
| Leasehold improvements .......... | 16,525 | 16,525 |
|  | 2,102,059 | 2,058,559 |
| Less accumulated depreciation .... | 554,043 | 254,585 |
|  | $1,548,016 | $1,803,974 |

Depreciation expense for the years ended June 30, 2000, 1999 and 1998 was $299,458, $221,049 and $16,612, respectively.

## 6. OTHER ASSETS

|  | June 30, | |
|---|---|---|
|  | 2000 | 1999 |
| Patent costs ........................ | $676,069 | $676,069 |
| Security deposits ................... | 33,352 | 24,750 |
|  | 709,421 | 700,819 |
| Less accumulated amortization ....... | 608,247 | 540,640 |
|  | $100,174 | $160,179 |

7.  HUMASCAN AGREEMENT/SETTLEMENT

On March 15, 1999 pursuant to a Settlement Agreement ("Agreement") dated as of the 11th day of March 1999, between the Company and HumaScan, Inc. ("HumaScan"), the Company regained the rights to market and sell its BreastCare(TM)/BreastAlert(TM) in the United States and Canada.

Pursuant to the Agreement, all licensing agreements between the Company and HumaScan which gave HumaScan the right to manufacture, market and sell the BreastCare(TM)/BreastAlert(TM), were terminated. Pursuant to the original and amended licensing agreements, HumaScan was indebted to the Company for failure to pay license fees, royalties and other sums of money. In exchange for the cancellation of $575,000 of indebtedness due to the Company by HumaScan and for the payment by the Company to HumaScan of an additional $340,000, HumaScan agreed to assign certain special manufacturing equipment, furniture, raw materials, tools, materials, laboratory equipment and inventory of HumaScan for the manufacture of the BreastCare(TM)/BreastAlert(TM).

The Company recognized $375,000 as license fee income in its statement of operations for the year ended June 30, 1999, that was previously written off in accordance with the amended licensing agreement. The Company recorded raw materials and finished goods in the amount of approximately $859,000, which represents the fair market value of the inventory received. Equipment with an initial acquisition cost of approximately $2.5 million has been recorded for approximately $59,000, which represents the cost the Company paid HumaScan as part of the Agreement.

F-12

The Company entered into an exclusive license agreement, dated September 22, 1997, and amended February 18, 1998, with Sandell Corporation S.A. (the "Sandell Agreement"), a Uruguayan corporation, ("Sandell"), pursuant to which the Company granted to Sandell an exclusive license to market and distribute the BreastCare(TM)/BreastAlert(TM) in Brazil, Venezuela, Columbia, Costa Rica, Ecuador, Nicaragua, Paraguay, Panama, Peru, Bolivia, Argentina and Uruguay. The Sandell Agreement was for a term of fourteen (14) years. Under the Sandell Agreement, Sandell was to pay the Company a non-refundable license fee of (i) $500,000 and (ii) thirty-five (35%) percent of the outstanding shares of Sandell on a fully diluted basis. Upon execution of the agreement the Company received $100,000. As of June 30, 1999, upon mutual consent of both parties, the Company terminated its agreement with Sandell. In connection with the termination of the agreement, the Company wrote off the balance of the $400,000 license fee due the Company, and approximately $103,000, which represented its investment in Sandell. The Company will manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) throughout the majority of South America through the Company's South American subsidiaries.

On July 19, 1999, the Company executed a letter of intent with Contrutoro CEC LTDA ("CEC") and EPIC - Empressa de Participacano, Investmentoe

> Consultoria s/c LTDA. ("EPIC") to create a joint venture with exclusive
> rights to import, manufacture, market and distribute the
> BreastCare(TM)/BreastAlert(TM) in Brazil. After completing its due
> diligence, the Company terminated its letter of intent.

On July 14, 1999, the Company granted an exclusive license to NuGard HealthCare Ltd. ("NuGard"), an Irish Company; to market the Company's BreastCare(TM)/BreastAlert(TM) in Ireland and the United Kingdom. Pursuant to the licensing agreement, NuGard will pay a non-refundable licensing fee of $350,000 by June 30, 2001, of which $59,000 was received as of June 30, 2000, and recorded as income. The purchase price for the BreastCare(TM)/BreastAlert(TM) will range from $10 to $15 per unit - FOB US. The license agreement requires minimum purchases of 5,000 units a month and payments of license fees, which have been postponed until the license agreements can be renegotiated. The Company also received common shares equivalent to fifteen (15%) percent of NuGard's total outstanding common shares. The shares received have no value and nothing has been recorded.

On August 15, 1996, the Company entered into a license agreement with Health Technologies International Inc. ("HTI"), whereby HTI is to assemble, market and sell the BreastCare(TM)/BreastAlert(TM) in Chile and Singapore. HTI paid the Company a licensing fee of $250,000, which has been recorded as license fee income. During April 1997, HTI was acquired by D-Lanz Development Group, Inc. ("D-Lanz"). As part of the licensing agreement, the Company received 2,000,000 shares of D-Lanz common stock which is publicly traded on the Electronic Bulletin Board under the Symbol DLNZ, and the Company recorded the investment in the shares for $2,000. The Company will classify its investment as "available for sale" and accordingly reflect unrealized gains, net of deferred taxes, as a separate component of stockholders' equity.

F-13

On April 15, 2000, PLant and the Company entered into an agreement to amend its previous license agreement. Plant will have a change in control and the License will be assigned to a new corporation, Global Agri-Med Technologies, Inc. ("Global"). The Company agreed to assign and transfer the license to Global, which includes the exclusive license in Chile and Singapore. In addition, the Company has agreed to give Global non-exclusive license extensions to Africa, Korea, and South Asia. Global must receive final clearance from the Company before any participation or distribution can proceed in any city, state, territory or country in the non exclusive extensions as stated above.

The Company agreed to not less than 10% of Global's total issued and outstanding shares, equating to approximately 2,000,000 shares of Global and $27,500 in cash, which the Company has recorded as income. The payments extinguishes the Company's right to minimum royalties in any year until the first full calendar year following the fiscal year in which Global becomes profitable. The shares will be delivered, prior the establishment of a trading market for Global shares. The terms in this agreement will be deemed to amend the prior agreement, and thus will govern the prior agreement in the terms related to the previous agreement. Both parties have agreed to update certain terms in the previous agreement that will be beneficial to both parties. At June 30, 2000, the Company wrote down the marketable securities to $-0- as there was no quoted market value for the marketable securities.

F-14

Short-term debt at June 30, is as follows:

|  | 2000 | 1999 |
|---|---|---|
| Unsecured notes, interest at 10% to 16% per year, due on various dates through 12/31/00 (1) ..... | $830,593 | $500,000 |
| Unsecured officer loans, due 7/20/00, interest at prime plus 2% (11.5% at June 30, 2000) (2) ........ | 30,000 | 24,271 |
|  | $860,593 | $524,271 |

Long-term debt at June 30, is as follows:

|  | 2000 | 1999 |
|---|---|---|
| Secured note due September 30, 2001, interest at 12% per year. The loan is secured by production equipment ........................... | $ 850,000 | $ 750,000 |
| Unsecured officer loans, due December 31, 2001 interest at prime plus 2% (11.5% at June 30, 2000) (3) ................. | 1,166,603 | 939,003 |
| Unsecured notes, interest at prime plus 2% (11.5% at June 30, 2000) due December 31, 2001 (4) .......... | 888,006 | 888,006 |
|  | 2,904,609 | 2,577,009 |
| Current portion of long-term debt ................................ | 300,000 | -- |
|  | $2,604,609 | $2,577,009 |

Annual maturities on long-term debt as of June 30, 2000 during the next five years are:

| Year Ending June 30, | |
|---|---|
| 2001 ................. | 300,000 |
| 2002 ................. | 2,604,609 |
| 2003 ................. | -- |
| 2004 ................. | -- |
| 2005 ................. | -- |
|  | $2,904,609 |

(1) The holders of these notes received as additional consideration 180,250 shares of the Company's common stock. For the year ended June 30, 2000 and 1999 the Company recorded interest and consulting expense in the amount of $50,184 and $6,250, respectively and for the year ended June 30, 1999 recorded interest expense of $84,375 in connection with this financing.

(2) The unsecured note payable represents loans made to the Company by the Company's Vice President and Secretary. Interest expense for the year ended June 30, 2000 and 1999 amounted to $1,223 and $946, respectively. In consideration for the loan, the Company issued 5,703 shares of the Company's common stock and recorded additional interest expense in the amount of $3,208 for the year ended June 30, 2000.

(3) The unsecured note payable represents loans made to the Company by Mr. Zsigmond Sagi ("Mr. Sagi"), the Company's president and Chief Executive Officer. Interest expense for the years ended June 30, 2000, 1999 and 1998 amounted to $105,452, $74,348 and $31,906, respectively. Accrued interest at June 30, 2000 and 1999 was $147,604 and $43,652, respectively. In consideration for loans, the Company issued 79,250 shares of the Company's common stock and recorded additional interest expense in the amount of $32,969 for the year ended June 30, 2000.

(4) The holder of the note was a corporation controlled by Mr. Sagi. On March 31, 1998, the corporation holding the note dissolved and distributed the note to its five shareholders in equal amounts of $177,601. Two of the five shareholders are executive officers of the Company, including Mr. Sagi and Carlo Civelli, former Vice President of Finance International. The note terms were renegotiated with the lenders with principal payments due December 31, 2000 and interest at prime plus two (2%) percent. The notes have been extended to December 31, 2001. Accrued interest at June 30, 2000 and 1999 was $230,880 and $142,080, respectively. Interest expense for the year, ended June 30, 2000, 1999 and 1998, amounted to $88,800, $88,800 and $71,040, respectively.

10. INCOME TAXES

At June 30, 2000, the Company had a net operating loss ("NOL") carryforward of approximately $8,000,000 for financial reporting purposes and approximately $4,600,000 for tax purposes. The difference between financial reporting and tax purposes results from the temporary difference caused by the capitalization of start-up expenditures for tax purposes required by Internal Revenue Code Section 195 and the net unrealized losses on marketable securities. The Company has not reflected any benefit of such net operating loss carryforwards in the accompanying financial statements in accordance with Financial Accounting Standards Board Statement No. 109 as the realization of this deferred tax benefit is not more than likely. The tax NOL carryforwards expire in the years 2005 through 2012.

F-16

A reconciliation of taxes on income at the federal statutory rate to amounts provided is as follows:

|  | Years Ended June 30, | | |
|  | 2000 | 1999 | 1998 |
|---|---|---|---|
| Tax provision (benefit) computed at the Federal statutory rate ............. | $(958,000) | $(537,000) | $ 223,000 |
| Increase (decrease) in taxes resulting from: Utilization of Federal net operating loss carryforward .......... | -- | -- | (223,000) |
| Effect of unused tax losses ................. | 958,000 | 537,000 | -- |
|  | $  -- | $  -- | $  -- |

The types of temporary differences between the tax basis of assets and liabilities and their financial reporting amounts that give rise to a deferred tax asset and deferred tax liability and their approximate tax effects are:

|  | June 30, | | | |
|  | 2000 | | 1999 | |
|  | Temporary Difference | Tax Effect | Temporary Difference | Tax Effect |
|---|---|---|---|---|
| Net operating loss carry- forward ................................. | $(5,729,000) | $(2,292,000) | $(3,180,000) | $(1,272,000) |
| Deferred start- up expenses ............................. | (2,229,000) | (892,000) | (2,051,000) | (820,000) |
| Unrealized (losses) on marketable securities ................................ | (281,000) | (112,000) | (166,000) | (66,000) |
| Valuation allowance ................................. | 8,239,000 | 3,296,000 | 5,397,000 | 2,158,000 |
|  | $  -- | $  -- | $  -- | $  -- |

## 11. SEGMENTS - GEOGRAPHIC AREAS

The Company does not have reportable operating segments as defined in the Statement of Financial Accounting Standards No. 131, "Disclosure about Segments of an Enterprise and Related Information". The method for attributing revenues to individual countries is based on the destination to which finished goods are shipped. The Company operates facilities in the United States and South America.

F-17

One hundred (100%) percent of the sales ($127,775) of the BreastCare(TM)/BreastAlert(TM) for the year ended June 30, 1999 were to the Company's South American licensee, Sandell Corporation S.A. ("Sandell"), a related party, in which the Company owns 35% of the outstanding shares. Sales of the BreastCare(TM)/BreastAlert(TM) are not recorded by the Company until Sandell ships the BreastCare (TM)/BreastAlert(TM) to unrelated entities. Revenues include license fees received by the Company in connection with various arrangements contracted throughout the world. As of June 30, 1999 the Company has terminated its license agreement with Sandell. See Note 7 of Notes to Consolidated Financial Statements for further information.

|  | June 30, | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
| **Revenues from unrelated entities and countries of Company's domicile:** | | | |
| United States | $ 59,420 | $ 727,500 | $ 1,801,582 |
| South America | 24,000 | 127,775 | -- |
| Ireland | 5,355 | -- | -- |
|  | $ 88,775 | $ 855,275 | $ 1,801,582 |
| **Total Revenues:** | | | |
| United States | $ 59,420 | $ 832,936 | $ 1,801,582 |
| South America | 24,000 | 127,775 | -- |
| Ireland | 5,355 | -- | -- |
| Less: intergeographic revenue | -- | (75,436) | -- |
|  | $ 88,775 | $ 855,275 | $ 1,801,582 |
| **Loss from operations:** | | | |
| United States | $(1,880,632) | $ (952,368) | $ 405,871 |
| South America | (553,954) | (243,122) | (4,092) |
|  | $(2,434,586) | $(1,195,490) | $ 401,779 |
| **Assets:** | | | |
| United States | $ 3,125,614 | $ 3,645,404 | $ 5,212,438 |
| South America | 118,599 | 127,883 | 18,360 |
| Less: intergeographic eliminations | (887,564) | (411,263) | (22,451) |
|  | $ 2,426,649 | $ 3,362,024 | $ 5,208,347 |
| **Capital Expenditures:** | | | |
| United States | $ -- | $ 1,202,980 | 447,203 |
| South America | 43,500 | -- | -- |
|  | $ 43,500 | $ 1,202,980 | $ 447,203 |
| **Depreciation and amortization expense:** | | | |
| United States | $ 367,065 | $ 288,655 | $ 84,220 |
| South America | -- | -- | -- |
|  | $ 367,065 | $ 288,655 | $ 84,220 |

F-18

SWANPEK MEDICAL INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

11. SEGMENTS - GEOGRAPHIC AREAS (Continued)

Transfers between geographic areas include raw materials manufactured in the United States which are shipped to South America to be manufactured into finished products. Loss from operations represents total revenue less operating expenses.

