UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SCANTEK MEDICAL, INC.,

Index No.: 08 CV 00453 (CM)

Plaintiff,

**AFFIDAVIT**

-against-

ANGELA CHEN SABELLA and
ACCORDANT HOLDINGS, LLC,

Defendants and
Third-Party Plaintiffs,

-against-

MINTZ & FRAADE, P.C., FRED MINTZ, ALAN
FRAADE, MINTZ & FRAADE ENTERPRISES, LLC,
ZSIGMOND L. SAGI, and GIBRALTAR GLOBAL
MARKETING LLC,

Third-Party Defendants.
-----------------------------------------------------------------X
State of New York    )
                     ) ss.:
County of New York)

Alan P. Fraade, being duly sworn, deposes and says:

1. At all times relevant to this action through to the date hereof, Mintz & Fraade,
P.C. ("M&F"), the law firm of which I am a member, has acted as attorneys for the
Plaintiff Scantek Medical, Inc. (hereinafter referred to as "Scantek" or "Plaintiff").  I am
fully familiar with the facts stated in this affidavit and know the same to be true to my
own knowledge.  I am fully familiar with the pleadings and proceedings heretofore had
herein and the matters hereinafter set forth.

1

2. The Plaintiff engaged in a series of financing transactions with Defendants Sabella and Accordant (jointly the "Defendants"), in which the Defendants loaned certain sums of money to Plaintiff pursuant to which promissory notes were executed in favor of Defendants and shares of Plaintiff's common stock were agreed to be issued to the Defendants as additional compensation. Defendant Sabella's Affidavit and Defendants' Memorandum of Law in support of the Motion to Dismiss contain numerous factual inaccuracies and false statements with respect to these transactions.

3. The following documents (collectively the "Documents") were executed as hereinafter set forth:

    A. The Promissory Note dated April 25, 2002 (the "April 2002 Note"), in the principal amount of $100,000 executed by Plaintiff in favor of Defendant Sabella,

    B. The Subscription Agreement dated April 25, 2002 (the "April 2002 Subscription Agreement") executed by Defendant Sabella for the issuance of shares as additional compensation for the loan evidenced by the April 2002 Note,

    C. The Promissory Note dated August 20, 2002 (the "August 2002 Note"), in the principal amount of $253,250.80 which superseded the April 2002 Note, executed by Plaintiff in favor of Defendant Sabella,

N:\Clients\Scantek Medical Inc\Sabella\Litigation\Motion to Dismiss\Affidavit 3.28.08 v.final.doc

D.  The Subscription Agreement dated August 20, 2002 (the "August 2002 Subscription Agreement") executed by Defendant Sabella for the issuance of shares as additional compensation for the loan evidenced by the August 2002 Note,

E.  The Promissory Note dated February 10, 2003 (the "February 2003 Note"), in the principal amount of $50,000 executed by Plaintiff in favor of Defendant Accordant, and

F.  The Subscription Agreement dated February 10, 2003 (the "February 2003 Subscription Agreement") executed by Defendant Sabella as additional compensation for the loan evidenced by the February 2003 Note.

A more detailed description of the Documents is set forth in the Complaint.

4.  Plaintiff alleges in the Complaint that the transactions evidenced by the Documents are criminally usurious and in violation of N.Y. PENAL LAW § 190.40.

5.  Throughout the entire negotiation process and the execution of the Documents, the Defendants were advised by Mark Stepniewski (a/k/a Mark Step), who negotiated with Plaintiff on Defendants' behalf, and holds himself out as a sophisticated adviser and consultant to wealthy individuals with respect to investments.   Mr. Stepniewski introduced the Defendants to Plaintiff.

6.  M&F had known Mr. Stepniewski for many years when my partner Frederick Mintz and I introduced Plaintiff to Mr. Stepniewski.   We inquired whether Mr.

3

Stepniewski knew any investors who might be interested in investing in Plaintiff. This is when Mr. Stepniewski introduced Plaintiff to Defendants.

7. Upon information and belief, Mr. Stepniewski has a long history with Defendants, and has introduced Defendant Sabella to many entities, including several in which she has invested millions of dollars in many calendar years. Upon information and belief, Mr. Stepniewski has participated in a substantial number of Defendant Sabella's investments by investing his own money in the same entities in which Defendant Sabella has invested, and has advised me that he has an interest in Defendant Accordant. Mr. Stepniewski's relationship with Defendants was thus extremely close.

