UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X Case No. 08 cv 00453 (CM)

SCANTEK MEDICAL INC.,                                       :
                                                            :   ANSWER AND
                            Plaintiff,                       :   COUNTERCLAIMS
                                                            :
            vs.                                             :
                                                            :
ANGELA CHEN SABELLA and ACCORDANT                           :
HOLDINGS, LLC,                                              :
                                                            :
                            Defendants.                      :
----------------------------------------------------------- X

     Accordant Holdings LLC ("Accordant") and Angela Chen Sabella ("Sabella")

(collectively "Defendants" or "Accordant and Sabella"), by and through their attorneys, McCue

Sussmane & Zapfel, P.C., as and for their answer to the Amended Complaint and counterclaims

allege, upon information and belief, as follows:

     1.    Defendants admit the allegations contained in paragraph 1 of the Complaint.

     2.    Defendants admit the allegations contained in paragraph 2 of the Complaint.

     3.    Defendants admit the allegations contained in paragraph 3 of the Complaint.

     4.    Defendants deny the allegations contained in paragraph 4 of the Complaint and

refer to the promissory notes for their terms.

     5.    Defendants admit the allegations contained in paragraph 5 of the Complaint.

     6.    Defendants deny the allegations contained in paragraph 6 of the Complaint and

refer to the document for its terms.

     7.    Defendants deny the allegations contained in paragraph 7 of the Complaint.

     8.    Defendants deny knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations contained in paragraph 8 of the Complaint.

9.     Defendants deny the allegations contained in paragraph 9 of the Complaint and refer to the purported document for its terms.

10.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 10 of the Complaint.

11.     Defendants deny the allegations contained in paragraph 11 of the Complaint.

12.     Defendants deny the allegations contained in paragraph 12 of the Complaint and refer to the statute for its terms.

13.     Defendants deny the allegations contained in paragraph 13 of the Complaint.

14.     Defendants admit the allegations contained in paragraph 14 of the Complaint.

15.     Defendants admit the allegations contained in paragraph 15 of the Complaint.

16.     Defendants deny the allegations contained in paragraph 16 of the Complaint and refer to the August 2002 Note for its terms.

17.     Defendants deny the allegations contained in paragraph 17 of the Complaint.

18.     Defendants deny the allegations contained in paragraph 18 of the Complaint, and refer to the document for its terms, except Defendants admit that Plaintiff and Defendant Sabella entered into the August 2002 Subscription Agreement and that Defendant Sabella received the August 2002 Note.

19.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 19 of the Complaint.

20.     Defendants deny the allegations contained in paragraph 20 of the Complaint.

21.     Defendants deny the allegations contained in paragraph 21 of the Complaint and refer to the statute for its terms.

22.     Defendants deny the allegations contained in paragraph 22 of the Complaint.

23.    Defendants deny the allegations contained in paragraph 23 of the Complaint

24.    Defendants deny the allegations contained in paragraph 24 of the Complaint.

25.    Defendants deny the allegations contained in paragraph 25 of the Complaint, except as expressly admitted in paragraphs 1 through 24 above.

26.    Defendants admit the allegations contained in paragraph 26 of the Complaint, except defendants deny that Defendant Sabella is the "principal" of Defendant Accordant.

27.    Defendants admit the allegations contained in paragraph 27 of the Complaint.

28.    Defendants deny the allegations contained in paragraph 28 of the Complaint.

29.    Defendants deny the allegations contained in paragraph 29 of the Complaint.

30.    Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 30 of the Complaint.

31.    Defendants deny the allegations contained in paragraph 31 of the Complaint.

32.    Defendants deny the allegations contained in paragraph 32 of the Complaint and refer to the statute for its terms.

33.    Defendants deny the allegations contained in paragraph 33 of the Complaint.

34.    Defendants deny the allegations contained in paragraph 34 of the Complaint.

35.    Defendants deny the allegations contained in paragraph 35 of the Complaint.

36.    Defendants deny the allegations contained in paragraph 36 of the Complaint, except as expressly admitted in paragraphs 1 through 35 above.

37.    Defendants deny the allegations contained in paragraph 37 of the Complaint.

38.    Defendants admit the allegations contained in paragraph 38 of the Complaint.

39.    Defendants deny the allegations contained in paragraph 39 of the Complaint and refer to the purported document for its terms.

40.     Defendants deny the allegations contained in paragraph 40 of the Complaint and refer to the purported document for its terms.

41.     Defendants deny the allegations contained in paragraph 41 of the Complaint and refer to the purported document for its terms.

42.     Defendants deny the allegations contained in paragraph 42 of the Complaint and refer to the purported document for its terms.

