**AFFIRMATION**

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NEW YORK  )


    Keith G. Sklar, being duly sworn, deposes and says, that: I am an attorney duly admitted to practice law in New York, I am not a party to the within action, am over the age of 18 years, and reside in Fairfield County, Connecticut; that on April 17, 2008, I caused the Amended Third Party Complaint to be served on the following person by mailing the same in a sealed envelope with postage prepaid thereon, in an official depository of the U.S. Postal Service within the State of New York:


Mintz and Fraade, P.C.
Attorneys for Third Party Defendants
488 Madison Avenue
New York, New York 10022


Keith Sklar


Dated:    New York New York
          April 17, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X  Case No. 08 cv 00453 (CM)

SCANTEK MEDICAL INC.,                                  :

                                            :  AMENDED

               Plaintiff,                              :  THIRD PARTY COMPLAINT

                                            :

      vs.                                              :

                                              :

ANGELA CHEN SABELLA and ACCORDANT              :
HOLDINGS, LLC,                                         :

                                              :

               Defendants and Third-Party          :
               Plaintiffs,                              :

      vs.                                              :

                                              :

MINTZ & FRAADE, P.C., FRED MINTZ, ALAN        :
FRAADE, MINTZ & FRAADE ENTERPRISES,          :
LLC, ZSIGMOND L. SAGI, and GIBRALTAR          :
GLOBAL MARKETING LLC.                              :

                                            :

               Third-Party Defendants.            :

------------------------------------------------------------ X

        Accordant Holdings LLC ("Accordant") and Angela Chen Sabella ("Sabella")

(collectively "Defendants" or "Third-Party Plaintiffs"), by and through their attorneys, McCue

Sussmane & Zapfel, P.C., as and for their amended third-party complaint allege, upon

information and belief, as follows:

## SUMMARY OF CLAIMS

        1.     Scantek Medical, Inc. ("Scantek" or the "Company") commenced this action

seeking a judgment declaring that $303,280.80 of promissory notes and 2,000,000 shares of

common stock issued by Scantek to Sabella and Accordant are void under New York criminal

usury law. Such securities represent a portion of the $828,250 invested by Sabella and Accordant

in Scantek.

        2.     Accordant and Sabella bring third-party claims for common law fraud and

negligent misrepresentation, and federal securities fraud. In connection with the sale of securities

of Scantek, Third-Party Defendants and Scantek made numerous untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of the Section 10(b) Securities Exchange Act of 1934 (the "1934 Act").

3.    Scantek and Third-Party Defendants failed to state to Accordant and Sabella the material facts that they believed that securities offered by Scantek violated New York criminal usury laws and were voidable by Scantek.

4.    Scantek and Third-Party Defendants failed to state to Accordant and Sabella the material fact that Scantek and Third-Party Defendants were engaged in a scheme to issue securities that Scantek did not intend to honor.

5.    Scantek and Third-Party Defendants made numerous false statements regarding Scantek in its Forms 10K and 10Q filed with the U.S. Securities and Exchange Commission ("SEC").

6.    Scantek and Third-Party Defendants intended to deceive, manipulate, or defraud Accordant and Sabella, who relied on such misrepresentations, and sustained damages as a proximate result thereof.

7.    Accordant and Sabella bring third-party claims against their attorneys Mintz & Fraade P.C. (the "Mintz Firm"), Alan Fraade and Fred Mintz for malpractice and breach of fiduciary duty. The Mintz Firm, Mr. Fraade, and Mr. Mintz failed to advise Accordant and Sabella of their opinion that the securities offering that they structured and drafted violated New York criminal usury statutes, and that Scantek and Third-Party Defendants were engaged in a scheme to issue securities which Scantek did not intend to honor. The Mintz Firm had conflicts of interest, which conflicts were not waived.

2

8.      Accordant and Sabella bring this action against Zsigmond l. Sagi ("Sagi"), the president and largest shareholder of Scantek as the result of his personal guarantee of certain obligations of Scantek and for federal securities fraud, common law fraud and negligent misrepresentation, and breach of fiduciary duty.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332 and 1338, and pursuant to Section 27 of the Securities Exchange Act of 1934 (the "1934 Act"). Third-Party Plaintiffs assert counterclaims and third-party claims arising under Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §78j(b) and 78t(a), and Rule l0b-5, 17 C.F.R.§240.10b-5, promulgated thereunder by the Securities and Exchange Commission, and 35 U.S.C. §261.

10.      There is complete diversity of citizenship and the amount in controversy exceeds $75,000.

11.      Venue is proper in this District pursuant to 28 U.S.C.§ 1391(b). Many of the acts giving rise to the violations complained of occurred in this District and at least two of the Third-Party Defendants reside in this District.

## THE PARTIES

12.      Accordant is a Delaware limited liability company which maintains its sole place of business in the state of California.

13.      Angela Chen Sabella ("Sabella") is an individual residing in the state of California and is the sole member of Accordant.

14.      Scantek is a Delaware corporation which maintains its principal place of business at 1705 Route 46 West, Unit 5, Ledgewood, New Jersey 07852.

15.     Third-Party Defendant Zsigmond L. Sagi ("Sagi") is the President and a director of Scantek and a resident of the State of New Jersey.

