UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
SCANTEK MEDICAL, INC.,

                                         Index No.: 08 CV 00453 (CM)

                       Plaintiff,

                                    **AFFIDAVIT**

        -against-

ANGELA CHEN SABELLA and
ACCORDANT HOLDINGS, LLC,

                             Defendants and
                             Third-Party Plaintiffs,

        -against-

MINTZ & FRAADE, P.C., FRED MINTZ, ALAN
FRAADE, MINTZ & FRAADE ENTERPRISES, LLC,
ZSIGMOND L. SAGI, and GIBRALTAR GLOBAL
MARKETING LLC,

                             Third-Party Defendants.
--------------------------------------------------------------------X
State of New York   )
                      ) ss.:
County of New York)

Alan P. Fraade, being duly sworn, deposes and says:

   1.  At all times relevant to this action through the date hereof, Mintz & Fraade, P.C.

("M&F"), the law firm of which I am a member, has acted as attorneys for the Plaintiff

Scantek Medical, Inc. (hereinafter referred to as "Scantek" or "Plaintiff").  I am also a

Third Party Defendant in this action as an individual, and I am a member of Third Party

Defendants Mintz & Fraade, P.C., and Mintz & Fraade Enterprises, LLC.  I am fully

familiar with the facts stated in this affidavit and know the same to be true to my own

knowledge.  I am fully familiar with the pleadings and proceedings heretofore had herein

and the matters hereinafter set forth.  I am attaching hereto the following:     the

Complaint, which is attached hereto and made a part hereof as Exhibit "A" the Defendants Answer and Counterclaims, which is attached hereto and made a part hereof as Exhibit "B", and th Defendants Third Party Complaint, which is attached hereto and made a part hereof as Exhibit "C".

2.   This affidavit is being submitted in support of the Motion to Dismiss certain of the Counterclaims and all Counts of the Third Party Complaint by Plaintiff and Third Party Defendants M&F, Frederick M. Mintz, Mintz & Fraade Enterprises, LLC, Zsigmond L. Sagi, Gibraltar Global Marketing, LLC and me (collectively, the "Third Party Defendants").   In particular, the Plaintiff and the Third Party Defendants seek dismissal of the following claims:

    A.   Counterclaim IV and Count IV of the Third Party Complaint based upon allegations of a fraudulent conveyance;

    B.   Counterclaim V and Count V of the Third Party Complaint based upon allegations of common law fraud;

    C.   Counterclaim VI and Count VI of the Third Party Complaint based upon allegations of violation of Section 10(b) of the Securities Exchange Act of 1934, as amended;

    D.   Counterclaim VII and Count VIII of the Third Party Complaint based upon allegations of common law negligent misrepresentation;

    E.   Count VII of the Third Party Complaint based upon allegations of violation of Section 20(a) of the Securities Exchange Act of 1934, as amended;

    F.   Count IX of the Third Party Complaint based upon allegations of malpractice; and

    G.   Count X of the Third Party Complaint based upon allegations of breach of fiduciary duty.

Although the Plaintiff and Third Party Defendants intend to fully defend each and every

claim made by the Defendants in their Answer and Counterclaims and in their Third Party Complaint, the Plaintiff and Third Party Defendants have determined at this time to seek dismissal of only the Counterclaims IV, V, VI and VII and Counts IV, V, VI, VII, VIII, IX and X of the Third Party Complaint. Although we believe that no genuine issues of material fact will arise in connection with Counterclaims I, II, and III and Counts I, II, and III of the Third Party Complaint, it is the Plaintiff and Third Party Defendants position that at this stage in the instant litigation, it would be premature to seek dismissal of these claims.  In particular, the Plaintiff's defense with respect to Counterclaims I and III and Counts I, II and III of the Third Party Complaint is predicated upon criminal usury, and determination of such requires a valuation of the stock issued to the Defendants pursuant to certain transactions.  Additionally, the defendants are not seeking dismissal of Counterclaim II because Plaintiff's defense is predicated upon superior or prior security interests existing with respect to the patents with respect to which Defendants seeks a "Declaratory Judgment Regarding Patents".  A determination of the facts is necessary to establish that the Defendants are not entitled to the subject patents. Accordingly, because issues of fact encompass the Plaintiff's defense with respect to Counterclaim II it would also be inappropriate to seek judgment or dismissal at this stage in the instant litigation.

3.  The Defendants, Counterclaimants and Third Party Complainants Sabella and Accordant (jointly the "Defendants"), loaned the Plaintiff certain sums of monies upon criminally usurious terms.  In particular, the Defendants advanced certain sums of money to Plaintiff in exchange for promissory notes executed in favor of Defendants, as well as shares of Plaintiff's common stock (collectively, the "Loan Transactions").  The

following documents (collectively the "Documents") were executed as hereinafter set forth:

    A. The Promissory Note dated April 25, 2002 (the "April 2002 Note"), in the principal amount of $100,000 executed by Plaintiff in favor of Defendant Sabella, a copy of which is annexed hereto as Exhibit "D",

    B. The Subscription Agreement dated April 25, 2002 (the "April 2002 Subscription Agreement") executed by Defendant Sabella requiring the issuance of shares as additional compensation for the loan evidenced by the April 2002 Note, a copy of which is annexed hereto as Exhibit "E",

    C. The Promissory Note dated August 20, 2002 (the "August 2002 Note"), in the principal amount of $253,250.80 which superseded the April 2002 Note, executed by Plaintiff in favor of Defendant Sabella, , a copy of which is annexed hereto as Exhibit "F",

    D. The Subscription Agreement dated August 20, 2002 (the "August 2002 Subscription Agreement") executed by Defendant Sabella requiring the issuance of shares as additional compensation for the loan evidenced by the August 2002 Note, , a copy of which is annexed hereto as Exhibit "G",

    E. The Promissory Note dated February 10, 2003 (the "February 2003 Note"), in the principal amount of $50,000 executed by Plaintiff in favor of Defendant Accordant, a copy of which is annexed hereto as Exhibit "H", and

    F. The Subscription Agreement dated February 10, 2003 (the "February 2003 Subscription Agreement") executed by Defendant Sabella requiring the issuance of shares as additional compensation for the loan evidenced by the February 2003 Note , a copy of which is annexed hereto as Exhibit "I".

    4. Plaintiff alleges in the Complaint that the Loan Transactions evidenced by the Documents are criminally usurious in violation of N.Y. PENAL LAW § 190.40.

    5. The Defendants claim that a transfer from the Plaintiff of certain distribution rights of its medical device to Third Party Defendant Gibraltar Global Marketing, LLC ("Gibraltar") was a fraudulent conveyance should be dismissed by this Court.  In particular, the Defendants fail to accurately set forth the basis for their claim of a

fraudulent conveyance. As set forth in more detail in the accompanying Memorandum of Law (the "Memorandum"), the Defendants fail to properly plead their Counterclaim IV and Count IV of the Third Party Complaint alleging fraudulent conveyance. In particular, the Defendants, as is set forth below, have no support beyond bare allegation that: (A) the transaction was without fair consideration, (B) the Plaintiff was left with "unreasonably small capital" after the transaction, and (C) the transaction was made with "intent to hinder, delay or defraud" the Defendants. If anything, the Plaintiff was in a better position following the sale of the 50% voting interest and 48% equity interest to its U.S. and Canadian distributor, because it received an agreement to be paid $5 million dollars.

6. Gibraltar is a limited liability company which was formed by the Plaintiff to own the distribution rights to the Plaintiff's medical device in more than 150 countries throughout the world, but which does not including 36 countries, including, but not limited to, the United States, China, Canada, France, Brazil, England, Wales, and Scotland. The Defendants claim that the transfer pursuant to a certain Acquisition Agreement dated March 7, 2007 (the "Acquisition Agreement") to the Plaintiff's U.S. and Canadian distributor of 48% equity interest and a 50% voting interest in Gibraltar for five million ($5,000,000) dollars was fraudulent. The Defendants fail to properly plead with the requisite particularity how this conveyance was fraudulent. Based upon the Plaintiff having received an agreement to be paid five million dollars for one-half of the voting rights and 48% of the equity in Gibraltar, then the total value of Gibraltar would be approximately ten million ($10,000,000) dollars. The Defendants have not alleged how $10,000,000 is inadequate, or how such a transfer leaves the Plaintiff with

inadequate capital; rather they come to the unreasonable and meritless conclusion that it must be.  Nothing is further from the truth.

7.   In view of the fact that a copy of the Acquisition Agreement is a public record and available 24 hours a day on the SEC's website, the Defendants' had every opportunity to become aware of the fair compensation which the Plaintiff received, and how the Plaintiff was not left with unreasonably small capital.

8.   More importantly, the Defendants have provided no facts that the conveyance of an interest in Gibraltar was with an "intent to hinder, delay, or defraud" the Defendants, rather they base their allegations solely upon information and belief.  Such a claim is particularly absurd because, as of the date of the Acquisition Agreement (March 7, 2007), there was no litigation between the Plaintiff and the Defendant.  In fact, Plaintiff had every reason to believe that a resolution of their claim would be worked out with the Defendants.  Notwithstanding the foregoing, and as set forth in the Memorandum, Defendants have not sufficiently pled fraud, including statutory fraudulent conveyance.

9.   Defendants' claims based upon fraud (including the claims based upon common law fraud (Counterclaim V and Count V of the Third Party Complaint), claims based upon the violation of Section 10(b) of the Securities Exchange Act of 1934, as amended (Counterclaim VI and Count VI of the Third Party Complaint) are similarly insufficient to survive this motion to dismiss because they also fail to plead fraud with the requisite particularity.

10. Comparable to Defendants' Motion to Dismiss, a copy of which is annexed hereto and Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss

("Defendants Reply"), the Defendants' Counterclaims and Third Party Complaint contain numerous factual inaccuracies and false statements with respect to the Transactions.

11.  Most serious of the inaccuracies are Defendants' patently false statements with respect to an alleged ongoing scheme by the Plaintiff and the Third-Party Defendant to knowingly engage in a series of usurious transactions, and later to void such transactions pursuant to N.Y. PENAL LAW §190.40 (the "Alleged Scheme").   Any reasonable examination of the facts of the instant matter reveals that the Alleged Scheme is patently false, however such analysis is not relevant at this stage in the litigation.  It is essential, however, that the Defendants' baseless allegation be responded to briefly in order to provide context to the remainder of this affidavit.   In brief, the Defendants' have absolutely no basis to support such Alleged Scheme, and instead rely exclusively upon speculation and conjecture.   In particular, the possibility of the Alleged Scheme is undermined entirely as it was the Defendants, and their representative, Mr. Mark Stepniewski, who dictated the terms of the Transactions, and not the Plaintiffs (or Third Party Defendants).  In a similar vein, while some investors (e.g. Edward Rotter and Douglas Bowen, as mentioned in Defendants' Reply) may have received notes (and shares pursuant to subscription agreements) upon similar terms to the Defendants, this is not a function of a scheme, but rather a consequence of Mr. Stepniewski introducing and then negotiating on behalf of both the Defendants and Messrs. Rotter and Bowen, and demanding the same terms as the Defendants.  In addition, notwithstanding the fact that the transactions with Messrs. Rotter and Bower were upon similar terms as the Defendants, and accordingly also upon criminally usurious terms the Plaintiff paid the amounts due pursuant to their notes to Messrs Rotter and Bowen.

12.   The Plaintiff and Defendants also entered into serious settlement negotiations, and nearly agreed upon terms which would have placed a serious burden on the Plaintiff, before the Defendants' attorney added onerous terms at the eleventh hour. If the Plaintiff had engaged in the Alleged Scheme, why did it: (i) satisfy the notes to Messrs. Rotter and Bowen, which had the same terms as the Loans, and (ii) expend its time and legal fees in attempting to reach an amicable settlement with the Defendants?  These facts totally contradict the Defendants claims of the Alleged Scheme.

13.   The Defendants were aware that the terms which they forced upon the Plaintiff were criminally usurious based upon a prior litigation between Defendant Sabella and Graphco Technologies, Inc (the "Graphco Litigation").  The similarities, between the instant action and the Graphco Litigation are striking.  In particular, Graphco borrowed certain monies from Defendant Sabella upon criminally usurious terms, and raised the defense of usury when Graphco was sued to enforce such notes.  Accordingly, the Defendants' were aware that the financing terms upon which they routinely negotiated were likely to be defended by a claim of criminal usury.  Defendant Sabella, individually or through her company Accordant Holdings, LLC, dictates the terms of financing transactions, and coerces business entities in desperate need of money, to whom banks or other financial institutions are unwilling to lend, into accepting financing terms so oppressive that they violate the laws including, but not limited to, N.Y. PENAL LAW § 190.40 with respect to criminal usury.   Notwithstanding Defendants' false claim to the contrary in the Reply, the Court in the Graphco Litigation did not reject the defense of usury; it merely rendered its decision based upon other grounds, and did not rule upon the issue of usury.

14.   In order to establish common law fraud, a violation of Section 10(b) of the Securities Exchange Act of 1934, as amended (the "'34 Act"), a violation of Section 20(a) of the '34 Act, and negligent misrepresentation, as set forth in Counterclaims IV, V, VI and VII and Third Party Counts IV, V VI, VII and VIII the Defendants are required to establish that they "justifiably relied" upon Plaintiff's and Third Party Defendants' purported misrepresentations.

15. The Defendants have failed to plead "reasonable reliance" with the requisite particularity.  The Defendants either:  (a) impermissibly plead fraud upon information and belief, (b) fail to allege with specificity what the purported misreprentations were; and/or (c) claim such "reasonable reliance" upon statements upon which they represented they did not rely, or were specifically cautioned to not place undue reliance upon such statements.

16. Aside from the statements set forth by the Plaintiff in its SEC filings, which I will discuss in greater detail below, the Defendants fail to specify which statements they relied upon and, accordingly, fail to plead fraud with the requisite particularity.  Rather, the Defendants claim inappropriate conduct based upon "information and belief" without stating the source upon which such "information and belief" is founded.  For example, Defendants state upon information and belief that  "Scantek was engaged in a scheme to issue Securities which it did not intend to honor", to engage in "similar schemes by structuring offerings on behalf of other issuers and then attempting to void the securities by claiming violation of usury laws," and to "select New York law as the governing law for the Securities even though New York had no connection to the transaction because New York law allows a corporation to interpose the defense of criminal usury."

However, they fail to specifically set forth what information leads them to come to their conclusions and therefore lack any basis to support their claims.

17. As previously discussed, Defendants allege that New York law was selected as part of the Alleged Scheme. In fact, M&F and not the Plaintiff selected New York law. M&F selects New York law whenever possible because, along with my law partner, Third Party Defendant Frederick M. Mintz, I am licensed to practice law only in New York, and not in any other jurisdiction. Accordingly, it would be unusual, and only upon the insistence of another party, to base any agreement in which we are representing a client, upon the law of a jurisdiction in which I am not qualified to practice. Based upon the foregoing, it is our standard practice, regardless of the situs of our clients' state of incorporation or principal place of business, to have agreements governed by the law of New York. Additionally, the Documents were each drafted in New York and the primary negotiations for each took place in New York with Defendants' representative, Mr. Stepniewski. Accordingly, notwithstanding the allegations of the Defendant, there were in fact connections between New York and the Transactions.

18. Defendant states that false statements were made by the Plaintiff and M&F. However, the Defendants fail to plead with specificity what statements were made, who made them, and when they were made. For example, in Paragraph 112 of the Counterclaim, Defendants state that false statements were made to induce the Defendant to purchase securities of the Plaintiff. They fail to specify what was communicated. Accordingly, Defendants have failed to sufficiently plead the causes of action related to fraud with particularity as required by Rule 9(b).

19. In addition, the Defendants claim that the Plaintiff and Third Party Defendant Sagi made certain false statements, including that the initial "$100,000 loan by [Defendant] Sabella 'will be used exclusively would be used solely [sic] for [Plaintiff's] Brazilian activates", that "an order for 100,000 Breastcare unites had been confirmed and would be emitted with a letter of credit inside 30 days," and that the Plaintiff represented in writing that "a test by INCA (Brazilian National Institute of Cancer)" would start on May 15, 2003.   Answer and Counterclaims ¶153-55 Third Party Complaint ¶117-19. However, the Defendants have failed to set forth their basis for assuming that these statements were false at the time they were made.   Accordingly, the Defendants have again failed to sufficiently plead the causes of action related to fraud with particularity as required by Rule 9(b).

20. In a similar vein, the Defendants also fail to establish their affirmative defense of unclean hands.  Although the Defendants do not specify, it appears that their "unclean hands" defense is based upon effectively the same alleged actions as the claims based upon common law fraud.  In view of the fact that the Defendants have failed to establish any support for the following:  (A) the Alleged Scheme, (B) that they relied upon certain statements of the Plaintiff or the Third Party Defendants or (C) that the statements made by the Defendants were false, the Defendants have failed to establish grounds for their affirmative defense of unclean hands.   Accordingly, Defendants second affirmative defense of unclean hands should be stricken.

21. Notwithstanding the foregoing paragraph, the Defendants are not entitled to assert the affirmative of unclean hand in the first place.  Unclean hands is an equitable defense, and therefore may only be alleged as a defense when an equitable remedy is sought.

However, the Plaintiff is not seeking an equitable remedy, Plaintiff's remedy relies upon N.Y. PENAL LAW §190.40 with respect to criminal usury.

22. At no time did M&F represent both Plaintiff and Defendants with respect to negotiating, structuring or the drafting of the Documents with respect to the Transactions. M&F represented solely Plaintiff throughout the entire course of dealings between Plaintiff and Defendants. M&F did not commence any representation of the Defendants until after the commencement of the Transactions. Defendant Sabella's assertion that she "relied" upon M&F in any way during the Transactions is unfounded and incredulous.

23. In fact, the Defendants have not alleged that M&F was her attorney in connection with the Transactions, only that "the Mintz Firm, Fraade and Mintz performed legal services for [Defendant] Sabella and [Defendant] Accordant," without specifying that the services rendered in connection with the Transactions were solely on behalf of the Plaintiff. Accordingly, the Defendant cannot maintain a cause of action in malpractice if they have not alleged that M&F, Mintz or Fraade were her attorneys with respect to the Transactions.

24. More importantly, Defendants have specifically represented in the Subscription Agreements, as follows:

> I acknowledge that I have received, read, understand, and am familiar with this Subscription Agreement. I further acknowledge that no statements, representations or warranties, have been made or furnished to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Securities, and/or the economic, tax, or any other aspects or consequences of this investment, and that **I have not relied upon any information with respect to the offering, written or oral, other than the information contained in this Subscription Agreement.** I further understand that any documents other

than this Subscription Agreement, regardless of whether distributed prior to, simultaneously with, or subsequent to, the date of this Subscription Agreement should not be relied upon in determining whether to make an investment in the Securities and **I expressly acknowledge, agree and affirm that I have not relied upon any such literature in making my determination to make an investment in the Securities.** (emphasis added) (where "Securities" is defined both as shares of the Plaintiff's common stock and the promissory notes.)

Each subscription agreement also contains the following representation by the Defendants: "I have not relied, and will not rely upon, any information with respect to this offering other than the information contained herein and set forth in the Company's filings with the Securities and Exchange Commission."

25. Based upon Defendants representations in the Subscription Agreements, Defendants' cannot claim to have relied upon statements or representations other than those in the Plaintiff's securities filings or in the Subscription Agreements. For example, as stated in the above in paragraph 17, the Defendants purportedly relied upon statements that the sales of Plaintiff's medical device "in Brazil had commenced, and the [Plaintiff] had commenced earning revenue from such sales,", that "the proceeds of the initial $100,000 loan made by Sabella 'will be used exclusively would be used solely [sic] for our Brazilian activities'" that "an order for 100,000 Breastcare units had been confirmed and would be emitted with a letter of credit inside of 30 days," and that a "test by INCA (Brazil National Institute of Cancer) would start on May 15, 2003". Answer and Counterclaims ¶¶152-56, Third Party Complaint ¶¶116-20. In view of the fact that such statements are not found anywhere in the subscription documents or the Plaintiff's filings with the SEC, the Defendants cannot rely upon such statements based upon their agreement to only rely upon the Subscription documents and the Plaintiff's SEC filings.

26. Moreover each of the statements upon which the Defendants' purportedly relied from the Plaintff's SEC filings involves Plaintiff's expectations, beliefs and anticipations, *i.e.* forward-looking statements, and not statements of historical fact. Initially, I would speculate that, Defendant Sabella, who upon information and belief is a sophisticated investor, in addition to being very wealthy, would recognize that the mere fact that the Plaintiff's expectations did not come to fruition is not evidence of intent to deceive. More importantly, the Defendants were specifically cautioned to not place reliance upon the statement which Defendants' now claim to have purportedly relied:

> All statements contained herein that are not historical facts, including, but not limited to, **statements regarding anticipated growth in revenue,** gross margins and earnings, statements regarding the Company's current business strategy, the Company's projected sources and uses of cash, and the Company's expectations, are forward-looking statements in nature and involve a number of risks and uncertainties. **Actual results may differ materially**. Among the factors that could cause results to differ materially are the following: the availability of sufficient capital to finance the Company's business plans on terms satisfactory to the Company's competitive factors; the ability of the terms satisfactory to the Company's competitive factors; the ability of the Company to adequately defend or reach a settlement of outstanding litigations and investigations involving the Company or its management; changes in labor, equipment and capital costs; changes in regulations affecting the Company's business; future acquisitions or strategic partnerships; general business and economic conditions; and other factors described from time to time in the Company's reports filed with the Securities and Exchange Commission. **The Company wishes to caution readers not to place undue reliance on any such forward-looking statements.** These statements are made pursuant to the Private Litigation Reform Act of 1995 and, as such, speak only as of the date made. (emphasis added).

Accordingly, the Defendants rely upon statements, which by their very nature, were speculative, and upon which the Defendants were specifically cautioned to not place any

"undue reliance". As set forth more fully in the accompanying Memorandum of Law, such claims are not only outrageous, but also insufficient to plead claims of fraudulent conduct by the Plaintiffs and Third Party Defendants.

27. Notwithstanding the foregoing, if this Court were to conclude that the Defendants have sufficiently plead "justifiable reliance", their claims based upon securities fraud pursuant to Section 10(b) of the Securities Exchange Act of 1934, as amended (the '34 Act"), must be dismissed as a result of the expiration of the applicable statute of limitations.  The statute of limitations for claims arising under Section 10(b) of the '34 Act provides that a claim shall be made no later than two years after the discovery of the alleged misrepresentations.

28. Defendants have failed to timely assert any claim based upon Section 10(b); accordingly, their claims are barred by the Statute of Limitations.  The Defendants cannot reasonably claim that they were not aware of the alleged misrepresentations two years prior to the filing of the counterclaim and Third Party Complaint.  Much of Defendants' claims based upon fraud rely upon alleged misrepresentations with respect to the imminence of sales of the Plaintiff's medical device in Brazil.  As Defendants' set forth in the Counterclaims and Third Party Complaint, pursuant to the August 20, 2002 promissory note, which is annexed hereto as Exhibit "F", Defendant Sabella was to receive "$.475 for each medical devise sold in Brazil until principal and interest were paid in full."  The Defendants are aware, or at least should have been aware, that they did

not receive any funds pursuant to this provision.  The maturity date for such note was February 20, 2003.  Moreover, as set forth in the Affidavit of Frederick M. Mintz dated May 23, 2008, Mr. Stepniewski, who acted as Defendants advisor during the course of the Transaction, was informed that no sales had been made.  Any reasonable investor, upon not having received a single payment on, or prior to, the maturity date, and having received oral communications that no sale had been made would be put on notice to inquire which respect to whether any sales occurred,  and have a duty thereafter to investigate.

29. Claims against Third Party Defendants Dr. Sagi, M&F, Mintz and me pursuant to Section 20(a) of the '34 are also without merit. Defendants have failed to state a claim pursuant to Section 10(b) for which relief can be granted.  As set forth in the Memorandum, claims pursuant to Section 20(a) are derivative of Section 10(b), and if no claims for Section 10(b) exist, there cannot be any claim pursuant to Section 20(a). Accordingly, the claims made by Defendants pursuant to Section 20(a) must also fail.

30. In addition, each of M&F, Mintz, Fraade and Mintz & Fraade Enterprises, LLC is not, individually or collectively, a control person, which is necessary to sustain an action based upon an allegation of breach of fiduciary duty.

