UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X  Case No. 08 cv 00453 (CM)

SCANTEK MEDICAL INC.,                                          :
                                                              :
            Plaintiff,                                        :  AFFIRMATION OF
                                                              :  KENNETH SUSSMANE IN RESPONSE TO
      vs.                                                     :  PLAINTIFF'S AND THIRD-PARTY
                                                              :  DEFENDANTS' MOTION TO DISMISS
ANGELA CHEN SABELLA and ACCORDANT                             :  CERTAIN COUNTS OF THE
HOLDINGS, LLC,                                                :  COUNTERCLAIMS AND THIRD-PARTY
                                                              :  COMPLAINT
            Defendants and Third-Party                        :
                        Plaintiffs,                           :
      vs.                                                     :
                                                              :
MINTZ & FRAADE, P.C., FRED MINTZ, ALAN                        :
FRAADE, MINTZ & FRAADE ENTERPRISES,                           :
LLC, ZSIGMOND L. SAGI, and GIBRALTAR                          :
GLOBAL MARKETING LLC.                                         :
                                                              :
            Third-Party Defendants.                           :
                                                              :
                                                              :
-------------------------------------------------------------- X

STATE OF NEW YORK      )
                       )ss.
COUNTY OF NEW YORK     )


      I, Kenneth Sussmane, being duly sworn, do depose and say, that:

      1.      I am an attorney admitted to practice law in the State of New York. I
practice law with McCue Sussmane & Zapfel, P.C., attorneys for Defendants and Third-Party
Plaintiffs in this action.

      2.      I submit this affirmation in opposition to Plaintiff's and Third-Party
Defendants' motion to dismiss certain counts of Defendants' Counterclaims and Third-Party
Complaint.

      3.      Prior to commencement of this action, I made requests for documents and
information from the attorneys for Scantek Medical Inc. I was informed by such attorneys that

Scantek was a publicly-traded company and could not release documents or information to my clients that were not available to the public.

4.     In 2003, Plaintiff ceased its SEC filings, further frustrating any reasonable investigation into Scantek.

5.     Attached hereto as Exhibit A is the Affidavit of Alan Fraade dated March 28, 2008, submitted in opposition to defendants' motion to dismiss this action.

6.     Attached hereto as Exhibit B is an email and letter sent by Fred Mintz.

7.     Attached hereto as Exhibit C are documents filed by plaintiff with the SEC, including a press release, operating agreement and acquisition agreement regarding Gibraltar Global Marketing LLC.

8.     Attached hereto as Exhibit D are certain documents relating to Graphco Technologies Inc.

9.     Attached hereto as Exhibit E is the Affidavit of Edward Kramer dated March 28, 2008, submitted in opposition to defendants' motion to dismiss this action.

10.     Attached hereto as Exhibit F is the Form 10Q-SB filed by plaintiff with the SEC on May 20, 2003.


New York, New York
June 20, 2008

                              /s/ Ken Sussmane

                              _____
                              Kenneth Sussmane (KS 9301)

EXHIBITS

Exhibit A          Fraade Affidavit dated March 28, 2008

Exhibit B          Mintz letter dated January 28, 2008

Exhibit C          Scantek SEC filings Re: Gibralter deal with Life Medical Technologies

Exhibit D          Graphco litigation documents

Exhibit E          Kramer Affidavit dated March 28, 2008

Exhibit F          Scantek Form 10Q-SB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SCANTEK MEDICAL, INC.,

                                            Index No.: 08 CV 00453 (CM)

                          Plaintiff,

                                            **AFFIDAVIT**

            -against-

ANGELA CHEN SABELLA and
ACCORDANT HOLDINGS, LLC,

                          Defendants and
                          Third-Party Plaintiffs,

            -against-

MINTZ & FRAADE, P.C., FRED MINTZ, ALAN
FRAADE, MINTZ & FRAADE ENTERPRISES, LLC,
ZSIGMOND L. SAGI, and GIBRALTAR GLOBAL
MARKETING LLC,

                          Third-Party Defendants.
------------------------------------------------------------------X
State of New York    )
                     ) ss.:
County of New York)

Alan P. Fraade, being duly sworn, deposes and says:

    1.  At all times relevant to this action through to the date hereof, Mintz & Fraade,

P.C. ("M&F"), the law firm of which I am a member, has acted as attorneys for the

Plaintiff Scantek Medical, Inc. (hereinafter referred to as "Scantek" or "Plaintiff").  I am

fully familiar with the facts stated in this affidavit and know the same to be true to my

own knowledge.  I am fully familiar with the pleadings and proceedings heretofore had

herein and the matters hereinafter set forth.

2. The Plaintiff engaged in a series of financing transactions with Defendants Sabella and Accordant (jointly the "Defendants"), in which the Defendants loaned certain sums of money to Plaintiff pursuant to which promissory notes were executed in favor of Defendants and shares of Plaintiff's common stock were agreed to be issued to the Defendants as additional compensation. Defendant Sabella's Affidavit and Defendants' Memorandum of Law in support of the Motion to Dismiss contain numerous factual inaccuracies and false statements with respect to these transactions.

3. The following documents (collectively the "Documents") were executed as hereinafter set forth:

A. The Promissory Note dated April 25, 2002 (the "April 2002 Note"), in the principal amount of $100,000 executed by Plaintiff in favor of Defendant Sabella,

B. The Subscription Agreement dated April 25, 2002 (the "April 2002 Subscription Agreement") executed by Defendant Sabella for the issuance of shares as additional compensation for the loan evidenced by the April 2002 Note,

C. The Promissory Note dated August 20, 2002 (the "August 2002 Note"), in the principal amount of $253,250.80 which superseded the April 2002 Note, executed by Plaintiff in favor of Defendant Sabella,

2

D. The Subscription Agreement dated August 20, 2002 (the "August 2002 Subscription Agreement") executed by Defendant Sabella for the issuance of shares as additional compensation for the loan evidenced by the August 2002 Note,

E. The Promissory Note dated February 10, 2003 (the "February 2003 Note"), in the principal amount of $50,000 executed by Plaintiff in favor of Defendant Accordant, and

F. The Subscription Agreement dated February 10, 2003 (the "February 2003 Subscription Agreement") executed by Defendant Sabella as additional compensation for the loan evidenced by the February 2003 Note.

A more detailed description of the Documents is set forth in the Complaint.

4. Plaintiff alleges in the Complaint that the transactions evidenced by the Documents are criminally usurious and in violation of N.Y. PENAL LAW § 190.40.

5. Throughout the entire negotiation process and the execution of the Documents, the Defendants were advised by Mark Stepniewski (a/k/a Mark Step), who negotiated with Plaintiff on Defendants' behalf, and holds himself out as a sophisticated adviser and consultant to wealthy individuals with respect to investments. Mr. Stepniewski introduced the Defendants to Plaintiff.

6. M&F had known Mr. Stepniewski for many years when my partner Frederick Mintz and I introduced Plaintiff to Mr. Stepniewski. We inquired whether Mr.

3

Stepniewski knew any investors who might be interested in investing in Plaintiff. This is when Mr. Stepniewski introduced Plaintiff to Defendants.

7.   Upon information and belief, Mr. Stepniewski has a long history with Defendants, and has introduced Defendant Sabella to many entities, including several in which she has invested millions of dollars in many calendar years. Upon information and belief, Mr. Stepniewski has participated in a substantial number of Defendant Sabella's investments by investing his own money in the same entities in which Defendant Sabella has invested, and has advised me that he has an interest in Defendant Accordant. Mr. Stepniewski's relationship with Defendants was thus extremely close.

8.   M&F was not representing Defendants with respect to the transactions which are the subject of the Complaint (the "Transactions").

9.   Upon information and belief, Defendant Sabella is a sophisticated investor, in additional to being very wealthy. I have been advised by Mr. Stepniewski that Defendant Sabella's personal wealth, in addition to certain of her family's assets, which she controls, totals substantially in excess of one billion dollars. Defendant Sabella runs a substantial business, has inside counsel on at least a part-time basis, and has many lawyers who represent her as outside counsel. If she did not consult with respect to the Transactions with any of the many lawyers she retains, then that was Defendant Sabella's choice. It is inconceivable that Defendant Sabella, as a sophisticated investor and businesswoman, would have believed that she could have relied upon the attorneys representing the Plaintiff borrowing money from her in a loan transaction.

4

10. Each of the subscription agreements executed by Defendants with respect to the

Transactions contains the following provision:

> I acknowledge that I have received, read, understand, and am familiar with this Subscription Agreement. I further acknowledge that no statements, representations or warranties, have been made or furnished to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Securities, and/or the economic, tax, or any other aspects or consequences of this investment, and that I have not relied upon any information with respect to the offering, written or oral, other than the information contained in this Subscription Agreement. I further understand that any documents other than this Subscription Agreement, regardless of whether distributed prior to, simultaneously with, or subsequent to, the date of this Subscription Agreement should not be relied upon in determining whether to make an investment in the Securities and I expressly acknowledge, agree and affirm that I have not relied upon any such literature in making my determination to make an investment in the Securities.

Each subscription agreement also states: "I have not relied, and will not rely upon, any

information with respect to this offering other than the information contained herein and

set forth in the Company's filings with the Securities and Exchange Commission."

11. The subscription agreements also contained an indemnification clause, which

reads:

> I hereby agree to indemnify and hold harmless the Company, Counsel [Mintz & Fraade, P.C.], and persons affiliated with them, from any and all damages, losses, costs and expenses (including reasonable attorneys' fees) which they, or any of them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this Subscription Agreement or by reason of my breach of any of my representations and warranties contained in this Subscription Agreement.

12. That is why I find it puzzling to read in the Defendants' Motion to Dismiss that

the Defendants' "relied" upon M&F and Plaintiff with respect to the financing

transactions between the Defendants and the Plaintiff. (See the Affidavit of Angela Chen

5

Sabella dated February 11, 2008 (the "Sabella Affidavit") ¶¶ 9, 11.) I do not believe that Defendants relied upon M&F or the Plaintiff at any time with respect to the Transactions. M&F dealt primarily with Mr. Stepniewski with respect to the Transactions, and M&F and Plaintiff had limited direct contact with Defendants during the negotiations and/or execution of the Documents. Even if Defendants did not have any of the numerous attorneys they utilize review the Documents, both Defendant Sabella and Mr. Stepniewski are sophisticated businesspeople who are entirely capable of understanding the meaning of the provisions quoted above. If Defendant Sabella is intending to suggest in Paragraphs 11-14 of her Affidavit that neither she, nor Mr. Stepniewski read the Documents, or were not capable of understanding the Documents, then such assertion is an outright lie.

13. It is also an outright lie to suggest that M&F structured the terms of the Documents. I doubt that any corporate attorney would recommend such harsh terms for their own client. The terms of the Documents were set forth by Defendants, and were agreed to by Plaintiff because Defendants had tremendous leverage with respect to the Transactions. Defendants used their influence to secure terms in the Documents which no borrower would consider favorable.

14. On or about April 25, 2002, Defendants loaned $100,000 to Plaintiff, pursuant, in part, to a promissory note dated April 25, 2002 (the "April 2002 Note"), which was executed by Dr. Zsigmond L. Sagi, Plaintiff's Chief Executive Officer, on behalf of Plaintiff, in favor of Defendant Sabella. Plaintiff and Defendants, through Mr. Stepniewski as Defendants' representative, negotiated the terms and structure of this transaction. M&F had limited involvement in structuring the Transactions.

6

15. Plaintiff and Defendants entered into the April 2002 Subscription Agreement for 400,000 shares of Plaintiff's Common Stock (the "April 2002 Shares"). This was in accordance with the terms and structure demanded by the Defendants, through Mr. Stepniewski.

16. On or about August 20, 2002, Defendants loaned an additional $150,000 to Plaintiff. On or about August 20, 2002, Plaintiff executed the August 2002 Note in favor of Defendants which replaced and superseded the April 2002 Note, and incorporated both the principal balance of the April 2002 Note, plus the accrued interest thereon in the amount of $3,250.80, plus the newly loaned principal in the sum of $150,000. Thus, the principal of the August 2002 Note was $253,250.80. The structure of the August 2002 Note was also created by Defendants, through Mr. Stepniewski.

17. The August 2002 Note bore interest at the rate of 10% per annum. As additional compensation, Defendant Sabella, through Mr. Stepniewski, demanded 2,000,000 shares of Plaintiff's Common Stock (the "August 2002 Shares"), not including the 400,000 shares of Plaintiff's Common Stock which Defendants were entitled to pursuant to the April 2002 Subscription Agreement.

18. On August 20, 2002 Plaintiff and Defendants entered into a Subscription Agreement, pursuant to which Plaintiff agreed to issue to Defendants the August 2002 Shares. The August 2002 Subscription Agreement specifically states that as additional compensation for the loans to Plaintiff totaling $250,000, Defendants received the August 2002 Note, and was entitled to the 2,000,000 August 2002 Shares. The terms and structure of this transaction were demanded by the Defendants through Mr. Stepniewski.

7

19. Some of the August 2002 Shares were issued to Defendant Sabella pursuant to the August 2002 Subscription Agreement. Defendants' Memorandum of Law states that the August 2002 Shares "were included in the 2,099,466 shares reported as issued for the year ended June 30, 2002, for which Scantek's auditors reported a 'Value' of $2,099, or a 'Value' of $2,000 for the 2,000,000" August 2002 Shares. (See Defendants' Memorandum of Law at 7.) Although the valuation of the stock is not relevant for purposes of the present motion, Defendants have completely misread Plaintiff's Consolidated Statements of Stockholders' Deficiency ("Plaintiff's Consolidated Statements") on which this information is based, a copy of which is annexed hereto as Exhibit "A". First, auditors do not "report a value" of the stock. Auditors review financial information provided by the Plaintiff to ensure that the financial statements are properly prepared. Second, the "value" which Defendants refer is based only upon the par value of the stock, not upon the actual market value. The "value" listed under the column "Common Stock" on Exhibit "A" shows that the 2,099,466 shares reported for the year ended June 30, 2002 were worth $2,099 because the par value was $.001 per share. However, the column "additional paid-in capital" represents the price over and above the par value Plaintiff received for the Common Stock. Thus, Plaintiff received an average of an additional $.0751 per share over and above the par value. Thus, it is clear that Defendants' assertion that the "value" Plaintiff's stock is $.001 per share (see Defendants' Memorandum of Law at 17) comes from a gross misreading of Plaintiff's Consolidated Statements which is attached hereto as Exhibit "A".

20. Defendants also erroneously state that the "February 2003 Subscription Agreement, the August 2002 Subscription Agreement and subscription agreements

8

delivered to other investors provided for the delivery of funds in payment for the Securities to the operating account of 'Mintz & Fraade, P.C.', not Scantek's operating account, and not an escrow account maintained by any attorney, bank or brokerage firm". (Defendants' Memorandum of Law at 8.) Again, this is inaccurate and not relevant to the present motion.   The February 2003 Subscription Agreement and the August 2002 Subscription Agreement provide that payment for the securities should be made "by delivery of a check made payable to 'Mintz & Fraade, P.C.'" to M&F.  Although it is not specified that the funds will be deposited on M&F's escrow account, such funds were in fact deposited in M&F's escrow account, not M&F's operating account.  Annexed hereto as Exhibit "B" is an email dated August 19, 2002 from Kitty L. Lew, Defendant Sabella's Office Manager, confirming that Defendant Sabella wired $75,000 with respect to the Transaction to M&F's escrow account.  Defendants' baseless assertion that the funds were deposited in M&F's operating account is blatantly false, and is a total fabrication.

21. Ultimately, Plaintiff was unable to meet the payment terms dictated by the Documents.

22. Mr. Stepniewski, acting on behalf of Defendants entered into negotiations with M&F, acting on behalf of Plaintiff, to attempt to reach a settlement with respect to Plaintiff's default.  Mr. Stepniewski negotiated primarily with my partner, Frederick Mintz.  Mr. Mintz advised me that he and Mr. Stepniewski had very nearly reached an agreement with respect to settling Plaintiff's outstanding debt to Defendants.  A draft of a settlement proposal between Plaintiff and Defendant Accordant was prepared by M&F dated July 14, 2006, a copy of which is annexed hereto as Exhibit "C".  Numerous discussions took place thereafter between Mr. Stepniewski, Mr. Mintz and me, and we

9

believed that we were close to a final settlement in the end of 2007. However, before a final settlement could be reached, Ken Sussmane, the attorney of record for Defendants in this action, submitted extreme and unreasonable demands upon Plaintiff. The original intention of the settlement was for Defendants to own a 48% interest in a limited liability company which would distribute Plaintiff's product in mainland China, including Hong Kong and Macao. A copy of the demand letter from Mr. Sussmane dated December 10, 2007 is annexed hereto as Exhibit "D". It was not until this time that Plaintiff, unable to meet Defendants' unreasonable demands and with no other choice, determined to institute a lawsuit in order to protect itself against Defendants' attempt to enforce a usurious contract.

23. Defendants also allege that M&F represented Defendants, and therefore M&F owed the Defendants a fiduciary duty. (See Defendants' Memorandum of Law dated February 11, 2008 ("Defendants' Memorandum of Law") at 13.) This is, at best, misleading. M&F's sole representation of Defendant Sabella with respect to one prospective unrelated loan transaction was in or around August 2002 (the "Sabella Representation"), four months after the initial agreement between Plaintiff and Defendants. Defendants were interested in investing in a company, Electronic Control Security Inc. Although M&F drafted documents based upon negotiations by Mr. Stepniewski on behalf of Defendants with the prospective borrower, the transaction was aborted. M&F charged Defendants a fee of $2,500 for the Sabella Representation pursuant to a bill dated March 24, 2003, a copy of which is annexed hereto as Exhibit "E". This representation in no manner related to, nor involved, the Plaintiff. Furthermore, the Sabella Representation was an isolated transaction for which M&F did

10

limited work.  With respect to the Sabella Representation, M&F dealt almost exclusively with Mr. Stepniewski, and not with Defendant Sabella.  Defendant Sabella characterizes this by stating that M&F "represented [her] in connection with certain investments made by [her] on or about the time of [her] investments in Scantek".  (Sabella Aff. ¶ 8.)  This statement is untrue because M&F only represented Defendant Sabella with respect to one investment, not multiple investments, and that transaction was aborted.  Defendant Sabella's statement is also misleading because M&F did not begin representing Defendant Sabella until August 2002, which was well after her first investment in Plaintiff, which occurred in April 2002.

24. In addition, in or about February 2004, M&F handled a filing with the Securities and Exchange Commission for Defendant Sabella on a one-time basis.  My firm charged the Defendants a nominal fee of $1,500 for these legal services pursuant to a bill dated February 4, 2004, a copy of which is annexed hereto as Exhibit "F".  These services could best be described as "ministerial", and did not foster a fiduciary relationship between Defendants and M&F.

25. M&F did not owe Defendant Sabella a fiduciary duty with respect to the Sabella Representation.  The Sabella Representation was entirely unrelated to the Transactions. The Sabella Representation was short lived, and given that M&F dealt almost exclusively with Mr. Stepniewski throughout the Sabella Representation, the suggestion that Defendants relied upon M&F as counsel with respect to the Transactions, which were initiated before the start of the Sabella representation, is totally without merit.

11

26. Plaintiff and Defendant first came to an initial agreement evidenced by the April 2002 Note. However, negotiations between the Plaintiff and the Defendants had begun before such date. Before the negotiations which led to the April 2002 Note, my firm did not represent the Defendants nor provide any legal advice whatsoever to the Defendants.

27. The Defendants were aware that my firm represented the Plaintiff, Scantek, generally, and in all of the transactions entered into between the Defendants and the Plaintiff.

28. At no time did M&F represent both Plaintiff and Defendants with respect to the negotiations, structuring, or the drafting of the documents with respect to the Transactions. M&F represented solely Plaintiff throughout the entire course of dealings between Plaintiff and Defendants. Thus, Defendant Sabella's assertion that she "relied" upon M&F in any way during the Transactions is unfounded and has absolutely no merit.

29. The Defendants' allege that M&F had a duty to speak concerning the illegality of the Transactions. M&F, at the time of the transactions, never evaluated the question of criminal usury. Because Defendant Sabella structured the terms of the Documents, and because no party to the Transactions raised the issue of usury, M&F did not take it upon itself to conduct research or analyze whether the Transactions were usurious.

30. The Documents embodied the negotiations and the demands that the Defendants' placed upon the Plaintiff. M&F memorialized the terms that the Defendants demanded.

31. The Defendants claim that M&F should have disclosed that Plaintiff and M&F were engaged in a "scheme" to have Plaintiff issue securities that it would not honor.

12

This statement is blatantly absurd and false. First, Plaintiff had every intention of honoring the terms of the Documents, which is evidenced by the fact that when Plaintiff could not make its scheduled payments, it attempted to negotiate a new payment schedule. The allegation that Plaintiff did not intend to honor the terms of the Documents is completely unfounded.

32. M&F has represented Plaintiff in numerous transactions over many years. Plaintiff has never asserted usury as a defense, nor has Plaintiff ever started any other lawsuit where it alleged usury as a basis for a complaint. The allegation that there was a "scheme" on the part of M&F and/or Plaintiff cannot be true because it was Defendant Sabella and Mr. Stepniewski, not Plaintiff or M&F, who structured the Transactions.

33. I have been advised that this is not the first time Defendant Sabella has structured a criminally usurious transaction. I have been further advised that at the time Defendant Sabella structured the criminally usurious transaction with Plaintiff, both she and her financial adviser Mr. Stepniewski were aware that there had been allegations of criminal usury connected with another transaction. Edward C. Kramer, Esq., who is presently Of Counsel to M&F, represented Graphco Holdings Corp. ("Graphco") in 2002 before becoming Of Counsel to our firm. Mr. Kramer has advised me that Defendant Sabella loaned money to Graphco, and as consideration for the loan, received warrants to purchase Graphco's common stock. When the value of the warrants was added to the interest charged Graphco pursuant to the promissory note which evidenced the loan from Defendant Sabella, the total interest exceeded the criminal usury rate of 25% per annum. It should be noted that Defendant Sabella's total investment in Graphco was substantial, and approximately $3 million. In connection with the litigation between Graphco and

13

Defendant Sabella (the "Graphco Litigation"), Mr. Kramer prepared an affirmation dated May 7, 2002 which was submitted in the Graphco Litigation and which alleged criminal usury. Although this issue was never decided by the court, Defendant Sabella and her financial adviser Mr. Stepniewski were on notice from Defendant Sabella's involvement in the Graphco Litigation that this structure for offering financing to companies, whereupon she would receive large amounts of securities as additional compensation for loans, was potentially criminally usurious. She was definitely aware of this as early as May 7, 2002, and more likely as early as April 2002.

34.     Based upon what I have been advised by Mr. Kramer, when Defendant Sabella and Mr. Stepniewski structured the terms of the August 2002 Note and the February 2003 Note, and possibly the April 2002 Note as well, she was aware that the terms of the Transactions could lead to a claim of criminal usury, as it had in the Graphco Litigation.

35.     Although M&F has represented Graphco in the past, M&F was unaware of the Graphco Litigation. Although M&F believes that it commenced its representation of Graphco in 2001 at the recommendation of Mr. Stepniewski, M&F was retained solely with respect to limited corporate and securities matters and was not aware of the Graphco Litigation until recently.

