UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SCANTEK MEDICAL, INC.,

                                      Index No.: 08 CV 00453 (CM)

                  Plaintiff,

                               **REPLY AFFIDAVIT**

    -against-

ANGELA CHEN SABELLA and
ACCORDANT HOLDINGS, LLC,

                         Defendants and
                         Third-Party Plaintiffs,

    -against-

MINTZ & FRAADE, P.C., FRED MINTZ, ALAN
FRAADE, MINTZ & FRAADE ENTERPRISES, LLC,
ZSIGMOND L. SAGI, and GIBRALTAR GLOBAL
MARKETING LLC,

                         Third-Party Defendants.
-----------------------------------------------------------------X
State of New York   )
               ) ss.:
County of New York)

Alan P. Fraade, being duly sworn, deposes and says:

   1.  At all times relevant to this action through the date hereof, Mintz & Fraade, P.C.

("M&F"), the law firm of which I am a member, has acted as attorneys for the Plaintiff

Scantek Medical, Inc. (hereinafter referred to as "Scantek" or "Plaintiff"). I am also a

Third Party Defendant in this action as an individual, and I am a member of Third Party

Defendants M&F and Mintz & Fraade Enterprises, LLC ("Enterprises"). I am fully

familiar with the facts stated in this affidavit and know the same to be true to my own

knowledge. I am fully familiar with the pleadings and proceedings heretofore had herein

and the matters hereinafter set forth.

2. This reply affidavit is being submitted in support of the Plaintiff and Third Party Defendants M&F, Frederick M. Mintz ("Mintz"), Enterprises, Zsigmond L. Sagi ("Sagi"), Gibraltar Global Marketing, LLC ("Gibraltar") and me (collectively, the "Third-Party Defendants") and their Motion to Dismiss ("Plaintiff's Motion to Dismiss") certain of the Counterclaims, Affirmative Defenses and Counts of the Third-Party Complaint by Angela Chen Sabella and Accordant Holdings, LLC.

3. The Affirmation of Kenneth Sussmane dated June 20, 2008 (the "Sussmane Affirmation"), the Affidavit of Mark Stepniewski dated June 20, 2008 (the "Stepniewski Affidavit") and Defendants' Memorandum of Law dated June 20, 2008 ("Defendants' Memorandum") each contains distorted, misleading and irrelevant facts, most of which have no bearing on the legal issues set forth in Plaintiff's Motion to Dismiss, and which are designed solely to attempt to disparage Plaintiff and Third-Party Defendants. Plaintiff and Third-Party Defendants respectfully submit that Defendants' erroneous factual allegations should not be considered in resolving Plaintiff's Motion to Dismiss. Although it is respectfully submitted that the disputed facts which will be addressed in this Affidavit are not of the nature which need to be resolved in order for this Court to rule upon the issues of law raised in Plaintiff's Motion to Dismiss, it is worth noting Defendants' egregious mistakes and the extent to which they are willing to distort the facts in bad faith to attempt to strengthen their position in this lawsuit.

4. The entire thrust of the brief Sussmane Affirmation seems to be to emphasize that Scantek has not filed all of its SEC filings. The Sussmane Affirmation states: "In 2003, Plaintiff ceased its SEC filings, further frustrating a reasonable investigation into Scantek". (Sussmane Aff. ¶ 4.)

2

5.  In October 2005, Scantek's certified public accountants ceased providing services because Scantek was unable to pay them.  At the time Scantek's accountants ceased providing services, they were preparing the SEC filings which Scantek had not filed since 2003.  However, the SEC filings which Scantek's accountants were preparing in 2005 were not completed.  Since 2003, Scantek has made filings with the SEC which did not require financial statements.  Scantek continued to make SEC filings which did not require statements prepared by a certified public accountant.  The assertion that Scantek "ceased" its SEC filings is incorrect, which is demonstrated to anyone who visits www.sec.gov and searches the EDGAR filings of Scantek.  Furthermore, Defendants are obviously aware of this fact, because they obtained information with respect to Third-Party Defendant Gibraltar from a Form 8-K filed by Scantek on March 21, 2007.  Although Scantek is not up to date in all of its required periodic filings, Scantek has made many filings since 2003.  The latest filing was dated November 8, 2007.

6.  The statement that the lack of complete SEC filings "further frustrat[ed] any reasonable investigation into Scantek", (Sussmane Aff. ¶ 4), is intentionally misleading.  Each of the loans which are the subject of the Complaint, evidenced by promissory notes dated April 25, 2002, August 20, 2002, and February 20, 2003 (the "Loans"), were made prior to the date upon which Scantek ceased filing SEC reports which required financial statements.  Furthermore, in spite of the fact that Scantek ceased filing SEC reports with financial statements in 2003, Defendants allege in the Third-Party Complaint that Defendants made several additional advances (the "Additional Advances") to Scantek through May 2004 (see Third-Party Complaint ¶¶ 60-64), after Defendants were aware that Scantek ceased filing SEC reports with financial statements in 2003.  Scantek's

failure to remain up to date in all of its SEC filings should have raised concern and put Defendants on notice that Scantek was not in good financial condition.