Identifiable assets are those assets of the Company that are identified with the operation of each geographic area.

12. STOCK-BASED COMPENSATION

On April 14, 2000, the Company issued 238,170 shares of the Company's common stock to three (3) consultants for services rendered to the Company in the amount of $88,438 for the year ended June 30, 2000.

13. STOCK OPTIONS AND WARRANTS

The Company has adopted the disclosure-only provisions of the Statement of Financial Accounting Standards No. 123 "Accounting for Stock-Based Compensation". Accordingly, no compensation cost has been recognized for the stock options awarded. Had compensation cost for the Company's issuance of stock options and warrants been determined based on the fair value at the grant date for awards in fiscal years ended 2000 and 1999, consistent with the provision of SFAS No. 123, the Company's net loss and net loss per share would have increased to the pro-forma amounts indicated below:

|  | June 30, | |
|---|---|---|
|  | 2000 | 1999 |
| Net (loss) - as reported ..... | $ (2,816,465) | $ (1,579,568) |
| Net (loss) - pro-forma ....... | (3,260,223) | (1,722,680) |
| Loss per share - basic | | |
|   - as reported .............. | $(.15) | $(.09) |
|   - pro-forma ................ | $(.18) | $(.10) |
| Loss per share - diluted | | |
|   - as reported .............. | $(.15) | $(.09) |
| Loss per share - diluted | | |
|   - pro-forma ................ | $(.18) | $(.10) |

F-19

Case 1:08-cv-00453-CM-HBP    Document 9-3    Filed 02/11/2008    Page 55 of 78

The fair value of options and warrants are estimated on the date of grant using the Black-Scholes option pricing method with the following weighted average assumptions issued for grants in 2000 and 1999, for both years:
dividend yield of 0%, expected volatility of 145% to 161%, risk free interest rate of 5.0% and expected lives of 2 1/2 years.

The Company has granted stock options and warrants as follows:

(a) On March 7, 1995, the Company established a Non-Qualified Stock Option Plan (the "Plan"), which provides for the granting to key employees stock options. The Plan provides for the issuance of up to 500,000 shares, none of which have been registered. No shares have been granted as of June 30, 2000.

(b) On March 7, 1995, the Company established a Stock Grant Program which provides for the granting to key employees common stock of the Company. The Stock Grant Program provides for the issuance of up to 500,000 shares, none of which have been registered. No shares have been granted as of June 30, 2000.

(c) The following options and warrants were granted outside the two March 7, 1995 Plans during the year ending June 30, 2000:

On December 30, 1999 the Company granted warrants to purchase 190,000 shares of the Company's common stock at an exercise price of $.07 per share, the fair value at the date of grant, to the Company's attorneys, for legal services, which were charged to general and administrative expenses, in the amount of $9,728. The warrants are exercisable immediately and expire December 29, 2004.

On December 30, 1999, the Company granted options to purchase up to 5,428,571 shares of the Company's common stock at an option price of $.07 per share, the fair value at the date of grant, for the conversion of accrued salaries to the Company's President and Chief Executive Officer. The options are exercisable immediately and expires December 29, 2004.

On December 30, 1999, the Company granted options to purchase up to 1,428,572 shares of the Company's common stock at an option price of $.07 per share, the fair value at the date of grant, for the conversion of accrued salaries to the Company's Vice President and Secretary. The options are exercisable immediately and expires December 29, 2004.

On December 30, 1999, the Company granted warrants to purchase 100,000 shares of the Company's common stock at an exercise price of $.07 per share, the fair value at the date of grant, to consultants for financial consulting services rendered, which was charged to general and administrative expense, in the amount of $5,120. The warrants are exercisable immediately and expires December 29, 2004.

On December 30, 1999, the Company granted warrants to purchase 600,000 shares of the Company's common stock at an exercise price of $.07 per share, the fair value at the date of grant, to the Company's President and Chief Executive Officer. The warrants are exercisable immediately and expire December 29, 2004.

On December 30, 1999, the Company granted warrants to purchase 340,000 shares of the Company's common stock at an exercise price of $.07, the fair value at the date of grant, to the Company's Vice-President and Secretary. The warrants are exercisable immediately and expire December 29, 2004.

On December 30, 1999, the Company granted options to three directors totaling 40,000 shares each (120,000 shares) of the Company's common stock at an exercise price of $.07, the fair value at the date of grant. The options are exercisable immediately and expire December 29, 2004.

On December 30, 1999, the Company granted warrants to purchase 750,000 shares of the Company's common stock at an exercise price of $.07, the fair value at the date of the grant, to employees of the Company. The warrants are exercisable immediately and expire December 29, 2004.

On May 14, 1999, the Company granted 4,375,027 options to officers and employees to purchase the Company's common stock at an exercise price of $.21875 per share, the fair value at the date of grant. The options are exercisable immediately and expire May 14, 2004.

On December 14, 1998 the Company granted warrants to purchase 100,000 shares of the Company's common stock at an exercise price of $.1875 per share, the fair value at the date of grant, to consultants in exchange for professional services rendered which were charged to general and administrative expense, in the amount of $3,981. The warrants are exercisable immediately and expire November 30, 2003.

On August 5, 1998, the Company granted options to two directors totaling 40,000 shares each (80,000 shares) of the Company's common stock at an option price of $.5625 per share, the fair value at the date of grant. The options are exercisable immediately and expire August 5, 2003.

During the year ended June 30, 1998, the Company granted 400,000 warrants to purchase the Company's common stock at exercise prices ranging from $.55 to $1.125, the fair value on the date of grant, to consultants for services rendered, which were charged to general and administrative expenses, in the amount of $27,780. The warrants are exercisable immediately and expire on dates ranging from July 31, 2000 to January 26, 2003.

On January 26, 1998, the Company granted options to officers of the Company to purchase a total of 450,000 shares of the Company's common stock at an exercise price of $.55 per share, the fair value at the date of grant. The options are exercisable immediately and expire January 25, 2003.

F-21

Information regarding the Company's Stock Option Plan and Warrants, for fiscal years ended 2000, 1999 and 1998, is as follows:

|  | 2000 | | 1999 | | 1998 | |
|---|---|---|---|---|---|---|
|  | Shares | Weighted Average Exercised Price | Shares | Weighted Average Exercised Price | Shares | Weighted Average Exercised Price |
| Options and warrants outstanding beginning of year ............... | 6,418,205 | $.28 | 2,013,178 | $.54 | 1,163,178 | $.49 |
| Options and warrants exercised .... | -- | -- | -- | -- | -- | -- |
| Options and  warrants granted ..... | 8,957,143 | .07 | 4,555,027 | .22 | 850,000 | .60 |
| Options and warrants expired ...... | (973,198) | .48 | (150,000) | .63 | -- | -- |
| Options and warrants outstanding, end of year .................... | 14,402,170 | $.15 | 6,418,205 | $.28 | 2,013,178 | $.54 |
| Option and warrants price range at end of year .................. | $ .07 | | $.19 to $.56 | | $.38 to $1.125 | |
| Option and warrants price range for exercised shares ........... | -- | | -- | | -- | |
| Options and warrants available for grant ...................... | 1,000,000 | | 1,000,000 | | 1,000,000 | |

F-22

The weighted exercise price and weighted fair value of options and warrants granted by the Company for the fiscal years ended 2000, 1999 and 1998 are as follows:

|  | 2000 | | 1999 | | 1998 | |
|---|---|---|---|---|---|---|
|  | Weighted Average Exercised Price | Weighted Average Fair Value | Weighted Average Exercised Price | Weighted Average Fair Value | Weighted Average Exercised Price | Weighted Average Fair Value |
| Weighted average of options and warrants granted during the year whose exercise price exceeded fair market value at the date of grant | -- | -- | -- | -- | $ .75 | $ .36 |
| Weighted average of options and warrants granted during the year whose exercise price was equal to fair market value at the date of grant | $ .07 | $ .05 | $ .22 | $ .14 | $ .56 | $ .38 |

The following table summarizes information about fixed-price stock options and warrants outstanding at June 30, 2000:

| Range of Exercise Prices | Number Outstanding at June 30, 1999 | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable at June 30, 1999 | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $ .07 | 8,957,143 | 4.5 years | $ .07 | 8,957,143 | $ .07 |
| $ .19 to $.38 | 4,515,027 | 3.8 years | $ .22 | 4,515,000 | $ .22 |
| $ .55 to $1.13 | 930,000 | 2.6 years | $ .60 | 930,000 | $ .60 |
|  | 14,402,170 | | | 14,402,170 | |

F-23

a) On December 1, 1998 the Company issued 200,000 and 150,000 shares of the Company's common stock to Mr. Sagi and the Company's Vice President/Secretary, respectively, in consideration for deferring their current year salaries. In connection with the transaction the Company recorded a compensation expense in the amount of $65,625 for the year ending June 30, 1999.

b) On March 31, 1998, SMC Corp. dissolved and distributed the note due from the Company to its five shareholders, including Mr. Sagi and Carlo Civelli. See Note 8 of Notes to Consolidated Financial Statements for further information. The principal amount of the note at June 30, 2000 and 1999 was $177,601 for Mr. Sagi and Mr. Civelli. Interest expense for the year ended June 30, 2000, 1999 and 1998 was $17,760, $17,760 and $14,208 each, for Mr. Sagi and Mr. Civelli. As of June 30, 2000 and 1999 accrued interest in the amount of $46,176 and $28,416 was due Mr. Sagi and Mr. Civelli.

c) On November 16, 1998, the Company sold a total of 300,000 shares of the Company's common stock to a Director of the Company and an officer of the Company. The Company received $100,000 net proceeds from the sale.

d) On July 1, 1999, the Company issued 79,250 and 5,703 shares of the Company's common stock to Mr. Sagi and the Company's Vice-President and Secretary, respectively, in consideration for loan financing for operations. In connection with the transaction the Company recorded accrued interest expense in the amount of $36,177 for the year ending June 30, 2000.

e) On July 1, 1999, December 30, 1999 and March 8, 2000, the Company issued a total of 7,500 shares of the Company's common stock to a Company director in consideration for loan financing for operations. In connection with the transaction the Company recorded accrued interest expense in the amount of $2,419 for the year ending June 30, 2000.

f) On July 7, 1999, the Company issued 50,000 shares of the Company's common stock to a former director of the Company as part of his employment agreement. In connection with the transaction the Company recorded compensation expense in the amount of $9,375 for the year ending June 30, 2000.

g) On July 7, 1999, the Company sold 45,767 shares of the Company's common stock to an officer and director of the Company. The Company received $10,000 net proceeds from the sale. On April 14, 2000, the Company also issued 35,200 shares of the Company's common stock to the same officer and director in exchange for consulting services worth $8,800.

F-24

h) The Company and Zigmed Corporation ("Zigmed") have entered into various agreements. Zigmed is owned and controlled by two sons of Mr. Sagi, who, prior to 1990, owned Zigmed. The Company has contracted with Zigmed to manufacture its sensor production equipment needed for its production centers. The Company sublets warehouse space to Zigmed for $1,970 per month and received $23,640 and $20,000 as rental income from Zigmed for the years ended June 30, 2000 and 1999. The Company has also contracted with Zigmed for the production of the BreastCare(TM)/BreastAlert(TM) sensors. Zigmed provided material, labor and product testing services of $74,430 and $42,109 for the years ended June 30, 2000 and 1999. The Company owes Zigmed approximately $63,000 and $17,000 as of June 30, 2000 and 1999 for labor. See Note 13 of Notes to Consolidated Financial Statements for further information.

## 15. COMMITMENTS AND CONTINGENCIES

### Leases

The Company leases office and warehousing facilities. Certain of these leases require the Company to pay certain executory costs (such as insurance and maintenance). In June, 1997 the Company signed a three (3) year lease for office and warehouse space in Denville, New Jersey and amended its lease on April 15, 1999 to include an additional 6,000 square feet adjacent to its corporate headquarters. The lease has been extended through June 30, 2001. The Company also rents warehouse space in Uruguay, on a month to month basis, costing approximately $1,350 a month and office space in Brazil, on a month to month basis, costing approximately $350 a month.

Future minimum lease payments for operating leases are as follows:

```
Years Ending June 30,
---------------------
    2001 .....................     119,600
    2002 .....................         --
    2003 .....................         --
    2004 .....................         --
    Thereafter ...............         --
                                  --------
                                  $119,600
                                  ========
```

Rent expense for the years ended June 30, 2000, 1999 and 1998 was approximately $104,000, $86,000 and $68,000, respectively.

### Employment Agreements

The Company has entered into employment contracts with the two officers/directors of the Company. The agreements all provide the following: base salaries increasing upon certain conditions, incentive bonus plans and severance benefits.