8. M&F was not representing Defendants with respect to the transactions which are the subject of the Complaint (the "Transactions").

9. Upon information and belief, Defendant Sabella is a sophisticated investor, in additional to being very wealthy. I have been advised by Mr. Stepniewski that Defendant Sabella's personal wealth, in addition to certain of her family's assets, which she controls, totals substantially in excess of one billion dollars. Defendant Sabella runs a substantial business, has inside counsel on at least a part-time basis, and has many lawyers who represent her as outside counsel. If she did not consult with respect to the Transactions with any of the many lawyers she retains, then that was Defendant Sabella's choice. It is inconceivable that Defendant Sabella, as a sophisticated investor and businesswoman, would have believed that she could have relied upon the attorneys representing the Plaintiff borrowing money from her in a loan transaction.

10. Each of the subscription agreements executed by Defendants with respect to the

Transactions contains the following provision:

> I acknowledge that I have received, read, understand, and am familiar with this Subscription Agreement. I further acknowledge that no statements, representations or warranties, have been made or furnished to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Securities, and/or the economic, tax, or any other aspects or consequences of this investment, and that I have not relied upon any information with respect to the offering, written or oral, other than the information contained in this Subscription Agreement. I further understand that any documents other than this Subscription Agreement, regardless of whether distributed prior to, simultaneously with, or subsequent to, the date of this Subscription Agreement should not be relied upon in determining whether to make an investment in the Securities and I expressly acknowledge, agree and affirm that I have not relied upon any such literature in making my determination to make an investment in the Securities.

Each subscription agreement also states: "I have not relied, and will not rely upon, any

information with respect to this offering other than the information contained herein and

set forth in the Company's filings with the Securities and Exchange Commission."

11. The subscription agreements also contained an indemnification clause, which

reads:

> I hereby agree to indemnify and hold harmless the Company, Counsel [Mintz & Fraade, P.C.], and persons affiliated with them, from any and all damages, losses, costs and expenses (including reasonable attorneys' fees) which they, or any of them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this Subscription Agreement or by reason of my breach of any of my representations and warranties contained in this Subscription Agreement.

12. That is why I find it puzzling to read in the Defendants' Motion to Dismiss that

the Defendants' "relied" upon M&F and Plaintiff with respect to the financing

transactions between the Defendants and the Plaintiff. (See the Affidavit of Angela Chen

5

Sabella dated February 11, 2008 (the "Sabella Affidavit") ¶¶ 9, 11.) I do not believe that Defendants relied upon M&F or the Plaintiff at any time with respect to the Transactions. M&F dealt primarily with Mr. Stepniewski with respect to the Transactions, and M&F and Plaintiff had limited direct contact with Defendants during the negotiations and/or execution of the Documents. Even if Defendants did not have any of the numerous attorneys they utilize review the Documents, both Defendant Sabella and Mr. Stepniewski are sophisticated businesspeople who are entirely capable of understanding the meaning of the provisions quoted above. If Defendant Sabella is intending to suggest in Paragraphs 11-14 of her Affidavit that neither she, nor Mr. Stepniewski read the Documents, or were not capable of understanding the Documents, then such assertion is an outright lie.

13. It is also an outright lie to suggest that M&F structured the terms of the Documents. I doubt that any corporate attorney would recommend such harsh terms for their own client. The terms of the Documents were set forth by Defendants, and were agreed to by Plaintiff because Defendants had tremendous leverage with respect to the Transactions. Defendants used their influence to secure terms in the Documents which no borrower would consider favorable.

14. On or about April 25, 2002, Defendants loaned $100,000 to Plaintiff, pursuant, in part, to a promissory note dated April 25, 2002 (the "April 2002 Note"), which was executed by Dr. Zsigmond L. Sagi, Plaintiff's Chief Executive Officer, on behalf of Plaintiff, in favor of Defendant Sabella.    Plaintiff and Defendants, through Mr. Stepniewski as Defendants' representative, negotiated the terms and structure of this transaction. M&F had limited involvement in structuring the Transactions.

6

15. Plaintiff and Defendants entered into the April 2002 Subscription Agreement for 400,000 shares of Plaintiff's Common Stock (the "April 2002 Shares"). This was in accordance with the terms and structure demanded by the Defendants, through Mr. Stepniewski.