43.     Defendants deny the allegations contained in paragraph 43 of the Complaint.

## SUMMARY OF COUNTERCLAIMS AND AFFIRMATIVE DEFENSES

44.     Scantek Medical, Inc. ("Scantek" or the "Company") commenced this action seeking a judgment declaring that $303,280.80 of promissory notes and 2,000,000 shares of common stock issued by Scantek to Sabella and Accordant are void under New York criminal usury law. Such securities represent a portion of the $828,250 invested by Sabella and Accordant in Scantek.

45.     Sabella and Accordant bring these counterclaims to recover $828,250, plus interest, late fees, legal fees and punitive damages.

46.     Sabella seeks an order transferring certain patents pursuant to a collateral assignment of such patents.

47.     Accordant and Sabella bring counterclaims for common law fraud and negligent misrepresentation, breach of fiduciary duty, and federal securities fraud.  In connection with the sale of its securities, Scantek made numerous untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of the Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act").

48.     Scantek failed to state to Accordant and Sabella the material facts that its attorneys believed that securities offered by Scantek violated New York criminal usury laws and were voidable by Scantek.

49.     Scantek failed to state to Accordant and Sabella the material fact that Scantek was engaged in a scheme to issue securities that Scantek did not intend to honor.

50.     Scantek made numerous false statements regarding Scantek in its Forms 10K and 10Q filed with the U.S. Securities and Exchange Commission ("SEC").

51.     Scantek intended to deceive, manipulate, or defraud Accordant and Sabella, who relied on misrepresentations made by Scantek, and sustained damages as a proximate result thereof.

## THE PARTIES

52.     Accordant is a Delaware limited liability company which maintains its sole place of business in the state of California.

53.     Angela Chen Sabella ("Sabella") is an individual residing in the state of California and is the sole member of Accordant.

54.     Scantek is a Delaware corporation which maintains its principal place of business at 1705 Route 46 West, Unit 5, Ledgewood, New Jersey 07852.

55.     Zsigmond L. Sagi ("Sagi") is the President and a director of Scantek and a resident of the State of New Jersey.

56.     Mintz & Fraade P.C. (the "Mintz Firm") is a New York professional corporation with offices at 488 Madison Avenue, New York, New York 10022.

57.    Fred Mintz ("Mintz") is a resident of the State of New York and a practicing attorney, who upon information and belief, is a shareholder of the Mintz Firm, Mintz & Fraade LLC and a member of Mintz LLC.

58.    Alan Fraade ("Fraade") is a resident of the State of New York and a practicing attorney, who, upon information and belief, is a shareholder of the Mintz Firm, Mintz & Fraade LLC and a member of Mintz LLC.

59.    The Mintz Firm, Fraade and Mintz were counsel to Scantek at all times relevant hereto.

60.    The Mintz Firm represented Sabella and Accordant.

61.    Mintz & Fraade Enterprises, LLC ("Mintz LLC") is a New York limited liability company with offices at 488 Madison Avenue, New York, New York 10022. (Mintz LLC, the Mintz Firm, Mintz and Fraade are collectively referred to as the "Mintz Parties").

62.    Mintz LLC is Scantek's second largest shareholder, holding at least 3,300,000 shares of Scantek Common Stock issued in exchange for the legal services of the Mintz Firm and Fred Mintz.  Such shares include 3,000,000 shares (over 9% of Scantek's common stock) issued to the Mintz Firm as payment for $45,000 of legal services.

63.    Gibraltar Global Marketing LLC is a Delaware limited liability company formed in January 2007 by Scantek and Mintz LLC ("Gibraltar"), which maintains its principal place of business at 1705 Route 46 West, Unit 5, Ledgewood, New Jersey 07852. Scantek and Mintz LLC are members of Gibraltar.

## FACTS

64.    Scantek is a publicly-held company listed on the "pink sheets" under the symbol SKML.

65.     Scantek claims to be engaged in the business of developing, manufacturing, selling and licensing products and devices that assist in the early detection and diagnosis of disease.

66.     From 1999 through May 20, 2003, Scantek filed the periodic reports required of public companies by the SEC. For the periods after March 31, 2003, Scantek ceased filing its quarterly and annual reports (Forms 10Q and Forms 10K) and financial statements with the SEC in violation of federal securities law and its fiduciary obligations to its shareholders.