16.     Third-Party Defendant Mintz & Fraade P.C. (the "Mintz Firm") is a New York professional corporation with offices at 488 Madison Avenue, New York, New York 10022.

17.     Third-Party Defendant Fred Mintz ("Mintz") is a resident of the State of New York and a practicing attorney who, upon information and belief, is a shareholder of the Mintz Firm, Mintz & Fraade LLC and a member of Mintz LLC.

18.     Third-Party Defendant Alan Fraade ("Fraade") is a resident of the State of New York and a practicing attorney who, upon information and belief, is a shareholder of the Mintz Firm, Mintz & Fraade LLC and a member of Mintz LLC.

19.     The Mintz Firm, Fraade and Mintz were counsel to Scantek at all times relevant hereto.

20.     The Mintz Firm represented Sabella in connection with certain investments made by Sabella on or about the time of her investments in Scantek.

21.     Third-Party Defendant Mintz & Fraade Enterprises, LLC ("Mintz LLC") is a New York limited liability company with offices at 488 Madison Avenue, New York, New York 10022. (Mintz LLC, the Mintz Firm, Mintz and Fraade are collectively referred to as the "Mintz Defendants").

22.     Mintz LLC is Scantek's second largest shareholder, holding at least 3,300,000 shares of Scantek Common Stock issued in exchange for the legal services of the Mintz Firm and Fred Mintz. Such shares include 3,000,000 shares (over 9% of Scantek's common stock) issued to the Mintz Firm as payment for $45,000 of legal services.

4

23.    Gibraltar Global Marketing LLC is a Delaware limited liability company formed in January 2007 by Scantek and Mintz LLC ("Gibraltar"), which maintains its principal place of business at 1705 Route 46 West, Unit 5, Ledgewood, New Jersey 07852. Scantek and Mintz LLC are members of Gibraltar.

## FACTS

24.    Scantek is a publicly-held company listed on the "pink sheets" under the symbol SKML.

25.    Scantek claims to be engaged in the business of developing, manufacturing, selling and licensing products and devices that assist in the early detection and diagnosis of disease.

26.    From 1999 through May 20, 2003, Scantek filed the periodic reports required of public companies by the SEC. For the periods after March 31, 2003, Scantek ceased filing its quarterly and annual reports (Forms 10Q and Forms 10K) and financial statements with the SEC in violation of federal securities law and its fiduciary obligations to its shareholders.

27.    Scantek reported the following financial information in its SEC filings:

|  | 9 months ended March 31, 2003 | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|---|
| Accumulated Deficit | $(14,678,582) | $(12,849,147) | $(10,827,551) | $(8,466,380) | $(5,649,915) |
| Stockholder's deficiency | $(9,318,526) | $(8,280,364) | $(6,815,733) | $(5,001,859) | $(2,364,728) |
| Net Sales | 0 | 0 | $21,137 | $88,775 | $855,275 |
| Net Loss | $(1,527,435) | $(2,021,596) | $(2,361,171) | $(2,816,465) | $(1,579,568) |
| Weighted Average # shares of common stock outstanding | 32,857,889 | 26,557,923 | 20,521,527 | 18,431,820 | 17,679,575 |

5

28.    Scantek's SEC filings reported negligible sales for the fiscal years ended June 30, 2000, and June 30, 2001, no sales for the fiscal year ended June 30, 2002, and no sales for the nine months ending March 31, 2003.  Each Form 10 K filed by Scantek reported that:

> "The Company's need for funds has increased from period to period . . . Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Operating Officer and major shareholder."

29.    In order to fund Scantek's capital needs, Third-Party Defendants structured private placements pursuant to which Scantek offered to sell investors a combination of its promissory notes and restricted common stock (collectively the "Securities"). The Securities were purchased by Sabella, Accordant and numerous third parties, as well as Scantek's President (Sagi), its Vice President and Secretary, its Vice President of Development, and two directors.

30.    From 1999 through 2003, Scantek's Forms 10K reported information regarding the following 18 private placements of the Securities under the heading "Recent Sales of Unregistered Securities":

|   | Date | Name | Number of Shares Issued Pursuant to Financing | Office |
|---|---|---|---|---|
| 1 | 12/1/98 | three individuals | 75,000 | |
| 2 | 7/1/99 | Sagi | 79,250 | Pres./CEO |
| 3 | 7/1/99 | Patricia Furness | 5,703 | V.P/Sec. |
| 4 | 7/1/99 | Louis Gottlieb | 25,000 | V.P. |
| 5 | 7/1/99 | Two individuals including Paul Nelson | 52,500 | Director |
| 6 | 12/30/99 | Two individuals including Paul Nelson | 7,500 | Director |
| 7 | 3/8/00 | Paul Nelson | 2,500 | Director |
| 8 | 3/8/00 | Louis Gottlieb | 23,750 | V.P. |
| 9 | 4/14/00 | Louis Gottlieb | 50,000 | V.P. |
| 10 | 4/14/00 | Paul Nelson | 2,500 | Director |
| 11 | 8/1/00 | Sagi | 67,900 | Pres./CEO |
| 12 | 8/1/00 | Patricia Furness | 8,750 | V.P/Sec. |
| 13 | 10/20/00 | Carriage House | 100,000 | |