31. Defendants claims in Count IX of the Third Party Complaint with respect to malpractice is unfounded,.  M&F did represent Defendant Sabella with respect to the following two transactions which commenced after the loan from the Defendants to the Plaintiff on April 25, 2002:  A) one was a financing transaction which never materialized

16

and was totally unrelated to the Plaintiff and B) the other involved the filing of a Form 3 and Schedule 13-D with respect to the stock issued to the Defendants in connection with the Loans.  In view of the fact that Defendants did not have securities counsel, Mr. Stepniewski requested that we file this paperwork upon Defendant Sabella's behalf, which consisted of completing each form with Defendants basic contact information and her ownership of securities.  In addition the subscription agreements contained an indemnification clause, which reads:

> I hereby agree to indemnify and hold harmless the Company, Counsel [Mintz & Fraade, P.C.], and persons affiliated with them, from any and all damages, losses, costs and expenses (including reasonable attorneys' fees) which they, or any of them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this Subscription Agreement or by reason of my breach of any of my representations and warranties contained in this Subscription Agreement.

If the M&F, Mintz and Fraade represented the Defendants, then why did the Defendants agree to indemnify them if Defendants breached any representations and warranties contained in the Subscription Agreement?

32. In any event, Defendants claims for malpractice are barred by the statute of limitations.  The statute of limitations in New York for legal malpractice is three years.  In addition to the promissory notes, the Defendants only advanced certain sums to the Plaintiff by wire transfer, which were not documented by any promissory note, subscription agreement, or other document.  The last of these wire transfers occurred on May 20, 2004.  Accordingly, the last possible time which Plaintiff could conceivably set forth that such an alleged "relationship" existed is also May 20, 2004.  In addition, as set forth in the Memorandum, our role as an escrow agent pursuant the Transactions is

insufficient to impute an attorney client relationship.  In view of the fact that more than three years has elapsed between sending the last of the Additional Advances on May 20, 2004, and the filing of the counterclaims and the third party complaint, the malpractice claim is barred by the statute of limitations.

33.   The statute of limitations has also passed for Defendants claim for breach of a fiduciary relationship.  The law provides that, where money damages are sought, a claimant must bring the claim within three years.  As more than three years have elapsed, between the last of the Additional Advance on May 20, 2004 and the filing of the counterclaims and the third party complaint, the breach of fiduciary duty claim is barred by the statute of limitations.

**WHEREFORE**, it is respectfully submitted that the Court grant the Plaintiff and Third Party Defendants Motion to Dismiss Counterclaim IV V VI and VII and Counts IV, V, VI, VII, VIII, IX and X of the Third Party Complaint, and that the Court grant such other and further relief as to it may seem just and proper.

*/s/ Alan P. Fraade*

_____
Alan P. Fraade

Sworn to before me this
23rd day of May 2008

*/s/*
_____
Notary Public

18

# EXHIBIT "A"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------------X
SCANTEK MEDICAL, INC.,

                           Plaintiff,

          -against-

ANGELA CHEN SABELLA and
ACCORDANT HOLDINGS, LLC,

                         Defendant.

----------------------------------------------------------------------X

Index No.: 07/604212

**AMENDED SUMMONS**

The basis of the venue is:
Plaintiff designates New
York County as the venue
pursuant to CPLR 503.

Plaintiff's business address:
1705 Route 46 West, Unit 5
Ledgewood, NJ 07852

To the above named Defendants:

     **You are hereby summoned** to appear in the Supreme Court of the State of New York, County of New York at the said Courthouse at 60 Centre Street in the County of New York, City and State of New York, within the time provided by law as noted below and to serve your answer to the complaint upon the attorney for Plaintiff: upon your failure to answer, judgment will be taken against you by default for the relief requested herein.

Dated: New York, New York
       January 21, 2008

Mintz & Fraade, P.C.

By: _____
     Alan P. Fraade
Attorneys for Plaintiff
488 Madison Avenue
New York, New York 10022
(212) 486-2500

TO:   Ms. Angela Chen Sabella
      853 East Valley Boulevard, Suite 200
      San Gabriel, CA 91776

      Accordant Holdings, LLC
      853 East Valley Boulevard, Suite 200
      San Gabriel, CA 91776
      Attn: Ms. Angela Chen Sabella

      Kenneth Sussmane, Esq
      Sussmane & Zapfel, P.C.
      521 Fifth Avenue, 28th Floor
      New York, NY 10175

NOTE: The law provides that: (a) If this summons is served by its delivery to you personally within the State of New York, you must appear and answer within TWENTY days after such service; or (b) If this summons is served by delivery to any person other than you personally, or is served outside the State of New York, or by publication, or by any means other than personal delivery to you within the State of New York, you are allowed THIRTY days after service of this summons is complete as provided by law within which to appear and answer.

N:\Clients\Scantek Medical Inc\Sabella\Litigation\Amended Summons & Complaint v. final.doc

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X
SCANTEK MEDICAL, INC.,

                              Plaintiff,

          -against-

ANGELA CHEN SABELLA and
ACCORDANT HOLDINGS, LLC,

                         Defendant.

-----------------------------------------------------------------------X

Index No.: 07/604212

**AMENDED COMPLAINT**

Plaintiff, Scantek Medical, Inc, ("Plaintiff") complaining of Defendants, Angela Chen Sabella ("Defendant Sabella") and Accordant Holdings, LLC ("Defendant Accordant") (jointly, the "Defendants"), alleges, upon information and belief as follows:

### AS AND FOR A FIRST CAUSE OF ACTION

1.      Plaintiff is a Delaware corporation, with an address at 1705 Route 46 West, Unit 5, Ledgewood, New Jersey 07852.

2.      Upon information and belief, Defendant Sabella has an office address at 853 East Valley Boulevard, Suite 200, San Gabriel, California 91776, and is a member of Accordant.

3.      Upon information and belief, Defendant Accordant is a Delaware limited liability company, with an address at 853 East Valley Boulevard, Suite 200, San Gabriel, California 91776.

4.      The promissory notes and subscription agreements evidencing the loans described herein each contain the following identical provision: "The parties hereby consent to and irrevocably submit to personal jurisdiction over each of them by the Courts of the State of New York in any action or proceeding".

1

5.      On or about April 25, 2002, Defendant Sabella loaned $100,000 to Plaintiff, pursuant, in part, to a promissory note dated April 25, 2002 (the "April 2002 Note"), which was executed by Dr. Zsigmond L. Sagi, Plaintiff's Chief Executive Officer, on behalf of Plaintiff, in favor of Defendant Sabella.

6.      The April 2002 Note had a maturity date of 120 days after the date of the Note (that is, August 23, 2002), and bore interest at the rate of 10% per annum.

7.      As additional consideration for the $100,000 loan, Defendant Sabella demanded additional consideration of 400,000 shares of Plaintiff's Common Stock (the "April 2002 Shares").

8.      Plaintiff and Defendant Sabella entered into a subscription agreement dated April 24, 2002 (the "April 2002 Subscription Agreement") for the April 2002 Shares.

9.      The April 2002 Subscription Agreement specifically states that as consideration for the $100,000 loan, Defendant Sabella received the April 2002 Note, and was entitled to the 400,000 April 2002 Shares.

10.     On April 25, 2002, the date of the April 2002 Note, and on April 24, 2002, the date of the April 2002 Subscription Agreement, the closing market price of Plaintiff's Common Stock was $.05 per share.

11.     Accordingly, the value of the April 2002 Shares based upon the closing market price was $20,000.

12.     Pursuant to New York Penal Law § 190.40, a person is guilty of criminal usury when she "knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

2

13.    In view of the fact that that April 2002 Note (which bore interest at 10% per annum), in conjunction with the April 2002 Subscription Agreement (which required stock valued at $20,000, or the equivalent interest rate of approximately 61% per annum), charged a total rate of interest of approximately 71% per annum, which is almost three times the legal percentage, the April 2002 Note is criminally usurious on its face.

14.    On or about August 20, 2002, Defendant Sabella loaned an additional $150,000 to Plaintiff.

15.    On or about August 20, 2002, Plaintiff executed a promissory note in favor of Defendant Sabella which replaced and superseded the April 2002 Note, and incorporated both the principal balance of the April 2002 Note in the amount of $100,000, plus the accrued interest thereon in the amount of $3,250.80, plus the newly loaned principal in the sum of $150,000 (the "August 2002 Note"). Thus, the principal of the August 2002 Note was $253,250.80.

16.    The August 2002 Note called for four separate payment dates: November 20, 2002, December 20, 2002, January 20, 2003 and February 20, 2003. The August 2002 Note bore interest at the rate of 10% per annum.

17.    As additional consideration, Defendant Sabella demanded 2,000,000 shares of Plaintiff's Common Stock (the "August 2002 Shares"), not including the 400,000 shares of Plaintiff's Common Stock which Defendant Sabella was entitled to pursuant to the April 2002 Subscription Agreement.

18.    On August 20, 2002 Plaintiff and Defendant Sabella entered into a Subscription Agreement (the "August 2002 Subscription Agreement"), pursuant to which Plaintiff agreed to issue to Defendant Sabella the August 2002 Shares. The August 2002 Subscription Agreement specifically states that as consideration for the loans to Plaintiff totaling $250,000, Defendant

3

Sabella received the August 2002 Note, and was entitled to the 2,000,000 August 2002 Shares.

19.    On the date of the August 2002 Note, the closing market price of Plaintiff's Common Stock was $.05 per share.

20.    Accordingly, the value of the August 2002 Shares based upon the closing market price was $100,000 (which does not include the value of the April 2002 Shares which Plaintiff agreed to issue Defendant Sabella).

21.    Pursuant to New York Penal Law § 190.40, a person is guilty of criminal usury when she "knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

22.    Because the August 2002 Note (which bore interest at 10% per annum), in conjunction with the August 2002 Subscription Agreement (which required stock valued at $100,000, or the equivalent interest rate of approximately 79% per annum), charged a total rate of interest of approximately 89% per annum, which is over three times the legal percentage, the August 2002 Note is criminally usurious on its face.

23.    Some of the August 2002 Shares have already been issued to Defendant Sabella pursuant to the criminally usurious August 2002 Subscription Agreement.

24.    Accordingly, Plaintiff seeks a declaratory judgment declaring that the August 2002 Note, August 2002 Subscription Agreement and any August 2002 Shares issued to Defendant Sabella are void as criminally usurious pursuant to N.Y. PENAL LAW § 190.40.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>

25.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "24" with the same force and effect as if more fully set forth herein.

4

26.     On or about February 10, 2003, Defendant Accordant loaned $50,000 to Plaintiff, pursuant, in part, to a promissory note dated February 10, 2003 (the "February 2003 Note") executed by Dr. Sagi, Plaintiff's Chief Executive Officer, on behalf of Plaintiff, in favor of Defendant Accordant.   Upon information and belief, Defendant Sabella is the principal of Defendant Accordant.

27.     The February 2003 Note had a maturity date of June 6, 2003, and bore interest at the rate of 12% per annum.

28.     In consideration for the $50,000 loan evidenced by the February 2003 Note, Defendant Sabella required that Plaintiff issue to Defendant Accordant 300,000 shares of Plaintiff's Common Stock the "February 2003 Shares").

29.     Defendant Accordant and Plaintiff entered into a subscription agreement dated February 10, 2003 (the "February 2003 Subscription Agreement"), pursuant to which Plaintiff agreed to issue Defendant Accordant the February 2003 Shares. The February 2003 Subscription Agreement specifically states that as consideration for the $50,000 loan, Defendant Accordant received the February 2003 Note, and was entitled to the 300,000 February 2003 Shares.

30.     On the date of the February 2003 Note, the closing market price of Plaintiff's Common Stock was $.06 per share.

31.     Accordingly, the value of the February 2003 Shares based upon the closing market price was $18,000.

32.     Pursuant to New York Penal Law § 190.40, a person is guilty of criminal usury when she "knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

5

33.     In view of the fact that the February 2003 Note (which bore interest at 12% per annum), in conjunction with the February 2003 Subscription Agreement (which required stock valued at $18,000, or the equivalent interest rate of 113% per annum), charges a total rate of interest of approximately 125% per annum, which is five times the legal percentage, the February 2003 Note is criminally usurious on its face.

34.     Some of the February 2003 Shares have already been issued to Defendant Accordant pursuant to the criminally usurious February 2003 Subscription Agreement.

35.     Accordingly, Plaintiff seeks a declaratory judgment declaring that the February 2003 Note, February 2003 Subscription Agreement and any February 2003 Shares issued to Defendant Accordant are void as criminally usurious pursuant to N.Y. PENAL LAW § 190.40.

AS AND FOR A THIRD CAUSE OF ACTION

36.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "35" with the same force and effect as if more fully set forth herein.

37.     In the alternative of the Second Cause of Action, the February 2003 Note, in conjunction with the February 2003 Subscription Agreement, charged a criminally usurious rate of interest after default.

38.     Plaintiff defaulted on the February 2003 Note.  To date, Plaintiff has not paid any principal or interest on the February 2003 Note.

39.     The February 2003 Subscription Agreement provides that for each of the first five business days after the maturity date, if the February 2003 Note remained unpaid, Plaintiff owed Defendant Accordant 10,000 shares of Plaintiff's Common Stock.

40.     Plaintiff was required to issue to Defendant Accordant 50,000 shares of its Common Stock for the five business days after the February 2003 Note's maturity date.  The

6

value of the 50,000 shares based upon the closing market price which Plaintiff owed Defendant

Accordant after being in default for five days was $3,000.

41.    For each subsequent day, Plaintiff owed Defendant Accordant an additional

25,000 shares of Plaintiff's Common Stock.

42.    Accordingly, at the rate of 25,000 shares per day, on an annual basis Defendant

Accordant would receive 9,125,000 shares in Plaintiff's Common stock.  Assuming a value of

$.06 per share (pursuant to the closing market value of each share of Plaintiff's Common Stock

on the date of the February 2003 Note), this would equal a value of $547,500 per year, which is

equivalent to an interest rate of 2,007% per annum when added to the 12% interest due pursuant

to the February 2003 Note.

43.    Accordingly, Plaintiff seeks a declaratory judgment declaring the February 2003

Note, February 2003 Subscription Agreement and any February 2003 Shares issued to Defendant

Accordant are void as criminally usurious pursuant to N.Y. PENAL LAW § 190.40.

WHEREFORE, Plaintiff demands judgment as follows:

(a)    On its first cause of action against Defendant Sabella, a declaratory
judgment declaring that the August 2002 Note, the August 2002
Subscription Agreement and any August 2002 Shares issued to Defendant
Sabella are void for being criminally usurious pursuant to N.Y. PENAL
LAW § 190.40;

(b)    On its second cause of action against Defendant Accordant, a declaratory
judgment declaring that the February 2003 Note, the February 2003
Subscription Agreement and any February 2003 Shares issued to
Defendant Accordant are void for being criminally usurious pursuant to
N.Y. PENAL LAW § 190.40;

(c)    On its third cause of action against Defendant Accordant, a declaratory
judgment declaring that the February 2003 Note the February 2003
Subscription Agreement and any February 2003 Shares issued to
Defendant Accordant are void for being criminally usurious pursuant to
N.Y. PENAL LAW § 190.40; and

7

(d)     Such other and further relief as to this Court deems just and proper, together with cost and disbursements as provided by law.

Dated: New York, New York
       January 21, 2008

Mintz & Fraade, P.C.

By: _____

     Alan P. Fraade
Attorneys for Plaintiff
488 Madison Avenue
New York, New York 10022
(212) 486-2500

8

## AFFIRMATION OF SERVICE

Collin Robert Sherman, an attorney duly admitted to practice under the laws of the State of New York, hereby affirms the truth of the following under the penalty of perjury:

On January 21, 2008, I served the within Amended Summons & Complaint

[**X**]    Service By Certified Mail – Return Receipt Requested, by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to each of the following persons at the last known address set forth after each name:

[  ]    Service By Electronic Means, by transmitting the papers by electronic means to the telephone number listed below, which number was designated by the attorney for such purpose. I received a signal from the equipment of the attorney served indicating that the transmission was received. I also deposited a true copy of the papers, enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service, addressed to the attorney at the address set forth after the name:

[  ]    Service By Delivery Service, by depositing a true copy thereof, enclosed in a wrapper addressed as shown below, into the custody of _____
for overnight delivery, prior to the latest time designated by that service for overnight delivery:

> Ms. Angela Chen Sabella
> 853 East Valley Boulevard, Suite 200
> San Gabriel, CA 91776
>
> Accordant Holdings, LLC
> 853 East Valley Boulevard, Suite 200
> San Gabriel, CA 91776
> Attn: Ms. Angela Chen Sabella
>
> Kenneth Sussmane, Esq
> Sussmane & Zapfel, P.C.
> 521 Fifth Avenue, 28th Floor
> New York, NY 10175

Dated: New York, New York
        January 21, 2008

Collin Robert Sherman

N:\Clients\Scantek Medical Inc\Sabella\Litigation\Affirmation of Service - Amended Summons & Complaint.doc

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------- X Case No. 08 cv 00453 (CM)
SCANTEK MEDICAL INC.,                                     :
                                                          :   ANSWER AND
                            Plaintiff,                    :   COUNTERCLAIMS
                                                          :
          vs.                                             :
                                                          :
ANGELA CHEN SABELLA and ACCORDANT                         :
HOLDINGS, LLC,                                            :
                                                          :
                            Defendants.                   :
----------------------------------------------------------- X

        Accordant Holdings LLC ("Accordant") and Angela Chen Sabella ("Sabella")

(collectively "Defendants" or "Accordant and Sabella"), by and through their attorneys, McCue

Sussmane & Zapfel, P.C., as and for their answer to the Amended Complaint and counterclaims

allege, upon information and belief, as follows:

        1.      Defendants admit the allegations contained in paragraph 1 of the Complaint.

        2.      Defendants admit  the allegations contained in paragraph 2 of the Complaint.

        3.      Defendants admit  the allegations contained in paragraph 3 of the Complaint.

        4.      Defendants deny the allegations contained in paragraph 4 of the Complaint and

refer to the promissory notes for their terms.

        5.      Defendants admit the allegations contained in paragraph 5 of the Complaint.

        6.      Defendants deny the allegations contained in paragraph 6 of the Complaint and

refer to the document for its terms.

        7.      Defendants deny the allegations contained in paragraph 7 of the Complaint.

        8.      Defendants deny knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations contained in paragraph 8 of the Complaint.

1

9.     Defendants deny the allegations contained in paragraph 9 of the Complaint and refer to the purported document for its terms.

10.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 10 of the Complaint.

11.     Defendants deny the allegations contained in paragraph 11 of the Complaint.

12.     Defendants deny the allegations contained in paragraph 12 of the Complaint and refer to the statute for its terms.

13.     Defendants deny the allegations contained in paragraph 13 of the Complaint.

14.     Defendants admit the allegations contained in paragraph 14 of the Complaint.

15.     Defendants admit the allegations contained in paragraph 15 of the Complaint.

16.     Defendants deny the allegations contained in paragraph 16 of the Complaint and refer to the August 2002 Note for its terms.

17.     Defendants deny the allegations contained in paragraph 17 of the Complaint.

18.     Defendants deny the allegations contained in paragraph 18 of the Complaint, and refer to the document for its terms, except Defendants admit that Plaintiff and Defendant Sabella entered into the August 2002 Subscription Agreement and that Defendant Sabella received the August 2002 Note.

19.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 19 of the Complaint.

20.     Defendants deny the allegations contained in paragraph 20 of the Complaint.

21.     Defendants deny the allegations contained in paragraph 21 of the Complaint and refer to the statute for its terms.

22.     Defendants deny the allegations contained in paragraph 22 of the Complaint.

23.     Defendants deny the allegations contained in paragraph 23 of the Complaint

24.     Defendants deny the allegations contained in paragraph 24 of the Complaint.

25.     Defendants deny the allegations contained in paragraph 25 of the Complaint, except as expressly admitted in paragraphs 1 through 24 above.

26.     Defendants admit the allegations contained in paragraph 26 of the Complaint, except defendants deny that Defendant Sabella is the "principal" of Defendant Accordant.

27.     Defendants admit the allegations contained in paragraph 27 of the Complaint.

28.     Defendants deny the allegations contained in paragraph 28 of the Complaint.

29.     Defendants deny the allegations contained in paragraph 29 of the Complaint.

30.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 30 of the Complaint.

31.     Defendants deny the allegations contained in paragraph 31 of the Complaint.

32.     Defendants deny the allegations contained in paragraph 32 of the Complaint and refer to the statute for its terms.

33.     Defendants deny the allegations contained in paragraph 33 of the Complaint.

34.     Defendants deny the allegations contained in paragraph 34 of the Complaint.

35.     Defendants deny the allegations contained in paragraph 35 of the Complaint.

36.     Defendants deny the allegations contained in paragraph 36 of the Complaint, except as expressly admitted in paragraphs 1 through 35 above.

37.     Defendants deny the allegations contained in paragraph 37 of the Complaint.

38.     Defendants admit the allegations contained in paragraph 38 of the Complaint.

39.     Defendants deny the allegations contained in paragraph 39 of the Complaint and refer to the purported document for its terms.

40.     Defendants deny the allegations contained in paragraph 40 of the Complaint and refer to the purported document for its terms.

41.     Defendants deny the allegations contained in paragraph 41 of the Complaint and refer to the purported document for its terms.

42.     Defendants deny the allegations contained in paragraph 42 of the Complaint and refer to the purported document for its terms.

43.     Defendants deny the allegations contained in paragraph 43 of the Complaint.

### SUMMARY OF COUNTERCLAIMS AND AFFIRMATIVE DEFENSES

44.     Scantek Medical, Inc. ("Scantek" or the "Company") commenced this action seeking a judgment declaring that $303,280.80 of promissory notes and 2,000,000 shares of common stock issued by Scantek to Sabella and Accordant are void under New York criminal usury law. Such securities represent a portion of the $828,250 invested by Sabella and Accordant in Scantek.

45.     Sabella and Accordant bring these counterclaims to recover $828,250, plus interest, late fees, legal fees and punitive damages.

46.     Sabella seeks an order transferring certain patents pursuant to a collateral assignment of such patents.

47.     Accordant and Sabella bring counterclaims for common law fraud and negligent misrepresentation, breach of fiduciary duty, and federal securities fraud.  In connection with the sale of its securities, Scantek made numerous untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of the Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act").

48.     Scantek failed to state to Accordant and Sabella the material facts that its attorneys believed that securities offered by Scantek violated New York criminal usury laws and were voidable by Scantek.

49.     Scantek failed to state to Accordant and Sabella the material fact that Scantek was engaged in a scheme to issue securities that Scantek did not intend to honor.

50.     Scantek made numerous false statements regarding Scantek in its Forms 10K and 10Q filed with the U.S. Securities and Exchange Commission ("SEC").

51.     Scantek intended to deceive, manipulate, or defraud Accordant and Sabella, who relied on misrepresentations made by Scantek, and sustained damages as a proximate result thereof.

## THE PARTIES

52.     Accordant is a Delaware limited liability company which maintains its sole place of business in the state of California.

53.     Angela Chen Sabella ("Sabella") is an individual residing in the state of California and is the sole member of Accordant.

54.     Scantek is a Delaware corporation which maintains its principal place of business at 1705 Route 46 West, Unit 5, Ledgewood, New Jersey 07852.

55.     Zsigmond L. Sagi ("Sagi") is the President and a director of Scantek and a resident of the State of New Jersey.

56.     Mintz & Fraade P.C. (the "Mintz Firm") is a New York professional corporation with offices at 488 Madison Avenue, New York, New York 10022.

5

57.     Fred Mintz ("Mintz") is a resident of the State of New York and a practicing attorney, who upon information and belief, is a shareholder of the Mintz Firm, Mintz & Fraade LLC and a member of Mintz LLC.

58.     Alan Fraade ("Fraade") is a resident of the State of New York and a practicing attorney, who, upon information and belief, is a shareholder of the Mintz Firm, Mintz & Fraade LLC and a member of Mintz LLC.