36.     Defendants' allegation that Plaintiff and M&F were involved in a "scheme" to draft usurious Documents which Plaintiff did not intend to honor is completely refuted by the facts.

14

37. Defendants are wrong in asserting that Plaintiff has been engaged in "18 private placements of Securities" from 1999 through 2003. (Defendants' Memorandum of Law at 4.) The transactions which Defendants refer to were not "private placements" as such term is commonly understood. Most of these transactions involved issuing stock for the payment of the Plaintiff's debts or in lieu of the salary due to the Plaintiff's officers and directors and were not loan transactions.

**WHEREFORE**, it is respectfully submitted that the Court deny the Defendants' Motion to Dismiss this action, and that the Court grant such other and further relief as to it may seem just and proper.

_____
Alan P. Fraade

Sworn to before me this
28th day of March 2008

_____
Notary Public

COLLIN ROBERT SHERMAN
Notary Public, State of New York
No. 02SH6156333
Qualified in New York County
Commission Expires Nov. 27, 2010

15

**EXHIBIT B**

**Ken Sussmane**

---

| | |
|---|---|
| **From:** | patgitalia@yahoo.com |
| **Sent:** | Monday, January 28, 2008 9:32 AM |
| **To:** | Ken Sussmane |
| **Subject:** | Fw: Letter from fred |



PatGirondi.ltr.0128
08doc.doc (...

        Dear Ken,

I wanted to share this with you.

Pat

Sent from my BlackBerry® wireless handheld

-----Original Message-----
From: "Nilda Gonzales" <nsg@mintzfraade.com>

Date: Mon, 28 Jan 2008 15:14:13
To:<pgirondi@errantgene.com>
Subject: Letter


Dear Mr. Girondi:

        At the request of Mr. Mintz, Please see the attached.

        Thank you,

        Nilda Gonzalez
        Secretary,
        Frederick M. Mintz

# MINTZ & FRAADE, P.C.

### COUNSELORS AT LAW
### 488 MADISON AVENUE
### NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

———

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
EDWARD C. KRAMER
KEVIN J. MCGRAW
ARTHUR L. PORTER, JR
JON M. PROBSTEIN
SEYMOUR REITKNECHT
I. FREDERICK SHOTKIN

January 28, 2008

**Via Email**

Mr. Patrizio Girondi
Piazza Duomo 5
Altamura Bari, Italy 70026

Dear Pat,

I believe that my relationship with Mark Step has terminated. I enjoyed my relationship with you and thought that we had a lot in common. I would like our relationship to continue regardless of my situation with Mark. This has nothing to do with business. If we cannot do any future business because of Mark, then I would still like our personal relationship to continue.

Best regards.

Sincerely,

*//s// Frederick M. Mintz*

Frederick M. Mintz

FMM:sc

EXHIBIT C

## Scantek Medical Inc – 8-K – EX-99.1 · Misc

### EX-99.1 · Miscellaneous Exhibit

**FOR IMMEDIATE RELEASE**

### Scantek Medical Enters into Joint Venture; Scantek Medical to Sell Distribution License.

**Cedar Knolls, NJ—March 15, 2007—**Scantek Medical, Inc. (SKML.PK, *"Scantek"*) announced today that it created a limited liability company, Gibraltar Global Marketing LLC (*"Gibraltar"*), through which it will engage in a joint venture (the *"Joint Venture"*) with Life Medical Technologies, Inc. (*"Life Medical"*). Gibraltar was organized to distribute Scantek's BreastCare™/BreastAlert™ Differential Temperature Sensor product (*"BreastCare"*) in more than 150 countries throughout the world.

In connection with the Joint Venture, Scantek has entered into three agreements with Life Medical: (A) an acquisition agreement (the *"Acquisition Agreement"*), pursuant to which Life Medical shall pay Scantek $5,000,000 (the *"Gibraltar Purchase Price"*) in exchange for a 50% voting interest and 48% ownership interest in Gibraltar, (B) an operating agreement (the *"Operating Agreement"*), which sets forth the rights and responsibilities of Scantek and Life Medical with respect to Gibraltar, and (C) a distribution agreement granting Gibraltar exclusive distribution rights for BreastCare in more than 150 countries throughout the world.

The Gibraltar Purchase Price shall be paid to Scantek as follows: (a) $250,000 which was paid by Life Medical upon entering into the Operating Agreement, (b) a payment by Life Medical to Scantek from Life Medical's share of Gibraltar's distributions equal to 25% of Gibraltar's total distribution, and (c) a percentage of the funds received by Life Medical from offerings of its securities as follows: 20% of monies raised by Life Medical in its next private placement financing, and 30% of monies raised by Life Medical in financings subsequent to the termination of such private placement financing (*"Subsequent Financings"*); provided, however, that such payments from Subsequent Financings shall not commence until Life Medical has paid Scantek the amount due for United States distribution rights (regardless of whether or not the option for such rights (*"US Option"*) is exercised) pursuant to the amendment dated as of the 7th day of March, 2007 (the *"Amendment"*) of the Agreement by and between Scantek Medical, Inc. (*"Scantek"*) and Life Medical Technologies Inc. (*"Life Medical"*), dated the 22nd day of August, 2006, which Agreement amended and restated the agreement (the *"Definitive Agreement"*) between Scantek and Life Medical dated as of the 3rd day of December 2004, and the distribution agreement attached thereto and made a part thereof (*"Life Medical Distribution Agreement"*), which would be entered into by Scantek and Life Medical upon the execution of the US Option.

The Amendment sets forth new payment terms for the $900,000 balance of the purchase price for Life Medical's US exclusive distribution license (*"US License Fee"*) pursuant to the Life Medical Distribution Agreement. The balance of the US License Fee would be paid in seven equal monthly installments commencing 30 days after Life Medical's notification that it is exercising the US Option. If Life Medical raises any funds from its next private placement financing, 20% of the funds raised will be paid to Scantek, and 30% of the funds raised from any Subsequent Financings will be paid to Scantek until either the US License Fee is paid in full or, if the US Option is not exercised, Scantek has received an amount from Life Medical equivalent to the US License Fee in consideration of receiving the US Option.

The Amendment also sets forth new terms and conditions if the US Option is exercised. If the US Option is exercised, Scantek agrees to reserve 40% of the output from its two existing production lines for Life Medical, both for Life Medical's current orders and for an inventory of up to 1,000,000 units of BreastCare, provided that Life Medical pays for the space to store 1,000,000 units of BreastCare and that Life Medical makes a down payment of $4 either (1) at the time of the order for each unit or (2) at the time a unit is placed in inventory. Life Medical will pay the remainder of the price of each unit ordered within 90 days after shipment; provided, however, that if the aggregate unpaid balance with respect to units ordered by Life Medical is $1,000,000 or greater, Life Medical must pay in full for all additional orders at the time of the order until the unpaid balance is reduced below $1,000,000. Life Medical also agreed that if it obtains 510(k) marketing clearance and/or clearance for over-the-counter sales (*"OTC Clearance"*) from the Food & Drug Administration, it will assign such 510(k) marketing clearance and/or OTC Clearance, as the case may be, to Scantek.

Scantek and Life Medical also entered into a letter agreement which gives Life Medical the option to acquire an interest in a limited liability company (the *"LLC"*) which would own the worldwide distribution rights for devices being developed by Scantek to screen for prostate problems and susceptibility to stroke (*"Prostate and Stroke Option"*). Scantek and Life Medical would each have a 50% voting interest and a 48.5% total interest in the LLC. The exercise price for the Prostate and Stroke Option is $3.2 million, payable 50% at the time of exercise and 50% within six months after the time of exercise. The Prostate and Stroke Option will expire if it is not exercised prior to December 31, 2008. The following should be noted: (i) the prostate device and susceptibility to stroke device are in early stages of planning, and (ii) Scantek does not have FDA approvals with respect to either device.

BreastCare is a safe, non-invasive, low-cost, single-use medical device which detects tissue heat differentials between the breasts. The pads are placed inside of a woman's bra for 15 minutes, after which the device registers a digital reading of the heat conducted from within the breast tissue. BreastCare has received marketing clearance from the United States Food and Drug Administration to be used by physicians as an adjunct to clinical breast examination, mammography and other established modalities for the detection of breast disease. In clinical studies in the United States (Memorial Sloan Kettering Cancer Center - NY, M. D. Anderson Cancer Center - Houston, Guttman Institute - NY, Georgetown University, and Brotman - UCLA), in Brazil, and at the European Institute of Oncology in Milan, Italy, BreastCare has been clinically proven capable of recognizing metabolic activity (angiogenesis) by recording the heat differentiation of corresponding areas of the breast, and has identified tumors as small as 5 mm in diameter.

Scantek believes that no other product on the market is able to accurately detect significant temperature differentials, which are an indication of the possibility of breast cancer, while still being inexpensive and easy to use. Those attributes make BreastCare ideal for public health systems in developing countries, where a substantial percentage of the adult female population does not have easy access to mammograms. BreastCare creates a medically and economically viable way to screen large numbers of women in poor or rural areas for breast cancer.

About Scantek Medical

Scantek Medical, Inc. developed, produces, and distributes the BreastCare™/ BreastAlert™ Differential Temperature Sensor product. Scantek is also developing medical devices which use this temperature differential technology to screen for other medical conditions, including prostate problems and susceptibility to stroke. Scantek's manufacturing facility and corporate offices are located in Cedar Knolls, New Jersey, and it has subsidiaries in Brazil and Hungary.

Statements in this press release which are not historical, including management's intentions, hopes, beliefs, expectations, representations, projections, plans or predictions of the future are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 and are subject to the risk factors and other information set forth in Scantek's filings with the Securities and Exchange Commission. Actual results could differ materially from any forward-looking statements and may vary from management's expectations and cannot be guaranteed.

For more information, please contact:

Dr. Zsigmond L. Sagi

Phone: (973) 401-0434
Fax: (973) 401-0459
E-Mail: skml@garden.net

-3-

## Scantek Medical Inc – 8-K - EX-1.1  ·  Underwriting Agreement

### ACQUISITION AGREEMENT

AGREEMENT, dated as of the 7th day of March, 2007 (the *"Agreement"*), by and between Scantek Medical, Inc., a Delaware corporation with an address at 4B Wing Drive, Cedar Knolls, NJ 07927 (*"Scantek"*) and Life Medical Technologies, Inc., a Delaware corporation with an address at P.O. Box 473, Babylon, NY 11702 (*"Life Medical"*).

WHEREAS, Scantek has formed Gibraltar Global Marketing LLC as a Delaware limited liability company (the *"Company"*) on January 9, 2007 which Company shall be governed by an operating agreement setting forth their rights and responsibilities with respect to the Company (the *"Operating Agreement"*);

WHEREAS, the purpose of the Company will be to distribute Scantek's BreastCare™/BreastAlert™ Differential Temperature Sensor/Breast Abnormality Indicator device (the *"Product"*) in numerous countries throughout the world (*"Territories"*);

WHEREAS, Life Medical desires to acquire forty eight (48) Class A Interests in the Company, representing fifty (50%) percent of the Company's voting Interests and forty eight (48%) percent of the Company's total number of issued and outstanding Interests (the *"LM Interests"*), and Scantek has agreed to issue the LM Interests to Life Medical;

WHEREAS, Life Medical shall make payments to Scantek pursuant to this Agreement in consideration for Scantek's agreement to issue the LM Interests to Life Medical;

WHEREAS, Scantek and Life Medical are entering into this Agreement in order to set forth the terms and conditions with respect to the purchase price for the LM Interests;

NOW, THEREFORE, in consideration of the mutual covenants of the parties hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged,

IT IS AGREED:

1.      Recitals.

The parties hereby adopt as part of this Agreement each of the recitals which is contained above in the WHEREAS clauses, and agree that such recitals shall be binding upon the parties hereto by way of contract and not merely by way of recital or inducement; and such clauses are hereby confirmed and ratified as being accurate by each party hereto.

2.     Purchase Price.

Life Medical shall pay to Scantek the sum of five million ($5,000,000) dollars (the *"Purchase Price"*) in consideration for Scantek's agreement to issue the LM Interests to Life Medical, which Purchase Price shall be paid as follows:

(A) Two hundred fifty thousand ($250,000) dollars simultaneously with Scantek and Life Medical signing this Agreement, which payment shall be in addition to, not in lieu of, any other monies due to Scantek pursuant to this Agreement;

(B) Twenty (20%) percent of the funds raised from Life Medical's financing to be conducted subsequent to the termination of its offering of shares at fifty ($0.50) cents per share, which was conducted pursuant to the Form D filed with the SEC on January 24, 2007, in which subsequent financing Life Medical is contemplating raising one million five hundred thousand ($1,500,000) dollars (the *"Second Financing"*);

(C) Thirty (30%) percent of all funds raised from any financings conducted by Life Medical subsequent to the termination of the Second Financing (*"Subsequent Financings"*); provided, however, that such payment pursuant to this Paragraph *"(C)"* of this Article *"2"* of this Agreement shall not commence until the time upon which Life Medical has paid Scantek the amount due for United States distribution rights (regardless of whether or not the option for such rights is exercised) pursuant to the amendment dated as of the 7th day of March, 2007 of the Agreement by and between Scantek and Life Medical, dated the 22nd day of August, 2006, which Agreement amended and restated the agreement between Scantek and Life Medical dated as of the 3rd day of December 2004, and the distribution agreement attached thereto and made a part thereof;

(D)

(i) If the Company makes a distribution to its Members (*"Distribution"*), and if the Purchase Price has not been paid in full, the Company's profits shall be retained by the Company or distributed on a pro rata basis among the owners of the Company's Interests as set forth in the Operating Agreement; provided, however, that Life Medical shall make a payment to Scantek equal to twenty five (25%) percent of the Distribution to be credited towards the Purchase Price, and that such payment shall be deducted by the Company from Life Medical's portion of the total Distribution and paid to Scantek at the time such distributions are paid to Life Medical and Scantek. For example, if Scantek has not received full payment of the Purchase Price, and the total Distribution is $100,000, $25,000 would be deducted from Life Medical's portion of the total Distribution and paid to Scantek at the time such distributions are paid to Life Medical and Scantek; such $25,000 would be deemed paid to Scantek by Life Medical to be credited towards the Purchase Price; and

(ii) after the Purchase Price has been paid in full, the Company's profits shall be retained by the Company or distributed on a pro rata basis among the owners of the Company's Interests as set forth in the Operating Agreement.

- 2 -

(E) As of the date that the full Purchase Price has been paid, no further payments shall be due from Life Medical to Scantek pursuant to this Agreement.

3.    Miscellaneous.

(A)    Headings.
        Headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(B)    Enforceability.
        If any provision which is contained in this Agreement should, for any reason, be held to be invalid or unenforceable in any respect under the laws of any state or of the United States, such invalidity or unenforceability shall not affect any other provision of this Agreement. Instead, this Agreement shall be construed as if such invalid or unenforceable provisions had not been contained herein.

(C)    Notices.
        Any notices or other communication required or permitted hereunder shall be sufficiently given if sent by (i) certified or registered mail, postage prepaid, return receipt requested, (ii) overnight delivery with confirmation of delivery or (iii) facsimile transmission with an original mailed by first class mail, postage prepaid, addressed as follows:

If to Scantek:                     Scantek Medical, Inc.
                                   4B Wing Drive
                                   Cedar Knolls, New Jersey 07927
                                   Attn: Dr. Zsigmond L. Sagi, President
                                   Fax No.: (973) 401-0459

With a copy to:                    Mintz & Fraade, P.C.
                                   488 Madison Avenue
                                   New York, New York 10022
                                   Attn: Frederick M. Mintz, Esq.
                                   Fax No.: (212) 486-0701

With a copy to:                    Edward C. Kramer, Esq.
                                   488 Madison Avenue
                                   New York, New York 10022
                                   Fax No.: (212) 783-0028

If to Life Medical:                Life Medical Technologies, Inc.
                                   P.O. Box 473
                                   Babylon, NY 11702
                                   Attn: Mr. Steven Cantor, President
                                   Fax No.: (516) 977-3425

- 3.

With a copy to:                    Mintz & Fraade, P.C.

488 Madison Avenue

New York, New York 10022

Attn: Frederick M. Mintz, Esq.

Fax No.: (212) 486-0701

or in each case to such other address as shall have last been furnished by like notice. If mailing by registered or certified mail is impossible due to an absence of postal service, notice may be given by personal delivery against written receipt therefor. Each notice or communication shall be deemed to have been given as of the first day following the date so mailed or overnight delivered, or on the date personally delivered, as the case may be; provided, however, that any notice sent by facsimile shall be deemed to have been given as of the date sent by facsimile if a copy of such notice is also mailed by first class mail on the date sent by facsimile; if the date of mailing is not the same as the date of sending facsimile, then the date of mailing by first class mail shall be deemed to be the date upon which notice was given.

    (D)        <u>Governing Law; Disputes</u>.

        This Agreement shall in accordance with Section 5-1401 of the General Obligations Law of New York in all respects be construed, governed, applied and enforced under the internal laws of the State of New York without giving effect to the principles of conflicts of laws and be deemed to be an agreement entered into in the State of New York and made pursuant to the laws of the State of New York. The parties agree that they shall be deemed to have agreed to binding arbitration solely in New York, New York, with respect to the entire subject matter of any and all disputes relating to or arising under this Agreement including, but not limited to, the specific matters or disputes as to which arbitration has been expressly provided for by other provisions of this Agreement. Any such arbitration shall be by a panel of three arbitrators and pursuant to the commercial rules then existing of the American Arbitration Association in the State of New York, County of New York. In all arbitrations, judgment upon the arbitration award may be entered in any court having jurisdiction. The parties agree, further, that the prevailing party in any such arbitration as determined by the arbitrators shall be entitled to such costs and attorney's fees, if any, in connection with such arbitration as may be awarded by the arbitrators. In connection with the arbitrators' determination for the purpose of which party, if any, is the prevailing party, they shall take into account all of the factors and circumstances including, without limitation, the relief sought, and by whom, and the relief, if any, awarded, and to whom. In addition, and notwithstanding the foregoing sentence, a party shall not be deemed to be the prevailing party in a claim seeking monetary damages, unless the amount of the arbitration award exceeds the amount offered in a legally binding writing by the other party by fifteen (15%) percent or more. For example, if the party initiating arbitration (*"A"*) seeks an award of one hundred thousand ($100,000) dollars plus costs and expenses, the other party (*"B"*) has offered A fifty thousand ($50,000) dollars in a legally binding written offer prior to the commencement of the arbitration proceeding, and the arbitration panel awards any amount less than fifty-seven thousand five hundred ($57,500) dollars to A, the panel should determine that B has *"prevailed"*. The parties specifically designate the courts in the City of New York, State of New York as properly having jurisdiction for any proceeding to confirm and enter judgment upon any such arbitration award. The parties hereby consent to and submit to personal jurisdiction over each of them solely by the courts of the State of New York in any action or proceeding, waive personal service of any and all process and specifically consent that in any such action or proceeding in the courts of the State of New York, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph *"(C)"* of this Article *"3"* of this Agreement.

- 4 -

    (E)        <u>Entire Agreement</u>.

The parties have not made any representations, warranties, or covenants with respect to the subject matter hereof which is not set forth herein, and this Agreement, together with any instruments executed simultaneously herewith, constitutes the entire agreement between them with respect to the subject matter hereof. All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Agreement and any such instrument, which alone fully and completely expresses their agreement. This Agreement may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by all of the parties to this Agreement.

       (F)        <u>Further Assurance</u>.

The parties agree to execute any and all such other further instruments and documents, and to take any and all such further actions, which are reasonably required to effectuate this Agreement and the intents and purposes hereof.

       (G)        <u>Non-Waiver</u>.

Except as otherwise expressly provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment for the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other or subsequent breach.

       (H)        <u>Counterparts</u>.

This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

       (I)        <u>Expenses</u>.

The Company shall pay the expenses incident to the negotiation and preparation of this Agreement. Each party hereto shall pay its own expenses incident to the preparation of all other documents

necessary or appropriate to consummate the transactions provided for herein, and shall bear the costs and expenses incurred in closing and carrying out the transactions provided for by this Agreement.

       (J)      <u>Construction</u>.

Each of the parties hereto hereby acknowledges and agrees that (i) Mintz & Fraade, P.C. drafted this Agreement on behalf of all of the parties to this Agreement, (ii) each party has been separately advised by counsel other than Mintz & Fraade, P.C. during the course of reviewing this Agreement and (iii) this Agreement shall not, therefore, be construed more strictly against any party responsible for its drafting regardless of any presumption or rule requiring construction against the party whose attorney drafted this Agreement.

       (K)      <u>Survival</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assignees.

       (L)      <u>Signatures</u>.

This Agreement may be validly signed and executed by a facsimile of the signature of any party with the same force and effect as if an original signature was affixed.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

Scantek Medical, Inc.

By: _____

                   Title

Life Medical Technologies, Inc.

By: _____

                   Title

## Scantek Medical Inc – 8-K – EX-1.2 · Operating Agreement

### OPERATING AGREEMENT

AGREEMENT, dated as of the 7th day of March, 2007, effective as of the 9th day of January, 2007 (the *"Agreement"*), by and between Scantek Medical, Inc., a Delaware corporation with an address at 4B Wing Drive, Cedar Knolls, NJ 07927 (*"Scantek"*), Life Medical Technologies, Inc., a Delaware corporation with an address at P.O. Box 473, Babylon, NY 11702 (*"Life Medical"*) and Mintz & Fraade Enterprises, LLC, a New York limited liability company with an address at 300 DeMott Avenue, Rockville Centre, NY 11570 (*"M&F"*), (Scantek, Life Medical and M&F are hereinafter referred to as the *"Members"*).

### WITNESSETH:

**WHEREAS**, the Members have formed Gibraltar Global Marketing LLC as a Delaware limited liability company (the *"Company"*) in order to distribute Scantek's BreastCare™/BreastAlert™ Differential Temperature Sensor/Breast Abnormality Indicator device (the *"Product"*) throughout all of the current and future countries and other governmental entities on the earth, excluding the countries set forth on Exhibit A (all such countries and entities excluding the countries set forth on Exhibit A, the *"Territories"*), which is annexed hereto and made a part hereof; and

**WHEREAS**, the Members desire to set forth certain provisions with respect to the affairs, operations and management of the Company.

1

**NOW, THEREFORE**, in consideration of the mutual covenants of the parties hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged,

**IT IS AGREED:**

1.        Recitals.

 The parties hereby adopt as part of this Agreement each of the recitals which is contained above in the WHEREAS clauses, and agree that such recitals shall be binding upon the parties hereto by way of contract and not merely by way of recital or inducement; and such clauses are hereby confirmed and ratified as being accurate by each party hereto.

2.        Formation; Term; Membership Interests.

 A. The Members have formed the Company as a limited liability company in the State of Delaware on January 9, 2007.

 B. The term of the Company shall commence as of January 9, 2007 and shall be of unlimited duration unless otherwise terminated as set forth in Article *"8"* of this Agreement.

 C. The Company shall have one hundred (100) Interests issued and outstanding, of which ninety six (96) shall be Class A Interests and four (4) shall be Class B Interests. The Class A and Class B Interests shall have identical rights, with the exception that Class B Interests shall not have voting rights except as required by law or as explicitly provided in Paragraph *"M"* of Article *"4"* of this Agreement.