7. The Sussmane Affidavit also states that Sussmane "made requests for documents and information from the attorneys for Scantek Medical Inc.  I was informed by such attorneys that Scantek was a publicly-traded company and could not release documents or information to my clients that were not available to the public."  (Sussmane Aff. ¶ 3.) After Sussmane made the request for documents and information, Mintz informed him that M&F would provide Mr. Stepniewski and Defendants with the requested information if Sussmane, Mr. Stepniewski and Defendants would execute a confidentiality agreement. Annexed hereto as Exhibit "A" is an email I sent to Mr. Sussmane dated June 27, 2006, forwarding a confidentiality agreement which was attached to be executed by Mr. Sussmane, Mr. Stepniewski and Defendant Sabella.  In view of the fact that Scantek is a public company, it would violate SEC rules to provide Sussmane with information with respect to Scantek which was not available to the general public without first obtaining a confidentiality agreement.  Sussmane and Defendants never executed or returned the confidentiality agreement.    Accordingly, M&F did not provide Sussmane with information with respect to Scantek which was not known to the public.

8. Similarly, the Stepniewski Affidavit contains many factual errors.    Mr. Stepniewski begins by stating that he has "had an attorney client relationship with Fred Mintz, Alan Fraade and their law firm for more than fifteen years".  (Stepniewski Aff. ¶ 2.) In the very next sentence, Mr. Stepniewski changes the duration of the relationship from "more than fifteen years" to "more than ten years", exhibiting a total disregard of the truth.    In fact, M&F provided only minor legal services for Mr. Stepniewski

periodically over a period which was less than ten years, and probably closer to six-and-one-half years, which is less than half the time Mr. Stepniewski originally alleges. Furthermore, the statement that M&F has represented Mr. Stepniewski "in dozens of transactions" is a gross exaggeration. (Id.) In fact, I believe that M&F has represented Mr. Stepniewski only with respect to the following four matters:

    A. A confidentiality agreement in August 2001.

    B. A lawsuit commenced by a dentist against Mr. Stepniewski and his wife, seeking unpaid fees of approximately $10,000, which was commenced in late 2001 and was settled in late 2002, and for which M&F did minimal work.

    C. Two finders fee agreements, one in late 2003 and the other in 2004.

    D. A prospective merger between a privately held company and a public shell, pursuant to which M&F reviewed (i) an executive summary of the privately held company in late 2003 and (ii) a term sheet with respect to the proposed merger in July 2007, pursuant to which Mr. Stepniewski signed as the representative of the shareholders of the public shell.

9.  M&F cannot locate any bills to, nor any payments from, Mr. Stepniewski in connection with any of the matters listed above. Mr. Stepniewski had a personal relationship with Mintz and me, and we handled the aforementioned matters as a favor to him. In addition, M&F and I loaned Mr. Stepniewski several thousand dollars on various occasions.

10. Although the Stepniewski Affidavit states that Mr. Stepniewski has referred "many individual and corporate clients" to Mintz and me, I cannot recall more than two

prospective clients other than Defendants; one was Errant Gene Therapeutics, LLC, from which we received $5,000. The principal of Errant Gene Therapeutics, LLC is Mr. Patrizio Girondi, a letter to whom Mr. Sussmane attached to his Affidavit from Mintz. The second client was a company called World Wide Eyes, LLC, which M&F billed $1,350. The bill was never paid. With respect to Defendants, M&F represented them in two minor, isolated instances: (A) one was a prospective financing transaction which never materialized and was totally unrelated to the Plaintiff and (B) the other involved the filing with the SEC of a Form 3 and Schedule 13-D with respect to the stock to be issued to the Defendants in connection with the Loans. M&F billed $2,500 for services with respect to the proposed financing transaction, and $1,500 (which was never paid) for services with respect to preparing and filing the Schedule 13-D.

11. The Stepniewski Affidavit also states that "Fred [Mintz] introduced Ms. Sabella and me to Scantek Medical, Inc. and recommended an investment in Scantek". (Stepniewski Aff. ¶ 6.) This is not true. Sagi was introduced by a third party to Mr. Herman Finesod, the father-in-law of Mr. Stepniewski. Although Mr. Finesod is a client of M&F, he met Sagi independently of M&F. Mr. Finesod attempted to locate potential investors to invest money in Scantek, and contacted his son-in-law, Mr. Stepniewski, to arrange for the Defendants to invest in Scantek.

12. Mr. Stepniewski determined to bypass his father-in-law and introduced Sagi to Defendants, and collected substantial finders' fees and received stock in Scantek in connection with his introduction of Defendant Sabella and Defendant Accordant to Scantek. This introduction is more fully described in the Affidavit of Mintz dated July 25, 2008 (the "Mintz Affidavit") ¶¶ 5-9.