F-25

**Production Agreements**

The Company intends to construct strategic regional production centers throughout the world to manufacture, assemble and market the BreastCare(TM)/BreastAlert(TM). The Company has entered into an amended agreement with Zigmed pursuant to which Zigmed will manufacture the sensor production equipment needed for the manufacturing centers for the contract price of $1,850,680 plus 100,000 shares of the Company's common stock. In August 1996, the Company paid Zigmed an advance deposit of $200,000 to begin production of the manufacturing equipment, and in September, 1996 issued Zigmed 100,000 shares of the Company's common stock (valued at $1.00 per share) against the contract. As of June 30, 2000, the Company has advanced Zigmed $1,068,304. See Note 4 of Notes to Consolidated Financial Statements.

The Company's Brazilian subsidiary has signed an agreement to construct a 2,550 square meter manufacturing facility in Recife, Pernambuco - Brazil at the new port of Suape. The Company has broken ground and anticipates construction to be completed by the first half of calendar 2001. The Company's Brazilian subsidiary purchased the land for $43,500 and anticipates the building cost to approximate $1,000,000.

**Financial Agreements**

On May 11, 2000 the Company's Brazilian subsidiary received final approval to participate in the Sudene Program, a federal program organized to develop the Northeast area of Brazil. Scantek do Brasil Ltda was approved to receive funding of approximately $3 million in the Sudene federal program under Finor Article 9. Final documentation has been submitted to Sudene in October,2000. Funding is anticipated to be received within 60 to 90 days. The terms of the agreement include a repayment of $1,000,000 over seven years. The funding is secured by 10% of the outstanding shares of the Brazilian subsidiary and various renegotiated terms to be completed by the Company.

16. SUBSEQUENT EVENT

On September 30, 2000, the Company and its Brazilian subsidiary executed an agreement with a Brazilian investment group. Scantek Medical Inc. will sell 36% of its equity in Scantek Medical do Brasil Ltda for two million ($2,000,000) dollars to the Brazilian investment group.

The new partner will play a major roll in expediting the Brazilian operations, including the construction of the new manufacturing facility, expanding Scantek Medical do Brasil Ltda's operations, marketing and sales. The $2,000,000 will be funded in various stages and milestones until the Sudene Federal Funding from the government is completed.

In connection with the agreement, the Brazilian investment group purchased 750,000 shares of Scantek Medical Inc. common stock for $350,000. The Company has guaranteed to redeem these shares within twelve months at a price of not less than $350,000. If the total market value at the time of redemption is greater than $350,000 the Company will guarantee the $350,000 plus fifty (50%) percent of the profit generated.

**ITEM 8. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

## PART III

**ITEM 9. DIRECTORS AND EXECUTIVE OFFICERS; PROMOTERS AND CONTROL PERSONS; COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT**

The following table and biographical outlines set forth the directors, and officers within the Company, positions presently held by each executive officer of the Company, and a brief account of the business experience of each such director and officer for the past five years.

```
                                                   Positions and Officers
                                                   within the Company/
        Name                       Age             Business Experience
        ----                       ---             -------------------

Zsigmond L. Sagi, Ph.D.            67              President, Chairman of
                                                   the Board, and Chief
                                                   Executive Officer

Patricia B. Furness               53              Vice President, Corporate
                                                   Secretary and Director

Maurice Siegel, Ph.D.             70              Vice President of
                                                   Research and
                                                   Development and Director

Louis Gottlieb                    72              Vice President of
                                                   Corporate Development

Paul Nelson                       70              Director
```

-33-

ZSIGMOND L. SAGI, PH.D., has served as President, Chairman of the Board, Chief Executive Officer and Chief Scientist of the Company since October, 1991. Mr. Sagi has over 30 years experience in the health-care field and has invented or developed several commercial medical devices and technological products. From 1968 until 1977 he served as Executive Vice President and Chief Operating Officer of Bio-Medical Sciences, Inc., a publicly held company of which he was one of the founders. Thereafter, he organized and managed several companies, including Zigmed Corp., a healthcare engineering firm. In 1974, he founded BCSI Laboratories, Inc., the company which developed the BreastCare(TM)/BreastAlert(TM). From 1986 until 1991, Mr. Sagi served as Chairman of the Board and President of SMC Corp., a company he founded in 1986. Mr. Sagi has been issued numerous United States and foreign patents in the fields of healthcare, chemical applications, electronics and mechanics, including the disposable oral thermometer, the Zigzag sewing machine, an ambulatory automated feeding device, and a sterilization indicator. He received his master's in mechanical engineering in 1954 and his doctorate in Physics in 1956 from the Technical University of Hungary.

PATRICIA B. FURNESS, has served as the Vice President, Secretary and Director of the Company since 1991. In addition to managing marketing and public relations for the Company, Ms. Furness is also responsible for coordinating product and business information to the medical and financial community and for coordinating clinical follow up studies. From 1988 until 1991 she served as Vice President and Secretary of Scantek Medical Corp., and, in 1989, was elected to its Board of Directors. In 1987, Ms. Furness became the Manager of Corporate Development of Zigmed, Inc., a manufacturer of automated systems for the health care industry. Ms. Furness received a Bachelor of Science Degree in education from Appalachian State University in Boone, North Carolina in 1969 and graduate course study in Human Relations.

MAURICE SIEGEL, PH.D., has served as the Company's Vice President of Research and Development since 1991 and as a Director of the Company since August, 1997. Since 1989, Mr. Siegel served in the same capacity with Scantek Medical Corp., the Company's predecessor. From 1980 to 1984, Mr. Siegel was responsible for the continuing research and development of the BreastCare(TM)/BreastAlert(TM). He supervised the analytical and manufacturing operation and was involved in the process of receiving FDA medical device approval for the BreastCare(TM)/BreastAlert(TM)for sale to the professional market. Mr. Siegel was employed by Faberge, Inc. from 1957 through 1987, as Director of Research and Development from 1957 to 1996, as Vice President of Research and Development from 1966 to 1977, and last holding the position of Executive Vice President of Research and Development from 1977 to 1987. Since 1987, Mr. Siegel has been self employed and has served, and continues to serve, as a consultant to numerous companies, including Tri-Scent, Imported Beauty Lines, Telebrands and Sun Laboratories. Mr. Siegel received a Ph.D. in Physical and Organic Chemistry from New York University in 1957.

LOUIS GOTTLIEB, has served as Vice President of Corporate Development since August, 1996. Presently, he is on the Board of Directors at Brookdale Hospital Medical Center, Linrock Nursing Home, First Central Financial Corp. From 1992-1995, Mr. Gottlieb was Treasurer and a board member of South Shore Association for Independent Living. Since 1973 he has served as CEO of the Gottlieb Group, one of the largest 500 construction firms in the U.S. From 1942 to 1945, Mr. Gottlieb served in the US Air Corps. as a Commissioned Lt. Fighter pilot. Mr. Gottlieb studied civil engineering at Brooklyn Polytechnical Institute.

-34-

PAUL NELSON has served on the Company's Board of Directors since 1993. From 1987 until 1996 he served as a Director of Scantek Medical Corp., the Company's Predecessor. In 1968, Mr. Nelson founded compressed Gas, Inc., a wholesale supplier of medical and industrial compressed gases, whereby he served as President and a Director of such company; Mr. Nelson has since sold his ownership in such company. Mr. Nelson received a Bachelor of Science Degree from the University of North Carolina in Chapel Hill, North Carolina.

### Compliance with 16(a) of the Securities and Exchange Act of 1934

To the Company's knowledge, based solely on a review of such materials as are required by the Securities and Exchange Commission, no officer, director or beneficial holder of more than ten (10%) percent of the Company's issued and outstanding shares of Common Stock failed to timely file with the Securities and Exchange Commission any form or report required to be so filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 during the fiscal year ended June 30, 2000.

### ITEM 10. EXECUTIVE COMPENSATION

The following sets forth, for the fiscal years ended June 30, 2000, 1999 and 1998, the annual and long-term compensation paid or accrued of the Company's named officers.

```
                        SUMMARY COMPENSATION TABLE


                                                        Long-Term
                                                     Compensation Awards
                                                        Securities
Name and                           Annual Compensation  Underlying
Principal Position      Year   Salary    Bonus     Other  Options/SARs (#)  Compensation
------------------      ----   ------    -----     -----  ----------------  ------------
Zsigmond L. Sagi .......... 2000  $190,000   $       $--      6,028,571       $--
President, Chairman ....... 1999   190,000  $ 37,500 $--      2,847,900       $--
of the Board, Chief ....... 1998   190,000    --     $--        300,000       $--
Executive Officer

Patricia Furness .......... 2000    90,000    --     $--      1,768,572       $--
Vice President ............ 1999    90,000   28,125  $--      1,427,127       $--
Secretary and ............. 1998    90,000    --     $--        150,000       $--
```

### EMPLOYMENT AGREEMENTS

In July 1996, the Company entered into employment agreements in principle with Mr. Sagi and Ms. Furness. The agreements provide for base salaries of $190,000 and $75,000 respectively, incentive bonus plans and severance benefits. Mr. Furness's base salary was increased to $90,000 effective July 1997.

In December 1998, the Company issued 200,000 and 150,000 shares of the Company's common stock to Mr. Sagi and Ms. Furness for deferring their current year salaries.

The following table contains information regarding the grant of stock options during the year ended June 30, 2000 to the named Executive Officers.

OPTION/SAR GRANTS IN LAST FISCAL YEAR

| Name | Number of Securities Underlying Options/SARs Granted (#) | Percent of Total Options/SARs Granted to Employees in 2000 | Exercise or Base Price ($/sh.) | Expiration Date | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation For Option Term (3) | |
| | | | | | 5% ($) | 10% ($) |
| ---- | ----------- | ------- | ------- | ---- | ------ | ------- |
| Zsigmond L. Sagi (1) ......... | 6,028,571 | 67.3% | $.07 | 12/29/2004 | 84,400 | 168,880 |
| Patricia Furness (2) ......... | 1,768,572 | 19.7% | $.07 | 12/29/2004 | 24,760 | 49,520 |

(1) On December 30, 1999 the Company issued 5,428,571 options to purchase the Company's common stock to Mr. Sagi for accrued salaries. An additional 600,000 options were issued as a bonus for deferring salary.

(2) On December 30, 1999 the Company issued 1,428,572 options to purchase the Company's common stock to Ms. Furness for accrued salaries. An additional 340,000 options were issued as a bonus for deferring salary.

(3) Amounts represent hypothetical gains that could be achieved if the listed options were exercised at the end of the option term. These gains are based on assumed rates of stock price appreciation of 5% and 10% compounded annually from the date the options were granted to their expiration date, based upon fair market value of the Common Stock as of the date the options were granted. Actual gains, if any, on stock option exercises and stock holdings are dependent upon the future performance of the Company and overall financial market conditions. There can be no assurance that amounts reflected in this table will be achieved.

## OPTION EXERCISES AND HOLDINGS

The following table sets forth information regarding stock options exercised by the Named Officers during the year ended June 30, 2000, including the aggregate value of gains on the date of exercise. In addition, the following table provides data regarding the number of shares covered by both exercisable and non-exercisable stock options at June 30, 2000. Also reported are the values for "in-the-money" options, which represent the positive spread between the exercise price of existing options and either $.75 the closing sale price of the Company's common stock on June 30, 2000.

**AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION/SAR VALUES**

| Name | Common Shares Acquired on Exercise # | Realized Value (Market) Price on Exercise Date Less Exercise Price ($) | Number of Securities Underlying Unexercised Options/SARs at Year End # | | Value of Unexercised In-The-Money Options/SARs at Year End $ | |
|------|------|------|------|------|------|------|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Zsigmond L. Sagi ............... | 9,176,471 | -- | 9,176,471 | -- | 6,882,353 | -- |
| Patricia Furness ............... | 3,345,699 | -- | 3,345,699 | -- | 2,509,274 | -- |

## ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information known to the Company as of the date of this Statement, with respect to beneficial ownership of: (i) each person who is known by the Company to be the beneficial owner of more than five (5%) percent of the Company's outstanding Common Stock; (ii) each of the Company's directors and executive officers; and (iii) all officers and directors as a group. Except as otherwise indicated, the Company believes that the beneficial owners of the Common Stock listed below, based on information furnished by such owners, have sole investment and voting power with respect to such shares, subject to community property laws, where applicable.

-37-

| TITLE OF CLASS | NAME & ADDRESS OF BENEFICIAL OWNER | AMOUNT & NATURE OF BENEFICIAL OWNER | PERCENT OF CLASS |
|---|---|---|---|
| Common Stock | Zsigmond L. Sagi<br>19 Lockley Court<br>Mountain Lakes, NJ 07046 | 14,468,188<br><br>(2), (3), (4), (5), (6) | 51.7% |
| Common Stock | 361 Acquisition Corp.<br>885 W. Georgia St.<br>Suite 1200<br>Vancouver, BC<br>Canada V6L 3E8 | 2,121,250<br><br><br>(7) | 11.3% |
| Common Stock | Patricia B. Furness<br>25 Beechway Road<br>Mountain Lakes, NJ 07046 | 4,427,153<br><br>(8), (9), (10), (11) | 19.9% |
| Common Stock | Louis Gottlieb<br>20 N. Central Avenue<br>Valley Stream, NY 11580 | 526,250<br><br>(15) | 2.8% |
| Common Stock | Paul Nelson<br>69 Lookout Road<br>Mountain Lakes, NJ 07046 | 189,500<br><br>(12) (16) | .01% |
| Common Stock | Maurice L. Siegel<br>560 W. 43rd Street<br>New York, NY 10036 | 155,767<br><br>(13), (14) | .01% |
| Common Stock | All Directors & Officers<br>as a Group (consisting of<br>5 persons) | 19,766,858 | 61.2% |

(1) There were 19,639,690 shares of Common Stock outstanding as of September 30, 2000.