16. On or about August 20, 2002, Defendants loaned an additional $150,000 to Plaintiff. On or about August 20, 2002, Plaintiff executed the August 2002 Note in favor of Defendants which replaced and superseded the April 2002 Note, and incorporated both the principal balance of the April 2002 Note, plus the accrued interest thereon in the amount of $3,250.80, plus the newly loaned principal in the sum of $150,000. Thus, the principal of the August 2002 Note was $253,250.80. The structure of the August 2002 Note was also created by Defendants, through Mr. Stepniewski.

17. The August 2002 Note bore interest at the rate of 10% per annum. As additional compensation, Defendant Sabella, through Mr. Stepniewski, demanded 2,000,000 shares of Plaintiff's Common Stock (the "August 2002 Shares"), not including the 400,000 shares of Plaintiff's Common Stock which Defendants were entitled to pursuant to the April 2002 Subscription Agreement.

18. On August 20, 2002 Plaintiff and Defendants entered into a Subscription Agreement, pursuant to which Plaintiff agreed to issue to Defendants the August 2002 Shares. The August 2002 Subscription Agreement specifically states that as additional compensation for the loans to Plaintiff totaling $250,000, Defendants received the August 2002 Note, and was entitled to the 2,000,000 August 2002 Shares. The terms and structure of this transaction were demanded by the Defendants through Mr. Stepniewski.

7

19. Some of the August 2002 Shares were issued to Defendant Sabella pursuant to the August 2002 Subscription Agreement. Defendants' Memorandum of Law states that the August 2002 Shares "were included in the 2,099,466 shares reported as issued for the year ended June 30, 2002, for which Scantek's auditors reported a 'Value' of $2,099, or a 'Value' of $2,000 for the 2,000,000" August 2002 Shares. (See Defendants' Memorandum of Law at 7.) Although the valuation of the stock is not relevant for purposes of the present motion, Defendants have completely misread Plaintiff's Consolidated Statements of Stockholders' Deficiency ("Plaintiff's Consolidated Statements") on which this information is based, a copy of which is annexed hereto as Exhibit "A". First, auditors do not "report a value" of the stock. Auditors review financial information provided by the Plaintiff to ensure that the financial statements are properly prepared. Second, the "value" which Defendants refer is based only upon the par value of the stock, not upon the actual market value. The "value" listed under the column "Common Stock" on Exhibit "A" shows that the 2,099,466 shares reported for the year ended June 30, 2002 were worth $2,099 because the par value was $.001 per share. However, the column "additional paid-in capital" represents the price over and above the par value Plaintiff received for the Common Stock. Thus, Plaintiff received an average of an additional $.0751 per share over and above the par value. Thus, it is clear that Defendants' assertion that the "value" Plaintiff's stock is $.001 per share (see Defendants' Memorandum of Law at 17) comes from a gross misreading of Plaintiff's Consolidated Statements which is attached hereto as Exhibit "A".

20. Defendants also erroneously state that the "February 2003 Subscription Agreement, the August 2002 Subscription Agreement and subscription agreements

8

delivered to other investors provided for the delivery of funds in payment for the Securities to the operating account of 'Mintz & Fraade, P.C.', not Scantek's operating account, and not an escrow account maintained by any attorney, bank or brokerage firm". (Defendants' Memorandum of Law at 8.)  Again, this is inaccurate and not relevant to the present motion.    The February 2003 Subscription Agreement and the August 2002 Subscription Agreement provide that payment for the securities should be made "by delivery of a check made payable to 'Mintz & Fraade, P.C.'" to M&F.  Although it is not specified that the funds will be deposited on M&F's escrow account, such funds were in fact deposited in M&F's escrow account, not M&F's operating account.  Annexed hereto as Exhibit "B" is an email dated August 19, 2002 from Kitty L. Lew, Defendant Sabella's Office Manager, confirming that Defendant Sabella wired $75,000 with respect to the Transaction to M&F's escrow account.  Defendants' baseless assertion that the funds were deposited in M&F's operating account is blatantly false, and is a total fabrication.