67.     Scantek reported the following financial information in its SEC filings:

|  | 9 months ended March 31, 2003 | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|---|
| Accumulated Deficit | $(14,678,582) | $(12,849,147) | $(10,827,551) | $(8,466,380) | $(5,649,915) |
| Stockholder's deficiency | $(9,318,526) | $(8,280,364) | $(6,815,733) | $(5,001,859) | $(2,364,728) |
| Net Sales | 0 | 0 | $21,137 | $88,775 | $855,275 |
| Net Loss | $(1,527,435) | $(2,021,596) | $(2,361,171) | $(2,816,465) | $(1,579,568) |
| Weighted Average # shares of common stock outstanding | 32,857,889 | 26,557,923 | 20,521,527 | 18,431,820 | 17,679,575 |

68.     Scantek's SEC filings reported negligible sales for the fiscal years ended June 30, 2000, and June 30, 2001, no sales for the fiscal year ended June 30, 2002, and no sales for the nine months ending March 31, 2003.  Each Form 10 K filed by Scantek reported that:

>   "The Company's need for funds has increased from period to period . . .  Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Operating Officer and major shareholder."

69.     In order to fund Scantek's capital needs,  Scantek, Sagi and the Mintz Parties structured private placements pursuant to which Scantek offered to sell investors a combination of its promissory notes and restricted common stock (collectively the "Securities"). The

Securities were purchased by Sabella, Accordant and numerous third parties, as well as

Scantek's President (Sagi), its Vice President and Secretary, its Vice President of Development,

and two directors.

70.      From 1999 through 2003, Scantek's Forms 10K reported information regarding

the following 18 private placements of the Securities under the heading "Recent Sales of

Unregistered Securities":

|    | Date     | Name                                    | Number of Shares Issued Pursuant to Financing | Office     |
|----|----------|-----------------------------------------|-----------------------------------------------|------------|
| 1  | 12/1/98  | three individuals                       | 75,000                                        |            |
| 2  | 7/1/99   | Sagi                                    | 79,250                                        | Pres./CEO  |
| 3  | 7/1/99   | Patricia Furness                        | 5,703                                         | V.P/Sec.   |
| 4  | 7/1/99   | Louis Gottlieb                          | 25,000                                        | V.P.       |
| 5  | 7/1/99   | Two individuals including Paul Nelson   | 52,500                                        | Director   |
| 6  | 12/30/99 | Two individuals including Paul Nelson   | 7,500                                         | Director   |
| 7  | 3/8/00   | Paul Nelson                             | 2,500                                         | Director   |
| 8  | 3/8/00   | Louis Gottlieb                          | 23,750                                        | V.P.       |
| 9  | 4/14/00  | Louis Gottlieb                          | 50,000                                        | V.P.       |
| 10 | 4/14/00  | Paul Nelson                             | 2,500                                         | Director   |
| 11 | 8/1/00   | Sagi                                    | 67,900                                        | Pres./CEO  |
| 12 | 8/1/00   | Patricia Furness                        | 8,750                                         | V.P/Sec.   |
| 13 | 10/20/00 | Carriage House                          | 100,000                                       |            |
| 14 | 12/14/01 | A lender                                | 300,000                                       |            |
| 15 | 6/30/02  | two companies                           | 79,390                                        |            |
| 16 | 6/30/02  | Sagi                                    | 6,435                                         | Pres./CEO  |
| 17 | 6/30/02  | Patricia Furness                        | 31,141                                        | V.P/Sec.   |
| 18 | 8/20/02  | Sabella                                 | 2,000,000                                     |            |

71.      Private placements of Securities after August 20, 2002 are not reported because

Scantek ceased its SEC filings.

72.      The financial statements of Scantek filed with the SEC reported that:

(a) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors secured notes in the face amount of $492,500 and 135,625 shares of common stock.

(b) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors unsecured notes in the face amount of $1,059,393 and 2,377,765 shares of common stock.

(c) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to Sagi and the Vice President of  Scantek unsecured notes in the face amount of $107,257 and 45,594 shares of common stock.

(d) During the years ended June 30, 2000, 2001 and 2002,  Scantek engaged in private placements of Securities pursuant to which it offered and sold Sagi unsecured notes in the face amount of $1,128,684 and 153,585 shares of common stock.

73.    The audited financial statements of Scantek and each of its SEC filings fail to include any reference to or discussion of the violation of any usury law by the officers, directors and third parties to whom Scantek issued the Securities.