6

|    | Date     | Name             | Number of Shares Issued Pursuant to Financing | Office     |
|----|----------|------------------|-----------------------------------------------|------------|
| 14 | 12/14/01 | A lender         | 300,000                                       |            |
| 15 | 6/30/02  | two companies    | 79,390                                        |            |
| 16 | 6/30/02  | Sagi             | 6,435                                         | Pres./CEO  |
| 17 | 6/30/02  | Patricia Furness | 31,141                                        | V.P/Sec.   |
| 18 | 8/20/02  | Sabella          | 2,000,000                                     |            |

31.     Private placements of Securities after August 20, 2002 are not reported because Scantek ceased its SEC filings.

32.     The financial statements of Scantek filed with the SEC reported that:

(a) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors secured notes in the face amount of $492,500 and 135,625 shares of common stock.

(b) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors unsecured notes in the face amount of $1,059,393 and 2,377,765 shares of common stock.

(c) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to Sagi and the Vice President of Scantek unsecured notes in the face amount of $107,257 and 45,594 shares of common stock.

(d) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold Sagi unsecured notes in the face amount of $1,128,684 and 153,585 shares of common stock.

33.     The audited financial statements of Scantek and each of its SEC filings fail to include any reference to or discussion of the violation of any usury law by the officers, directors and third parties to whom Scantek issued the Securities.

**August 2002 Note**

34.     In August 2002, Scantek delivered to Sabella a document drafted by the Mintz Firm titled "SUBSCRIPTION AGREEMENT" which set forth the proposed terms of the offering of Securities by Scantek to Sabella (the "August 2002 Subscription Agreement"). The August 2002 Subscription Agreement states:

> 1. The "Securities"
>
> I hereby agree to invest $150,000 in Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a 10% promissory note in the principal amount of one hundred and fifty thousand ($150,000) dollars (the "Note"); and to purchase shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "8" of this Subscription Agreement . . . The Note and the Shares are hereinafter jointly referred to as the "Securities." I hereby agree to pay for the Securities subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").
>
> 2.     Payment
>
> I am herewith forwarding the aggregate amount of one hundred and fifty thousand ($150,000) dollars by wire transfer to the account of "Mintz & Fraade, P.C."

35.     Sabella paid to Mintz & Fraade, P.C. the sum of $150,000.

36.     Scantek issued to Sabella a promissory note dated August 20, 2002 in the principal amount of $253,250 (the "August 2002 Note"). The August 2002 Note reflected the incorporation and cancellation of a prior promissory note issued by Scantek to Sabella in April 2002, thereby extending the repayment date of the $100,000 and capitalizing unpaid interest in the amount of $3,250.

8

37.    The August 2002 Note bears interest at the rate of 10% per annum, and provides that in the event of a default, interest is payable at the rate of 24% per annum.

38.    The August 2002 Note requires monthly payments of interest and periodic principal payments, with the entire unpaid balance of principal and interest due and payable on February 20, 2003.

39.    The president of Scantek, Zsigmond L. Sagi ("Sagi") personally guaranteed the payment and performance of the obligations of Scantek by executing a guaranty at the end of the August 2002 Note.

40.    The August 2002 Note requires Scantek to pay all reasonable costs of collection, including attorney's fees and costs.

41.    The August 2002 Note provides that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision.

42.    Scantek granted to Sabella a security interest in and collaterally assigned to Sabella any and all patents now or hereinafter owned by Scantek (the "Patents").

43.    UCC-1 Financing Statements were filed in favor of Sabella to perfect a security interest in such collateral.

44.    Scantek and Sagi delivered confessions of judgment with respect to the August 2002 Note.

45.    The August 2002 Subscription Agreement provides for the purchase by Sabella of such number of shares of the common stock of Scantek as will result in ownership by Sabella of six percent of all issued and outstanding common stock, including previously purchased shares. Scantek's SEC filings report that Sabella purchased 2,000,000 shares for par value of $.001 per share pursuant to the August 2002 Subscription Agreement (the "Sabella Shares").

46.    Scantek's financial statements filed with the SEC with it Form 10K for the year ended June 30, 2002 reported:

|  | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|
| Proceeds from Borrowings | $311,460 | $575,600 | $473,215 | 1,150,000 |
| Number of shares issued for loan financing | 2,099,466 | 3,013,900 | 694,573 | 200,000 |
| Value | $2,099 | $3,015 | $694 | $200 |

47.    The 2,000,000 Sabella Shares issued on August 20, 2002 were included in the 2,099,466 shares reported as issued for the year ended June 30, 2002, for which Scantek's auditors reported a "Value" of $2,099, or a "Value" of $2,000 for the 2,000,000 Sabella Shares.

48.    Such valuation reflects the fact that the Sabella shares were restricted and could not be sold without the filing of a registration statement or otherwise complying with the rules and regulations regarding the sale of unregistered shares of stock.

49.    Such valuation reflects the facts that Scantek had no sales since December 2000, and that as of June 30, 2002, the date of Scantek's last audited financial statements, Scantek had a negative net worth of $.31 per share and an accumulated deficit of $.48 per share.