59.      The Mintz Firm, Fraade and Mintz were counsel to Scantek at all times relevant hereto.

60.     The Mintz Firm represented Sabella and Accordant.

61.     Mintz & Fraade Enterprises, LLC ("Mintz LLC") is a New York limited liability company with offices at 488 Madison Avenue, New York, New York 10022. (Mintz LLC, the Mintz Firm, Mintz and Fraade are collectively referred to as the "Mintz Parties").

62.     Mintz LLC is Scantek's second largest shareholder, holding at least 3,300,000 shares of Scantek Common Stock issued in exchange for the legal services of the Mintz Firm and Fred Mintz.  Such shares include 3,000,000 shares (over 9% of Scantek's common stock) issued to the Mintz Firm as payment for $45,000 of legal services.

63.     Gibraltar Global Marketing LLC is a Delaware limited liability company formed in January 2007 by Scantek and Mintz LLC ("Gibraltar"), which maintains its principal place of business at 1705 Route 46 West, Unit 5, Ledgewood, New Jersey 07852. Scantek and Mintz LLC are members of Gibraltar.

## **FACTS**

64.     Scantek is a publicly-held company listed on the "pink sheets" under the symbol SKML.

65.    Scantek claims to be engaged in the business of developing, manufacturing, selling and licensing products and devices that assist in the early detection and diagnosis of disease.

66.    From 1999 through May 20, 2003, Scantek filed the periodic reports required of public companies by the SEC. For the periods after March 31, 2003, Scantek ceased filing its quarterly and annual reports (Forms 10Q and Forms 10K) and financial statements with the SEC in violation of federal securities law and its fiduciary obligations to its shareholders.

67.    Scantek reported the following financial information in its SEC filings:

|  | 9 months ended March 31, 2003 | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|---|
| Accumulated Deficit | $(14,678,582) | $(12,849,147) | $(10,827,551) | $(8,466,380) | $(5,649,915) |
| Stockholder's deficiency | $(9,318,526) | $(8,280,364) | $(6,815,733) | $(5,001,859) | $(2,364,728) |
| Net Sales | 0 | 0 | $21,137 | $88,775 | $855,275 |
| Net Loss | $(1,527,435) | $(2,021,596) | $(2,361,171) | $(2,816,465) | $(1,579,568) |
| Weighted Average # shares of common stock outstanding | 32,857,889 | 26,557,923 | 20,521,527 | 18,431,820 | 17,679,575 |

68.    Scantek's SEC filings reported negligible sales for the fiscal years ended June 30, 2000, and June 30, 2001, no sales for the fiscal year ended June 30, 2002, and no sales for the nine months ending March 31, 2003.  Each Form 10 K filed by Scantek reported that:

> "The Company's need for funds has increased from period to period . . .  Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Operating Officer and major shareholder."

69.    In order to fund Scantek's capital needs,  Scantek, Sagi and the Mintz Parties structured private placements pursuant to which Scantek offered to sell investors a combination of its promissory notes and restricted common stock (collectively the "Securities"). The

Securities were purchased by Sabella, Accordant and numerous third parties, as well as

Scantek's President (Sagi), its Vice President and Secretary, its Vice President of Development,

and two directors.

70.    From 1999 through 2003, Scantek's Forms 10K reported information regarding

the following 18 private placements of the Securities under the heading "Recent Sales of

Unregistered Securities":

|   | Date | Name | Number of Shares Issued Pursuant to Financing | Office |
|---|------|------|-----------------------------------------------|--------|
| 1 | 12/1/98 | three individuals | 75,000 | |
| 2 | 7/1/99 | Sagi | 79,250 | Pres./CEO |
| 3 | 7/1/99 | Patricia Furness | 5,703 | V.P/Sec. |
| 4 | 7/1/99 | Louis Gottlieb | 25,000 | V.P. |
| 5 | 7/1/99 | Two individuals including Paul Nelson | 52,500 | Director |
| 6 | 12/30/99 | Two individuals including Paul Nelson | 7,500 | Director |
| 7 | 3/8/00 | Paul Nelson | 2,500 | Director |
| 8 | 3/8/00 | Louis Gottlieb | 23,750 | V.P. |
| 9 | 4/14/00 | Louis Gottlieb | 50,000 | V.P. |
| 10 | 4/14/00 | Paul Nelson | 2,500 | Director |
| 11 | 8/1/00 | Sagi | 67,900 | Pres./CEO |
| 12 | 8/1/00 | Patricia Furness | 8,750 | V.P/Sec. |
| 13 | 10/20/00 | Carriage House | 100,000 | |
| 14 | 12/14/01 | A lender | 300,000 | |
| 15 | 6/30/02 | two companies | 79,390 | |
| 16 | 6/30/02 | Sagi | 6,435 | Pres./CEO |
| 17 | 6/30/02 | Patricia Furness | 31,141 | V.P/Sec. |
| 18 | 8/20/02 | Sabella | 2,000,000 | |

71.    Private placements of Securities after August 20, 2002 are not reported because

Scantek ceased its SEC filings.

72.    The financial statements of Scantek filed with the SEC reported that:

(a) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors secured notes in the face amount of $492,500 and 135,625 shares of common stock.

(b) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors unsecured notes in the face amount of $1,059,393 and 2,377,765 shares of common stock.

(c) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to Sagi and the Vice President of  Scantek unsecured notes in the face amount of $107,257 and 45,594 shares of common stock.

(d) During the years ended June 30, 2000, 2001 and 2002,  Scantek engaged in private placements of Securities pursuant to which it offered and sold Sagi unsecured notes in the face amount of $1,128,684 and 153,585 shares of common stock.

73.     The audited financial statements of Scantek and each of its SEC filings fail to include any reference to or discussion of the violation of any usury law by the officers, directors and third parties to whom Scantek issued the Securities.

**August 2002 Note**

74.     In August 2002, Scantek delivered to Sabella a document drafted by the Mintz Firm titled "Subscription Agreement" which set forth the proposed terms of the offering of Securities by Scantek to Sabella (the "August 2002 Subscription Agreement").  The August 2002 Subscription Agreement states:

9

1. The "Securities"

> I hereby agree to invest $150,000 in Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a 10% promissory note in the principal amount of one hundred and fifty thousand ($150,000) dollars (the "Note"); and to purchase shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "8" of this Subscription Agreement . . . The Note and the Shares are hereinafter jointly referred to as the "Securities." I hereby agree to pay for the Securities subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

2. Payment

> I am herewith forwarding the aggregate amount of one hundred and fifty thousand ($150,000) dollars by wire transfer to the account of "Mintz & Fraade, P.C."

75. Sabella paid to Mintz & Fraade, P.C. the sum of $150,000.

76. Scantek issued to Sabella a promissory note dated August 20, 2002 in the principal amount of $253,250 (the "August 2002 Note"). The August 2002 Note reflected the incorporation and cancellation of a prior promissory note issued by Scantek to Sabella in April 2002, thereby extending the repayment date of the $100,000 and capitalizing unpaid interest in the amount of $3,250.

77. The August 2002 Note bears interest at the rate of 10% per annum, and provides that in the event of a default, interest is payable at the rate of 24% per annum.

78. The August 2002 Note requires monthly payments of interest and periodic principal payments, with the entire unpaid balance of principal and interest due and payable on February 20, 2003.

79. The president of Scantek, Zsigmond L. Sagi ("Sagi") personally guaranteed the payment and performance of the obligations of Scantek by executing a guaranty at the end of the August 2002 Note.

80. The August 2002 Note requires Scantek to pay all reasonable costs of collection, including attorney's fees and costs.

81. The August 2002 Note provides that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision.

82. Scantek granted to Sabella a security interest in and collaterally assigned to Sabella any and all patents now or hereinafter owned by Scantek (the "Patents").

83. UCC-1 Financing Statements were filed in favor of Sabella to perfect a security interest in such collateral.

84. Scantek and Sagi delivered confessions of judgment with respect to the August 2002 Note.

85. The August 2002 Subscription Agreement provides for the purchase by Sabella of such number of shares of the common stock of Scantek as will result in ownership by Sabella of six percent of all issued and outstanding common stock, including previously purchased shares. Scantek's SEC filings report that Sabella purchased 2,000,000 shares for par value of $.001 per share pursuant to the August 2002 Subscription Agreement (the "Sabella Shares").

86. Scantek's financial statements filed with the SEC with it Form 10K for the year ended June 30, 2002 reported:

|  | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|
| Proceeds from Borrowings | $311,460 | $575,600 | $473,215 | 1,150,000 |
| Number of shares issued for loan financing | 2,099,466 | 3,013,900 | 694,573 | 200,000 |
| Value | $2,099 | $3,015 | $694 | $200 |

87.    The 2,000,000 Sabella Shares issued on August 20, 2002 were included in the 2,099,466 shares reported as issued for the year ended June 30, 2002, for which Scantek's auditors reported a "Value" of $2,099, or a "Value" of $2,000 for the 2,000,000 Sabella Shares.

88.    Such valuation reflects the fact that the Sabella shares were restricted and could not be sold without the filing of a registration statement or otherwise complying with the rules and regulations regarding the sale of unregistered shares of stock.

89.    Such valuation reflects the facts that Scantek had no sales since December 2000, and that as of June 30, 2002, the date of Scantek's last audited financial statements, Scantek had a negative net worth of $.31 per share and an accumulated deficit of $.48 per share.

**February 2003 Note**

90.    In February 2003, Scantek delivered to Accordant a document drafted by the Mintz Firm titled "SUBSCRIPTION AGREEMENT" which purported to set forth the terms of the offering of $50,000 of securities by Scantek to Accordant (the "February 2003 Subscription Agreement"). The February 2003 Subscription Agreement states:

> The "Securities"
>
> 1. The undersigned hereby agree to invest an aggregate of fifty thousand ($50,000) dollars in Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a promissory note in the principal amount of fifty thousand ($50,000) dollars bearing interest at the rate of one (1%) percent per month (the "Note"); and to the purchase of shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "9" of this Subscription Agreement. . . The Note and the Shares are hereinafter jointly referred to as the "Securities." The undersigned hereby agree to pay for the Securities subscribed for by the undersigned in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").
>
> Payment
>
> 2. We are herewith agreeing to forward the amount of the Subscription Price upon execution hereto to the account of "Mintz & Fraade, P.C."

12

91.     Accordant paid to Mintz & Fraade P.C. the sum of $50,000.

92.     The February 2003 Subscription Agreement, the August 2002 Subscription Agreement, and subscription agreements delivered to other investors provided for the delivery of funds in payment for the Securities to the operating account of "Mintz & Fraade, P.C.", not Scantek's operating account, and not an escrow account maintained by any attorney, bank or brokerage firm.  Due to Scantek's failure to prepare SEC reports and financial statements, the Mintz Firm has not accounted for the funds deposited into its account.

93.     Scantek issued to Accordant a promissory note dated February 10, 2003 in the principal amount of $50,000 (the "February 2003 Note").  The February 2003 Note bears interest at the rate of 12% per annum.  Interest and principal were payable in full on June 6, 2003.

94.     Sagi personally guaranteed the payment and performance of the obligations of Scantek by executing the February 2003 Note.

95.     The February 2003 Note requires Scantek to pay all reasonable costs of collection, including attorney's fees and costs.

96.     The February 2003 Note provides that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision of the note.

97.     The Sagi guarantee of the February 2003 Note was secured by 3,000,000 shares of common stock of Scantek owned by Sagi and stock powers executed by Sagi (the "Sagi Shares"), which were required to be held in escrow by the Mintz Firm pursuant to an Escrow Agreement dated March 5, 2003 (the "Escrow Agreement"). The Mintz Firm agreed to act as Escrow Agent for Accordant and has acted in such capacity from March 5, 2003 through the present day.  Accordant demanded proof that the Sagi Shares were held in escrow, and upon default, demanded release of the Sagi Shares to Accordant.

98.    The February 2003 Subscription Agreement provided for the purchase of 300,000 shares of common stock by Accordant. No such shares were issued by Scantek.

99.    The February 2003 Subscription Agreement provided for issuance of additional shares in the event of a default under the February 2003 Note.  No such shares were issued by Scantek.

**Additional Loans**

100.    From November 2003 through May 2004, Accordant loaned to Scantek $425,000 (the "Additional Accordant Loans"), which were funded by making the following wire transfers to the attorney escrow account of the Mintz Firm:

| | |
|---|---|
| November 13, 2003 | $25,000 |
| December 5, 2003 | $60,000 |
| December 12, 2003 | $40,000 |
| March 5, 2004 | $85,000 |
| April 6, 2004 | $125,000 |
| May 20, 2004 | $90,000 |

101.    The Additional Accordant Loans bore interest at the rate of 10% per annum and provided, that in the event of a default, interest is payable at the lesser of 18% per annum or the highest rate permitted under New York law.

102.    Sagi personally guaranteed the November 13, 2003 Additional Accordant Loan in the amount of $25,000.

103.    On February 17, 2004, Sabella loaned to Scantek the sum of $100,000, which was funded by wire transfer into the attorney escrow account of the Mintz Firm (the "Additional Sabella Loan")(the Additional Accordant Loans and Additional Sabella Loan are collectively referred to as the "Additional Loans").

104.     The Additional Sabella Loan bore interest at the rate of 10% per annum and provided that in the event of a default, interest is payable at lesser of 18% per annum or the highest rate permitted under New York law.

105.     All Additional Loans have matured.

**Defaults**

106.     Scantek made no payments of principal or interest to Sabella or Accordant under the August 2002 Promissory Note, the February 2003 Promissory Note, the Additional Accordant Loans or the Additional Sabella Loan.

107.     Sabella and Accordant notified Scantek, Sagi and the Mintz Firm of the defaults, demanded payment in full, and demanded release of the collateral securing the indebtedness, including the Patents collaterally assigned to Sabella and the Sagi Shares which the Mintz Firm agreed to hold in escrow on behalf of Accordant.

108.     Scantek failed to make any payments or release any collateral.

**AFFIRMATIVE DEFENSE I**

109.     Plaintiff's claims are barred by the doctrine of estoppel.

**AFFIRMATIVE DEFENSE II**

110.     Plaintiff's claims are barred by the doctrine of unclean hands.

**COUNTERCLAIM I AND AFFIRMATIVE DEFENSE III**
**For Breach of Contract**

111.     Sabella repeats and realleges each and every allegation contained in paragraphs 44  through 108 as if fully set forth herein.

112.     Scantek is duly indebted to Sabella for $353,250, plus interest.

113.     Scantek failed to make any payments to Sabella.

15

114.    Sabella provided notices of default and demand that Scantek cure the defaults.

115.    Scantek has no defense to payment of the sums due to Sabella.

116.    Sabella is entitled to damages in the amount of $353,250, plus interest from August 20, 2002 on the outstanding balance, plus all reasonable costs of collection, including attorney's fees and costs.

## COUNTERCLAIM II
### For Declaratory Judgment Regarding Patents

117.    Sabella repeats and realleges each and every allegation contained in paragraphs 44 through 108 and 111 through 116 as if fully set forth herein.

118.    In August 2002, Scantek delivered to Sabella a Collateral Assignment (the "Assignment") which provided that Scantek, as security for the repayment of the August 2002 Note, "hereby collaterally assigns to Angela Chen Sabella . . . any and all Patents now or hereinafter owned by Scantek . . . which assignment shall take place upon the occurrence of an Event of Default pursuant to the Note and the failure to cure such event of Default within the applicable time to cure."

119.    The August 2002 Note provided for payment in full by February 20, 2003.

120.    Scantek defaulted on such payment and failed to pay the balance due five business days after receipt of notice of default.

121.    Under the terms of the Assignment, all patents owned by Scantek were assigned to Sabella upon such default and failure to cure.

122.    Sabella is entitled to an order requiring Scantek to execute an assignment of all patents owned by Scantek to be recorded in the United States Patent and Trademark Office.

## COUNTERCLAIM III AND AFFIRMATIVE DEFENSE IV
### For Breach of Contract

123.    Accordant repeats and realleges each and every allegation contained in paragraphs 44 through 108 and 111 through 122 as if fully set forth herein.

124.    Scantek is duly indebted to Accordant for the sum of $475,000, plus interest from February 10, 2003, on the outstanding balance, plus late fees.

125.    Scantek failed to make any payments to Accordant.

126.    Accordant provided notices of default and demand that Scantek cure such default.

127.    Scantek has no defense to payment of the sums due to Accordant.

128.    Accordant is entitled to damages in the amount of $475,000, plus interest from February 10, 2003 on the outstanding balance, plus late fees, plus all reasonable costs of collection, including attorney's fees and costs.

## COUNTERCLAIM IV
### For Fraudulent Conveyance

129.    Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 44 through 108 and 111 through 128 as if fully set forth herein.

130.    On or about March 15, 2007, Scantek announced that it created a limited liability company, Gibraltar and entered into a distribution agreement with Gibraltar granting to Gibraltar distribution rights to a Scantek medical device in more than 150 countries throughout the world (the "Gibraltar Distribution Agreement"). The granting of such rights constituted a conveyance within the meaning of New York Debtor Creditor Law Section 270.

131.    Upon information and belief, such conveyance was made without fair consideration to Scantek within the meaning of New York Debtor Creditor Law Section 272.

132.    Upon information and belief, such conveyance was made at a time Scantek was insolvent within the meaning of New York Debtor Creditor Law Section 271.

133.    Upon information and belief, the property remaining in Scantek's hands after the conveyance to Gibraltar was an unreasonably small capital within the meaning of New York Debtor Creditor Law Section 274.

134.    Upon information and belief, the conveyance to Gibraltar was made with actual intent to hinder, delay or defraud Sabella and Accordant within the meaning of New York Debtor Creditor Law Section 276.

135.    Sabella and Accordant are entitled to have the Gibraltar Distribution Agreement set aside or annulled.

### COUNTERCLAIM V AND AFFIRMATIVE DEFENSE V
### For Common Law Fraud

136.    Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 44 through 108 and 111 through 135 as if fully set forth herein.

137.    In order to fund the its capital needs, Scantek structured private placements pursuant to which Scantek sold the Securities to numerous investors.

138.    The private placements were a device, scheme or article to defraud investors because, upon information and belief, Scantek, Sagi and the Mintz Parties structured the transactions with the intent of claiming that the Securities violated New York State criminal usury laws and were voidable by Scantek.

139.    Upon information and belief, Scantek was engaged in a scheme to issue Securities which Scantek did not intend to honor.

140.    Scantek, Sagi and the Mintz Parties had the authority and, in fact, ability to control the contents of the disclosures made in connection with the offering of the Securities to

Accordant and Sabella, including the Subscription Agreements and the Forms 10K and 10 Q

filed with the SEC, and other false and misleading statements and material omissions to Sabella

and Accordant. Scantek, Sagi and the Mintz Parties were aware that the statements made to

Accordant and Sabella were misleading and contained material omissions, and had the ability

and opportunity to prevent such statements and omissions or cause them to be corrected, but

failed to do so.

141.    Upon information and belief, the Mintz Parties engaged in similar schemes by

structuring securities offerings on behalf of other issuers and then attempting to void the

securities by claiming violation of usury laws.

142.    Scantek selected New York law as the governing law for the Securities even

though New York had no connection to the transactions because New York law allows a

corporation to interpose the defense of criminal usury.  Scantek did not select Delaware law,

under which the defense of usury is not available to corporations pursuant to 6 Del.C. § 2306.

Scantek did not select New Jersey law, under which loans in the amount of $50,000.00 or more

may be made at any rate of interest pursuant to N.J.S.A. 31:1-1(e)(1).

143.    Scantek had a duty to disclose any risk that the Securities were not duly and

validly issued and enforceable in accordance with their terms and any risk that the Securities

violated any law.

144.    Scantek failed to disclose the opinion of its counsel that the Securities violated

New York state usury law and were not duly and validly issued and enforceable in accordance

with their terms.

145.    Scantek, Sagi and the Mintz Parties filed Forms 10K and Forms 10Q and audited

financial statements with the SEC which disclosed and discussed numerous private placements

of the Securities from 1999 through 2003 to third parties as well as officers and directors of Scantek.

146.     The Scantek SEC filings contain no reference to or discussion of a purported violation of any usury law by the officers, directors and third parties to whom Scantek issued the Securities.

147.     Scantek's audited financial statements report such transactions in accordance with generally accepted accounting principles without discussion of potential violation of any usury law and in fact "blessed" the transactions.

148.     Scantek induced Sabella and Accordant to acquire the Securities and make the Additional Loans by making false statements to Sabella and Accordant that sales of medical devices by Scantek in Brazil were imminent. Pursuant to their scheme to deceive Sabella about the status of such sales, a provision was included in the August 2002 Note providing for payment to Sabella of $.475 for each  medical device sold in Brazil until principal and interest were paid in full.

149.     Scantek's Form 10K filed with the SEC for the calendar year ending June 30, 2001, included false statements that Scantek "expects to ship the BreastCare (TM)/BreastAlert(TM) device from the United States during the fourth quarter of calendar 2001 to Brazil" and "shipments to other parts of South America and Europe will commence during the latter part of 2002."  Scantek did not expect such shipments to commence as stated and included such false statements to induce investors to purchase Securities.

150.     Scantek's Form 10K filed with the SEC for the calendar year ending June 30, 2002, included false statements that Scantek "expects to ship the BreastCare (TM)/ BreastAlert(TM) device from the United States during the fourth quarter of calendar 2002 to

Brazil" and "expects cash flow from sales commencing in the fourth quarter of calendar 2002."
Scantek did not expect such shipments to commence and cash flow to commence in the fourth
quarter of 2002 and included such false statements to induce investors to purchase Securities.

151.    Scantek's Form 10Q filed with the SEC on May 20, 2003 for the quarter ending
March 31, 2003, included false statements that Scantek (a) anticipates sale of its entire inventory
in calendar year 2003, and (b) the Company expects cash flow from sales commencing in 2003
to cover operations of the Company through December 2003.

152.    Scantek induced Sabella and Accordant to invest in the Securities and to make the
Additional Loans by making false oral and written statements to Sabella and Accordant from
April 2002 through the May 20, 2004. These statements included regarding the quantity of orders
received for Scantek products in Brazil, that Scantek's sales of medical devices in Brazil had
commenced, and that Scantek had commenced earning revenue from such sales which would be
used by Scantek to repay its obligations to Sabella and Accordant.

153.    On April 24, 2002, Scantek and Sagi falsely represented to defendant Sabella in
writing that the proceeds of the initial $100,000 loan made by Sabella "will be used exclusively
would be used solely for our Brazilian activities.  It will not be used to pay any outstanding
debts."

154.    On January 14, 2003, Scantek and Sagi represented to defendants in writing that
an order for 100,000 Breastcare units had been confirmed and would be emitted with a letter of
credit inside of 30 days.

155.    In May 2003, Scantek falsely represented to defendants in writing that a test by
INCA (Brazilian National Institute of Cancer) would start on May 15, 2003.

156.    In May 2003, Scantek's private placement memorandum (a) falsely represented that Scantek had largely executed its strategy in South America of establishing a regional manufacturing and/or assembly center to supply demand created by local marketing partners. Scantek (b) failed to disclose that sales to Brazil had not yet commenced, (c) failed to disclose that orders in Brazil (which Scantek represented had been received) had not been shipped by Scantek, (d) falsely represented that Scantek has received approvals required for sale of its products in Brazil, and (e) failed to disclose that Scantek had not received an import license in Brazil required to ship products to Brazil.

157.    Scantek made misrepresentations of numerous material facts and failed to disclose material facts to Sabella and Accordant, as set forth above.

158.    Scantek made the misrepresentations intentionally or recklessly in order to deceive Sabella and Accordant.

159.    Sabella and Accordant justifiably relied on the misrepresentations made by Scantek.

160.    Accordant and Sabella would not have invested in Scantek if Scantek had not made the misrepresentations set forth above and such misrepresentations caused Accordant and Sabella to suffer a loss in an amount to be proven at trial.

161.    Scantek had knowledge of the existence of the misrepresentations and rendered substantial assistance to the fraud.

162.    Scantek is liable to Accordant and Sabella for damages suffered in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Scantek.

## COUNTERCLAIM VI AND AFFIRMATIVE DEFENSE VI
### For Violation of Section 10(b) of the 1934 Act

163.    Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 44 through 108 and 111 through 162 as if fully set forth herein.

164.    Accordant and Sabella relied on the untrue statements and omissions of Scantek, Sagi and the Mintz Parties in investing in Scantek. Accordant and Sabella would not have made such investment if Scantek, Sagi and the Mintz Parties had not made material misstatements and misrepresentations.