D. Scantek and Life Medical each own forty eight (48) Class A Interests, and therefore shall each have fifty (50%) percent of the voting Interests.

E. M&F owns four (4) Class B Interests. At such time as <u>the Company</u>'s securities are traded or quoted in the United States or any foreign country, including, but not limited to, on any of the following exchanges or quotation systems: Nasdaq National Market, Nasdaq SmallCap Market, OTC Bulletin Board, Pink Sheets, London Stock Exchange, AIM, Borsa Italiana S.p.A., Bourse de Montréal, Bolsa Mexicana de Valores or Tokyo Stock Exchange, M&F's Class B Interests shall be converted into Class A Interests.

3.      <u>Board of Managers</u>.

A. The Board of Managers of <u>the Company</u> (the *"Board"*) shall consist of six (6) Managers.

B. Managers shall be elected annually. Scantek and Life Medical agree to vote their Interests for the election of three (3) Managers selected by each of them. Dr. Zsigmond L. Sagi shall be one of Scantek's three (3) Managers and shall serve as Chairman of the Board.

C. M&F shall have the right to designate an observer to the Board (the *"M&F Observer"*), who shall have the right to attend all Board meetings and receive all notices and other information which are given to the Managers. The M&F Observer shall not be deemed to be a Manager, shall not have voting rights and shall not count towards a quorum.

D. The Board shall meet at least once in each calendar quarter. The Secretary of the Company shall give written notice pursuant to Paragraph *"C"* of Article *"15"* of this Agreement to all Members and to the M&F Observer of the time and place of each meeting of the Board at least five (5) business days prior to such meeting.

E. The Secretary of the Company shall send the minutes of each meeting of the Board to all Members and to the M&F Observer within five (5) business days after such meeting.

F. Additional meetings of the Board may be called by any two Managers by written notice pursuant to Paragraph *"C"* of Article *"15"* of this Agreement to the other Managers and to the M&F Observer specifying the matters to be considered at the meeting. The Chairman of the Board shall set the time and place of the meeting within five (5) business days after receipt of such written notice, which meeting shall be held within ten (10) business days after receipt of such written notice.

G. Notice of Action to be Voted Upon by the Board. If the meeting of the Board has as one of its purposes any amendment to the Company's articles of organization, this Agreement or any other document, or the approval of any document, including, but not limited to, any contract or a plan of merger, consolidation, division, conversion or voluntary winding up and liquidation of the Company, each Manager and the M&F Observer shall be given, together with the written notice of the meeting, a copy of the relevant document to be considered at the meeting, and with respect to any proposed amendments, a copy of the original document to which an amendment is proposed.

H. Waiver of Notice.

(i) Written Waiver. Whenever any written notice is required to be given pursuant to the Delaware Limited Liability Company Act (*"DLLCA"*) or this Agreement, a waiver of such notice in writing, signed by the person or persons entitled to the notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Neither the business to be transacted at, nor the purpose of, the meeting shall be required to be specified in the waiver of notice of the meeting.

4

(ii) Waiver by Attendance. Attendance of a person at any meeting shall constitute a waiver of notice of the meeting, except where a person attends a meeting for the express purpose of objecting, at the

commencement of the meeting, to the transaction of any business because the meeting was not lawfully called or convened.

I. The Chairman of the Board shall preside at all meetings of the Board.

J. A quorum shall be five (5) Managers.

K. The votes of five (5) Managers shall be required to engage in any act for which the consent of the Board is required.

L. Any action which could be taken at a meeting of Managers may be taken through the written consent of five (5) Managers in lieu of a meeting in accordance with applicable law.

M. In addition to acts by the Company which require the consent of the Board as a matter of law, the following acts shall require the consent of the Board:

        (i)        Enter into a distribution agreement;

        (ii)        Sell or modify any rights with respect to any Territory; or

        (iii)        Enter into any subcontracting agreement.

N. <u>Adjournment</u>. Any regular or special meeting of the Board, including one which cannot be deemed effective because a quorum has not attended, may be adjourned to another place and time until a quorum shall be present or represented. When a meeting is adjourned to another place and time, written notice need not be given of the adjourned meeting if the place and time thereof are announced at the meeting at which the adjournment is announced; provided, however, that if the date of any adjourned meeting is more than fifteen (15) days after the date for which the meeting was originally noticed, or if a new record date is fixed for the adjourned meeting, written notice of the place and time of the adjourned meeting shall be given in conformity herewith. At any adjourned meeting, any business may be transacted which might have been transacted at the original meeting.

5

4.        <u>Member Meetings</u>.

A. <u>Manner of Giving Notice</u>. Whenever written notice of a meeting of the Members is required to be given pursuant to the Act or this Agreement, such notice shall be given pursuant to Paragraph *"C"* of Article *"15"* of this Agreement. Such notice shall specify the time and place of the meeting and any other information required by the DLLCA or this Agreement.

B. <u>Annual Meeting</u>. The annual meeting of the Members shall be held on such date, at such time and at such place as shall be designated from time to time by the Board and stated in the notice of the meeting, at which the Members holding Class A Interests shall transact such business as may properly be brought before the meeting.

C. <u>Special Meetings</u>. Special meetings of the Members may be called at any time by (i) the Board or (ii) Members holding twenty five (25%) percent or more of the Class A Interests. The meeting shall be held at the time requested by the person or persons calling the meeting as set forth in the notice.

6

D. <u>Procedure for Calling Meetings</u>. Upon request of any person entitled to call a meeting, written notice of the meeting of the Members shall be given by, or at the direction of, the Secretary or, in the absence of the Secretary, any other person authorized by the Board, to each Member of record, at least five (5) business days prior to the date upon which the meeting is to be held. If notice is not given within twenty (20) days after receipt of the request, the

person or persons calling the meeting may give the notice. If the meeting of the Members is a special meeting, the notice shall specify the matters to be considered at the meeting.

E. <u>Notice of Action to be Voted Upon by the Members</u>. If the meeting of the Members has as one of its purposes any amendment to the Company's articles of organization, this Agreement or any other document, or the approval of any document, including, but not limited to, any contract or a plan of merger, consolidation, division, conversion or voluntary winding up and liquidation of the Company, each Member shall be given, together with the written notice of the meeting, a copy of the relevant document to be considered at the meeting, and with respect to any proposed amendments, a copy of the original document to which an amendment is proposed.

F. <u>Waiver of Notice</u>.

(i) <u>Written Waiver</u>. Whenever any written notice is required to be given pursuant to the DLLCA or this Agreement, a waiver of such notice in writing, signed by the person or persons entitled to the notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Neither the business to be transacted at, nor the purpose of, the meeting shall be required to be specified in the waiver of notice of the meeting.

7

(ii) <u>Waiver by Attendance</u>. Attendance of an authorized representative of a Member at any meeting shall constitute a waiver of notice of the meeting, except where such authorized representative attends a meeting for the express purpose of objecting, at the commencement of the meeting, to the transaction of any business because the meeting was not lawfully called or convened.

G. <u>Quorum</u>. At any meeting of the Members, the presence of the Member or Members owning a majority of the Class A Interests, in person or by proxy, shall constitute a quorum unless a larger number is required by the DLLCA or this Agreement.

H. <u>Adjournment</u>. Any regular or special meeting of the Members, including one which cannot be deemed effective because a quorum has not attended, may be adjourned to another place and time until a quorum shall be present or represented. When a meeting is adjourned to another place and time, written notice need not be given of the adjourned meeting if the place and time thereof are announced at the meeting at which the adjournment is announced; provided, however, that if the date of any adjourned meeting is more than fifteen (15) days after the date for which the meeting was originally noticed, or if a new record date is fixed for the adjourned meeting, written notice of the place and time of the adjourned meeting shall be given in conformity herewith. At any adjourned meeting, any business may be transacted which might have been transacted at the original meeting.

I. <u>Action by Members</u>. Except as otherwise provided in the DLLCA or this Agreement, whenever any Company action is to be taken by vote of the Members, it shall be authorized upon receiving the affirmative vote of Members holding a majority of the Class A Interests.

8

J. <u>Organization</u>. At every meeting of the Members, the Chairman of the Board, if there be one, or, in the case of a vacancy in the office or if the Chairman of the Board is not present, one of the following persons present in the order stated: the Chief Executive Officer, if there be one, the President, the Vice Presidents in their order of rank and seniority, or a person chosen by a vote of the Members present, shall act as chairman of the meeting. The Secretary, or, in the absence of the Secretary, a person appointed by the chairman of the meeting, shall act as secretary of the meeting.

K. Any action which could be taken at a meeting of the Members may be taken through the written consent of Members holding a majority of the Class A Interests in lieu of a meeting in accordance with applicable law.

L. <u>Voting and Other Action by Proxy</u>.

      (i)        <u>General Rule</u>.

(a) Every Member holding Class A Interests may authorize another person to act for him, her or it by proxy.

(b) Any vote of a Member, by proxy, shall constitute the presence of, or vote or action by, or written consent or dissent of, said Member.

(c) An unrevoked proxy shall be valid for a period of three (3) years after the date of its execution unless a longer time is expressly provided therein.

(ii)      <u>Execution and Filing</u>. Every proxy shall be executed in writing by the Member or by the duly authorized attorney-in-fact of the Member and filed with the Secretary of <u>the Company</u>. A telegram, telex, cablegram, datagram or similar transmission from a Member or attorney-in-fact, or a photographic, facsimile or similar reproduction of a writing executed by a Member or attorney-in-fact may be treated as properly executed for purposes of this Subparagraph *"(ii)"* of this Paragraph *"L"* of this Article *"4"* of this Agreement.

9

(iii)      <u>Revocation</u>. A proxy, unless coupled with an interest, shall be revocable at will, notwithstanding any other agreement or any provision in the proxy to the contrary, but the revocation of a proxy shall not be effective until written notice thereof has been given to the Secretary of <u>the Company</u>. A proxy shall not be revoked by the death or incapacity of the maker unless, before the vote is counted or the authority is exercised, written notice of the death or incapacity is given to the Secretary of <u>the Company</u>.

M. <u>Non-Voting Members</u>. Members holding Class B Interests (*"Non-Voting Members"*) shall have the right to attend all meetings of the Members and receive all notices and other information which are given to Members holding Class A Interests. Non-Voting Members shall not have voting rights and shall not count towards a quorum; provided, however, that if any action is taken to reduce the rights and privileges of the Class B Interests, the holders of Class B Interests shall have the right to vote with respect to such action, and such action shall be void unless approved by the holders of two thirds (2/3) of the Class B Interests.

N. <u>Authority</u>. All actions which require a vote of the Members, either (i) as a matter of law or (ii) which are listed below in this Paragraph *"N"* of this Article *"4"* of this Agreement, shall require the vote of the Members owning two thirds (2/3) of the Class A Interests:

(a) Merger, consolidation, division or reorganization of <u>the Company</u>;

(b) An amendment to <u>the Company</u>'s <u>articles of organization</u>;

(c) Sale or transfer of all or substantially all of <u>the Company</u>'s assets;

10

(d) Issuance of Interests;

(e) Termination and dissolution of <u>the Company</u> (shall require a 2/3 vote of the Class A Interests pursuant to Subparagraph *"(ii)"* of Paragraph *"A"* of Article *"8"* of this Agreement).

O. The Secretary of <u>the Company</u> shall send the minutes of each meeting of the Members to all Members within five (5) business days after such meeting, and shall send a copy of any resolution executed by written consent

pursuant to Paragraph *"K"* of this Article *"4"* of this Agreement to all Members within five (5) business days after the date of such resolution.

5.    Officers.

 A. The Members shall use their best efforts to cause the Managers which they selected to elect Dr. Zsigmond L. Sagi as the CEO and Secretary of the Company.

 B. The Members shall use their best efforts to cause the Managers which they selected to elect Steven Cantor as the President and Treasurer of the Company.

 C. The CEO and President may each designate, by means of written notice to the Board and the other officers, one or more designees with the authority to carry out all or such portion of the duties of the CEO or President position, as the case may be, as the CEO or President shall determine, and shall specify such designees in such written notice (the *"Designees"*). Any action taken by a Designee acting within the scope of his or her authority shall be deemed to have been taken by the CEO or President, as the case may be.

 D. The joint action of (i) the CEO and (ii) the President, or in either or both cases, their respective Designees acting within the scope of their authority, shall bind the Company on any matter not requiring the consent of the Board pursuant to Paragraph *"M"* of Article *"3"* of this Agreement.

11

 E. Either the CEO or President, or the Designee of either of them acting within the scope of his or her authority, may sign any check of the Company for an amount of less than $10,000. The signatures of both the CEO and President, or in either or both cases, their respective Designees acting within the scope of their authority, shall be required for any check of the Company for an amount of $10,000 or greater.

 F. The Board may designate and elect such additional officers of the Company as it deems necessary.

6.    Capitalization; Capital Accounts.

A. The capitalization of the Company shall be one million ($1,000,000) dollars (the *"Capitalization"*), payable as set forth in Paragraphs *"B"* and *"C"* of this Article *"6"* of this Agreement.

B. On, or prior, to June 1, 2007, Life Medical shall contribute two hundred fifty thousand ($250,000) dollars to the Capitalization.

C. On, or prior, to March 1, 2008, Life Medical shall contribute an additional seven hundred fifty thousand ($750,000) dollars to the Capitalization.

D. No Member shall be entitled to interest on any capital contributions.

E. Except as approved by a five sixths (5/6) vote of the Board, no Member shall have the right to redeem all or any part of such Member's Interest, otherwise withdraw such Member's investment in the Company, or receive a return of his, her or its capital contributions. In addition, no Member shall have a right to receive any distributions from the Company, except as provided in Article *"7"* of this Agreement.

12

F. A capital account (the *"Capital Account"*) shall be maintained for each Member. Each Member's Capital Account shall be credited with the amount of the Capitalization contributed by such Member. A Member's Capital Account shall be increased by the amount, if any, of additional capital contributions and Net Profits and gain allocated to such Member, and shall be decreased by the amount, if any, of cash distributed to such Member and Net Losses, expenses and deductions allocated to such Member.

G. If a Member's entire Interest is transferred pursuant to the terms of Article *"9"* of this Agreement, the transferee shall succeed to such Member's Capital Account; provided, however that if only a portion of such Member's Interest is transferred, the transferee shall succeed to such share of such Member's Capital Account which corresponds to a fraction, the numerator of which is the Interest received by the transferee, and the denominator of which is the Interest which such Member held prior to the transfer. For example, if Life Medical has a 48% Interest and its Capital Account has $1,000,000, and Life Medical transfers a 12% Interest to Company **X**, then Company X would

succeed to $250,000 of Life Medical's capital account, which amount is arrived at by multiplying Life Medical's Capital Account of $1,000,000 by a fraction, the numerator of which is 12%, the Interest received by the transferee, and the denominator of which is 48%, the Interest which Life Medical held prior to the transfer.

13

7.        Accounting; Distributions.

 A. All transactions of the Company shall be properly recorded in its books and records. Each Member, or such person as a Member may designate by written notice to the Board, shall have access to the books and records of the Company.

 B. All funds belonging to the Company shall be deposited in the name of the Company in banks or other depositories designated by the joint action of (i) the CEO and (ii) the President, or in either or both cases, their respective Designees acting within the scope of their authority.

 C. The fiscal year of the Company shall begin upon each January 1.

D. The terms *"Net Profits"* and *"Net Losses"* with respect to a time period are hereby defined as the taxable income or taxable loss of the Company attributable to that period, as determined by the accountants regularly employed by the Company in accordance with U.S. GAAP as consistently applied. At the end of each calendar quarter (*"Accounting Period"*), there shall be a minimum distribution of seventy five (75%) percent of Net Profits with respect to that Accounting Period until Scantek receives full payment of the Purchase Price pursuant to the Acquisition Agreement dated as of the 7th day of March, 2007 between Scantek and Life Medical (the *"Acquisition Agreement"*). After Scantek receives full payment of the Purchase Price pursuant to the Acquisition Agreement, the minimum distribution for each Accounting Period shall be thirty (30%) percent of Net Profits with respect to that Accounting Period.

E. Additional distributions shall be at the discretion of the Board.

14

F. Each Member shall receive the portion of the distribution made by the Company (the *"Distribution"*) which shall be an amount determined by multiplying the total Distribution by a fraction, the numerator of which shall be the number of Interests owned by such Member, and the denominator of which shall be the total number of Interests of the Company which are issued and outstanding. Until such time as Scantek receives full payment of the Purchase Price pursuant to the Acquisition Agreement, Life Medical shall make a payment to Scantek equal to twenty five (25%) percent of the Distribution to be credited towards the Purchase Price pursuant to the Acquisition Agreement, which payment shall be deducted by the Company from Life Medical's portion of the Distribution and paid to Scantek at the time such distributions are paid to Life Medical and Scantek. For example, if Scantek has not received full payment of the Purchase Price pursuant to the Acquisition Agreement, and the total Distribution is $100,000, $25,000 would be deducted from Life Medical's portion of the total Distribution and paid to Scantek at the time such distributions are paid to Life Medical and Scantek. Such $25,000 would be deemed paid to Scantek by Life Medical to be credited towards the Purchase Price pursuant to the Acquisition Agreement.

G. All distributions shall be made within thirty (30) days after the end of each Accounting Period.

H. It is expressly intended that the Company be treated as a limited liability company taxable as a partnership by the applicable provisions of the Internal Revenue Code of 1986, as the same may be amended from time to time, or any provisions of any future law which covers the subject matter of the Internal Revenue Code of 1986, and that in every respect all of the terms and provisions of this Agreement shall at all times be so construed and interpreted as to give effect to this intent. If the Internal Revenue Service of the United States (the *"IRS"*) or any governmental authority having jurisdiction shall in any way or at any time determine that any provision or provisions of this Agreement affects the status of the Company as a limited liability company taxable as a partnership, then and in such event the Board shall have the authority to and shall modify, amend or supplement the terms and provisions of this Agreement to the extent necessary to comply with the rules, regulations and requirements of the IRS or any other governmental authority having jurisdiction, in order that the Company be treated as a limited liability company taxed as a partnership, and the Members thereof taxable as partners of a partnership, which modification or amendment shall be retroactively applied to the date of this Agreement.

15

8.        Termination and Dissolution.

A. Termination and Dissolution. The Company shall be terminated and dissolved upon the occurrence of any of the following:

(i) Any event which makes it unlawful for the Company's business to be continued;

(ii) The vote of two-thirds (2/3) of the Class A Interests;

(iii) The sale of all or substantially all of the Company's assets; or

(iv) The entry of a decree of judicial dissolution pursuant to Section 18-802 of the DLLCA.

B. Liquidation. Upon termination and dissolution of the Company for any reason, the Company shall cease to engage in further business, except to the extent necessary to perform existing obligations, and the CEO and the

President, or in either or both cases, their respective Designees acting within the scope of their authority, (*"Liquidators"*) shall jointly wind up the affairs of the Company and liquidate or distribute the Company's assets.

16

(i) All assets of the Company may be sold in connection with any liquidation at public or private sale, at such price and upon such terms as the Liquidators, in their sole and absolute discretion, may deem advisable, provided that such Liquidators are acting within their fiduciary duties pursuant to Delaware law. Any Member and any partnership, corporation or other firm in which any Member is in any way interested may purchase assets at such sale.

(ii) The Liquidators shall (a) cause the Company's accountants to make a full and proper accounting of the assets, liabilities and operations of the Company, as of and through the last day of the month in which the dissolution occurs, (b) liquidate the assets as promptly as is consistent with obtaining a reasonable value for such assets, but in no event later than one (1) year after the occurrence of an event of dissolution, and (c) apply and distribute the proceeds therefrom pursuant to Section 18-804 of the DLLCA.

(iii) Distributions of the Company's assets may be made either in kind or in money, or partly in kind and partly in money, in the sole and absolute discretion of the Liquidators. All distributions in kind shall be valued as of the date of distribution as determined by the Liquidators in their sole and absolute discretion. The Liquidators shall not be required to give to the various persons interested similar or like property. For example, if the Liquidators are distributing assets and cash, the Liquidators, in their sole and absolute discretion, may give one distributee cash and give the other distributees assets or a combination of assets and cash.

17

(iv) Upon dissolution and completion of the winding up of the Company and distribution of its assets, the Liquidators shall cause to be executed and filed with the Delaware Court of Chancery, a certificate of cancellation pursuant to Section 18-203 of the DLLCA.

9.    Transfer.

A. The Members shall not sell, assign, transfer, encumber or otherwise dispose of, any Interests now owned or hereafter acquired by them, except as provided for in this Article *"9"* of this Agreement.

B. If Scantek or Life Medical (the *"Selling Party"*) receives a bona fide offer for its Interests from a third party (the *"Offeror"*) pursuant to a written offer which shall state (i) the identity and contact information of the Offeror, and if an entity, the type of entity and state or country of formation, (ii) the number of Interests to be purchased, (iii) the price per Interest, (iv) the proposed closing date of the purchase and (v) any other material terms and conditions of the proposed purchase, including, but not limited to, the terms of payment (the *"Interests Offer"*; the Interests which are the subject of the Interests Offer are hereinafter referred to as the *"Offered Interests"*), the Selling Party shall first offer the Offered Interests to the Company by giving it written notice pursuant to Paragraph *"C"* of Article *"15"* of this Agreement, which written notice shall include a copy of the Interests Offer. The notice shall be deemed to be an offer to sell the Offered Interests to the Company at the price, terms and conditions set forth in the Interests Offer. Such notice shall remain open for ten (10) days after the notice is given to the Company (the *"Company Offering Period"*). The Company shall have the irrevocable and exclusive first option, but not obligation, to

purchase all or a portion of the Offered Interests. The Company may accept such offer by giving the Selling Party written notice of such acceptance within the Company Offering Period. If the offer to sell to the Company is not accepted or is accepted only in part within the Company Offering Period, the Selling Party must then provide written notice pursuant to Paragraph *"C"* of Article *"15"* of this Agreement to the other of Scantek or Life Medical (the *"Second Party"*). The offer to the Second Party shall remain open for five (5) days after notice is given to the Second Party (the *"Second Party Offering Period"*). Within the Second Party Offering Period, the Second Party may accept the offer to purchase all or the remaining Offered Interests, as the case may be, by giving the Selling Party written notice of such acceptance. If the offer to the Company and the Second Party to purchase all or the remaining Offered Interests, as the case may be, is rejected, and the Company and the Second Party have not agreed to purchase, in the aggregate, all of the Offered Interests, the Selling Party shall thereupon be at liberty to sell all of the Offered Interests pursuant to the Interests Offer, solely upon the terms and conditions which were specified in the Interests Offer and solely to the Offeror, and if such sale is consummated, written notice thereof shall be sent to the other Members. If the Selling Party does not sell, assign, transfer or otherwise dispose of all of the remaining Offered Interests pursuant to the Interests Offer within one hundred twenty (120) days after giving written notice to the Second Party, then the Selling Party shall not thereafter sell, assign, transfer, or otherwise dispose of the remaining Offered Interests without again first offering same to the Company and the Second Party pursuant to this Paragraph *"B"* of this Article *"9"* of this Agreement.