6

13. The statement that "Ms. Sabella, Accordant and [Mr. Stepniewski] relied on Fred [Mintz] and Alan [Fraade] to draft binding and enforceable documents and advise us of any risks or issues in connection with the enforceability of the securities being issued by Scantek" is a total fabrication. (<u>See</u> Stepniewski Aff. ¶ 6.) Although not an attorney, Mr. Stepniewski held himself out as representing the Defendants' interests with respect to the Loans. Simply because Defendants did not retain separate counsel does not mean that M&F acted as counsel for Defendants. It is critical to note that, upon information and belief, Accordant has an in-house attorney, so that Defendants had access to an attorney if they wished for an attorney to review the documents evidencing the Loans. It was not the understanding of any of the parties that M&F was representing either the Defendants or Mr. Stepniewski with respect to the Loans. Defendants' claim to the contrary is a blatant lie. It should be noted that Defendants have not submitted an affidavit from either of the Defendants that they were not advised by counsel and that the various documents were not reviewed by other counsel.

14. The Stepniewski Affidavit next refers to the January 28, 2008 letter which Mintz emailed to Mr. Patrizio Girondi making reference to the end of Mintz's "relationship" with Mr. Stepniewski. (Stepniewski Aff. ¶ 8.) Mr. Stepniewski introduced Mr. Girondi to Mintz with the understanding that Mr. Girondi may become a client of M&F, however, Mr. Girondi and Mintz had much in common, and pursued a personal relationship. Although said letter does not define the nature of the "relationship" between Mintz and Mr. Stepniewski, it refers to their personal relationship, not an attorney-client relationship. M&F did not view Mr. Stepniewski as a client, but rather as a friend. The matters M&F handled for Mr. Stepniewski were very minor, and were done as a favor to

Mr. Stepniewski.  Mr. Stepniewski is now attempting to use the complimentary legal services performed for him by M&F against Plaintiff and Third-Party Defendants.  In spite of Mr. Stepniewski's uninformed assumption, Mintz has not sent similar letters to other individuals.  (See id.)  Attached hereto as Exhibit "B" is the response which Mintz received from Mr. Girondi later in the evening on January 28, 2008.  Said response concerns itself with the relationship between Mintz and Mr. Stepniewski, not with M&F being retained by Mr. Girondi as a client.  An earlier email sent from Mr. Girondi to Mintz and Fraade, a copy of which is annexed hereto as Exhibit "C", demonstrates the personal nature of the developing relationship between Mr. Girondi and Mintz.  The January 28, 2008 email from Mintz to Mr. Girondi, which Mr. Stepniewski attempts to portray as a crass plea for continued business, was in fact a communication with respect to a mutual friend, now former friend, Mr. Stepniewski.  It is clear from the letters between Mintz and Mr. Girondi that even if there was to be no business relationship, Mintz and Mr. Girondi wanted there to be a personal relationship.

15. Mr. Stepniewski's cryptic references to the fact that Mintz, Fraade and Ted Kramer ("Kramer") have "ignored their duties" to Mr. Stepniewski are completely uncalled for and unexplained, not to mention completely false.  (Stepniewski Aff. ¶ 9.) Although Mr. Stepniewski alleges fifteen instances in which Mintz, Fraade and Kramer have collectively breached their duty to him, he fails to give even one single instance or explain what specific duty to him he believes has been breached.  Furthermore, the information which Mr. Stepniewski cites was not learned by Mintz, Fraade or Kramer as a result of an attorney-client relationship, and upon information and belief, was communicated by Mr. Stepniewski to many third parties.  This is merely another ploy to

direct attention away from the straightforward legal issues involved in Plaintiff's Motion to Dismiss.

16. The purported "facts" set forth in Defendants' Memorandum are the most egregious lies set forth in all of Defendants' papers. The first six-and-one-half pages of Defendants' Memorandum contain fabrications masquerading as facts, which notably are not contained in an affidavit, the vast majority of which are not relevant to Plaintiff's Motion to Dismiss. The sole purpose of the purported "facts" set forth in Defendants' Memorandum is to discredit Plaintiff, Mintz, Fraade and M&F without any regard to the law applicable to Plaintiff's Motion to Dismiss or the actual facts.

17. Defendants summarize this lawsuit by stating that Defendants have brought third-party claims against "their attorneys" Mintz, Fraade and M&F. M&F only represented Defendants with respect to two isolated transactions as discussed above, but *not* the transaction with respect to the Loans. Defendants state that their breach of fiduciary duty claim is based upon M&F's breach of its duty to advise Defendants "of their opinion that the securities offering that they structured and drafted violated New York criminal usury statutes". (Defendants' Memorandum at 2.) This statement is blatantly incorrect because M&F did not structure the Loans, the Loans were structured by Defendants pursuant to terms Scantek reluctantly accepted because Scantek was desperate for funds. It was not until after Scantek had been in negotiations with Defendants to settle their claims, and Defendants made unreasonable demands which Scantek could not satisfy and Scantek faced the possibility that Defendants would seek to enforce their claims which could be brought against Scantek (see the Declaration of Zsigmond L. Sagi dated May 23, 2008 (the "Sagi Declaration") ¶ 6) that M&F sought to find a defense to Defendants' claim and

realized that the Loans were criminally usurious.