(2) Includes 200,000 shares of the Company's Common Stock issued on December 1, 1998 to Mr. Sagi for deferring annual salary.

(3) Includes 2,847,900 shares issuable to Mr. Sagi upon the exercise of options granted on May 14, 1999 for the conversion of accrued salary; 5,428,571 shares issuable to Mr. Sagi upon the exercise of options granted on December 30, 1998 for the conversion of accrued salary; 900,000 shares issuable to

-38-

Mr. Sagi upon the exercise of options granted in January 1998 and December 1999 for deferring accrued salary.

(4) Includes 535,785 shares received upon the dissolution of SMC Corp. (See "Certain Relationships and Related Transactions").

(5) Does not include 45,000 shares of the Company's Common Stock owned by Mr. Sagi's former wife, and 98,500 shares of the Company's Common Stock owned by Mr. Sagi's children and their spouses, as to which Mr. Sagi disclaims beneficial ownership.

(6) Includes 79,250 shares issued to Mr. Sagi on July 1, 1999 and 67,900 shares issued on August 1, 2000 in connection with financing for the Company.

(7) Includes 621,250 shares of the Company's Common Stock which 361 Acquisition Corp. received as part of the 361 Acquisition Agreement. (See "Certain Relationships and Related Transactions").

(8) Includes 10,000 shares owned by Ms. Furness' children, as to which Ms. Furness disclaims beneficial ownership.

(9) Includes 150,000 shares of the Company's Common Stock issued to Ms. Furness for deferring annual salary.

(10) Includes 1,427,127 shares issuable to Ms. Furness upon the exercise of options granted on May 14, 1999 for the conversion of accrued salary; 1,428,572 shares issuable to Ms. Furness upon the exercise of options granted on December 30, 1999 for the conversion of accrued salary; 490,000 shares issuable to Ms. Furness upon the exercise of stock options granted in January 1998 and December 1999 for deferring annual salaries; 40,000 shares issuable to Ms. Furness upon the exercise of options granted in August 1996.

(11) Includes 5,703 shares issued to Ms. Furness on July 1, 1999 and 8,750 shares issued on August 1, 2000 in connection with financing for the Company.

(12) Includes 40,000 shares issuable to Mr. Nelson upon the exercise of options granted on December 30, 1999.

(13) Includes 80,000 shares of the Company's Common Stock, issuable upon the exercise of options granted on August 5, 1998 and December 30, 1999 to Mr. Siegel.

(14) Includes 35,200 shares issued to Mr. Siegel, in connection with financing for the Company.

(15) Includes 290,000 shares of the Company's Common Stock issued to Louis and Ruth Gottlieb, in connection with financing for the Company.

(16) Includes 2,500 shares issued to Mr. Nelson in connection with financing for the Company.

-39-

(a) On December 1, 1998, the Company issued 200,000 and 150,000 shares of the Company's common stock to Mr. Zsigmond Sagi, the Company's President and Chief Executive Officer and Ms. Patricia Furness, the Company's Vice President/Corporate Secretary, respectively, in consideration for deferring their current year salaries. In connection with this transaction, the Company recorded compensation expense in the amount of $65,625 for the year ended June 30, 1999.

(b) The Company and SMC Corp. entered into various agreements with an investment banking firm ("361 Acquisition Corp.") to, among other things, provide financing for the Company in exchange for shares of common stock. In exchange for terminating all prior agreements between 361 and the Company and SMC Corp., the Company issued 621,250 shares of its common stock to 361 representing services valued at approximately $78,000, which was approved by the Board of Directors on March 7, 1995. On March 31, 1998, SMC Corp. dissolved and distributed the note receivable of $888,006 from the Company to its five shareholders in equal amounts of $177,601, including Mr. Sagi (the Company's President and Chief Executive Officer), Carlo Civelli (former Vice President of Finance International of the Company), Kilham Management, Malir Enterprises Corp., and Zurow Investment S.A. The note terms were renegotiated with the lenders with principal payments due September 30, 1999 and interest at prime plus two (2%) percent. As of June 30, 2000, accrued interest in the amount of $147,601 was due Mr. Sagi. The notes have been extended to December 31, 2001.

(c) On November 16, 1998, the Company sold 150,000 shares of the Company's common stock to Kenneth Courey, a former Director of the Company and to Louis Gottlieb, Vice President of Corporate Development; the Company received $100,000 net proceeds from the sale.

(d) The Company intends to construct regional production centers throughout the world to manufacture, assemble and market the BreastCare (TM)/BreastAlert(TM). Accordingly, the Company entered into an agreement dated August 25, 1996, as amended, with Zigmed, Inc. ("Zigmed"), a company owned by the two sons of Mr. Zsigmond Sagi; Zigmed, Inc. was owned by Mr. Sagi prior to 1990. Pursuant to such agreement, Zigmed agreed to manufacture the sensor production equipment for such manufacturing centers for the contract price of $1,850,680 plus 100,000 shares of the Company's Common Stock. In August 1996, the Company paid Zigmed an advance deposit of $200,000 to begin production of the manufacturing equipment, and in March 1997 issued Zigmed 100,000 shares of the Company's Common Stock (valued at $1.00 per share) under the contract. As of June 30, 2000, the Company has advanced Zigmed $1,068,304.

(e) The Company and Zigmed have entered into various agreements. The Company sublets warehouse space to Zigmed for $1,970 per month and received $23,640 and $20,000 as rental income from Zigmed for the years ended June 30, 2000 and 1999. The Company has also contracted with Zigmed for the production of the BreastCare(TM)/BreastAlert(TM) sensors. Zigmed provided material, labor and product testing services of $74,430 and $42,109 for the years ended June 30, 2000 and 1999. The Company owes Zigmed approximately $63,000 and $17,000 as of June 30, 2000 and 1999 for labor. See Note 14 of Notes to Consolidated Financial Statements for further information.

(f) The Company has borrowed funds from Mr. Zsigmond Sagi, the Company's President and Chief Executive Officer. The promissory note to Mr. Sagi bears interest at prime plus two (2%) percent, 10% at June 30, 2000, and is payable on December 31, 2001. The principal amount of the note is $1,166,603 at June 30, 2000. Subsequent to the balance sheet date, Mr. Sagi advanced an additional $120,500. Interest expense for the year ended June 30, 2000 was $138,421.

(g) On July 1, 1999 the Company issued 5,703 shares of the Company's common stock to the Company's Vice-President/Corporate Secretary, in consideration for loan financing for operations. In connection with the transaction the Company recorded interest expense in the amount of $3,208 for the year ending June 30, 2000.

(h) On July 1, 1999, December 30, 1999 and March 8, 2000, the Company issued a total of 7,500 shares of the Company's common stock to a Company director in consideration for loan financing for operations. In connection with the transaction the Company recorded interest expense in the amount of $2,419 for the year ending June 30, 2000.

(i) On July 7, 1999, the Company issued 50,000 shares of the Company's common stock to a former director of the Company as part of his employment agreement. In connection with the transaction the Company recorded compensation expense in the amount of $9,375 for the year ending June 30, 2000.

(j) On July 7, 1999, the Company sold 45,767 shares of the Company's common stock to an officer and director of the Company. The Company received $10,000 net proceeds from the sale. On April 14, 2000, the Company also issued 35,200 shares of the Company's common stock to the same officer and director in exchange for consulting services worth $8,800.

-41-

(a) The following financial statements and supplementary financial information are filed as part of this Annual Report on Form 10-KSB:

```
                                                                    Page
                                                                    ----
        1. Financial Documents:

        Independent Auditors' Report .........................   F-1

        Consolidated Balance Sheets, June 30,
        2000 and 1999 ........................................   F-3

        Consolidated Statements of Operations,
        Years Ended June 30, 2000, 1999 and 1998 ............   F-4

        Consolidated Statements of Stockholders'
        Equity, Years Ended June 30, 2000, 1999 and 1998 .....  F-5

        Consolidated Statements of Cash Flows,
        Years Ended June 30, 2000, 1999 and 1998 ............  F-6 - F-7
```

Notes to Consolidated Financial
Statements .......................................... F-8 - F-26

-42-

2. Financial Statement Schedules:

All schedules are omitted because they are inapplicable, not required or the information is included in the financial statements or notes thereto.

(b) Reports on Form 8-K:

There were no reports on Form 8-K during the quarter ended June 30, 2000.

(c) The following Exhibit Index sets forth the applicable exhibits (numbered in accordance with Item 601 of Regulation S-B) which are required to be filed with this Annual Report on Form 10-KSB.

```
Exhibit
Number                      Title
-------                     -------

3.1    Certificate of Incorporation and Bylaws of the Registrant --
       Incorporated by Reference to Exhibit 2.1 and 2.2 of the Company's Report
       on Form 10-SB/A-1 dated September 17, 1996.

3.2    Amendment to the Certificate of Incorporation filed March 31, 1997 --
       Incorporated by Reference to Exhibit 3.2 of the Company's Report on Form
       10-KSB for the year ended June 30, 1997.

10.1   Private Placement Memorandum dated May 17, 1994 -- Incorporated by
       Reference to Exhibit 3.1 of the Company's Report on Form 10-SB/A-1 dated
       September 17, 1996.

10.2   Instrument defining shareholder rights regarding 18,000 shares of the
       Company's Common Stock purchased on November 29, 1991 -- Incorporated by
       Reference to Exhibit 3.2 of the Company's Report on Form 10-SB/A-1 dated
       September 17, 1996.

10.3   Instruments defining shareholder rights regarding 18,000 shares of the
       Company's Common Stock purchased between June and August, 1993 --
       Incorporated by Reference to Exhibit 3.3 of the Company's Report on Form
       10-SB/A-1 dated September 17, 1996.

10.4   Agreement defining Bio-Life shareholders' rights regarding 35,000 shares
       of the Company's Common Stock -- Incorporated by Reference to Exhibit
       3.4 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.5   Asset Transfer Agreement among SDSI (as SMC Acquisition Corp.), Mr. Sagi
       and Scantek Medical Corp. dated August 12, 1991 -- Incorporated by
       Reference to Exhibit 6.1 of the Company's Report on Form 10-SB/A-1 dated
       September 17, 1996.

10.6   Letter Agreement between SMC Corp. and Zigmed Corporation dated January
       8, 1991 ("Zigmed Agreement") -- Incorporated by Reference to Exhibit 6.2
       of the Company's Report on Form 10-SB/A-1 dated September 17, 1996.
```

10.7    Amendment to Purchase Order Agreement dated August 28, 1996 --
        Incorporated by Reference to Exhibit 10.7 of the Company's Form 10-KSB
        for the year ended June 30, 1997.

10.8    Purchase Order between SMC Corp. and Zigmed Corp. dated January 22, 1991
        -- Incorporated by Reference to Exhibit 6.3 of the Company's Report on
        Form 10-SB/A-1 dated September 17, 1996.

10.9    Amendment to Purchase Order Agreement dated August 28, 1996 -
        Incorporated by Reference to Exhibit 10.9 of the Company's Form 10-KSB
        for the year ended June 30, 1997.

10.10   Non-Disclosure Agreement between SMC Corp. and Zigmed Corp. dated
        January 7, 1990 -- Incorporated by Reference to Exhibit 6.4 of the
        Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.11   Escrow Agreement among SMC Corp., 361 Acquisition Corp. and Chase
        Lincoln First Bank dated August 20, 1991 -- Incorporated by Reference to
        Exhibit 6.5 of the Company's Report on Form 10-SB/A-1 dated September
        17, 1996.

10.12   Termination Agreement among Scantek Medical Corp., Mr. Sagi, 361
        Acquisition Corp., Dal Brynelsen, Douglas E. McRae and Scantek Medical
        Ltd. dated August 12, 1991 -- Incorporated by Reference to Exhibit 6.6
        of the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.13   Acquisition Agreement (Amendment No. 2) between SMC Corp., Mr. Sagi, 361
        Acquisition Corp., Brynelsen, Scantek Medical Ltd. and Scantek Medical,
        Inc. dated March 7, 1995 -- Incorporated by Reference to Exhibit 6.7 of
        the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.14   HumaScan Inc. Licensing Agreement between Scantek Medical, Inc. and
        HumaScan, Inc. dated October 20, 1995 -- Incorporated by Reference to
        Exhibit 6.8 of the Company's Report on Form 10-SB/A-1 dated September
        17, 1996.

10.15   Amendment to the HumaScan Inc. Licensing Agreement between Scantek
        Medical, Inc. and HumaScan, Inc. dated April 29, 1996 -- Incorporated by
        Reference to Exhibit 6.9 of the Company's Report on Form 10-SB/A-1 dated
        September 17, 1996.

10.16   Lease between Scantek Medical, Inc. and Kabert Realty Corporation for
        Storage and Office Space -- Incorporated by Reference to Exhibit 6.10 of
        the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.17   Lease between Scantek Medical, Inc. and Carol Yang for Office Space --
        Incorporated by Reference to Exhibit 6.11 of the Company's Report on
        Form 10-SB/A-1 dated September 17, 1996.

-44-

10.18    Lease between Scantek Medical, Inc. and Pablito, L.L.C. Warehouse and Office Space dated June 13, 1997 - Incorporated by Reference to Exhibit 10.18 of the Company's Form 10-KSB for the year ended June 30, 1997.

10.19    Letters of Employment for Mr. Zsigmond Sagi and Ms. Patricia Furness dated February 26, 1993 -- Incorporated by Reference to Exhibit 6.12 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.20    Amendment to the HumaScan Inc. Licensing Agreement between Scantek Medical, Inc. and HumaScan, Inc. dated May 31, 1996 -- Incorporated by Reference to Exhibit 6.13 of the Company's Report on Form 10-SB/A-1 dated September 17, 1996.