21. Ultimately, Plaintiff was unable to meet the payment terms dictated by the Documents.

22. Mr. Stepniewski, acting on behalf of Defendants entered into negotiations with M&F, acting on behalf of Plaintiff, to attempt to reach a settlement with respect to Plaintiff's default.  Mr. Stepniewski negotiated primarily with my partner, Frederick Mintz.  Mr. Mintz advised me that he and Mr. Stepniewski had very nearly reached an agreement with respect to settling Plaintiff's outstanding debt to Defendants.  A draft of a settlement proposal between Plaintiff and Defendant Accordant was prepared by M&F dated July 14, 2006, a copy of which is annexed hereto as Exhibit "C".  Numerous discussions took place thereafter between Mr. Stepniewski, Mr. Mintz and me, and we

believed that we were close to a final settlement in the end of 2007. However, before a final settlement could be reached, Ken Sussmane, the attorney of record for Defendants in this action, submitted extreme and unreasonable demands upon Plaintiff. The original intention of the settlement was for Defendants to own a 48% interest in a limited liability company which would distribute Plaintiff's product in mainland China, including Hong Kong and Macao. A copy of the demand letter from Mr. Sussmane dated December 10, 2007 is annexed hereto as Exhibit "D". It was not until this time that Plaintiff, unable to meet Defendants' unreasonable demands and with no other choice, determined to institute a lawsuit in order to protect itself against Defendants' attempt to enforce a usurious contract.

23. Defendants also allege that M&F represented Defendants, and therefore M&F owed the Defendants a fiduciary duty. (See Defendants' Memorandum of Law dated February 11, 2008 ("Defendants' Memorandum of Law") at 13.) This is, at best, misleading. M&F's sole representation of Defendant Sabella with respect to one prospective unrelated loan transaction was in or around August 2002 (the "Sabella Representation"), four months after the initial agreement between Plaintiff and Defendants. Defendants were interested in investing in a company, Electronic Control Security Inc. Although M&F drafted documents based upon negotiations by Mr. Stepniewski on behalf of Defendants with the prospective borrower, the transaction was aborted. M&F charged Defendants a fee of $2,500 for the Sabella Representation pursuant to a bill dated March 24, 2003, a copy of which is annexed hereto as Exhibit "E". This representation in no manner related to, nor involved, the Plaintiff. Furthermore, the Sabella Representation was an isolated transaction for which M&F did

10

limited work. With respect to the Sabella Representation, M&F dealt almost exclusively with Mr. Stepniewski, and not with Defendant Sabella. Defendant Sabella characterizes this by stating that M&F "represented [her] in connection with certain investments made by [her] on or about the time of [her] investments in Scantek". (Sabella Aff. ¶ 8.) This statement is untrue because M&F only represented Defendant Sabella with respect to one investment, not multiple investments, and that transaction was aborted. Defendant Sabella's statement is also misleading because M&F did not begin representing Defendant Sabella until August 2002, which was well after her first investment in Plaintiff, which occurred in April 2002.

24. In addition, in or about February 2004, M&F handled a filing with the Securities and Exchange Commission for Defendant Sabella on a one-time basis. My firm charged the Defendants a nominal fee of $1,500 for these legal services pursuant to a bill dated February 4, 2004, a copy of which is annexed hereto as Exhibit "F". These services could best be described as "ministerial", and did not foster a fiduciary relationship between Defendants and M&F.

25. M&F did not owe Defendant Sabella a fiduciary duty with respect to the Sabella Representation. The Sabella Representation was entirely unrelated to the Transactions. The Sabella Representation was short lived, and given that M&F dealt almost exclusively with Mr. Stepniewski throughout the Sabella Representation, the suggestion that Defendants relied upon M&F as counsel with respect to the Transactions, which were initiated before the start of the Sabella representation, is totally without merit.

26. Plaintiff and Defendant first came to an initial agreement evidenced by the April 2002 Note. However, negotiations between the Plaintiff and the Defendants had begun before such date. Before the negotiations which led to the April 2002 Note, my firm did not represent the Defendants nor provide any legal advice whatsoever to the Defendants.

27. The Defendants were aware that my firm represented the Plaintiff, Scantek, generally, and in all of the transactions entered into between the Defendants and the Plaintiff.

28. At no time did M&F represent both Plaintiff and Defendants with respect to the negotiations, structuring, or the drafting of the documents with respect to the Transactions. M&F represented solely Plaintiff throughout the entire course of dealings between Plaintiff and Defendants. Thus, Defendant Sabella's assertion that she "relied" upon M&F in any way during the Transactions is unfounded and has absolutely no merit.

29. The Defendants' allege that M&F had a duty to speak concerning the illegality of the Transactions. M&F, at the time of the transactions, never evaluated the question of criminal usury. Because Defendant Sabella structured the terms of the Documents, and because no party to the Transactions raised the issue of usury, M&F did not take it upon itself to conduct research or analyze whether the Transactions were usurious.