**August 2002 Note**

74.    In August 2002, Scantek delivered to Sabella a document drafted by the Mintz Firm titled "Subscription Agreement" which set forth the proposed terms of the offering of Securities by Scantek to Sabella (the "August 2002 Subscription Agreement").  The August 2002 Subscription Agreement states:

1. The "Securities"

I hereby agree to invest $150,000 in Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a 10% promissory note in the principal amount of one hundred and fifty thousand ($150,000) dollars (the "Note"); and to purchase shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "8" of this Subscription Agreement . . . The Note and the Shares are hereinafter jointly referred to as the "Securities." I hereby agree to pay for the Securities subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

2.      Payment

I am herewith forwarding the aggregate amount of one hundred and fifty thousand ($150,000) dollars by wire transfer to the account of "Mintz & Fraade, P.C."

75.     Sabella paid to Mintz & Fraade, P.C. the sum of $150,000.

76.     Scantek issued to Sabella a promissory note dated August 20, 2002 in the principal amount of $253,250 (the "August 2002 Note"). The August 2002 Note reflected the incorporation and cancellation of a prior promissory note issued by Scantek to Sabella in April 2002, thereby extending the repayment date of the $100,000 and capitalizing unpaid interest in the amount of $3,250.

77.     The August 2002 Note bears interest at the rate of 10% per annum, and provides that in the event of a default, interest is payable at the rate of 24% per annum.

78.     The August 2002 Note requires monthly payments of interest and periodic principal payments, with the entire unpaid balance of principal and interest due and payable on February 20, 2003.

79.     The president of Scantek, Zsigmond L. Sagi ("Sagi") personally guaranteed the payment and performance of the obligations of Scantek by executing a guaranty at the end of the August 2002 Note.

80. The August 2002 Note requires Scantek to pay all reasonable costs of collection, including attorney's fees and costs.

81. The August 2002 Note provides that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision.

82. Scantek granted to Sabella a security interest in and collaterally assigned to Sabella any and all patents now or hereinafter owned by Scantek (the "Patents").

83. UCC-1 Financing Statements were filed in favor of Sabella to perfect a security interest in such collateral.

84. Scantek and Sagi delivered confessions of judgment with respect to the August 2002 Note.

85. The August 2002 Subscription Agreement provides for the purchase by Sabella of such number of shares of the common stock of Scantek as will result in ownership by Sabella of six percent of all issued and outstanding common stock, including previously purchased shares. Scantek's SEC filings report that Sabella purchased 2,000,000 shares for par value of $.001 per share pursuant to the August 2002 Subscription Agreement (the "Sabella Shares").

86. Scantek's financial statements filed with the SEC with it Form 10K for the year ended June 30, 2002 reported:

| | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|
| Proceeds from Borrowings | $311,460 | $575,600 | $473,215 | 1,150,000 |
| Number of shares issued for loan financing | 2,099,466 | 3,013,900 | 694,573 | 200,000 |
| Value | $2,099 | $3,015 | $694 | $200 |

87.    The 2,000,000 Sabella Shares issued on August 20, 2002 were included in the 2,099,466 shares reported as issued for the year ended June 30, 2002, for which Scantek's auditors reported a "Value" of $2,099, or a "Value" of $2,000 for the 2,000,000 Sabella Shares.

88.    Such valuation reflects the fact that the Sabella shares were restricted and could not be sold without the filing of a registration statement or otherwise complying with the rules and regulations regarding the sale of unregistered shares of stock.

89.    Such valuation reflects the facts that Scantek had no sales since December 2000, and that as of June 30, 2002, the date of Scantek's last audited financial statements, Scantek had a negative net worth of $.31 per share and an accumulated deficit of $.48 per share.

**February 2003 Note**

90.    In February 2003, Scantek delivered to Accordant a document drafted by the Mintz Firm titled "SUBSCRIPTION AGREEMENT" which purported to set forth the terms of the offering of $50,000 of securities by Scantek to Accordant (the "February 2003 Subscription Agreement"). The February 2003 Subscription Agreement states:

The "Securities"

1. The undersigned hereby agree to invest an aggregate of fifty thousand ($50,000) dollars in Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a promissory note in the principal amount of fifty thousand ($50,000) dollars bearing interest at the rate of one (1%) percent per month (the "Note"); and to the purchase of shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "9" of this Subscription Agreement. . . The Note and the Shares are hereinafter jointly referred to as the "Securities." The undersigned hereby agree to pay for the Securities subscribed for by the undersigned in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

Payment

2. We are herewith agreeing to forward the amount of the Subscription Price upon execution hereto to the account of "Mintz & Fraade, P.C."

91.     Accordant paid to Mintz & Fraade P.C. the sum of $50,000.

92.     The February 2003 Subscription Agreement, the August 2002 Subscription Agreement, and subscription agreements delivered to other investors provided for the delivery of funds in payment for the Securities to the operating account of "Mintz & Fraade, P.C.", not Scantek's operating account, and not an escrow account maintained by any attorney, bank or brokerage firm.  Due to Scantek's failure to prepare SEC reports and financial statements, the Mintz Firm has not accounted for the funds deposited into its account.