**February 2003 Note**

50.    In February 2003, Scantek delivered to Accordant a document drafted by the Mintz Firm titled "Subscription Agreement" which purported to set forth the terms of the offering of $50,000 of securities by Scantek to Accordant (the "February 2003 Subscription Agreement"). The February 2003 Subscription Agreement states:

The "Securities"

1. The undersigned hereby agree to invest an aggregate of fifty thousand ($50,000) dollars in Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a

promissory note in the principal amount of fifty thousand ($50,000) dollars bearing interest at the rate of one (1%) percent per month (the "Note"); and to the purchase of shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "9" of this Subscription Agreement. . . The Note and the Shares are hereinafter jointly referred to as the "Securities." The undersigned hereby agree to pay for the Securities subscribed for by the undersigned in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

Payment

2. We are herewith agreeing to forward the amount of the Subscription Price upon execution hereto to the account of "Mintz & Fraade, P.C."

51.    Accordant paid to Mintz & Fraade P.C. the sum of $50,000.

52.    The February 2003 Subscription Agreement, the August 2002 Subscription Agreement, and subscription agreements delivered to other investors provided for the delivery funds in payment for the Securities to the operating account of "Mintz & Fraade, P.C.", not Scantek's operating account, and not an escrow account maintained by any attorney, bank or brokerage firm. Due to Scantek's failure to prepare SEC reports and financial statements, the Mintz Firm has not accounted for the funds deposited into its account.

53.    Scantek issued to Accordant a promissory note dated February 10, 2003 in the principal amount of $50,000 (the "February 2003 Note"). The February 2003 Note bears interest at the rate of 12% per annum. Interest and principal were payable in full on June 6, 2003.

54.    Sagi personally guaranteed the payment and performance of the obligations of Scantek by executing the February 2003 Note.

55.    The February 2003 Note requires Scantek to pay all reasonable costs of collection, including attorney's fees and costs.

56.    The February 2003 Note provides that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision of the note.

11

57.     The Sagi guarantee of the February 2003 Note was secured by 3,000,000 shares of common stock of Scantek owned by Sagi and stock powers executed by Sagi (the "Sagi Shares"), which were required to be held in escrow by the Mintz Firm pursuant to an Escrow Agreement dated March 5, 2003 (the "Escrow Agreement"). The Mintz Firm agreed to act as Escrow Agent for Accordant and has acted in such capacity from March 5, 2003 through the present day. Accordant demanded proof that the Sagi Shares were held in escrow, and upon default, demanded release of the Sagi Shares to Accordant.

58.     The February 2003 Subscription Agreement provided for the purchase of 300,000 shares of common stock by Accordant. No such shares were issued by Scantek.

59.     The February 2003 Subscription Agreement provided for issuance of additional shares in the event of a default under the February 2003 Note. No such shares were issued by Scantek.

**Additional Loans**

60.     From November 2003 through May 2004, Accordant loaned to Scantek $425,000 (the "Additional Accordant Loans"), which were funded by making the following wire transfers to the attorney escrow account of the Mintz Firm:

| | |
|---|---|
| November 13, 2003 | $25,000 |
| December 5, 2003 | $60,000 |
| December 12, 2003 | $40,000 |
| March 5, 2004 | $85,000 |
| April 6, 2004 | $125,000 |
| May 20, 2004 | $90,000 |

61.     The Additional Accordant Loans bore interest at the rate of 10% per annum and provided, that in the event of a default, interest is payable at the lesser of 18% per annum or the highest rate permitted under New York law.

62.    Sagi personally guaranteed the payment and performance of the obligations of Scantek to repay the $25,000 Additional Accordant Loan made on November 13, 2003.

63.    On February 17, 2004, Sabella loaned to Scantek the sum of $100,000, which was funded by wire transfer into the attorney escrow account of the Mintz Firm (the "Additional Sabella Loan")(the Additional Accordant Loans and Additional Sabella Loan are collectively referred to as the "Additional Loans").

64.    The Additional Sabella Loan bore interest at the rate of 10% per annum and provided that in the event of a default, interest is payable at lesser of 18% per annum or the highest rate permitted under New York law.

65.    All Additional Loans have matured.

**Defaults**

66.    Scantek made no payments of principal or interest to Sabella or Accordant under the August 2002 Promissory Note, the February 2003 Promissory Note, the Additional Accordant Loans or the Additional Sabella Loan.

67.    Sabella and Accordant notified Scantek and Third-Party Defendants of the defaults, demanded payment in full, and demanded release of the collateral securing the indebtedness, including the Patents collaterally assigned to Sabella and the Sagi Shares which the Mintz Firm agreed to hold in escrow on behalf of Accordant.

68.    Scantek and Third-Party Defendants failed to make any payments or release any collateral.

## COUNT I
### Breach of Contract
### By Sabella against Sagi

69.     Sabella repeats and realleges each and every allegation contained in paragraphs 1 through 68 as if fully set forth herein.

70.     Scantek is duly indebted to Sabella for the principal sum of $253,250, plus interest and legal fees pursuant to the August 2002 Note.

71.     Scantek failed to make any payments to Sabella.

72.     Sagi guaranteed the obligations of Scantek to Sabella pursuant to the August 2002 Note.

73.     Sabella provided notices of default and demand that Sagi cure the defaults.

74.     Sagi has no defense to payment of the sums due to Sabella.

75.     Sabella is entitled to damages in the amount of $253,250, plus interest from August 20, 2002 on the outstanding balance, plus all reasonable costs of collection, including attorney's fees and costs.