165.    Scantek, Sagi and the Mintz Parties induced Accordant and Sabella to rely on the material misstatements and misrepresentations knowing that such representations were false and in doing so, intended to deceive, manipulate, or defraud Accordant and Sabella. Scantek, Sagi and the Mintz Parties knew that Accordant and Sabella would not invest if the material facts had been disclosed.

166.    Accordant and Sabella sustained damages as the proximate result of the untrue statements and omissions.

167.    At all relevant times, Scantek, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct whereby it knowingly and/or recklessly made materially false and misleading statements to induce Accordant and Sabella to invest in Scantek.

168.    Scantek is a direct participant in the wrongs complained of herein.  Scantek did, directly or indirectly, control the content of the disclosures and other statements made to induce Accordant and Sabella to invest in Scantek and failed to correct those statements in timely fashion once it knew or was reckless in not knowing that those statements were no longer true or accurate.

169.     Scantek had actual knowledge of the facts making the material statements false and misleading, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though same were available to Scantek.

170.     Without knowledge of the true facts concerning the Securities and the scheme engaged in by Scantek, Sagi and the Mintz Parties, Accordant and Sabella invested in the Securities and made the Additional Loans and have been damaged thereby.

171.     Accordant and Sabella have incurred a loss in an amount to be proven at trial.

172.     By virtue of the foregoing, Scantek violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

173.     By virtue of the conduct alleged herein, Scantek is liable to Accordant and Sabella for damages suffered in an amount to be proven at trial, but in no event less than $828,250, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Scantek.

## COUNTERCLAIM VII AND AFFIRMATIVE DEFENSE VII
### Common Law Negligent Misrepresentation

174.     Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 44 through 108 and 111 through 173 as if fully set forth herein.

175.     Scantek acted with carelessness in imparting words by making the material misstatements and misrepresentations to Accordant and Sabella as set forth above.

176.     Scantek expected Accordant and Sabella to rely on such misstatements and misrepresentations.

177.     Accordant and Sabella acted upon the misstatements and misrepresentations of Scantek in investing in Scantek, to their damage.

178.     Scantek directed the words directly to Accordant and Sabella, with knowledge that they would be acted upon by Accordant and Sabella.

24

179.    As the issuer of securities, Scantek was bound to Accordant and Sabella by a relation of duty or care.

180.    Scantek is liable for the aforesaid wrongful conduct and is liable to Accordant and Sabella for damages suffered in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Scantek, Sagi and the Mintz Parties.

## JURY DEMAND

Accordant and Sabella hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Accordant and Sabella demand judgment:

a.    On Counterclaim I, awarding damages to Sabella from Scantek in an amount to be proven at trial, but in no event less than $353,250, plus interest from August 20, 2003, plus attorneys fees;

b.    On Counterclaim II, ordering Scantek to execute an assignment to Sabella of all patents owned by Scantek to be recorded in the United States Patent and Trademark Office.

c.    On Counterclaim III, awarding damages to Accordant from Scantek in an amount to be proven at trial, but in no event less than $475,000, plus interest from February 10, 2003, plus late fees and attorneys fees;

d.    On Counterclaim IV, entering an order declaring that Gibraltar Distribution Agreement is null and void;

e.    On Counterclaim V, awarding damages to Sabella and Accordant from Scantek in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

f.    On Counterclaim VI, awarding damages to Sabella and Accordant from Scantek in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

g.    On Counterclaim VII, awarding damages to Sabella and Accordant from Scantek in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct; and

        h.      Awarding such other relief as this Court deems just and proper.

Dated: New York, New York
      April 17, 2008

                                McCue Sussmane & Zapfel, P.C.


                                By:____/S/_____
                                Kenneth Sussmane (KS 9301)
                                521 Fifth Avenue, 28th Floor
                                New York, New York  10175
                                212-931-5500
                                ksussmane@mszpc.com

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X  Case No. 08 cv 00453 (CM)
SCANTEK MEDICAL INC.,                               :
                                                    :  AMENDED
                              Plaintiff,            :  THIRD PARTY COMPLAINT
                                                    :
            vs.                                     :
                                                    :
ANGELA CHEN SABELLA and ACCORDANT                   :
HOLDINGS, LLC,                                      :
                                                    :
                    Defendants and Third-Party      :
                    Plaintiffs,                     :
            vs.                                     :
                                                    :
MINTZ & FRAADE, P.C., FRED MINTZ, ALAN              :
FRAADE, MINTZ & FRAADE ENTERPRISES,                 :
LLC, ZSIGMOND L. SAGI, and GIBRALTAR                :
GLOBAL MARKETING LLC.                               :
                                                    :
                    Third-Party Defendants.         :
------------------------------------------------------------- X

         Accordant Holdings LLC ("Accordant") and Angela Chen Sabella ("Sabella")

(collectively "Defendants" or "Third-Party Plaintiffs"), by and through their attorneys, McCue

Sussmane & Zapfel, P.C., as and for their amended third-party complaint allege, upon

information and belief, as follows:

## SUMMARY OF CLAIMS

         1.       Scantek Medical, Inc. ("Scantek" or the "Company") commenced this action

seeking a judgment declaring that $303,280.80 of promissory notes and 2,000,000 shares of

common stock issued by Scantek to Sabella and Accordant are void under New York criminal

usury law. Such securities represent a portion of the $828,250 invested by Sabella and Accordant

in Scantek.

         2.       Accordant and Sabella bring third-party claims for common law fraud and

negligent misrepresentation, and federal securities fraud. In connection with the sale of securities

1

of Scantek, Third-Party Defendants and Scantek made numerous untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of the Section 10(b) Securities Exchange Act of 1934 (the "1934 Act").

3.     Scantek and Third-Party Defendants failed to state to Accordant and Sabella the material facts that they believed that securities offered by Scantek violated New York criminal usury laws and were voidable by Scantek.

4.     Scantek and Third-Party Defendants failed to state to Accordant and Sabella the material fact that Scantek and Third-Party Defendants were engaged in a scheme to issue securities that Scantek did not intend to honor.

5.     Scantek and Third-Party Defendants made numerous false statements regarding Scantek in its Forms 10K and 10Q filed with the U.S. Securities and Exchange Commission ("SEC").

6.     Scantek and Third-Party Defendants intended to deceive, manipulate, or defraud Accordant and Sabella, who relied on such misrepresentations, and sustained damages as a proximate result thereof.

7.     Accordant and Sabella bring third-party claims against their attorneys Mintz & Fraade P.C. (the "Mintz Firm"), Alan Fraade and Fred Mintz for malpractice and breach of fiduciary duty.  The Mintz Firm, Mr. Fraade, and Mr. Mintz failed to advise Accordant and Sabella of their opinion that the securities offering that they structured and drafted violated New York criminal usury statutes, and that Scantek and Third-Party Defendants were engaged in a scheme to issue securities which Scantek did not intend to honor.  The Mintz Firm had conflicts of interest, which conflicts were not waived.

2

8.      Accordant and Sabella bring this action against Zsigmond l. Sagi ("Sagi"), the president and largest shareholder of Scantek as the result of his personal guarantee of certain obligations of Scantek and for federal securities fraud, common law fraud and negligent misrepresentation, and breach of fiduciary duty.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332 and 1338, and pursuant to Section 27 of the Securities Exchange Act of 1934 (the "1934 Act").  Third-Party Plaintiffs assert counterclaims and third-party claims arising under Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §78j(b) and 78t(a), and Rule l0b-5, 17 C.F.R.§240.10b-5, promulgated thereunder by the Securities and Exchange Commission, and 35 U.S.C. §261.

10.     There is complete diversity of citizenship and the amount in controversy exceeds $75,000.

11.     Venue is proper in this District pursuant to 28 U.S.C.§ 1391(b). Many of the acts giving rise to the violations complained of occurred in this District and at least two of the Third-Party Defendants reside in this District.

## THE PARTIES

12.     Accordant is a Delaware limited liability company which maintains its sole place of business in the state of California.

13.     Angela Chen Sabella ("Sabella") is an individual residing in the state of California and is the sole member of Accordant.

14.     Scantek is a Delaware corporation which maintains its principal place of business at 1705 Route 46 West, Unit 5, Ledgewood, New Jersey 07852.

3

15.     Third-Party Defendant Zsigmond L. Sagi ("Sagi") is the President and a director of Scantek and a resident of the State of New Jersey.

16.     Third-Party Defendant Mintz & Fraade P.C. (the "Mintz Firm") is a New York professional corporation with offices at 488 Madison Avenue, New York, New York 10022.

17.     Third-Party Defendant Fred Mintz ("Mintz") is a resident of the State of New York and a practicing attorney who, upon information and belief, is a shareholder of the Mintz Firm, Mintz & Fraade LLC and a member of Mintz LLC.

18.     Third-Party Defendant Alan Fraade ("Fraade") is a resident of the State of New York and a practicing attorney who, upon information and belief, is a shareholder of the Mintz Firm, Mintz & Fraade LLC and a member of Mintz LLC.

19.      The Mintz Firm, Fraade and Mintz were counsel to Scantek at all times relevant hereto.

20.     The Mintz Firm represented Sabella in connection with certain investments made by Sabella on or about the time of her investments in Scantek.

21.     Third-Party Defendant Mintz & Fraade Enterprises, LLC ("Mintz LLC") is a New York limited liability company with offices at 488 Madison Avenue, New York, New York 10022. (Mintz LLC, the Mintz Firm, Mintz and Fraade are collectively referred to as the "Mintz Defendants").

22.     Mintz LLC is Scantek's second largest shareholder, holding at least 3,300,000 shares of Scantek Common Stock issued in exchange for the legal services of the Mintz Firm and Fred Mintz.  Such shares include 3,000,000 shares (over 9% of Scantek's common stock) issued to the Mintz Firm as payment for $45,000 of legal services.

23.    Gibraltar Global Marketing LLC is a Delaware limited liability company formed in January 2007 by Scantek and Mintz LLC ("Gibraltar"), which maintains its principal place of business at 1705 Route 46 West, Unit 5, Ledgewood, New Jersey 07852. Scantek and Mintz LLC are members of Gibraltar.

## FACTS

24.    Scantek is a publicly-held company listed on the "pink sheets" under the symbol SKML.

25.    Scantek claims to be engaged in the business of developing, manufacturing, selling and licensing products and devices that assist in the early detection and diagnosis of disease.

26.    From 1999 through May 20, 2003, Scantek filed the periodic reports required of public companies by the SEC. For the periods after March 31, 2003, Scantek ceased filing its quarterly and annual reports (Forms 10Q and Forms 10K) and financial statements with the SEC in violation of federal securities law and its fiduciary obligations to its shareholders.

27.    Scantek reported the following financial information in its SEC filings:

|  | 9 months ended March 31, 2003 | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|---|
| Accumulated Deficit | $(14,678,582) | $(12,849,147) | $(10,827,551) | $(8,466,380) | $(5,649,915) |
| Stockholder's deficiency | $(9,318,526) | $(8,280,364) | $(6,815,733) | $(5,001,859) | $(2,364,728) |
| Net Sales | 0 | 0 | $21,137 | $88,775 | $855,275 |
| Net Loss | $(1,527,435) | $(2,021,596) | $(2,361,171) | $(2,816,465) | $(1,579,568) |
| Weighted Average  # shares of common stock outstanding | 32,857,889 | 26,557,923 | 20,521,527 | 18,431,820 | 17,679,575 |

28.    Scantek's SEC filings reported negligible sales for the fiscal years ended June 30, 2000, and June 30, 2001, no sales for the fiscal year ended June 30, 2002, and no sales for the nine months ending March 31, 2003.  Each Form 10 K filed by Scantek reported that:

> "The Company's need for funds has increased from period to period . . .  Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Operating Officer and major shareholder."

29.    In order to fund Scantek's capital needs, Third-Party Defendants structured private placements pursuant to which Scantek offered to sell investors a combination of its promissory notes and restricted common stock (collectively the "Securities"). The Securities were purchased by Sabella, Accordant and numerous third parties, as well as Scantek's President (Sagi), its Vice President and Secretary, its Vice President of Development, and two directors.

30.    From 1999 through 2003, Scantek's Forms 10K reported information regarding the following 18 private placements of the Securities under the heading "Recent Sales of Unregistered Securities":

|   | Date | Name | Number of Shares Issued Pursuant to Financing | Office |
|---|------|------|------------------------------------------------|--------|
| 1 | 12/1/98 | three individuals | 75,000 | |
| 2 | 7/1/99 | Sagi | 79,250 | Pres./CEO |
| 3 | 7/1/99 | Patricia Furness | 5,703 | V.P/Sec. |
| 4 | 7/1/99 | Louis Gottlieb | 25,000 | V.P. |
| 5 | 7/1/99 | Two individuals including Paul Nelson | 52,500 | Director |
| 6 | 12/30/99 | Two individuals including Paul Nelson | 7,500 | Director |
| 7 | 3/8/00 | Paul Nelson | 2,500 | Director |
| 8 | 3/8/00 | Louis Gottlieb | 23,750 | V.P. |
| 9 | 4/14/00 | Louis Gottlieb | 50,000 | V.P. |
| 10 | 4/14/00 | Paul Nelson | 2,500 | Director |
| 11 | 8/1/00 | Sagi | 67,900 | Pres./CEO |
| 12 | 8/1/00 | Patricia Furness | 8,750 | V.P/Sec. |
| 13 | 10/20/00 | Carriage House | 100,000 | |

|    | Date     | Name             | Number of Shares Issued Pursuant to Financing | Office     |
|----|----------|------------------|-----------------------------------------------|------------|
| 14 | 12/14/01 | A lender         | 300,000                                       |            |
| 15 | 6/30/02  | two companies    | 79,390                                        |            |
| 16 | 6/30/02  | Sagi             | 6,435                                         | Pres./CEO  |
| 17 | 6/30/02  | Patricia Furness | 31,141                                        | V.P/Sec.   |
| 18 | 8/20/02  | Sabella          | 2,000,000                                     |            |

31.     Private placements of Securities after August 20, 2002 are not reported because Scantek ceased its SEC filings.

32.     The financial statements of Scantek filed with the SEC reported that:

(a) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors secured notes in the face amount of $492,500 and 135,625 shares of common stock.

(b) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to investors unsecured notes in the face amount of $1,059,393 and 2,377,765 shares of common stock.

(c) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold to Sagi and the Vice President of  Scantek unsecured notes in the face amount of $107,257 and 45,594 shares of common stock.

(d) During the years ended June 30, 2000, 2001 and 2002, Scantek engaged in private placements of Securities pursuant to which it offered and sold Sagi unsecured notes in the face amount of $1,128,684 and 153,585 shares of common stock.

33.     The audited financial statements of Scantek and each of its SEC filings fail to

include any reference to or discussion of the violation of any usury law by the officers, directors

and third parties to whom Scantek issued the Securities.

**August 2002 Note**

34.     In August 2002, Scantek delivered to Sabella a document drafted by the Mintz

Firm titled "SUBSCRIPTION AGREEMENT" which set forth the proposed terms of the

offering of Securities by Scantek to Sabella (the "August 2002 Subscription Agreement").  The

August 2002 Subscription Agreement states:

1. The "Securities"

I hereby agree to invest $150,000 in Scantek Medical, Inc., a corporation
organized and existing under the laws of the State of Delaware (the "Company"),
evidenced by a 10% promissory note in the principal amount of one hundred and
fifty thousand ($150,000) dollars (the "Note"); and to purchase shares of
Common Stock, par value $.001, (the "Shares") from the Company as set forth in
Article "8" of this Subscription Agreement . . . The Note and the Shares are
hereinafter jointly referred to as the "Securities."  I hereby agree to pay for the
Securities subscribed for by me in the manner which is described in Article "2" of
this Subscription Agreement (the "Subscription Agreement").

2.      Payment

I am herewith forwarding the aggregate amount of one hundred and fifty
thousand ($150,000) dollars by wire transfer to the account of "Mintz & Fraade,
P.C."

35.     Sabella paid to Mintz & Fraade, P.C. the sum of $150,000.

36.     Scantek issued to Sabella a promissory note dated August 20, 2002 in the

principal amount of $253,250 (the "August 2002 Note").  The August 2002 Note reflected the

incorporation and cancellation of a prior promissory note issued by Scantek to Sabella in April

2002, thereby extending the repayment date of the $100,000 and capitalizing unpaid interest in

the amount of $3,250.

37.     The August 2002 Note bears interest at the rate of 10% per annum, and provides that in the event of a default, interest is payable at the rate of 24% per annum.

38.     The August 2002 Note requires monthly payments of interest and periodic principal payments, with the entire unpaid balance of principal and interest due and payable on February 20, 2003.

39.     The president of Scantek, Zsigmond L. Sagi ("Sagi") personally guaranteed the payment and performance of the obligations of Scantek by executing a guaranty at the end of the August 2002 Note.

40.     The August 2002 Note requires Scantek to pay all reasonable costs of collection, including attorney's fees and costs.

41.     The August 2002 Note provides that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision.

42.     Scantek granted to Sabella a security interest in and collaterally assigned to Sabella any and all patents now or hereinafter owned by Scantek (the "Patents").

43.     UCC-1 Financing Statements were filed in favor of Sabella to perfect a security interest in such collateral.

44.     Scantek and Sagi delivered confessions of judgment with respect to the August 2002 Note.

45.     The August 2002 Subscription Agreement provides for the purchase by Sabella of such number of shares of the common stock of Scantek as will result in ownership by Sabella of six percent of all issued and outstanding common stock, including previously purchased shares. Scantek's SEC filings report that Sabella purchased 2,000,000 shares for par value of $.001 per share pursuant to the August 2002 Subscription Agreement (the "Sabella Shares").

46.    Scantek's financial statements filed with the SEC with it Form 10K for the year ended June 30, 2002 reported:

|  | Year Ended June 30,2002 | Year Ended June 30, 2001 | Year ended June 30, 2000 | Year ended June 30, 1999 |
|---|---|---|---|---|
| Proceeds from Borrowings | $311,460 | $575,600 | $473,215 | 1,150,000 |
| Number of shares issued for loan financing | 2,099,466 | 3,013,900 | 694,573 | 200,000 |
| Value | $2,099 | $3,015 | $694 | $200 |

47.    The 2,000,000 Sabella Shares issued on August 20, 2002 were included in the 2,099,466 shares reported as issued for the year ended June 30, 2002, for which Scantek's auditors reported a "Value" of $2,099, or a "Value" of $2,000 for the 2,000,000 Sabella Shares.

48.    Such valuation reflects the fact that the Sabella shares were restricted and could not be sold without the filing of a registration statement or otherwise complying with the rules and regulations regarding the sale of unregistered shares of stock.

49.    Such valuation reflects the facts that Scantek had no sales since December 2000, and that as of June 30, 2002, the date of Scantek's last audited financial statements, Scantek had a negative net worth of $.31 per share and an accumulated deficit of $.48 per share.

**February 2003 Note**

50.    In February 2003, Scantek delivered to Accordant a document drafted by the Mintz Firm titled "Subscription Agreement" which purported to set forth the terms of the offering of $50,000 of securities by Scantek to Accordant (the "February 2003 Subscription Agreement"). The February 2003 Subscription Agreement states:

The "Securities"

1. The undersigned hereby agree to invest an aggregate of fifty thousand ($50,000) dollars in Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a

10

promissory note in the principal amount of fifty thousand ($50,000) dollars bearing interest at the rate of one (1%) percent per month (the "Note"); and to the purchase of shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "9" of this Subscription Agreement. . . The Note and the Shares are hereinafter jointly referred to as the "Securities." The undersigned hereby agree to pay for the Securities subscribed for by the undersigned in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

Payment

2. We are herewith agreeing to forward the amount of the Subscription Price upon execution hereto to the account of "Mintz & Fraade, P.C."

51.	Accordant paid to Mintz & Fraade P.C. the sum of $50,000.

52.	The February 2003 Subscription Agreement, the August 2002 Subscription Agreement, and subscription agreements delivered to other investors provided for the delivery funds in payment for the Securities to the operating account of "Mintz & Fraade, P.C.", not Scantek's operating account, and not an escrow account maintained by any attorney, bank or brokerage firm. Due to Scantek's failure to prepare SEC reports and financial statements, the Mintz Firm has not accounted for the funds deposited into its account.

53.	Scantek issued to Accordant a promissory note dated February 10, 2003 in the principal amount of $50,000 (the "February 2003 Note"). The February 2003 Note bears interest at the rate of 12% per annum. Interest and principal were payable in full on June 6, 2003.

54.	Sagi personally guaranteed the payment and performance of the obligations of Scantek by executing the February 2003 Note.

55.	The February 2003 Note requires Scantek to pay all reasonable costs of collection, including attorney's fees and costs.

56.	The February 2003 Note provides that if any provision should be held to be invalid or unenforceable, such invalidity shall not affect any other provision of the note.

11

57.    The Sagi guarantee of the February 2003 Note was secured by 3,000,000 shares of common stock of Scantek owned by Sagi and stock powers executed by Sagi (the "Sagi Shares"), which were required to be held in escrow by the Mintz Firm pursuant to an Escrow Agreement dated March 5, 2003 (the "Escrow Agreement").  The Mintz Firm agreed to act as Escrow Agent for Accordant and has acted in such capacity from March 5, 2003 through the present day.  Accordant demanded proof that the Sagi Shares were held in escrow, and upon default, demanded release of the Sagi Shares to Accordant.

58.    The February 2003 Subscription Agreement provided for the purchase of 300,000 shares of common stock by Accordant. No such shares were issued by Scantek.

59.    The February 2003 Subscription Agreement provided for issuance of additional shares in the event of a default under the February 2003 Note.  No such shares were issued by Scantek.

**Additional Loans**

60.    From November 2003 through May 2004, Accordant loaned to Scantek $425,000 (the "Additional Accordant Loans"), which were funded by making the following wire transfers to the attorney escrow account of the Mintz Firm:

| | |
|---|---|
| November 13, 2003 | $25,000 |
| December 5, 2003 | $60,000 |
| December 12, 2003 | $40,000 |
| March 5, 2004 | $85,000 |
| April 6, 2004 | $125,000 |
| May 20, 2004 | $90,000 |

61.    The Additional Accordant Loans bore interest at the rate of 10% per annum and provided, that in the event of a default, interest is payable at the lesser of 18% per annum or the highest rate permitted under New York law.

62.    Sagi personally guaranteed the payment and performance of the obligations of Scantek to repay the $25,000 Additional Accordant Loan made on November 13, 2003.

63.    On February 17, 2004, Sabella loaned to Scantek the sum of $100,000, which was funded by wire transfer into the attorney escrow account of the Mintz Firm (the "Additional Sabella Loan")(the Additional Accordant Loans and Additional Sabella Loan are collectively referred to as the "Additional Loans").

64.    The Additional Sabella Loan bore interest at the rate of 10% per annum and provided that in the event of a default, interest is payable at lesser of 18% per annum or the highest rate permitted under New York law.

65.    All Additional Loans have matured.

**Defaults**

66.    Scantek made no payments of principal or interest to Sabella or Accordant under the August 2002 Promissory Note, the February 2003 Promissory Note, the Additional Accordant Loans or the Additional Sabella Loan.

67.    Sabella and Accordant notified Scantek and Third-Party Defendants of the defaults, demanded payment in full, and demanded release of the collateral securing the indebtedness, including the Patents collaterally assigned to Sabella and the Sagi Shares which the Mintz Firm agreed to hold in escrow on behalf of Accordant.

68.    Scantek and Third-Party Defendants failed to make any payments or release any collateral.

**COUNT I**
**Breach of Contract**
**By Sabella against Sagi**

69.     Sabella repeats and realleges each and every allegation contained in paragraphs 1

through 68 as if fully set forth herein.

70.     Scantek is duly indebted to Sabella for the principal sum of $253,250, plus

interest and legal fees pursuant to the August 2002 Note.

71.     Scantek failed to make any payments to Sabella.

72.     Sagi guaranteed the obligations of Scantek to Sabella pursuant to the August 2002

Note .

73.     Sabella provided notices of default and demand that Sagi cure the defaults.

74.     Sagi has no defense to payment of the sums due to Sabella.

75.     Sabella is entitled to damages in the amount of $253,250, plus interest from

August 20, 2002 on the outstanding balance, plus all reasonable costs of collection, including

attorney's fees and costs.