18

C. If a Selling Party or Parties propose to transfer any Interests of the Company to a third-party Offeror in a bona fide sale, then no sale, assignment, transfer or disposition shall be made unless the Offeror agrees to purchase, and the Selling Party agrees to include in such sale, such number of M&F's Interests as are set forth in Paragraph *"D"* of this Article *"9"* of this Agreement for the same price per Interest and upon the same terms and conditions and at the same time as the Selling Party, in which case M&F shall be obligated to sell such number of Interests to the Offeror pursuant to the terms and conditions which were specified in the Interests Offer.

19

D. The number of Interests which M&F shall sell pursuant to Paragraph *"C"* of this Article *"9"* of this Agreement shall equal the total number of Interests owned by M&F multiplied by a fraction, the numerator of which shall be the number of Interests which the Selling Party or Parties propose to sell, and the denominator of which shall be 96. For example, if Scantek determines to sell 36 of its 48 Interests (or ¾) to a third-party Offeror in a bona fide sale, M&F shall sell 1.5 Interests, which number is arrived at by multiplying the total number of Interests owned by M&F, 4, by a fraction, the numerator of which is the number of Interests which the Selling Party proposes to sell, 36, and the denominator of which is 96, which equals 4 X (36/96) = 1.5 Interests.

E. All sales, assignments, transfers, and other dispositions of any Interest pursuant to this Agreement, shall have as a condition precedent thereto the requirement that the purchaser, assignee or transferee execute a document in form and substance which is satisfactory to the Company's counsel, agreeing to be bound by all of the terms and conditions of this Agreement. Upon the execution of said document, the purchaser, assignee or transferee shall have all of the rights and obligations pursuant to this Agreement. All Members of the Company, other than those selling all of their interests, shall be obligated to execute such document, and shall have all rights and obligations pursuant to this Agreement relative to such purchaser, assignee or transferee.

10.     <u>Representations and Warranties</u>.

A.      Scantek, Life Medical and M&F each represent and warrant to the other parties as follows:

(i)      It is a corporation, or in the case of M&F, a limited liability company, with all of the requisite power and authority to carry on its businesses as presently conducted in all jurisdictions where presently conducted.

(ii)      It has full right, power and legal capacity to enter into this Agreement and to consummate the transactions contemplated hereby. The execution of this Agreement by it and the consummation by it of the transactions contemplated hereby have been duly approved and authorized by all necessary action by its Board of Directors or in the case of M&F, its members, and no further authorization shall be necessary on its part for the performance and consummation by it of the transactions contemplated hereby.

(iii)      The performance of this Agreement by it in accordance with its terms shall not result in any breach of, or constitute a default under, or result in the imposition of any lien or encumbrance upon any of its property or cause an acceleration under any arrangement, agreement or other instrument to which it is a party, whether jointly or severally, or by which any of its assets are bound.

(iv)      The execution, delivery and performance of this Agreement in accordance with its terms does not and will not require the consent, authorization or approval of any governmental agency or authority.

21

(v)        No representation or warranty of it which is contained in this Agreement, or in a writing furnished or to be furnished pursuant to this Agreement, contains or shall contain any untrue statement of a material fact, or omits or shall omit to state any material fact which is required to make the statements which are contained herein or therein, in light of the circumstances under which they were made, not misleading. There is no material fact relating to the business, affairs, operations, conditions (financial or otherwise) or prospects of it which would materially adversely affect same which has not been disclosed to the other parties hereto.

(vi)        It shall not be a defense to a suit against it for damages for any misrepresentation or breach of covenant or warranty by another party hereto that such party knew or had reason to know that any covenant, representation or warranty in this Agreement or furnished or to be furnished to such party contained untrue statements.

11.    Survival of Representations, Warranties and Covenants.

All covenants, agreements, representations and warranties made in or in connection with this Agreement shall survive its termination, and shall continue in full force and effect after its termination, it being understood and agreed that each of such covenants, agreements, representations and warranties is of the essence of this Agreement and the same shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns.

22

12.     <u>Confidentiality and Non-Competition</u>.

      A.     As used in this Agreement, *"Confidential Information"* shall mean oral or written information which is directly or indirectly presented to a Member, its past, present or future <u>subsidiaries</u>, parents, officers, consultants, directors, stockholders, affiliates, attorneys, employees, agents and its and their respective Immediate Families (as defined below; all of the foregoing are hereinafter collectively referred to as *"Agents"*) by another Member or the Company or their respective Agents, including, but not limited to, information which is developed, conceived or created by that other Member or by <u>the Company</u>, as the case may be, or disclosed to a Member or its Agents or known by or conceived or created by a Member or its Agents during the term or after the termination of this Agreement if disclosed to a Member or its Agents or known by or conceived or created by a Member or its Agents as a result of this Agreement, with respect to another Member or <u>the Company</u>, as the case may be, either of their businesses or any of their products, processes, and other services relating thereto relating to the past or present business or any plans with respect to future business of that other Member or <u>the Company</u>, as the case may be, or relating to the past or present business of a third party or plans with respect to future business of a third party which are disclosed to a Member or its Agents. Confidential Information includes, but is not limited to, all documentation, hardware and software relating thereto, and information and data in written, graphic and/or machine readable form, products, processes and services, whether or not patentable, trademarkable or copyrightable or otherwise protectable, including, but not limited to, information with respect to discoveries; know-how; ideas; computer programs, source codes and object codes; designs; algorithms; processes and structures; product information; marketing information; price lists; cost information; product contents and formulae; manufacturing and production techniques and methods; research and development information; lists of clients and vendors and other information relating thereto; financial data and information; business plans and processes; documentation with respect to any of the foregoing; and any other information of a Member or <u>the Company</u> that such Member or <u>the Company</u>, as the case may be, informs another Member or its Agents or that a Member or its Agents should know, by virtue of its or their position or the circumstances in which that Member or its Agents learned such other information, is to be kept confidential including, but not limited to, any information acquired by a Member or its Agents from any sources prior to the commencement of this Agreement. Confidential Information also includes similar information obtained by <u>the Company</u> in confidence from its vendors, licensors, licensees, customers and/or clients. Confidential

Information may or may not be labeled as confidential. Notwithstanding anything contained in this Paragraph *"A"* of this Article *"12"* of this Agreement to the contrary, the restrictions with respect to Confidential Information shall not be applicable to Scantek with respect to the Product or any of Scantek's intellectual property.

23

*"Immediate Family"* shall include the following: (i) any spouse, parent, spouse of a parent, mother-in-law, father-in-law, brother-in-law, sister-in-law, child, spouse of a child, adopted child, spouse of an adopted child, sibling, spouse of a sibling, grandparent, spouse of a grandparent, and any issue or spouse of any of the foregoing, and (ii) such child or issue of such child which is born and/or adopted during or after the term of this Agreement and the issue (whether by blood or adoption) of such person. For purposes of this Agreement, an Immediate Family shall also be deemed to include any affiliate of a member of that Immediate Family, as defined in Rule 405 of the Securities Act of 1933, as amended, and any trust created for the benefit of one or more persons in that Immediate Family.

24

B.    Except as required in the performance of a Member or its Agents' obligations pursuant to this Agreement, neither a Member nor its Agents shall, during or after the Term, directly or indirectly, use any Confidential Information or disseminate or disclose any Confidential Information to any person, firm, corporation, association or other entity. Each Member and its Agents shall take reasonable measures to protect Confidential Information from any accidental, unauthorized or premature use, disclosure or destruction. Information shall not be considered Confidential Information if it: (i) is at the time of disclosure or thereafter a part of the public domain without breach of this Agreement by a Member or its Agents; provided, however, that the act of copyrighting shall not cause or be construed as causing the copyrighted materials to be in the public domain, (ii) is disclosed as reasonably required in a proceeding to enforce a Member's rights under this Agreement or (iii) is disclosed as required by court order or applicable law; provided, however, that if either a Member or its Agents is legally requested or required by court order or applicable law, including, but not limited to, by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands or similar processes to disclose any Confidential Information of another Member or the Company, that Member or its Agents, as the case may be, shall promptly notify such other Member or the Company, as the case may be, of such request or requirement so that such other Member or the Company, as the case may be, may seek an appropriate protective order; provided further, however; that if such protective order is not obtained, that Member and its Agents agree to furnish only that portion of the Confidential Information which they are advised by their respective counsels is legally required.

25

C.    Upon termination of this Agreement for any reason or at any time upon request of a Member, each other Member and its Agents agree to deliver to the requesting Member all materials of any nature which are in such other Members' or their Agents' possession or control and which are or contain Confidential Information, or which are otherwise the property of the requesting Member or any vendor, licensor, licensee, customer or client of the requesting Member, including, but not limited to writings, designs, documents, records, data, memoranda, tapes and disks containing software, computer source code listings, routines, file layouts, record layouts, system design information, models, manuals, documentation and notes. In any such event, each other Member and its Agents shall destroy all written documentation prepared by them for internal purposes based in whole or in part on any Confidential Information of the Company or the requesting Member, as the case may be, and if applicable, such destruction shall be confirmed to the requesting Member in writing by an officer of each other Member and/or its Agents.

D.    Upon the sale of all of a Member's Interest, all documents, records, notebooks, and similar repositories of or containing Confidential Information, including copies thereof, in its possession, whether prepared by it or others, shall be left with the Company.

E.    Neither a Member nor its Agents shall assert any rights with respect to any other Member or the Company, their business, or any of their products, processes and other services relating thereto, or any Confidential Information as having been acquired or known by such Member or its Agents prior to the commencement of the term of this Agreement.

F.     In order to induce Scantek to enter into this Agreement, each other Member agrees, on its own behalf and on behalf of its Agents, that neither such other Member, nor any of its Agents, shall during the term of this Agreement and, for a period of two (2) years from the date of termination of this Agreement, (i) manufacture any competing product, (ii) sell or market any product which competes either directly or indirectly with the Product, (iii) directly or indirectly sell or market any product which competes either directly or indirectly with any product manufactured, sold or marketed by Scantek, or (iv) directly or indirectly own, manage, participate in the operation or control of, or be connected as an officer, director, shareholder, partner, consultant, owner, employee, agent, lender, donor, vendor or otherwise, or have any financial interest in or aid or assist anyone else in the conduct of any Competing Entity which manufactures, distributes or offers for sale goods similar to the Product. For the purposes herewith, the term *"Competing Entity"* shall mean any business or enterprise of any and every kind whatsoever which is engaged in the manufacture, distribution or sale of goods similar or having a similar purpose to the Product, anywhere in the world.

G.     Each Member agrees, on its own behalf and on behalf of its Agents, that it shall not during the term of this Agreement and for a period of five (5) years from the date of termination of this Agreement (i) personally, or cause others to personally induce or attempt to induce any employee to terminate their employment with any other Member or the Company; (ii) interfere with or disrupt any other Member or the Company's relationship with its suppliers, vendors, customers or employees; or (iii) solicit or entice any person to leave their employ with any other Member or the Company.

27

H.    Each Member agrees, on its behalf and on behalf of its Agents, that the duration, scope and geographic area for which the provisions set forth in Paragraphs *"F"* and *"G"* of this Article *"12"* of this Agreement are to be effective are reasonable. If any court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable by reason of such provision extending the covenants and agreements contained herein for too great a period of time or over too great a geographical area, or by reason of it being too extensive in any other respect, such agreement or covenant shall be interpreted to extend only over the maximum period of time and geographical area, and to the maximum extent in all other respects, as to which it is valid and enforceable, all as determined by such court in such action. Any determination that any provision of this Agreement is invalid or unenforceable, in whole or in part, shall have no effect on the validity or enforceability of any remaining provision of this Agreement.

I.    Any period of time set forth in this Agreement shall not be construed to permit a Member or its Agents to engage in any of the prohibited acts set forth in this Agreement after such period if such acts would otherwise be prohibited by any applicable statute, legal precedent or other agreement between the parties hereto.

13.    <u>Specific Performance; Injunction</u>.

 Each party hereto recognizes and acknowledges that each of the other parties hereto shall be irreparably damaged if this Agreement is breached. Therefore, in the event of any breach by any party hereto of this Agreement (the *"Breaching Party"*), each other party hereto (*"Non-Breaching Parties"*) shall have the right, at its election, to obtain equitable relief, including, but not limited to, an order for specific performance of this Agreement or an injunction, without the need to: (i) post a bond or other security, (ii) prove any actual damage or (iii) prove that money damages would not provide an adequate remedy. Resort to such equitable relief, however, shall not be construed to be a waiver of any other rights or remedies which a Non-Breaching Party may have against the Breaching Party for damages or otherwise.

14.     <u>Indemnification</u>.

A. <u>Definitions</u>. For purposes of this Article *"14"* of this Agreement:

(i) *"Indemnified Capacity"* means any and all past, present and future service by an Indemnified Representative (as defined in Subparagraph *"(ii)"* of this Paragraph *"A"* of this Article *"14"* of this Agreement) in one or more capacities as a Manager, officer, employee or agent of <u>the Company</u>, or, at the request of the Company, as a Manager, officer, employee, agent, fiduciary or trustee of another limited liability company, corporation, partnership, joint venture, trust, employee benefit plan or other entity or enterprise;

(ii) *"Indemnified Representative"* means any and all Managers and officers of the Company and any other person designated as an Indemnified Representative by the Board (which may, but need not, include any person serving at the request of the Company, as a Manager, officer, employee, agent, fiduciary or trustee of another limited liability company, corporation, partnership, joint venture, trust, employee benefit plan or other entity or enterprise);

(iii) *"Liability"* means any damage, judgment, amount paid in settlement, fine, penalty, punitive damages, excise tax assessed with respect to an employee benefit plan, or cost or expense of any nature (including, without limitation, attorneys' fees and disbursements); and

29

(iv) *"Proceeding"* means any threatened, pending or completed action, suit, appeal or other proceeding of any nature, whether civil, criminal, administrative or investigative, whether formal or informal, and whether brought by or in the right of the Company, its Board, its Members or otherwise.

B. General Rule. The Company shall indemnify an Indemnified Representative against any Liability incurred in connection with any Proceeding in which the Indemnified Representative may be involved as a party or otherwise by reason of the fact that such person is or was serving in an Indemnified Capacity, including, without limitation, Liabilities resulting from any actual or alleged breach or neglect of duty, error, misstatement or misleading statement, negligence or act giving rise to strict or products liability, except:

(i) where such indemnification is expressly prohibited by applicable law;

(ii) where the conduct of the Indemnified Representative has been finally determined on the merits or in defense of any Proceeding or in defense of any claim, issue or matter therein or otherwise:

(a) to constitute fraud, gross negligence, willful misconduct or recklessness sufficient in the circumstances to bar indemnification against Liabilities arising from the conduct; or

(b) to be based upon or attributable to the receipt by the Indemnified Representative from the Company or a subsidiary of a personal benefit to which the Indemnified Representative is not legally entitled;

(iii) where the Indemnified Representative did not act in good faith in a manner he reasonably believed to be in or not opposed to the best interests of the Company, or, with respect to any criminal matter, he had reasonable cause to believe his conduct was unlawful; or

(iv) to the extent such indemnification has been finally determined in a final adjudication to be otherwise unlawful.

C. <u>Partial Payment.</u> If an Indemnified Representative is entitled to indemnification in respect of a portion, but not all, of any Liabilities to which such person may be subject, <u>the Company</u> shall indemnify such Indemnified Representative to the maximum extent for such portion of the Liabilities.

D. <u>Presumption</u>. The termination of a Proceeding by judgment, order, settlement or conviction or upon a plea of nolo contendere or its equivalent shall not of itself create a presumption that the Indemnified Representative is not entitled to indemnification.

15.    <u>Miscellaneous</u>.

   A.    <u>Headings</u>.

 Headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

   B.    <u>Enforceability</u>.

 If any provision which is contained in this Agreement should, for any reason, be held to be invalid or unenforceable in any respect under the laws of any state or of the United States, such invalidity or unenforceability shall not affect any other provision of this Agreement. Instead, this Agreement shall be construed as if such invalid or unenforceable provisions had not been contained herein.

C.      <u>Notices</u>.

 Any notice or other communication required or permitted hereunder shall be sufficiently given if sent by (i) mail by (a) certified mail, postage prepaid, return receipt requested and (b) first class mail, postage prepaid (ii) overnight delivery with confirmation of delivery or (iii) facsimile transmission with an original mailed by first class mail, postage prepaid, addressed as follows:

| | |
|---|---|
| If to Scantek: | Scantek Medical, Inc. |
| | 4B Wing Drive |
| | <u>Cedar</u> <u>Knolls</u>, <u>New Jersey</u> <u>07927</u> |
| | Attn: Dr. Zsigmond L. Sagi, President |
| | Fax No.: (<u>973</u>) 401-0459 |
| | |
| With a copy to: | Mintz & Fraade, P.C. |
| | 488 Madison Avenue |
| | <u>New</u> <u>York</u>, <u>New York</u> <u>10022</u> |
| | Attn: Frederick M. Mintz, Esq. |
| | Fax No.: (<u>212</u>) 486-0701 |

| | |
|---|---|
| With a copy to: | Edward C. Kramer, Esq. |
| | 488 Madison Avenue |
| | New York, New York 10022 |
| | Fax No.: (212) 783-0028 |
| | |
| If to Life Medical: | Life Medical Technologies, Inc. |
| | P.O. Box 473 |
| | Babylon, New York 11702 |
| | Attn: Mr. Steven Cantor, President |
| | Fax No.: (516) 977-3425 |
| | |
| With a copy to: | Mintz & Fraade, P.C. |
| | 488 Madison Avenue |
| | New York, New York 10022 |
| | Attn: Frederick M. Mintz, Esq. |
| | Fax No.: (212) 486-0701 |
| | |
| If to M&F: | Mintz & Fraade Enterprises, LLC |
| | 488 Madison Avenue |
| | New York, NY 10022 |
| | Attn: Frederick M. Mintz, Esq. |
| | Fax No.: (212) 486-0701 |

With a copy to:                     Alan P. Fraade, Esq.
                                    18 Nob Court
                                    New Rochelle, NY 10804
                                    Fax No.: (914) 636-3391

or in each case to such other address and facsimile number as shall have last been furnished by like notice. If all of the methods of notice set forth in this Paragraph *"C"* of this Article *"15"* of this Agreement are impossible for any reason, notice shall be in writing and personally delivered to the aforesaid addresses. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered as the case may be; provided, however, that any notice sent by facsimile shall be deemed to have been given as of the date so sent if a copy thereof is also mailed by first class mail on the date sent by facsimile. If the date of mailing is not the same as the date of sending by facsimile, then the date of mailing by first class mail shall be deemed to be the date upon which notice is given; provided further, however, that any notice sent by overnight delivery shall be deemed to have been given as of the date of delivery.

D.    <u>Governing Law; Disputes</u>.

This Agreement shall in accordance with Section 5-1401 of the General Obligations Law of New York in all respects be construed, governed, applied and enforced under the internal laws of the State of New York without giving effect to the principles of conflicts of laws and be deemed to be an agreement entered into in the State of New York and made pursuant to the laws of the State of New York; provided, however, that with respect to issues relating to the corporate governance of the Company which are not specifically provided for in this Agreement, the Limited Liability Company Act of the State of Delaware shall be applicable. Except as otherwise set forth in Article *"13"* of this Agreement, the parties agree that they shall be deemed to have agreed to binding arbitration with respect to the entire subject matter of any and all disputes relating to or arising under this Agreement including, but not limited to, the specific matters or disputes as to which arbitration has been expressly provided for by other provisions of this Agreement and that any such arbitration shall be commenced exclusively in New York, New York. Any such arbitration shall be by a panel of three arbitrators and pursuant to the commercial rules then existing of the American Arbitration Association in the State of New York, County of New York. In all arbitrations, judgment upon the arbitration award may be entered in any court having jurisdiction. The parties specifically designate the courts in the City of New York, State of New York as properly having jurisdiction for any proceeding to confirm and enter judgment upon any such arbitration award. The parties hereby consent to and submit to the exclusive jurisdiction of the courts of the State of New York in any action or proceeding and submit to personal jurisdiction over each of them by such courts. The parties hereby waive personal service of any and all process and specifically consent that in any such action or proceeding brought in the courts of the State of New York, any service of process may be effectuated upon any of them by certified mail, return receipt requested, pursuant to Paragraph *"C"* of this Article *"15"* of this Agreement. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

The parties agree, further, that the prevailing party in any such arbitration as determined by the arbitrators shall be entitled to such costs and attorney's fees, if any, in connection with such arbitration as may be awarded by the arbitrators. In connection with the arbitrators' determination for the purpose of which party, if any, is the prevailing party, they shall take into account all of the factors and circumstances including, without limitation, the relief sought, and by whom, and the relief, if any, awarded, and to whom. In addition, and notwithstanding the foregoing sentence, a party shall not be deemed to be the prevailing party in a claim seeking monetary damages, unless the amount of the arbitration award exceeds the amount offered in a legally binding writing by the other party by fifteen (15%) percent or more. For example, if the party initiating arbitration (*"A"*) seeks an award of one hundred thousand ($100,000) dollars plus costs and expenses, the other party (*"B"*) has offered A fifty thousand ($50,000) dollars in a legally binding written offer prior to the commencement of the arbitration proceeding, and the arbitration panel awards any amount less than fifty-seven thousand five hundred ($57,500) dollars to A, the panel should determine that B has *"prevailed"*.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. It shall also have no power to award (i) damages inconsistent with any applicable agreement between the parties or (ii) punitive damages or any other damages not measured by the prevailing party's actual damages; and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy which could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the rules of the American Arbitration Association in New York, New York. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interest.

E.     <u>Entire Agreement</u>.

This Agreement and all documents and instruments referred to herein (i) constitute the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, and (ii) are not intended to confer upon any person other than the parties hereto any rights or remedies hereunder. Each party hereto agrees that, except for the representations and warranties contained in this Agreement, none of the parties hereto make any other representations or warranties, and each hereby disclaims any other representations and warranties made by itself or any of its officers, directors, managers, employees, agents, financial and legal advisors or other representatives, with respect to the execution and delivery of this Agreement or the transactions contemplated hereby, notwithstanding the delivery or disclosure to the other or the other's representatives of any documentation or other information with respect to any one or more of the foregoing.

37

    F.      <u>Further Assurance</u>.

The Parties agree to execute any and all such other further instruments and documents, and to take any and all such further actions, which are reasonably required to effectuate this Agreement and the intents and purposes hereof.

    G.      <u>Non-Waiver</u>.

Except as otherwise expressly provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment for the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other or subsequent breach.

    H.      <u>Counterparts</u>.

This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    I.      <u>Expenses</u>.

The Company shall pay the expenses incident to the negotiation and preparation of this Agreement. Each party hereto shall pay its own expenses incident to the preparation of all other documents necessary or appropriate to consummate the transactions provided for herein, and shall bear the costs and expenses incurred in closing and carrying out the transactions provided for by this Agreement.

J.       Construction.

Each of the parties hereto hereby acknowledges and agrees that (i) Mintz & Fraade, P.C. drafted this Agreement on behalf of all of the parties to this Agreement, (ii) each party has been separately advised by counsel other than Mintz & Fraade, P.C. during the course of reviewing this Agreement and (iii) this Agreement shall not, therefore, be construed more strictly against any party responsible for its drafting regardless of any presumption or rule requiring construction against the party whose attorney drafted this Agreement.