18. Defendants assert that Plaintiff's/Third-Party Defendants' contention that Defendants dictated the terms of the Loans "has previously been rebutted by Plaintiff's documentary evidence". (Defendants' Memorandum at 22.) This is a compete lie. Defendants have failed to specify what documentary evidence provided by Plaintiff, or any other party, would serve as documentary evidence that Defendants' did not structure the terms of the Loans. Defendants' brazen assertion that they have produced documentary evidence which proves that Defendants did not structure the terms of the Loans, when obviously no such evidence has been presented, is appalling and shameful.

19. Defendants attempt to mangle the facts at issue by presenting the following falsehoods as fact:

      A. Mintz, Fraade and M&F were "major shareholders in Scantek" (Defendants' Memorandum at 2) – this is not true because, although Mintz and M&F owns shares in Scantek, they are not "major shareholders".

      B. Mintz, Fraade and M&F "acted as promoters of Scantek when they solicited investors for Scantek" (id.) – this is not true because none of Mintz, Fraade or M&F act as promoters for Scantek and because none of Mintz, Fraade or M&F solicited Defendants as investors for Scantek. Rule 405, promulgated pursuant to the Securities Act of 1933, defines "promoter" as a person who either (i) "takes initiative in founding and organizing the business" or (ii) in connection with the founding of the business, receives "10 percent or more of any class of securities". This definition does not apply to Mintz, Fraade or M&F with respect to

Scantek.

C. Mintz, Fraade and M&F "represented defendants and Scantek in connection with the transactions between the parties" (id.) – this is not true because none of Mintz, Fraade or M&F represented Defendants with respect to the Loans or any other transaction between the parties to this lawsuit.

20. It is true that M&F did not "deal with any other attorney" in connection with the Loans, and that "no attorneys are listed in the notice sections" of the documents with respect to the Loans; however, M&F was not representing Defendants or Mr. Stepniewski with respect to the Loans.  Furthermore, no affidavit has been submitted by Defendants stating that Defendants did not discuss the transaction with respect to the Loans with another attorney, or that Defendants did not have another attorney review the documents prepared with respect to the Loans.  Upon information and belief, Accordant has an in-house attorney, so that Defendants had access to an attorney if they wished for an attorney to review the documents evidencing the Loans.

21. With respect to M&F's limited representation of Defendants, it has never been the position of M&F that it "owed no duty to Ms. Sabella because she paid only 'minor' legal fees of $4,000" or that "the filing of SEC forms . . . does not constitute performance of legal services".  (Defendants' Memorandum at 3.)  Rather, with respect to the two matters with respect to which M&F did represent Defendants, M&F took its duty to Defendants very seriously.  However, M&F was not representing Defendants with respect to the Loans.  Defendants had vastly superior bargaining power with respect to the Loans, and dictated the terms of the Loans.

22. Defendants purposely attempt to distort Third-Party Defendants' position by stating "the Mintz Defendants' argument that $4,000 in billing for legal work did not establish an attorney-client relationship is simply spurious". (Defendants' Memorandum at 22.) First, this issue is completely irrelevant to the issue of whether Plaintiff is estopped from asserting a defense of usury. Second, Mintz, Fraade and M&F never contended that Defendants were not clients of M&F, but only that Defendants were not clients of M&F with respect to the Loans. (See my Affidavit dated May 23, 2008 ¶¶ 31-32.) Defendants' entire account of M&F not realizing that it had an "obligation to refrain from making false statements to the Court regarding [its] involvement in the Graphco transaction is" (Defendants Memorandum at 23), is (i) completely irrelevant to the issue of whether Plaintiff is estopped from asserting a claim of usury and (ii) is completely false.

23. Because of the prior litigation between Defendant Sabella and Graphco Technologies, Inc (the "Graphco Litigation"), Defendants were aware that the financing terms upon which they routinely negotiated were likely to be defended by a claim of criminal usury. The statement in the Defendants' Memorandum that the court's "granting of summary judgment in lieu of complaint in the Graphco Litigation only made Defendants aware that the promissory notes drafted were readily enforceable" is untrue, because the court in the Graphco Litigation did not rule upon the defense of usury; but rather rendered its decision based upon other grounds. (Defendants' Memorandum at 6.)

24. Defendants further misstate Mintz, Fraade's and M&F's relationship to the Graphco Litigation to the point where it is clearly an intentional misstatement of the facts with the intention of misleading this Court.