10.21    Licensing Agreement with Health Technologies International Inc. and Scantek Medical Inc. dated August 15, 1996 -- Incorporated by Reference to Exhibit 10.21 of the Company's Form 10-KSB for the year ended June 30, 1997.

10.22    Amendment to Licensing Agreement dated August 15, 1996 between Health Technologies International Inc. and Scantek Medical, Inc. dated April 30, 1997 -- Incorporated by Reference to Exhibit 10.22 of the Company's Form 10-KSB for the year ended June 30, 1997.

10.23    Licensing Agreement with Scantek Medical, Inc. and Sandell Corp. S.A. dated September 22, 1997 -- Incorporated by Reference to Exhibit 10.23 of the Company's Form 10-KSB for the year ended June 30, 1997.

10.24    Amendment to Licensing Agreement between HumaScan, Inc. and Scantek Medical Inc. dated May 15, 1998 -- Incorporated by Reference to Exhibit 10.1 of the Company's Form 8-K filed May 27, 1998.

10.25    Amendment to Licensing Agreement with Scantek Medical, Inc. and Sandell Corp. S.A. dated February 18, 1998 -- Incorporated by Reference to Exhibit 10.25 of the Company's Form 10-KSB for the year ended June 30, 1998.

10.26    Settlement Agreement between Scantek Medical, Inc and HumaScan, Inc. dated March 11, 1999 -- Incorporated by reference to Exhibit 10.1 of the Company's Form 8-K filed April 2, 1999.

10.27    Amendment to Lease Agreement between Scantek Medical, Inc. and Pablito, L.L.C. dated April 15, 1999--Incorporated by reference to Exhibit 10.27 of the Company's Form 10-KSB for the year ended June 30, 1999.

10.28    Distribution Agreement with Scantek Medical, Inc. and Nugard HealthCare Ltd. dated July 14, 1999. --Incorporated by reference to Exhibit 10.28 of the Company's Form 10-KSB for the year ended June 30, 1999.

-45-

10.29* Sublicense Implementation Agreement with Scantek Medical S.A. and the
       Government of Pernambuco dated November 19, 1999.

10.30* Consulting Agreement with Scantek Medical Inc. and Multiconsulteria S/C
       LTDA dated November 1999.

10.31* Letter of Approval for funding with Scantek Medical Inc./Scantek Medical
       do Brasil Ltda and North East Brazil Federal Program of Sudene Finor
       Article 9 dated May 11, 2000.

10.32* Letter of Intent Agreement with Scantek Medical Inc. and Scantek
       Medical do Brasil Ltda and Instituto Materno Infantil de Pernambuco
       dated May 31, 2000.

10.33* Suape Land Purchase Agreement with Scantek Medical do Brasil Ltda and
       the State of Pernambuco dated May 25, 2000.

10.34* Letter of Commitment for BreastCare(TM) usage and purchase order with
       Scantek Medical do Brasil Ltda and Unimed Recife-Cooperativa de Trabalho
       Medico dated June 1, 2000.

11     A statement regarding the computation of earnings per share is omitted
       because such computation can be clearly determined from the material
       contained in this Annual Report on Form 10-KSB.

21     Subsidiaries of the Registrant: (i) Scantek Medical S.A., Inc.,
       incorporated in Uruguay; and (ii) Scantek Medical do Brasil, LTDA,
       incorporated in Brazil.

27     Financial Data Schedule.

99.1   Reinstatement of Patent No. RE.4,624,264 United States, Extension to
       November 25, 2003, dated August 12, 1997 -- Incorporated by reference of
       the Company's Form 10-KSB for the year ended June 30, 1998.

       ------------

* These exhibits are in Portuguese. A translation will be filed as an amendment to this form 10KSB.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

### SCANTEK MEDICAL INC.

```
By: /s/ ZSIGMOND L. SAGI
    -----------------------------------
        Zsigmond L. Sagi, President

Date:  October 12, 2000
```

-47-

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

```
                              /s/ ZSIGMOND L. SAGI
                              --------------------------------
                              Zsigmond L. Sagi
                              President, Chairman of the Board,
                              Chief Executive Officer
                              and Director

                              /s/ PATRICIA B. FURNESS
                              --------------------------------
                              Patricia B. Furness
                              Vice President, Corporate Secretary
                              and Director

                              /s/ PAUL NELSON
                              --------------------------------
                              Paul Nelson
                              Director


                              /s/ MAURICE SIEGEL
                              --------------------------------
                              Maurice Siegel
                              Vice-President and Director
```

THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM SCANTEK MEDICAL, INC. FINANCIAL STATEMENTS AT JUNE 30, 2000 AND THE TWELVE MONTHS THEN ENDED AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH FINANCIAL STATEMENTS.

MULTIPLIER: 1

| | |
|---|---|
| PERIOD TYPE | 12 MOS |
| FISCAL YEAR END | JUN 30 2000 |
| PERIOD END | JUN 30 2000 |
| CASH | 2,898 |
| SECURITIES | 20,735 |
| RECEIVABLES | 24,000 |
| ALLOWANCES | 0 |
| INVENTORY | 721,315 |
| CURRENT ASSETS | 777,459 |
| PP&E | 2,102,059 |
| DEPRECIATION | 554,053 |
| TOTAL ASSETS | 2,426,649 |
| CURRENT LIABILITIES | 4,823,899 |
| BONDS | 0 |
| COMMON | 18,810 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| OTHER SE | (5,020,669) |
| TOTAL LIABILITY AND EQUITY | 2,426,649 |
| SALES | 29,775 |
| TOTAL REVENUES | 88,775 |
| CGS | 537,216 |
| TOTAL COSTS | 2,523,361 |
| OTHER EXPENSES | 0 |
| LOSS PROVISION | 0 |
| INTEREST EXPENSE | 417,109 |
| INCOME PRETAX | (2,816,465) |
| INCOME TAX | 0 |
| INCOME CONTINUING | (2,816,465) |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | (2,816,465) |
| EPS BASIC | (.15) |
| EPS DILUTED | (.15) |

**End of Filing**

Powered By 

© 2005 | EDGAR Online, Inc.

EXHIBIT E

# FORM 10-QSB

# SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C.

**[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2003

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ............. to ..............

*Commission File Number: 000-27592*

# SCANTEK MEDICAL INC.

### (Exact name of registrant as specified in its charter)

```
        DELAWARE                              84-1090126
(State or other jurisdiction of              (I.R.S. Employer
incorporation or organization)               Identification No.)
```

**4B WING DRIVE, CEDAR KNOLLS, NEW JERSEY 07927**
(973) 401-0434
(Address and telephone number, including area code, of
registrant's principal executive office)

(Former name, former address and former fiscal year, if changed
since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

```
        YES             NO X
        ---             ---
```

```
        Indicate the number of shares outstanding of each of the issuer's
```

classes of common stock, as of the latest practicable date.

At April 30, 2003, there were 44,977,398 shares of Common Stock, $.001
par value, outstanding.

**SCANTEK MEDICAL INC.**

INDEX
-----

| | | Page |
|---|---|---|
| Part I. | Financial Information | ---- |
| Item 1. | Financial Statements | 1 |
| | Consolidated Balance Sheets as of March 31, 2003 (unaudited) | 2 |
| | Consolidated Statements of Operations and Comprehensive Loss for the Nine Months and Three Months Ended March 31, 2003 and 2002 (unaudited) | 3 |
| | Consolidated Statements of Cash Flows For the Nine Months Ended March 31, 2003 and 2002 (unaudited) | 4 |
| | Notes to Consolidated Financial Statements (unaudited) | 5 - 11 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| Item 14. | Controls and Procedures | 20 |
| Part II. | Other Information | 20 |
| | | 20 |
| Item 1. | Legal Proceedings | 20 |
| Item 2. | Changes in Securities | |
| Item 3. | Defaults Upon Senior Securities | 20 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 20 |
| Item 5. | Other Information | 20 |
| Item 6. | Exhibits and Report on Form 8-K | 21 |
| Signatures | | 22 |

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements**

Certain information and footnote disclosures required under accounting principles generally accepted in the United States of America have been condensed or omitted from the following consolidated financial statements pursuant to the rules and regulations of the Securities and Exchange Commission. It is suggested that the following condensed consolidated financial statements be read in conjunction with the year-end consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-KSB for the year ended June 30, 2002.

The results of operations for the nine and three month period ended March 31, 2003, are not necessarily indicative of the results to be expected for the entire fiscal year or for any other period.

-1-

SCANTEK MEDICAL INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

March 31,
2003
(Unaudited)

## ASSETS

```
Current Assets:
    Cash                                             $         779
    Marketable securities                                    2,212
    Inventories                                            562,037
                                                     ------------
        Total Current Assets                               565,028
                                                     ------------

Property and equipment - net                               677,803
Other assets - net                                          18,911
                                                     ------------

    TOTAL ASSETS                                     $   1,261,742
                                                     ============
```

LIABILITIES AND STOCKHOLDERS' DEFICIENCY

```
Current Liabilities:
    Short-term debt                                  $   1,484,980
    Current portion of long-term debt                    1,274,560
    Accounts payable (includes $808,303
     to a related party)                                 1,448,594
    Accrued interest                                     1,626,540
    Accrued salaries                                     1,967,472
    Accrued expenses                                       658,217
                                                     ------------
        Total Current Liabilities                        8,460,363
                                                     ------------

Long-term debt                                           2,119,905
                                                     ------------
    Total Liabilities                                   10,580,268
                                                     ------------

Commitments and Contingencies

Stockholders' Deficiency:
    Preferred stock, par value $.001
     per share - authorized 5,000,000
     shares; none issued                                        --
    Common stock, par value $.001
     per share - authorized 45,000,000
     shares; outstanding 44,977,398 shares                  44,977
    Additional paid-in-capital                            5,312,867
    Cumulative other comprehensive income                    2,212
    Deficit                                            (14,678,582)
                                                     ------------
        Total Stockholders' Deficiency                  (9,318,526)
                                                     ------------

    TOTAL LIABILITIES AND STOCKHOLDERS'
     DEFICIENCY                                       $   1,261,742
                                                     ============
```

See notes to consolidated financial statements.

-2-

SCANTEK MEDICAL, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS
(UNAUDITED)

|  | Nine Months Ended March 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
|  | 2003 | 2002 | 2003 | 2002 |
| Revenues: | | | | |
| Net sales | $ -- | $ -- | $ -- | $ -- |
| License fees | -- | -- | -- | -- |
|  | -- | -- | -- | -- |
| Costs and expenses: | | | | |
| Cost of sales (consisting of depreciation expense) | 198,288 | 201,636 | 66,096 | 66,654 |
| General and administrative expenses | 932,709 | 554,473 | 294,306 | 176,519 |
| Research and development | -- | 210,000 | -- | 70,000 |
|  | 1,130,997 | 966,109 | 360,402 | 313,173 |
| Loss from operations | (1,130,997) | (966,109) | (360,402) | (313,173) |
| Other income (expense): | | | | |
| Interest and dividends | -- | 8 | -- | 2 |
| Miscellaneous income | -- | -- | -- | -- |
| Interest expense | (396,438) | (313,651) | (120,220) | (101,940) |
|  | (396,438) | (313,643) | (120,220) | (101,938) |
| Net loss | $ (1,527,435) | $ (1,279,752) | $ (480,622) | $ (415,111) |
| Loss per common share - basic and diluted | $ (0.05) | $ (0.05) | $ (0.01) | $ (0.02) |
| Weighted average number of common shares outstanding - basic and diluted | 32,857,889 | 26,311,385 | 38,781,255 | 26,921,523 |
| Net loss | $ (1,527,435) | $ (1,279,752) | $ (480,622) | $ (415,111) |
| Other comprehensive income (expense) net of income taxes: | | | | |
| Unrealized loss on marketable securities | (829) | 691 | (553) | 691 |
| Comprehensive loss | $ (1,528,264) | $ (1,279,061) | $ (481,175) | $ (414,420) |

-3-

SCANTEK MEDICAL, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)

| | Nine Months Ended March 31, | |
| | 2003 | 2002 |
| --- | --- | --- |
| Cash flows from operating activities: | | |
|    Net loss | $(1,527,435) | $(1,279,752) |
| Adjustments to reconcile net | | |
|  loss to net cash used in operating activities: | | |
|    Depreciation and amortization | 218,058 | 221,438 |
|    Write off of leasehold improvements | 14,231 | -- |
|    Non-employee stock based compensation | 97,547 | 165,669 |
|    Non-cash officers compensation | 7,212 | -- |
|    Other non-cash items | 135,343 | -- |
|    Changes in operating assets | | |
|    and liabilities | 790,979 | 607,936 |
|       Net Cash Used in | | |
|         Operating Activities | (264,065) | (284,709) |
| Cash flows from financing activities: | | |
|    Proceeds from borrowings | 314,000 | 162,960 |
|    Proceeds from officer loans | 4,947 | 55,159 |
|    Repayment of officer loans | (9,029) | (3,759) |
|    Repayment of notes | (56,303) | (7,245) |
|    Proceeds from sale of common stock | -- | 72,000 |
|       Net Cash Provided by | | |
|         Financing Activities | 253,615 | 279,115 |
| Net decrease in cash | (10,450) | (5,594) |
| Cash - beginning of period | 11,229 | 6,026 |
| Cash - end of period | $ 779 | $ 432 |
| Changes in operating assets and liabilities consist of: | | |
|    Decrease in other assets | $ 14,441 | $ -- |
|    Increase in accounts payable | | |
|    and accrued expenses | 776,538 | 607,936 |
| | $ 790,979 | $ 607,936 |
| Supplementary information: | | |
|    Cash paid during the period for: | | |
|      Interest | $ 328 | $ 225 |
|      Income Taxes | $ 340 | $ 200 |
| Non-cash investing activities: | | |
|    Unrealized loss on | | |
|    marketable securities | $ (829) | $ 691 |
| Non-cash financing activities: | | |
|    Common stock issued to officers for | | |
|    loan financing | $ 7,212 | $ -- |
|    Common stock issued for loan financing | $ 55,947 | $ 6,405 |
|    Issuance of stock options to non-employees | $ 135,343 | $ 42,044 |
|    Common stock issued for bonuses and | | |
|    consulting services | $ 41,600 | $ 117,220 |
|    Common stock issued in exchange for debt | $ 250,000 | $ -- |

SCANTEK MEDICAL INC. AND SUBSIDIARIES

**NOTES CONDENSED TO CONSOLIDATED FINANCIAL STATEMENTS**

1. ORGANIZATION

Scantek Medical, Inc. and its subsidiaries (the "Company"), operates in one industry segment and is engaged, in developing, manufacturing, marketing, and licensing the BreastCare(TM)/BreastAlert(TM). The BreastCare(TM)/BreastAlert(TM) is an early screening device which can detect certain breast tissue abnormalities, including breast cancer. This device has been patented and has Food and Drug Administration ("FDA") approval for sale.