30. The Documents embodied the negotiations and the demands that the Defendants' placed upon the Plaintiff. M&F memorialized the terms that the Defendants demanded.

31. The Defendants claim that M&F should have disclosed that Plaintiff and M&F were engaged in a "scheme" to have Plaintiff issue securities that it would not honor.

12

This statement is blatantly absurd and false. First, Plaintiff had every intention of honoring the terms of the Documents, which is evidenced by the fact that when Plaintiff could not make its scheduled payments, it attempted to negotiate a new payment schedule. The allegation that Plaintiff did not intend to honor the terms of the Documents is completely unfounded.

32. M&F has represented Plaintiff in numerous transactions over many years. Plaintiff has never asserted usury as a defense, nor has Plaintiff ever started any other lawsuit where it alleged usury as a basis for a complaint. The allegation that there was a "scheme" on the part of M&F and/or Plaintiff cannot be true because it was Defendant Sabella and Mr. Stepniewski, not Plaintiff or M&F, who structured the Transactions.

33. I have been advised that this is not the first time Defendant Sabella has structured a criminally usurious transaction. I have been further advised that at the time Defendant Sabella structured the criminally usurious transaction with Plaintiff, both she and her financial adviser Mr. Stepniewski were aware that there had been allegations of criminal usury connected with another transaction. Edward C. Kramer, Esq., who is presently Of Counsel to M&F, represented Graphco Holdings Corp. ("Graphco") in 2002 before becoming Of Counsel to our firm. Mr. Kramer has advised me that Defendant Sabella loaned money to Graphco, and as consideration for the loan, received warrants to purchase Graphco's common stock. When the value of the warrants was added to the interest charged Graphco pursuant to the promissory note which evidenced the loan from Defendant Sabella, the total interest exceeded the criminal usury rate of 25% per annum. It should be noted that Defendant Sabella's total investment in Graphco was substantial, and approximately $3 million. In connection with the litigation between Graphco and

13

Defendant Sabella (the "Graphco Litigation"), Mr. Kramer prepared an affirmation dated May 7, 2002 which was submitted in the Graphco Litigation and which alleged criminal usury. Although this issue was never decided by the court, Defendant Sabella and her financial adviser Mr. Stepniewski were on notice from Defendant Sabella's involvement in the Graphco Litigation that this structure for offering financing to companies, whereupon she would receive large amounts of securities as additional compensation for loans, was potentially criminally usurious. She was definitely aware of this as early as May 7, 2002, and more likely as early as April 2002.

34.      Based upon what I have been advised by Mr. Kramer, when Defendant Sabella and Mr. Stepniewski structured the terms of the August 2002 Note and the February 2003 Note, and possibly the April 2002 Note as well, she was aware that the terms of the Transactions could lead to a claim of criminal usury, as it had in the Graphco Litigation.

35.      Although M&F has represented Graphco in the past, M&F was unaware of the Graphco Litigation. Although M&F believes that it commenced its representation of Graphco in 2001 at the recommendation of Mr. Stepniewski, M&F was retained solely with respect to limited corporate and securities matters and was not aware of the Graphco Litigation until recently.

36.      Defendants' allegation that Plaintiff and M&F were involved in a "scheme" to draft usurious Documents which Plaintiff did not intend to honor is completely refuted by the facts.

14

37. Defendants are wrong in asserting that Plaintiff has been engaged in "18 private placements of Securities" from 1999 through 2003. (Defendants' Memorandum of Law at 4.) The transactions which Defendants refer to were not "private placements" as such term is commonly understood. Most of these transactions involved issuing stock for the payment of the Plaintiff's debts or in lieu of the salary due to the Plaintiff's officers and directors and were not loan transactions.

**WHEREFORE**, it is respectfully submitted that the Court deny the Defendants' Motion to Dismiss this action, and that the Court grant such other and further relief as to it may seem just and proper.