93.     Scantek issued to Accordant a promissory note dated February 10, 2003 in the principal amount of $50,000 (the "February 2003 Note").  The February 2003 Note bears interest at the rate of 12% per annum.  Interest and principal were payable in full on June 6, 2003.

94.     Sagi personally guaranteed the payment and performance of the obligations of Scantek by executing the February 2003 Note.

95.     The February 2003 Note requires Scantek to pay all reasonable costs of collection, including attorney's fees and costs.

96.     The February 2003 Note provides that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision of the note.

97.     The Sagi guarantee of the February 2003 Note was secured by 3,000,000 shares of common stock of Scantek owned by Sagi and stock powers executed by Sagi (the "Sagi Shares"), which were required to be held in escrow by the Mintz Firm pursuant to an Escrow Agreement dated March 5, 2003 (the "Escrow Agreement"). The Mintz Firm agreed to act as Escrow Agent for Accordant and has acted in such capacity from March 5, 2003 through the present day.  Accordant demanded proof that the Sagi Shares were held in escrow, and upon default, demanded release of the Sagi Shares to Accordant.

98.     The February 2003 Subscription Agreement provided for the purchase of 300,000 shares of common stock by Accordant. No such shares were issued by Scantek.

99.      The February 2003 Subscription Agreement provided for issuance of additional shares in the event of a default under the February 2003 Note.  No such shares were issued by Scantek.

**Additional Loans**

100.     From November 2003 through May 2004, Accordant loaned to Scantek $425,000 (the "Additional Accordant Loans"), which were funded by making the following wire transfers to the attorney escrow account of the Mintz Firm:

| | |
|---|---|
| November 13, 2003 | $25,000 |
| December 5, 2003 | $60,000 |
| December 12, 2003 | $40,000 |
| March 5, 2004 | $85,000 |
| April 6, 2004 | $125,000 |
| May 20, 2004 | $90,000 |

101.     The Additional Accordant Loans bore interest at the rate of 10% per annum and provided, that in the event of a default, interest is payable at the lesser of 18% per annum or the highest rate permitted under New York law.

102.     Sagi personally guaranteed the November 13, 2003 Additional Accordant Loan in the amount of $25,000.

103.     On February 17, 2004, Sabella loaned to Scantek the sum of $100,000, which was funded by wire transfer into the attorney escrow account of the Mintz Firm (the "Additional Sabella Loan")(the Additional Accordant Loans and Additional Sabella Loan are collectively referred to as the "Additional Loans").

104.    The Additional Sabella Loan bore interest at the rate of 10% per annum and provided that in the event of a default, interest is payable at lesser of 18% per annum or the highest rate permitted under New York law.

105.    All Additional Loans have matured.

**Defaults**

106.    Scantek made no payments of principal or interest to Sabella or Accordant under the August 2002 Promissory Note, the February 2003 Promissory Note, the Additional Accordant Loans or the Additional Sabella Loan.

107.    Sabella and Accordant notified Scantek, Sagi and the Mintz Firm of the defaults, demanded payment in full, and demanded release of the collateral securing the indebtedness, including the Patents collaterally assigned to Sabella and the Sagi Shares which the Mintz Firm agreed to hold in escrow on behalf of Accordant.

108.    Scantek failed to make any payments or release any collateral.

**AFFIRMATIVE DEFENSE I**

109.    Plaintiff's claims are barred by the doctrine of estoppel.

**AFFIRMATIVE DEFENSE II**

110.    Plaintiff's claims are barred by the doctrine of unclean hands.

**COUNTERCLAIM I AND AFFIRMATIVE DEFENSE III**
**For Breach of Contract**

111.    Sabella repeats and realleges each and every allegation contained in paragraphs 44  through 108 as if fully set forth herein.

112.    Scantek is duly indebted to Sabella for $353,250, plus interest.

113.    Scantek failed to make any payments to Sabella.

114.    Sabella provided notices of default and demand that Scantek cure the defaults.

115.    Scantek has no defense to payment of the sums due to Sabella.

116.    Sabella is entitled to damages in the amount of $353,250, plus interest from August 20, 2002 on the outstanding balance, plus all reasonable costs of collection, including attorney's fees and costs.

## COUNTERCLAIM II
### For Declaratory Judgment Regarding Patents

117.    Sabella repeats and realleges each and every allegation contained in paragraphs 44 through 108 and 111 through 116 as if fully set forth herein.