## COUNT II
### Breach of Contract
### By Accordant Against Sagi

76.     Accordant repeats and realleges each and every allegation contained in paragraphs 1 through 75 as if fully set forth herein.

77.     Scantek is duly indebted to Accordant for the principal sum of $50,000 pursuant to the February 2003 Note, and $25,000 pursuant to the November 2003 Note, plus interest from February 10, 2003 on the outstanding balance, plus late fees and legal fees.

78.     Scantek failed to make any payments to Accordant.

14

79.    Sagi guaranteed the obligations of Scantek to Accordant.

80.    Accordant provided notices of default and demand that Sagi cure such default.

81.    Sagi has no defense to payment of the sums due to Accordant.

82.    Accordant is entitled to damages in the amount of $75,000, plus interest from February 10, 2003 on the outstanding balance, plus late fees, plus all reasonable costs of collection, including attorney's fees and costs.

## COUNT III
### Breach of Contract
### By Accordant Against Sagi and Mintz Firm

83.    Accordant repeats and realleges each and every allegation contained in paragraphs 1 through 82 as if fully set forth herein.

84.    Sagi pledged to Accordant the Sagi Shares as collateral for his guarantee of the February 2003 Note, which shares were required to be held in escrow by the Mintz Firm.

85.    The Escrow Agreement provided that if the Mintz Firm did not receive a bank or certified check for the principal amount of the February 2003 Note plus interest, the Mintz Firm "shall deliver the Shares, the Stock Powers and the Scantek Note to the Payee as instructed by the Payee."

86.    The Mintz Firm did not receive payment from Scantek and wilfully failed to release the Sagi Shares to Accordant.

87.    Accordant demanded that the Mintz Firm release the Sagi Shares to Accordant and demanded proof that the Mintz Firm was holding the Sagi Shares in Escrow.

88.    Upon information and belief, the Sagi Shares were pledged to other lenders as security for other loans to Scantek without permission from or notice to Accordant in willful violation of the Escrow Agreement.

15

89.    Upon information and belief the Sagi Shares were either never deposited in escrow pursuant to the Escrow Agreement, or were released to provide collateral to other lenders, without notice to Accordant, in willful violation of the Escrow Agreement.

90.    The Mintz Firm refused to deliver the Sagi Shares or provide proof that it was holding the Sagi Shares in willful violation of the Escrow Agreement.

91.    Accordant is entitled to an order requiring the Mintz Firm and Sagi to deliver to Accordant the Sagi Shares.

### COUNT IV
### For Fraudulent Conveyance
### By Sabella and Accordant Against Gibraltar

92.    Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 1 through 91 as if fully set forth herein.

93.    On or about March 15, 2007, Scantek announced that it created a limited liability company, Gibraltar and entered into a distribution agreement with Gibraltar granting to Gibraltar distribution rights to a Scantek medical device in more than 150 countries throughout the world (the "Gibraltar Distribution Agreement"). The granting of such rights constituted a conveyance within the meaning of New York Debtor Creditor Law Section 270.

94.    Upon information and belief, such conveyance was made without fair consideration to Scantek within the meaning of New York Debtor Creditor Law Section 272.

95.    Upon information and belief, such conveyance was made at a time Scantek was insolvent within the meaning of New York Debtor Creditor Law Section 271.

96.    Upon information and belief, the property remaining in Scantek's hands after the conveyance to Gibraltar was an unreasonably small capital within the meaning of New York Debtor Creditor Law Section 274.

97.    Upon information and belief, the conveyance to Gibraltar was made with actual intent to hinder, delay or defraud Sabella and Accordant within the meaning of New York Debtor Creditor Law Section 276.

98.    Sabella and Accordant are entitled to have the Gibraltar Distribution Agreement set aside or annulled.

99.    Gibraltar is liable for the debts of Scantek to Sabella and Accordant.

## COUNT V
## Common Law Fraud
### By Sabella and Accordant Against Sagi and the Mintz Defendants

100.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 99 as if fully set forth herein.

101.    In order to fund Scantek's capital needs, Sagi and the Mintz Defendants structured private placements pursuant to which Scantek sold to the Securities to numerous investors.

102.    The private placements were a device, scheme or article to defraud investors because, upon information and belief, Sagi and the Mintz Defendants structured the transactions with the intent of claiming that the Securities violated New York State criminal usury laws and were voidable by Scantek.

103.    Upon information and belief, Sagi and the Mintz Defendants engaged in a scheme to issue Securities which Scantek did not intend to honor.

104.    Sagi and the Mintz Defendants had the authority and, in fact, ability to control the contents of the disclosures made in connection with the offering of the Securities to Third-Party Plaintiffs, including the Subscription Agreements and the Forms 10K and 10Q filed with the SEC, and other false and misleading statements and material omissions to Third-Party Plaintiffs.

17

Sagi and the Mintz Defendants were aware that the statements made to Third-Party Plaintiffs were misleading and contained material omissions, and had the ability and opportunity to prevent such statements and omissions or cause them to be corrected, but failed to do so.