**COUNT II**
**Breach of Contract**
**By Accordant Against Sagi**

76.     Accordant repeats and realleges each and every allegation contained in paragraphs

1 through 75 as if fully set forth herein.

77.     Scantek is duly indebted to Accordant for the principal sum of $50,000 pursuant

to the February 2003 Note, and $25,000 pursuant to the November 2003 Note, plus interest from

February 10, 2003 on the outstanding balance, plus late fees and legal fees.

78.     Scantek failed to make any payments to Accordant.

14

79.   Sagi guaranteed the obligations of Scantek to Accordant.

80.   Accordant provided notices of default and demand that Sagi cure such default.

81.   Sagi has no defense to payment of the sums due to Accordant.

82.   Accordant is entitled to damages in the amount of $75,000, plus interest from February 10, 2003 on the outstanding balance, plus late fees, plus all reasonable costs of collection, including attorney's fees and costs.

### COUNT III
### Breach of Contract
### By Accordant Against Sagi and Mintz Firm

83.   Accordant repeats and realleges each and every allegation contained in paragraphs 1 through 82 as if fully set forth herein.

84.   Sagi pledged to Accordant the Sagi Shares as collateral for his guarantee of the February 2003 Note, which shares were required to be held in escrow by the Mintz Firm.

85.   The Escrow Agreement provided that if the Mintz Firm did not receive a bank or certified check for the principal amount of the February 2003 Note plus interest, the Mintz Firm "shall deliver the Shares, the Stock Powers and the Scantek Note to the Payee as instructed by the Payee."

86.   The Mintz Firm did not receive payment from Scantek and wilfully failed to release the Sagi Shares to Accordant.

87.   Accordant demanded that the Mintz Firm release the Sagi Shares to Accordant and demanded proof that the Mintz Firm was holding the Sagi Shares in Escrow.

88.   Upon information and belief, the Sagi Shares were pledged to other lenders as security for other loans to Scantek without permission from or notice to Accordant in willful violation of the Escrow Agreement.

15

89.    Upon information and belief the Sagi Shares were either never deposited in escrow pursuant to the Escrow Agreement, or were released to provide collateral to other lenders, without notice to Accordant, in willful violation of the Escrow Agreement.

90.    The Mintz Firm refused to deliver the Sagi Shares or provide proof that it was holding the Sagi Shares in willful violation of the Escrow Agreement.

91.    Accordant is entitled to an order requiring the Mintz Firm and Sagi to deliver to Accordant the Sagi Shares.

**COUNT IV**
**For Fraudulent Conveyance**
**By Sabella and Accordant Against Gibraltar**

92.    Accordant and Sabella repeat and reallege each and every allegation contained in paragraphs 1 through 91 as if fully set forth herein.

93.    On or about March 15, 2007, Scantek announced that it created a limited liability company, Gibraltar and entered into a distribution agreement with Gibraltar granting to Gibraltar distribution rights to a Scantek medical device in more than 150 countries throughout the world (the "Gibraltar Distribution Agreement"). The granting of such rights constituted a conveyance within the meaning of New York Debtor Creditor Law Section 270.

94.    Upon information and belief, such conveyance was made without fair consideration to Scantek within the meaning of New York Debtor Creditor Law Section 272.

95.    Upon information and belief, such conveyance was made at a time Scantek was insolvent within the meaning of New York Debtor Creditor Law Section 271.

96.    Upon information and belief, the property remaining in Scantek's hands after the conveyance to Gibraltar was an unreasonably small capital within the meaning of New York Debtor Creditor Law Section 274.

97.     Upon information and belief, the conveyance to Gibraltar was made with actual intent to hinder, delay or defraud Sabella and Accordant within the meaning of New York Debtor Creditor Law Section 276.

98.     Sabella and Accordant are entitled to have the Gibraltar Distribution Agreement set aside or annulled.

99.     Gibraltar is liable for the debts of Scantek to Sabella and Accordant.

### COUNT V
### Common Law Fraud
### By Sabella and Accordant Against Sagi and the Mintz Defendants

100.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 99 as if fully set forth herein.

101.     In order to fund Scantek's capital needs, Sagi and the Mintz Defendants structured private placements pursuant to which Scantek sold to the Securities to numerous investors.

102.    The private placements were a device, scheme or article to defraud investors because, upon information and belief, Sagi and the Mintz Defendants structured the transactions with the intent of claiming that the Securities violated New York State criminal usury laws and were voidable by Scantek.

103.    Upon information and belief, Sagi and the Mintz Defendants engaged in a scheme to issue Securities which Scantek did not intend to honor.

104.    Sagi and the Mintz Defendants had the authority and, in fact, ability to control the contents of the disclosures made in connection with the offering of the Securities to Third-Party Plaintiffs, including the Subscription Agreements and the Forms 10K and 10Q filed with the SEC, and other false and misleading statements and material omissions to Third-Party Plaintiffs.

17

Sagi and the Mintz Defendants were aware that the statements made to Third-Party Plaintiffs were misleading and contained material omissions, and had the ability and opportunity to prevent such statements and omissions or cause them to be corrected, but failed to do so.

105.    Upon information and belief the Mintz Defendants engaged in similar schemes by structuring securities offerings on behalf of other issuers and then attempting to void the securities by claiming violation of usury laws.

106.    Sagi and the Mintz Defendants selected New York law as the governing law for the Securities even though New York had no connection to the transactions because New York law allows a corporation to interpose the defense of criminal usury.  They did not select Delaware law, under which the defense of usury is not available to corporations pursuant to 6 Del.C. § 2306.  They did not select New Jersey law, under which loans in the amount of $50,000.00 or more may be made at any rate of interest pursuant to N.J.S.A. 31:1-1(e)(1).

107.    Sagi and the Mintz Defendants had a duty to disclose any risk that the Securities were not duly and validly issued and enforceable in accordance with their terms and any risk that the Securities violated any law.

108.    Sagi and the Mintz Defendants failed to disclose their opinions that the Securities were not duly and validly issued and enforceable in accordance with their terms any risk that the Securities violated any law.

109.    Sagi and the Mintz Defendants filed Forms 10K and Forms 10Q and audited financial statements with the SEC which disclosed and discussed numerous private placements of the Securities from 1999 through 2003 to third parties as well as officers and directors of Scantek.

110.    The Scantek SEC filings contain no reference to or discussion of a purported violation of any usury law by the officers, directors and third parties to whom Scantek issued the Securities.

111.    Scantek's audited financial statements report such transactions in accordance with generally accepted accounting principles without discussion of potential violation of any usury law and in fact "blessed" the transactions.

112.    Sagi and the Mintz Defendants induced Sabella and Accordant to acquire the Securities and make the Additional Loans by making false statements to Sabella and Accordant that sales of medical devices by Scantek in Brazil were imminent. Pursuant to their scheme to deceive Sabella about the status of such sales, a provision was included in the August 2002 Note providing for payment to Sabella of $.475 for each  medical device sold in Brazil until principal and interest were paid in full.

113.    Scantek's Form 10K filed with the SEC for the calendar year ending June 30, 2001, included false statements that Scantek "expects to ship the BreastCare (TM)/BreastAlert(TM) device from the United States during the fourth quarter of calendar 2001 to Brazil" and "shipments to other parts of South America and Europe will commence during the latter part of 2002."  Sagi and the Mintz Defendants did not expect such shipments to commence as stated and included such false statements to induce investors to purchase Securities.

114.    Scantek's Form 10K filed with the SEC for the calendar year ending June 30, 2002, included false statements that Scantek "expects to ship the BreastCare (TM)/ BreastAlert(TM) device from the United States during the fourth quarter of calendar 2002 to Brazil" and "expects cash flow from sales commencing in the fourth quarter of calendar 2002." Sagi and the Mintz Defendants did not expect such shipments to commence and cash flow to

commence in the fourth quarter of 2002 and included such false statements to induce investors to purchase Securities.

115.    Scantek's Form 10Q filed with the SEC on May 20, 2003 for the quarter ending March 31, 2003, included false statements that Scantek (a) anticipates sale of its entire inventory in calendar year 2003, and (b) the Company expects cash flow from sales commencing in 2003 to cover operations of the Company through December 2003.

116.    Scantek, Sagi and the Mintz Defendants induced Sabella and Accordant to invest in the Securities and to make the Additional Loans by making false oral and written statements to Sabella and Accordant from April 2002 through the May 20, 2004.  These false statements included  the quantity of orders received for Scantek products in Brazil, that Scantek's sales of medical devices in Brazil had commenced, and that Scantek had commenced earning revenue from such sales which would be used by Scantek to repay its obligations to Sabella and Accordant.

117.    On April 24, 2002, Scantek and Sagi falsely represented to defendant Sabella in writing that the proceeds of the initial $100,000 loan by Sabella "will be used exclusively would be used solely for our Brazilian activities.  It will not be used to pay any outstanding debts."

118.    On January 14, 2003, Scantek and Sagi represented to defendants in writing that an order for 100,000 Breastcare units had been confirmed and would be emitted with a letter of credit inside of 30 days.

119.    In May 2003, Scantek falsely represented to defendants in writing that a test by INCA (Brazilian National Institute of Cancer) would start on May 15, 2003.

120.    In May 2003, Scantek's private placement memorandum (a) falsely represented that Scantek had largely executed its strategy in South America of establishing a regional

20

manufacturing and/or assembly center to supply demand created by local marketing partners. Scantek (b) failed to disclose that sales to Brazil had not yet commenced, (c) failed to disclose that orders in Brazil (which Scantek represented had been received) had not been shipped by Scantek, (d) falsely represented that Scantek has received approvals required for sale of its products in Brazil, and (e) failed to disclose that Scantek had not received an import license in Brazil required to ship products to Brazil.

121.    Sagi and the Mintz Defendants made misrepresentations of numerous material facts to Third-Party Plaintiffs, as set forth above.

122.    Sagi and the Mintz Defendants made the misrepresentations intentionally or recklessly in order to deceive Third-Party Plaintiffs.

123.    Third-Party Plaintiffs justifiably relied on the misrepresentations made by Sagi and the Mintz Defendants.

124.    Third-Party Plaintiffs would not have invested in Scantek if Sagi and the Mintz Defendants had not made the misrepresentations set forth above and such misrepresentations caused Third-Party Plaintiffs to suffer a substantial loss.

125.    Each of Sagi and the Mintz Defendants had knowledge of the existence of the misrepresentations and rendered substantial assistance to the fraud.

126.    Sagi and the Mintz Defendants are liable for the aforesaid wrongful conduct and are liable to the Third-Party Plaintiffs for damages suffered in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Sagi and the Mintz Defendants.

**COUNT VI**
**For Violation of Section 10(b) of the 1934 Act**
**By Sabella and Accordant Against Sagi and the Mintz Defendants**

127.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in

paragraphs 1 through 126 as if fully set forth herein.

128.    Third-Party Plaintiffs relied on the untrue statements and omissions of Sagi and

the Mintz Defendants in investing in Scantek. Third-Party Plaintiffs would not have made such

investment if Sagi and the Mintz Defendants had not made material misstatements and

misrepresentations.

129.    Sagi and the Mintz Defendants induced Third-Party Plaintiffs to rely on the

material misstatements and misrepresentations knowing that such representations were false and

in doing so, intended to deceive, manipulate, or defraud Third-Party Plaintiffs. Sagi and the

Mintz Defendants knew that Third-Party Plaintiffs would not invest if the material facts had been

disclosed.

130.    Third-Party Plaintiffs sustained damages as the proximate result of the untrue

statements and omissions of Sagi and the Mintz Defendants.

131.    At all relevant times, Sagi and the Mintz Defendants, individually and in concert,

directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or

of the mails, engaged and participated in a continuous course of conduct whereby they

knowingly and/or recklessly made materially false and misleading statements to induce Third-

Party Plaintiffs to invest in Scantek.

132.    The Mintz Defendants and Sagi are liable as direct participants in and as

controlling persons of Scantek. By virtue of their positions of control and authority, the Mintz

Defendants and Sagi were able to and did, directly or indirectly, control the content of the

disclosures and other statements made to induce Third-Party Plaintiffs to invest in Scantek and failed to correct those statements in timely fashion once they knew or were reckless in not knowing that those statements were no longer true or accurate.

133.    Sagi and the Mintz Defendants were motivated to act as aforesaid for their personal benefit by reason of their ownership of interests in Scantek. Each of Sagi and the Mintz Defendants had actual knowledge of the facts making the material statements false and misleading, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though same were available to them.

134.    Without knowledge of the true facts concerning the Securities and the scheme engaged in by Scantek, Sagi and the Mintz Defendants, Third-Party Plaintiffs invested in the Securities and made the Additional Loans and have been damaged thereby.

135.    Third-Party Plaintiffs have incurred a loss in an amount to be proven at trial.

136.    By virtue of the foregoing, Sagi and the Mintz Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

137.    By virtue of the conduct alleged herein, Sagi and the Mintz Defendants are liable to the Third-Party Plaintiffs for damages suffered in an amount to be proven at trial, but in no event less than $828,250, plus interest, plus punitive damages in an amount sufficient to deter future misconduct.

**COUNT VII**
**For Violation of Section 20(a) of the 1934 Act**
**By Sabella and Accordant Against Sagi and Mintz Defendants**

138.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 137 as if fully set forth herein.

139.    This count is asserted against Sagi and the Mintz Defendants and is based upon Section 20(a) of the 1934 Act.

140.    Sagi and the Mintz Defendants are controlling persons of Scantek within the meaning of Section 20(a) of the 1934 Act.  Sagi and the Mintz had the power to influence and exercised the same to cause Scantek to engage in the illegal conduct and practices complained of herein by causing Scantek to disseminate the false and misleading information referred to above.

141.    Sagi and the Mintz Defendants were motivated to act as aforesaid for their personal benefit by reason of their ownership of interests in Scantek. Sagi and the Mintz Defendants had actual knowledge of the facts making the material statements false and misleading, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though same were available to them.

142.    The positions of Sagi and the Mintz Defendants made them privy to and provided them with actual knowledge of the material facts concealed from the Third-Party Plaintiffs.

143.    Sagi and the Mintz Defendants intended to deceive, manipulate, and defraud Third-Party Plaintiffs.

144.    By virtue of the conduct alleged herein Sagi and the Mintz Defendants are liable for the aforesaid wrongful conduct and are liable to plaintiffs for damages suffered in an amount to be proven at trial, but in no event less than $828,250 plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Scantek.

24

**COUNT VIII**
**Common Law Negligent Misrepresentation**
**By Sabella and Accordant Against Sagi and the Mintz Defendants**

145.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 144 as if fully set forth herein.

146.    Sagi and the Mintz Defendants acted with carelessness in imparting words by making the material misstatements and misrepresentations to Third-Party Plaintiffs as set forth above.

147.    Sagi and the Mintz Defendants expected Third-Party Plaintiffs to rely on such misstatements and misrepresentations.

148.    Third-Party Plaintiffs acted upon the misstatements and misrepresentations Sagi and the Mintz Defendants in investing in Scantek, to their damage.

149.    Sagi and the Mintz Defendants directed the words directly to Third-Party Plaintiffs, with knowledge that they would be acted upon by Third-Party Plaintiffs.

150.    As the issuer of securities and the persons that controlled the issuer, Sagi and the Mintz Defendants were bound to Third-Party Plaintiffs by a relation of duty or care.

151.    Sagi and the Mintz Defendants are liable for the aforesaid wrongful conduct and are liable to the Third-Party Plaintiffs for damages suffered in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by Sagi and the Mintz Defendants.

**COUNT IX**
**Malpractice**
**By Sabella and Accordant Against Mintz Firm, Fraade and Mintz**

152.    Third-Party Plaintiffs repeat and realleges each and every allegation contained in paragraphs 1 through 151 as if fully set forth herein.

153.    The Mintz Firm, Fraade and Mintz performed legal services for Sabella and Accordant.

154.    The Mintz Firm, Fraade and Mintz acted as counsel for Scantek.

155.    The Mintz Firm acted and continues to act on behalf of Sabella as escrow agent for the Sagi Shares under the Escrow Agreement.

156.    Sabella did not retain separate counsel in connection with the purchase of the Securities.

157.    Sabella did not waive any conflict of interest.

158.    Sabella and Accordant relied on the Mintz Firm, Fraade and Mintz to draft agreements which were the valid and binding obligations of Scantek enforceable in accordance with their terms and advise Sabella and Accordant of any risks or issues in connection with the enforceability of the Securities.

159.    The Mintz Firm, Fraade and Mintz claim that the documents they drafted violated New York usury law and are void.

160.    The Mintz Firm, Fraade and Mintz failed to advise Sabella or Accordant of their opinion that the transactions they structured and documents they drafted violated New York usury law and are voidable by Scantek.

26

161.    The Mintz Firm, Fraade and Mintz failed to advise Sabella or Accordant of any risk that the securities offerings that they structured and documents they drafted violated any usury or other law.

162.    The Mintz Firm, Fraade and Mintz failed to advise Sabella or Accordant that, upon information and belief, Scantek entered into the transactions with the intent of claiming that the Securities violated New York State criminal usury laws.

163.    The Mintz Firm, Fraade and Mintz owed a duty to Sabella and Accordant as attorneys and breached such duty.

164.    Sabella and Accordant suffered damages as the proximate result of the breach of duty owed by the Mintz Firm, Fraade and Mintz in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by the Mintz Firm, Fraade and Mintz.

**COUNT X**
**Breach of Fiduciary Duty**
**By Sabella and Accordant Against all Third-Party Defendants**

165.    Third-Party Plaintiffs repeat and realleges each and every allegation contained in paragraphs 1 through 164 as if fully set forth herein.

166.    The attorney-client relationship of Sabella with the Mintz Firm, Fraade and Mintz created a fiduciary relationship and a duty of higher trust.

167.    As President and a controlling shareholder of Scantek, Sagi was a fiduciary for and owed to the shareholders of Scantek a fiduciary duty of honesty, loyalty, good faith and fairness.

168.    As a controlling shareholder of Scantek, Mintz LLC was a fiduciary for and owed to the shareholders of Scantek a fiduciary duty of honesty, loyalty, good faith and fairness a fiduciary duty to the shareholders of Scantek.

169.    Third-Party Defendants had a duty advise Sabella and Accordant, her wholly-owned limited liability company, of any risk that the securities offerings that they structured and drafted violated any usury or other law.

170.    Third-Party Defendants breached their fiduciary duties to Sabella and Accordant by failing to disclose any risk that the securities violated any law.

171.    Upon information and belief, Third-Party Defendants breached their fiduciary duties to Sabella and Accordant engaging in a scheme to issue Scantek Securities that they intended to claim violated New York usury laws and were voidable by Scantek.

172.    Third-Plaintiffs suffered damages as the result of the breaches of fiduciary duties in an amount to be proven at trial, but in no event less than $828,500, plus interest, plus punitive damages in an amount sufficient to deter future misconduct by the Third-Party Defendants.

## JURY DEMAND

Third-Party Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Third-Party Plaintiffs demand judgment:

a.      On Count I, awarding damages to Sabella from Sagi in an amount to be proven at trial, but in no event less than $253,250, plus interest from August 20, 2003, plus attorneys fees;

b.      On Count II, awarding damages to Accordant from Sagi in an amount to be proven at trial, but in no event less than $75,000, plus interest from February 10, 2003, plus late fees and attorneys fees;

        c.      On Count III, ordering the Mintz Firm and Sagi to deliver to Accordant the Sagi Shares;

        d.      On Count IV, entering an order declaring that the Gibraltar Distribution Agreement is null and void and awarding damages to Sabella and Accordant from Gibraltar in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, late fees and attorneys fees;

        e.      On Count V, awarding damages to awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

        f.      On Count VI, awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount sufficient to deter future misconduct;

        g.      On Count VII, awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount sufficient to deter future misconduct;

        h.      On Count VIII, awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

        i.      On Count IX, awarding damages to Sabella and Accordant from the Mintz Firm, Mintz and Fraade in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct;

        j.      On Count X, awarding damages to Sabella and Accordant from Sagi and the Mintz Defendants in an amount to be determined at trial, but in no event less than $828,250 plus interest from August 20, 2002, plus punitive damages in an amount to deter future misconduct; and

        k.      Awarding such other relief as this Court deems just and proper.

Dated: New York, New York
      April 16, 2008

                                   McCue Sussmane & Zapfel, P.C.


                                   By:_____/S/_____
                                   Kenneth Sussmane (KS 9301)
                                   521 Fifth Avenue, 28th Floor
                                   New York, New York  10175
                                   212-931-5500
                                   ksussmane@mszpc.com

# EXHIBIT "D"

THIS NOTE AND THE COMMON STOCK ISSUABLE UPON CONVERSION OF THIS PROMISSORY NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED, DISPOSED OF OR OFFERED FOR SALE, IN WHOLE OR IN PART, IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THAT ACT COVERING THIS PROMISSORY NOTE AND/OR THE COMMON STOCK ISSUABLE UPON CONVERSION THEREOF, OR AN OPINION OF COUNSEL SATISFACTORY TO THE CORPORATION AND ITS COUNSEL THAT AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

## CONVERTIBLE PROMISSORY NOTE

$100,000

April 25, 2002

FOR VALUE RECEIVED, Scantek Medical, Inc., a Delaware corporation with an address at 321 Palmer Road, Denville, NJ 07834 (hereinafter referred to as the "Payor"), agrees to pay to the order of Angela Chen Sabella, with an address at 853 East Valley Boulevard, Suite 200, San Gabriel, CA 91776 (hereinafter referred to as the "Payee"), on the Maturity Date set forth in Paragraph "(A)" of Article "2" of this Convertible Promissory Note (the "Note"), unless earlier converted or redeemed in accordance with the terms of this Note, the principal sum of One Hundred Thousand ($100,000) Dollars, with interest on the aforesaid amount as calculated in Article "1" below.

1.    Interest

(A)    Interest on the unpaid principal balance shall be calculated from the date of this Note to and including the date of repayment at an interest rate equal to ten (10%) percent per annum.

(B)    Payment of the accrued and unpaid interest shall be due and payable upon payment of the principal balance of this Note pursuant to Paragraph "(A)" of Article "2" of this Note.

2.    Method of Payment

(A)    Subject to conversion pursuant to Article "3" of this Note, payment of the principal balance of this Note, together with any unpaid and accrued interest thereon, shall be due and payable in full one hundred and twenty (120) days after the date of this Note ("Maturity Date").

(B)    Repayment of this Note by the Payor shall be made by check drawn to the Payee at the Payee's address which is set forth above or at such other place as may be designated pursuant to Paragraph "(C)" of Article "14" of this Note.

000201

3.    <u>Conversion</u>

(A)    The Payee shall have the right, at its option, by notifying the Payor in writing, pursuant to Paragraph "(B)" of Article "14" of this Note, at any time prior to the Maturity Date, to convert the Principal amount of this Note into shares of the Payor's Common Stock, par value $.001 (the "Common Shares" or "Shares"), a conversion price of twelve and one half cents (US$.125) cents per Share or if the conversion price has been adjusted pursuant to Paragraph "(E)" of this Article "3" of this Note then at such adjusted conversion price, upon surrender of this Note at the office of the Payor, accompanied by a written instrument of conversion which shall beoin the form of the instrument annexed hereto and made a part hereof, as Exhibit "A," and which shall be duly executed by the Payee or its assigns.

(B)    As promptly as practicable after any conversion, as herein provided, of this Note by the Payee, the Payor shall:

(i)    Deliver or cause to be delivered to, or upon the written order of, the Payee, certificates representing the number of fully paid and nonassessable Shares into which this Note is converted in accordance with the provisions of this Note; and

(ii)    Deliver to the holder of the shares of Common Stock which were converted, pursuant to this Article "3", the whole number of shares rounded up or down to the nearest whole number determined by rounding to the next greater whole number if the fractional Share is 0.5 or greater and the next lower whole number if the fractional share is less than 0.5.