K.       Binding Agreement.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assignees.

L.       Exhibits.

All Exhibits annexed or attached to this Agreement are incorporated into this Agreement by reference thereto and constitute an integral part of this Agreement.

M.       Facsimile Signatures.

Any signature which is delivered via facsimile shall be deemed to be an original and have the same force and effect as if such facsimile signature were the original thereof.

39

N.        Modifications.

This Agreement may not be changed, modified, extended, terminated or discharged orally, except by a written agreement specifically referring to this Agreement which is signed by all of the parties to this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

Scantek Medical, Inc.

By: _____
        Title

Life Medical Technologies, Inc.

By: _____
        Title

Mintz & Fraade Enterprises, LLC

By: _____
        Title

40

# Exhibit A - Excluded Countries

Afghanistan

Bosnia & Herzegovina

Canada

Croatia

France

Jordan

Libya

Morocco

Qatar

Serbia & Montenegro

Syria

United States

Algeria

Brazil

Chile

Egypt

Iran

Kuwait

Macedonia

Oman

Saudi Arabia

Slovenia

Tunisia

Wales

Bahrain

Bulgaria

China

England

Iraq

Lebanon

Malaysia

Pakistan

Scotland

Sudan

United Arab Emirates

Yemen

41

**EXHIBIT D**

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: **IRA GAMMERMAN**                                    PART 34
                              *Justice*

                                                    INDEX NO.        107787/02

Angela Soulla                                       MOTION DATE      5/24/02

              - v -                                 MOTION SEQ. NO.       (?)

Cupboards Tech                                      MOTION CAL. NO.  _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|                                                                          | PAPERS NUMBERED |
|--------------------------------------------------------------------------|-----------------|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...         |                 |
| Answering Affidavits — Exhibits _____     |                 |
| Replying Affidavits _____      |                 |

**Cross-Motion:**   ☐ **Yes**   ☐ **No**

Upon the foregoing papers, it is ordered that this motion  is granted. See record.

It is so ordered. R. feir

              Enles

FILED

MAY 24 2002

NEW YORK
COUNTY CLERKS OFFICE

Dated: _____ 5/24/02 _____

Check one:   ☑ **FINAL DISPOSITION**       ☐ **NON-FINAL DISPOSITION**

**IRA GAMMERMAN**       *J.S.C.*

MOTION/CASE IS RESPECTFULLY REFERRED TO

JUSTICE _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------X
ANGELA CHEN SABELLA ,                               :

                                                   .   Index No.: 02 / 07 5 3 2

               Plaintiff,                          :

              - against -                          :   **SUMMONS**

GRAPHCO TECHNOLOGIES, INC.,                         :

               Defendant.                          :
---------------------------------------------------------------------X

TO:   GRAPHCO TECHNOLOGIES, INC.
      41 University Drive, Suite 205
      Newton, Pennsylvania 18940

      YOU ARE HEREBY SUMMONED, to submit answering papers to the
accompanying motion for summary judgment in this action, and to serve a copy of such papers on
the undersigned attorneys for Plaintiff in accordance with the accompanying Notice of Motion. In
case of your failure to appear and respond to the attached motion for summary judgment, judgment
will be taken against you by default for the relief demanded therein, on the return date thereof.

      New York County is designated as the venue, as the defendant, by written agreement,
has consented thereto.

Dated: New York, New York           GOLENBOCK, EISEMAN, ASSOR,
      April 12, 2002             BELL & PESKOE

                                By: _____
                                    Martin S. Hyman

                            437 Madison Avenue, 35th Floor
                            New York, New York 10022
                            (212) 907-7300

                            Attorneys for plaintiff Angela Chen Sabella

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------                 -----------------------------------X
ANGELA CHEN SABELLA .                                 :

                                                          Index No.: 02/07532
            Plaintiff.                                :

         - against -                                  :    **NOTICE OF MOTION FOR**
                                                           **SUMMARY JUDGMENT IN**
GRAPHCO TECHNOLOGIES. INC.,                           :    **LIEU OF COMPLAINT;**
                                                           **AFFIDAVIT OF**
            Defendant.                                :    **ANGELA CHEN SABELLA**
-----------------------------------------------------------------------X


            **PLEASE TAKE NOTICE** that, upon the accompanying affidavit of plaintiff Angela

Chen Sabelia, sworn to on March 31, 2002, and the promissory note annexed thereto ("Note"),

plaintiff, in lieu of filing a Complaint in this action, will move this Court, at the Motion Support

Office, Supreme Courthouse. 60 Centre Street, New York, New York 10007, at 9:30 a.m. on the **8th**

**day of May, 2002,** or as soon thereafter as counsel may be heard, for an order, pursuant to

CPLR 3213, granting plaintiff summary judgment against defendant Graphco Technologies, Inc., and

awarding plaintiff the sum of $1,292,990,000, plus interest thereon at the rate of 11% from October

30, 2001, plus all costs and fees, including attorneys' fees, that plaintiff has incurred in connection

with the enforcement of and collection upon the Note, and such other and further relief as the Court

may deem just and proper.

*206005.1*

PLEASE TAKE FURTHER NOTICE that, pursuant to CPLR 3213 and 2214(b),

answering papers, if any, shall be served upon the undersigned counsel for plaintiff, no later than ten

(10) days prior to the return date of this motion.

Dated: New York, New York
       April 12, 2002

GOLENBOCK, FISEMAN, ASSOR,
BELL & PESKOE

By: _____

Martin S. Hyman
Sydney R. Smith

437 Madison Avenue, 35th Floor
New York, New York 10022
(212) 907-7300

Attorneys for plaintiff Angela Chen Sabella

TO:   Graphco Technologies, Inc.
      41 University Drive, Suite 205
      Newton, Pennsylvania 18940

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------x
ANGELA CHEN SABELLA,                                :

                                                    Index No.:

           Plaintiff,                       :

        - against -                            :      **AFFIDAVIT OF**
                                                           **ANGELA CHEN SABELLA**
GRAPHCO TECHNOLOGIES, INC.,                         :

           Defendant.                        ·
---------------------------------------------------------x

STATE OF CALIFORNIA  )
                     ) ss.:
COUNTY OF LAS ANGELES)

      ANGELA CHEN SABELLA, being duly sworn, deposes and says:

      1.    I am the plaintiff in this action and submit this affidavit in support of my

motion for summary judgment in lieu of complaint against defendant Graphco Technologies, Inc.

("Graphco"), seeking to recover the principal amount of $1,292,990.00, plus interest thereon at the

rate of 11% from October 30, 2001 due under a certain Promissory Note, dated October 30, 2001,

executed by Graphco, in addition to the costs and attorneys' fees that I have has incurred in

connection with this matter.

      2.    Upon information and belief, Graphco is a New Jersey corporation with a

place of business located at 41 University Drive, Suite 205, Newton, Pennsylvania 18940.

      3    On or about October 30, 2001, Graphco executed a promissory note in my

favor in the principal amount of $1,292,990.00 (the "Note"). A true and accurate copy of the Note is

annexed hereto as Exhibit A, and its terms are incorporated herein by reference.

2080741

4. The terms of the Note required payment of the principal amount of $1,292,990.00, plus interest from the date of execution of the Note at a rate of 11% per annum.

5. By its terms, the Note required Graphco to pay these sums by March 1, 2002. Graphco failed to make payment on the Note by March 1, 2002, despite due demand therefor.

6. The terms of the Note, as set forth in paragraph 12 thereof, require Graphco to reimburse me for all costs of enforcement of the Note and/or collection, compromise, or enforcement of the indebtedness established thereby, including but not limited to, attorneys' fees incurred by me in connection with the exercise of any rights and remedies under the Note.

7. Demands have been made upon Graphco for payment in full of all principal and interest due under the Note. Graphco did not respond to those demands.

8. Graphco has not paid any amount due under the Note.

9. As a result of Graphco's default on the Note, I have been injured and caused damage in the amount of $1,292,990.00, plus interest thereon at the designated rate of 11% from October 20, 2001, plus costs and fees, including attorneys' fees, that I have incurred in connection with the enforcement of Graphco's obligations under the Note. Graphco is now liable to me in the full amount thereof.

10. For these reasons, I respectfully request that summary judgment be granted in my favor against defendant Graphco Technologies, Inc. and that judgment be issued for the principal

amount the Note, $1,292,900.00, plus interest thereon at the designated rate of 11% from October

30, 2001, plus costs and fees, including attorneys' fees, that I have incurred in connection with the

enforcement of Graphco's obligations under the Note, and any other or further relief that the Court

may deem appropriate.

ANGELA CHEN SABELLA

Sworn to before me this $\underline{31^{ST}}$
day of March, 2002

Notary Public

KITTY L. LEW
Comm. #1323792
NOTARY PUBLIC - CALIFORNIA
Los Angeles County
My Comm. Expires Oct. 5, 2005

Exhibit A

THIS NOTE AND THE COMMON STOCK ISSUABLE UPON CONVERSION OF THIS PROMISSORY NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED, DISPOSED OF OR OFFERED FOR SALE, IN WHOLE OR IN PART, IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THAT ACT COVERING THIS PROMISSORY NOTE AND/OR THE COMMON STOCK ISSUABLE UPON CONVERSION THEREOF, OR AN OPINION OF COUNSEL SATISFACTORY TO THE CORPORATION AND ITS COUNSEL THAT AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

## CONVERTIBLE PROMISSORY NOTE

$1,292,990

October 30, 2001

FOR VALUE RECEIVED, Graphco Technologies, Inc., a New Jersey Corporation with an address at 41 University Drive, Suite 205, Newton, PA 18940 (hereinafter referred to as the "Payor"), agrees to pay to the order of Angela Chen Sabella, with an address at 853 East Valley Boulevard, Suite 200, San Gabriel, CA 91776 (hereinafter referred to as the "Payee"), on the Maturity Date set forth in Paragraph "(A)" of Article "2" of this Convertible Promissory Note (the "Note"), unless earlier converted in accordance with the terms of this Note, the principal sum of One Million, Two Hundred Thousand, Ninety Two Thousand, Nine Hundred and Ninety (US$1,292,990) Dollars, with interest on the aforesaid amount as calculated in Article "1" below.

1.   Interest

     (A)   Interest on the unpaid principal balance shall be calculated from the date of this Note to and including the date of repayment at an interest rate equal to eleven (11%) percent per annum.

     (B)   Payment of the accrued and unpaid interest shall be due and payable upon payment of the principal balance of this Note pursuant to Paragraph "(A)" of Article "2" of this Note.

2.   Method of Payment

     (A)   Payment of the principal balance of this Note, together with any unpaid and accrued interest thereon, shall be due and received in full no later than March 1, 2002 by 1:00pm Pacific Standard Time (the "Maturity Date").

     (B)   Repayment of this Note by the Payor shall be made by wire transfer to the Payee as set below or at such other place as may be designated pursuant to Paragraph "(C)" of Article "14" of this Note: Cathay Bank, 777 North Broadway, Los Angeles, CA 90012; Attention: Ms. Rose Chow, ABA#122203950, AC#02151928, Account name: Angela Chen Sabella.

\\Graphco_dec7\u (graphco)\Private\Mark Miller\My Documents at Server\Loan Documents\Chen 500k oct 2001\Chen.note 1,292,990.doc

(C)    If this Note is paid in full or converted (pursuant to Article "3" of this Note) on or prior to the Maturity Date, the principal balance of this Note shall be reduced by the sum of Eighteen Thousand and Eighty Two (US$18,082) Dollars.

3.    Conversion

(A)    The Payee shall have the right, at her option, by notifying the Payor in writing, pursuant to Paragraph "(B)" of Article "14" of this Note, at any time prior to the Maturity Date, to convert the Principal amount of this Note into shares of the Payor's Common Stock, without par value (the "Common Shares" or "Shares"), at a conversion price of One Dollar and Fifty Cents (US$1.50) per share, upon surrender of this Note at the office of the Payor, accompanied by a written instrument of conversion which shall be in the form of the instrument annexed hereto and made a part hereof as Exhibit "A," and which shall be duly executed by the Payee or her assigns.

(B)    As promptly as practicable after any conversion, as herein provided, of this Note by the Payee, the Payor shall:

(i)    Deliver or cause to be delivered to, or upon the written order of, the Payee, certificates representing the number of fully paid and nonassessable Shares into which this Note is converted in accordance with the provisions of this Note and;

(ii)    Deliver to the holder of the shares of Common Stock which were converted, pursuant to this Article "3" of this Note, the whole number of shares rounded up or down to the nearest whole number determined by rounding to the next greater whole number if the fractional Share is 0.5 or greater and the next lower whole number if the fractional share is less than 0.5.

Subject to the following provisions of this Article "3" of this Note, such conversion shall be deemed to have been made at the close of business upon the date when this Note has been surrendered for conversion, so that the rights of the Payee of this Note with respect to the Principal amount of this Note so converted shall cease at such time and the person or persons entitled to receive the Shares upon conversion of this Note shall be treated, for all purposes, as having become the record holder or holders of such Shares at the time of such surrender for conversion; provided, however, that such surrender on any date when the stock transfer books of the Payor are closed shall be effective to constitute the person or persons entitled to receive such Shares as the record holder or holders thereof for all purposes at the close of business on the next succeeding day on which such stock transfer books are open. If, for example, this Note is surrendered for conversion at a time when the stock transfer books of the Payor are closed, and a stock dividend is declared or a record date is set for a shareholder vote during such period when the stock transfer books of the Payor are closed, such conversion shall not take effect until the date upon which the stock transfer books are opened, and the holder of this Note shall not be entitled to receive such stock dividend or to cast such vote.

(C)   If the last day for the exercise of the conversion right is a Saturday, Sunday, or Holiday, such conversion right may be exercised until the next succeeding day which is not a Saturday, Sunday, or Holiday. The term "Holidays" shall include New Year's Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving Day, Christmas Day, and any other weekday upon which banks are closed in the State of New York.

(D)   The Payee shell not be required to pay any costs or expenses in connection with the issuance of certificates for Shares upon conversion of this Note. Such certificates shall be issued in the name or names (not to exceed five names) directed by the Payee.

4.   Registration

(A)   If the Payor shall at any time seek to register or qualify any of its capital stock or the securities holdings of any of its controlling shareholders, on each such occasion it shall furnish the holders of this Note with at least thirty (30) days' prior written notice thereof and the holders of this Note shall have the option, without cost or expense, to include all of their Common Shares issuable upon conversion in such registration or qualification. The holders of the Common Shares shall exercise the "piggy back rights" pursuant to this Article "4" by giving written notice to the Payor within twenty (20) days after receipt of the written notice from the Payor.

(B)   All expenses in connection with preparing and filing any registration statement pursuant to this Article "4" hereof (and any registration or qualification under the securities or "Blue Sky" laws of states in which the offering will be made under such registration statement) shall be borne in full by the Payor; provided, however, that the Payee shall pay any and all underwriting commissions and expenses and the fees and expenses of any legal counsel selected by the Payee to represent her with respect to the sale of the Common Shares.

(C)   If the Company makes a public offering of its Common Stock pursuant to the Act, the Holder agrees to execute and deliver a "lock-up" agreement as requested by the underwriter or underwriters for such offering, having the same duration as the comparable agreements for officers, directors and 5% stockholders of the Company.

5.   Events of Default

The term "Event of Default" as used herein shall mean the occurrence of any one or more of these following events:

(A)   The default in the performance of any material covenant on the part of the Payor to be performed pursuant to the terms hereof (other than for the payment of principal or interest) and such failure continues for ten (10) days after Payee notifies Payor thereof in writing, pursuant to Paragraph "(C)" of Article "14" of this Note;

(B)     The admission in writing by the Payor of its inability to pay its debts as they mature;

(C)     The filing by the Payor of a petition in bankruptcy;

(D)     The making of an assignment by the Payor for the benefit of its creditors;

(E)     Consent by the Payor to the appointment of, or possession by, a custodian for itself or for all or substantially all of its property;

(F)     The filing of a petition in bankruptcy against the Payor with the consent of the Payor;

(G)     The filing of a petition in bankruptcy against the Payor without the consent of the Payor, and the failure to have such petition dismissed within sixty (60) days from the date upon which such petition is filed;

(H)     Notwithstanding the sixty (60) day provision in Paragraph "(G)" of this Article "5" of this Note, on a petition in bankruptcy filed against Payor, Payor is adjudicated a bankrupt; and

(I)     The entry by a court of competent jurisdiction of a final non-appealable order, judgment or decree appointing, without the consent of the Payor, of a receiver, trustee or custodian for the Payor or of all or substantially all of the respective property or assets of Payor.

6.     Replacement Note

This Note replaces and supercedes the Convertible Promissory Notes dated February 12, 2001 and April 6, 2001 in the principal amounts of $200,000 and $500,000, respectively, executed by Graphco Technologies, Inc. as the Borrower and Angella Sabella Chen as the Lender.

7.     Remedies Upon Default

Upon the occurrence of an Event of Default (as defined in Article "5" of this Note), and any time thereafter while such Event of Default is continuing, the entire unpaid principal balance which is due pursuant to this Note shall, at the Payee's option, be accelerated and become and be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Payor.

8.     Non-Exclusive Remedy

\\Graphco_dc01\h (graphco)\Private\Mark Makelsly Documents at Server\Loan Documents\Chen 5\Ok oct 2001\Chen note 1,222,990.doc

Graphco Technologies

2154979320

p.13

KHE HUNG COMPANY          Fax.020-760-2692                 no1   1   02   12:00      ...

Any remedy that is set forth in this Note is not exclusive of any remedies that are provided by law.

9.      Liability Upon Default

The liability of the Payor upon default shall be unconditional and shall not be in any manner affected by any indulgence whatsoever granted or consented to by the Payee including, but not limited to, any extension of time, renewal, waiver or other modification.

10.     Exercise of Remedy Upon Default

No failure on the part of the Payee to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

11.     Validity of Provisions

Any provision of this Note that may prove to be unenforceable under any law shall not affect the validity of any other provision of this Note.

12.     Collection Costs

Payor agrees to pay all reasonable costs of collection, including attorney's fees and costs, which may be paid or incurred by Payee in connection with Payee's exercise of its rights or remedies under this Note.

13.     Full Recourse

Anything in this Note to the contrary notwithstanding, the Payor hereunder shall be liable on this Note for the full amount of the principal and interest due pursuant to this Note.

14.     Prepayment

If the Payor intends to pay the full principal amount plus any interest of this Note prior to the Maturity Date, the Payor shall give the Payee at least ten (10) days prior notice and subsequent to any such notice and prior to re-payment, the Payee shall have the right to convert the Principal amount of this Note into shares of Common Stock pursuant to Paragraph "A" of this Article "3" of this Note at a conversion price of One Dollar and Fifty Cents (US$1.50).

15.     Miscellaneous

        (A)     Modification   This Note may not be changed, modified, extended, terminated or

\\Graphco_dc01\b (graphco)\PrivateMark Miller\My Documents at Server\Loan Documents\Chen 500k oct 2001\Chen note  \,292,999.doc

discharged orally, but only by an agreement in writing, which is signed by the Payor and the Payee of this Note.

(B)    Further Actions  The Payor agrees to execute any and all instruments and documents, and to take any and all such further actions reasonably required to effectuate this Note and the intents and purposes hereof.

(C)    Notices  All notices or other communications required or permitted hereunder shall be in writing and shall be mailed by First Class, Registered or Certified Mail (Return Receipt Requested), postage prepaid, as follows:

| | |
|---|---|
| To the Payor: | Graphco Technologies, Inc. |
| | 41 University Drive |
| | Newton, Pennsylvania 18940 |
| | Attn: Markl L. Miller, |
| | Chief Financial Officer |
| Copy to: | Mintz & Fraade, P.C. |
| | 488 Madison Avenue |
| | New York, New York 10022 |
| | Attn.: Frederick M. Mintz, Esq. |
| To the Payee: | Angela Chen Sabella |
| | 853 East Valley Boulevard, Suite 200 |
| | San Gabriel, CA 91776 |
| Copy to: | |

or in each case to such other address as shall have last been furnished by like notice. If mailing by Registered or Certified Mail is impossible due to an absence or delay in the postal service, notice shall be in writing and personally delivered to the appropriate address set forth above. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be.

(D)    Governing Law       This Note shall in all respects be construed, governed, applied and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed therein, without giving effect to the principles of conflicts of law. Furthermore, the Payor and Payee hereby agree that any proceeding to enforce the provisions of this Note may be commenced in the Courts of the State of New York having subject matter jurisdiction and hereby consent to and submit to personal jurisdiction over each of them by the Courts of the State of New York in any action or proceeding, waiver personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of

\\Grephco_dc\(I\\tgraphco)\Private\Mark L Millen\My Documents at Server\Loan Documents\Chen 5001 oct 2001\Chen.note.1,297.990.doc

them by certified mail, return receipt requested, to the addresses which are set forth on page one of this Debenture or in each case to such other addresses as shall have last been furnished by the like Notice.

(E)    Assignment   This Note may be assigned or transferred by the Payee without the prior written consent of the Payor.

(F)    Successors and Assigns   This Note shall be binding upon the Payor and its successors and assigns.

(G)    Binding Agreement   This Note shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

IN WITNESS WHEREOF, the Payor has executed this Note as of the 30th day of October, 2001.

Graphco Technologies, Inc.

By

Mark L. Miller,
Chief Financial Officer.

W:Graphco_de01\h (graphco)\Private\Mark Miller\My Documents\Set Service\Loan Documents\Chen 500k oct 2001\Chen.note.1,292,990.doc

**Exhibit A**

## FORM OF CONVERSION

(To be Delivered by the Payee desiring to convert
the Convertible Promissory Note to Common Stock)

To: Graphco Technologies, Inc.

The undersigned hereby irrevocably elects to surrender this Convertible Promissory Note, issued by Graphco Technologies. Inc. to the Payee, dated October 30, 2001 (the "Convertible Promissory Note"), for, and to purchase thereunder, _____ full shares of Common Stock of the Company, at the conversion price of $1.50 per share, issuable upon conversion of said Convertible promissory note as specified in the Convertible Promissory Note.

The undersigned requests that [a] certificate[s] for such shares be issued in the name[s] of _____.

PAYEE'S SOCIAL SECURITY
OR TAX IDENTIFICATION NUMBER: _____

_____
(Please print name and address)

_____

_____
(Signature)

_____

If said number of Common Stock shall not be all of the Common Stock evidenced by the Convertible Promissory Note, the undersigned requests that a new Convertible Promissory Note evidencing the amount not so converted be issued in the name of and delivered to: _____

_____
(Please print name and address)

_____

_____
(SIGNATURE)

\\Graphco_dc01\t (graphco)\Private\Marc Miller\My Documents on Server\Loan Documents\Chen 500k oct 2001\Chen_note_1,292,990.doc

# GOLENBOCK, EISEMAN, ASSOR, BELL & PESKOE
437 MADISON AVENUE
NEW YORK, NY 10022-7302

(212) 907-7300
FAX (212) 754-0330

April 11, 2002

**MARTIN S. HYMAN**
*Direct Dial No.: 212-907-7360*
*Direct Fax No.: 212-754-0777*
*Email Address: mhyman@golenbock.com*

### VIA FACSIMILE (212-486-0701)

Frederick Mintz, Esq.
Mintz & Fraade
488 Madison Avenue
Suite 1100
New York, New York 10022

Re: Angela Chen Sabella — Graphco Technologies, Inc. —
Default On Promissory Note, Dated October 30, 2001

Dear Mr. Mintz:

Angela Chen Sabella is in the process of filing suit against Graphco Technologies,
Inc. ("the Company"), on the Promissory Note, for $1,292,990, plus interest, costs and attorneys'
fees. Please advise me by return whether you are authorized to accept service of process on
behalf of the Company.