25. Although I stated in my affidavit dated March 28, 2008 that M&F began representing Graphco at the recommendation of Mr. Stepniewski, my recollection has been refreshed, and I now believe that M&F began representation of Graphco at the recommendation of Mr. Finesod, who is Mr. Stepniewski's father-in-law as previously indicated in this Affidavit. M&F commenced representation of Graphco in 2001 at the recommendation of Mr. Finesod, and M&F was retained only with respect to limited corporate securities matters and was not aware of the defenses raised in the Graphco Litigation until recently.

26. Defendants make several allegations with respect to M&F's representation of Graphco, and make wild and unsubstantiated inferences from each of their allegations that M&F must have been aware of the fact that the Graphco Litigation included the defense of usury. Defendants allege that the following circumstances demonstrate that M&F was aware of the nature of the Graphco Litigation:

    A. "On April 11, 2002, Mr. Mintz received a letter advising him of the filing of the Graphco Litigation and inquiring whether he was authorized to accept service of process." (Defendants' Memorandum at 6.) This does not demonstrate that M&F was aware of the nature of the Graphco Litigation because (i) Mintz did not accept service of process with respect to the Graphco Litigation and (ii) Mintz did not review the Graphco Litigation papers.

    B. After a judgment was entered against Graphco in favor of Sabella, I was involved in M&F's representation of Graphco in an attempt to settle the matter after a judgment was entered. (Id.) This does not demonstrate that

M&F was aware of the nature of the Graphco Litigation or the particular defenses raised because the settlement negotiations were with respect to the judgment only. There was no need to review or discuss the underlying claims and defenses in the Graphco Litigation, because the only issue *post-judgment* was whether Graphco and Sabella could reach a settlement with respect to the judgment.

C. M&F prepared a private placement memorandum ("PPM") for Graphco dated April 10, 2002 which disclosed the existence of the Graphco Litigation and listed M&F as Graphco's general counsel. (Id.) First, although the PPM lists M&F as Graphco's counsel with respect to the PPM, it does not state that M&F was Graphco's "general counsel". Second, although the PPM discloses the fact that an attorney was in the process of filing the Graphco Litigation, the PPM did not disclose the nature of the suit or the potential defenses.

27.  Furthermore, in Graphco's 10-KSB/A filed July 28, 2003 for the fiscal year ended December 31, 2002, which was prepared by M&F, the following is stated with respect to the Graphco Litigation:

> Angela Chen Sabella, one of our stockholders, has obtained a judgment against Graphco Technologies, Inc. in the Supreme Court of the State of New York, County of New York in the sum of approximately $1,376,000, plus any applicable interest since the date of the Judgment. Ms. Sabella has not taken any recent actions to enforce this Judgment. We have had negotiations with Ms. Sabella to forebear from levying upon our assets. However, there can be no assurance that an agreement will be reached.

(10-KSB/A filed July 28, 2002 at 10.)

28.  The quoted language from the 10-KSB/A obviously does not contain

14

information about the substance of the defenses in the Graphco Litigation because it was not relevant.

29. Defendants next discuss the allegedly fraudulent conveyance with respect to Gibraltar. Defendants' lack of understanding of the Gibraltar transaction is evidenced by their inaccurate explanation and utter lack of specificity to support their allegation of fraud. Scantek entered into a joint venture with an independent party, Life Medical Technologies, Inc. ("Life Medical") to create Gibraltar. Defendants claim that Scantek "issued 48% of the interests in Gibraltar to Life Medical for inadequate consideration". (Defendants' Memorandum at 11.) This is no basis for Defendants' allegation of fraud, because Scantek could enter into a joint venture for absolutely no consideration if it was determined that this was in the best business interest of the corporation.

30. Defendants note that Scantek granted Gibraltar "distribution rights to Scantek's sole product in more than 150 countries throughout the world". (Id.) First, it must be noted that the distribution rights with respect to these countries were of questionable value. Scantek was not a thriving company. The 150 countries involved were only countries which were not covered by existing or anticipated distribution agreements. If Gibraltar did distribute BreastCare in any of the 150 countries, Scantek would receive from Gibraltar substantial revenues from the sale of BreastCare to Gibraltar. Thus, if Gibraltar made any sales or entered into any distribution agreements, the BreastCare devices would be purchased from Scantek, and Scantek would receive substantial profits for manufacturing the BreastCare device. Defendants have completely failed to allege what was fraudulent, and why the consideration involved was "inadequate". (Defendants' Memorandum at 11.)

31. Defendants also state that there were no interests of Gibraltar issued to "other shareholders of Scantek". (Defendants' Memorandum at 11.) This is ludicrous, because Scantek owned 48% of Gibraltar. Thus, the shareholders of Scantek benefited from Scantek's ownership interest in Gibraltar.