2. BASIS OF PRESENTATION

The consolidated balance sheet as of March 31, 2003, and the consolidated statements of operations and cash flows for the period presented herein have been prepared by the Company and are unaudited. In the opinion of management, all adjustments (consisting solely of normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows for all period presented have been made.

The financial statements in the Form 10-QSB were not reviewed Company's independent auditors in accordance with Item 310 of Regulation SX.

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business.

The Company has experienced losses during its development stage. Losses and negative cash flows from operations have continued in the current fiscal year subsequent to June 30, 2002. As of March 31, 2003, the Company has a working capital deficit of approximately $6.8 million.

The activities of the Company are being financed through the sale of its common stock and debt securities. The Company's continued existence is dependent upon its ability to obtain needed working capital through additional equity and/or debt financing, and the commercial acceptability of the BreastCare(TM)/BreastAlert(TM) to create sales that will help the Company achieve a profitable level of operations. However, there is no assurance that additional capital will be obtained or the BreastCare(TM)/BreastAlert(TM) will be commercially successful. This raises substantial doubt about the ability of the Company to continue as a going concern.

The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

The Company classifies its investments in equity securities as "available for sale", and accordingly, reflects unrealized gains and losses as a separate component of stockholders' deficiency.

The fair value of marketable securities are estimated based on quoted market prices. Realized gains or losses from the sale of marketable securities are based on the specific identification method.

The Company uses professional judgment to determine whether a decline of an available-for-sale instrument is temporary or other than temporary. The Company determines whether the decline in value results from Company-specific events, industry developments, general economic conditions or other reasons. After the general reason for the decline is identified, further determinations are required as to whether those events are likely to reverse and whether that reversal is likely to result in a recovery of the fair value of the investment.

## 4. INVENTORIES

The Company's policy is to reserve or write-off surplus or obsolete inventory. The inventory is reviewed by management for each reporting period.

## 5. REVENUE RECOGNITION

Revenue is recognized when the BreastCare(TM)/BreastAlert(TM) is shipped and title passes to customers.

Revenue from licensing the BreastCare(TM)/BreastAlert(TM) will be recognized when licensees commence operations and substantial performance has occurred. The Company historically has amended and renegotiated its licensees agreements. Therefore, upon receipt of license fee income in the future, the Company will recognize license fee income over the life of the agreement.

## 6. RESEARCH AND DEVELOPMENT

Research and development costs are expensed as incurred, consisting primarily of salaries of employees in developing the BreastCare (TM)/BreastAlert(TM).

## 7. FOREIGN CURRENCY TRANSLATION

Expenses for the Company's foreign subsidiaries are currently transacted in U.S. dollars. Future revenues will be invoiced and collected in U.S. dollars. The functional currency for the foreign subsidiary is the U.S. dollar. For the nine months ended March 31, 2003 and 2002, there were no foreign exchange gains or losses as all transactions were in U.S. dollars.

8. LOSS PER SHARE

Basic loss per common share is computed by dividing net loss by the weighted average number of common shares outstanding during the year. Diluted earnings per common share are computed by dividing net earnings by the weighted average number of common and potential common shares outstanding during the year. Potential common shares used in computing diluted earnings per share relate to stock options and warrants that, if exercised, would have a dilutive effect on earnings per share. For the nine and three months ended March 31, 2003 and 2002, potential common shares were not used in the computation of diluted loss per common share, as their effect would be antidilutive.

9. SEGMENTS - GEOGRAPHIC AREAS

The Company does not have reportable operating segments as defined in the Statement of Financial Accounting Standards No. 131, "Disclosure about Segments of an Enterprise and Related Information". The method for attributing revenues to individual countries is based on the destination to which finished goods are shipped. The Company operates facilities in the United States and South America. Revenues, when received, include license fees received by the Company in connection with various arrangements contracted throughout the world.

|  | Nine Months Ended March 31, | | Three Months Ended March 31, | |
|  | 2003 | 2002 | 2003 | 2002 |
|  | ---- | ---- | ---- | ---- |
| Total Revenues: | | | | |
| United States | $ -- | $ -- | $ -- | $ -- |
| South America | -- | -- | -- | -- |
| Less intergeographic revenue | -- | -- | -- | -- |
|  | ----------- | --------- | --------- | --------- |
|  | $ -- | -- | -- | -- |
|  | =========== | ========= | ========= | ========= |
| Loss from operations: | | | | |
| United States | $(1,060,875) | $(890,449) | $(336,162) | $(308,173) |
| South America | (70,122) | (75,660) | (9,000) | (5,000) |
|  | ----------- | --------- | --------- | --------- |
|  | $(1,130,997) | $(966,109) | $(345,162) | $(313,173) |
|  | =========== | ========= | ========= | ========= |

In December 2002, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure, an amendment of FASB Statement No. 123". SFAS No. 148 provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. It also requires disclosure in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. SFAS No. 148 is effective for annual and interim periods beginning after December 15, 2002. The Company will continue to account for stock-based employee compensation under the recognition and measurement principle of APB Opinion No. 25 and related interpretations. The Company complied with the additional annual and interim disclosure requirements effective December 31, 2002 and March 31, 2003.

## 11. STOCK ISSUED FOR SERVICES AND LOAN FINANCING

During the nine months ended March 31, 2003 and 2002, the Company issued 2,232,242 and 1,062,500 shares, respectively, of the Company's common stock to employees and non-employees as stock - based compensation in the amount of $104,759 and $123,625. The Company accounts for the services using the fair market value of the services received.

## 12. STOCKHOLDERS' DEFICIENCY

On September 30, 2002, the Company issued 1,426,039 shares of the Company's common stock to officers and non employees for consulting services and loan financing valued at $.035 per share. The Company recorded an expense of $49,911 during the nine months ended March 31, 2003.

On November 2, 2002, the Company granted 1,000,000 warrants to non-employees for services performed to purchase the Company's common stock at an exercise price of $.05 per share the fair market value at the date of grant. The Company recorded an expense of $48,051 during the nine months ended March 31, 2003 in connection with the issuance of the warrants. The warrants are exercisable immediately and expire on November 1, 2007.

On November 8, 2002, the Company issued 3,000,000 shares of the Company's common stock in exchange for the reduction of a $45,000 liability for professional services.

On November 18, 2002, the Company issued 1,200,000 shares of the Company's common stock to non-employees from the exercise of options and warrants in exchange for the reduction of accrued interest of $26,500 and a $21,000 liability for professional services. The Company also issued 565,000 shares of the Company's common stock to non-employees for consulting services and loan financing valued at $45,200.

On February 20, 2003, the Company issued 10,500,000 shares of the Company's common stock to officers and non-employees from the exercise of options and warrants in exchange for the reduction of accrued wages of $135,000, a liability for professional services of $15,000 and a liability of consulting services of $7,500.

On March 14, 2003, the Company issued 241,203 shares of the Company's common stock to officers and non-employees for loan financing valued at $9,648.

On March 31, 2003, the Company expensed $87,292 for warrants granted previously and not yet fully amortized.

During the nine months ended March 31, 2002 the Company sold 975,000 shares of the Company's common stock for $72,000.

During the nine months ended March 31, 2002 the Company issued options to purchase shares of the Company's common stock to non-employees. The fair value of the options of $42,044 has been expensed to operations.

|  | Nine Months Ended March 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
|  | 2003 | 2002 | 2003 | 2002 |
|  | ---- | ---- | ---- | ---- |
| Net loss: |  |  |  |  |
| As reported | $(1,527,435) | $(1,279,752) | $(480,622) | $(415,111) |
| Amortization of compensation expense | (86,491) | -- | -- | -- |
| Proforma | (1,613,926) | (1,279,752) | (480,622) | (415,111) |
| Basic and diluted loss per share: |  |  |  |  |
| As report | $ (0.05) | $ (0.05) | $ (0.01) | $ (0.02) |
| Proforma | $ (0.05) | $ (0.05) | $ (0.01) | $ (0.02) |

## 13. LEGAL PROCEEDINGS

The Company is a defendant in various legal proceedings seeking claims aggregating approximately $100,000, which has been included in accrued expenses in the Company's financial statements at March 31, 2003.

## 14. RECENT ACCOUNTING PRONOUNCEMENTS

In August 2001, the FASB issued SFAS No. 143 "Accounting for Asset Retirement Obligations". SFAS No. 143 addresses financial accounting and reporting for obligations and costs associated with the retirement of tangible long-lived assets. The Company adopted SFAS 143 on January 1, 2003. The adoption of SFAS No.143 did not have a material impact on the Company's results of operations or financial position.

-9-

In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections". This statement eliminates the automatic classification of gain or loss on extinguishment of debt as an extraordinary item of income and requires that such gain or loss be evaluated for extraordinary classification under the criteria of Accounting Principles Board No. 30 "Reporting Results of Operations". This statement also requires sales-leaseback accounting for certain lease modifications that have economic effects that are similar to sales-leaseback transactions, and makes various other technical corrections to existing pronouncements. The Company adopted SFAS No. 145 on July 1, 2002. The adoption of this statement did not have a material effect on the Company's results of operations or financial position.

In June 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." This Statement requires recording costs associated with exit or disposal activities at their fair values when a liability has been incurred. Under previous guidance, certain exit costs were accrued upon management's commitment to an exit plan. The Company adopted SFAS No. 146 on July 1, 2002. The adoption of SFAS No. 146 did not have a material impact on the Company's result of operations or financial position.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement No. 133 on Derivative Instruments and Hedging Activities." This statement amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts and for hedging activities under FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities." This Statement is effective for contracts entered into or modified after June 30, 2003, and for hedging relationships designated after June 30, 2003.

In November 2002, the FASB issued FASB Interpretation No. 45 (FIN 45), Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and interpretation of FASB Statements No. 5, 57,and 107 and Rescission of FASB Interpretation No. 34. FIN 45 clarifies the requirements of FASB Statement No. 5, Accounting for Contingencies, relating to the guarantor's accounting for, and disclosure of, the issuance of certain types of guarantees. This interpretation clarifies that a guarantor is required to recognize, at the inception of certain types of guarantees, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of this Interpretation are applicable on a prospective basis to guarantees issued or modified after December 31, 2002, irrespective of the guarantor's fiscal year-end. The disclosure requirements in this interpretation are effective for financial statements of interim or annual periods ending after December 15, 2002. The Company adopted FIN 45 on January 1, 2003. The adoption of FIN 45 did not have a material impact on the Company's disclosure requirements.

-10-

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which addresses consolidation by business enterprises of variable interest entities. In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. A variable interest entity often holds financial assets, including loans or receivables, real estate or other property. A variable interest entity may be essentially passive or it may engage in research and development or other activities on behalf of another company. The objective of Interpretation No. 46 is not to restrict the use of variable interest entities but to improve financial reporting by companies involved with variable interest entities. Until now, a company generally has included another entity in its consolidated financial statements only if it controlled the entity through voting interests. Interpretation No. 46 changes that by requiring a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation No. 46 apply immediately to variable interest entities created after January 31, 2003. The consolidation requirements apply to older entities in the first fiscal year or interim period beginning after June 15, 2003. Certain of the disclosure requirements apply in all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. The Company does not have any variable interest entities, and, accordingly, adoption is not expected to have a material effect on the Company.

Case 1:08-cv-00453-GM-HBP    Document 9-4    Filed 02/11/2008    Page 15 of 27

of Operations

The Company's quarterly and annual operating results are affected by a wide variety of factors that could materially and adversely affect revenues and profitability, including competition from other suppliers; changes in the regulatory and trade environment; changes in consumer preferences and spending habits; the inability to successfully manage growth; seasonality; the ability to introduce and the timing of the introduction of new products and the inability to obtain adequate supplies or materials at acceptable prices. As a result of these and other factors, the Company may experience material fluctuations in future operating results on a quarterly or annual basis, which could materially and adversely affect its business, financial condition, operating results, and stock price. Furthermore, this document and other documents filed by the Company with the Securities and Exchange Commission (the "SEC") contain certain forward-looking statements under the Private Securities Litigation Reform Act of 1995 with respect to the business of the Company. These forward-looking statements are subject to certain risks and uncertainties, including those mentioned above, and those detailed in the Company's Annual Report on Form 10-KSB for the year ended June 30, 2002, which may cause actual results to differ significantly from these forward-looking statements. The Company undertakes no obligation to publicly release the results of any revisions to these forward-looking statements which may be necessary to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. An investment in the Company involves various risks, including those mentioned above and those that are detailed from time to time in the Company's SEC filings.