_____
Alan P. Fraade

Sworn to before me this
28th day of March 2008

_____
Notary Public

COLLIN ROBERT SHERMAN
Notary Public, State of New York
No. 02SH6156333
Qualified in New York County
Commission Expires Nov. 27, 2010

15

EXHIBIT "A"

SCANTEK MEDICAL, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

| | Total | Comprehensive Income (Loss) | Accumulated Deficit | Cumulative Other Comprehensive Income (Loss) | Common Stock # of Shares | Common Stock Value | Additional Paid-In Capital |
|---|---|---|---|---|---|---|---|
| Balance June 30, 1999 | $(2,364,728) | | $(5,649,915) | $ (165,885) | 18,070,200 | $18,070 | $ 3,433,002 |
| Sale of common stock (at $.2185 per share) | 10,000 | | | | 45,767 | 46 | 9,954 |
| Common stock issued for loan financing and services rendered (issued at $.01 to $.5625 per share) | 199,254 | | | | 694,573 | 694 | 198,560 |
| Issuance of stock warrants for services (issued at $.1875 to $.75 per share) | 85,460 | | | | | | 85,460 |
| Net unrealized loss on marketable securities | (115,380) | $ (115,380) | | (115,380) | | | |
| Net loss | (2,816,465) | (2,816,465) | (2,816,465) | | | | |
| Comprehensive loss | | $(2,931,845) | | | | | |
| Balance, June 30, 2000 | (5,001,859) | | (8,466,380) | (281,265) | 18,810,540 | 18,810 | 3,726,976 |
| Common stock issued for loan financing and services rendered (issued at $.08 to $.51 per share) | 302,517 | | | | 3,013,900 | 3,015 | 299,502 |
| Common stock issued for loan conversion (issued at $.10 per share) | 10,000 | | | | 100,000 | 100 | 9,900 |
| Sale of common stock (at $.08 to $.20 per share | 250,900 | | | | 3,046,250 | 3,046 | 247,854 |
| Issuance of stock warrants for services (issued at $.07 per share) | 1,850 | | | | | | 1,850 |
| Net unrealized loss on marketable securities | (17,970) | $ (17,970) | | (17,970) | | | |
| Net loss | (2,361,171) | (2,361,171) | (2,361,171) | | | | |
| Comprehensive loss | | $ (2,379,141) | | | | | |
| Balance, June 30, 2001 | (6,815,733) | | (10,827,551) | (299,235) | 24,970,690 | 24,971 | 4,286,082 |
| Sale of common stock ($.05 to $.08 per share) | 72,000 | | | | 975,000 | 975 | 71,025 |
| Common stock issued for loan financing and services rendered (issued at $.035 to $.20 per share) | 159,918 | | | | 2,099,466 | 2,099 | 157,819 |
| Issuance of stock warrants for services (issued at $.015 to $.07 per share) | 324,771 | | | | | | 324,771 |
| Net unrealized gain on marketable securities | 276 | $ 276 | | 276 | | | |
| Net loss | (2,021,596) | (2,021,596) | (2,021,596) | | | | |
| Comprehensive loss | | $ (2,021,320) | | | | | |
| Balance, June 30, 2002 | $ (8,280,364) | | $ (12,849,147) | $ (298,959) | 28,045,156 | $28,045 | $ 4,839,697 |

See notes to consolidated financial statements

F-6

EXHIBIT "B"

**Alan Fraade**

| | |
|---|---|
| **From:** | Kitty L. Lew [kllkfc@pacbell.net] |
| **Sent:** | Tuesday, August 20, 2002 2:06 PM |
| **To:** | 'Alan Fraade' |
| **Subject:** | FW: Scantek Medical, Inc. |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Kitty L. Lew

626-280-2825 or 323-685-8590 (office)
626-280-2839 (fax)
PRIVACY AND CONFIDENTIALITY NOTICE:
The information contained in this e-mail is intended for the named recipients only.  It may contain privileged and confidential information and if you are not an intended recipient, you must not copy, distribute or take any action in reliance on it.  If you have received this e-mail in error, please notify us immediately by return e-mail to kllkfc@pacbell.net and delete the original from your server and any replicated databases.  Thank you.

-----Original Message-----
**From:** Kitty L. Lew [mailto:kllkfc@pacbell.net]
**Sent:** Monday, August 19, 2002 1:35 PM
**To:** Alan P. Fraade (apf@mintz&fraade.com)
**Subject:** Scantek Medical, Inc.

Mr. Fraade,

Per Ms. Sabella's instructions this morning, our office has wired $75,000 (less wiring fees) to your attorney escrow account at HSBC Bank USA for Scantek, Medical, Inc..  Please confirm your receipt of said funds by either return email or fax.  Thank you.

Kitty L. Lew

626-280-2825 or 323-685-8590 (office)
626-280-2839 (fax)
PRIVACY AND CONFIDENTIALITY NOTICE:
The information contained in this e-mail is intended for the named recipients only.  It may contain privileged and confidential information and if you are not an intended recipient, you must not copy, distribute or take any action in reliance on it.  If you have received this e-mail in error, please notify us immediately by return e-mail to kllkfc@pacbell.net and delete the original from your server and any replicated databases.  Thank you.