118.    In August 2002, Scantek delivered to Sabella a Collateral Assignment (the "Assignment") which provided that Scantek, as security for the repayment of the August 2002 Note, "hereby collaterally assigns to Angela Chen Sabella . . . any and all Patents now or hereinafter owned by Scantek . . . which assignment shall take place upon the occurrence of an Event of Default pursuant to the Note and the failure to cure such event of Default within the applicable time to cure."

119.    The August 2002 Note provided for payment in full by February 20, 2003.

120.    Scantek defaulted on such payment and failed to pay the balance due five business days after receipt of notice of default.

121.    Under the terms of the Assignment, all patents owned by Scantek were assigned to Sabella upon such default and failure to cure.

122.    Sabella is entitled to an order requiring Scantek to execute an assignment of all patents owned by Scantek to be recorded in the United States Patent and Trademark Office.

## COUNTERCLAIM III AND AFFIRMATIVE DEFENSE IV
### For Breach of Contract

123.    Accordant repeats and realleges each and every allegation contained in paragraphs 44 through 108 and 111 through 122 as if fully set forth herein.

124.    Scantek is duly indebted to Accordant for the sum of $475,000, plus interest from February 10, 2003, on the outstanding balance, plus late fees.

125.    Scantek failed to make any payments to Accordant.

126.    Accordant provided notices of default and demand that Scantek cure such default.

127.    Scantek has no defense to payment of the sums due to Accordant.

128.    Accordant is entitled to damages in the amount of $475,000, plus interest from February 10, 2003 on the outstanding balance, plus late fees, plus all reasonable costs of collection, including attorney's fees and costs.

## COUNTERCLAIM IV
### For Fraudulent Conveyance

129.    Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 44 through 108 and 111 through 128 as if fully set forth herein.

130.    On or about March 15, 2007, Scantek announced that it created a limited liability company, Gibraltar and entered into a distribution agreement with Gibraltar granting to Gibraltar distribution rights to a Scantek medical device in more than 150 countries throughout the world (the "Gibraltar Distribution Agreement"). The granting of such rights constituted a conveyance within the meaning of New York Debtor Creditor Law Section 270.

131.    Upon information and belief, such conveyance was made without fair consideration to Scantek within the meaning of New York Debtor Creditor Law Section 272.

132.    Upon information and belief, such conveyance was made at a time Scantek was insolvent within the meaning of New York Debtor Creditor Law Section 271.

133.    Upon information and belief, the property remaining in Scantek's hands after the conveyance to Gibraltar was an unreasonably small capital within the meaning of New York Debtor Creditor Law Section 274.

134.    Upon information and belief, the conveyance to Gibraltar was made with actual intent to hinder, delay or defraud Sabella and Accordant within the meaning of New York Debtor Creditor Law Section 276.

135.    Sabella and Accordant are entitled to have the Gibraltar Distribution Agreement set aside or annulled.

### COUNTERCLAIM V AND AFFIRMATIVE DEFENSE V
### For Common Law Fraud

136.    Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 44 through 108 and 111 through 135 as if fully set forth herein.

137.    In order to fund the its capital needs, Scantek structured private placements pursuant to which Scantek sold the Securities to numerous investors.

138.    The private placements were a device, scheme or article to defraud investors because, upon information and belief, Scantek, Sagi and the Mintz Parties structured the transactions with the intent of claiming that the Securities violated New York State criminal usury laws and were voidable by Scantek.

139.    Upon information and belief, Scantek was engaged in a scheme to issue Securities which Scantek did not intend to honor.

140.    Scantek, Sagi and the Mintz Parties had the authority and, in fact, ability to control the contents of the disclosures made in connection with the offering of the Securities to

Accordant and Sabella, including the Subscription Agreements and the Forms 10K and 10 Q

filed with the SEC, and other false and misleading statements and material omissions to Sabella

and Accordant. Scantek, Sagi and the Mintz Parties were aware that the statements made to

Accordant and Sabella were misleading and contained material omissions, and had the ability

and opportunity to prevent such statements and omissions or cause them to be corrected, but

failed to do so.

141.    Upon information and belief, the Mintz Parties engaged in similar schemes by

structuring securities offerings on behalf of other issuers and then attempting to void the

securities by claiming violation of usury laws.

142.    Scantek selected New York law as the governing law for the Securities even

though New York had no connection to the transactions because New York law allows a

corporation to interpose the defense of criminal usury.  Scantek did not select Delaware law,

under which the defense of usury is not available to corporations pursuant to 6 Del.C. § 2306.