105.    Upon information and belief the Mintz Defendants engaged in similar schemes by structuring securities offerings on behalf of other issuers and then attempting to void the securities by claiming violation of usury laws.

106.    Sagi and the Mintz Defendants selected New York law as the governing law for the Securities even though New York had no connection to the transactions because New York law allows a corporation to interpose the defense of criminal usury.  They did not select Delaware law, under which the defense of usury is not available to corporations pursuant to 6 Del.C. § 2306.  They did not select New Jersey law, under which loans in the amount of $50,000.00 or more may be made at any rate of interest pursuant to N.J.S.A. 31:1-1(e)(1).

107.    Sagi and the Mintz Defendants had a duty to disclose any risk that the Securities were not duly and validly issued and enforceable in accordance with their terms and any risk that the Securities violated any law.

108.    Sagi and the Mintz Defendants failed to disclose their opinions that the Securities were not duly and validly issued and enforceable in accordance with their terms any risk that the Securities violated any law.

109.    Sagi and the Mintz Defendants filed Forms 10K and Forms 10Q and audited financial statements with the SEC which disclosed and discussed numerous private placements of the Securities from 1999 through 2003 to third parties as well as officers and directors of Scantek.

110.    The Scantek SEC filings contain no reference to or discussion of a purported violation of any usury law by the officers, directors and third parties to whom Scantek issued the Securities.

111.    Scantek's audited financial statements report such transactions in accordance with generally accepted accounting principles without discussion of potential violation of any usury law and in fact "blessed" the transactions.

112.    Sagi and the Mintz Defendants induced Sabella and Accordant to acquire the Securities and make the Additional Loans by making false statements to Sabella and Accordant that sales of medical devices by Scantek in Brazil were imminent. Pursuant to their scheme to deceive Sabella about the status of such sales, a provision was included in the August 2002 Note providing for payment to Sabella of $.475 for each medical device sold in Brazil until principal and interest were paid in full.

113.    Scantek's Form 10K filed with the SEC for the calendar year ending June 30, 2001, included false statements that Scantek "expects to ship the BreastCare (TM)/BreastAlert(TM) device from the United States during the fourth quarter of calendar 2001 to Brazil" and "shipments to other parts of South America and Europe will commence during the latter part of 2002." Sagi and the Mintz Defendants did not expect such shipments to commence as stated and included such false statements to induce investors to purchase Securities.

114.    Scantek's Form 10K filed with the SEC for the calendar year ending June 30, 2002, included false statements that Scantek "expects to ship the BreastCare (TM)/ BreastAlert(TM) device from the United States during the fourth quarter of calendar 2002 to Brazil" and "expects cash flow from sales commencing in the fourth quarter of calendar 2002." Sagi and the Mintz Defendants did not expect such shipments to commence and cash flow to

commence in the fourth quarter of 2002 and included such false statements to induce investors to purchase Securities.

115.    Scantek's Form 10Q filed with the SEC on May 20, 2003 for the quarter ending March 31, 2003, included false statements that Scantek (a) anticipates sale of its entire inventory in calendar year 2003, and (b) the Company expects cash flow from sales commencing in 2003 to cover operations of the Company through December 2003.

116.    Scantek, Sagi and the Mintz Defendants induced Sabella and Accordant to invest in the Securities and to make the Additional Loans by making false oral and written statements to Sabella and Accordant from April 2002 through the May 20, 2004. These false statements included the quantity of orders received for Scantek products in Brazil, that Scantek's sales of medical devices in Brazil had commenced, and that Scantek had commenced earning revenue from such sales which would be used by Scantek to repay its obligations to Sabella and Accordant.

117.    On April 24, 2002, Scantek and Sagi falsely represented to defendant Sabella in writing that the proceeds of the initial $100,000 loan by Sabella "will be used exclusively would be used solely for our Brazilian activities. It will not be used to pay any outstanding debts."

118.    On January 14, 2003, Scantek and Sagi represented to defendants in writing that an order for 100,000 Breastcare units had been confirmed and would be emitted with a letter of credit inside of 30 days.

119.    In May 2003, Scantek falsely represented to defendants in writing that a test by INCA (Brazilian National Institute of Cancer) would start on May 15, 2003.

120.    In May 2003, Scantek's private placement memorandum (a) falsely represented that Scantek had largely executed its strategy in South America of establishing a regional

manufacturing and/or assembly center to supply demand created by local marketing partners. Scantek (b) failed to disclose that sales to Brazil had not yet commenced, (c) failed to disclose that orders in Brazil (which Scantek represented had been received) had not been shipped by Scantek, (d) falsely represented that Scantek has received approvals required for sale of its products in Brazil, and (e) failed to disclose that Scantek had not received an import license in Brazil required to ship products to Brazil.

121.    Sagi and the Mintz Defendants made misrepresentations of numerous material facts to Third-Party Plaintiffs, as set forth above.

122.    Sagi and the Mintz Defendants made the misrepresentations intentionally or recklessly in order to deceive Third-Party Plaintiffs.

123.    Third-Party Plaintiffs justifiably relied on the misrepresentations made by Sagi and the Mintz Defendants.

124.    Third-Party Plaintiffs would not have invested in Scantek if Sagi and the Mintz Defendants had not made the misrepresentations set forth above and such misrepresentations caused Third-Party Plaintiffs to suffer a substantial loss.