Subject to the following provisions of this Article "3" of this Note, such conversion shall be deemed to have been made at the close of business upon the date when this Note has been surrendered for conversion, so that the rights of the Payee of this Note with respect to the Principal amount of this Note so converted shall cease at such time and the person or persons entitled to receive the Shares upon conversion of this Note shall be treated, for all purposes, as having become the record holder or holders of such Shares at the time of such surrender for conversion; provided, however, that such surrender on any date when the stock transfer books of the Payor are closed shall be effective to constitute the person or persons entitled to receive such Shares as the record holder or holders thereof for all purposes at the close of business on the next succeeding day on which such stock transfer books are open. If for example, a Note is surrendered for conversion at a time when the stock transfer books of the Payor are closed, and a stock dividend is declared or a record date is set for a shareholder vote during such period when the stock transfer books of the Payor are closed, such conversion shall not take effect until the date upon which the stock transfer books are opened, and the Note holder shall not be entitled to receive such stock dividend or to cast such vote.

(C)    If the last day for the exercise of the conversion right is a Saturday, Sunday, or Holiday, such conversion right may be exercised until the next succeeding day which is not a Saturday, Sunday, or Holiday. The term "Holidays" shall include New Year's Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving Day,

000202

Christmas Day, and any other weekday upon which banks are closed in the State of New York.

(D)    The Payee shall not be required to pay any costs or expenses in connection with the issuance of certificates for Shares upon conversion of this Note. Such certificates shall be issued in the name or names (not to exceed five names) directed by the Payee.

(E)    In order to preserve the conversion rights of the Payee of this Note, the conversion rate is subject to adjustment if certain events occur, including, but not limited to, any of the events that are set forth below:

(i)    The issuance of any previously authorized or newly authorized shares (common or any other securities convertible into common) of the Payor for less than $.10 per share.

(ii)    A recapitalization of the outstanding shares of the Payor which has the effect of changing the percentage of Shares which this Note may be converted into in relation to the total number of outstanding shares.

(iii)    The payment of any stock dividends;

(iv)    The distribution to any holders of shares of the Payor's securities, evidences of indebtedness of the Payor or assets (excluding cash dividends paid from retained earnings); and

(v)    The issuance after the date hereof of any stock options, warrants or other rights to acquire shares in the Payor at a price less than $.10 per share.

(vi)    Any capital reorganization by the Payor, any reclassification or recapitalization of the Payor's capital stock, or any transfer of all or substantially all the assets of the Payor to or consolidation or merger of the Payor with or into any other Person.

Upon the occurrence of any of the above events, or any other event which might result in a change in the percentage of the number of Common Shares which this Note may be converted into (any of such events is hereinafter referred to as a "Dilution Event"), then, in such event, the Payor will immediately take whatever measures are necessary to insure that the percentage interest in the Payor which the Note may be converted into would not be increased or reduced. Any adjustment which is required by this Paragraph "E" of this Article "3" of this Note shall be deemed effective retroactive to the date of the Dilution Event. The provisions of this Paragraph "E" of Article "3" of this Note shall be applicable to any Dilution Event which occurs at any time after the date of this Note. If any of the Dilution Events occur, the Payor will mail or cause to be mailed a notice pursuant to Paragraph "(C)" of Article "14", to the Payee of this Note specifying the Dilution Event(s) which has occurred.

4.    Registration

(A)    The Company shall use its best efforts to cause the Shares issued hereunder and upon conversion of the Note to be included in a Registration Statement. The Company shall use its best efforts to file said Registration Statement with the Securities and Exchange Commission within one hundred and twenty (120) days after the closing of this offering.

(B)    All expenses in connection with preparing and filing any registration statement under Article "4" hereof (and any registration or qualification under the securities or "Blue Sky" laws of states in which the offering will be made under such registration statement) shall be borne in full by the Payor; provided, however, that the Payee shall pay any and all underwriting commissions and expenses and the fees and expenses of any legal counsel selected by the Payee to represent them with respect to the sale of the Securities.

5.    Events of Default

The term "Event of Default" as used herein shall mean the occurrence of any one or more of these following events:

(A)    The failure of the Payor to pay when due any payment due hereunder.

(B)    The default in the performance of any material covenant on the part of the Payor to be performed pursuant to the terms hereof and, except for a default pursuant to Article "A" of this Article "5" of this Note, for which no notice or cure period shall be applicable, such failure continues for ten (10) days after Payee notifies Payor thereof in writing, pursuant to Paragraph "(C)" of Article "16" of this Note;

(C)    The admission in writing by the Payor of its inability to pay its debts as they mature;

(D)    The filing by the Payor of a petition in bankruptcy;

(E)    The making of an assignment by the Payor for the benefit of its creditors;

(F)    Consent by the Payor to the appointment of, or possession by, a custodian for itself or for all or substantially all of its property;

(G)    The filing of a petition in bankruptcy against the Payor with the consent of the Payor;

(H)    The filing of a petition in bankruptcy against the Payor without the consent of the Payor, and the failure to have such petition dismissed within sixty (60)

000204

days from the date upon which such petition is filed;

(I)    Notwithstanding the sixty (60) day provision in Paragraph "(H)" of this Article "5" of this Note, on a petition in bankruptcy filed against Payor, Payor is adjudicated;

(J)    The entry by a court of competent jurisdiction of a final non-appealable order, judgment or decree appointing, without the consent of the Payor, of a receiver, trustee or custodian for the Payor or of all or substantially all of the respective property or assets of Payor;

(K)    The commencement of a proceeding to foreclose the security interest in, or lien on, any property or assets to satisfy the security interest or lien therein of any creditor of the Payor;

(L)    The entry of a final judgment for the payment of money by a court of competent jurisdiction against the Payor, which judgment the Payor shall not discharge (or provide for such discharge) in accordance with its terms within ninety (90) days of the date of entry thereof, or procure a stay of execution thereof within ninety (90) days from the date of entry thereof and, within such ninety (90) day period, or such longer period during which execution of such judgment shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal; and

(M)    The imposition of any attachment or levy, or the issuance of any note of eviction against the assets or properties of the Payor.

6.    Remedies Upon Default

Upon the occurrence of an Event of Default (as defined in Article "5" of this Note), and any time thereafter while such Event of Default is continuing, the entire unpaid principal balance which is due pursuant to this Note shall, at the Payee's option, be accelerated and become and be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Payor.

7.    Non-Exclusive Remedy

Any remedy that is set forth in this Note is not exclusive of any remedies that are provided by law.

8.    Liability Upon Default

The liability of the Payor upon default shall be unconditional and shall not be in any manner

affected by any indulgence whatsoever granted or consented to by the Payee including, but not limited to, any extension of time, renewal, waiver or other modification.

9.    <u>Exercise of Remedy Upon Default</u>

No failure on the part of the Payee to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

10.    <u>Validity of Provisions</u>

Any provision of this Note that may prove to be unenforceable under any law shall not affect the validity of any other provision of this Note.

11.    <u>Collection Costs</u>

Payor agrees to pay all reasonable costs of collection, including attorney's fees and costs, which may be paid or incurred by Payee in connection with Payee's exercise of its rights or remedies under this Note.

12.    <u>Security</u>

This Promissory Note shall be secured by a security interest in certain Patents held by the Payor. The Payor shall execute Assignment of Patent Form in favor of the Payee, copies of which are attached hereto as Exhibit "B."

13.    <u>Confession of Judgment</u>

Dr. Zsigmond L. Sagi, President of the Payor, agrees to execute a Confession of Judgment in favor of the Payee, which is annexed hereto and made a part hereof, as Exhibit "C."

14.    <u>Full Recourse</u>

Anything in this Note to the contrary notwithstanding, the Payor hereunder shall be liable on this Note for the full amount of the principal and interest due pursuant to this Note.

15.    <u>Prepayment</u>

If the Payor at anytime intends to pay the full principal amount plus any interest of this Note, the Payor shall give the Payee at least ten (10) days prior notice and subsequent to any such notice and prior to re-payment, the Payee shall have the right to convert the Principal amount of this Note into shares of Payor's Common Stock pursuant to Paragraph "A" of this Article "3" of this Note at a conversion price of $.125.

16.    Miscellaneous

(A)    Modification    This Note may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by the Payor and the Payee of this Note.

(B)    Further Actions    The Payor agrees to execute any and all instruments and documents, and to take any and all such further actions reasonably required to effectuate this Note and the intents and purposes hereof.

(C)    Notices    All notices or other communications required or permitted hereunder shall be in writing and shall be mailed by First Class, Registered or Certified Mail (Return Receipt Requested), postage prepaid, as follows:

<table>
<tr><td>To the Payor:</td><td>Scantek Medical, Inc.<br>321 Palmer Road,<br>Denville, NJ 07834<br>Attn.: Dr. Zsigmond L. Sagi</td></tr>
<tr><td>Copy to:</td><td>Mintz & Fraade, P.C.<br>488 Madison Avenue<br>New York, New York 10022<br>Attn.: Frederick M. Mintz, Esq.</td></tr>
<tr><td>To the Payee:</td><td>Angela Chen Sabella<br>853 East Valley Boulevard, Suite 200<br>San Gabriel, CA  91776</td></tr>
<tr><td>Copy to:</td><td>_____<br>_____<br>_____</td></tr>
</table>

or in each case to such other address as shall have last been furnished by like notice.  If mailing by Registered or Certified Mail is impossible due to an absence or delay in the postal service, notice shall be in writing and personally delivered to the appropriate address set forth above.  Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be.

(D)    Governing Law    This Note shall in all respects be construed, governed, applied and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed therein, without giving effect to the principles of conflicts of law.  The parties hereby consent to and irrevocably submit to personal jurisdiction over each of them by the Courts of

000207

the State of New York in any action or proceeding, irrevocably waive trial by jury and personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph "C" of this Article "16" of this Note.

(E)     <u>Assignment</u>  This Note may be assigned or transferred by the Payee without the prior written consent of the Payor.

(F)     <u>Successors and Assigns</u>  This Note shall be binding upon the Payor and its successors and assigns.

(G)     <u>Binding Agreement</u>  This Note shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

IN WITNESS WHEREOF, the Payor has executed this Note as of the 25th day of April 2002.

Scantek Medical, Inc., Inc.

By: _____
Zsigmond L. Sagi, President & CEO

In order to induce the Payee to enter into the foregoing Note, the payment and performance of the obligations of the Payor are hereby personally guaranteed by Zsigmond L. Sagi and Zsigmond L. Sagi, as guarantor hereof, hereby consents that any provisions of this Note, may be waived, modified or extended without affecting the liability of Zsigmond L. Sagi, as guarantor of the Payor.

_____
Zsigmond L. Sagi

N:\Clients\Scantek Medical Inc\Bridge Financing\note.Sabella.v5.doc 8

000203

**Exhibit A**

**FORM OF CONVERSION**

**(To be Delivered by the Payee desiring to convert
the Convertible Promissory Note to Common Stock)**

To: Scantek Medical, Inc.

      The undersigned hereby irrevocably elects to surrender this Convertible Promissory Note, issued by Scantek Medical, Inc., Inc. (the "Company") to the Payee, dated _____ \_\_\_\_\_, 2002 (the "Convertible Promissory Note"), for, and to purchase thereunder, _____ full shares of Common Stock of the Company, at the conversion price of $.125 per share,  issuable upon conversion of said Convertible promissory note as specified in the Convertible Promissory Note.

      The undersigned requests that [a] certificate[s] for such shares be issued in the name[s] of _____.

PAYEE'S SOCIAL SECURITY
OR TAX IDENTIFICATION NUMBER:_____

_____
(Please print name and address)

_____

_____

_____
(Signature)

_____

      If said number of Common Stock shall not be all of the Common Stock evidenced by the Convertible Promissory Note, the undersigned requests that a new Convertible Promissory Note evidencing the amount not so converted be issued in the name of and delivered to:

_____
(Please print name and address)

_____

_____

_____
(Signature)

000209

# EXHIBIT "E"

# SCANTEK MEDICAL, INC.

## SUBSCRIPTION AGREEMENT

### DATED APRIL 24, 2002

Scantek Medical, Inc.
321 Palmer Road,
Denville, NJ 07834

Gentlemen:

1.      The "Securities"

I hereby subscribe to purchase: (A) a 10% promissory note in the principal amount of one hundred thousand ($100,000) dollars (the "Note"); and (B) four hundred thousand (400,000) shares of Common Stock, par value $.001, (the "Shares") from Scantek Medical, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Company"). The form of the Note is annexed hereto as Exhibit "A." The Note and the Shares are hereinafter jointly referred to as the "Securities." I hereby agree to pay for the Securities subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

2.      Payment

I am herewith tendering payment for the Securities by delivery of a check payable to "Mintz & Fraade, P.C." at 488 Madison Avenue, New York, NY 10022, in the amount of Securities subscribed for.

3.      The Offering

I understand that this offering will terminate on, or prior to, April 30, 2002, subject to extension, in the sole and absolute discretion of the Company. This offering may be so extended without amending this Subscription Agreement and without notice to either the Investors who have submitted their subscription documents to the Company or to prospective Investors. The Company reserves the right, in its sole and absolute discretion, (i) to withdraw the subject offering or (ii) to reject any subscription for Securities in whole or in part. In the event of a complete rejection, the Company will return to me all of my subscription documents and my subscription funds for the subscription, without interest thereon and without deduction of escrow costs. In the event of a partial rejection, the Company will return to me the appropriate portion of my subscription funds for the rejected portion of the subscription, without interest thereon and without deduction of escrow costs, and I will be obligated to promptly furnish the Company with

1

000013

such amended subscription documents as the Company may request, including, but not limited to, a new Subscription Agreement. If my subscription is accepted for a lesser number of Securities than requested by me, it will be within the sole and absolute discretion of the Company whether or not to allow me to withdraw my full subscription.

4.    Acceptance of Subscription

I understand that this Subscription Agreement is not binding upon the Company unless and until it is accepted by the Company. I also understand and agree that the acceptance of my subscription to purchase Securities by the Company shall not be deemed binding upon the Company until the funds paid by me herewith clear and are credited to the account of Mintz & Fraade, P.C. The Securities will be issued to me within thirty (30) days after acceptance.

5.    No Reliance

I acknowledge that I have received, read, understand, and am familiar with this Subscription Agreement. I further acknowledge that no statements, representations or warranties, have been made or furnished to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Securities, and/or the economic, tax, or any other aspects or consequences of this investment, and that I have not relied upon any information with respect to the offering, written or oral, other than the information contained in this Subscription Agreement. I further understand that any documents other than this Subscription Agreement, regardless of whether distributed prior to, simultaneously with, or subsequent to, the date of this Subscription Agreement should not be relied upon in determining whether to make an investment in the Securities and I expressly acknowledge, agree and affirm that I have not relied upon any such literature in making my determination to make an investment in the Securities.

6.    Representations and Warranties of the Investor

In order to induce the Company, Counsel and their respective agents, to accept my subscription, I further represent and warrant to the Company, Counsel, and their respective Affiliates, as follows:

(A)    If I have chosen to do so, I have been represented by such legal counsel and others, each of whom has been personally selected by me, as I have found necessary to consult concerning the purchase of the Securities, and such representation has included an examination of applicable documents and an analysis of all tax, financial, and securities law aspects thereof. I, my counsel, my advisors, and such other persons with whom I have found it necessary or advisable to consult, have sufficient knowledge and experience in business and financial matters to evaluate the information set forth in this Subscription Agreement, and the risks of the investment, and to make an informed investment decision with respect thereto.

(B)    With respect to the tax aspects of my investment, I am relying solely upon the advice of my own personal tax advisors, and upon my own knowledge with respect thereto.

(C)    I have not relied, and will not rely upon, any information with respect to this offering other than the information contained herein and set forth in the Company's filings with the Securities and Exchange Commission.

(D)    I understand that this offering has not been, and it is not anticipated that the same will be, registered under the Securities Act of 1933, as amended (the "1933 Act"), or pursuant to the provisions of the securities or other laws of any other applicable jurisdictions. I am fully aware of the restrictions on sale, transferability and assignment of the Securities and that I must bear the economic risk of my investment herein for an indefinite period of time because the offering has not been registered under the 1933 Act and, therefore, the Securities cannot be offered or sold unless the offering is subsequently registered under the 1933 Act or an exemption from such registration is available to me.

(E)    My execution and delivery of this Subscription Agreement has been duly authorized by all necessary action. I do not presently have any plans to pledge, transfer or assign the Securities and any Shares issuable upon the conversion of the Note which I acquire pursuant to this offering. I am making the investment hereunder for my own account and not for the account of others and for investment purposes only and not with a view to or for the transfer, assignment, resale or distribution thereof, in whole or in part. I have no present plans to enter into any such contract, undertaking, agreement or arrangement.

(F)    I agree that, subject to any applicable state securities laws, I shall not cancel, terminate or revoke this Subscription Agreement, executed by me with respect to the purchase of the Securities, and that this Subscription Agreement shall survive my death or disability, except pursuant to the laws of any applicable jurisdiction.

(G)    Although one of my motivations for investing in the Company is to derive the economic benefits, I am aware that the purchase of the Securities is a speculative investment involving a high degree of risk and that there is no guarantee that I will realize any gain from my investment, realize any tax benefits therefrom and that I may lose all or a substantial part of my investment. I can afford the loss of my entire investment.

(H)    The address set forth below is my true and correct residence, and I have no present intention of becoming a resident of any other state or jurisdiction prior to my purchase of the Securities.

(I)    I understand the meaning and legal consequences of the foregoing representations and warranties, which are true and correct as of the date hereof and will be true and correct as of the date of my purchase of the Securities subscribed for herein. Each such representation and warranty shall survive such purchase.

(J)    I agree that it shall not be a defense to a suit for damages for any misrepresentation or breach of covenant or warranty of mine that the Company knew or had reason to know that any covenant, representation or warranty in this Subscription Agreement or

3

furnished or to be furnished to the Company contained untrue statements. The foregoing shall survive any investigation by the Company.

(K).   No representation or warranty which I have made in this Subscription Agreement, or in a writing furnished or to be furnished pursuant to this Subscription Agreement, contains or shall contain any untrue statement of fact, or omits or shall omit to state any fact which is required to make the statements which are contained herein or therein, in light of the circumstances under which they were made, not misleading.

(L)    I am an "accredited investor" as that term is defined in Rule 501 of Regulation D, which was promulgated under the 1933 Act. Pursuant to Rule 501, an accredited investor includes (i) a natural person who (with spouse, if any) has a net worth which exceeds $1,000,000 at the time of the purchase; (ii) a natural person who has had an individual income in excess of $200,000 for the prior two years (or joint income with such spouse which exceeds $300,000 in each such year) and have a reasonable expectation of reaching the same income level (or joint income level) in the current year; (iii) an organization as described in section 501 (c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000; (iv) a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 (b)(2)(ii); or (v) an entity in which all of the equity owners are accredited investors.

7.    Indemnification by the Investor

I hereby agree to indemnify and hold harmless the Company, Counsel, and persons affiliated with them, from any and all damages, losses, costs and expenses (including reasonable attorneys' fees) which they, or any of them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this Subscription Agreement or by reason of my breach of any of my representations and warranties contained in this Subscription Agreement.

8.    General Provisions

(a).    Headings. The headings contained in this Subscription Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Subscription Agreement.

(b)    Enforceability. If any provision which is contained in this Subscription Agreement should, for any reason, be held to be invalid or unenforceable in any respect under the laws of any State of the United States, such invalidity or unenforceability shall not affect any other provision of this Subscription Agreement. Instead, this Subscription Agreement shall be construed as if such invalid or unenforceable provisions had not been contained herein.

4

000016

(c)    <u>Notices</u>.    Any notice or other communication required or permitted hereunder must be in writing and sent by either (i) registered or certified mail, postage prepaid, return receipt requested, (ii) overnight delivery with confirmation of delivery or (iii) facsimile transmission with an original mailed by first class mail, postage prepaid, in each case addressed as follows:

| | |
|---|---|
| To the Company: | Scantek Medical, Inc.<br>321 Palmer Road,<br>Denville, NJ 07834<br>Attn.: Dr. Zsigmond L. Sagi<br>Facsimile No.: (631) 981-6043 |
| Copy to: | Mintz & Fraade, P.C.<br>488 Madison Avenue, Suite 1100<br>New York, New York 10022<br>Attn.: Frederick M. Mintz, Esq.<br>Facsimile No.:(212) 486-0701 |
| To the Investor: | To the address specified hereinafter on page "8" of this Subscription Agreement |

or in each case to such other address and facsimile number as shall have last been furnished by like notice. If mailing by registered or certified mail is impossible due to an absence of postal service, and if the other methods of sending notice set forth in Paragraph "C" of this Article "8" of this Subscription Agreement are not otherwise available, notice shall be in writing and personally delivered to the aforesaid addresses. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be; provided, however, that any notice sent by facsimile shall be deemed to have been given as of the date sent by facsimile if a copy of such notice is also mailed by first class mail on the date sent by facsimile; if the date of mailing differs from the date of sending by facsimile, then the date of mailing by first class mail shall be deemed to be the date upon which notice given.

(d)    <u>Governing Law; Disputes</u>.    This Subscription Agreement shall in all respects be construed, governed, applied and enforced with the laws of the State of New York without giving effect to the principles of conflicts of laws and be deemed to be an agreement entered into in the State of New York and made pursuant to the laws of the State of New York. The parties hereby consent to and irrevocably submit to personal jurisdiction over each of them by the Courts of the State of New York in any action or proceeding, irrevocably waive trial by jury and personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph "C" of this Article "8" of this Subscription Agreement.

5

**000017**

The parties agree, further, that the prevailing party in any action or proceeding as determined by the Tribunal making the final and non-appealable determination of the matter in dispute shall be entitled to reimbursement of all its reasonable fees, costs and expenses, including its attorneys fees, in connection with such matter. In connection with the Tribunal's determination for the purpose of which party, if any, is the prevailing party, the Tribunal shall take into account all of the factors and circumstances including, without limitation, the relief sought, and by whom, and the relief, if any, awarded, and to whom. In addition, and notwithstanding the foregoing sentence, a party shall not be deemed to be the prevailing party in a claim seeking monetary damages, unless the amount of the final determination exceeds the amount offered in a writing by the other party by fifteen percent (15%) or more. For example, if the party initiating a claim ("A") seeks damages of $100,000 plus costs and expenses, the other party ("B") has offered A $50,000 prior to the commencement of the proceeding, and if the Tribunal awards any amount less than $57,500 to A, the Tribunal should determine that B has "prevailed".

     (e)   <u>Further Actions.</u>   The parties agree to execute any and all instruments and documents, and to take any and all such further actions reasonably required to effectuate this Agreement and the intents and purposes hereof.

     (f)   <u>Binding Agreement</u>.  This Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns

     (g)   <u>Waiver</u>.   Except as otherwise expressly provided herein, no waiver of any covenant, condition, or provision of this Subscription Agreement shall be deemed to have been made unless expressly set forth in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Subscription Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment for the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Subscription Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other or subsequent breach.

     (h)   <u>Counterparts</u>. This Subscription Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

     (i)   <u>Entire Agreement</u>.   The parties have not made any representations, warranties, or covenants with respect to the subject matter hereof, orally or in writing, which are not set forth herein, and this Subscription Agreement, together with any instruments or other agreements executed simultaneously herewith, constitutes the entire agreement between them with respect to the subject matter hereof. All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Subscription

6

Agreement and any such instrument, which alone fully and completely expresses their agreement. This Subscription Agreement may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by all of the parties to this Subscription Agreement.

      11.    Certification with respect to Federal Interest Payments; Backup Withholding in Lieu of Internal Revenue Service Form W-9 –

      Under penalties of perjury I certify as follows:

      The number(s) shown below as my (our) taxpayer identification number(s) (social security number or employer identification number) is my (our) correct taxpayer identification number; and I (we) am (are) not subject to backup withholding either because I (we) have not been notified by the Internal Revenue Service that I (we) am (are) subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me (us) that I (we) am (are) no longer subject to backup withholding.

[Signature page follows]

000019

# EXHIBIT "F"

# PROMISSORY NOTE

$253,250.80

August 20, 2002

FOR VALUE RECEIVED, Scantek Medical, Inc., a Delaware corporation with an address at 4 B Wing Drive, Cedar Knolls, NJ 07929 (the "Payor"), agrees to pay to the order of Angela Chen Sabella, with an address at 853 East Valley Boulevard, Suite 200, San Gabriel, CA 91776 (the "Payee"), on the Maturity Date set forth in Paragraph "(A)" of Article "2" of this Promissory Note (the "Note"), unless earlier prepaid in accordance with the terms of this Note, the principal sum of two hundred and fifty three thousand, two hundred and fifty dollars and eighty cents ($253,250.80) Dollars, with interest on the aforesaid amount as calculated in Article "1" below.