Very truly yours,

Martin S. Hyman

MSH/lm

209477.1

## GOLENBOCK, EISEMAN, ASSOR, BELL & PESKOE
### 437 MADISON AVENUE
### NEW YORK, NY 10022-7302
### (212) 907-7300
### FAX (212) 754-0330

June 20, 2002

**MARTIN S. HYMAN**
*Direct Dial No. · 212-907-7360*
*Direct Fax No. 212-754-0777*
*Email Address mhyman@golenbock.com*

### VIA FACSIMILE (212-486-0701)

Alan Fraade, Esq.
Mintz & Fraade
488 Madison Avenue
Suite 1100
New York, New York 10022

      Re:    <u>Angela Chen Sabella -- Graphco Technologies, Inc.</u>

Dear Mr. Fraade:

      I have reviewed your letter of June 12 and have the following response on behalf of my client:

      1.    Ms. Sabella will not release her judgment. Nor will she suspend enforcement proceedings thereon without adequate security. The items enumerated in your letter would not provide Ms. Sabella with adequate security for a number of reasons. Some of the assets are either valueless or of speculative value; some appear to be encumbered; several "promises" are either subjective in nature or subject to contingencies over which Ms. Sabella has no control; Ms. Sabella does not have sufficient information to assess the accuracy of claims concerning, or the real value of, proffered assets; escrow arrangements that do not involve independent escrow agents will not be acceptable; etc. Offers to secure promises or other representations with confessions of judgment are meaningless, given the history of this matter and the fact that Ms. Sabella already possesses a judgment for a sum certain and for attorneys'

*214333.1*

GOLENBOCK, EISEMAN, ASSOR, BELL & PESKOE

Alan Fraade, Esq.
Page 2

fees. She has no need or desire to file new lawsuits or commence a new round of enforcement proceedings.

2. Graphco's attorneys have made representations to the effect that Graphco has signed an agreement in principle to merge with another company and is in the process of obtaining additional financing. The placement memorandum indicated that Graphco intended to use some of the proceeds of that offering to satisfy its obligations to Ms. Sabella. I suggest that Graphco devote its efforts to do just that or, if it wishes to move forward, to arrange for its merger "partner" to satisfy those obligations. At this point, however, a settlement that does not involve a significant cash payment and adequate security will not be acceptable. Any transfer of assets in violation of the judgment lien and/or restraining notice will result in further proceedings, including contempt, if appropriate.

3. In at least one conversation with me, Mr. Kramer mentioned that if Ms. Sabella did not accede to Graphco's proposals, Graphco might file bankruptcy. That, of course, is an option on which you undoubtedly will counsel your client. We will not, however, enter into any arrangement that will spawn further delay, expense or litigation or one that does not involve substantial and immediate monetary payments to Ms. Sabella.

If you have any other thoughts as to how to advance this matter in a way that will provide real and immediate value to Ms. Sabella, I would be happy to discuss them with you.

Very truly yours,

Martin S. Hyman

MSH/lm
cc: Angela Chen Sabella

214333.1

MINTZ & FRAADE, P. C.
COUNSELORS AT LAW
488 MADISON AVENUE
NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2 500

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
ARTHUR L. PORTER JR
MELVIN L. LEBOW
JON M. PROBSTEIN
MARTIN L. LERNER

July 17, 2002

VIA FACSIMILIE

Martin S. Hyman, Esq.
Golenbock, Eiseman, Assor, Bell & Peskoe
437 Madison Avenue
New York, New York 10022-7302

Re: Angela Chen Sabella with
Graphco Technologies, Inc.

Dear Mr. Hyman:

This is to confirm that we have been advised by our client that NGM TEC is not an affiliate of Graphco Technologies, Inc.

We advised you at our meeting that we do not know the identity of the prospective "partner". In view of the fact that the entity in question is in the process of making certain SEC filings to clean up its capitalization, we will not have definitive discussions with the subject entity until the end of this week. The absence of the $1,000,000 "matching of funds" was an error by the other attorney and we have sent them a re-draft containing this provision. The attorney received our re-draft last Wednesday, July 10, 2002, and we are expecting comments shortly in response to our re-draft.

The parties contemplate executing the agreement shortly. There was a conference call on Monday with one of the principals of the investment banker that has structured the transaction. Mark Miller of Graphco Technologies, Inc. and Mark Step participated with me on the call. The investment banker confirmed that his firm will be contributing the $1,000,000 to the transaction from their own capital. It is not necessary for them to raise money from third parties. In addition, Graphco Technologies, Inc., has advised us they have a number of strong indications of interest from investors who are prepared to fund the Company after the transaction closes.

Mark Step, who was advised on Monday of who the investment banker was who was doing the transaction, has participated with them in fund raising recently, in which they raised a portion of the monies. He is confident of their ability to do this transaction.

The investment banker had indicated a concern with respect to Angela receiving 25% of the proceeds from capital raising activities. We had suggested a combination with Angela receiving one half of the DPI Funds, including $75,000 from the payment of $150,000, which is expected in the next few weeks. In addition, Angela would get 10% of future capital raised. This would provide her with $200,000 from the initial $2,000,000.

I did not get back to you with respect to the assignment provision that you had previously sent us, in view of the fact that you had indicated in your letter that any discussion would be "premature at this time". I believe that we could accomplish the above result utilizing a document substantially similar to your proposal.

Your partner, Larry Bell, tried calling me last week on Thursday and Friday and each day I returned his calls and left a message for him. I have not heard back from him. Please let me know the purpose of his call. If you would like to see a current version of the draft of the Merger Agreement, I can send it to you, but I would prefer to wait until the next draft, which hopefully will be close to a final version.

Thank you for your continued cooperation with respect to the resolution of this matter.

Very truly yours,

Alan P. Fraade

APF:eg

cc:    Graphco Technologies, Inc.

# MINTZ & FRAADE, P. C.
## COUNSELORS AT LAW
### 488 MADISON AVENUE
### NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
ARTHUR L. PORTER, JR
MELVIN L LEBOW
JON M. PROBSTEIN
MARTIN L LERNER

Via Facsimile                                     July 18, 2002

Martin S. Hyman, Esq.
Golenbock, Eiseman, Assor, Bell & Peskoe
437 Madison Avenue
New York, New York 10022

Re:  Graphco Technologies, Inc.

Dear Mr. Hyman:

As you are aware, Graphco Technologies, Inc. is close to completing a merger into a public company. Based upon discussions between our respective clients and taking into consideration concerns raised by the investment banker with respect to the extension of the Convertible Promissory Note, dated October 30, 2001, in favor of Angela Chen Sabella in the principal amount of $1,292,990 (the "Note"). In consideration for your client's agreement to extend the due date of the Note until January 15, 2003, our client and, we believe the investment banker, will agree to the following:

1.      Grant your client a first lien upon Graphco's VoicePass® technology, and provide your client with the name, address, and telephone number of the developer of such technology. The VoicePass® source code will be held in escrow by a mutually agreed escrow agent;

2.      Make payments to your client based upon future payments which Graphco receives in connection with the sale of Digital Personnel™, Graphco would pay fifty percent (50%) of each payment received by Graphco from the sale of Digital Personnel™ to your client;

3.      For monies raised by Graphco in future financings, Graphco will pay to your client ten percent (10%) of what is raised;

N:\Clients\Graphco\sabellaattyfB.doc          Page 1

4.      Graphco agrees not pay any accrued, unpaid wages due to management as of the date of the settlement until fifty percent (50%) of the Note has been repaid;

5.      Cristian Ivanescu agrees to provide two million five hundred thousand (2,500,000) shares of Graphco common stock as collateral for the repayment of the Note which shares shall be held in escrow by a mutually agreed upon escrow agent;

6.      Your client, and her agents specifically, her accountant, her assistant Kitty and Mark Step shall have the right to examine Graphco's books and records, and your client shall have the right to speak to Graphco's customers, subject to the execution of a confidentiality agreement by your client and any of her agents and/ or representatives acting on her behalf;

7.      Graphco will provide your client with a Confession of Judgment in the State of New York if the Note has not been repaid upon the extended maturity date;

8.      Graphco agrees to pay your client for any future legal fees if Graphco fails to repay the Note by the extended maturity date or otherwise comply with the terms set forth herein.

        The foregoing terms shall be subject to the parties entering into a definitive agreement containing the foregoing terms. Graphco contemplates closing the transaction with the investment banker shortly, thus if the foregoing terms are agreeable to your client in principle please respond to us tomorrow by 3 P.M. and forward to us a signed copy of this letter. If the terms set forth herein are not satisfactory to your client, please contact the undersigned at your earliest convenience to discuss the matter.

                                        Very truly yours,

                                        Mintz & Fraade, P.C.

                                        By: _Alan P. Fraade_

                                        Alan P. Fraade

Agreed to in principle
on behalf of Angela Chen Sabella

_____

cc: Graphco Technologies, Inc.

MINTZ & FRAADE, P. C.

COUNSELORS AT LAW

488 MADISON AVENUE

NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
ARTHUR L. PORTER, JR
MELVIN L. LEBOW
JON M. PROUSTEIN
MARTIN L. LERNER

July 29, 2002

VIA FACSIMILE

Lawrence M. Bell, Esq.
Golenbock, Eiseman, Assor, Bell & Peskoe
437 Madison Avenue
New York, NY 10022

Re: Graphco Technologies, Inc. with Angela Chen Sabella

Dear Larry:

Following up our telephone conversation on Friday, the following are responses of our client, Graphco Technologies, Inc. to the Terms of Forbearance dated 7/22/02 which you sent to us. The responses refer to the paragraphs in the Terms of Forbearance.

1) Paragraphs (a), (c) and (d) are not acceptable. Our client will agree that if someone obtains a judgment in excess of $100,000, there will be a default.

2) We need to determine whether we can agree upon an escrow agent or whether Angela will accept our firm as escrow agent.

3) Although the concept is agreeable, the payment should not be made directly to you, but should be made either to Mintz & Fraade, P.C. or an independent escrow agent. In addition, the dates and amounts in this paragraph should be reduced and extended, such as $200,000 by September 15, 2002 and $400,000 by December 31, 2002. Our client is not agreeable for the shares of NGM to be held in escrow on behalf of Angela or that any elections will be exercisable by Angela.

4) The client is willing to pay Angela ten percent (10%) of the monies raised.

5) Christian's stock should be held by an independent escrow agent which should be the same as pursuant to paragraph 2.

6) Acceptable.

7) Acceptable.

MINTZ & FRAADE, P. C.

8)   Acceptable, provided that in paragraph (a) we propose August 15, 2002. In addition, in Paragraph (b), we suggest that September 6, 2002 be inserted and you should provide a maximum legal fee for your firm's fees and expenses.

We are continuing to move forward with the merger with the shell and are attempting to arrange for a closing within the week which will be subject to us finalizing the transaction with Angela and arranging for an extension of the Wilson loan until January 31, 2003.

Please call me after you have had an opportunity to review the foregoing with your client in order to determine if we are ready to draft the necessary documents to reflect the understanding of the parties.

Very truly yours,

Mintz & Fraade, P.C.

By: _____
Alan P. Fraade

cc: Graphco Technologies, Inc

APF: da

MINTZ & FRAADE, P. C.

COUNSELORS AT LAW

488 MADISON AVENUE

NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
ARTHUR L. PORTER, JR.
MELVIN L. LEBOW
JON M. PROBSTEIN
MARTIN L. LERNER

SENIOR COUNSEL
FRANK J. GLINSKY

October 3, 2002

Via Hand Delivery

Lawrence Bell, Esq.
Golenbock, Eiseman, Assor, Bell & Peskoe
437 Madison Avenue
New York, NY 10022

Re: Graphco Technologies, Inc.
(the "Company")

Dear Larry:

Reference is made to our correspondence to you dated August 14, 2002 with respect to Angela Chen Sabella's extension of the Convertible Promissory Note, dated October 30, 2001, which was executed by the Company as Payor in Ms. Sabella's favor in the principal amount of $1,292,990 (the "Note"). Although you have not responded to such correspondence and in our follow-up telephone calls you advised me that you had not spoken to your client, from discussions with Mr. Mark Step, it is our understanding that Ms. Sabella is ready to proceed with her agreement to forbear from levying upon the assets of the Company and extend the Note. Accordingly, we are in the process of drafting the requisite documents with respect to such forbearance.

To bring you up to date with respect to the status of the Company, we are attaching a Letter of Intent with respect to the Company's intention of entering into a merger agreement with Greenhold Group, Inc. (the "Merger Agreement"). In addition, I am attaching a draft of the Merger Agreement, which we have prepared and are awaiting comments from our client with respect to same prior to forwarding to counsel to Greenhold Group, Inc. The Company is also in the process of obtaining the consent of the California Institute of Technology "Caltech") to assign the License to NGM TEC, Inc. with respect to the License Agreement dated December 15, 1999 between Caltech and Digital Personnel, Inc. In that regard, I am attaching a copy of a letter dated August 26, 2002 from Cristian Ivanescu to a Licensing Associate at Caltech. We have been advised that NGM Tech, Inc. is withholding its payments to the Company pending receipt of such consent which we have been advised is expected imminently.

In addition, the Company is in the process of following up with respect to the security interest in the Company's Voicepass® technology which was improperly filed by Edward T. Wilson and the Edward T. Wilson Trust.

MINTZ & FRAADE, P. C.

      We will be sending to you copies of draft documents with respect to Ms. Sabella's agreement with the Company for your review.

      If you have any questions, please contact the undersigned

                           Very truly yours,

                           Mintz & Fraade, P.C.

                           By: _____
                               Alan P. Fraade

APF:sew

Cc: Graphco Technologies, Inc.
Mr. Mark Step

# MINTZ & FRAADE, P. C.

### COUNSELORS AT LAW
### 488 MADISON AVENUE
### NEW YORK, NEW YORK 10022

TELEPHONE
(212) 486-2500

TELECOPIER
(212) 486-0701

OF COUNSEL
JAY D. FISCHER
ARTHUR L. PORTER, JR.
MELVIN L. LEBOW
JON M. PROBSTEIN
MARTIN L. LERNER

SENIOR COUNSEL
FRANK J. GLINSKY

December 5, 2002

<u>Via Hand Delivery</u>

Lawrence Bell, Esq.
Golenbock, Eiseman, Assor, Bell & Peskoe
437 Madison Avenue
New York, NY 10022

Re: Graphco Technologies, Inc.
(the "Company")

Dear Larry:

Reference is made to our correspondence to you dated October 3, 2002 with respect to Angela Chen Sabella's extension of the Convertible Promissory Note, dated October 30, 2001, which was executed by the Company as Payor in Ms. Sabella's favor in the principal amount of $1,292,990 (the "Note"). Although you have not responded to such correspondence, it is our understanding that Ms. Sabella is still ready to proceed with her agreement to forbear from levying upon the assets of the Company and extend the Note.

To bring you up to date with respect to the status of the Company, the Company has entered into a definitive agreement with RCM Interests, Inc., a reporting company registered with the Securities and Exchange Commission, whose stock is eligible to be quoted on the OTC Bulletin Board. A copy of the executed Merger Agreement dated November 21, 2002 by and between the Company, RCM Interests, Inc. and RCM Interests Inc. Acquisition Corp. (the "Merger Agreement") is being enclosed herewith on a confidential basis.

The continued inability to confirm Angela's forbearance of enforcing her judgment has caused concerns with respect to the Company's raising funds and closing prior transactions with public shells. Accordingly, we would appreciate your obtaining your clients agreement to the enclosed letter confirming the terms of forbearance.

MINTZ & FRAADE, P. C.

If you have any questions, please contact the undersigned.

Very truly yours,

Mintz & Fraade, P.C.

By: _Alan P. Fraade_

Alan P. Fraade

APF:kam

cc: Graphco Technologies, Inc.
Mr. Mark Step

GRAPHCO TECHNOLOGIES, INC.
41 University Drive
Newton, Pennsylvania 18940

December 5, 2002

Ms. Angela Chen Sabella
853 East Valley Boulevard, Suite 200
San Gabriel, CA 91776

Re: Graphco Technologies,
Inc.("Graphco")

. Dear Ms. Sabella:

The purpose of this letter is to set forth our understanding with respect to the
extension of the Convertible Promissory Note, dated October 30, 2001, which was
executed by the Company as Payor in your favor in the principal amount of $1,292,990
(the "Note").

In consideration for your agreement to forbear from levying upon the assets of
Graphco until June 30, 2003, Graphco will agree to the following:

1.    The lien of the judgment you have obtained (the "Judgment") may attach, but you
will not proceed to further enforce such lien by levying upon the assets of Graphco until
June 30, 2003, unless an Event of Default shall occur. For purposes hereof, an Event of
Default shall include (a) if NGM TEC, Inc. fails to make any payment due under the
certain Agreement dated as of June 7, 2002 (the "DP Agreement") and if (i) Graphco
receives $2,000,000 or more from any financing transaction after the date hereof and (ii)
Graphco fails to make such payment on behalf of NGM TEC, Inc. within thirty (30) days
after the due date thereof, (b) any failure of Graphco to perform the terms set forth in this
letter, or (c) a judgment against Graphco is entered in the sum of more than $100,000;

2.    Graphco will grant you a first lien upon Graphco's VoicePass® technology, and
provide you with the name, address, and telephone number of the developer of such
technology. The VoicePass® source code will be held in escrow by a mutually agreed
escrow agent;

3.    Graphco will transfer, assign and grant you a first lien upon all rights of Graphco
in and to the DP Agreement, including, but not limited to, all payments in respect to the

sale of Digital Personnel technology. Graphco will direct NGM TEC, Inc. ("NGM") to make payments for the benefit of you to a mutually agreed escrow agent of all payments of the purchase price payable under Paragraph "2" thereof, and all payments of royalties payable under Paragraph "3" thereof, and all proceeds of such Agreement, which shall be allocated as follows:

You shall be entitled to retain, and to apply against the Judgment, fifty percent (50%) of the funds received from NGM; provided that, if by the date specified below, you shall not have received, in the aggregate, the amount specified below in respect of payment under the DP Agreement for application to the outstanding amount of the Judgment plus any amounts payable under Section "4" below, then thereafter you shall be entitled to retain, in lieu of fifty percent (50%) as specified above, the percent specified below of each payment under the DP Agreement:

| Additional Amount | Due Date | Percent |
|---|---|---|
| $200,000 | February 28, 2003 | 65 |
| $400,000 | April 30, 2003 | 75 |

4.   For monies raised by Graphco in future financings, Graphco will pay to you twelve and one-half percent (12 ½ %) of what is raised;

5.   Graphco agrees not to pay any accrued, unpaid wages due to management as of the date of the settlement until fifty percent (50%) of the Note has been repaid;

6.   Cristian Ivanescu agrees to provide two million five hundred thousand (2,500,000) shares of Graphco common stock as collateral for the repayment of the Note which shares shall be held in escrow by a mutually agreed upon escrow agent;

7.   You, and your agents specifically, your accountant, your assistant Kitty and your counsel shall have the right to examine Graphco's books and records, and you shall have the right to speak to Graphco's customers, subject to the execution of a confidentiality agreement by you and any of your agents and/ or representatives acting on your behalf;

8.   Graphco agrees to pay you for any future legal fees if Graphco fails to repay the Note by the extended maturity date or otherwise comply with the terms set forth herein.

9.   You are not waiving and have not waived any default of any of your rights with respect to any breach by Graphco except as expressly set forth herein. You are willing to agree to the matters set forth herein for the sole purpose of allowing Graphco an additional opportunity to resolve its financial difficulties and repay the Note without immediate exercise of default rights by you. Nothing contained herein shall be effective and you shall have no obligation to forbear from exercising your rights or remedies unless and until each of the following conditions precedent have been satisfied not later than the respective date set forth below:

(a)     On or before December 31, 2002, Graphco shall have taken all action and executed and delivered (or caused NGM to execute and deliver) to you all documents necessary or appropriate in your sole discretion; and

(b)     On or before December 31, 2002, Graphco shall have paid you a fee to reimburse you for your costs and expenses, including but not limited to, reasonable attorneys' fees and expenses incurred in connection with the review of merger and financing documents and the negotiation and drafting of this Agreement and the transaction contemplated hereby in an amount not to exceed an amount to be agreed upon.

10.     Upon execution of a definitive agreement containing the foregoing terms Graphco will withdraw its appeal pending in the Appellate Division, of the Supreme Court of the State of New York.

The foregoing terms shall be subject to the parties entering into a definitive agreement containing the foregoing terms. If the foregoing terms are agreeable to you in principle please respond to us as soon as possible and forward to us a signed copy of this letter.

Very truly yours,

Graphco Technologies, Inc.

By:_____
                    Title

Agreed to in principle:

_____
Angela Chen Sabella

**EXHIBIT E**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
SCANTEK MEDICAL, INC.,

                                       Index No.: 08 CV 00453 (CM)

                  Plaintiff,

                                    **AFFIDAVIT**

      -against-

ANGELA CHEN SABELLA and
ACCORDANT HOLDINGS, LLC,

                            Defendants and
                            Third-Party Plaintiffs,

      -against-

MINTZ & FRAADE, P.C., FRED MINTZ, ALAN
FRAADE, MINTZ & FRAADE ENTERPRISES, LLC,
ZSIGMOND L. SAGI, and GIBRALTAR GLOBAL
MARKETING LLC,

                            Third-Party Defendants.
--------------------------------------------------------------------X
State of New York   )
                     ) ss.:
County of New York)

Edward C. Kramer, being duly sworn, deposes and says:

1.  I am a principal of the Law Offices of Edward C. Kramer, P.C., and I am of counsel to Third-Party Defendant Mintz & Fraade, P.C. ("M&F"). I am fully familiar with the facts stated in this affidavit and know the same to be true to my own knowledge. I am fully familiar with the pleadings and proceedings heretofore had herein and the matters hereinafter set forth.

2.  This affidavit is submitted in opposition to Defendants' Motion to Dismiss.

1

3.   During the years 2002 and 2003, the Plaintiff and the Defendants engaged in a series of financing transactions, which are referenced in greater detail in the accompanying Affidavit of Alan P. Fraade.  In brief however, the following transactions occurred:

> a.   On April 25, 2002, Defendant Angela Chen Sabella ("Sabella") loaned to Plaintiff $100,000 to Plaintiff in exchange for a promissory note of equal amount, earning 10% interest per annum, together 300,000 shares of Plaintiff's common stock pursuant to a Subscription Agreement simultaneously executed.

> b.   On August 20, 2002, Sabella loaned to Plaintiff $100,000 to Plaintiff in exchange for a promissory note of equal amount, earning 10% interest per annum (with a default interest rate of 24% per annum), together 2,000,000 shares of Plaintiff's common stock pursuant to a Subscription Agreement simultaneously executed.