32. Defendants' further queries about the identity of Life Medical, as if it were some mysterious organization, are also without relevance. Defendants have not alleged anything about the identity of Life Medical which would suggest that the Gibraltar Distribution Agreement was fraudulent or suspicious, and the Defendants are misleading this Court by insinuating that there is anything improper about Life Medical or its role with respect to the Gibraltar Distribution Agreement.

33. Defendants also state that Scantek issued a 4% interest in Gibraltar to Enterprises for "no consideration". (Defendants' Memorandum at 5, 18.) This is inaccurate. M&F received a 2% interest in Gibraltar from each of Scantek and Life Medical. The purpose of issuing an interest to Enterprises (an affiliate of Mintz and Fraade) was that each of Scantek and Life Medical made a business determination that they desired to have Mintz and Fraade participate in Gibraltar in addition to representing Gibraltar as attorneys through M&F.

34. Defendants also state that Sagi owed a duty of loyalty to Defendants with respect to the Loans. (Id.) Defendants fail to state the basis upon which Sagi owed Defendants a duty of loyalty with respect to the Loans.

35. Defendants' Memorandum also states: "The Mintz Attorneys drafted all agreements and represented all parties" with respect to the Gibraltar Distribution Agreement. (Defendants' Memorandum at 5.) Again, Defendants are completely wrong.

Life Medical utilized separate counsel with respect to the Gibraltar Distribution Agreement. The Gibraltar Distribution Agreement specifically states:

> Each of the parties hereto hereby acknowledges and agrees that (i) Mintz & Fraade, P.C. drafted this Agreement on behalf of both of the parties to this Agreement, (ii) *each party has been separately advised by counsel other than Mintz & Fraade, P.C. during the course of reviewing this Agreement* and (iii) this Agreement shall not, therefore, be construed more strictly against any party responsible for its drafting regardless of any presumption or rule requiring construction against the party whose attorney drafted this Agreement.

(Gibraltar Distribution Agreement at 46) (emphasis added).

36. M&F was listed in the notice provision of the Gibraltar Distribution Agreement which would receive copies of documents on behalf of both Scantek and Life Medical because, although Life Medical was represented by other counsel with respect to the review of the Distribution Agreement, M&F was instructed by Life Medical that it desired all future correspondence with respect to Gibraltar should be sent to M&F rather than Life Medical's other counsel, because although M&F did not represent Life Medical with respect to the Gibraltar Distribution Agreement, Life Medical contemplated that M&F would represent Life Medical with respect to future matters.

37. Attention must be paid to the numerous alleged facts set forth in the "Argument" section of Defendants' Memorandum, the vast majority of which are incorrect and inappropriately asserted in Defendants' Memorandum by not being supported by an affidavit. For example, Defendants state on numerous occasions that Mintz, Fraade, M&F and/or Enterprises are major shareholders in Scantek. (Defendants' Memorandum at 2, 8, 9.) Any interest which Mintz, Fraade, M&F and/or Enterprises has in Scantek was disclosed to Defendants before Defendants made any investment in Scantek. Furthermore, a Schedule 13-D reflecting M&F's ownership in Scantek was filed with the

SEC on November 18, 2002, which was before Defendants had made the third Loan to Scantek and before any of the Additional Advances.

38. Defendants also claim that M&F violated a duty to Defendants by representing both Defendants and Plaintiff with respect to the Loans. As has been repeated an exhausting number of times throughout this litigation, M&F did not represent either Mr. Stepniewski or Defendants with respect to the Loans, and had no "duty" to them. Defendants' theories with respect to agency law are absurd and inapplicable, as is further explained in Plaintiff's/Third-Party Defendants' Memorandum of Law. Anyone who examined the notice provisions of any of the documents prepared with respect to the Loans could not come to the conclusion that M&F represented either Mr. Stepniewski or Defendants with respect to the Loans. The promissory note dated April 25, 2002 contains the following notice provision:

| | |
|---|---|
| To the Payor: | Scantek Medical, Inc.<br>321 Palmer Road,<br>Denville, NJ 07834<br>Attn.: Dr. Zsigmond L. Sagi |
| Copy to: | Mintz & Fraade, P.C.<br>488 Madison Avenue<br>New York, New York 10022<br>Attn.: Frederick M. Mintz, Esq. |
| To the Payee: | Angela Chen Sabella<br>853 East Valley Boulevard, Suite 200<br>San Gabriel, CA 91776 |
| Copy to: | _____<br>_____<br>_____ |

Although the name and address of a specific attorney is not listed for Sabella, it is clear from this provision that M&F was representing Scantek, and not Sabella. It was

intended that Sabella would fill in the blanks upon execution of the promissory note, but she did not.

The subscription agreement dated April 24, 2002 contains the following notice provision:

| | |
|---|---|
| To the Company: | Scantek Medical, Inc.<br>321 Palmer Road,<br>Denville, NJ 07834<br>Attn.: Dr. Zsigmond L. Sagi<br>Facsimile No.: (631) 981-6043 |
| Copy to : | Mintz & Fraade, P.C.<br>488 Madison Avenue, Suite 1100<br>New York, New York 10022<br>Attn.: Frederick M. Mintz, Esq.<br>Facsimile No.:(212) 486-0701 |
| To the Investor: | To the address specified hereinafter on page "8" of this Subscription Agreement |

Again, it is clear that M&F is representing Scantek, but not the investor, Sabella.