The following discussion and analysis should be read in conjunction with the Company's consolidated financial statements and the notes related thereto. The discussion of results, causes and trends should not be construed to infer any conclusion that such results, causes or trends will necessarily continue in the future.

## Critical Accounting Policies

The Company's discussion and analysis of its financial condition and results of operations are based upon the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires the Company to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an on-going basis, the Company evaluates its estimates, including those related to product returns, bad debts, inventories, intangible assets, investments, income taxes and contingencies and litigation. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results under different assumptions or conditions may differ from these estimates.

-12-

The Company believes the following critical accounting policies affect its more significant judgments and estimates used in the preparation of its consolidated financial statements. The Company maintains allowances for doubtful accounts for estimated losses resulting from the inability of its customers to make required payments. If the financial condition of the Company's customers were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required.

The Company intends to make purchasing decisions principally based upon firm sales orders from customers, the availability and pricing of raw materials and projected customer requirements. Future events that could adversely affect these decisions and result in significant charges to the Company's operations include slow down in customer demand, customers delaying the issuance of sales orders to the Company, miscalculating customer requirements, technology changes which render the raw materials and finished goods obsolete, loss of customers and/or cancellation of sales orders. The Company writes down its inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value based upon the aforementioned assumptions. If actual market conditions are less favorable than those projected by management, additional inventory write-downs may be required. Even though sales have been minimal, the Company has received a purchase order in Brazil for the BreastCare(TM)/BreastAlert(TM). Based upon the purchase order received, the Company anticipates the entire inventory will be used in calendar 2003.

The Company seeks sales and profit growth by expanding its existing customer base, developing new products and by pursuing strategic acquisitions that meet the Company's criteria relating to (i) the market for the products; (ii) the Company's ability to efficiently manufacture the product; (iii) synergies that are created by the acquisition; and (iv) a purchase price that represents fair value. If the Company's evaluation of a target company misjudges its technology, estimated future sales and profitability levels, or inability to keep pace with the latest technology, these factors could impair the value of the investment, which could materially adversely affect the Company's profitability.

The Company files income tax returns in every jurisdiction in which it has reason to believe it is subject to tax. Historically, the Company has been subject to examination by various taxing jurisdictions. To date, none of these examinations has resulted in any material additional tax. Nonetheless, any tax jurisdiction may contend that a filing position claimed by the Company regarding one or more of its transactions is contrary to that jurisdiction's laws or regulations.

-13-

Results of Operations

The following table sets forth for the periods indicated, the percentage increase or (decrease) of certain items included in the Company's consolidated statement of operations:

|  | % Increase (Decrease) from Prior Period | % Increase (Decrease) from Prior Period |
|---|---|---|
|  | Nine Months Ended March 31, 2003 compared with Nine Months Ended March 31, 2002 | Three Months Ended March 31, 2003 compared with Three Months Ended March 31, 2002 |
| Sales | -- % | -- % |
| Cost of sales | (1.7)% | (0.8)% |
| General and administrative expense | 68.2 % | 66.7 % |
| Research and development | (100.0) | (100.0)% |
| Interest expense | 26.4 % | 17.9 % |
| Net (loss) | 19.4 % | 15.8 % |

**NINE MONTHS ENDED MARCH 31, 2003 VS.
NINE MONTHS ENDED MARCH 31, 2002**

**Revenues**

There were no sales for the nine months ended March 31, 2003 and 2002. The Company expects sales to commence in the last quarter of its fiscal year.

**Cost of Sales**

Cost of sales (which consists of depreciation expense) decreased 1.7% to $198,288 during the nine months ended March 31, 2003 from $201,636 during the nine months ended March 31, 2002.

**General and Administrative Expenses**

General and administrative expenses increased 68.2% to $932,709 during the nine months ended March 31, 2003 from $554,473 during the nine months ended March 31, 2002 due to increases in travel expenses, rent, outside services, accrued wages and professional fees attributable to stock and stock options issued for services offset by higher consulting fees in 2002 also attributable to stock options issued for services.

**Interest Expense**

Interest expense increased to $396,438 during the nine months ended March 31, 2003 from $313,651 during the nine months ended March 31, 2002 primarily due to interest expense on stock issuance for loan financing and additional interest on increase in debt.

-14-

Research and Development Expense

Research and development decreased from $210,000 for the nine months ended March 31, 2002 to $-0- for the nine months ended March 31, 2003. The Company fully developed the BreastCare(TM)/BreastAlert(TM) but in the future contemplates to develop other products to market.

## THREE MONTHS ENDED MARCH 31, 2003 VS.
## THREE MONTHS ENDED MARCH 31, 2002

### Revenues

There were no sales for the three months ended March 31, 2003 and 2002.

### Cost of Sales

Cost of sales (which consists of depreciation expense) decreased .8% to $66,096 during the three months ended March 31, 2003 from $66,654 during the three months ended March 31, 2002.

### General and Administrative Expenses

General and administrative expenses increased 66.7% to $294,306 during the three months ended March 31, 2003 from $176,519 during the three months ended March 31, 2002 due to primarily the same reasons set forth in the nine months analysis.

### Interest Expense

Interest expense increased to $120,220 during the three months ended March 31, 2003 from $101,940 during the three months ended March 31, 2002 primarily due to interest expense on stock issuance for loan financing and additional interest on increased debt.

### Research and Development Expense

Research and development expense decreased from $70,000 for the three months ended March 31, 2002 to $-0- for the three months ended March 31, 2003 due to primarily the same reasons set forth in the nine month analysis.

### Liquidity and Capital Resources

The Company's need for funds has increased from period to period, as it has incurred expenses for among other things, research and development; applications for and maintenance of domestic and international trademarks and international patent protection; licensing and pre-marketing activities; and, attempts to raise the necessary capital to expand the Company's production capacity. Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Executive Officer and major shareholder. The Company has entered into various license agreements that have raised additional funds. In addition, the Company's auditors' report for the year ended June 30, 2002 dated October 10, 2002, expressed an opinion as to the Company continuing as a going concern.

-15-

During September 1998, the Company commenced the sale of its BreastCare(TM)/BreastAlert(TM) device in Brazil, Uruguay and Paraguay through its South American licensee. The Company terminated its license agreement with its former licensee in South America. The Company's Brazilian subsidiary plans to manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) device in Brazil and export to other South American countries. As of this date only minimal shipments have been made and the Company has not generated any material revenues.

Until cash flow generated from the shipment of the BreastCare(TM) device is sufficient to support the Company's operations, the Company will require financing to fund its current overhead and various capital requirements. As of March 31, 2003, the Company borrowed approximately $2.7 million from unaffiliated third parties. These loans are payable by the Company on various dates through December 31, 2003. In addition, as of March 31, 2003, the Company's President advanced the Company approximately $1.1 million. These loans have supported the Company through the prior and the current fiscal year. The Company expects the cash flow from sales commencing in 2003 to cover the operations of the Company through December 2003, provided the Company is successful in raising additional capital to support the operations until cash flows generated from the sales of the BreastCare(TM)/BreastAlert(TM) device commences.

In 2003, the Company will market and distribute the BreastCare(TM)/BreastAlert(TM) device throughout South America through the Company's South American subsidiaries.

Through its Brazilian subsidiary, the Company signed an agreement with the State of Pernambuco in December 1999. The State of Pernambuco has the second largest concentration of hospitals in Brazil offering quality care and management believes that the location is also the most desirable for production, shipping, financing and tax incentives. The State of Pernambuco has offered various incentives, including acreage to build the facility at a reduced price, an 85% reduction in taxes through 2013, free shipping outside the state, and in connection with the federal programs offered in Northeast Brazil, financing programs to help fund the operations and capital improvements.

The Company plans to ship the BreastCare(TM)/BreastAlert(TM) device from the United States until a production facility in Brazil is operational.

On July 14, 1999, the Company granted an exclusive license to NuGard HealthCare Ltd. ("NuGard"), an Irish Company; to market Scantek's BreastCare(TM)/BreastAlert(TM) device in Ireland and the United Kingdom. Pursuant to the licensing agreement, NuGard is obligated to pay a non-refundable licensing fee of $350,000 in various stages, of which $59,000 was received, and the Company received common shares equivalent to fifteen (15%) percent of NuGard's total outstanding common shares. The purchase price will range from $10 to $15 per unit - FOB US. The licensing agreement requires minimum purchases of 5,000 units a month and payments of licensing fees, both of which NuGard is in default. At the present time the Company has not renegotiated the license agreement.

In August/September 2001, Fiocruz, a government agency in the Ministry of Health assisted in the BreastCare(TM) educational program for the Women's Health Program for the City of Nova Iguacu and Fiocruz will be an integrated part of the Company's BreastCare(TM) educational process.

On October 1, 2005 the Company signed an agreement with Compat Comercio Exterior Ltd., a Brazilian company located in Rio De Janeiro, Brazil, for a long-term exclusive marketing and sales agreement for the BreastCare(TM) product in the country of Brazil, excluding 4 states where the Company is pursuing more direct agreements. The Compat Comercio agreement calls for the shipment of a minimum of 100,000 units during the first six months of the term of the agreement, 400,000 units during the second six months and 1,000,000 units during the second year. Management believes that the timely fulfillment of the Compat Comercio agreement will result in net profits in excess of $2,000,000 for the first year of the Compat Comercio agreement, subject to Compat Comercio meeting its minimum purchase obligations to the Company. Pursuant to such agreement which has a term of five years with a renewal term of an additional five years, subsequent to the initial two year term of the agreement, the Company has the right to terminate the agreement if the parties cannot agree upon the minimum number of units. There can be no assurance that Compat Comercio will meet the minimum purchase requirement, or that the Company will recover any damages that may result from such failure.

Pursuant to the Compat Comercio agreement, the first shipment of 10,000 BreastCare(TM) units will be prepaid and such payments will be deposited into a bank escrow account and will be released when a Brazil government import license is secured. Subsequent shipments will be paid fifty (50%) at the time of request and fifty (50%) percent sixty (60) days later.

The Company's working capital and capital requirements will depend on numerous factors, including the level of resources that the Company devotes to support start-up production and to the marketing aspects of its products. The Company intends to construct assembly centers abroad to manufacture, market and sell the BreastCare(TM)/BreastAlert(TM) device in the international market. The Company entered into an agreement with Zigmed Inc., pursuant to which Zigmed Inc. will manufacture the sensor production equipment needed for manufacturing of the BreastCare(TM)/BreastAlert(TM) device. The balance of $718,276 will be paid when the Company raises the additional capital.

The Company's success is dependent on raising sufficient capital to establish a fully operable production and assembly facility to manufacture the BreastCare(TM)/BreastAlert(TM) device for the international market. The Company believes the device will be commercially accepted throughout the international market. The Company does not have all the financing in place at this time, nor may it ever, to meet these objectives.

This Management's Discussion and Analysis of Financial Condition and Results of Operations includes forward-looking statements that may or may not materialize. Additional information on factors that could potentially affect the Company's financial results may be found in the Company's filings with the Securities and Exchange Commission.

**ACCOUNTING PRONOUNCEMENTS TO BE ADOPTED IN 2003**

In August 2001, the FASB issued SFAS No. 143 "Accounting for Asset Retirement Obligations". SFAS No. 143 addresses financial accounting and reporting for obligations and costs associated with the retirement of tangible long-lived assets. The Company adopted SFAS 143 on January 1, 2003. The adoption of SFAS No.143 did not have a material impact on the Company's results of operations or financial position.

In April 2002, the FASB issued SFAS No. 145 "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections". This statement eliminates the automatic classification of gain or loss on extinguishment of debt as an extraordinary item of income and requires that such gain or loss be evaluated for extraordinary classification under the criteria of Accounting Principles Board No. 30 "Reporting Results of Operations". This statement also requires sales-leaseback accounting for certain lease modifications that have economic effects that are similar to sales-leaseback transactions, and makes various other technical corrections to existing pronouncements. This statement will be effective for the Company for the year ending December 31, 2003. Management believes that adopting this statement will not have a material effect on the Company's results of operations or financial position.

In June 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." This Statement requires recording costs associated with exit or disposal activities at their fair values when a liability has been incurred. Under previous guidance, certain exit costs were accrued upon management's commitment to an exit plan. The Company adopted SFAS No. 146 on January 1, 2003. The adoption of SFAS No. 146 did not have a material impact on the Company's result of operations or financial position.

In January 2003, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure, an amendment of FASB Statement No. 123" SFAS No. 148 provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. It also requires disclosure in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. SFAS No. 148 is effective for annual and interim periods beginning after December 15, 2002. The Company will continue to account for stock-based employee compensation under the recognition and measurement principle of APB Opinion No. 25 and related interpretations. On January 1, 2003 the Company adopted the disclosure provisions of SFAS No. 148.

-18-

In November 2002, the FASB issued FASB Interpretation No. 45 (FIN 45), "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and interpretation of FASB Statements No. 5, 57,and 107 and Rescission of FASB Interpretation No. 34. FIN 45 clarifies the requirements of FASB Statement No. 5, Accounting for Contingencies, relating to the guarantor's accounting for, and disclosure of, the issuance of certain types of guarantees. This interpretation clarifies that a guarantor is required to recognize, at the inception of certain types of guarantees, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of this Interpretation are applicable on a prospective basis to guarantees issued or modified after December 31, 2002, irrespective of the guarantor's fiscal year-end. The disclosure requirements in this interpretation are effective for financial statements of interim or annual periods ending after December 15, 2002. The Company adopted FIN 45 on January 1, 2003. The adoption of FIN 45 did not have a material impact on the Company's disclosure requirements.