3/25/2008

EXHIBIT "C"

**Scantek Medical, Inc. Settlement Proposal for Accordant Holdings LLC**
**July 14, 2006**

1. Scantek Medical, Inc. (the "Company") and Accordant Holdings LLC ("AH") will simultaneously execute a new promissory note for the entire debt plus interest as agreed upon.

2. The principal of the promissory note will be paid in eighteen (18) equal monthly installments starting on December 30, 2006 and ending on May 31, 2008.

3. The interest rate on the promissory note will be one (1%) percent greater than the prime rate.

4. The accrued interest on the promissory note will start to accrue upon execution of the new note and will be paid monthly commencing 30 days after Scantek receives its first payment from Brazil for sales of BreastCare, but not later then December 30, 2006.

5. The promissory note will be secured by the present UCC filing held by AH.

6. The Company will execute a confession of judgment for the full amount of the note.

7. After the Company has increased its number of authorized shares, it shall issue to AH the shares that shall be agreed upon. The Company will be unable to increase its number of authorized shares until its SEC filings are up to date. The SEC filings will require substantial work by accountants, the time frame for which is difficult to predict. We estimate that it will take approximately five months for us to increase our authorized shares, but cannot make any guarantees in this respect since the time involved in the accountants' efforts and SEC review is beyond our control.

8. Pursuant to comment "7", above, after the Company becomes up to date with its SEC filings, it will arrange to have its shares listed on the OTC Bulletin Board. We estimate that it will take approximately four months for our SEC filings to be up to date, but cannot make any guarantees in this respect since the time involved in the accountants' efforts and SEC review is beyond our control.

9. AH will have an option to acquire forty-eight (48%) percent of a JV for the marketing and sale of BreastCare products in mainland China, including Hong Kong and Macao.

10. The JV will be a limited liability company ("LLC") and will be formed if and when AH exercises its option.

11. AH has the right to exercise its option for 48% of the JV at any time until thirty (30) days after the Company notifies AH in writing that it has attained $2.5 million in BreastCare gross sales in a 12-month period.

12. By exercising its option to acquire 48% of the JV, AH would thereby agree to forfeit all principal, interest, and penalties on the promissory note, and return all principal payments that the Company made on the promissory note prior to that point.

13. If AH decides to exercise its option to acquire 48% of the JV, AH would then put up $500,000 in working capital for the JV, $250,000 of which would be repaid by the Company in four (4) equal monthly installments starting January 31, 2007.

14. The JV will have four members:
    a.  Scantek Medical, Inc. – 48%
    b.  AH – 48%
    c.  Mintz & Fraade Enterprises – 2%
    d.  Mark Step – 2%

15. The JV's operating agreement will provide for quarterly distribution of thirty (30%) percent of its pre-tax profits to its members.

EXHIBIT "D"

# McCue Sussmane & Zapfel, P.C.

### 521 FIFTH AVENUE
### 28th FLOOR
### NEW YORK, NEW YORK 10175

TELEPHONE: (212) 931-5500
FACSIMILE: (212) 931-5508

735 POST ROAD EAST
WESTPORT, CT 06880
TELEPHONE: (203) 227-6133
FACSIMILE: (203) 454-0875

December 10, 2007

Mr. Fred Mintz
Mintz & Fraade
488 Madison Avenue
New York, NY  10022

Re: Scantek

Dear Fred:

Our clients Angela Sabella and Accordant Holdings LLC are prepared to make the following final settlement offer regarding their dispute with Scantek Medical Inc. (the "Company"):

1.  Company will pay $100,000 immediately, which will be applied to interest.

2.  Company will execute a new promissory note for entire $825,000 debt plus accrued interest and late fees and costs of collection. New promissory note will bear interest at a floating rate equal to the greater of 12% per annum or prime plus 4%.  Default rate will be 24% per annum.  Company will make 11 payments of $50,000 each commencing on February 1, 2008, with unpaid balance of principal and interest due on January 1, 2009. The note may be prepaid at any time without penalty.

3.  Promissory note will be secured by guarantee of Mr. Sagi and Gibraltar Global Marketing LLC.  All parties will execute confessions of judgment.