Scantek did not select New Jersey law, under which loans in the amount of $50,000.00 or more

may be made at any rate of interest pursuant to N.J.S.A. 31:1-1(e)(1).

143.    Scantek had a duty to disclose any risk that the Securities were not duly and

validly issued and enforceable in accordance with their terms and any risk that the Securities

violated any law.

144.    Scantek failed to disclose the opinion of its counsel that the Securities violated

New York state usury law and were not duly and validly issued and enforceable in accordance

with their terms.

145.    Scantek, Sagi and the Mintz Parties filed Forms 10K and Forms 10Q and audited

financial statements with the SEC which disclosed and discussed numerous private placements

of the Securities from 1999 through 2003 to third parties as well as officers and directors of Scantek.

146.    The Scantek SEC filings contain no reference to or discussion of a purported violation of any usury law by the officers, directors and third parties to whom Scantek issued the Securities.

147.    Scantek's audited financial statements report such transactions in accordance with generally accepted accounting principles without discussion of potential violation of any usury law and in fact "blessed" the transactions.

148.    Scantek induced Sabella and Accordant to acquire the Securities and make the Additional Loans by making false statements to Sabella and Accordant that sales of medical devices by Scantek in Brazil were imminent. Pursuant to their scheme to deceive Sabella about the status of such sales, a provision was included in the August 2002 Note providing for payment to Sabella of $.475 for each  medical device sold in Brazil until principal and interest were paid in full.

149.    Scantek's Form 10K filed with the SEC for the calendar year ending June 30, 2001, included false statements that Scantek "expects to ship the BreastCare (TM)/BreastAlert(TM) device from the United States during the fourth quarter of calendar 2001 to Brazil" and "shipments to other parts of South America and Europe will commence during the latter part of 2002."  Scantek did not expect such shipments to commence as stated and included such false statements to induce investors to purchase Securities.

150.    Scantek's Form 10K filed with the SEC for the calendar year ending June 30, 2002, included false statements that Scantek "expects to ship the BreastCare (TM)/ BreastAlert(TM) device from the United States during the fourth quarter of calendar 2002 to

Brazil" and "expects cash flow from sales commencing in the fourth quarter of calendar 2002."
Scantek did not expect such shipments to commence and cash flow to commence in the fourth
quarter of 2002 and included such false statements to induce investors to purchase Securities.

151.    Scantek's Form 10Q filed with the SEC on May 20, 2003 for the quarter ending
March 31, 2003, included false statements that Scantek (a) anticipates sale of its entire inventory
in calendar year 2003, and (b) the Company expects cash flow from sales commencing in 2003
to cover operations of the Company through December 2003.

152.    Scantek induced Sabella and Accordant to invest in the Securities and to make the
Additional Loans by making false oral and written statements to Sabella and Accordant from
April 2002 through the May 20, 2004. These statements included regarding the quantity of orders
received for Scantek products in Brazil, that Scantek's sales of medical devices in Brazil had
commenced, and that Scantek had commenced earning revenue from such sales which would be
used by Scantek to repay its obligations to Sabella and Accordant.

153.    On April 24, 2002, Scantek and Sagi falsely represented to defendant Sabella in
writing that the proceeds of the initial $100,000 loan made by Sabella "will be used exclusively
would be used solely for our Brazilian activities.  It will not be used to pay any outstanding
debts."

154.    On January 14, 2003, Scantek and Sagi represented to defendants in writing that
an order for 100,000 Breastcare units had been confirmed and would be emitted with a letter of
credit inside of 30 days.

155.    In May 2003, Scantek falsely represented to defendants in writing that a test by
INCA (Brazilian National Institute of Cancer) would start on May 15, 2003.

156.    In May 2003, Scantek's private placement memorandum (a) falsely represented that Scantek had largely executed its strategy in South America of establishing a regional manufacturing and/or assembly center to supply demand created by local marketing partners. Scantek (b) failed to disclose that sales to Brazil had not yet commenced, (c) failed to disclose that orders in Brazil (which Scantek represented had been received) had not been shipped by Scantek, (d) falsely represented that Scantek has received approvals required for sale of its products in Brazil, and (e) failed to disclose that Scantek had not received an import license in Brazil required to ship products to Brazil.

157.    Scantek made misrepresentations of numerous material facts and failed to disclose material facts to Sabella and Accordant, as set forth above.

158.    Scantek made the misrepresentations intentionally or recklessly in order to deceive Sabella and Accordant.

159.    Sabella and Accordant justifiably relied on the misrepresentations made by Scantek.

160.    Accordant and Sabella would not have invested in Scantek if Scantek had not made the misrepresentations set forth above and such misrepresentations caused Accordant and Sabella to suffer a loss in an amount to be proven at trial.