125.    Each of Sagi and the Mintz Defendants had knowledge of the existence of the misrepresentations and rendered substantial assistance to the fraud.

126.    Sagi and the Mintz Defendants are liable for the aforesaid wrongful conduct and are liable to the Third-Party Plaintiffs for damages suffered in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Sagi and the Mintz Defendants.

**COUNT VI**
**For Violation of Section 10(b) of the 1934 Act**
**By Sabella and Accordant Against Sagi and the Mintz Defendants**

127.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in

paragraphs 1 through 126 as if fully set forth herein.

128.    Third-Party Plaintiffs relied on the untrue statements and omissions of Sagi and

the Mintz Defendants in investing in Scantek. Third-Party Plaintiffs would not have made such

investment if Sagi and the Mintz Defendants had not made material misstatements and

misrepresentations.

129.    Sagi and the Mintz Defendants induced Third-Party Plaintiffs to rely on the

material misstatements and misrepresentations knowing that such representations were false and

in doing so, intended to deceive, manipulate, or defraud Third-Party Plaintiffs. Sagi and the

Mintz Defendants knew that Third-Party Plaintiffs would not invest if the material facts had been

disclosed.

130.    Third-Party Plaintiffs sustained damages as the proximate result of the untrue

statements and omissions of Sagi and the Mintz Defendants.

131.    At all relevant times, Sagi and the Mintz Defendants, individually and in concert,

directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or

of the mails, engaged and participated in a continuous course of conduct whereby they

knowingly and/or recklessly made materially false and misleading statements to induce Third-

Party Plaintiffs to invest in Scantek.

132.    The Mintz Defendants and Sagi are liable as direct participants in and as

controlling persons of Scantek. By virtue of their positions of control and authority, the Mintz

Defendants and Sagi were able to and did, directly or indirectly, control the content of the

22

disclosures and other statements made to induce Third-Party Plaintiffs to invest in Scantek and failed to correct those statements in timely fashion once they knew or were reckless in not knowing that those statements were no longer true or accurate.

133.    Sagi and the Mintz Defendants were motivated to act as aforesaid for their personal benefit by reason of their ownership of interests in Scantek. Each of Sagi and the Mintz Defendants had actual knowledge of the facts making the material statements false and misleading, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though same were available to them.

134.    Without knowledge of the true facts concerning the Securities and the scheme engaged in by Scantek, Sagi and the Mintz Defendants, Third-Party Plaintiffs invested in the Securities and made the Additional Loans and have been damaged thereby.

135.    Third-Party Plaintiffs have incurred a loss in an amount to be proven at trial.

136.    By virtue of the foregoing, Sagi and the Mintz Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

137.    By virtue of the conduct alleged herein, Sagi and the Mintz Defendants are liable to the Third-Party Plaintiffs for damages suffered in an amount to be proven at trial, but in no event less than $828,250, plus interest, plus punitive damages in an amount sufficient to deter future misconduct.

## COUNT VII
### For Violation of Section 20(a) of the 1934 Act
#### By Sabella and Accordant Against Sagi and Mintz Defendants

138.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 137 as if fully set forth herein.

139.    This count is asserted against Sagi and the Mintz Defendants and is based upon Section 20(a) of the 1934 Act.

140.    Sagi and the Mintz Defendants are controlling persons of Scantek within the meaning of Section 20(a) of the 1934 Act. Sagi and the Mintz had the power to influence and exercised the same to cause Scantek to engage in the illegal conduct and practices complained of herein by causing Scantek to disseminate the false and misleading information referred to above.

141.    Sagi and the Mintz Defendants were motivated to act as aforesaid for their personal benefit by reason of their ownership of interests in Scantek. Sagi and the Mintz Defendants had actual knowledge of the facts making the material statements false and misleading, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though same were available to them.

142.    The positions of Sagi and the Mintz Defendants made them privy to and provided them with actual knowledge of the material facts concealed from the Third-Party Plaintiffs.

143.    Sagi and the Mintz Defendants intended to deceive, manipulate, and defraud Third-Party Plaintiffs.

144.    By virtue of the conduct alleged herein Sagi and the Mintz Defendants are liable for the aforesaid wrongful conduct and are liable to plaintiffs for damages suffered in an amount to be proven at trial, but in no event less than $828,250 plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Scantek.

24

## COUNT VIII
## Common Law Negligent Misrepresentation
## By Sabella and Accordant Against Sagi and the Mintz Defendants

145.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 144 as if fully set forth herein.

146.    Sagi and the Mintz Defendants acted with carelessness in imparting words by making the material misstatements and misrepresentations to Third-Party Plaintiffs as set forth above.

147.    Sagi and the Mintz Defendants expected Third-Party Plaintiffs to rely on such misstatements and misrepresentations.

148.    Third-Party Plaintiffs acted upon the misstatements and misrepresentations Sagi and the Mintz Defendants in investing in Scantek, to their damage.

149.    Sagi and the Mintz Defendants directed the words directly to Third-Party Plaintiffs, with knowledge that they would be acted upon by Third-Party Plaintiffs.