1.    Interest

(A)    Interest on the unpaid principal balance shall be calculated from the date of this Note to and including the date of repayment at an interest rate equal to ten (10%) percent per annum and shall be payable monthly.

(B)    Any principal and interest and other amounts, payable pursuant to this Note which is not paid when due shall thereafter bear interest from and including the date due to, but excluding the date paid in full, at the lesser of twenty four (24%) percent or the highest permissible rate then allowable under the laws of the State of New York ("Default Interest"). Default Interest shall be payable ON DEMAND together with any payment of principal or interest due pursuant to this Note.

2.    Method of Payment

(A)    Any payments due pursuant to this Note by the Payor shall be made by check drawn to the Payee at the Payee's address which is set forth above or at such other place as may be designated pursuant to Paragraph "(C)" of Article "14" of this Note.

(B)    Interest on the unpaid principal shall be due and payable on the twentieth day of each month.

(C)    The Payee shall receive the greater of (i)$ .475 for each unit of Payor's medical devices sold by it in Brazil for which the Payor receives payment, until the principal balance of this Note, together with any unpaid and accrued interest thereon is paid in full; or (ii) interest due pursuant to Paragraph "B" of this Article "2" of this Note; payments of the following: fifty thousand

1

000194

($50,000) dollars on November 20, 2002, fifty thousand ($50,000) dollars on December 20, 2002, seventy five thousand ($75,000) dollars on January 20, 2003, and the balance of this Note together will all accrued and unpaid interest on February 20, 2003 ("Maturity Date"). For example, if payment of $101,382.04 is made to the Payee on November 20, 2002 from the proceeds of the sale of the Payor's medical devices in Brazil, said payment shall be lieu of payment of the $50,000 and interest of $6,382.04 which are due on November 20, 2002. If the Payee makes an additional payment of $158,639.20 from the proceeds of the sale of the Payor's medical devices in Brazil on November 30, 2002, which payment represents the balance of the Note plus accrued interest of $433.40, then the Payee shall not be obligated to make additional payments, including interest, and this Note shall be paid in full.

      (D)    Payments pursuant to subparagraph (i) of Paragraph "C" of this Article "2" shall be made to the Payee within 10 days after the end of the month in which the Payor receives payment for each unit of its device sold

3.    <u>Events of Default</u>

      The term "Event of Default" as used herein shall mean the occurrence of any one or more of these following events:

      (A)    The failure of the Payor to pay when due any payment due hereunder and such failure continues for five (5) business days after Payee notifies Payor thereof in writing, pursuant to Paragraph "(C)" of Article "14" of this Note;

      (B)    The default in the performance of any material covenant on the part of the Payor to be performed pursuant to the terms hereof and, except for a default pursuant to Article "A" of this Article "3" of this Note, for which no notice or cure period shall be applicable, such failure continues for ten (10) days after Payee notifies Payor thereof in writing, pursuant to Paragraph "(C)" of Article "14" of this Note;

      (C)    The admission in writing by the Payor of its inability to pay its debts as they mature;

      (D)    The filing by the Payor of a petition in bankruptcy;

      (E)    The making of an assignment by the Payor for the benefit of its creditors;

      (F)    Consent by the Payor to the appointment of, or possession by, a custodian for itself or for all or substantially all of its property;

2

000195

(G)     The filing of a petition in bankruptcy against the Payor with the consent of the Payor;

(H)     The filing of a petition in bankruptcy against the Payor without the consent of the Payor, and the failure to have such petition dismissed within sixty (60) days from the date upon which such petition is filed;

(I)      Notwithstanding the sixty (60) day provision in Paragraph "(H)" of this Article "3"of this Note, on a petition in bankruptcy filed against Payor, Payor is adjudicated;

(J)     The entry by a court of competent jurisdiction of a final non-appealable order, judgment or decree appointing, without the consent of the Payor, of a receiver, trustee or custodian for the Payor or of all or substantially all of the respective property or assets of Payor;

(K)     The commencement of a proceeding to foreclose the security interest in, or lien on, any property or assets to satisfy the security interest or lien therein of any creditor of the Payor;

(L)     The entry of a final judgment for the payment of money by a court of competent jurisdiction against the Payor, which judgment the Payor shall not discharge (or provide for such discharge) in accordance with its terms within ninety (90) days of the date of entry thereof, or procure a stay of execution thereof within ninety (90) days from the date of entry thereof and, within such ninety (90) day period, or such longer period during which execution of such judgment shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal; and

(M)     The imposition of any attachment or levy, or the issuance of any note of eviction against the assets or properties of the Payor.

4.     Replacement Note

This Note replaces and supercedes the Convertible Promissory Note dated April 25, 2002 in the principal amount of $100,000, plus accrued interest of $3,250.80, executed by Scantek Medical Inc. as the Borrower and Angella Sabella Chen as the Lender.

3

000196

5.     Remedies Upon Default

Upon the occurrence of an Event of Default (as defined in Article "3" of this Note), and any time thereafter while such Event of Default is continuing, the entire unpaid principal balance which is due pursuant to this Note shall, at the Payee's option, be accelerated and become and be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Payor.

6.     Non-Exclusive Remedy

Any remedy that is set forth in this Note is not exclusive of any remedies that are provided by law.

7.     Liability Upon Default

The liability of the Payor upon default shall be unconditional and shall not be in any manner affected by any indulgence whatsoever granted or consented to by the Payee including, but not limited to, any extension of time, renewal, waiver or other modification.

8.     Exercise of Remedy Upon Default

No failure on the part of the Payee to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

9.     Validity of Provisions

Any provision of this Note that may prove to be unenforceable under any law shall not affect the validity of any other provision of this Note.

10.     Collection Costs

Payor agrees to pay all reasonable costs of collection, including attorney's fees and costs, which may be paid or incurred by Payee in connection with Payee's exercise of its rights or remedies under this Note.

11.     Security

This Promissory Note shall be secured by a security interest in certain Patents held by the

4

000197

Payor. The Payor shall execute an Assignment of Patent in favor of the Payee, in the form of which is attached hereto as Exhibit "B."

12.    Confession of Judgment

Dr. Zsigmond L. Sagi, President of the Payor, agrees to execute a Confession of Judgment in favor of the Payee, which is annexed hereto and made a part hereof, as Exhibit "C."

13.    Full Recourse

Anything in this Note to the contrary notwithstanding, the Payor hereunder shall be liable on this Note for the full amount of the principal and interest due pursuant to this Note.

14.    Miscellaneous

(A)    Modification    This Note may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by the Payor and the Payee of this Note.

(B)    Further Actions    The Payor agrees to execute any and all instruments and documents, and to take any and all such further actions reasonably required to effectuate this Note and the intents and purposes hereof.

(C)    Notices    All notices or other communications required or permitted hereunder shall be in writing and shall be mailed by First Class, Registered or Certified Mail (Return Receipt Requested), postage prepaid, as follows:

|  |  |
|---|---|
| To the Payor: | Scantek Medical, Inc.<br>4 B Wing Drive,<br>Cedar Knolls, NJ 07927<br>Attn.: Dr. Zsigmond L. Sagi |
| Copy to: | Mintz & Fraade, P.C.<br>488 Madison Avenue<br>New York, New York 10022<br>Attn.: Frederick M. Mintz, Esq. |
| To the Payee: | Angela Chen Sabella<br>853 East Valley Boulevard, Suite 200<br>San Gabriel, CA  91776 |

5

000198

Copy to:          Mark Step
                    P.O. Box 1056
                    FDR Station
                    New York, NY 10022

or in each case to such other address as shall have last been furnished by like notice. If mailing by Registered or Certified Mail is impossible due to an absence or delay in the postal service, notice shall be in writing and personally delivered to the appropriate address set forth above. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be.

(D)   <u>Governing Law</u>     This Note shall in all respects be construed, governed, applied and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed therein, without giving effect to the principles of conflicts of law. The parties hereby consent to and irrevocably submit to personal jurisdiction over each of them by the Courts of the State of New York in any action or proceeding, irrevocably waive trial by jury and personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph "C" of this Article "14" of this Note.

(E)   <u>Assignment</u>  This Note may be assigned or transferred by the Payee without the prior written consent of the Payor.

(F)   <u>Successors and Assigns</u>  This Note shall be binding upon the Payor and its successors and assigns.

(G)   <u>Binding Agreement</u>  This Note shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

[Signature page follows]

6

**000199**

IN WITNESS WHEREOF, the Payor has executed this Note as of the $\underline{20}$ th day of August 2002.

Scantek Medical, Inc., Inc.

By: _____

Zsigmond L. Sagi, President & CEO

In order to induce the Payee to enter into the foregoing Note, the payment and performance of the obligations of the Payor are hereby personally guaranteed by Zsigmond L. Sagi and Zsigmond L. Sagi, as guarantor thereof, hereby consents that any provisions of this Note, may be waived, modified or extended without affecting the liability of Zsigmond L. Sagi, as guarantor of the Payor.

_____
Zsigmond L. Sagi

C:\K items\Scantek Medical Incusurge Financing\note, isabella.2nd.v3.doc

000200

# EXHIBIT "G"

**SCANTEK MEDICAL, INC.**

**SUBSCRIPTION AGREEMENT**

**DATED AUGUST 20, 2002**

Scantek Medical, Inc.
4 B Wing Drive,
Cedar Knolls, NJ 07927


Gentlemen:


1.     The "Securities"

I hereby agree to invest $150,000 in Scantek Medical, Inc, a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a 10% promissory note in the principal amount of one hundred and fifty thousand ($150,000) dollars (the "Note"); and to purchase shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "8" of this Subscription Agreement. The Note in the principal amount of two hundred and fifty three thousand, two hundred and five dollars and eighty cents which is annexed hereto as Exhibit "A" includes the Note which is the subject of this Subscription Agreement and the Convertible Promissory Note dated April 25, 2002 in the principal amount of $100,000 plus accrued interest of $3,205.80, which is hereby superseded by the attached Note. The Note and the Shares are hereinafter jointly referred to as the "Securities." I hereby agree to pay for the Securities subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

*√ # 3250.80 [handwritten]*

2.     Payment

I am herewith forwarding the aggregate amount of one hundred and fifty ($150,000) dollars by wire transfer to the account of "Mintz & Fraade, P.C."


3.     The Offering

I understand that this offering will terminate on, or prior to, August 22, 2002, subject to extension, in the sole and absolute discretion of the Company. This offering may be so extended without amending this Subscription Agreement and without notice to either the Investors who have submitted their subscription documents to the Company or to prospective Investors. The

1

Company reserves the right, in its sole and absolute discretion, (i) to withdraw the subject offering or (ii) to reject any subscription for Securities in whole or in part. In the event of a complete rejection, the Company will return to me all of my subscription documents and my subscription funds for the subscription, without interest thereon and without deduction of escrow costs. In the event of a partial rejection, the Company will return to me the appropriate portion of my subscription funds for the rejected portion of the subscription, without interest thereon and without deduction of escrow costs, and I will be obligated to promptly furnish the Company with such amended subscription documents as the Company may request, including, but not limited to, a new Subscription Agreement. If my subscription is accepted for a lesser number of Securities than requested by me, it will be within the sole and absolute discretion of the Company whether or not to allow me to withdraw my full subscription.

4.     Acceptance of Subscription

I understand that this Subscription Agreement is not binding upon the Company unless and until it is accepted by the Company. I also understand and agree that the acceptance of my subscription to purchase Securities by the Company shall not be deemed binding upon the Company until the funds paid by me herewith clear and are credited to the account of Mintz & Fraade, P.C. The Securities will be issued to me within thirty (30) days after acceptance.

5.     No Reliance

I acknowledge that I have received, read, understand, and am familiar with this Subscription Agreement. I further acknowledge that no statements, representations or warranties, have been made or furnished to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Securities, and/or the economic, tax, or any other aspects or consequences of this investment, and that I have not relied upon any information with respect to the offering, written or oral, other than the information contained in this Subscription Agreement. I further understand that any documents other than this Subscription Agreement, regardless of whether distributed prior to, simultaneously with, or subsequent to, the date of this Subscription Agreement should not be relied upon in determining whether to make an investment in the Securities and I expressly acknowledge, agree and affirm that I have not relied upon any such literature in making my determination to make an investment in the Securities.

6.     Representations and Warranties of the Investor

In order to induce the Company, Counsel and their respective agents, to accept my subscription, I further represent and warrant to the Company, Counsel, and their respective Affiliates, as follows:

2

000247



(A)     If I have chosen to do so, I have been represented by such advisors as I have found necessary to consult concerning the purchase of the Securities, and such representation has included an examination of applicable documents and an analysis of all tax, financial, and securities law aspects thereof. I, my advisors, and such other persons with whom I have found it necessary or advisable to consult, have sufficient knowledge and experience in business and financial matters to evaluate the information set forth in this Subscription Agreement, and the risks of the investment, and to make an informed investment decision with respect thereto.

(B)     With respect to the tax aspects of my investment, I am relying solely upon the advice of my own personal tax advisors, and upon my own knowledge with respect thereto.

(C)     I have not relied, and will not rely upon, any information with respect to this offering other than the information contained herein and set forth in the Company's filings with the Securities and Exchange Commission.

(D)     I understand that this offering has not been, and it is not anticipated that the same will be, registered under the Securities Act of 1933, as amended (the "1933 Act"), or pursuant to the provisions of the securities or other laws of any other applicable jurisdictions. I am fully aware of the restrictions on sale, transferability and assignment of the Securities and that I must bear the economic risk of my investment herein for an indefinite period of time because the offering has not been registered under the 1933 Act and, therefore, the Securities cannot be offered or sold unless the offering is subsequently registered under the 1933 Act or an exemption from such registration is available to me.

(E)     My execution and delivery of this Subscription Agreement has been duly authorized by all necessary action. I do not presently have any plans to pledge, transfer or assign the Securities and any Shares issuable upon the conversion of the Note which I acquire pursuant to this offering. I am making the investment hereunder for my own account and not for the account of others and for investment purposes only and not with a view to or for the transfer, assignment, resale or distribution thereof, in whole or in part. I have no present plans to enter into any such contract, undertaking, agreement or arrangement.

(F)     I agree that, subject to any applicable state securities laws, I shall not cancel, terminate or revoke this Subscription Agreement, executed by me with respect to the purchase of the Securities, and that this Subscription Agreement shall survive my death or disability, except pursuant to the laws of any applicable jurisdiction.

(G)     Although one of my motivations for investing in the Company is to derive the economic benefits, I am aware that the purchase of the Securities is a speculative investment involving a high degree of risk and that there is no guarantee that I will realize any gain from my investment, realize any tax benefits therefrom and that I may lose all or a substantial part of my investment. I can afford the loss of my entire investment.

3

000248

(H)    The address set forth below is my true and correct residence, and I have no present intention of becoming a resident of any other state or jurisdiction prior to my purchase of the Securities.

(I)    I understand the meaning and legal consequences of the foregoing representations and warranties, which are true and correct as of the date hereof and will be true and correct as of the date of my purchase of the Securities subscribed for herein. Each such representation and warranty shall survive such purchase.

(J)    I agree that it shall not be a defense to a suit for damages for any misrepresentation or breach of covenant or warranty of mine that the Company knew or had reason to know that any covenant, representation or warranty in this Subscription Agreement or furnished or to be furnished to the Company contained untrue statements. The foregoing shall survive any investigation by the Company.

(K).    No representation or warranty which I have made in this Subscription Agreement, or in a writing furnished or to be furnished pursuant to this Subscription Agreement, contains or shall contain any untrue statement of fact, or omits or shall omit to state any fact which is required to make the statements which are contained herein or therein, in light of the circumstances under which they were made, not misleading.

(L)    I am an "accredited investor" as that term is defined in Rule 501 of Regulation D, which was promulgated under the 1933 Act. Pursuant to Rule 501, an accredited investor includes (i) a natural person who (with spouse, if any) has a net worth which exceeds $1,000,000 at the time of the purchase; (ii) a natural person who has had an individual income in excess of $200,000 for the prior two years (or joint income with such spouse which exceeds $300,000 in each such year) and have a reasonable expectation of reaching the same income level (or joint income level) in the current year; (iii) an organization as described in section 501 (c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000; (iv) a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 (b)(2)(ii); or (v) an entity in which all of the equity owners are accredited investors.

7.    Indemnification by the Investor

I hereby agree to indemnify and hold harmless the Company, Counsel, and persons affiliated with them, from any and all damages, losses, costs and expenses (including reasonable attorneys' fees) which they, or any of them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this Subscription Agreement or by reason of my breach of any of my representations and warranties contained in this Subscription Agreement.

4

000249



8.    Subscription for Shares

The Company shall issue to you such number of shares of Common Stock of the Company's Common Stock which will result in the ownership by you of six (6) percent of the issued and outstanding shares of Common Stock of the Company, therefore assuming a total of 40,000,000 shares of Common Stock the Company issued and outstanding, you will be issued 2,400,000 shares including the four hundred thousand (400,000) shares of Common Stock of the Company purchased by you pursuant to the Subscription Agreement dated April 24, 2002. The Company is contemplating a reverse merger and hereby agrees to take whatever measures are necessary to maintain your current percentage ownership in the Company in such event.

9.    Registration

(A)    The Company shall use its best efforts to cause the Shares issued hereunder and issued pursuant to the Subscription Agreement dated April 24, 2002 to be included in a Registration Statement. The Company shall use its best efforts to file said Registration Statement with the Securities and Exchange Commission within one hundred and twenty (120) days after the closing of this offering.

(B)    All expenses in connection with preparing and filing any registration statement under Article "9" hereof (and any registration or qualification under the securities or "Blue Sky" laws of states in which the offering will be made under such registration statement) shall be borne in full by the Payor; provided, however, that the Payee shall pay any and all underwriting commissions and expenses and the fees and expenses of any legal counsel selected by the Payee to represent them with respect to the sale of the Securities.

10.    General Provisions

(a).    Headings.  The headings contained in this Subscription Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Subscription Agreement.

(b)    Enforceability.  If any provision which is contained in this Subscription Agreement should, for any reason, be held to be invalid or unenforceable in any respect under the laws of any State of the United States, such invalidity or unenforceability shall not affect any other provision of this Subscription Agreement.  Instead, this Subscription Agreement shall be construed as if such invalid or unenforceable provisions had not been contained herein.

(c)    Notices.  Any notice or other communication required or permitted hereunder must be in writing and sent by either (i) registered or certified mail, postage prepaid, return receipt requested, (ii) overnight delivery with confirmation of delivery or (iii) facsimile

5

000250



transmission with an original mailed by first class mail, postage prepaid, in each case addressed as follows:

| | |
|---|---|
| To the Company: | Scantek Medical, Inc.<br>4 B Wing Drive,<br>Cedar Knolls, NJ 07927<br>Attn.: Dr. Zsigmond L. Sagi<br>Facsimile No.: (973) 401-0459 |
| Copy to: | Mintz & Fraade, P.C.<br>488 Madison Avenue, Suite 1100<br>New York, New York 10022<br>Attn.: Frederick M. Mintz, Esq.<br>Facsimile No.:(212) 486-0701 |
| To the Investor: | Angela Chen Sabella<br>853 East Valley Boulevard, Suite 200<br>San Gabriel, CA 91776<br>Facsimile No.: (626) 280-2839 |
| Copy to: | Mark Step<br>P.O. Box 1056<br>FDR Station<br>New York, NY 10022<br>Facsimile No.: (203) 255-6234 |

or in each case to such other address and facsimile number as shall have last been furnished by like notice. If mailing by registered or certified mail is impossible due to an absence of postal service, and if the other methods of sending notice set forth in Paragraph "C" of this Article "10" of this Subscription Agreement are not otherwise available, notice shall be in writing and personally delivered to the aforesaid addresses. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be; provided, however, that any notice sent by facsimile shall be deemed to have been given as of the date sent by facsimile if a copy of such notice is also mailed by first class mail on the date sent by facsimile; if the date of mailing differs from the date of sending by facsimile, then the date of mailing by first class mail shall be deemed to be the date upon which notice given.

(d)     Governing Law; Disputes.     This Subscription Agreement shall in all respects be construed, governed, applied and enforced with the laws of the State of New York without giving effect to the principles of conflicts of laws and be deemed to be an agreement entered into in the State of New York and made pursuant to the laws of the State of New York. The parties hereby consent to and irrevocably submit to personal jurisdiction over each of them by the Courts of the State of New York in any action or proceeding, irrevocably waive trial by jury and

6

000251

personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph "C" of this Article "9" of this Subscription Agreement.

The parties agree, further, that the prevailing party in any action or proceeding as determined by the Tribunal making the final and non-appealable determination of the matter in dispute shall be entitled to reimbursement of all its reasonable fees, costs and expenses, including its attorneys fees, in connection with such matter. In connection with the Tribunal's determination for the purpose of which party, if any, is the prevailing party, the Tribunal shall take into account all of the factors and circumstances including, without limitation, the relief sought, and by whom, and the relief, if any, awarded, and to whom. In addition, and notwithstanding the foregoing sentence, a party shall not be deemed to be the prevailing party in a claim seeking monetary damages, unless the amount of the final determination exceeds the amount offered in a writing by the other party by fifteen percent (15%) or more. For example, if the party initiating a claim ("A") seeks damages of $100,000 plus costs and expenses, the other party ("B") has offered A $50,000 prior to the commencement of the proceeding, and if the Tribunal awards any amount less than $57,500 to A, the Tribunal should determine that B has "prevailed".

(e)    Further Actions.    The parties agree to execute any and all instruments and documents, and to take any and all such further actions reasonably required to effectuate this Agreement and the intents and purposes hereof.

(f)    Binding Agreement.    This Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns

(g)    Waiver.    Except as otherwise expressly provided herein, no waiver of any covenant, condition, or provision of this Subscription Agreement shall be deemed to have been made unless expressly set forth in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Subscription Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment for the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Subscription Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other or subsequent breach.

(h)    Counterparts. This Subscription Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7

000252



(i)     <u>Entire Agreement</u>.     The parties have not made any representations, warranties, or covenants with respect to the subject matter hereof, orally or in writing, which are not set forth herein, and this Subscription Agreement, together with any instruments or other agreements executed simultaneously herewith, constitutes the entire agreement between them with respect to the subject matter hereof.  All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Subscription Agreement and any such instrument, which alone fully and completely expresses their agreement.  This Subscription Agreement may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by all of the parties to this Subscription Agreement.

11.     Certification with respect to Federal Interest Payments; Backup Withholding in Lieu of Internal Revenue Service Form W-9 –

Under penalties of perjury I certify as follows:

The number(s) shown below as my (our) taxpayer identification number(s) (social security number or employer identification number) is my (our) correct taxpayer identification number; and I (we) am (are) not subject to backup withholding either because I (we) have not been notified by the Internal Revenue Service that I (we) am (are) subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me (us) that I (we) am (are) no longer subject to backup withholding.

[Signature page follows]

8

000253

IN WITNESS WHEREOF, I have executed this Subscription Agreement this <u>19th</u> day of August 2002.

**<u>Individuals:</u>**                                          **<u>Entities:</u>**


<u>Angela Chen Sabella</u>                     _____
Name (Please Print)                          Name of Entity (Please Print)


<u>_____</u>        By:_____
Signature                                            Signature and Title


<u>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</u>
Social Security Number


_____            _____
Name of Joint Tenant or                     Employer Identification
Tenant in-Common, if                         Number
applicable (Please Print)
                                             [Corporate Seal (if applicable)]


_____
Signature of Joint Tenant
or Tenant-in-Common, if
applicable.


_____
Social Security Number


9

000254

## <u>TO BE COMPLETED BY ALL SUBSCRIBERS</u>

Address to which information regarding
this subscription should be mailed:

<u>853 East Valley Blvd., Suite 200</u>
Street Address

<u>San Gabriel, CA  91776</u>
City and State                          Zip

( 626) 280-2825
Telephone Number

( 626) 280-2839
Facsimile Number

Accepted And Agreed To This _____ Day of _____, 2002

Scantek Medical, Inc.