> c.   On February 10, 2003, Defendant Accordant Holdings, LLC ("Accordant"), a Delaware LLC in which Sabella is a member, loaned $50,000 to Plaintiff in exchange for a promissory note of equal amount, earning 1% interest per month (12% per annum), together 400,000 shares of Plaintiff's common stock pursuant to a Subscription Agreement simultaneously executed.

(collectively, the "Transactions").

4.   In connection with each of these transactions, the Plaintiff alleges in the Complaint that the foregoing transactions are criminally usurious and in violation of N.Y. PENAL LAW § 190.40.  In particular, the Plaintiff claims that, when the value of the shares of common stock issued in exchange for the loans is added to the interest directly payable pursuant to the promissory notes, the rate of effective interest exceeds the maximum amounts allowable pursuant to applicable law.

5.   Prior to the foregoing transactions, Graphco Technologies, Inc. ("Graphco"), a company for which I served as an officer, director and general counsel, became involved

in a lawsuit with Sabella, with facts substantially similar to the instant litigation (the "Graphco Litigation"). Sabella had invested and loaned substantial sums to Graphco, which to my recollection was approximately three million dollars. As it relates directly to the instant matter, Sabella loaned money to Graphco, and as consideration for the loan, received warrants to purchase Graphco's common stock. When the value of the warrants was added to the interest charged Graphco pursuant to the promissory note which evidenced the loan from Sabella, the total interest exceeded the criminal usury rate of 25% per annum. This issue was part of the focus of litigation between Graphco and Defendant Sabella in which she sought, in pertinent part, to recover loans which Graphco had defaulted upon. I wish to note that I had no involvement in the negotiation, the drafting of documents, or the execution of the Graphco loans, which were wholly handled by the CFO of Graphco and a Pennsylvania law firm.

6. Defendant Sabella was on notice from her involvement in the Graphco Litigation that this structure for offering financing to companies, whereupon she would receive large amounts of securities as additional compensation for loans, was criminally usurious. On May 7, 2002, I submitted an affirmation in the Graphco Litigation, a copy of which I am annexing hereto as Exhibit "A", which specifically raised the issue of usury. In particular, I wrote that:

> "For example, there are triable issues with respect to the value of warrants, which represented a 'kicker' in the subject transaction, and extended the amount of interest of the transaction well beyond the 25% criminal usury standard, which applies equally to individuals and corporations. General Obligations Law Section 5-521(3). Violation of the criminal usury standard would negate the promissory note and any debt thereon.

7. Moreover, with respect to the Graphco Litigation, I had discussions with respect to the issue of usury with Mark Stepniewski, whom I am advised negotiated with Plaintiff on Defendants' behalf. In fact, I recall Stepniewski informing me that Sabella was "annoyed" with Graphco for raising the defense of usury.

8. Based upon my interactions with both Stepniewski and Sabella, Sabella is clearly extremely financially sophisticated. I have been advised by Stepniewski that Sabella is worth "several hundred million dollars", and at any time invests substantial sums in numerous projects. For example, Stepniewski advised me that, at or around the time of the Graphco investments, Sabella had invested many millions of dollars into a ski resort. More importantly, however, and as a result of her vast amounts of money, she has the ability to control the terms of any agreement, including the Transactions. I have personally witnessed her, in a telephone call, negotiate specific terms of a promissory note (unrelated to both Plaintiff and Graphco).

9. Notwithstanding my present relationship with Mintz & Fraade, P.C., nor my involvement with the Graphco Litigation in 2002, and particularly in view of the fact that my "of counsel" relationship with M&F did not commence until after the Transactions and the Graphco Litigation, M&F was not aware of the Graphco Litigation, nor that usury was an issue, until very recently when I told Third-Party Defendant Frederick M. Mintz, Esq., that the Transaction reminded me of what Sabella tried to do (and did) with Graphco. Although M&F did render legal services on behalf of Graphco, specifically with respect to a securities matter involving a potential reverse merger, these were at all

4

times unrelated to the Graphco Litigation.  Accordingly, Sabella was on notice from her involvement in the Graphco Litigation that the loans to Plaintiff were potentially usurious, and pursued them.   M&F certainly was not made known, nor could have been aware that such a defense was being raised by Graphco in a time period which was during the same time period as the Transactions.

**WHEREFORE**, it is respectfully submitted that the Court deny the Defendants' Motion to Dismiss this action, and that the Court grant such other and further relief as to it may seem just and proper.

/s/ Edward C. Kramer
_____
Edward C. Kramer

Sworn to before me this
28th day of March 2008

_/s/_
_____
Notary Public

# Exhibit "A"

Supreme Court of the State of New York
County of New York

------------------------------------------------------------------x

ANGELA CHEN SABELLA,

      Plaintiff,

    -against-

GRAPHCO TECHNOLOGIES, INC.,

      Defendant.

------------------------------------------------------------------x

Index No. 107532/02

Affirmation in Support of
Cross-Motion and in
Opposition to Motion

  Edward C. Kramer, an attorney duly admitted to practice in the State of New York,

hereby affirms the truth of the following under the penalties of perjury.

  1. I am a principal of the firm of the Law Offices of Edward C. Kramer, P.C. and am

fully familiar with the pleadings and proceedings heretofore had herein and the matters

hereinafter set forth.

  2. This affirmation is submitted in support of Defendant's cross-motion to dismiss the

action on the grounds of lack of personal jurisdiction, because service of process was defective

in that it failed to allow at least thirty days to respond to the summons with notice of motion for

summary judgment in lieu of complaint, which was served upon the Defendant by other than

personal service and was served outside the State of New York and that the notice was otherwise

defective because it not permit sufficient time to answer as required by law. This affirmation is

also submitted in opposition to Plaintiff's motion for summary judgment in lieu of complaint on

the same procedural grounds.

3. Pursuant to CPLR Section 320 (a), if service is made other than by personal service within the State of New York (in this case pursuant to CPLR Section 313), the summons must provide for thirty days time, from when service is perfected, in which to respond. Plaintiff claims that, pursuant to a contractual provision, it served the Summons with Notice of Motion for Summary Judgment in Lieu of Complaint by certified mail, return receipt requested on the Defendant at its offices in Newtown, Pennsylvania. As stated in the accompanying Affidavit of Cristian Ivanescu, CEO of Defendant, sworn to on the 6th day of May 2002, the summons with notice and moving papers were received by certified mail on April 15, 2002, less than thirty days prior to the stated return date of May 8, 2002. In fact, based upon the post date on the envelope, April 11, 2002 (Exhibit 1), the mailing was made less than thirty days prior to the stated return date of May 8, 2002. In fact, the summons, as well as the notice of motion (Exhibit 2), are both dated April 12, 2002 (for an unknown reason they are dated after the post date on the envelope), less than thirty days prior to the stated return date of May 8, 2002. Furthermore, since Plaintiff has demanded and noticed that Defendant's answering papers be served ten days prior to the return date, i.e. April 28, 2002, Plaintiff failed to allow Defendant even twenty days to answer the summons and notice of motion. In fact, it only permitted fourteen days instead of the required thirty days. Therefore, even if twenty days notice were sufficient, Plaintiff's service would still fail. Accordingly, it is respectfully submitted that both service is defective and the motion is defective. See, Crossland Savings, FSB v. Pilevsky, 197 A.D.2d 661,604 N.Y.S.2d 784 (2nd Dep't 1993); Huang v. Revilla,170 Misc.2d 617, 620, 651 N.Y.S.2d 286, 288 (Sup. Ct. Queens Co. 1996).

4. In addition, there exists a technical defect to Plaintiff's summons. Contrary to CPLR Section 305, the summons fails to bear the date of filing with the clerk of the court. Accordingly, it appears that Plaintiff has made little, if any effort, to comply with the CPLR, making dismissal of the action all the more appropriate a remedy.

5. Not only is there insufficient time in which to address the motion on a substantive basis, but based on certain case law, addressing the motion on the merits may be deemed to waive jurisdictional defenses, which is not the intent of Defendant. Surface it to say, Defendant, in good faith believes that it has a defense on the merits, as well as counterclaims related to the transaction at issue. For one example, there are triable issues with respect to the value of warrants, which represented a "kicker" in the subject transaction, and extends the amount of interest of the transaction well beyond the 25% criminal usury standard, which applies equally to individuals and corporations. General Obligations Law Section 5-521(3). Violation of the criminal usury standard would negate the promissory note and any debt thereon. General Obligations Law Section 5-521(1) and (3). Therefore, should the instant cross-motion be denied, Defendant would request an opportunity to address Plaintiff's motion on its merits.

6. Accordingly, it is respectfully submitted that the action and the motion for summary judgment in lieu of complaint should be dismissed and that the motion for summary judgment in lieu of complaint should be denied.

WHEREFORE, it is respectfully requested that Defendant's cross-motion to dismiss the action and the motion for summary judgment in lieu of complaint should be granted, that

3

Plaintiff's motion for summary judgment in lieu of complaint should be denied and that the

Court grant Defendant such other and further relief as to it may seem just and proper.

Dated: New York

May 7, 2002

S/

Edward C. Kramer

4

EXHIBIT F

# FORM 10-QSB

# SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C.

**[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2003

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ............. to ..............

*Commission File Number: 000-27592*

# SCANTEK MEDICAL INC.

(Exact name of registrant as specified in its charter)

```
        DELAWARE                                84-1090126
(State or other jurisdiction of            (I.R.S. Employer
 incorporation or organization)            Identification No.)
```

**4B WING DRIVE, CEDAR KNOLLS, NEW JERSEY 07927**
(973) 401-0434
(Address and telephone number, including area code, of
registrant's principal executive office)

(Former name, former address and former fiscal year, if changed
since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

```
        YES           NO X
        ---           ---
```

Indicate the number of shares outstanding of each of the issuer's

classes of common stock, as of the latest practicable date.

At April 30, 2003, there were 44,977,398 shares of Common Stock, $.001
par value, outstanding.

**SCAN TEK MEDICAL INC.**

INDEX
-----

| | | Page |
|---|---|---|
| Part I. | Financial Information | ---- |
| | | |
| Item 1. | Financial Statements | 1 |
| | | |
| | Consolidated Balance Sheets as of | |
| | March 31, 2003 (unaudited) | 2 |
| | | |
| | Consolidated Statements of Operations | |
| | and Comprehensive Loss for the | |
| | Nine Months and Three Months Ended | |
| | March 31, 2003 and 2002 (unaudited) | 3 |
| | | |
| | Consolidated Statements of Cash Flows | |
| | For the Nine Months Ended March | |
| | 31, 2003 and 2002 (unaudited) | 4 |
| | | |
| | Notes to Consolidated Financial Statements | 5 - 11 |
| | (unaudited) | |
| Item 2. | Management's Discussion and Analysis of | |
| | Financial Condition and Results of | |
| | Operations | 12 |
| | | |
| Item 14. | Controls and Procedures | 20 |
| | | |
| Part II. | Other Information | 20 |
| | | 20 |
| Item 1. | Legal Proceedings | 20 |
| Item 2. | Changes in Securities | |
| Item 3. | Defaults Upon Senior Securities | 20 |
| Item 4. | Submission of Matters to a Vote of Security | |
| | Holders | 20 |
| Item 5. | Other Information | 20 |
| Item 6. | Exhibits and Report on Form 8-K | 21 |
| | | |
| Signatures | | 22 |

**Item 1. Financial Statements**

Certain information and footnote disclosures required under accounting principles generally accepted in the United States of America have been condensed or omitted from the following consolidated financial statements pursuant to the rules and regulations of the Securities and Exchange Commission. It is suggested that the following condensed consolidated financial statements be read in conjunction with the year-end consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-KSB for the year ended June 30, 2002.

The results of operations for the nine and three month period ended March 31, 2003, are not necessarily indicative of the results to be expected for the entire fiscal year or for any other period.

-1-

SCANPEK MEDICAL, INC. AND SUBSIDIARIES
**CONSOLIDATED BALANCE SHEETS**

March 31,
2003
(Unaudited)

## ASSETS

```
Current Assets:
    Cash                                           $         779
    Marketable securities                                  2,212
    Inventories                                          562,037
                                                    ------------
        Total Current Assets                             565,028
                                                    ------------

Property and equipment - net                             677,803
Other assets - net                                        18,911
                                                    ------------

    TOTAL ASSETS                                   $   1,261,742
                                                    ============
```

### LIABILITIES AND STOCKHOLDERS' DEFICIENCY

```
Current Liabilities:
    Short-term debt                                $   1,484,980
    Current portion of long-term debt                  1,274,560
    Accounts payable (includes $808,303
      to a related party)                              1,448,594
    Accrued interest                                   1,626,540
    Accrued salaries                                   1,967,472
    Accrued expenses                                     658,217
                                                    ------------
        Total Current Liabilities                      8,460,363
                                                    ------------

Long-term debt                                         2,119,905
                                                    ------------
    Total Liabilities                                 10,580,268
                                                    ------------

Commitments and Contingencies

Stockholders' Deficiency:
    Preferred stock, par value $.001
      per share - authorized 5,000,000
      shares; none issued                                     --
    Common stock, par value $.001
      per share - authorized 45,000,000
      shares; outstanding 44,977,398 shares              44,977
    Additional paid-in-capital                         5,312,867
    Cumulative other comprehensive income                 2,212
    Deficit                                          (14,678,582)
                                                    ------------
        Total Stockholders' Deficiency                (9,318,526)
                                                    ------------

    TOTAL LIABILITIES AND STOCKHOLDERS'
      DEFICIENCY                                    $   1,261,742
                                                    ============
```

See notes to consolidated financial statements.

-2-

**SWANK MEDICAL, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(UNAUDITED)**

|  | Nine Months Ended March 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
|  | 2003 | 2002 | 2003 | 2002 |
| **Revenues:** | | | | |
| Net sales | $ -- | $ -- | $ -- | $ -- |
| License fees | -- | -- | -- | -- |
|  | -- | -- | -- | -- |
| **Costs and expenses:** | | | | |
| Cost of sales (consisting of depreciation expense) | 198,288 | 201,636 | 66,096 | 66,654 |
| General and administrative expenses | 932,709 | 554,473 | 294,306 | 176,519 |
| Research and development | -- | 210,000 | -- | 70,000 |
|  | 1,130,997 | 966,109 | 360,402 | 313,173 |
| Loss from operations | (1,130,997) | (966,109) | (360,402) | (313,173) |
| **Other income (expense):** | | | | |
| Interest and dividends | -- | 8 | -- | 2 |
| Miscellaneous income | -- | -- | -- | -- |
| Interest expense | (396,438) | (313,651) | (120,220) | (101,940) |
|  | (396,438) | (313,643) | (120,220) | (101,938) |
| Net loss | $ (1,527,435) | $ (1,279,752) | $ (480,622) | $ (415,111) |
| Loss per common share - basic and diluted | $ (0.05) | $ (0.05) | $ (0.01) | $ (0.02) |
| Weighted average number of common shares outstanding - basic and diluted | 32,857,889 | 26,311,385 | 38,781,255 | 26,921,523 |
| Net loss | $ (1,527,435) | $ (1,279,752) | $ (480,622) | $ (415,111) |
| Other comprehensive income (expense) net of income taxes: | | | | |
| Unrealized loss on marketable securities | (829) | 691 | (553) | 691 |
| Comprehensive loss | $ (1,528,264) | $ (1,279,061) | $ (481,175) | $ (414,420) |

-3-

SWANPEK MEDICAL INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)

| | Nine Months Ended March 31, | |
| | 2003 | 2002 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $(1,527,435) | $(1,279,752) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 218,058 | 221,438 |
| Write off of leasehold improvements | 14,231 | -- |
| Non-employee stock based compensation | 97,547 | 165,669 |
| Non-cash officers compensation | 7,212 | -- |
| Other non-cash items | 135,343 | -- |
| Changes in operating assets and liabilities | 790,979 | 607,936 |
| Net Cash Used in Operating Activities | (264,065) | (284,709) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from borrowings | 314,000 | 162,960 |
| Proceeds from officer loans | 4,947 | 55,159 |
| Repayment of officer loans | (9,029) | (3,759) |
| Repayment of notes | (56,303) | (7,245) |
| Proceeds from sale of common stock | -- | 72,000 |
| Net Cash Provided by Financing Activities | 253,615 | 279,115 |
| | | |
| Net decrease in cash | (10,450) | (5,594) |
| Cash - beginning of period | 11,229 | 6,026 |
| Cash - end of period | $ 779 | $ 432 |
| | | |
| Changes in operating assets and liabilities consist of: | | |
| Decrease in other assets | $ 14,441 | $ -- |
| Increase in accounts payable and accrued expenses | 776,538 | 607,936 |
| | $ 790,979 | $ 607,936 |
| | | |
| Supplementary information: | | |
| Cash paid during the period for: | | |
| Interest | $ 328 | $ 225 |
| Income Taxes | $ 340 | $ 200 |
| | | |
| Non-cash investing activities: | | |
| Unrealized loss on marketable securities | $ (829) | $ 691 |
| | | |
| Non-cash financing activities: | | |
| Common stock issued to officers for loan financing | $ 7,212 | $ -- |
| Common stock issued for loan financing | $ 55,947 | $ 6,405 |
| Issuance of stock options to non-employees | $ 135,343 | $ 42,044 |
| Common stock issued for bonuses and consulting services | $ 41,600 | $ 117,220 |
| Common stock issued in exchange for debt | $ 250,000 | $ -- |

-4-

SCANTEK MEDICAL, INC. AND SUBSIDIARIES

**NOTES CONDENSED TO CONSOLIDATED FINANCIAL STATEMENTS**

1. ORGANIZATION

Scantek Medical, Inc. and its subsidiaries (the "Company"), operates in one industry segment and is engaged, in developing, manufacturing, marketing, and licensing the BreastCare(TM)/BreastAlert(TM). The BreastCare(TM)/BreastAlert(TM) is an early screening device which can detect certain breast tissue abnormalities, including breast cancer. This device has been patented and has Food and Drug Administration ("FDA") approval for sale.

2. BASIS OF PRESENTATION

The consolidated balance sheet as of March 31, 2003, and the consolidated statements of operations and cash flows for the period presented herein have been prepared by the Company and are unaudited. In the opinion of management, all adjustments (consisting solely of normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows for all period presented have been made.

The financial statements in the Form 10-QSB were not reviewed Company's independent auditors in accordance with Item 310 of Regulation SX.

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business.

The Company has experienced losses during its development stage. Losses and negative cash flows from operations have continued in the current fiscal year subsequent to June 30, 2002. As of March 31, 2003, the Company has a working capital deficit of approximately $6.8 million.

The activities of the Company are being financed through the sale of its common stock and debt securities. The Company's continued existence is dependent upon its ability to obtain needed working capital through additional equity and/or debt financing, and the commercial acceptability of the BreastCare(TM)/BreastAlert(TM) to create sales that will help the Company achieve a profitable level of operations. However, there is no assurance that additional capital will be obtained or the BreastCare(TM)/BreastAlert(TM) will be commercially successful. This raises substantial doubt about the ability of the Company to continue as a going concern.

The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

The Company classifies its investments in equity securities as "available for sale", and accordingly, reflects unrealized gains and losses as a separate component of stockholders' deficiency.

The fair value of marketable securities are estimated based on quoted market prices. Realized gains or losses from the sale of marketable securities are based on the specific identification method.

The Company uses professional judgment to determine whether a decline of an available-for-sale instrument is temporary or other than temporary. The Company determines whether the decline in value results from Company-specific events, industry developments, general economic conditions or other reasons. After the general reason for the decline is identified, further determinations are required as to whether those events are likely to reverse and whether that reversal is likely to result in a recovery of the fair value of the investment.

## 4. INVENTORIES

The Company's policy is to reserve or write-off surplus or obsolete inventory. The inventory is reviewed by management for each reporting period.

## 5. REVENUE RECOGNITION

Revenue is recognized when the BreastCare(TM)/BreastAlert(TM) is shipped and title passes to customers.

Revenue from licensing the BreastCare(TM)/BreastAlert(TM) will be recognized when licensees commence operations and substantial performance has occurred. The Company historically has amended and renegotiated its licensees agreements. Therefore, upon receipt of license fee income in the future, the Company will recognize license fee income over the life of the agreement.

## 6. RESEARCH AND DEVELOPMENT

Research and development costs are expensed as incurred, consisting primarily of salaries of employees in developing the BreastCare (TM)/BreastAlert(TM).

## 7. FOREIGN CURRENCY TRANSLATION

Expenses for the Company's foreign subsidiaries are currently transacted in U.S. dollars. Future revenues will be invoiced and collected in U.S. dollars. The functional currency for the foreign subsidiary is the U.S. dollar. For the nine months ended March 31, 2003 and 2002, there were no foreign exchange gains or losses as all transactions were in U.S. dollars.

-6-

8. LOSS PER SHARE

Basic loss per common share is computed by dividing net loss by the weighted average number of common shares outstanding during the year. Diluted earnings per common share are computed by dividing net earnings by the weighted average number of common and potential common shares outstanding during the year. Potential common shares used in computing diluted earnings per share relate to stock options and warrants that, if exercised, would have a dilutive effect on earnings per share. For the nine and three months ended March 31, 2003 and 2002, potential common shares were not used in the computation of diluted loss per common share, as their effect would be antidilutive.

9. SEGMENTS - GEOGRAPHIC AREAS

The Company does not have reportable operating segments as defined in the Statement of Financial Accounting Standards No. 131, "Disclosure about Segments of an Enterprise and Related Information". The method for attributing revenues to individual countries is based on the destination to which finished goods are shipped. The Company operates facilities in the United States and South America. Revenues, when received, include license fees received by the Company in connection with various arrangements contracted throughout the world.

|  | Nine Months Ended March 31, | | Three Months Ended March 31, | |
|  | 2003 | 2002 | 2003 | 2002 |
|  | ---- | ---- | ---- | ---- |
| **Total Revenues:** |  |  |  |  |
| United States | $      -- | $      -- | $      -- | $      -- |
| South America | -- | -- | -- | -- |
| Less intergeographic revenue | -- | -- | -- | -- |
|  | ----------- | --------- | --------- | --------- |
|  | $      -- | -- | -- | -- |
|  | =========== | ========= | ========= | ========= |
| **Loss from operations:** |  |  |  |  |
| United States | $(1,060,875) | $(890,449) | $(336,162) | $(308,173) |
| South America | (70,122) | (75,660) | (9,000) | (5,000) |
|  | ----------- | --------- | --------- | --------- |
|  | $(1,130,997) | $(966,109) | $(345,162) | $(313,173) |
|  | =========== | ========= | ========= | ========= |

10. STOCK-BASED COMPENSATION

In December 2002, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure, an amendment of FASB Statement No. 123". SFAS No. 148 provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. It also requires disclosure in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. SFAS No. 148 is effective for annual and interim periods beginning after December 15, 2002. The Company will continue to account for stock-based employee compensation under the recognition and measurement principle of APB Opinion No. 25 and related interpretations. The Company complied with the additional annual and interim disclosure requirements effective December 31, 2002 and March 31, 2003.

11. STOCK ISSUED FOR SERVICES AND LOAN FINANCING

During the nine months ended March 31, 2003 and 2002, the Company issued 2,232,242 and 1,062,500 shares, respectively, of the Company's common stock to employees and non-employees as stock - based compensation in the amount of $104,759 and $123,625. The Company accounts for the services using the fair market value of the services received.