The promissory note dated August 20, 2002 has the following notice provision:

| | |
|---|---|
| To the Payor: | Scantek Medical, Inc.<br>4 B Wing Drive,<br>Cedar Knolls, NJ 07927<br>Attn.: Dr. Zsigmond L. Sagi |
| Copy to: | Mintz & Fraade, P.C.<br>488 Madison Avenue<br>New York, New York 10022<br>Attn.: Frederick M. Mintz, Esq. |
| To the Payee: | Angela Chen Sabella<br>853 East Valley Boulevard, Suite 200<br>San Gabriel, CA  91776 |
| Copy to: | Mark Step<br>P.O. Box 1056<br>FDR Station<br>New York, NY 10022 |

This provision demonstrates both that M&F was representing Scantek and not Sabella. The notice provision would not have been drafted this way if M&F had not been advised to provide it this way by Defendants, or if M&F had been representing Defendants or Mr. Stepniewski with respect to the Loans. Again, the subscription agreement dated August 20, 2002 has the following notice provision:

To the Company:

Scantek Medical, Inc.
4 B Wing Drive,
Cedar Knolls, NJ 07927
Attn.: Dr. Zsigmond L. Sagi
Facsimile No.: (973) 401-0459

Copy to:

Mintz & Fraade, P.C.
488 Madison Avenue, Suite 1100
New York, New York 10022
Attn.: Frederick M. Mintz, Esq.
Facsimile No.:(212) 486-0701

To the Investor:

Angela Chen Sabella
853 East Valley Boulevard, Suite 200
San Gabriel, CA  91776
Facsimile No.: (626) 280-2839

Copy to:

Mark Step
P.O. Box 1056
FDR Station
New York, NY 10022
Facsimile No.: (203) 255-6234

The promissory note dated February 10, 2003 has the following notice provision:

To the Payor:

Scantek Medical, Inc.
4 B Wing Drive,
Cedar Knolls, NJ 07927
Attention:  Dr. Zsigmond Sagi, President

Copy to:

Mintz & Fraade, P.C.
488 Madison Avenue
New York, New York 10022
Attn.: Frederick M. Mintz, Esq.

To the Payee:

Accordant Holdings, LLC

853 East Valley Boulevard, Suite 200
San Gabriel, CA, 91776
Attn.: Angela C. Sabella

Copy to:                    _____
                            _____
                            _____

Finally, the subscription agreement dated February 10, 2003 has the following notice provision:

To the Company:          Scantek Medical, Inc.
                         4 B Wing Drive,
                         Cedar Knolls, NJ 07927
                         Attn.: Dr. Zsigmond L. Sagi, President
                         Facsimile No.: (973) 401-0459

Copy to:                 Mintz & Fraade, P.C.
                         488 Madison Avenue, Suite 1100
                         New York, New York 10022
                         Attn.: Frederick M. Mintz, Esq.
                         Facsimile No.:(212) 486-0701

To the Investor:         Accordant Holdings, LLC
                         853 East Valley Boulevard, Suite 200
                         San Gabriel, CA, 91776
                         Attn.: Angela C. Sabella

Copy to:                    _____
                            _____
                            _____

Any reasonable person reading these notice provisions would understand that (i) M&F was representing Scantek with respect to the Loans and (ii) that M&F was not representing Defendants with respect to the Loans.

39. Defendants' statement that Mintz, Fraade and M&F are "proud to repeat there [sic] position that they have no special relationship with clients who pay them only $4,000" is a shameful misstatement of a point made in Plaintiff's/Third-Party Defendants' Memorandum of Law dated May 23, 2008 ("Plaintiffs May 23 Memo").

Plaintiff's May 23 Memo merely stated that "there was no special relationship between the Defendants and the Plaintiff" which would prevent Plaintiff from being able to assert usury as a defense to repaying the Loans. (Plaintiff's Mat 23 Memo at 19.)

40. Defendants also allege that Scantek attempted to defraud investors, including Defendants, because the forward looking statements in its March 2003 Form 10-QSB filing did not come to fruition. (See Defendants' Memorandum at 13.) Defendant Sabella, who upon information and belief is a sophisticated investor, in addition to being very wealthy, would recognize that the mere fact that the Plaintiff's expectations did not come to fruition is not evidence of intent to deceive. More importantly, the subscription agreements themselves specifically caution potential investors to not place reliance upon the statement which Defendants' now claim to have purportedly relied. Each subscription agreement stated:

> I acknowledge that I have received, read, understand, and am familiar with this Subscription Agreement. I further acknowledge that no statements, representations or warranties, have been made or furnished to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Securities, and/or the economic, tax, or any other aspects or consequences of this investment, and that **I have not relied upon any information with respect to the offering, written or oral, other than the information contained in this Subscription Agreement.** I further understand that any documents other than this Subscription Agreement, regardless of whether distributed prior to, simultaneously with, or subsequent to, the date of this Subscription Agreement should not be relied upon in determining whether to make an investment in the Securities and **I expressly acknowledge, agree and affirm that I have not relied upon any such literature in making my determination to make an investment in the Securities.**

(Emphasis added.)