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which addresses consolidation by business enterprises of variable interest entities. In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. A variable interest entity often holds financial assets, including loans or receivables, real estate or other property. A variable interest entity may be essentially passive or it may engage in research and development or other activities on behalf of another company. The objective of Interpretation No. 46 is not to restrict the use of variable interest entities but to improve financial reporting by companies involved with variable interest entities. Until now, a company generally has included another entity in its consolidated financial statements only if it controlled the entity through voting interests. Interpretation No. 46 changes that by requiring a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation No. 46 apply immediately to variable interest entities created after January 31, 2003. The consolidation requirements apply to older entities in the first fiscal year or interim period beginning after June 15, 2003. Certain of the disclosure requirements apply in all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. The Company does not have any variable interest entities, and, accordingly, adoption is not expected to have a material effect on the Company.

-19-

Within the 90 days prior to the date of this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-14. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective. There have been no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

## PART II. Other Information

### Item 1. Legal Proceedings

There are several lawsuits against the Company that may have a material impact on the consolidated results of operations or financial condition of the Company.

### Item 2. Changes in Securities

None

### Item 3. Defaults Upon Senior Securities

None.

### Item 4. Submission of Matters to a Vote of Security Holders

None

### Item 5. Other Information

None

**Item 6. Exhibits and Reports on Form 8-k**

(a) Exhibits:

Exhibit 99.1 Certification of Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(b) There were no current reports on Form 8-k filed during the quarter ended March 31, 2003.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**SCANTEK MEDICAL INC.**

```
By: /s/ Zsigmond L. Sagi
    --------------------------------
    Zsigmond L. Sagi, President and
    Chief Financial Officer
```

```
Dated:  May 20, 2003
```

-22-

I, Zsigmond L. Sagi certify that:

1. I have reviewed this quarterly report on Form 10-Q of Scantek Medical Inc;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. I have indicated in this quarterly report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

```
        Date: May 20, 2003


                                  By:  /s/Zsigmond L. Sagi
                                       -----------------------------------
                                       Zsigmond L. Sagi, President and
                                       Chief Financial Officer
```

EXHIBIT 99.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
AS ADOPTED PURSUANT TO

SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the quarterly report of Scantek Medical Inc (the "Company") on Form 10-Q for the quarter ended March 31, 2003 filed with the Securities and Exchange Commission (the "Report"), I, Zsigmond L. Sagi, President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934;and

(2) The information contained in the Report fairly presents, in all material respects, the consolidated financial condition of the Company as of the dates presented and consolidated result of operations of the Company for the period presented.

```
        Dated: May 20, 2003


                            By: /s/ Zsigmond L. Sagi
                            --------------------------------
                              Zsigmond L. Sagi, President
                                and Chief Financial Officer
```

This certification has been furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. A signed original of this written statement required by Section 906 has been provided to Scantek Medical, Inc. and will be retained by Scantek Medical, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

---

**End of Filing**

**EXHIBIT F**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Receive d
1|31|08

-----------------------------------------------------------------------X    Index No.: 08 CV 00453 (CM)

SCANTEK MEDICAL, INC.,

Plaintiff,            **AMENDED COMPLAINT**

-against-

ANGELA CHEN SABELLA and
ACCORDANT HOLDINGS, LLC,

Defendant.

-----------------------------------------------------------------------X

Plaintiff, Scantek Medical, Inc, ("Plaintiff") complaining of Defendants, Angela Chen

Sabella ("Defendant Sabella") and Accordant Holdings, LLC ("Defendant Accordant") (jointly,

the "Defendants"), alleges, upon information and belief as follows:

### AS AND FOR A FIRST CLAIM FOR RELIEF

1.    Plaintiff is a Delaware corporation, with an address at 1705 Route 46 West, Unit

5, Ledgewood, New Jersey 07852.

2.    Upon information and belief, Defendant Sabella has an office address at 853 East

Valley Boulevard, Suite 200, San Gabriel, California 91776, and is a member of Accordant.

3.    Upon information and belief, Defendant Accordant is a Delaware limited liability

company, with an address at 853 East Valley Boulevard, Suite 200, San Gabriel, California

91776.

4.    The promissory notes and subscription agreements evidencing the loans described

herein each contain the following identical provision: "The parties hereby consent to and

irrevocably submit to personal jurisdiction over each of them by the Courts of the State of New

York in any action or proceeding".

5.     On or about April 25, 2002, Defendant Sabella loaned $100,000 to Plaintiff, pursuant, in part, to a promissory note dated April 25, 2002 (the "April 2002 Note"), which was executed by Dr. Zsigmond L. Sagi, Plaintiff's Chief Executive Officer, on behalf of Plaintiff, in favor of Defendant Sabella.

6.     The April 2002 Note had a maturity date of 120 days after the date of the Note (that is, August 23, 2002), and bore interest at the rate of 10% per annum.

7.     As additional consideration for the $100,000 loan, Defendant Sabella demanded additional consideration of 400,000 shares of Plaintiff's Common Stock (the "April 2002 Shares").

8.     Plaintiff and Defendant Sabella entered into a subscription agreement dated April 24, 2002 (the "April 2002 Subscription Agreement") for the April 2002 Shares.

9.     The April 2002 Subscription Agreement specifically states that as consideration for the $100,000 loan, Defendant Sabella received the April 2002 Note, and was entitled to the 400,000 April 2002 Shares.

10.     On April 25, 2002, the date of the April 2002 Note, and on April 24, 2002, the date of the April 2002 Subscription Agreement, the closing market price of Plaintiff's Common Stock was $.05 per share.

11.     Accordingly, the value of the April 2002 Shares based upon the closing market price was $20,000.

12.     Pursuant to New York Penal Law § 190.40, a person is guilty of criminal usury when she "knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

2

13.     In view of the fact that that April 2002 Note (which bore interest at 10% per annum), in conjunction with the April 2002 Subscription Agreement (which required stock valued at $20,000, or the equivalent interest rate of approximately 61% per annum), charged a total rate of interest of approximately 71% per annum, which is almost three times the legal percentage, the April 2002 Note is criminally usurious on its face.

14.     On or about August 20, 2002, Defendant Sabella loaned an additional $150,000 to Plaintiff.

15.     On or about August 20, 2002, Plaintiff executed a promissory note in favor of Defendant Sabella which replaced and superseded the April 2002 Note, and incorporated both the principal balance of the April 2002 Note in the amount of $100,000, plus the accrued interest thereon in the amount of $3,250.80, plus the newly loaned principal in the sum of $150,000 (the "August 2002 Note"). Thus, the principal of the August 2002 Note was $253,250.80.

16.     The August 2002 Note called for four separate payment dates: November 20, 2002, December 20, 2002, January 20, 2003 and February 20, 2003. The August 2002 Note bore interest at the rate of 10% per annum.

17.     As additional consideration, Defendant Sabella demanded 2,000,000 shares of Plaintiff's Common Stock (the "August 2002 Shares"), not including the 400,000 shares of Plaintiff's Common Stock which Defendant Sabella was entitled to pursuant to the April 2002 Subscription Agreement.

18.     On August ·20, 2002 Plaintiff and Defendant Sabella entered into a Subscription Agreement (the "August 2002 Subscription Agreement"), pursuant to which Plaintiff agreed to issue to Defendant Sabella the August 2002 Shares. The August 2002 Subscription Agreement specifically states that as consideration for the loans to Plaintiff totaling $250,000, Defendant

3

Sabella received the August 2002 Note, and was entitled to the 2,000,000 August 2002 Shares.

19.     On the date of the August 2002 Note, the closing market price of Plaintiff's Common Stock was $.05 per share.

20.     Accordingly, the value of the August 2002 Shares based upon the closing market price was $100,000 (which does not include the value of the April 2002 Shares which Plaintiff agreed to issue Defendant Sabella).

21.     Pursuant to New York Penal Law § 190.40, a person is guilty of criminal usury when she "knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

22.     Because the August 2002 Note (which bore interest at 10% per annum), in conjunction with the August 2002 Subscription Agreement (which required stock valued at $100,000, or the equivalent interest rate of approximately 79% per annum), charged a total rate of interest of approximately 89% per annum, which is over three times the legal percentage, the August 2002 Note is criminally usurious on its face.

23.     Some of the August 2002 Shares have already been issued to Defendant Sabella pursuant to the criminally usurious August 2002 Subscription Agreement.

24.     Accordingly, Plaintiff seeks a declaratory judgment declaring that the August 2002 Note, August 2002 Subscription Agreement and any August 2002 Shares issued to Defendant Sabella are void as criminally usurious pursuant to N.Y. PENAL LAW § 190.40.

### AS AND FOR A SECOND CLAIM FOR RELIEF

25.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "24" with the same force and effect as if more fully set forth herein.

4

26.    On or about February 10, 2003, Defendant Accordant loaned $50,000 to Plaintiff, pursuant, in part, to a promissory note dated February 10, 2003 (the "February 2003 Note") executed by Dr. Sagi, Plaintiff's Chief Executive Officer, on behalf of Plaintiff, in favor of Defendant Accordant.    Upon information and belief, Defendant Sabella is the principal of Defendant Accordant.

27.    The February 2003 Note had a maturity date of June 6, 2003, and bore interest at the rate of 12% per annum.

28.    In consideration for the $50,000 loan evidenced by the February 2003 Note, Defendant Sabella required that Plaintiff issue to Defendant Accordant 300,000 shares of Plaintiff's Common Stock the "February 2003 Shares").

29.    Defendant Accordant and Plaintiff entered into a subscription agreement dated February 10, 2003 (the "February 2003 Subscription Agreement"), pursuant to which Plaintiff agreed to issue Defendant Accordant the February 2003 Shares.  The February 2003 Subscription Agreement specifically states that as consideration for the $50,000 loan, Defendant Accordant received the February 2003 Note, and was entitled to the 300,000 February 2003 Shares.

30.    On the date of the February 2003 Note, the closing market price of Plaintiff's Common Stock was $.06 per share.

31.    Accordingly, the value of the February 2003 Shares based upon the closing market price was $18,000.

32.    Pursuant to New York Penal Law § 190.40, a person is guilty of criminal usury when she "knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

5

33.    In view of the fact that the February 2003 Note (which bore interest at 12% per annum), in conjunction with the February 2003 Subscription Agreement (which required stock valued at $18,000, or the equivalent interest rate of 113% per annum), charges a total rate of interest of approximately 125% per annum, which is five times the legal percentage, the February 2003 Note is criminally usurious on its face.

34.    Some of the February 2003 Shares have already been issued to Defendant Accordant pursuant to the criminally usurious February 2003 Subscription Agreement.

35.    Accordingly, Plaintiff seeks a declaratory judgment declaring that the February 2003 Note, February 2003 Subscription Agreement and any February 2003 Shares issued to Defendant Accordant are void as criminally usurious pursuant to N.Y. PENAL LAW § 190.40.

## AS AND FOR A THIRD CLAIM FOR RELIEF

36.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "35" with the same force and effect as if more fully set forth herein.

37.    In the alternative of the Second Claim for Relief, the February 2003 Note, in conjunction with the February 2003 Subscription Agreement, charged a criminally usurious rate of interest after default.

38.    Plaintiff defaulted on the February 2003 Note. To date, Plaintiff has not paid any principal or interest on the February 2003 Note.

39.    The February 2003 Subscription Agreement provides that for each of the first five business days after the maturity date, if the February 2003 Note remained unpaid, Plaintiff owed Defendant Accordant 10,000 shares of Plaintiff's Common Stock.

40.    Plaintiff was required to issue to Defendant Accordant 50,000 shares of its Common Stock for the five business days after the February 2003 Note's maturity date. The

value of the 50,000 shares based upon the closing market price which Plaintiff owed Defendant

Accordant after being in default for five days was $3,000.

41.     For each subsequent day, Plaintiff owed Defendant Accordant an additional

25,000 shares of Plaintiff's Common Stock.

42.     Accordingly, at the rate of 25,000 shares per day, on an annual basis Defendant

Accordant would receive 9,125,000 shares in Plaintiff's Common stock. Assuming a value of

$.06 per share (pursuant to the closing market value of each share of Plaintiff's Common Stock

on the date of the February 2003 Note), this would equal a value of $547,500 per year, which is

equivalent to an interest rate of 2,007% per annum when added to the 12% interest due pursuant

to the February 2003 Note.

43.     Accordingly, Plaintiff seeks a declaratory judgment declaring the February 2003

Note, February 2003 Subscription Agreement and any February 2003 Shares issued to Defendant

Accordant are void as criminally usurious pursuant to N.Y. PENAL LAW § 190.40.

WHEREFORE, Plaintiff demands judgment as follows:

(a)     On its first claim for relief against Defendant Sabella, a declaratory
        judgment declaring that the August 2002 Note, the August 2002
        Subscription Agreement and any August 2002 Shares issued to Defendant
        Sabella are void for being criminally usurious pursuant to N.Y. PENAL
        LAW § 190.40;

(b)     On its second claim for relief against Defendant Accordant, a declaratory
        judgment declaring that the February 2003 Note, the February 2003
        Subscription Agreement and any February 2003 Shares issued to
        Defendant Accordant are void for being criminally usurious pursuant to
        N.Y. PENAL LAW § 190.40;

(c)     On its third claim for relief against Defendant Accordant, a declaratory
        judgment declaring that the February 2003 Note the February 2003
        Subscription Agreement and any February 2003 Shares issued to
        Defendant Accordant are void for being criminally usurious pursuant to
        N.Y. PENAL LAW § 190.40; and

7

(d)    Such other and further relief as to this Court deems just and proper, together with cost and disbursements as provided by law.

Dated: New York, New York
        January 29, 2008

Alan P. Fraade (AF 9602)
Mintz & Fraade, P.C.
Attorney for Plaintiff
488 Madison Avenue, Suite 1100
New York, New York 10022
(212) 486-2500

8