4.  The 3,000,000 shares of Company stock issued to Mr. Sagi and held in escrow by Mintz and Fraade will be

Fred Mintz
December 10, 2007
Page 2

       transferred to McCue Sussmane & Zapfel, P.C. to hold
       in escrow as collateral for the new note.

5.    The Company or its shareholders will transfer to our
       clients 10% of the capital stock of the Company and
       5% of the membership interests of Gibraltar.  The
       Company shall deliver an additional 10% of the
       capital stock of the Company to be held in escrow
       pending payment in full of the promissory note.

    The foregoing is an offer of settlement, does not
contain an admission of any fact and is made without
prejudice.

    Please contact me to discuss the foregoing.

                    Very truly yours,

                    Kenneth Sussmane

```
                        ********************
                        ***   TX REPORT   ***
                        ********************


        TRANSMISSION OK

        TX/RX NO              0144
        RECIPIENT ADDRESS
        DESTINATION ID
        ST. TIME             12/11 11:20
        TIME USE             00'31
        PAGES SENT              3
        RESULT               OK
```

# MINTZ & FRAADE, P.C.
### COUNSELORS AT LAW
### 488 MADISON AVENUE
### NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
EDWARD C. KRAMER
KEVIN J. MCGRAW
ARTHUR L. PORTER, JR
JON M. PROBSTEIN
SEYMOUR REITKNECHT
I. FREDERICK SHOTKIN

## TELECOPIER TRANSMISSION COVER SHEET

DATE: 12/11/07

SENT BY: APF

CLIENT: 103

TO: Pat Furness

TELECOPIER NUMBER(S)  973-527-799

NUMBER OF PAGES: 3 (INCLUDING COVER SHEET)

FROM: Alon P. Fraade

If there is any problem with this transmission, please contact the sending office at (212) 486-2500.

Message: Please bring the attached to Ziggy's Attention - Thanks.

This transmission is intended only for the designated recipient and may contain information which is privileged, confidential and exempt from disclosure under state and exempt from disclosure under state and federal laws. If the reader or recipient of this transmission is not the designated recipient, or is the employee or agent responsible for delivery to the intended recipient, you are notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. Notice: this transmission shall not constitute a designation or a consent authorizing service of papers upon this firm by facsimile pursuant to New York CPLR §2103 (b) (5).

N:\M&F\ADMIN2\Faxcoversheet-new-2007.doc

# FAX COVER SHEET

| | |
|---|---|
| **TO** | Fred Mintz |
| **COMPANY** | Mintz & Fraade |
| **FAX NUMBER** | 12124860701 |
| **FROM** | Ken Sussmane |
| **DATE** | 2007-12-10 23:42:15 GMT |
| **RE** | |

## COVER MESSAGE

EXHIBIT "E"

MINTZ & FRAADE, P. C.

COUNSELORS AT LAW

488 MADISON AVENUE

NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
ARTHUR L. PORTER, JR.
MELVIN L. LEBOW
JON M. PROBSTEIN
MARTIN L. LERNER

SENIOR COUNSEL
FRANK J. GLINSKY

March 24, 2003

Ms. Angela Chen Sabella
853 East Valley Blvd., Suite # 200
San Gabriel, CA 91776

FOR PROFESSIONAL AND PARAPROFESSIONAL SERVICES
RENDERED WITH RESPECT TO ELECTRONIC CONTROL
SECURITY INC.................................................    **$ 2,500.00**

*Statement Sent: 7/11/03*
*Statement Sent: 12/31/03*

N:\M&F\Billing\Angela Chen-Sabella\March 21.doc

EXHIBIT "F"

# MINTZ & FRAADE, P. C.

## COUNSELORS AT LAW

### 488 MADISON AVENUE
### NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
EDWARD C. KRAMER
MELVIN L. LEBOW
MARTIN L. LERNER
MELVYN R. LEVENTHAL
KEVIN J. McGRAW
ARTHUR L. PORTER, JR.
JON M. PROBSTEIN

February 4, 2004

Ms. Angela Chen Sabella
853 East Valley Blvd., Suite # 200
San Gabriel, CA 91776

FOR PROFESSIONAL AND PARAPROFESSIONAL SERVICES
RENDERED WITH RESPECT TO PREPARATION AND FILING
OF FORM 3 AND FORM 13-D FOR SCANTEK MEDICAL, INC.
WITH THE SECURITIES AND EXCHANGE COMMISSION
(INCLUDING FEES FOR FILING SERVICES) ............................. **$ 1,500.00**