161.    Scantek had knowledge of the existence of the misrepresentations and rendered substantial assistance to the fraud.

162.    Scantek is liable to Accordant and Sabella for damages suffered in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Scantek.

## COUNTERCLAIM VI AND AFFIRMATIVE DEFENSE VI
### For Violation of Section 10(b) of the 1934 Act

163.    Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 44 through 108 and 111 through 162 as if fully set forth herein.

164.    Accordant and Sabella relied on the untrue statements and omissions of Scantek, Sagi and the Mintz Parties in investing in Scantek. Accordant and Sabella would not have made such investment if Scantek, Sagi and the Mintz Parties had not made material misstatements and misrepresentations.

165.    Scantek, Sagi and the Mintz Parties induced Accordant and Sabella to rely on the material misstatements and misrepresentations knowing that such representations were false and in doing so, intended to deceive, manipulate, or defraud Accordant and Sabella. Scantek, Sagi and the Mintz Parties knew that Accordant and Sabella would not invest if the material facts had been disclosed.

166.    Accordant and Sabella sustained damages as the proximate result of the untrue statements and omissions.

167.    At all relevant times, Scantek, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct whereby it knowingly and/or recklessly made materially false and misleading statements to induce Accordant and Sabella to invest in Scantek.

168.    Scantek is a direct participant in the wrongs complained of herein.  Scantek did, directly or indirectly, control the content of the disclosures and other statements made to induce Accordant and Sabella to invest in Scantek and failed to correct those statements in timely fashion once it knew or was reckless in not knowing that those statements were no longer true or accurate.

169.    Scantek had actual knowledge of the facts making the material statements false and misleading, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though same were available to Scantek.

170.    Without knowledge of the true facts concerning the Securities and the scheme engaged in by Scantek, Sagi and the Mintz Parties, Accordant and Sabella invested in the Securities and made the Additional Loans and have been damaged thereby.

171.    Accordant and Sabella have incurred a loss in an amount to be proven at trial.

172.    By virtue of the foregoing, Scantek violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

173.    By virtue of the conduct alleged herein, Scantek is liable to Accordant and Sabella for damages suffered in an amount to be proven at trial, but in no event less than $828,250, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Scantek.

### COUNTERCLAIM VII AND AFFIRMATIVE DEFENSE VII
### Common Law Negligent Misrepresentation

174.    Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 44 through 108 and 111 through 173 as if fully set forth herein.

175.    Scantek acted with carelessness in imparting words by making the material misstatements and misrepresentations to Accordant and Sabella as set forth above.

176.    Scantek expected Accordant and Sabella to rely on such misstatements and misrepresentations.

177.    Accordant and Sabella acted upon the misstatements and misrepresentations of Scantek in investing in Scantek, to their damage.

178.    Scantek directed the words directly to Accordant and Sabella, with knowledge that they would be acted upon by Accordant and Sabella.

179.    As the issuer of securities, Scantek was bound to Accordant and Sabella by a relation of duty or care.

180.    Scantek is liable for the aforesaid wrongful conduct and is liable to Accordant and Sabella for damages suffered in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Scantek, Sagi and the Mintz Parties.

## JURY DEMAND

Accordant and Sabella hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Accordant and Sabella demand judgment:

a.    On Counterclaim I, awarding damages to Sabella from Scantek in an amount to be proven at trial, but in no event less than $353,250, plus interest from August 20, 2003, plus attorneys fees;

b.    On Counterclaim II, ordering Scantek to execute an assignment to Sabella of all patents owned by Scantek to be recorded in the United States Patent and Trademark Office.

c.    On Counterclaim III, awarding damages to Accordant from Scantek in an amount to be proven at trial, but in no event less than $475,000, plus interest from February 10, 2003, plus late fees and attorneys fees;

d.    On Counterclaim IV, entering an order declaring that Gibraltar Distribution Agreement is null and void;

e.    On Counterclaim V, awarding damages to Sabella and Accordant from Scantek in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

f.    On Counterclaim VI, awarding damages to Sabella and Accordant from Scantek in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

g.    On Counterclaim VII, awarding damages to Sabella and Accordant from Scantek in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct; and

       h.      Awarding such other relief as this Court deems just and proper.

Dated: New York, New York
      April 17, 2008

                            McCue Sussmane & Zapfel, P.C.


                            By:_____/S/_____
                            Kenneth Sussmane (KS 9301)
                            521 Fifth Avenue, 28th Floor
                            New York, New York  10175
                            212-931-5500
                            ksussmane@mszpc.com