150.    As the issuer of securities and the persons that controlled the issuer, Sagi and the Mintz Defendants were bound to Third-Party Plaintiffs by a relation of duty or care.

151.    Sagi and the Mintz Defendants are liable for the aforesaid wrongful conduct and are liable to the Third-Party Plaintiffs for damages suffered in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Sagi and the Mintz Defendants.

## COUNT IX
### Malpractice
### By Sabella and Accordant Against Mintz Firm, Fraade and Mintz

152.    Third-Party Plaintiffs repeat and realleges each and every allegation contained in paragraphs 1 through 151 as if fully set forth herein.

153.    The Mintz Firm, Fraade and Mintz performed legal services for Sabella and Accordant.

154.    The Mintz Firm, Fraade and Mintz acted as counsel for Scantek.

155.    The Mintz Firm acted and continues to act on behalf of Sabella as escrow agent for the Sagi Shares under the Escrow Agreement.

156.    Sabella did not retain separate counsel in connection with the purchase of the Securities.

157.    Sabella did not waive any conflict of interest.

158.    Sabella and Accordant relied on the Mintz Firm, Fraade and Mintz to draft agreements which were the valid and binding obligations of Scantek enforceable in accordance with their terms and advise Sabella and Accordant of any risks or issues in connection with the enforceability of the Securities.

159.    The Mintz Firm, Fraade and Mintz claim that the documents they drafted violated New York usury law and are void.

160.    The Mintz Firm, Fraade and Mintz failed to advise Sabella or Accordant of their opinion that the transactions they structured and documents they drafted violated New York usury law and are voidable by Scantek.

161.    The Mintz Firm, Fraade and Mintz failed to advise Sabella or Accordant of any risk that the securities offerings that they structured and documents they drafted violated any usury or other law.

162.    The Mintz Firm, Fraade and Mintz failed to advise Sabella or Accordant that, upon information and belief, Scantek entered into the transactions with the intent of claiming that the Securities violated New York State criminal usury laws.

163.    The Mintz Firm, Fraade and Mintz owed a duty to Sabella and Accordant as attorneys and breached such duty.

164.    Sabella and Accordant suffered damages as the proximate result of the breach of duty owed by the Mintz Firm, Fraade and Mintz in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by the Mintz Firm, Fraade and Mintz.

## COUNT X
### Breach of Fiduciary Duty
#### By Sabella and Accordant Against all Third-Party Defendants

165.    Third-Party Plaintiffs repeat and realleges each and every allegation contained in paragraphs 1 through 164 as if fully set forth herein.

166.    The attorney-client relationship of Sabella with the Mintz Firm, Fraade and Mintz created a fiduciary relationship and a duty of higher trust.

167.    As President and a controlling shareholder of Scantek, Sagi was a fiduciary for and owed to the shareholders of Scantek a fiduciary duty of honesty, loyalty, good faith and fairness.

27

168.    As a controlling shareholder of Scantek, Mintz LLC was a fiduciary for and owed to the shareholders of Scantek a fiduciary duty of honesty, loyalty, good faith and fairness a fiduciary duty to the shareholders of Scantek.

169.    Third-Party Defendants had a duty advise Sabella and Accordant, her wholly-owned limited liability company, of any risk that the securities offerings that they structured and drafted violated any usury or other law.

170.    Third-Party Defendants breached their fiduciary duties to Sabella and Accordant by failing to disclose any risk that the securities violated any law.

171.    Upon information and belief, Third-Party Defendants breached their fiduciary duties to Sabella and Accordant engaging in a scheme to issue Scantek Securities that they intended to claim violated New York usury laws and were voidable by Scantek.

172.    Third-Plaintiffs suffered damages as the result of the breaches of fiduciary duties in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by the Third-Party Defendants.

## JURY DEMAND

Third-Party Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Third-Party Plaintiffs demand judgment:

a.    On Count I, awarding damages to Sabella from Sagi in an amount to be proven at trial, but in no event less than $253,250, plus interest from August 20, 2003, plus attorneys fees;

b.    On Count II, awarding damages to Accordant from Sagi in an amount to be proven at trial, but in no event less than $75,000, plus interest from February 10, 2003, plus late fees and attorneys fees;

c.      On Count III, ordering the Mintz Firm and Sagi to deliver to Accordant the Sagi Shares;

d.      On Count IV, entering an order declaring that the Gibraltar Distribution Agreement is null and void and awarding damages to Sabella and Accordant from Gibraltar in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, late fees and attorneys fees;

e.      On Count V, awarding damages to awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

f.      On Count VI, awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount sufficient to deter future misconduct;

g.      On Count VII, awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount sufficient to deter future misconduct;

h.      On Count VIII, awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

i.      On Count IX, awarding damages to Sabella and Accordant from the Mintz Firm, Mintz and Fraade in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

j.      On Count X, awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct; and

k.     Awarding such other relief as this Court deems just and proper.

Dated: New York, New York
       April 16, 2008

                              McCue Sussmane & Zapfel, P.C.

                              By:_____/S/
                              Kenneth Sussmane (KS 9301)
                              521 Fifth Avenue, 28th Floor
                              New York, New York  10175
                              212-931-5500
                              ksussmane@mszpc.com

30