By:

Name: _____

Title: _____

000255

# EXHIBIT "H"

# PROMISSORY NOTE

<u>$50,000</u>

FOR VALUE RECEIVED, Scantek Medical, Inc., a Delaware corporation with an address at 4B Wing Drive, Cedar Knolls, NJ 07927 (hereinafter referred to as the "Payor"), agrees to pay to the order of Accordant Holdings, LLC  with an address at 853 East Valley Boulevard, Suite 200, San Gabriel, CA, 91776 (the "Payee"), on the Maturity Date set forth in Paragraph "(A)" of Article "2" of this Promissory Note (the "Note"), unless earlier redeemed in accordance with the terms of this Note, the principal sum of Fifty Thousand ($50,000) Dollars, with interest on the aforesaid amount as calculated in Article "1" below.

February 10, 2003

1.     <u>Interest</u>

(A)     Interest on the unpaid principal balance shall be calculated from the date of each advance received by the Payor pursuant to this Note to and including the date of repayment at an interest rate equal to one (1%) percent per month.

(B)     Payment of the accrued and unpaid interest shall be due and payable upon payment of the principal balance of this Note pursuant to Paragraph "(A)" of Article "2" of this Note.

2.     <u>Method of Payment</u>

(A)     Payment of the principal balance of this Note, together with any unpaid and accrued interest thereon, shall be due and payable in full on or prior to April 17, 2003 (the "Maturity Date").

(B)     Repayment of this Note by the Payor shall be made by certified or bank check drawn to the Payee and delivered to Mintz & Fraade, P.C. on or prior to the Maturity Date at the address set forth in Paragraph "C" of Article "12" of this Note .

3.     <u>Events of Default</u>

The term "Event of Default" as used herein shall mean the occurrence of any one or more of these following events:

(A)     The failure of the Payor to pay when due any payment due hereunder.

(B)     The default in the performance of any material covenant on the part of the Payor to be performed pursuant to the terms hereof and, except for a default pursuant to Article "A" of this Article "3" of this Note, for which no notice or cure period shall be applicable, such failure continues for ten (10) days after Payee notifies Payor thereof in writing, pursuant to Paragraph "(C)" of Article "12" of this Note;

000188

(C)    The admission in writing by the Payor of its inability to pay its debts as they mature;

(D)    The filing by the Payor of a petition in bankruptcy;

(E)    The making of an assignment by the Payor for the benefit of its creditors;

(F)    Consent by the Payor to the appointment of, or possession by, a custodian for itself or for all or substantially all of its property;

(G)    The filing of a petition in bankruptcy against the Payor with the consent of the Payor;

(H)    The filing of a petition in bankruptcy against the Payor without the consent of the Payor, and the failure to have such petition dismissed within sixty (60) days from the date upon which such petition is filed;

(I)    Notwithstanding the sixty (60) day provision in Paragraph "(H)" of this Article "3"of this Note, on a petition in bankruptcy filed against Payor, Payor is adjudicated;

(J)    The entry by a court of competent jurisdiction of a final non-appealable order, judgment or decree appointing, without the consent of the Payor, of a receiver, trustee or custodian for the Payor or of all or substantially all of the respective property or assets of Payor;

(K)    The commencement of a proceeding to foreclose the security interest in, or lien on, any property or assets to satisfy the security interest or lien therein of any creditor of the Payor;

(L)    The entry of a final judgment for the payment of money by a court of competent jurisdiction against the Payor, which judgment the Payor shall not discharge (or provide for such discharge) in accordance with its terms within ninety (90) days of the date of entry thereof, or procure a stay of execution thereof within ninety (90) days from the date of entry thereof and, within such ninety (90) day period, or such longer period during which execution of such judgment shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal; and

(M)    The imposition of any attachment or levy, or the issuance of any note of eviction against the assets or properties of the Payor.

4.    <u>Remedies Upon Default</u>

Upon the occurrence of an Event of Default (as defined in Article "3" of this Note), and any time thereafter while such Event of Default is continuing, the entire unpaid principal balance which is due pursuant to this Note shall, at the Payee's option, be accelerated and become and be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Payor.

5.    <u>Non-Exclusive Remedy</u>

Any remedy that is set forth in this Note is not exclusive of any remedies that are provided by law.

6.    <u>Liability Upon Default</u>

The liability of the Payor upon default shall be unconditional and shall not be in any manner affected by any indulgence whatsoever granted or consented to by the Payee including, but not limited to, any extension of time, renewal, waiver or other modification.

7.    <u>Exercise of Remedy Upon Default</u>

No failure on the part of the Payee to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

8.    <u>Security.</u>

A.    This Promissory Note shall be secured by three million (3,000,000) shares of Common Stock of the Payor (the "Security Shares"), which are to be held in escrow pursuant to that certain Escrow Agreement by and between Dr. Zsigmond L. Sagi, the Payee, the Payor and Mintz & Fraade, P.C., to be executed simultaneously with this Promissory Note (the "Escrow Agreement").

B.    Upon default by the Payor, the Payor shall cause the Security Shares to be included in a Registration Statement and to file said Registration Statement with the Securities and Exchange Commission within sixty (60) days after the date of default and use its best efforts to cause such Registration Statement to be declared effective; provided, however, that such Registration Statement shall not be required if in the opinion of the Payor's counsel, the Security Shares will be freely tradable if the Payee receives the Security Shares pursuant to Subparagraph "B" of Paragraph "2" of the Escrow Agreement upon default by the Payor.

C.    All expenses in connection with preparing and filing any registration statement pursuant to this Article "8" hereof (and any registration or qualification under the securities or "Blue Sky" laws of states in which the offering will be made under such registration statement) shall be borne in full by the Payor.

9.    Validity of Provisions

Any provision of this Note that may prove to be unenforceable under any law shall not affect the validity of any other provision of this Note.

10.    Collection Costs

Payor agrees to pay all reasonable costs of collection, including attorney's fees and costs, which may be paid or incurred by Payee in connection with Payee's exercise of its rights or remedies under this Note.

11.    Full Recourse

Anything in this Note to the contrary notwithstanding, the Payor hereunder shall be liable on this Note for the full amount of the principal and interest due pursuant to this Note.

12.    Miscellaneous

(A)    Modification    This Note may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by the Payor and the Payee of this Note.

(B)    Further Actions    The Payor agrees to execute any and all instruments and documents, and to take any and all such further actions reasonably required to effectuate this Note and the intents and purposes hereof.

(C)    Notices    All notices or other communications required or permitted hereunder shall be in writing and shall be mailed by First Class, Registered or Certified Mail (Return Receipt Requested), postage prepaid, as follows:

> To the Payor:    Scantek Medical, Inc.
> 4 B Wing Drive,
> Cedar Knolls, NJ 07927
> Attention: Dr. Zsigmond Sagi, President
>
> Copy to:    Mintz & Fraade, P.C.
> 488 Madison Avenue
> New York, New York 10022
> Attn.: Frederick M. Mintz, Esq.

000191

To the Payee:        Accordant Holdings, LLC
                     853 East Valley Boulevard, Suite 200
                     San Gabriel, CA, 91776
                     Attn.: Angela C. Sabella


Copy to:             _____
                     _____
                     _____

or in each case to such other address as shall have last been furnished by like notice. If mailing by Registered or Certified Mail is impossible due to an absence or delay in the postal service, notice shall be in writing and personally delivered to the appropriate address set forth above. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be.

(D)    <u>Governing Law</u>        This Note shall in all respects be construed, governed, applied and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed therein, without giving effect to the principles of conflicts of law. The parties hereby consent to and irrevocably submit to personal jurisdiction over each of them by the Courts of the State of New York in any action or proceeding, irrevocably waive trial by jury and personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph "C" of this Article "12" of this Note.

(E)    <u>Assignment</u>   This Note may be assigned or transferred by the Payee without the prior written consent of the Payor.

(F)    <u>Successors and Assigns</u>   This Note shall be binding upon the Payor and its successors and assigns.

(G)    <u>Binding Agreement</u>   This Note shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.


[Signature page follows]

000192

IN WITNESS WHEREOF, the Payor has executed this Note as of the 10th day of February 2003.

Scantek Medical, Inc.

By: _____

Zsigmond L. Sagi, President & CEO

In order to induce the Payor to enter into the foregoing Note, the payment and performance of the obligations of the Payor are hereby personally guaranteed by Zsigmond L. Sagi and Zsigmond L. Sagi, as guarantor hereof, hereby consents that any provisions of this Note, may be waived, modified or extended without affecting the liability of Zsigmond L. Sagi, as guarantor of the Payor.

_____

Zsigmond L. Sagi

# EXHIBIT "I"

# SCANTEK MEDICAL, INC.

## SUBSCRIPTION AGREEMENT

### DATED FEBRUARY 10, 2003

Scantek Medical, Inc.
4 B Wing Drive,
Cedar Knolls, NJ 07927
Attn: Dr. Zsigmond L. Sagi, President

Gentlemen:

1.      The "Securities"

The undersigned hereby agree to invest an aggregate of fifty thousand ($50,000) dollars in Scantek Medical, Inc, a corporation organized and existing under the laws of the State of Delaware (the "Company"), evidenced by a promissory note in the principal amount of fifty thousand ($50,000) dollars bearing interest at the rate of one (1%) percent per month (the "Note"); and to the purchase of shares of Common Stock, par value $.001, (the "Shares") from the Company as set forth in Article "9" of this Subscription Agreement which shall be registered pursuant to Article "9" of this Subscription Agreement. The Note in the principal amount of fifty thousand ($50,000) dollars, is annexed hereto as Exhibit "A". The Note and the Shares are hereinafter jointly referred to as the "Securities." The undersigned hereby agree to pay for the Securities subscribed for by the undersigned in the manner which is described in Article "2" of this Subscription Agreement (the "Subscription Agreement").

2.      Payment

We are herewith agreeing to forward the amount of fifty thousand ($50,000) dollars upon execution hereto to the account of "Mintz & Fraade, P.C."

3.      The Offering

Each of the undersigned understand the following:

A.              This offering will terminate on, or prior to, February 17, 2003, subject to extension, in the sole and absolute discretion of the Company;

B.              This offering may be so extended without amending this

1

000256

Subscription Agreement and without notice to either the Investors who have submitted their subscription documents to the Company or to prospective Investors; and

C.     The Company reserves the right, in its sole and absolute discretion, (i) to withdraw the subject offering or (ii) to reject any subscription for Securities in whole or in part. In the event of a complete rejection, the Company will return to me all of my subscription documents and my subscription funds for the subscription, without interest thereon and without deduction of escrow costs. In the event of a partial rejection, the Company will return to me the appropriate portion of my subscription funds for the rejected portion of the subscription, without interest thereon and without deduction of escrow costs, and I will be obligated to promptly furnish the Company with such amended subscription documents as the Company may request, including, but not limited to, a new Subscription Agreement. If my subscription is accepted for a lesser number of Securities than requested by me, it will be within the sole and absolute discretion of the Company whether or not to allow me to withdraw my full subscription.

4.     Acceptance of Subscription

Each of the undersigned understand the following:

A.          that this Subscription Agreement is not binding upon the Company unless and until it is accepted by the Company; and

B.          that the acceptance of my subscription to purchase Securities by the Company shall not be deemed binding upon the Company until the funds paid by me herewith clear and are credited to the account of Mintz & Fraade, P.C.

5.     No Reliance

Each of the undersigned acknowledge the following:

A.     that I have received, read, understand, and am familiar with this Subscription Agreement;

B.     that no statements, representations or warranties, have been made or furnished to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Securities, and/or the economic, tax, or any other aspects or consequences of this investment, and that I have not relied upon any information with respect to the offering, written or oral, other than the information contained in this Subscription Agreement; and

C.     I further understand that any documents other than this Subscription

2

N:\Clients\Scantek Medical Inc\Bridge Financing\sub.ag.vACC.final2.docv1

000257

Agreement, regardless of whether distributed prior to, simultaneously with, or subsequent to, the date of this Subscription Agreement should not be relied upon in determining whether to make an investment in the Securities and I expressly acknowledge, agree and affirm that I have not relied upon any such literature in making my determination to make an investment in the Securities.

6.    <u>Representations and Warranties of the Investor</u>

In order to induce the Company, Counsel and their respective agents, to accept our subscription, each of the undersigned further represent and warrant to the Company, Counsel, and their respective Affiliates, as follows:

(A)    If I have chosen to do so, I have been represented by such advisors as I have found necessary to consult concerning the purchase of the Securities, and such representation has included an examination of applicable documents and an analysis of all tax, financial, and securities law aspects thereof. I, my advisors, and such other persons with whom I have found it necessary or advisable to consult, have sufficient knowledge and experience in business and financial matters to evaluate the information set forth in this Subscription Agreement, and the risks of the investment, and to make an informed investment decision with respect thereto;

(B)    With respect to the tax aspects of my investment, I am relying solely upon the advice of my own personal tax advisors, and upon my own knowledge with respect thereto;

(C)    I have not relied, and will not rely upon, any information with respect to this offering other than the information contained herein and set forth in the Company's filings with the Securities and Exchange Commission;

(D)    I understand that this offering has not been, and it is not anticipated that the same will be, registered under the Securities Act of 1933, as amended (the "1933 Act"), or pursuant to the provisions of the securities or other laws of any other applicable jurisdictions. I am fully aware of the restrictions on sale, transferability and assignment of the Securities and that I must bear the economic risk of my investment herein for an indefinite period of time because the offering has not been registered under the 1933 Act and, therefore, the Securities cannot be offered or sold unless the offering is subsequently registered under the 1933 Act or an exemption from such registration is available to me;

(E)    My execution and delivery of this Subscription Agreement has been duly authorized by all necessary action. I do not presently have any plans to pledge, transfer or assign the Securities and any Shares issuable upon the conversion of the Note which we acquire pursuant to this offering. I am making the investment hereunder for my own account and not for the account of others and for investment purposes only and not with a view to or for the transfer,

3

N:\Clients\Scantek Medical Inc\Bridge Financing\sub.ag.vACC.final2.docv1

000258

assignment, resale or distribution thereof, in whole or in part. I have no present plans to enter into any such contract, undertaking, agreement or arrangement;

(F)    I agree that, subject to any applicable state securities laws, I shall not cancel, terminate or revoke this Subscription Agreement, executed by me with respect to the purchase of the Securities, and that this Subscription Agreement shall survive my death or disability, except pursuant to the laws of any applicable jurisdiction;

(G)    Although one of my motivations for investing in the Company is to derive the economic benefits, I am aware that the purchase of the Securities is a speculative investment involving a high degree of risk and that there is no guarantee that I will realize any gain from my investment, realize any tax benefits therefrom and that I may lose all or a substantial part of my investment. I can afford the loss of my entire investment;

(H)    The address set forth below is my true and correct residence, and I have no present intention of becoming a resident of any other state or jurisdiction prior to our purchase of the Securities;

(I)    I understand the meaning and legal consequences of the foregoing representations and warranties, which are true and correct as of the date hereof and will be true and correct as of the date of my purchase of the Securities subscribed for herein. Each such representation and warranty shall survive such purchase;

(J)    I agree that it shall not be a defense to a suit for damages for any misrepresentation or breach of covenant or warranty of mine that the Company knew or had reason to know that any covenant, representation or warranty in this Subscription Agreement or furnished or to be furnished to the Company contained untrue statements. The foregoing shall survive any investigation by the Company;

(K).    No representation or warranty which I have made in this Subscription Agreement, or in a writing furnished or to be furnished pursuant to this Subscription Agreement, contains or shall contain any untrue statement of fact, or omits or shall omit to state any fact which is required to make the statements which are contained herein or therein, in light of the circumstances under which they were made, not misleading; and

(L)    I am an "accredited investor" as that term is defined in Rule 501 of Regulation D, which was promulgated under the 1933 Act. Pursuant to Rule 501, an accredited investor includes (i) a natural person who (with spouse, if any) has a net worth which exceeds $1,000,000 at the time of the purchase; (ii) a natural person who has had an individual income in excess of $200,000 for the prior two years (or joint income with such spouse which exceeds $300,000 in each such year) and have a reasonable expectation of reaching the same income level (or joint income level) in the current year; (iii) an organization as described in section 501 (c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total

4

00259

assets in excess of $5,000,000; (iv) a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 (b)(2)(ii); or (v) an entity in which all of the equity owners are accredited investors.

7.    Indemnification by the Investor

Each of the undersigned hereby agree to indemnify and hold harmless the Company, Counsel, and persons affiliated with them, from any and all damages, losses, costs and expenses (including reasonable attorneys' fees) which they, or any of them, may incur by reason of any of the undersigned failure, or alleged failure, to fulfill any of the terms and conditions of this Subscription Agreement or by reason of any of the undersigned breach of any of the undersigned representations and warranties contained in this Subscription Agreement.

8.    Subscription for Shares

The Company shall issue to the undersigned such number of shares which shall result in the ownership by the undersigned for every $1,000 loaned to the Company, six (6) Shares.

Add

9.    Registration

(A)    Upon the occurrence of an Event of Default (as defined in the Promissory Note), the Company shall in the Company's sole and absolute discretion either (i) deliver freely tradeable Shares to the Payee or (ii) file a Registration Statement with the Securities and Exchange Commission which shall include the Shares issued hereunder within sixty (60) days after the date of such Event of Default. If no Event of Default occurs, the Company shall file a Registration Statement with the Securities and Exchange Commission which shall include the Shares issued hereunder within one hundred twenty (120) days after closing of this offering.

(B)    All expenses in connection with preparing and filing any registration statement under Article "4" hereof (and any registration or qualification under the securities or "Blue Sky" laws of states in which the offering will be made under such registration statement) shall be borne in full by the Payor; provided, however, that the Payee shall pay any and all underwriting commissions and expenses and the fees and expenses of any legal counsel selected by the Payee to represent them with respect to the sale of the Securities.

10.    Changes in Common Stock

5

If there are any changes in the Company's common stock on or after to February 10, 2003, by way of stock split, stock dividend, reverse split, combination or reclassification, or through merger, consolidation, reorganization or recapitalization, or by any other means, appropriate adjustment shall be made in the provisions hereof, as may be required, so that any such adjustment shall result in the aggregate amount of shares issued to the undersigned pursuant to this Subscription Agreement shall equal not less than one hundred fifty thousand (150,000) shares of the Company's common stock effective immediately after the effective date of such action.

11.     Underline: General Provisions

    (A)     _Headings_.  The headings contained in this Subscription Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Subscription Agreement.

    (B)     _Enforceability_.  If any provision which is contained in this Subscription Agreement should, for any reason, be held to be invalid or unenforceable in any respect under the laws of any State of the United States, such invalidity or unenforceability shall not affect any other provision of this Subscription Agreement.  Instead, this Subscription Agreement shall be construed as if such invalid or unenforceable provisions had not been contained herein.

    (C)     _Notices_.  Any notice or other communication required or permitted hereunder must be in writing and sent by either (i) registered or certified mail, postage prepaid, return receipt requested, (ii) overnight delivery with confirmation of delivery or (iii) facsimile transmission with an original mailed by first class mail, postage prepaid, in each case addressed as follows:

To the Company:            Scantek Medical, Inc.
                           4 B Wing Drive,
                           Cedar Knolls, NJ 07927
                           Attn.: Dr. Zsigmond L. Sagi, President
                           Facsimile No.: (973) 401-0459

Copy to:                   Mintz & Fraade, P.C.
                           488 Madison Avenue, Suite 1100
                           New York, New York 10022
                           Attn.: Frederick M. Mintz, Esq.
                           Facsimile No.:(212) 486-0701

To the Investor:           Accordant Holdings, LLC
                           853 East Valley Boulevard, Suite 200
                           San Gabriel, CA, 91776

6

000261

Attn.: Angela C. Sabella

Copy to:        _____

               _____

               _____

or in each case to such other address and facsimile number as shall have last been furnished by like notice. If mailing by registered or certified mail is impossible due to an absence of postal service, and if the other methods of sending notice set forth in Paragraph "C" of this Article "11" of this Subscription Agreement are not otherwise available, notice shall be in writing and personally delivered to the aforesaid addresses. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be; provided, however, that any notice sent by facsimile shall be deemed to have been given as of the date sent by facsimile if a copy of such notice is also mailed by first class mail on the date sent by facsimile; if the date of mailing differs from the date of sending by facsimile, then the date of mailing by first class mail shall be deemed to be the date upon which notice given.

(D)    Governing Law; Disputes.    This Subscription Agreement shall in all respects be construed, governed, applied and enforced with the laws of the State of New York without giving effect to the principles of conflicts of laws and be deemed to be an agreement entered into in the State of New York and made pursuant to the laws of the State of New York. The parties hereby consent to and irrevocably submit to personal jurisdiction over each of them by the Courts of the State of New York in any action or proceeding, irrevocably waive trial by jury and personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph "C" of this Article "11" of this Subscription Agreement.

The parties agree, further, that the prevailing party in any action or proceeding as determined by the Tribunal making the final and non-appealable determination of the matter in dispute shall be entitled to reimbursement of all its reasonable fees, costs and expenses, including its attorneys fees, in connection with such matter. In connection with the Tribunal's determination for the purpose of which party, if any, is the prevailing party, the Tribunal shall take into account all of the factors and circumstances including, without limitation, the relief sought, and by whom, and the relief, if any, awarded, and to whom. In addition, and notwithstanding the foregoing sentence, a party shall not be deemed to be the prevailing party in a claim seeking monetary damages, unless the amount of the final determination exceeds the amount offered in a writing by the other party by fifteen percent (15%) or more. For example, if the party initiating a claim ("A") seeks damages of $100,000 plus costs and expenses, the other

7

000262

party ("B") has offered A $50,000 prior to the commencement of the proceeding, and if the Tribunal awards any amount less than $57,500 to A, the Tribunal should determine that B has "prevailed".

(E)    Further Actions.    The parties agree to execute any and all instruments and documents, and to take any and all such further actions reasonably required to effectuate this Agreement and the intents and purposes hereof.

(F)    Binding Agreement.    This Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns

(G)    Waiver.    Except as otherwise expressly provided herein, no waiver of any covenant, condition, or provision of this Subscription Agreement shall be deemed to have been made unless expressly set forth in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Subscription Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment for the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Subscription Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other or subsequent breach.

(H)    Counterparts.    This Subscription Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(I)    Entire Agreement.    The parties have not made any representations, warranties, or covenants with respect to the subject matter hereof, orally or in writing, which are not set forth herein, and this Subscription Agreement, together with any instruments or other agreements executed simultaneously herewith, constitutes the entire agreement between them with respect to the subject matter hereof.  All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Subscription Agreement and any such instrument, which alone fully and completely expresses their agreement. This Subscription Agreement may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by all of the parties to this Subscription Agreement.

12.    Certification with respect to Federal Interest Payments; Backup Withholding in Lieu of Internal Revenue Service Form W-9 –

Under penalties of perjury each of the undersigned certify as follows:

8

N:\Clients\Scantek Medical Inc\Bridge Financing\sub.ag.vACC.final2.docv1

000263

The number(s) shown below as my (our) taxpayer identification number(s) (social security number or employer identification number) is my (our) correct taxpayer identification number; and I (we) am (are) not subject to backup withholding either because I (we) have not been notified by the Internal Revenue Service that I (we) am (are) subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me (us) that I (we) am (are) no longer subject to backup withholding.

[Signature page follows]

9

000264

IN WITNESS WHEREOF, I have executed this Subscription Agreement this 10th day of February 2003.

**<u>Individuals:</u>**                                  **<u>Entities:</u>**


_____              _____
Name (Please Print)                          Name of Entity (Please Print)


_____              By:_____
Signature                                              Signature and Title


_____
Social Security Number


_____              _____
Name of Joint Tenant or                    Employer Identification
Tenant in-Common, if                        Number
applicable (Please Print)
                                                          [Corporate Seal (if applicable)]


_____
Signature of Joint Tenant
or Tenant-in-Common, if
applicable.


_____
Social Security Number

10

000265

## TO BE COMPLETED BY ALL SUBSCRIBERS

Address to which information regarding
this subscription should be mailed:

_____

Street Address

_____

City and State                                          Zip

(____)_____

Telephone Number

(____)_____

Facsimile Number


Accepted And Agreed To This _____ Day of _____, 2003

Scantek Medical, Inc.

By:

Name: _____

Title: _____PRESIDENT._____

000266