12. STOCKHOLDERS' DEFICIENCY

On September 30, 2002, the Company issued 1,426,039 shares of the Company's common stock to officers and non employees for consulting services and loan financing valued at $.035 per share. The Company recorded an expense of $49,911 during the nine months ended March 31, 2003.

On November 2, 2002, the Company granted 1,000,000 warrants to non-employees for services performed to purchase the Company's common stock at an exercise price of $.05 per share the fair market value at the date of grant. The Company recorded an expense of $48,051 during the nine months ended March 31, 2003 in connection with the issuance of the warrants. The warrants are exercisable immediately and expire on November 1, 2007.

On November 8, 2002, the Company issued 3,000,000 shares of the Company's common stock in exchange for the reduction of a $45,000 liability for professional services.

On November 18, 2002, the Company issued 1,200,000 shares of the Company's common stock to non-employees from the exercise of options and warrants in exchange for the reduction of accrued interest of $26,500 and a $21,000 liability for professional services. The Company also issued 565,000 shares of the Company's common stock to non-employees for consulting services and loan financing valued at $45,200.

On February 20, 2003, the Company issued 10,500,000 shares of the Company's common stock to officers and non-employees from the exercise of options and warrants in exchange for the reduction of accrued wages of $135,000, a liability for professional services of $15,000 and a liability of consulting services of $7,500.

On March 14, 2003, the Company issued 241,205 shares of the Company's common stock to officers and non-employees for loan financing valued at $9,648.

On March 31, 2003, the Company expensed $87,292 for warrants granted previously and not yet fully amortized.

During the nine months ended March 31, 2002 the Company sold 975,000 shares of the Company's common stock for $72,000.

During the nine months ended March 31, 2002 the Company issued options to purchase shares of the Company's common stock to non-employees. The fair value of the options of $42,044 has been expensed to operations.

|  | Nine Months Ended March 31, | | Three Months Ended March 31, | |
|  | 2003 | 2002 | 2003 | 2002 |
|  | ---- | ---- | ---- | ---- |
| Net loss: | | | | |
| As reported | $(1,527,435) | $(1,279,752) | $(480,622) | $(415,111) |
| Amortization of compensation expense | (86,491) | -- | -- | -- |
| Proforma | (1,613,926) | (1,279,752) | (480,622) | (415,111) |
| Basic and diluted loss per share: | | | | |
| As report | $ (0.05) | $ (0.05) | $ (0.01) | $ (0.02) |
| Proforma | $ (0.05) | $ (0.05) | $ (0.01) | $ (0.02) |

## 13. LEGAL PROCEEDINGS

The Company is a defendant in various legal proceedings seeking claims aggregating approximately $100,000, which has been included in accrued expenses in the Company's financial statements at March 31, 2003.

## 14. RECENT ACCOUNTING PRONOUNCEMENTS

In August 2001, the FASB issued SFAS No. 143 "Accounting for Asset Retirement Obligations". SFAS No. 143 addresses financial accounting and reporting for obligations and costs associated with the retirement of tangible long-lived assets. The Company adopted SFAS 143 on January 1, 2003. The adoption of SFAS No.143 did not have a material impact on the Company's results of operations or financial position.

In April 2002, the FASB issued SFAS No. 145 "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections". This statement eliminates the automatic classification of gain or loss on extinguishment of debt as an extraordinary item of income and requires that such gain or loss be evaluated for extraordinary classification under the criteria of Accounting Principles Board No. 30 "Reporting Results of Operations". This statement also requires sales-leaseback accounting for certain lease modifications that have economic effects that are similar to sales-leaseback transactions, and makes various other technical corrections to existing pronouncements. The Company adopted SFAS No. 145 on July 1, 2002. The adoption of this statement did not have a material effect on the Company's results of operations or financial position.

In June 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." This Statement requires recording costs associated with exit or disposal activities at their fair values when a liability has been incurred. Under previous guidance, certain exit costs were accrued upon management's commitment to an exit plan. The Company adopted SFAS No. 146 on July 1, 2002. The adoption of SFAS No. 146 did not have a material impact on the Company's result of operations or financial position.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement No. 133 on Derivative Instruments and Hedging Activities." This statement amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts and for hedging activities under FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities." This Statement is effective for contracts entered into or modified after June 30, 2003, and for hedging relationships designated after June 30, 2003.

In November 2002, the FASB issued FASB Interpretation No. 45 (FIN 45), Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and interpretation of FASB Statements No. 5, 57,and 107 and Rescission of FASB Interpretation No. 34. FIN 45 clarifies the requirements of FASB Statement No. 5, Accounting for Contingencies, relating to the guarantor's accounting for, and disclosure of, the issuance of certain types of guarantees. This interpretation clarifies that a guarantor is required to recognize, at the inception of certain types of guarantees, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of this Interpretation are applicable on a prospective basis to guarantees issued or modified after December 31, 2002, irrespective of the guarantor's fiscal year-end. The disclosure requirements in this interpretation are effective for financial statements of interim or annual periods ending after December 15, 2002. The Company adopted FIN 45 on January 1, 2003. The adoption of FIN 45 did not have a material impact on the Company's disclosure requirements.

-10-

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which addresses consolidation by business enterprises of variable interest entities. In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. A variable interest entity often holds financial assets, including loans or receivables, real estate or other property. A variable interest entity may be essentially passive or it may engage in research and development or other activities on behalf of another company. The objective of Interpretation No. 46 is not to restrict the use of variable interest entities but to improve financial reporting by companies involved with variable interest entities. Until now, a company generally has included another entity in its consolidated financial statements only if it controlled the entity through voting interests. Interpretation No. 46 changes that by requiring a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation No. 46 apply immediately to variable interest entities created after January 31, 2003. The consolidation requirements apply to older entities in the first fiscal year or interim period beginning after June 15, 2003. Certain of the disclosure requirements apply in all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. The Company does not have any variable interest entities, and, accordingly, adoption is not expected to have a material effect on the Company.

-11-

of Operations

The Company's quarterly and annual operating results are affected by a wide variety of factors that could materially and adversely affect revenues and profitability, including competition from other suppliers; changes in the regulatory and trade environment; changes in consumer preferences and spending habits; the inability to successfully manage growth; seasonality; the ability to introduce and the timing of the introduction of new products and the inability to obtain adequate supplies or materials at acceptable prices. As a result of these and other factors, the Company may experience material fluctuations in future operating results on a quarterly or annual basis, which could materially and adversely affect its business, financial condition, operating results, and stock price. Furthermore, this document and other documents filed by the Company with the Securities and Exchange Commission (the "SEC") contain certain forward-looking statements under the Private Securities Litigation Reform Act of 1995 with respect to the business of the Company. These forward-looking statements are subject to certain risks and uncertainties, including those mentioned above, and those detailed in the Company's Annual Report on Form 10-KSB for the year ended June 30, 2002, which may cause actual results to differ significantly from these forward-looking statements. The Company undertakes no obligation to publicly release the results of any revisions to these forward-looking statements which may be necessary to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. An investment in the Company involves various risks, including those mentioned above and those that are detailed from time to time in the Company's SEC filings.

The following discussion and analysis should be read in conjunction with the Company's consolidated financial statements and the notes related thereto. The discussion of results, causes and trends should not be construed to infer any conclusion that such results, causes or trends will necessarily continue in the future.

## Critical Accounting Policies

The Company's discussion and analysis of its financial condition and results of operations are based upon the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires the Company to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an on-going basis, the Company evaluates its estimates, including those related to product returns, bad debts, inventories, intangible assets, investments, income taxes and contingencies and litigation. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results under different assumptions or conditions may differ from these estimates.

-12-

The Company bases the following critical accounting policies upon its more significant judgments and estimates used in the preparation of its consolidated financial statements. The Company maintains allowances for doubtful accounts for estimated losses resulting from the inability of its customers to make required payments. If the financial condition of the Company's customers were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required.

The Company intends to make purchasing decisions principally based upon firm sales orders from customers, the availability and pricing of raw materials and projected customer requirements. Future events that could adversely affect these decisions and result in significant charges to the Company's operations include slow down in customer demand, customers delaying the issuance of sales orders to the Company, miscalculating customer requirements, technology changes which render the raw materials and finished goods obsolete, loss of customers and/or cancellation of sales orders. The Company writes down its inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value based upon the aforementioned assumptions. If actual market conditions are less favorable than those projected by management, additional inventory write-downs may be required. Even though sales have been minimal, the Company has received a purchase order in Brazil for the BreastCare(TM)/BreastAlert(TM). Based upon the purchase order received, the Company anticipates the entire inventory will be used in calendar 2003.

The Company seeks sales and profit growth by expanding its existing customer base, developing new products and by pursuing strategic acquisitions that meet the Company's criteria relating to (i) the market for the products; (ii) the Company's ability to efficiently manufacture the product; (iii) synergies that are created by the acquisition; and (iv) a purchase price that represents fair value. If the Company's evaluation of a target company misjudges its technology, estimated future sales and profitability levels, or inability to keep pace with the latest technology, these factors could impair the value of the investment, which could materially adversely affect the Company's profitability.

The Company files income tax returns in every jurisdiction in which it has reason to believe it is subject to tax. Historically, the Company has been subject to examination by various taxing jurisdictions. To date, none of these examinations has resulted in any material additional tax. Nonetheless, any tax jurisdiction may contend that a filing position claimed by the Company regarding one or more of its transactions is contrary to that jurisdiction's laws or regulations.

Results of Operations

The following table sets forth for the periods indicated, the percentage increase or (decrease) of certain items included in the Company's consolidated statement of operations:

| | % Increase (Decrease) from Prior Period | % Increase (Decrease) from Prior Period |
|---|---|---|
| | Nine Months Ended March 31, 2003 compared with Nine Months Ended March 31, 2002 | Three Months Ended March 31, 2003 compared with Three Months Ended March 31, 2002 |
| Sales | -- % | -- % |
| Cost of sales | (1.7)% | (0.8)% |
| General and administrative expense | 68.2 % | 66.7 % |
| Research and development | (100.0) | (100.0)% |
| Interest expense | 26.4 % | 17.9 % |
| Net (loss) | 19.4 % | 15.8 % |

## NINE MONTHS ENDED MARCH 31, 2003 VS. NINE MONTHS ENDED MARCH 31, 2002

### Revenues

There were no sales for the nine months ended March 31, 2003 and 2002. The Company expects sales to commence in the last quarter of its fiscal year.

### Cost of Sales

Cost of sales (which consists of depreciation expense) decreased 1.7% to $198,288 during the nine months ended March 31, 2003 from $201,636 during the nine months ended March 31, 2002.

### General and Administrative Expenses

General and administrative expenses increased 68.2% to $932,709 during the nine months ended March 31, 2003 from $554,473 during the nine months ended March 31, 2002 due to increases in travel expenses, rent, outside services, accrued wages and professional fees attributable to stock and stock options issued for services offset by higher consulting fees in 2002 also attributable to stock options issued for services.

### Interest Expense

Interest expense increased to $396,438 during the nine months ended March 31, 2003 from $313,651 during the nine months ended March 31, 2002 primarily due to interest expense on stock issuance for loan financing and additional interest on increase in debt.

-14-

Research and Development Expense

Research and development decreased from $210,000 for the nine months ended March 31, 2002 to $-0- for the nine months ended March 31, 2003. The Company fully developed the BreastCare(TM)/BreastAlert(TM) but in the future contemplates to develop other products to market.

## THREE MONTHS ENDED MARCH 31, 2003 VS.
## THREE MONTHS ENDED MARCH 31, 2002

### Revenues

There were no sales for the three months ended March 31, 2003 and 2002.

### Cost of Sales

Cost of sales (which consists of depreciation expense) decreased .8% to $66,096 during the three months ended March 31, 2003 from $66,654 during the three months ended March 31, 2002.

### General and Administrative Expenses

General and administrative expenses increased 66.7% to $294,306 during the three months ended March 31, 2003 from $176,519 during the three months ended March 31, 2002 due to primarily the same reasons set forth in the nine months analysis.

### Interest Expense

Interest expense increased to $120,220 during the three months ended March 31, 2003 from $101,940 during the three months ended March 31, 2002 primarily due to interest expense on stock issuance for loan financing and additional interest on increased debt.

### Research and Development Expense

Research and development expense decreased from $70,000 for the three months ended March 31, 2002 to $-0- for the three months ended March 31, 2003 due to primarily the same reasons set forth in the nine month analysis.

### Liquidity and Capital Resources

The Company's need for funds has increased from period to period, as it has incurred expenses for among other things, research and development; applications for and maintenance of domestic and international trademarks and international patent protection; licensing and pre-marketing activities; and, attempts to raise the necessary capital to expand the Company's production capacity. Since inception, the Company has funded these needs through private placements of its equity and debt securities and advances from the Company's President, Chief Executive Officer and major shareholder. The Company has entered into various license agreements that have raised additional funds. In addition, the Company's auditors' report for the year ended June 30, 2002 dated October 10, 2002, expressed an opinion as to the Company continuing as a going concern.

-15-

During September 1998, the Company commenced the sale of its BreastCare(TM)/BreastAlert(TM) device in Brazil, Uruguay and Paraguay through its South American licensee. The Company terminated its license agreement with its former licensee in South America. The Company's Brazilian subsidiary plans to manufacture, market and distribute the BreastCare(TM)/BreastAlert(TM) device in Brazil and export to other South American countries. As of this date only minimal shipments have been made and the Company has not generated any material revenues.

Until cash flow generated from the shipment of the BreastCare(TM) device is sufficient to support the Company's operations, the Company will require financing to fund its current overhead and various capital requirements. As of March 31, 2003, the Company borrowed approximately $2.7 million from unaffiliated third parties. These loans are payable by the Company on various dates through December 31, 2003. In addition, as of March 31, 2003, the Company's President advanced the Company approximately $1.1 million. These loans have supported the Company through the prior and the current fiscal year. The Company expects the cash flow from sales commencing in 2003 to cover the operations of the Company through December 2003, provided the Company is successful in raising additional capital to support the operations until cash flows generated from the sales of the BreastCare(TM)/BreastAlert(TM) device commences.

In 2003, the Company will market and distribute the BreastCare(TM)/BreastAlert(TM) device throughout South America through the Company's South American subsidiaries.

Through its Brazilian subsidiary, the Company signed an agreement with the State of Pernambuco in December 1999. The State of Pernambuco has the second largest concentration of hospitals in Brazil offering quality care and management believes that the location is also the most desirable for production, shipping, financing and tax incentives. The State of Pernambuco has offered various incentives, including acreage to build the facility at a reduced price, an 85% reduction in taxes through 2013, free shipping outside the state, and in connection with the federal programs offered in Northeast Brazil, financing programs to help fund the operations and capital improvements.

The Company plans to ship the BreastCare(TM)/BreastAlert(TM) device from the United States until a production facility in Brazil is operational.

On July 14, 1999, the Company granted an exclusive license to NuGard HealthCare Ltd. ("NuGard"), an Irish Company; to market Scantek's BreastCare(TM)/BreastAlert(TM) device in Ireland and the United Kingdom. Pursuant to the licensing agreement, NuGard is obligated to pay a non-refundable licensing fee of $350,000 in various stages, of which $59,000 was received, and the Company received common shares equivalent to fifteen (15%) percent of NuGard's total outstanding common shares. The purchase price will range from $10 to $15 per unit - FOB US. The licensing agreement requires minimum purchases of 5,000 units a month and payments of licensing fees, both of which NuGard is in default. At the present time the Company has not renegotiated the license agreement.

In August/September 2001, Fiocruz, a government agency in the Ministry of Health assisted in the BreastCare(TM) educational program for the Women's Health Program for the City of Nova Iguacu and Fiocruz will be an integrated part of the Company's BreastCare(TM) educational process.

-16-

On October 1, 2002 the Company signed an agreement with Compat Comercio Exterior Ltda., a Brazilian company located in Rio De Janeiro, Brazil, for a long-term exclusive marketing and sales agreement for the BreastCare(TM) product in the country of Brazil, excluding 4 states where the Company is pursuing more direct agreements. The Compat Comercio agreement calls for the shipment of a minimum of 100,000 units during the first six months of the term of the agreement, 400,000 units during the second six months and 1,000,000 units during the second year. Management believes that the timely fulfillment of the Compat Comercio agreement will result in net profits in excess of $2,000,000 for the first year of the Compat Comercio agreement, subject to Compat Comercio meeting its minimum purchase obligations to the Company. Pursuant to such agreement which has a term of five years with a renewal term of an additional five years, subsequent to the initial two year term of the agreement, the Company has the right to terminate the agreement if the parties cannot agree upon the minimum number of units. There can be no assurance that Compat Comercio will meet the minimum purchase requirement, or that the Company will recover any damages that may result from such failure.

Pursuant to the Compat Comercio agreement, the first shipment of 10,000 BreastCare(TM) units will be prepaid and such payments will be deposited into a bank escrow account and will be released when a Brazil government import license is secured. Subsequent shipments will be paid fifty (50%) at the time of request and fifty (50%) percent sixty (60) days later.

The Company's working capital and capital requirements will depend on numerous factors, including the level of resources that the Company devotes to support start-up production and to the marketing aspects of its products. The Company intends to construct assembly centers abroad to manufacture, market and sell the BreastCare(TM)/BreastAlert(TM) device in the international market. The Company entered into an agreement with Zigmed Inc., pursuant to which Zigmed Inc. will manufacture the sensor production equipment needed for manufacturing of the BreastCare(TM)/BreastAlert(TM) device. The balance of $718,276 will be paid when the Company raises the additional capital.

The Company's success is dependent on raising sufficient capital to establish a fully operable production and assembly facility to manufacture the BreastCare(TM)/BreastAlert(TM) device for the international market. The Company believes the device will be commercially accepted throughout the international market. The Company does not have all the financing in place at this time, nor may it ever, to meet these objectives.

This Management's Discussion and Analysis of Financial Condition and Results of Operations includes forward-looking statements that may or may not materialize. Additional information on factors that could potentially affect the Company's financial results may be found in the Company's filings with the Securities and Exchange Commission.

ACCOUNTING PRONOUNCEMENTS TO BE ADOPTED IN 2003

In August 2001, the FASB issued SFAS No. 143 "Accounting for Asset Retirement Obligations". SFAS No. 143 addresses financial accounting and reporting for obligations and costs associated with the retirement of tangible long-lived assets. The Company adopted SFAS 143 on January 1, 2003. The adoption of SFAS No.143 did not have a material impact on the Company's results of operations or financial position.

In April 2002, the FASB issued SFAS No. 145 "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections". This statement eliminates the automatic classification of gain or loss on extinguishment of debt as an extraordinary item of income and requires that such gain or loss be evaluated for extraordinary classification under the criteria of Accounting Principles Board No. 30 "Reporting Results of Operations". This statement also requires sales-leaseback accounting for certain lease modifications that have economic effects that are similar to sales-leaseback transactions, and makes various other technical corrections to existing pronouncements. This statement will be effective for the Company for the year ending December 31, 2003. Management believes that adopting this statement will not have a material effect on the Company's results of operations or financial position.

In June 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." This Statement requires recording costs associated with exit or disposal activities at their fair values when a liability has been incurred. Under previous guidance, certain exit costs were accrued upon management's commitment to an exit plan. The Company adopted SFAS No. 146 on January 1, 2003. The adoption of SFAS No. 146 did not have a material impact on the Company's result of operations or financial position.

In January 2003, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure, an amendment of FASB Statement No. 123" SFAS No. 148 provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. It also requires disclosure in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. SFAS No. 148 is effective for annual and interim periods beginning after December 15, 2002. The Company will continue to account for stock-based employee compensation under the recognition and measurement principle of APB Opinion No. 25 and related interpretations. On January 1, 2003 the Company adopted the disclosure provisions of SFAS No. 148.

In November 2002, the FASB issued FASB Interpretation No. 45 (FIN 45), Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and interpretation of FASB Statements No. 5, 57,and 107 and Rescission of FASB Interpretation No. 34. FIN 45 clarifies the requirements of FASB Statement No. 5, Accounting for Contingencies, relating to the guarantor's accounting for, and disclosure of, the issuance of certain types of guarantees. This interpretation clarifies that a guarantor is required to recognize, at the inception of certain types of guarantees, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of this Interpretation are applicable on a prospective basis to guarantees issued or modified after December 31, 2002, irrespective of the guarantor's fiscal year-end. The disclosure requirements in this interpretation are effective for financial statements of interim or annual periods ending after December 15, 2002. The Company adopted FIN 45 on January 1, 2003. The adoption of FIN 45 did not have a material impact on the Company's disclosure requirements.

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which addresses consolidation by business enterprises of variable interest entities. In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. A variable interest entity often holds financial assets, including loans or receivables, real estate or other property. A variable interest entity may be essentially passive or it may engage in research and development or other activities on behalf of another company. The objective of Interpretation No. 46 is not to restrict the use of variable interest entities but to improve financial reporting by companies involved with variable interest entities. Until now, a company generally has included another entity in its consolidated financial statements only if it controlled the entity through voting interests. Interpretation No. 46 changes that by requiring a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation No. 46 apply immediately to variable interest entities created after January 31, 2003. The consolidation requirements apply to older entities in the first fiscal year or interim period beginning after June 15, 2003. Certain of the disclosure requirements apply in all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. The Company does not have any variable interest entities, and, accordingly, adoption is not expected to have a material effect on the Company.

-19-

Within the 90 days prior to the date of this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-14. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective. There have been no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

**PART II. Other Information**

**Item 1. Legal Proceedings**

There are several lawsuits against the Company that may have a material impact on the consolidated results of operations or financial condition of the Company.

**Item 2. Changes in Securities**

None

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Submission of Matters to a Vote of Security Holders**

None

**Item 5. Other Information**

None

-20-

(a) Exhibits:

Exhibit 99.1 Certification of Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(b) There were no current reports on Form 8-k filed during the quarter ended March 31, 2003.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**SCANTEK MEDICAL INC.**

By: /s/ Zsigmond L. Sagi
    --------------------------------
    Zsigmond L. Sagi, President and
    Chief Financial Officer

Dated:  May 20, 2003

-22-

I, Zsigmond L. Sagi, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Scantek Medical Inc;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. I have indicated in this quarterly report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

        Date: May 20, 2003

                                By:  /s/Zsigmond L. Sagi
                                     -----------------------------------
                                     Zsigmond L. Sagi, President and
                                     Chief Financial Officer

                        -23-

EXHIBIT 99.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
AS ADOPTED PURSUANT TO

<u>SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002</u>

In connection with the quarterly report of Scantek Medical Inc (the "Company") on Form 10-Q for the quarter ended March 31, 2003 filed with the Securities and Exchange Commission (the "Report"), I, Zsigmond L. Sagi, President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934;and

(2) The information contained in the Report fairly presents, in all material respects, the consolidated financial condition of the Company as of the dates presented and consolidated result of operations of the Company for the period presented.

```
Dated: May 20, 2003


                              By: /s/ Zsigmond L. Sagi
                                 --------------------------------
                                  Zsigmond L. Sagi, President
                                    and Chief Financial Officer
```

This certification has been furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. A signed original of this written statement required by Section 906 has been provided to Scantek Medical, Inc. and will be retained by Scantek Medical, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

---

**End of Filing**

Powered By EDGAR® Online

**© 2005 | EDGAR Online, Inc.**