41. Furthermore, Scantek's 10-QSB for the quarter ending March 31, 2003, for example, states:

> [T]his document and other documents filed by the Company with the Securities and Exchange Commission (the "SEC") contain certain forward-looking statements under the Private Securities Litigation Reform Act of 1995 with respect to the business of the Company. These forward-looking statements are subject to certain risks and uncertainties, including those mentioned above, and those detailed in the Company's Annual Report on Form 10-KSB for the year ended June 30, 2002, which may cause actual results to differ significantly from these forward-looking statements. The Company undertakes no obligation to publicly release the results of any revisions to these forward-looking statements which may be necessary to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. An investment in the Company involves various risks, including those mentioned above and those that are detailed from time to time in the Company's SEC filings.

(10-QSB filed May 20, 2003 at 12.)

42. Defendants assert that Scantek's failure to file SEC forms after 2003 which contained financial statements "only put Defendants on notice that Scantek had failed to make required payments, and provided no information regarding sales from Brazil". (Defendants' Memorandum at 15.) This is not true. Defendants were entitled to a portion of the funds which Scantek received from sales in Brazil. If Defendants believed that Scantek was making sales of BreastCare in Brazil, and that Defendants were not receiving a share of said revenues, then why did Defendants never file a complaint based upon said breach of their agreement?

43. Defendants also make reference to "unexecuted subscription agreements". (Defendants Memorandum at 22.) First, one of the three subscription agreements (dated August 20, 2002, with respect to the $253,250.80 Loan), provided by Defendants themselves during discovery, is executed by Sabella. Second, what is the purpose of pointing out that Defendants cannot locate executed copies of each of the subscription agreements? Are Defendants taking the position that the subscription agreements do exist for the purpose of Defendants receiving Scantek's stock in 2003, but that they do

not exist for the purpose of being bound by the representations contained therein?  This is yet another example of Defendants' disingenuous position.


**WHEREFORE**, it is respectfully submitted that the Court grant the Plaintiff and Third Party Defendants Motion to Dismiss Counterclaim IV V VI and VII and Counts IV, V, VI, VII, VIII, IX and X of the Third Party Complaint, and that the Court grant such other and further relief as to it may seem just and proper.

_____
Alan P. Fraade

Sworn to before me this
25th day of July 2008

_____
Notary Public

COLLIN ROBERT SHERMAN
Notary Public, State of New York
No. 02SH6156333
Qualified in New York County
Commission Expires Nov. 27, 2010

## Alan Fraade

**From:**    Alan Fraade

**Sent:**    Tuesday, June 27, 2006 1:33 PM

**To:**    'ksussmane@mszpc.com'

**Subject:** Confidentiality Agreements with Scantek

Ken- As per your discussion with Fred Mintz, I am attaching a Confidentiality Agreement for each of Angela, Mark and you.

Please call if any questions.

Regards, Alan

Exhibit "A"

**Alan Fraade**

| | |
|---|---|
| **From:** | Pat Girondi [pgirondi@errantgene.com] |
| **Sent:** | Monday, January 28, 2008 8:08 PM |
| **To:** | Frederick mintz |
| **Subject:** | Pat girondi |

Dear Fred,

I was greatly saddened by your email. I have no idea of what might have happened.

I do know that you and Mark go way back.

I sincerely hope and pray that you can mend any rift that may be between you.

Life is so short and. I believe that you are both good men.

Forgiveness is not always easy but it is essential. I'm sure that dozens of times my good friends and colleagues have forgiven me and my many faults.

I obviously don't know the merit of the fall-out and appreciate you not elaborating.

I will pray for a resolution and hope that good news will arrive.

There's few things as sad as break-ups between long time friends.

I appreciate the intent of your communication.

Sincerely,

Pat girondi
Sent via BlackBerry from T-Mobile

Exhibit "B"

**Alan Fraade**

| | |
|---|---|
| **From:** | Pat [pgirondi@errantgene.com] |
| **Sent:** | Thursday, September 06, 2007 6:47 AM |
| **To:** | Fred Mintz; Alan Fraade |
| **Subject:** | Pat girondi |

Dear Fred and Al,

Thanks for lunch yesterday. It was truly a pleasure.

In Italy they say that the fortune of a person is another person.

I agree. I feel fortunate to have you with the project.

Have a good day.

Pat
Sent via BlackBerry from T-Mobile

Exhibit "C"

1